# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION )
)
)
Plaintiff, )
)
v. )
)
A CHICAGO CONVENTION CENTER, )
LLC, ANSHOO SETHI, and )
INTERCONTINENTAL REGIONAL )
CENTER TRUST OF CHICAGO, LLC )
)
Defendants. :

**FILED**

FEB X 6 2013

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**13CV982**
**JUDGE ST. EVE**
**MAG. JUDGE ROWLAND**

---

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF ITS EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, AND OTHER EMERGENCY RELIEF AGAINST DEFENDANTS A CHICAGO CONVENTION CENTER, LLC, ANSHOO SETHI, AND INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, LLC

Patrick M. Bryan (IL Bar No. 6277194)
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-4420
BryanP@sec.gov

Charles J. Felker
Adam Eisner
Mika Donlon
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549
FelkerC@sec.gov
EisnerA@sec.gov
DonlonM@sec.gov

*Counsel to Plaintiff*

The SEC brings this civil law enforcement action against A Chicago Convention Center, LLC, Anshoo Sethi, and Intercontinental Trust Center of Chicago, LLC (collectively, "Defendants") on an emergency basis to protect investors from potentially millions of dollars of losses. Over the past 18 months, Defendants have sold over $145 million in securities and collected an additional $11 million in administrative fees from investors using false and misleading information in violation of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934. And the Defendants' unlawful conduct is ongoing.

Defendants have perpetuated a large scale investment scheme to exploit a federal visa program as a means to defraud investors seeking strong returns and a legal path to U.S. residency. Specifically, Defendants are engaged in a scheme to sell securities—interests in A Chicago Convention Center, LLC ("ACCC"), an Illinois limited liability company—to hundreds of foreign investors purportedly to finance and build the "World's First Zero Carbon Emission Platinum LEED certified" hotel and conference center in the Chicago area and, at the same time, provide foreign investors a pathway to citizenship in the U.S. through the EB-5 Immigrant Investor Pilot Program (the "EB-5 Program") administered by U.S. Citizenship and Immigration Services (or "USCIS"). The EB-5 Program was established under the Immigration Act of 1990 and provides a method for foreign nationals to obtain a green card by investing in domestic projects that will create or preserve a minimum number of jobs for U.S. workers. Using the lure of gaining a pathway to U.S. citizenship and using false and misleading information concerning the purported investment, Defendants have convinced over 250 foreign individuals to wire a minimum of $500,000 apiece plus a $41,500 "administrative fee" to the Defendants' U.S. bank accounts.

Defendants' offering materials are materially misleading in a number of ways. *First*, Defendants' offering materials prominently feature several major hotel chains, including Hyatt, Starwood and Intercontinental Hotels, and claim that these hotel chains have executed franchise agreements with Defendants. This is false. These companies do not have franchise agreements with Defendants and none have authorized use of their brand-names in Defendants' marketing. Moreover, the SEC's preliminary investigation has shown that Defendants have falsified a "comfort letter" on Hyatt Hotel's letterhead in furtherance of their investment scheme.

*Second*, Defendants claim that "the Administrative Phase, covering the completion of the entitlement, design, civil engineering, permit securing, and fee payments for the Project property has been completed." This too is false. The only permits obtained by Defendants are for a tent for a purported groundbreaking ceremony held in November 2012, a demolition permit, and a minor electrical wiring permit.

*Third*, Defendants claim that the investment sponsors will contribute land valued at $177 million to the Project and claim that this valuation is supported by third-party appraisals. However, based on the SEC's preliminary investigation, no such appraisals appear to exist. In fact, one of the so-called appraisals cited in Defendants' offering materials expressly states that the "analysis is not an appraisal and should not be construed as such." Nowhere does that analysis mention much less support Defendants' purported $177 million valuation, and the available evidence demonstrates that the $177 million valuation is grossly overstated. For example, Defendants fail to disclose that an affiliated entity purchased the very parcel at issue three years prior for only $6 million.

*Fourth*, Defendants' offering materials omit critical information concerning the sponsors' background, including the fact that a major hotel chain terminated its franchise relationship with

Anshoo Sethi—the "CEO" of the purported investment enterprise—in 2011 for failure to operate a hotel in accordance with the franchisor's monetary and quality assurance obligations.

*Finally*, Defendants materially misstate the viability of the purported project, including the ability of the project to generate a sufficient number of jobs to satisfy the requirements of the EB-5 Program. Indeed, one of the consultants retained by Defendants and who is prominently featured and repeatedly cited in Defendants' offering materials has publicly stated the prospects of the project ever getting off the ground are "unlikely."

Simply put, Defendants' offering materials make numerous false statements and omit critical material information. Defendants have also falsified documents and submitted these false documents to USCIS as part of their investment scheme. Furthermore, Defendants appear to have misappropriated investors' funds and have already transferred over $2.5 million out of the U.S. to a personal bank account of Anshoo Sethi in Hong Kong. Thus, Defendants have violated and will continue to violate the federal securities laws if not restrained. To safeguard existing and future investors and to prevent the dissipation of millions of dollars in investors' assets, the SEC respectfully requests that the Court temporarily restrain Defendants from further marketing of securities and freeze Defendants' assets among other relief.

A.      **Defendants and the EB-5 Program**

Anshoo Sethi, age 29, is a resident of Illinois. He was licensed as a pharmacy technician by state of Illinois from 2002-2006, and has also worked at hotels that his family operated in Chicago. (Declaration of Charles J. Felker ("Felker Decl.") ¶ 6 (attached as Exhibit 1).)

A Chicago Convention Center, LLC ("ACCC") is an Illinois limited liability company (formed in January 2011) with its principal place of business in Chicago, Illinois. (Declaration of Ana L. Rili ("Rili Decl.") (attached as Exhibit B), Ex. E at 0000390.) It is the "offeror" of

securities (interests in ACCC) in a private placement purportedly to finance and build the "World's First Zero Carbon Emission Platinum LEED certified" hotel and conference center in the Chicago area and, at the same time, provide foreign investors a pathway to citizenship in the U.S. through the EB-5 Program. (*Id.*) Anshoo Sethi and his father, Ravinder Sethi, are ACCC's managing members and Anshoo Sethi is its agent. (Felker Decl. ¶ 5.)[1]

Intercontinental Regional Center Trust of Chicago, LLC ("IRCTC") is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Anshoo Sethi is a managing member of IRCTC as well as its agent. (*Id.*) In June 2011, USCIS designated IRCTC as a Regional Center under the EB-5 Program and, as such, is authorized to solicit investment from foreign investors. (Rili Decl. ¶ 7.)

The EB-5 Visa program was created by the Immigration Act of 1990 and is administered by USCIS, a component of the Department of Homeland Security. Under the EB-5 Program, a foreign national may obtain a provisional visa if he or she invests minimum amount of capital in U.S. commercial enterprises and can demonstrate the investment will create or preserve at least 10 jobs for U.S. workers. (*Id.* ¶ 4.)

Anshoo Sethi was the sole applicant for, and preparer of IRCTC's application to USCIS for designation as a Regional Center under the EB-5 Program, and regularly signed correspondence on behalf of IRCTC. (*Id.*, Ex. A.)

## B.    The ACCC Confidential Private Offering Memorandum

The ACCC Confidential Private Offering Memorandum dated December 13, 2011 ("Offering Memorandum"), offers to sell "securities"; specifically, 499 Limited Liability

---

[1]    Separately, a limited liability company agreement provided to USCIS that identifies Intercontinental Financial Group LLC, an Illinois limited liability company controlled by Anshoo and Ravinder Sethi, as the managing member of ACCC. (Felker Decl. ¶ 5.) Anshoo Sethi signed that LLC Agreement as the managing member of IFG. (*Id.*)

Company Membership Interests in ACCC to foreign investors for $500,000 each plus a $41,500 administrative fee. (*Id.*, Ex. E at 0000385.) Each Interest constitutes 0.025% of the ownership of ACCC. (*Id.* at 0000440.) The Offering Memorandum states that the securities offering "is made pursuant to an exemption from registration provided by Section 4(2) of the [Securities] Act, and/or Regulations D and/or S promulgated thereunder ..." (*Id.* at 0000391.) The purpose of the offering is to raise $249,500,000 to help fund IRCTC's project to build "a convention center and hotel complex, including convention and meeting space, five upscale hotels, and amenities including restaurants, lounges, bars, and entertainment facilities" (or the "the Project"). (*Id.* at 0000385.) In addition to the $249,000,000 of anticipated total investments, the sponsors claim that they will raise additional funding for the project through:  (1) the sponsors' contribution of the real estate site for the convention center (in their role as the Project developer), which they value at more than $177,000,000, and (2) other funds that the sponsors plan to raise from bond offerings and tax credits. (*Id.* at 0000396-397.)  The Offering Memorandum states that if the Project successfully creates or saves at least ten jobs per investor, then each investor in the ACCC offering could receive U.S. residency under the EB-5 Program. (*Id.* at 0000390.)

Attached to the Offering Memorandum is a subscription agreement.  (*Id.*, Ex. F.) Investors are instructed to execute subscription agreements for the purchase of securities in ACCC and, if the subscription is accepted by the sponsors, wire funds to an escrow agent in the U.S. (*Id.*, Ex. F at 0000459.) The Offering Memorandum claims that investors' funds will be released for the purchase of ACCC interests upon approval of the investors' U.S. visa applications. (*Id.*, Ex. E at 0000391.)

The Offering Memorandum identifies ACCC as the "Offeror" and IRCTC as a "sponsor" of the offering. (*Id*. at 0000384.) Anshoo Sethi is identified as (1) the contact person on the coverpage, (2) the person to contact with questions or to secure more information, and (3) the person to contact for access to information concerning the offering and to handle inquiries from investors or their representatives. (*Id*. at 0000384, -388, -460.)

## C.     Defendants' False Statements of Material Fact

### 1.     Participation of three major hotel chains in the Project

The Offering Memorandum prominently features three major hotel chains—Starwood Hotels, Intercontinental Hotel Group, and Hyatt Hotels—and claims that they are each participating in the Project. The Offering Memorandum claims:

> Hotels that *have executed franchise agreements to locate at the site include Element by Westin (a Starwood Hotel brand), Hotel Indigo and Staybridge Suites (Intercontinental Hotel Group brands) and Hyatt Place and Hyatt Summerfield Suites (Hyatt Brands)*. ... Accordingly, the Project should benefit from hosting five brand-name reservation systems and three popular loyalty programs to feed the hotel properties ...

(*Id*. at 0000395 (emphasis added).) A ten-page section of the Offering Memorandum titled "THE HOTEL BRAND ADVANTAGE" incorporates large logos of the hotel chains and describes their operations and the advantages they each purportedly bring to the Project. (*Id*. at 0000402-411.) For example, the Offering Memorandum describes Starwood Hotels' sales teams and states "[t]he Company believes Starwood's sales team will drive business and revenues from both new and existing customers." (*Id*. at 0000403.) The Offering Memorandum also identifies the Starwood, Intercontinental, and Hyatt hotel brands that will occupy each tower within the three-tower complex. (*Id*. at 0000402.) Finally, among the key milestones "already completed," the Offering Memorandum claims that franchise agreements have been executed with the

featured hotel chains. (*Id.* at 0000398 ("Franchise agreements have been executed for the hotels to be located at the Project site.").)

Defendants' statements regarding Starwood, Intercontinental, and Hyatt hotels are false and misleading. None of these hotel chains have executed franchise agreements with ACCC, IRCTC or Mr. Sethi and none had agreed to participate in the Project described in the Offering Memorandum. (*See* Declaration of Kevin Schramm ("Schramm Decl.") ¶ 15 (attached as Exhibit 3); Felker Decl. ¶¶ 22-30.)

Although Intercontinental Hotels and Starwood Hotels had entered into franchise agreements with Mr. Sethi and affiliated companies, these agreements were terminated well before Defendants' December 2011 Offering Memorandum was circulated to potential investors and well *before ACCC was formed* in 2011. Specifically, Intercontinental Hotels terminated its business relationship with Mr. Sethi (and his affiliated companies, Boutique Hospitality Investment, Inc. and Extended Hospitality, Inc.) as of July 7, 2010, nearly a year before IRCTC was granted status as a Regional Center under the EB-5 Program and more than a year before the Offering Memorandum was circulated to potential investors. (Felker Decl. ¶ 28.) Similarly, Starwood Hotels terminated its relationship with Mr. Sethi and an entity related to Mr. Sethi in 2009—more than two years before the Offering Memorandum was circulated to potential investors.[2] (*Id.* ¶¶ 24-25.) Hyatt Hotels has never had an executed franchise agreement in place with Defendants (or any company affiliated with the Defendants) and had specifically advised

---

[2]      Documents produced by Starwood demonstrate that Starwood terminated licensing agreements in connection with developing Element by Westin and Four Points by Sheraton hotel properties as of September 14, 2009, and November 20, 2009, respectively. (Felker Decl. ¶¶ 24-25.) Starwood terminated the agreements because of the licensees' failure to commence construction on properties by the agreed upon dates and to produce evidence of financing for the development. (*Id.* ¶ 25.) Starwood also advised Mr. Sethi, as licensee, that he should immediately cease associating Starwood brands with his proposed hotel project. (*Id.*)

Mr. Sethi to refrain from making representations concerning Hyatt Hotels' involvement in the Project. (Schramm Decl. ¶¶ 14-15.)

### 2. Completion of prerequisites for the Project

The Offering Memorandum claims that that "the Administrative Phase" of the Project is "already completed." Specifically, it states:

> **Administrative Phase (already completed)** – the Administrative Phase, covering the completion of entitlement, design, civil engineering, permit securing, and fee payments for the Project property has been completed. During the Administrative Phase, the Development Company assisted the Company in completing necessary preliminary steps in the entitlement and civil engineering process for the Project site. Contractor agreements have also been signed, and building permits were obtained by the Development Company and/or the Company.

(Rili Decl., Ex. E, at 0000398.) These statements are also false. A search of the Chicago Building Permits database for the project address shows that the only recent permits are for a tent for a groundbreaking ceremony staged in November 2012, a demolition permit, and a minor electrical wiring permit. (*See* https://data.cityofchicago.org/Buildings-Permits/ydr8-5enu.)

### 3. Value of land contributed by the Sponsors

The Offering Memorandum indicates that the sponsors of the Project will contribute to the Project a 2.8 acre parcel of land owned by an affiliate. (Rili Decl., Ex. E at 0000396.) The Offering Memorandum states that this property "recently has been separately appraised by both T.R. Mandigo & Co. and Integra Realty Resources at a net valuation of $177,547,465." [3] (*Id.*) However, the January 19, 2011 Integra report explicitly states that the report "is not an appraisal and should not be construed as such." (Boone Decl. ¶ 22.) Moreover, the $177 million amount is not mentioned anywhere in the Integra report. (*Id.*) Nor does the Integra Report provide any current value for the property. (*Id.* ¶¶ 22-23.)

---

[3] To date, SEC has been unable to obtain a copy of the T.R. Mandigo report referenced in the Offering Memorandum.

Other sources indicate that the purported $177 million valuation is vastly overstated. For example, property records indicate that the property was acquired by a company affiliated with Mr. Sethi in 2008 for $6 million. (*Id.* ¶ 19.) Further, a nearby 20 acre parcel of land sold for $7.7 million in 2011. (*Id.* ¶ 20.)

### 4. Offeror's background and experience

The Offering Memorandum states that proposed management is critical to the success of the offering, and that the loss of ACCC's management company—Intercontinental Financial Group, LLC, a limited liability company formed, owned and managed by Anshoo and Ravinder Sethi—"could have a material adverse effect" on the success of ACCC. (Rili Decl., Ex. E at 0000455; *see also id.* at 0000385.) The Offering Memorandum claims that Mr. Anshoo Sethi, age 29, has "over fifteen years of experience in real estate development and management, specifically in the lodging area." (*Id.* at 0000421.) However, the Offering Memorandum omits mention that the Wyndham Hotel chain sued Anshoo Sethi for failure to operate a Wyndham Hotel in accordance with Wyndham's monetary and quality assurance obligations, and that he entered into a consent judgment for violations of the wage and hour provisions of the Fair Labor Standards Act, including failure to keep records of employee hours and wages at the hotel. (*See* Boone Decl. ¶¶ 38-39.)

### 5. Ability of the Project to Create The Jobs Necessary To Qualify Under The EB-5 Program

A central focus of the Offering Memorandum is the Project's purported qualification under the EB-5 visa program. To qualify, the Project must create or save a minimum of ten U.S. jobs per investor consistent with the criteria established by USCIS. (Rili Decl. ¶¶ 4-6.) The Offering Memorandum states that the "Project falls within the scope of the Regional Center's approved activities, namely to qualify investments from foreign investors" under the EB-5

Program, and claims that the Project will create a total of approximately eight thousand, four hundred ninety-five (8,495) … U.S. jobs." (*Id.*, Ex. E at 0000446.) The SEC's preliminary investigation shows that these claims are unsupportable.

The Offering Memorandum notes that the Defendants' job creation estimate is based upon an "analysis" submitted to USCIS. That analysis applies a "multiplier" to estimated construction costs to derive an estimate of the jobs likely created by the Project. (*See* Boone Decl. ¶ 17.) Defendants, however, have vastly overstated construction costs and, consequently, have overstated the number of jobs likely created by the Project. (*Id.* ¶¶ 17, 35.) For example, the estimated construction costs are four times the per room construction cost of comparable hotels in the area. (*Id.* ¶¶ 11-13.) The sponsors also attribute 291 jobs to the Project's parking facility which equates to at least one job created for every six parking spots planned at the Project. (*Id.* ¶ 35.) Tellingly, one of the consultants retained by Defendants and who is prominently featured and repeatedly cited in the Offering Memorandum has publicly stated the prospects of the project ever getting off the ground are "unlikely" "for a number of reasons, not least of which is the staggering cost of the project." (*Id.* ¶ 16.)

**D.  Defendants' Submission of False Information To USCIS**

Not only have Defendants' overstated the estimate of jobs created by the Project, Defendants have also submitted false information to USCIS in connection with their scheme to defraud investors. In August 2012, in response to a request by USCIS for evidence supporting IRCTC's EB-5 application, Defendants submitted a letter which falsely stated that "[f]ranchise approvals [of Hyatt, Starwood and Intercontinental Hotels] (attached as Attachment 2) have been obtained by brands believed by the Company to be strong in the upscale and upper-upscale categories." (Rili Decl., Ex. K, at 0000988.) No such franchise agreements existed. *See* Section C.1., *supra*. However, attached to this August 2012 submission were two letters, one from

Starwood Hotels and one from Intercontinental Hotels, referring to franchise agreements that had been terminated by those hotel chains well before August 2012 and well before ACCC was even formed. (*Id.*, Ex. M at 00001098-1104; *see also* Felker Decl. ¶¶ 24-28.) In other words, Defendants knowingly submitted these letters to make it appear that Starwood Hotels and Intercontinental were participating in the Defendants' Project when they plainly were not.

A third letter, dated February 15, 2011, was also attached to Defendants August 2012 submission: this one purporting to be a comfort letter from Hyatt Hotels and referencing a purported franchise agreement between Hyatt and another company affiliated with Mr. Sethi. (*Id.* at 00001105-1109.) This third letter, however, is a forgery. (*See* Schramm Decl. ¶ 16.)[4] Hyatt Hotels had never executed a franchise agreement with the Defendants, let alone provided a comfort letter to Mr. Sethi. (*Id.* ¶¶ 14-16.)

In response to another request by USCIS for evidence supporting IRCTC's EB-5 application, Defendants also submitted a letter purportedly from the Qatar Investment Authority. In that letter, the Qatar Investment Authority purportedly commits to provide $340 million in "back up" financing for Defendants' Project. However, the letter is not genuine and was not sent with the authority of the Qatar Investment Authority. (*Compare* Rili Decl., Ex. O *with* Felker Decl. ¶ 31 & Ex. 15 thereto.) In other words, the letter is a fake.

### E.    Defendants' Apparent Misappropriation of Investors' Funds

The Offering Memorandum and the subscription agreement instruct investors to pay an administrative fee of $41,500 and provide that the administrative fee is fully refundable if the

---

[4]    Notably, before this falsified document was submitted to USCIS to further IRCTC's EB-5 application, a representative of Hyatt Hotels was contacted by a prospective Chinese investor in ACCC who sought confirmation that Hyatt Hotels had agreed to participate in the Project. (*Id.* ¶ 12.) A representative of Hyatt Hotels advised the investor that Hyatt Hotels had not agreed to participate in the Project and thereafter advised Mr. Sethi to refrain from using Hyatt Hotels trademarks or indicating it had agreed to participate in the Project. (*Id.* ¶¶ 12, 14.)

Sponsors reject the subscription or if the subscriber's visa petition is denied.  (Rili Decl., Ex. E at

0000391, 439.)  From November 28, 2011 to December 18, 2012, ACCC's domestic bank

account, held by SunTrust Bank, received 261 incoming wires for administrative fee payments

for total investor deposits of $10,726,466.  (Felker Decl. ¶ 12.)  During that time, however, the

sponsors have made numerous wires out of the SunTrust account leaving a recent balance of less

than $1 million, despite Defendants' promise to refund those fees if USCIS rejected the

investors' visa applications.[5]  (*Id.* ¶ 14.)

   A significant amount of these payments appear to have been misappropriated.  (*Id.* ¶¶ 14-

21.)  For example, between December 30, 2011 and December 10, 2012 there were at least 23

outgoing wires to an account in Anshoo Sethi's name at HSBC Bank in Hong Kong.  (*Id.* ¶ 15.)

For the most part these wires are for $100,000 or more and they typically occur several times a

month.  These wires total over $2.5 million dollars.  (*Id.*)

   ACCC has also made a number of wire transfers to an account in the name of IRCTC at

Cathay Bank.  (*Id.* ¶ 16.)  Anshoo Sethi, Ravinder Sethi, and Rajna Sethi are the signatories for

the Cathy Bank.  (*Id.* ¶ 17.)  The account appears to have commingled funds from different

entities owned or controlled by members of the Sethi family, as it had also received checks or

wires from a day care center, pharmacy and other businesses associated with Anshoo Sethi,

Ravinder Sethi or Rajna Sethi.  (*Id.* ¶ 18.)

   Other transfers are plainly not authorized under the terms of the Offering Memorandum

and subscription agreement.  For example, on May 29, 2012, Ravinder Sethi wrote a check to

_____

[5]   According to the Offering Memorandum, the administrative fees may be used for the following:
(1) legal, escrow and related expenses; (2) to reimburse the managing member for the expenses of the
offering; (3) to pay the managing member's fees; (4) to compensate the managing member for its efforts
associated with setting up the LLC and conducting the offering; and (5) for marketing expenses or other
fees to one or more consultants, brokers, public relation managers, investment advisors, or other parties in
connection with the sale of interests pursuant to the offering.  (Rili Decl., Ex. E at 0000391, 393, 440.)

"CASH" on the IRCTC Cathay Bank account and used that cash to purchase a cashier's made out to "Wyndham Resorts and Hotel." (*Id.* ¶¶ 19-21.) This payment appears to have been used to satisfy a settlement of litigation initiated by Wyndham Hotels against Anshoo Sethi, Ravinder Sethi, and A&A Hospitality LLC for breach of a licensing agreement to operate a Wyndham Hotel. (*Id.*)

### F.     Defendants Continued Marketing & Solicitation

ACCC's domestic SunTrust Bank accounts continue to receive wires from new and existing investors. (*Id.* ¶ 13.) Further, a Chinese website (www.eb5accc.com) concerning the proposed Project remains active and includes a schedule of investor-seminars promoting the Project. Thus, Defendants' marketing and solicitation is continuing.

### ARGUMENT

## I.   DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED FROM FURTHER VIOLATIONS OF THE SECURITIES LAWS.

To obtain a temporary restraining order or preliminary injunction, the SEC need only show "likelihood of success as to (a) current violations and (b) risk of repetition." *SEC v. Hollnagel*, 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007) (citing *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998)). Because the SEC approaches the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing securities laws," the SEC has a lower burden than a private party seeking a temporary restraining order or preliminary injunction. *SEC v. Mgmt. Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir. 1975). Thus, unlike private litigants, the SEC need not show irreparable injury, *id.*, and need only make a "proper showing" of violative activity to obtain a temporary restraining order or preliminary injunction against statutory violations. *See* 15 U.S.C. § 779(b); 15 U.S.C. § 78u(d); *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990). A "proper showing" is made where there is

"a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations for the statutes involved." *SEC v. GenRefractories Co.*, 400 F. Supp. 1248, 1254 (D.D.C. 1975); *see also SEC. v. Householder*, Case No. 02 C 4128, 2002 WL 1466812, at *5 (N.D. Ill. Jul. 8, 2002). The SEC has easily satisfied its burden here.

### A.     Defendants Conduct Violates The Securities Laws.

The Defendants' marketing of securities violates the antifraud provisions of the federal securities laws. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit any person, in connection with the purchase or sale of any security,[6] from directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaging in any act, practice, or course of business that operates as a fraud or deceit upon any person. 15 U.S.C. §78j(b); 17 C.F.R. 240.10b-5. Section 17(a) of

---

[6]      The sale of interests in ACCC, a limited liability company, qualifies as an investment contract under the definition set forth in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. The definition of a security is "flexible," designed to adapt to the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). The Supreme Court has held that an investment contract or security exists where: (1) a person invests his or her money; (2) in a common enterprise; and (3) is led to expect profits from the efforts of the promoter or a third party. *Id.* at 298-99. Here, Defendants' Offering Memorandum expressly offers to sell "securities in a private placement" to "investors." Defendants explain that the interests are offered and sold to Qualified Investors in reliance on an exemption from registration under Securities Act. Moreover, the investors' subscription amounts and fees are placed in a common account to be added to the sponsors' contributions and other resources and used to build the Project and provide returns to the investors based on the Defendants' efforts. Because the profits and losses of each investor are tied to the profits and losses of other investors, and their fortunes rise or fall depending on the Defendants' success or failure, the sale of interests in ACCC constitutes sales of securities for purposes of the Securities Act and the Exchange Act. *See Wals v. Fox Hills Development Corp.*, 24 F.3d 1016, 1017-19 (7th Cir. 1994); *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146-147 (7th Cir. 1984); *see also SEC v. Lowery*, 633 F. Supp. 2d 466, 479 (W.D. Mich. 2009) (finding limited sales of liability partnership interests to constitute a sale of securities).

the Securities Act prohibits any person in the offer or sale of any security from, directly or indirectly, (1) employing any device, scheme or artifice to defraud; (2) obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading; or (3) engaging in any transaction, practice or course of business that operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. §77q(a). Defendants' ongoing misrepresentations, and scheme to defraud investors, including misappropriation of funds, constitute violations of each of the foregoing provisions.

### 1. Defendants' Misrepresentations Violate Section 17(a)(2) Securities Act and Section 10(b) and Rule 10b-5(b) of the Exchange Act.

As detailed above, in connection with their marketing of securities, Defendants have made several false and misleading statements, including (among others):

| False Statement | Actual Facts |
|---|---|
| Starwood, Hyatt and IHG brand hotels have executed franchise agreements to locate at the site. | None of these hotel chains had had executed a franchise agreement related to Defendants' project; none had agreed to locate a hotel at the IRCTC site at the time the Offering Memorandum was drafted. |
| Building permits and all prerequisites for construction of the Project have been obtained by ACCC or the developer. | The only permits obtained are for a ceremonial groundbreaking, the demolition of an existing structure, and minor electrical wiring had been obtained. |
| The real estate that the Sponsors will contribute recently has been separately appraised by T.R. Mandigo & Co. and Integra Realty Resources at a net valuation of $177,547,465. | The Integra report states that it is not a real estate appraisal, and the $177 million amount is not mentioned in the report. Other sources demonstrate that the purported $177 million valuation is grossly overstated. |

These misrepresentations are material. Materiality is defined as a "substantial likelihood"

that the misrepresented or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Here, there can be little dispute that misrepresentations concerning the participation of three major hotel franchisors, the value of land contributed by the sponsors, and whether the Project has obtained necessary approvals for construction would have been viewed by an investor "as having significantly altered the 'total mix' of information made available," especially a foreign investor relying upon the Project to generate or save U.S. jobs to qualify under the EB-5 Program. (*See generally* Boone Decl.)

In addition, the Offering Memorandum omits critical information concerning the Project's principal, 29-year old Anshoo Sethi. While describing his purported "fifteen years of experience in real estate development and management, specifically in the lodging area," it omits any mention of the lawsuits against him filed by Wyndham Hotels and the U.S. Department of Labor, which both related to his qualifications to operate a hotel. Such an omission is critical and material to an average investor. (*Id.* ¶¶ 17-18.) *See also SEC v. Lowery*, 633 F. Supp.2d 466, 491 (W.D. Mich. 2009) (finding defendant's overstatements concerning his experience launching online casinos material in connection with the sale of securities in online gaming enterprise).

These misrepresentations and omissions were made with scienter.[7] The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Recklessness satisfies this scienter requirement. *See Sunstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044-45 (7th Cir.

---

[7] To establish a violation of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, the SEC must demonstrate that the defendant acted with scienter. *See Aaron v. SEC*, 446 U.S. 680, 695 (1980). The SEC need not demonstrate scienter to establish a violation of Section 17(a)(2) or (a)(3) of the Securities Act. *See, e.g., SEC v. Kearns*, 691 F. Supp. 2d 601, 614 (D.N.J. 2010); *SEC v. Power*, 525 F. Supp. 2d 415, 419 (S.D.N.Y. 2007).

1977). Here, Defendants knowingly made false statements concerning the participation of Starwood, Intercontinental, and Hyatt Hotels. Indeed, Defendants falsified documents to make it appear that Hyatt Hotels had agreed to participate in the Project and that Defendants had secured $340 million in "back up" financing from the Qatar Investment Authority. *See* Section D., *supra*. In addition, Defendants used hotel chains' brand names in connection with marketing the Project although they were expressly advised by the chains not to do so. These knowing misrepresentations demonstrate the requisite intent to deceive investors. *See, e.g., SEC v. Lyttle*, 538 F.3d 601, 603-04 (7th Cir. 2008). And, as principal of ACCC and IRCTC, Mr. Sethi's knowledge or reckless disregard of the truth is imputed to those entities. *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) ("The scienter of a company's officer may be attributed to the company, where, as here, there is no dispute that the officer was acting within the scope of his apparent authority."); *see also In re Sunbeam Corp.*, Exchange Act Rel. No. 34-44305, 2001 SEC LEXIS 931, at *43-*44 (May 15, 2001).

All three Defendants are "makers" of the false statements for purposes of the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, -- U.S. --, 131 S.Ct. 2296 (2011). In *Janus*, the Supreme Court held that, for purposes of Rule 10b-5(b), "the maker of [a false] statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 2302.[8]

Here, ACCC is plainly a "maker" of false statements under *Janus*—it is the "offeror" of securities and ACCC (or "the Company") is identified as the source of many of the false

---

[8]    *Janus* applies only to Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; it does not apply to Section 17(a)(2) of the Securities Act. *See, e.g., SEC v. Sentinel Mgt. Grp., Inc.*, No. 07 C 4684, 2012 WL 1079961, at *14-15 (N.D. Ill. Mar. 30, 2012) ("[T]he Supreme Court's policy concerns in Janus are not implicated by claims brought by the SEC under Section 17(a)."); *SEC v. Geswein*, No. 5:10CV1235, 2011 WL 4565861, at *2 (N.D. Ohio Sept. 29, 2011) (same).

statements in the Offering Memorandum. Defendant Anshoo Sethi is also the "maker" of false statements because he possessed the ultimate authority for these statements. He is identified in the Offering Memorandum as (1) the contact person on the cover page, (2) the person to contact with questions or to secure more information, and (3) the person to contact for access to information concerning the offering and to handle inquiries from investors or their representatives. (Rili Decl., Ex. E at 0000384, -388, -460.) While both Anshoo and Ravinder Sethi are founding members of, and authorized signatories for ACCC and IRCTC (and its putative managing member, Intercontinental Financial Group), Anshoo Sethi signed numerous documents, including investor escrow agreements for ACCC and limited liability agreements, as the managing member of ACCC and IRCTC. (*See* Felker Decl. ¶ 5; Rili Decl. Exs. G, J.) He also countersigned the subscription agreement on behalf of ACCC. (Rili Decl., Ex. F.) In addition, Anshoo Sethi was identified as the sole applicant for, and preparer of, the IRCTC's application to USCIS for designation as a Regional Center under the EB-5 Program. (*Id.*, Ex. A.) These facts demonstrate that Defendant Anshoo Sethi had authority over the statements made by ACCC and is therefore a "maker" of the false statements in ACCC's Offering Memorandum for purposes of the Supreme Court's *Janus* decision.

Furthermore, the evidence demonstrates that IRCTC is a "maker" of false statements because it is an alter ego of ACCC. Each has the same individual managing members; the funds of each were commingled when ACCC sent several wires of ACCC investor administrative fees to the IRCTC bank account, which also contained funds from other businesses related to the Sethi family. (*See* Felker Decl. ¶ 18.) IRCTC is also identified in the offering memorandum as the sponsor of the Project for which ACCC was created. (Rili Decl., Ex. E at 0000390.)

In short, all three Defendants have made false and misleading statements that violate the

antifraud provisions of the Securities Act and Exchange Act.[9]

> **2.  Defendants Are Engaged Scheme To Defraud In Violation of Section 17(a)(1) and (3) and Rule 10b-5(a) and (c).**

Here, Defendants also have orchestrated a fraudulent scheme in violation of Sections 17(a)(1) and (a)(3) of the Securities Act, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(a) and 10b-5(c).  A "scheme to defraud" is "merely a plan or means to obtain something of value by trick or deceit." *SEC v. Kimmes*, 799 F. Supp. 852, 858 (N.D. Ill. 1992).

Defendants knowingly or recklessly raised investor funds through a scheme to deceive USCIS.  Defendants represented to USCIS that the Project was further along than it was by claiming that all prerequisites for construction have been achieved.  *See* Section C.1.-2., *supra*. Defendants also falsified a document from Hyatt Hotels and informed USCIS and investors that Hyatt had agreed to locate at the project site.  Defendants also falsified a document from the Qatar Investment Authority to make it appear that Defendants had back up financing available for their Project.  *See* Section D., *supra*.  Defendants also knew or were reckless in not knowing that the Project would never create enough jobs to qualify the investors for green cards, but they nonetheless overstated the steps taken to develop the project in hopes of having the $145 million in escrow released to them.  For instance, Hyatt warned them that it needed to see actual plans before it could consider entering into a franchise agreement.   (Schramm Decl. ¶¶ 6, 11.) Nonetheless Defendants created a false franchise letter from Hyatt and told investors that Hyatt had agreed to locate at the Project.  (*Id.* ¶ 12.)  This scheme permitted to obtain funds from investors, including millions in administrative fees.

---

[9]     The interstate commerce element is easily satisfied here.  ACCC, for example, solicited investors via the internet in furtherance of the scheme.  Further, IRCTC and Anshoo Sethi used the mails (*e.g.*, correspondence with Hyatt Hotels and USCIS) as well as wire transfers in connection with their scheme.

In addition, Defendants have apparently misappropriated over $2.5 million of the investors' administrative fee payments, directing these funds to Anshoo Sethi's personal account, and using $35,000 of IRCTC's money to pay a prior judgment to Wyndham Hotels. And, despite their promise to refund investors' administrative fees if USCIS rejected the investors' visa applications, Defendants have expended over $9 million of investors' administrative fee payments, leaving considerable doubt as to whether Defendants could fulfill their commitment to investors. *See* Section E., *supra*. Defendants' misappropriation of administrative fees paid by investors was "in connection with" the purchase or sale of ACCC securities and violates Exchange Act Section 10(b) and Rule 10b-5 thereunder. *See SEC v. Zandford*, 535 U.S. 813 (2002) (broker's fraudulent scheme to misappropriate customer funds was "in connection with" the purchase or sale of securities because the scheme to defraud and sale of securities coincided); *see also SEC v. Lowrance*, No. 11–CV–03451–EJD, 2012 WL 2599127, at *4 (N.D. Cal. Jul. 5, 2012) ("Offering a security for sale with the intent to misappropriate the proceeds is a fraudulent scheme and violates Section 10b–5 of the Exchange Act. … Acts with the primary purpose of creating a false appearance of fact in furtherance of the scheme violate Rules 10b–5(a) and (c).") (internal citations omitted).

## B.     There Is a Likelihood of Future Violations

Once the SEC shows a probable violation of the law, it need only show that there is a reasonable likelihood of a future violation in order to obtain relief. *See Householder*, 2002 WL 1466812, at *5 (citing *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)).

Here, Defendants' unlawful conduct is ongoing, and future violations of the securities laws are not only likely but a near certainty. Defendants' unlawful marketing shows no signs of abating. Wires of investors' funds are continuing to flow into ACCC' domestic bank accounts.

(Felker Decl. ¶ 13.)   A Chinese language website (www.eb5accc.com) continues to solicit

investors.   Moreover, Defendants have utilized falsified documents in furtherance of their

scheme and there has been no effort to correct false statements contained in Defendants'

Offering Memorandum.   Simply put, there is nothing to suggest Defendants will cease marketing

securities on the basis of false and misleading information.   And the gravity of Defendants'

unlawful conduct is extreme:   over $150 million has been raised to date and more than $9 million

appears to have been dissipated through transfers to Defendants, including Anshoo Sethi's

personal bank accounts in Hong Kong.

## II.     AN ASSET FREEZE IS NECESSARY AND APPROPRIATE.

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22(a) of the Securities

Act, 15 U.S.C. § 77v(a), confer general equity powers upon the Court in an SEC action brought

pursuant to these provisions.   *See SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1103 (2d

Cir. 1972).   Once the equity jurisdiction of the Court has been properly invoked, the full panoply

of equitable remedies is available to the Court to effectuate the statutory purpose, including the

ordering of non-injunctive relief in a variety of forms.   *See J.L Case Co. v. Borak,* 377 U.S. 426,

433 (1964); *SEC v. Materia,* 745 F.2d 197, 200 (2d Cir. 1984).

Those broad powers include the authority to freeze assets.   *See SEC v. International*

*Swiss Inv. Corp.,* 895 F.2d 1272, 1276 (9th Cir. 1990).   An asset freeze serves to prevent waste

and dissipation of assets and to ensure the availability of funds for restitution and disgorgement.

*See, e.g., SEC v. Manor Nursing Centers, Inc.,* 458 F.2d at 1104-06; *see also CFTC v.*

*Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187 (4th Cir. 2002) (affirming freeze of relief

defendant's assets).   Courts recognize that a disgorgement order for ill-gotten gains will often be

rendered meaningless unless an asset freeze is imposed before the entry of final judgment. *See,*

e.g., *Int'l Controls Corp. v. Vesco,* 490 F.2d 1334, 1347 (2d Cir. 1974); *see also SEC v. Vaskevitch,* 657 F. Supp. 312, 315 (S.D.N.Y. 1987); *Gen. Refractories Co.,* 400 F. Supp. at 1259. Thus, an order freezing assets may also properly be directed to other persons or entities which allegedly hold the funds on behalf of the defendant. *See United States v. First Nat'l City Bank,* 379 U.S. 378 (1965).

To obtain an asset freeze, the SEC must establish only that it is likely to succeed on the merits, and need not show risk of irreparable injury (unlike a private litigant) or likelihood of a future violation. *SEC v. Cavanagh,* 155 F.3d at 132, 136. The SEC may, however, show the likelihood of future violations, and thereby bolster its application for an asset freeze, *SEC v. Margolin,* 1992 WL 279735, at *6-7 (S.D.N.Y. 1992), if a defendant has made "efforts to move assets offshore." *Vaskevitch,* 657 F. Supp. at 315; *see also SEC v. Bremont,* 954 F. Supp. 726, 730 n.3 (S.D.N.Y. 1997).

In this case, the need for an asset freeze is clear. In the absence of such a freeze, there is a strong likelihood that assets will be transferred out of the country. Defendants have already dissipated more than $9 million (despite a commitment to refund investors' administrative payments if their visa applications are denied), and over $2.5 million has already been transferred to Defendant Anshoo Sethi's personal bank account overseas. Furthermore, Defendants have already shown a willingness to use falsified documents in furtherance of their scheme—elevating the risk that funds will be dissipated or expatriated absent an asset freeze.

## III. DEFENDANTS SHOULD BE ORDERED TO PROVIDE AN ACCOUNTING.

To determine accurately the scope of a fraud and a defendant's ability to disgorge illicit proceeds, courts frequently require defendants to provide an accounting of all monies or property obtained as a result of any fraudulent activity, as well as their current financial resources or assets. *See, e.g., SEC v. Suter,* 732 F.2d 1294, 1298 (7th Cir. 1984) (affirming preliminary

injunction and order to provide accounting); *SEC v. Uni. Consulting Res. LLC*, No. 10-cv-02794-JLK-KLM, 2010 WL 4873733, at *2 (D. Colo. Nov. 23, 2010) (granting preliminary injunction and ordering accounting). An accounting is needed from Defendants to determine the scope of the fraud and to determine the amount of assets available for disgorgement. The SEC therefore asks the Court to issue an order requiring Defendants to provide, on an expedited basis, the straightforward accounting set forth in the proposed order submitted contemporaneously herewith.

## IV. DEFENDANTS SHOULD BE ORDERED TO REPATRIATE ASSETS LOCATED ABROAD.

Defendants should be required to return money that they illegally or fraudulently obtained. A federal court's broad equitable authority includes the authority to order the repatriation of the proceeds of illegal securities transactions. *See, e.g., SEC v. Infinity Group Co.*, 27 F. Supp. 2d 559, 561 (E.D. Pa. 1998); *SEC v. Antar*, 831 F. Supp. 380, 398 (D.N.J. 1993) (citing *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984)). Defendants have secreted over $2.5 million of investor money in a personal bank account in Hong Kong. They should be required to return the assets held for the benefit of the investors, so that the SEC can meaningfully pursue enforcement of an order requiring them to disgorge ill-gotten gains and pay civil penalties. *See, e.g., SEC v. Chemical Trust,* No. 00-8015, 2000 WL 33231600, at *12 (S.D. Fla. Dec.19, 2000) (citing *Manor Nursing Centers, Inc.,* 458 F.2d 1082 (2d Cir. 1972); *United States v. Cannistraro,* 694 F. Supp. 62, 71-72 (D.N.J. 1988) (continuing asset freeze and repatriation order against defendants and relief defendants for their violations of antifraud provisions of the federal securities laws).

## V.  OTHER REQUESTED RELIEF

In order to protect all documents necessary for full discovery in this matter, the SEC seeks an order preventing the alteration or destruction of documents and other information.  Such orders are routinely granted to protect the integrity of litigation.  *See, e.g., SEC v. Unifund SAL,* 910 F.2d 1028, 1040, n.11 (2d Cir. 1990); *SEC v. Musella,* 578 F. Supp. 425 (S.D.N.Y. 1984). Further, the SEC seeks an order for expedited discovery.  Rules 30(a), 33(b) and 34(b) of the Federal Rules of Civil Procedure provide for expedited discovery in appropriate circumstances. As provided by these rules, the SEC requests the Court grant expedited deposition, document, and other appropriate discovery from parties and non-parties, prior to a hearing on its application for preliminary injunction.

## CONCLUSION

For these reasons, the SEC respectfully requests that this Court grant its motion, grant the relief set forth in the proposed orders submitted contemporaneously herewith, and grant such other and further relief as this Court deems just and proper.

Dated: February 6, 2013

Respectfully submitted,

Patrick M. Bryan (IL Bar No. 6277194)
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-4420
BryanP@sec.gov

Charles J. Felker
Adam Eisner
Mika Donlon
U.S. Securities & Exchange Commission
100 F Street, NE

Washington, DC 20549
FelkerC@sec.gov
EisnerA@sec.gov
DonlonM@sec.gov

*Counsel to Plaintiff*