## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| A CHICAGO CONVENTION CENTER, LLC, ANSHOO SETHI, and INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, LLC | ) | **13CV982** |
| | ) | **JUDGE ST. EVE** |
| Defendants. | ) | **MAG. JUDGE ROWLAND** |

*FILED*

*FEB X 6 2013*

*THOMAS G. BRUTON*
*CLERK, U.S. DISTRICT COURT*

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF ITS EX PARTE MOTION FOR A TEMPORARY RESTRAINING**

Patrick M. Bryan (IL Bar No. 6277194)
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-4420
BryanP@sec.gov

Charles J. Felker
Adam Eisner
Mika Donlon
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549
FelkerC@sec.gov
EisnerA@sec.gov
DonlonM@sec.gov

*Counsel to Plaintiff*

The SEC brings this civil law enforcement action against A Chicago Convention Center, LLC, Anshoo Sethi, and Intercontinental Trust Center of Chicago, LLC (collectively, "Defendants") on an emergency basis to protect investors from potentially millions of dollars of losses. Over the past 18 months, Defendants have sold over $145 million in securities and collected an additional $11 million in administrative fees from investors using false and misleading information in violation of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934. And the Defendants' unlawful conduct is ongoing.

Defendants have perpetuated a large scale investment scheme to exploit a federal visa program as a means to defraud investors seeking strong returns and a legal path to U.S. residency. Specifically, Defendants are engaged in a scheme to sell securities—interests in A Chicago Convention Center, LLC ("ACCC"), an Illinois limited liability company—to hundreds

of foreign investors purportedly to finance and build the "World's First Zero Carbon Emission Platinum LEED certified" hotel and conference center in the Chicago area and, at the same time, provide foreign investors a pathway to citizenship in the U.S. through the EB-5 Immigrant Investor Pilot Program (the "EB-5 Program") administered by U.S. Citizenship and Immigration Services (or "USCIS"). The EB-5 Program was established under the Immigration Act of 1990 and provides a method for foreign nationals to obtain a green card by investing in domestic projects that will create or preserve a minimum number of jobs for U.S. workers. Using the lure of gaining a pathway to U.S. citizenship and using false and misleading information concerning the purported investment, Defendants have convinced over 250 foreign individuals to wire a minimum of $500,000 apiece plus a $41,500 "administrative fee" to the Defendants' U.S. bank accounts.

Defendants' offering materials are materially misleading in a number of ways. *First*, Defendants' offering materials prominently feature several major hotel chains, including Hyatt, Starwood and Intercontinental Hotels, and claim that these hotel chains have executed franchise agreements with Defendants. This is false. These companies do not have franchise agreements with Defendants and none have authorized use of their brand-names in Defendants' marketing. Moreover, the SEC's preliminary investigation has shown that Defendants have falsified a "comfort letter" on Hyatt Hotel's letterhead in furtherance of their investment scheme.

*Second*, Defendants claim that "the Administrative Phase, covering the completion of the entitlement, design, civil engineering, permit securing, and fee payments for the Project property has been completed." This too is false. The only permits obtained by Defendants are for a tent for a purported groundbreaking ceremony held in November 2012, a demolition permit, and a minor electrical wiring permit.

*Third*, Defendants claim that the investment sponsors will contribute land valued at $177

million to the Project and claim that this valuation is supported by third-party appraisals.

However, based on the SEC's preliminary investigation, no such appraisals appear to exist. In

fact, one of the so-called appraisals cited in Defendants' offering materials expressly states that

the "analysis is not an appraisal and should not be construed as such." Nowhere does that

analysis mention much less support Defendants' purported $177 million valuation, and the

available evidence demonstrates that the $177 million valuation is grossly overstated. For

example, Defendants fail to disclose that an affiliated entity purchased the very parcel at issue

three years prior for only $6 million.

*Fourth*, Defendants' offering materials omit critical information concerning the sponsors'

background, including the fact that a major hotel chain terminated its franchise relationship with

Anshoo Sethi—the "CEO" of the purported investment enterprise—in 2011 for failure to operate a hotel in accordance with the franchisor's monetary and quality assurance obligations.

*Finally*, Defendants materially misstate the viability of the purported project, including the ability of the project to generate a sufficient number of jobs to satisfy the requirements of the EB-5 Program. Indeed, one of the consultants retained by Defendants and who is prominently featured and repeatedly cited in Defendants' offering materials has publicly stated the prospects of the project ever getting off the ground are "unlikely."

Simply put, Defendants' offering materials make numerous false statements and omit critical material information. Defendants have also falsified documents and submitted these false documents to USCIS as part of their investment scheme. Furthermore, Defendants appear to have misappropriated investors' funds and have already transferred over $2.5 million out of the U.S. to a personal bank account of Anshoo Sethi in Hong Kong. Thus, Defendants have

violated and will continue to violate the federal securities laws if not restrained. To safeguard

existing and future investors and to prevent the dissipation of millions of dollars in investors'

assets, the SEC respectfully requests that the Court temporarily restrain Defendants from further

marketing of securities and freeze Defendants' assets among other relief.

### A.    Defendants and the EB-5 Program

Anshoo Sethi, age 29, is a resident of Illinois. He was licensed as a pharmacy technician

by state of Illinois from 2002-2006, and has also worked at hotels that his family operated in

Chicago. (Declaration of Charles J. Felker ("Felker Decl.") ¶ 6 (attached as Exhibit 1).)

A Chicago Convention Center, LLC ("ACCC") is an Illinois limited liability company

(formed in January 2011) with its principal place of business in Chicago, Illinois. (Declaration

of Ana L. Rili ("Rili Decl.") (attached as Exhibit B), Ex. E at 0000390.) It is the "offeror" of

securities (interests in ACCC) in a private placement purportedly to finance and build the "World's First Zero Carbon Emission Platinum LEED certified" hotel and conference center in the Chicago area and, at the same time, provide foreign investors a pathway to citizenship in the U.S. through the EB-5 Program. (*Id.*) Anshoo Sethi and his father, Ravinder Sethi, are ACCC's managing members and Anshoo Sethi is its agent. (Felker Decl. ¶ 5.)[1]

Intercontinental Regional Center Trust of Chicago, LLC ("IRCTC") is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Anshoo Sethi is a managing member of IRCTC as well as its agent. (*Id.*) In June 2011, USCIS designated IRCTC as a Regional Center under the EB-5 Program and, as such, is authorized to solicit investment from foreign investors. (Rili Decl. ¶ 7.)

The EB-5 Visa program was created by the Immigration Act of 1990 and is administered by USCIS, a component of the Department of Homeland Security. Under the EB-5 Program, a

foreign national may obtain a provisional visa if he or she invests minimum amount of capital in

U.S. commercial enterprises and can demonstrate the investment will create or preserve at least

10 jobs for U.S. workers. (*Id.* ¶ 4.)

Anshoo Sethi was the sole applicant for, and preparer of IRCTC's application to USCIS

for designation as a Regional Center under the EB-5 Program, and regularly signed

correspondence on behalf of IRCTC. (*Id.*, Ex. A.)

### B.     The ACCC Confidential Private Offering Memorandum

The ACCC Confidential Private Offering Memorandum dated December 13, 2011

("Offering Memorandum"), offers to sell "securities"; specifically, 499 Limited Liability

---

[1]     Separately, a limited liability company agreement provided to USCIS that identifies Intercontinental Financial Group LLC, an Illinois limited liability company controlled by Anshoo and Ravinder Sethi, as the managing member of ACCC. (Felker Decl. ¶ 5.) Anshoo Sethi signed that LLC Agreement as the managing member of IFG. (*Id.*)

4

Company Membership Interests in ACCC to foreign investors for $500,000 each plus a $41,500 administrative fee. (*Id.*, Ex. E at 0000385.) Each Interest constitutes 0.025% of the ownership of ACCC. (*Id.* at 0000440.) The Offering Memorandum states that the securities offering "is made pursuant to an exemption from registration provided by Section 4(2) of the [Securities] Act, and/or Regulations D and/or S promulgated thereunder ..." (*Id.* at 0000391.) The purpose of the offering is to raise $249,500,000 to help fund IRCTC's project to build "a convention center and hotel complex, including convention and meeting space, five upscale hotels, and amenities including restaurants, lounges, bars, and entertainment facilities" (or the "the Project"). (*Id.* at 0000385.) In addition to the $249,000,000 of anticipated total investments, the sponsors claim that they will raise additional funding for the project through: (1) the sponsors' contribution of the real estate site for the convention center (in their role as the Project developer), which they value at more than $177,000,000, and (2) other funds that the sponsors

plan to raise from bond offerings and tax credits. (*Id.* at 0000396-397.) The Offering

Memorandum states that if the Project successfully creates or saves at least ten jobs per investor,

then each investor in the ACCC offering could receive U.S. residency under the EB-5 Program.

(*Id.* at 0000390.)

Attached to the Offering Memorandum is a subscription agreement. (*Id.*, Ex. F.)

Investors are instructed to execute subscription agreements for the purchase of securities in

ACCC and, if the subscription is accepted by the sponsors, wire funds to an escrow agent in the

U.S. (*Id.*, Ex. F at 0000459.) The Offering Memorandum claims that investors' funds will be

released for the purchase of ACCC interests upon approval of the investors' U.S. visa

applications. (*Id.*, Ex. E at 0000391.)

5

The Offering Memorandum identifies ACCC as the "Offeror" and IRCTC as a "sponsor" of the offering. (*Id.* at 0000384.) Anshoo Sethi is identified as (1) the contact person on the coverpage, (2) the person to contact with questions or to secure more information, and (3) the person to contact for access to information concerning the offering and to handle inquiries from investors or their representatives. (*Id.* at 0000384, -388, -460.)

## C. Defendants' False Statements of Material Fact

### 1. Participation of three major hotel chains in the Project

The Offering Memorandum prominently features three major hotel chains—Starwood Hotels, Intercontinental Hotel Group, and Hyatt Hotels—and claims that they are each participating in the Project. The Offering Memorandum claims:

Hotels that *have executed franchise agreements to locate at the site include Element by Westin (a Starwood Hotel brand), Hotel Indigo and Staybridge Suites (Intercontinental Hotel Group brands) and Hyatt Place and Hyatt Summerfield Suites (Hyatt Brands)*. Accordingly, the Project should benefit

*Summerfield Suites (Hyatt Brands)*. ... Accordingly, the Project should benefit from hosting five brand-name reservation systems and three popular loyalty programs to feed the hotel properties ...

Case: 1:13-cv-00982 Document #: 10 Filed: 02/06/13 Page 14 of 225 PageID #:201

(*Id.* at 0000395 (emphasis added).) A ten-page section of the Offering Memorandum titled "THE HOTEL BRAND ADVANTAGE" incorporates large logos of the hotel chains and describes their operations and the advantages they each purportedly bring to the Project. (*Id.* at 0000402-411.) For example, the Offering Memorandum describes Starwood Hotels' sales teams and states "[t]he Company believes Starwood's sales team will drive business and revenues from both new and existing customers." (*Id.* at 0000403.) The Offering Memorandum also identifies the Starwood, Intercontinental, and Hyatt hotel brands that will occupy each tower within the three-tower complex. (*Id.* at 0000402.) Finally, among the key milestones "already completed," the Offering Memorandum claims that franchise agreements have been executed with the

featured hotel chains. (*Id.* at 0000398 ("Franchise agreements have been executed for the hotels to be located at the Project site.").)

Defendants' statements regarding Starwood, Intercontinental, and Hyatt hotels are false and misleading. None of these hotel chains have executed franchise agreements with ACCC, IRCTC or Mr. Sethi and none had agreed to participate in the Project described in the Offering Memorandum. (*See* Declaration of Kevin Schramm ("Schramm Decl.") ¶ 15 (attached as Exhibit 3); Felker Decl. ¶¶ 22-30.)

Although Intercontinental Hotels and Starwood Hotels had entered into franchise agreements with Mr. Sethi and affiliated companies, these agreements were terminated well before Defendants' December 2011 Offering Memorandum was circulated to potential investors and well *before ACCC was formed* in 2011. Specifically, Intercontinental Hotels terminated its business relationship with Mr. Sethi (and his affiliated companies, Boutique Hospitality

Investment, Inc. and Extended Hospitality, Inc.) as of July 7, 2010, nearly a year before IRCTC was granted status as a Regional Center under the EB-5 Program and more than a year before the Offering Memorandum was circulated to potential investors. (Felker Decl. ¶ 28.) Similarly, Starwood Hotels terminated its relationship with Mr. Sethi and an entity related to Mr. Sethi in 2009—more than two years before the Offering Memorandum was circulated to potential investors.[2] (*Id.* ¶¶ 24-25.) Hyatt Hotels has never had an executed franchise agreement in place with Defendants (or any company affiliated with the Defendants) and had specifically advised

---

[2]     Documents produced by Starwood demonstrate that Starwood terminated licensing agreements in connection with developing Element by Westin and Four Points by Sheraton hotel properties as of September 14, 2009, and November 20, 2009, respectively. (Felker Decl. ¶¶ 24-25.) Starwood terminated the agreements because of the licensees' failure to commence construction on properties by the agreed upon dates and to produce evidence of financing for the development. (*Id.* ¶ 25.) Starwood also advised Mr. Sethi, as licensee, that he should immediately cease associating Starwood brands with his proposed hotel project. (*Id.*)

Mr. Sethi to refrain from making representations concerning Hyatt Hotels' involvement in the
Project. (Schramm Decl. ¶¶ 14-15.)

### 2. Completion of prerequisites for the Project

The Offering Memorandum claims that that "the Administrative Phase" of the Project is
"already completed." Specifically, it states:

> Administrative Phase (already completed) – the Administrative Phase, covering the completion of entitlement,
> design, civil engineering, permit securing, and fee payments for the Project property has been completed.
> During the Administrative Phase, the Development Company assisted the Company in completing necessary
> preliminary steps in the entitlement and civil engineering process for the Project site. Contractor agreements
> have also been signed, and building permits were obtained by the Development Company and/or the
> Company.

(Rili Decl., Ex. E, at 0000398.) These statements are also false. A search of the Chicago
Building Permits database for the project address shows that the only recent permits are for a tent
for a groundbreaking ceremony staged in November 2012, a demolition permit, and a minor

electrical wiring permit. (See https://data.cityofchicago.org/Buildings-Permits/yd18-5cnu.)

### 3. Value of land contributed by the Sponsors

The Offering Memorandum indicates that the sponsors of the Project will contribute to the Project a 2.8 acre parcel of land owned by an affiliate. (Rili Decl., Ex. E at 0000396.) The Offering Memorandum states that this property "recently has been separately appraised by both T.R. Mandigo & Co. and Integra Realty Resources at a net valuation of $177,547,465." [3] (*Id.*) However, the January 19, 2011 Integra report explicitly states that the report "is not an appraisal and should not be construed as such." (Boone Decl. ¶ 22.) Moreover, the $177 million amount is not mentioned anywhere in the Integra report. (*Id.*) Nor does the Integra Report provide any current value for the property. (*Id.* ¶¶ 22-23.)

---

[3] To date, SEC has been unable to obtain a copy of the T.R. Mandigo report referenced in the Offering Memorandum.

Other sources indicate that the purported $177 million valuation is vastly overstated. For example, property records indicate that the property was acquired by a company affiliated with Mr. Sethi in 2008 for $6 million. (*Id.* ¶ 19.) Further, a nearby 20 acre parcel of land sold for $7.7 million in 2011. (*Id.* ¶ 20.)

### 4. Offeror's background and experience

The Offering Memorandum states that proposed management is critical to the success of the offering, and that the loss of ACCC's management company—Intercontinental Financial Group, LLC, a limited liability company formed, owned and managed by Anshoo and Ravinder Sethi—"could have a material adverse effect" on the success of ACCC. (Rili Decl., Ex. E at 0000455; *see also id.* at 0000385.) The Offering Memorandum claims that Mr. Anshoo Sethi, age 29, has "over fifteen years of experience in real estate development and management, specifically in the lodging area." (*Id.* at 0000421.) However, the Offering Memorandum omits

mention that the Wyndham Hotel chain sued Anshoo Sethi for failure to operate a Wyndham Hotel in accordance with Wyndham's monetary and quality assurance obligations, and that he entered into a consent judgment for violations of the wage and hour provisions of the Fair Labor Standards Act, including failure to keep records of employee hours and wages at the hotel. (*See* Boone Decl. ¶¶ 38-39.)

5. **Ability of the Project to Create The Jobs Necessary To Qualify Under The EB-5 Program**

A central focus of the Offering Memorandum is the Project's purported qualification under the EB-5 visa program. To qualify, the Project must create or save a minimum of ten U.S. jobs per investor consistent with the criteria established by USCIS. (Rili Decl. ¶¶ 4-6.) The Offering Memorandum states that the "Project falls within the scope of the Regional Center's approved activities, namely to qualify investments from foreign investors" under the EB-5

9

Program, and claims that the Project will create a total of approximately eight thousand, four hundred ninety-five (8,495) … U.S. jobs." (*Id.*, Ex. E at 0000446.) The SEC's preliminary investigation shows that these claims are unsupportable.

The Offering Memorandum notes that the Defendants' job creation estimate is based upon an "analysis" submitted to USCIS. That analysis applies a "multiplier" to estimated construction costs to derive an estimate of the jobs likely created by the Project. (*See* Boone Decl. ¶ 17.) Defendants, however, have vastly overstated construction costs and, consequently, have overstated the number of jobs likely created by the Project. (*Id.* ¶¶ 17, 35.) For example, the estimated construction costs are four times the per room construction cost of comparable hotels in the area. (*Id.* ¶¶ 11-13.) The sponsors also attribute 291 jobs to the Project's parking facility which equates to at least one job created for every six parking spots planned at the Project. (*Id.* ¶ 35.) Tellingly, one of the consultants retained by Defendants and who is

prominently featured and repeatedly cited in the Offering Memorandum has publicly stated the prospects of the project ever getting off the ground are "unlikely" "for a number of reasons, not least of which is the staggering cost of the project." (*Id.* ¶ 16.)

### D. Defendants' Submission of False Information To USCIS

Not only have Defendants' overstated the estimate of jobs created by the Project, Defendants have also submitted false information to USCIS in connection with their scheme to defraud investors. In August 2012, in response to a request by USCIS for evidence supporting IRCTC's EB-5 application, Defendants submitted a letter which falsely stated that "[f]ranchise approvals [of Hytatt, Starwood and Intercontinental Hotels] (attached as Attachment 2) have been obtained by brands believed by the Company to be strong in the upscale and upper-upscale categories." (Rili Decl., Ex. K, at 0000988.) No such franchise agreements existed. *See* Section C.1., *supra.* However, attached to this August 2012 submission were two letters, one from

10

Starwood Hotels and one from Intercontinental Hotels, referring to franchise agreements that had been terminated by those hotel chains well before August 2012 and well before ACCC was even formed. (*Id.*, Ex. M at 00001098-1104; *see also* Felker Decl. ¶¶ 24-28.) In other words, Defendants knowingly submitted these letters to make it appear that Starwood Hotels and Intercontinental were participating in the Defendants' Project when they plainly were not.

A third letter, dated February 15, 2011, was also attached to Defendants August 2012 submission: this one purporting to be a comfort letter from Hyatt Hotels and referencing a purported franchise agreement between Hyatt and another company affiliated with Mr. Sethi. (*Id.* at 00001105-1109.) This third letter, however, is a forgery. (*See* Schramm Decl. ¶ 16.)[4] Hyatt Hotels had never executed a franchise agreement with the Defendants, let alone provided a comfort letter to Mr. Sethi. (*Id.* ¶¶ 14-16.)

In response to another request by USCIS for evidence supporting IRCTC's EB-5

application. Defendants also submitted a letter purportedly from the Qatar Investment Authority. In that letter, the Qatar Investment Authority purportedly commits to provide $340 million in "back up" financing for Defendants' Project. However, the letter is not genuine and was not sent with the authority of the Qatar Investment Authority. (*Compare* Rili Decl., Ex. O *with* Felker Decl. ¶ 31 & Ex. 15 thereto.) In other words, the letter is a fake.

## E. Defendants' Apparent Misappropriation of Investors' Funds

The Offering Memorandum and the subscription agreement instruct investors to pay an administrative fee of $41,500 and provide that the administrative fee is fully refundable if the

---

[4] Notably, before this falsified document was submitted to USCIS to further IRCTC's EB-5 application, a representative of Hyatt Hotels was contacted by a prospective Chinese investor in ACCC who sought confirmation that Hyatt Hotels had agreed to participate in the Project. (*Id.* ¶ 12.) A representative of Hyatt Hotels advised the investor that Hyatt Hotels had not agreed to participate in the Project and thereafter advised Mr. Sethi to refrain from using Hyatt Hotels trademarks or indicating it had agreed to participate in the Project. (*Id.* ¶¶ 12, 14.)

11

Sponsors reject the subscription or if the subscriber's visa petition is denied. (Rili Decl., Ex. E at 0000391, 439.) From November 28, 2011 to December 18, 2012, ACCC's domestic bank account, held by SunTrust Bank, received 261 incoming wires for administrative fee payments for total investor deposits of $10,726,466. (Felker Decl. ¶ 12.) During that time, however, the sponsors have made numerous wires out of the SunTrust account leaving a recent balance of less than $1 million, despite Defendants' promise to refund those fees if USCIS rejected the investors' visa applications.[5] (*Id.* ¶ 14.)

A significant amount of these payments appear to have been misappropriated. (*Id.* ¶¶ 14-21.) For example, between December 30, 2011 and December 10, 2012 there were at least 23 outgoing wires to an account in Anshoo Sethi's name at HSBC Bank in Hong Kong. (*Id.* ¶ 15.) For the most part these wires are for $100,000 or more and they typically occur several times a month. These wires total over $2.5 million dollars. (*Id.*)

ACCC has also made a number of wire transfers to an account in 2015 number DIRC216 at
Cathay Bank. (*Id.* ¶ 16.) Anshoo Sethi, Ravinder Sethi, and Rajna Sethi are the signatories for the Cathy Bank. (*Id.* ¶ 17.) The account appears to have commingled funds from different entities owned or controlled by members of the Sethi family, as it had also received checks or wires from a day care center, pharmacy and other businesses associated with Anshoo Sethi, Ravinder Sethi or Rajna Sethi. (*Id.* ¶ 18.)

Other transfers are plainly not authorized under the terms of the Offering Memorandum and subscription agreement. For example, on May 29, 2012, Ravinder Sethi wrote a check to

---

[5]      According to the Offering Memorandum, the administrative fees may be used for the following: (1) legal, escrow and related expenses; (2) to reimburse the managing member for the expenses of the offering; (3) to pay the managing member's fees; (4) to compensate the managing member for its efforts associated with setting up the LLC and conducting the offering; and (5) for marketing expenses or other fees to one or more consultants, brokers, public relation managers, investment advisors, or other parties in connection with the sale of interests pursuant to the offering. (Rili Decl., Ex. E at 0000391, 393, 440.)

"CASH" on the IRCTC Cathay Bank account and used that cash to purchase a cashier's made out to "Wyndham Resorts and Hotel." (*Id.* ¶¶ 19-21.) This payment appears to have been used to satisfy a settlement of litigation initiated by Wyndham Hotels against Anshoo Sethi, Ravinder Sethi, and A&A Hospitality LLC for breach of a licensing agreement to operate a Wyndham Hotel. (*Id.*)

### F. Defendants Continued Marketing & Solicitation

ACCC's domestic SunTrust Bank accounts continue to receive wires from new and existing investors. (*Id.* ¶ 13.) Further, a Chinese website (www.eb5accc.com) concerning the proposed Project remains active and includes a schedule of investor-seminars promoting the Project. Thus, Defendants' marketing and solicitation is continuing.

## ARGUMENT

## I. DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED FROM

To obtain a temporary restraining order or preliminary injunction, the SEC need only show "likelihood of success as to (a) current violations and (b) risk of repetition." *SEC v. Hollnagel,* 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007) (citing *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998)). Because the SEC approaches the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing securities laws," the SEC has a lower burden than a private party seeking a temporary restraining order or preliminary injunction. *SEC v. Mgmt. Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir. 1975). Thus, unlike private litigants, the SEC need not show irreparable injury, *id.*, and need only make a "proper showing" of violative activity to obtain a temporary restraining order or preliminary injunction against statutory violations. *See* 15 U.S.C. § 779(b); 15 U.S.C. § 78u(d); *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990). A "proper showing" is made where there is

13

"a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations for the statutes involved." *SEC v. GenRefractories Co.,* 400 F. Supp. 1248, 1254 (D.D.C. 1975); *see also SEC. v. Householder*, Case No. 02 C 4128, 2002 WL 1466812, at *5 (N.D. Ill. Jul. 8, 2002). The SEC has easily satisfied its burden here.

### A. Defendants Conduct Violates The Securities Laws.

The Defendants' marketing of securities violates the antifraud provisions of the federal securities laws. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit any person, in connection with the purchase or sale of any security,[6] from directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made,

not misleading; or (3) engaging in any act, practice or course of business that operates as a

fraud or deceit upon any person. 15 U.S.C. §78j(b); 17 C.F.R. 240.10b-5. Section 17(a) of

---

[6]     The sale of interests in ACCC, a limited liability company, qualifies as an investment contract under the definition set forth in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. The definition of a security is "flexible," designed to adapt to the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). The Supreme Court has held that an investment contract or security exists where: (1) a person invests his or her money; (2) in a common enterprise; and (3) is led to expect profits from the efforts of the promoter or a third party. *Id.* at 298-99. Here, Defendants' Offering Memorandum expressly offers to sell "securities in a private placement" to "investors." Defendants explain that the interests are offered and sold to Qualified Investors in reliance on an exemption from registration under Securities Act. Moreover, the investors' subscription amounts and fees are placed in a common account to be added to the sponsors' contributions and other resources and used to build the Project and provide returns to the investors based on the Defendants' efforts. Because the profits and losses of each investor are tied to the profits and losses of other investors, and their fortunes rise or fall depending on the Defendants' success or failure, the sale of interests in ACCC constitutes sales of securities for purposes of the Securities Act and the Exchange Act. *See Wals v. Fox Hills Development Corp.*, 24 F.3d 1016, 1017-19 (7th Cir. 1994); *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146-147 (7th Cir. 1984); *see also SEC v. Lowery*, 633 F. Supp. 2d 466, 479 (W.D. Mich. 2009) (finding limited sales of liability partnership interests to constitute a sale of securities).

14

the Securities Act prohibits any person in the offer or sale of any security from, directly or indirectly, (1) employing any device, scheme or artifice to defraud; (2) obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading; or (3) engaging in any transaction, practice or course of business that operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. §77q(a). Defendants' ongoing misrepresentations, and scheme to defraud investors, including misappropriation of funds, constitute violations of each of the foregoing provisions.

### 1. Defendants' Misrepresentations Violate Section 17(a)(2) Securities Act and Section 10(b) and Rule 10b-5(b) of the Exchange Act.

As detailed above, in connection with their marketing of securities, Defendants have

made several false and misleading statements, including (among others):

| False Statement | Actual Facts |
| --- | --- |
| Starwood, Hyatt and IHG brand hotels have executed franchise agreements to locate at the site. | None of these hotel chains had had executed a franchise agreement related to Defendants' project; none had agreed to locate a hotel at the IRCTC site at the time the Offering Memorandum was drafted. |
| Building permits and all prerequisites for construction of the Project have been obtained by ACCC or the developer. | The only permits obtained are for a ceremonial groundbreaking, the demolition of an existing structure, and minor electrical wiring had been obtained. |
| The real estate that the Sponsors will contribute recently has been separately appraised by T.R. Mandigo & Co. and Integra Realty Resources at a net valuation of $177,547,465. | The Integra report states that it is not a real estate appraisal, and the $177 million amount is not mentioned in the report. Other sources demonstrate that the purported $177 million valuation is grossly overstated. |

These misrepresentations are material. Materiality is defined as a "substantial likelihood"

15

that the misrepresented or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Here, there can be little dispute that misrepresentations concerning the participation of three major hotel franchisors, the value of land contributed by the sponsors, and whether the Project has obtained necessary approvals for construction would have been viewed by an investor "as having significantly altered the 'total mix' of information made available," especially a foreign investor relying upon the Project to generate or save U.S. jobs to qualify under the EB-5 Program. (*See generally* Boone Decl.)

In addition, the Offering Memorandum omits critical information concerning the Project's principal, 29-year old Anshoo Sethi. While describing his purported "fifteen years of experience in real estate development and management, specifically in the lodging area," it omits any mention of the lawsuits against him filed by Wyndham Hotels and the U.S. Department of

Labor, which both related to his qualifications to operate a hotel. Such an omission is critical

and material to an average investor. (*Id.* ¶¶ 17-18.) *See also SEC v. Lowery*, 633 F. Supp.2d

466, 491 (W.D. Mich. 2009) (finding defendant's overstatements concerning his experience

launching online casinos material in connection with the sale of securities in online gaming

enterprise).

These misrepresentations and omissions were made with scienter.[7] The Supreme Court

has defined scienter as "a mental state embracing intent to deceive, manipulate or defraud."

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Recklessness satisfies this scienter

requirement. *See Sunstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044-45 (7th Cir.

---

[7]    To establish a violation of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, the SEC must demonstrate that the defendant acted with scienter. *See Aaron v. SEC*, 446 U.S. 680, 695 (1980). The SEC need not demonstrate scienter to establish a violation of Section 17(a)(2) or (a)(3) of the Securities Act. *See, e.g., SEC v. Kearns*, 691 F. Supp. 2d 601, 614 (D.N.J. 2010); *SEC v. Power*, 525 F. Supp. 2d 415, 419 (S.D.N.Y. 2007).

16

1977). Here, Defendants knowingly made false statements concerning the participation of Starwood, Intercontinental, and Hyatt Hotels. Indeed, Defendants falsified documents to make it appear that Hyatt Hotels had agreed to participate in the Project and that Defendants had secured $340 million in "back up" financing from the Qatar Investment Authority. *See* Section D., *supra*. In addition, Defendants used hotel chains' brand names in connection with marketing the Project although they were expressly advised by the chains not to do so. These knowing misrepresentations demonstrate the requisite intent to deceive investors. *See, e.g., SEC v. Lyttle*, 538 F.3d 601, 603-04 (7th Cir. 2008). And, as principal of ACCC and IRCTC, Mr. Sethi's knowledge or reckless disregard of the truth is imputed to those entities. *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) ("The scienter of a company's officer may be attributed to the company, where, as here, there is no dispute that the officer was acting within the scope of his apparent authority."); *see also In re Sunbeam Corp.*, Exchange Act Rel.

No. 34-44305, 2001 SEC LEXIS 931, at *43-*44 (May 15, 2001).

Case: 1:13-cv-00982 Document #: 10 Filed: 02/06/13 Page 36 of 225 PageID #:223

All three Defendants are "makers" of the false statements for purposes of the Supreme

Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, -- U.S. --, 131 S.Ct.

2296 (2011). In *Janus*, the Supreme Court held that, for purposes of Rule 10b-5(b), "the maker

of [a false] statement is the person or entity with ultimate authority over the statement, including

its content and whether and how to communicate it." *Id.* at 2302.[8]

Here, ACCC is plainly a "maker" of false statements under *Janus*—it is the "offeror" of

securities and ACCC (or "the Company") is identified as the source of many of the false

---

[8]     *Janus* applies only to Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; it does not
apply to Section 17(a)(2) of the Securities Act. *See, e.g., SEC v. Sentinel Mgt. Grp., Inc.*, No. 07 C 4684,
2012 WL 1079961, at *14-15 (N.D. Ill. Mar. 30, 2012) ("[T]he Supreme Court's policy concerns in Janus
are not implicated by claims brought by the SEC under Section 17(a)."); *SEC v. Geswein*, No.
5:10CV1235, 2011 WL 4565861, at *2 (N.D. Ohio Sept. 29, 2011) (same).

statements in the Offering Memorandum. Defendant Anshoo Sethi is also the "maker" of false statements because he possessed the ultimate authority for these statements. He is identified in the Offering Memorandum as (1) the contact person on the cover page, (2) the person to contact with questions or to secure more information, and (3) the person to contact for access to information concerning the offering and to handle inquiries from investors or their representatives. (Rili Decl., Ex. E at 0000384, -388, -460.) While both Anshoo and Ravinder Sethi are founding members of, and authorized signatories for ACCC and IRCTC (and its putative managing member, Intercontinental Financial Group), Anshoo Sethi signed numerous documents, including investor escrow agreements for ACCC and limited liability agreements, as the managing member of ACCC and IRCTC. (*See* Felker Decl. ¶ 5; Rili Decl. Exs. G, J.) He also countersigned the subscription agreement on behalf of ACCC. (Rili Decl., Ex. F.) In addition, Anshoo Sethi was identified as the sole applicant for, and preparer of, the IRCTC's

application to USCIS for designation as a Regional Center under the EB-5 Program. (*Id.*, Ex.

Case: 1:13-cv-00982 Document #: 10 Filed: 02/06/13 Page 38 of 225 PageID #:225

A.) These facts demonstrate that Defendant Anshoo Sethi had authority over the statements

made by ACCC and is therefore a "maker" of the false statements in ACCC's Offering

Memorandum for purposes of the Supreme Court's *Janus* decision.

Furthermore, the evidence demonstrates that IRCTC is a "maker" of false statements

because it is an alter ego of ACCC. Each has the same individual managing members; the funds

of each were commingled when ACCC sent several wires of ACCC investor administrative fees

to the IRCTC bank account, which also contained funds from other businesses related to the

Sethi family. (*See* Felker Decl. ¶ 18.) IRCTC is also identified in the offering memorandum as

the sponsor of the Project for which ACCC was created. (Rili Decl., Ex. E at 0000390.)

In short, all three Defendants have made false and misleading statements that violate the

18

antifraud provisions of the Securities Act and Exchange Act.[9]

### 2. Defendants Are Engaged Scheme To Defraud In Violation of Section 17(a)(1) and (3) and Rule 10b-5(a) and (c).

Here, Defendants also have orchestrated a fraudulent scheme in violation of Sections 17(a)(1) and (a)(3) of the Securities Act, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(a) and 10b-5(c). A "scheme to defraud" is "merely a plan or means to obtain something of value by trick or deceit." *SEC v. Kimmes*, 799 F. Supp. 852, 858 (N.D. Ill. 1992).

Defendants knowingly or recklessly raised investor funds through a scheme to deceive USCIS. Defendants represented to USCIS that the Project was further along than it was by claiming that all prerequisites for construction have been achieved. *See* Section C.1.-2., *supra*. Defendants also falsified a document from Hyatt Hotels and informed USCIS and investors that Hyatt had agreed to locate at the project site. Defendants also falsified a document from the Qatar Investment Authority to make it appear that Defendants had back-up financing available

Qatar Investment Authority to make it appear that Defendants had back up financing available for their Project. *See* Section D., *supra.* Defendants also knew or were reckless in not knowing that the Project would never create enough jobs to qualify the investors for green cards, but they nonetheless overstated the steps taken to develop the project in hopes of having the $145 million in escrow released to them. For instance, Hyatt warned them that it needed to see actual plans before it could consider entering into a franchise agreement. (Schramm Decl. ¶¶ 6, 11.) Nonetheless Defendants created a false franchise letter from Hyatt and told investors that Hyatt had agreed to locate at the Project. (*Id.* ¶ 12.) This scheme permitted to obtain funds from investors, including millions in administrative fees.

---

⁹ The interstate commerce element is easily satisfied here. ACCC, for example, solicited investors via the internet in furtherance of the scheme. Further, IRCTC and Anshoo Sethi used the mails (*e.g.*, correspondence with Hyatt Hotels and USCIS) as well as wire transfers in connection with their scheme.

19

In addition, Defendants have apparently misappropriated over $2.5 million of the investors' administrative fee payments, directing these funds to Anshoo Sethi's personal account, and using $35,000 of IRCTC's money to pay a prior judgment to Wyndham Hotels. And, despite their promise to refund investors' administrative fees if USCIS rejected the investors' visa applications, Defendants have expended over $9 million of investors' administrative fee payments, leaving considerable doubt as to whether Defendants could fulfill their commitment to investors. *See* Section E., *supra*. Defendants' misappropriation of administrative fees paid by investors was "in connection with" the purchase or sale of ACCC securities and violates Exchange Act Section 10(b) and Rule 10b-5 thereunder. *See SEC v. Zandford*, 535 U.S. 813 (2002) (broker's fraudulent scheme to misappropriate customer funds was "in connection with" the purchase or sale of securities because the scheme to defraud and sale of securities coincided); *see also SEC v. Lowrance*, No. 11–CV–03451–EJD, 2012 WL 2599127, at *4 (N.D. Cal. Jul. 5,

2012) ("Offering a security for sale with the intent to misappropriate the proceeds is a fraudulent scheme and violates Section 10b–5 of the Exchange Act. ... Acts with the primary purpose of creating a false appearance of fact in furtherance of the scheme violate Rules 10b–5(a) and (c).") (internal citations omitted).

## B. There Is a Likelihood of Future Violations

Once the SEC shows a probable violation of the law, it need only show that there is a reasonable likelihood of a future violation in order to obtain relief. *See Householder*, 2002 WL 1466812, at *5 (citing *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)).

Here, Defendants' unlawful conduct is ongoing, and future violations of the securities laws are not only likely but a near certainty. Defendants' unlawful marketing shows no signs of abating. Wires of investors' funds are continuing to flow into ACCC' domestic bank accounts.

(Felker Decl. ¶ 13.) A Chinese language website (www.eb5accc.com) continues to solicit investors. Moreover, Defendants have utilized falsified documents in furtherance of their scheme and there has been no effort to correct false statements contained in Defendants' Offering Memorandum. Simply put, there is nothing to suggest Defendants will cease marketing securities on the basis of false and misleading information. And the gravity of Defendants' unlawful conduct is extreme: over $150 million has been raised to date and more than $9 million appears to have been dissipated through transfers to Defendants, including Anshoo Sethi's personal bank accounts in Hong Kong.

## II. AN ASSET FREEZE IS NECESSARY AND APPROPRIATE.

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), confer general equity powers upon the Court in an SEC action brought pursuant to these provisions. *See SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1103 (2d

Cir. 1972). Once the equity jurisdiction of the Court has been properly invoked, the full panoply of equitable remedies is available to the Court to effectuate the statutory purpose, including the ordering of non-injunctive relief in a variety of forms. *See J.L Case Co. v. Borak,* 377 U.S. 426, 433 (1964); *SEC v. Materia,* 745 F.2d 197, 200 (2d Cir. 1984).

Those broad powers include the authority to freeze assets. *See SEC v. International Swiss Inv. Corp.,* 895 F.2d 1272, 1276 (9th Cir. 1990). An asset freeze serves to prevent waste and dissipation of assets and to ensure the availability of funds for restitution and disgorgement. *See, e.g., SEC v. Manor Nursing Centers, Inc.,* 458 F.2d at 1104-06; *see also CFTC v. Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187 (4th Cir. 2002) (affirming freeze of relief defendant's assets). Courts recognize that a disgorgement order for ill-gotten gains will often be rendered meaningless unless an asset freeze is imposed before the entry of final judgment. *See,*

21

*e.g., Int'l Controls Corp. v. Vesco,* 490 F.2d 1334, 1347 (2d Cir. 1974); *see also SEC v. Vaskevitch,* 657 F. Supp. 312, 315 (S.D.N.Y. 1987); *Gen. Refractories Co.,* 400 F. Supp. at 1259. Thus, an order freezing assets may also properly be directed to other persons or entities which allegedly hold the funds on behalf of the defendant. *See United States v. First Nat'l City Bank,* 379 U.S. 378 (1965).

To obtain an asset freeze, the SEC must establish only that it is likely to succeed on the merits, and need not show risk of irreparable injury (unlike a private litigant) or likelihood of a future violation. *SEC v. Cavanagh,* 155 F.3d at 132, 136. The SEC may, however, show the likelihood of future violations, and thereby bolster its application for an asset freeze, *SEC v. Margolin,* 1992 WL 279735, at *6-7 (S.D.N.Y. 1992), if a defendant has made "efforts to move assets offshore." *Vaskevitch,* 657 F. Supp. at 315; *see also SEC v. Bremont,* 954 F. Supp. 726, 730 n.3 (S.D.N.Y. 1997).

In this case, the need for an asset freeze is clear. In the absence of such a freeze, there is a strong likelihood that assets will be transferred out of the country. Defendants have already dissipated more than $9 million (despite a commitment to refund investors' administrative payments if their visa applications are denied), and over $2.5 million has already been transferred to Defendant Anshoo Sethi's personal bank account overseas. Furthermore, Defendants have already shown a willingness to use falsified documents in furtherance of their scheme—elevating the risk that funds will be dissipated or expatriated absent an asset freeze.

## III.     DEFENDANTS SHOULD BE ORDERED TO PROVIDE AN ACCOUNTING.

To determine accurately the scope of a fraud and a defendant's ability to disgorge illicit proceeds, courts frequently require defendants to provide an accounting of all monies or property obtained as a result of any fraudulent activity, as well as their current financial resources or assets. *See, e.g., SEC v. Suter*, 732 F.2d 1294, 1298 (7th Cir. 1984) (affirming preliminary

injunction and order to provide accounting); *SEC v. Uni. Consulting Res. LLC*, No. 10-cv-02794-JLK-KLM, 2010 WL 4873733, at \*2 (D. Colo. Nov. 23, 2010) (granting preliminary injunction and ordering accounting). An accounting is needed from Defendants to determine the scope of the fraud and to determine the amount of assets available for disgorgement. The SEC therefore asks the Court to issue an order requiring Defendants to provide, on an expedited basis, the straightforward accounting set forth in the proposed order submitted contemporaneously herewith.

## IV. DEFENDANTS SHOULD BE ORDERED TO REPATRIATE ASSETS LOCATED ABROAD.

Defendants should be required to return money that they illegally or fraudulently obtained. A federal court's broad equitable authority includes the authority to order the repatriation of the proceeds of illegal securities transactions. *See, e.g., SEC v. Infinity Group*

Co., 27 F. Supp. 2d 359, 361 (E.D. Pa. 1998); *SEC v. Antar,* 831 F. Supp. 380, 398 (D.N.J. 1993)

(citing *SEC v. Materia,* 745 F.2d 197, 200 (2d Cir. 1984)). Defendants have secreted over $2.5

million of investor money in a personal bank account in Hong Kong. They should be required to

return the assets held for the benefit of the investors, so that the SEC can meaningfully pursue

enforcement of an order requiring them to disgorge ill-gotten gains and pay civil penalties. *See,*

*e.g., SEC v. Chemical Trust,* No. 00-8015, 2000 WL 33231600, at *12 (S.D. Fla. Dec.19, 2000)

(citing *Manor Nursing Centers, Inc.,* 458 F.2d 1082 (2d Cir. 1972); *United States v. Cannistraro,*

694 F. Supp. 62, 71-72 (D.N.J. 1988) (continuing asset freeze and repatriation order against

defendants and relief defendants for their violations of antifraud provisions of the federal

securities laws).

23

## V. OTHER REQUESTED RELIEF

In order to protect all documents necessary for full discovery in this matter, the SEC seeks an order preventing the alteration or destruction of documents and other information. Such orders are routinely granted to protect the integrity of litigation. *See, e.g., SEC v. Unifund SAL,* 910 F.2d 1028, 1040, n.11 (2d Cir. 1990); *SEC v. Musella,* 578 F. Supp. 425 (S.D.N.Y. 1984). Further, the SEC seeks an order for expedited discovery. Rules 30(a), 33(b) and 34(b) of the Federal Rules of Civil Procedure provide for expedited discovery in appropriate circumstances. As provided by these rules, the SEC requests the Court grant expedited deposition, document, and other appropriate discovery from parties and non-parties, prior to a hearing on its application for preliminary injunction.

## CONCLUSION

For these reasons, the SEC respectfully requests that this Court grant its motion, grant the

relief set forth in the proposed orders submitted contemporaneously herewith, and grant such other and further relief as this Court deems just and proper.

Dated: February 6, 2013

Respectfully submitted,

Patrick M. Bryan (IL Bar No. 6277194)
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-4420
BryanP@sec.gov

Charles J. Felker
Adam Eisner
Mika Donlon
U.S. Securities & Exchange Commission
100 F Street, NE

24

Washington, DC 20549
FelkerC@sec.gov
EisnerA@sec.gov
DonlonM@sec.gov

*Counsel to Plaintiff*

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** )<br><br>)<br>**Plaintiff,** )<br><br>)<br>**v.** )<br><br>)<br>**A CHICAGO CONVENTION CENTER,** )<br>**LLC, ANSHOO SETHI, and** )<br>**INTERCONTINENTAL REGIONAL** )<br>**CENTER TRUST OF CHICAGO, LLC** )<br><br>)<br>**Defendants.** )<br>_____ ) | **DECLARATION OF CHARLES JOSHUA FELKER** |

I, Charles Joshua Felker, pursuant to 28 U.S.C. 1746, declare as follows:

am over 18 years of age and am employed as an Assistant Director in the Division of Enforcement of the United States Securities and Exchange Commission ("Commission"). I have been employed at the Commission for eighteen years. My duties are to supervise and conduct investigations into potential violations of the United States federal securities laws. In December 2012, the Division of Enforcement commenced a formal, expedited investigation into an offering by A Chicago Convention Center, LLC (ACCC) and Intercontinental Regional Center Trust of Chicago, LCC (IRCTC), the sponsor of the project for which ACCC was raising investor funds.

2. By way of background, in June 2011, the U.S. Citizenship and Immigration Services (USCIS) designated IRCTC as a Regional Center under the EB-5 Visa program. ACCC issued a Confidential Private Offering Memorandum (the "Offering Memorandum") that offered

1

Limited Liability Company interests to foreign investors who also sought to obtain U.S. visas

through the EB-5 Visa program. A true and correct copy of the Offering Memorandum dated

December 13, 2011, and bearing the Bates number SEC-USCIS-P-0000383-468, is being filed

along with this Declaration as Exhibit E to the Declaration of ▮▮▮▮▮▮▮ ("the ▮▮▮▮▮▮

Declaration").

3. I have worked on and supervised several other attorneys and investigators in

connection with that investigation since it started. I make this Declaration in support of the

Commission's Application for a Temporary Restraining Order. The Commission's Complaint is

being filed along with this declaration.

4. I make this Declaration based upon personal knowledge, information and belief.

The sources of my information and the bases of my belief are documents obtained and reviewed

by myself and other Commission staff working at my direction (including those annexed hereto

as Exhibits), interviews of witnesses conducted by Commission staff, and information provided to me by other members of the Commission staff. The statements of others set forth herein are described in substance and in part, and not verbatim. To the extent that there are assertions herein concerning dates and numbers, they are approximate, based upon information and evidence gathered to date. Because the Commission submits this Declaration for the limited purpose of supporting its Application, I have not set forth each and every fact that I know about the investigation.

     5.     According to the online records of the Illinois Secretary of State found at http://www.ilsos.gov/corporatellc/ :

     a.  A Chicago Convention Center, LLC, (ACCC) filed as an Illinois Limited Liability Company on January 24, 2011, with its principal office at 8201 W. Higgins

2

Road, Chicago, IL 60631, listing Anshoo Sethi and Ravinder Sethi as its members.

Anshoo Sethi is its Agent. Separately, a Limited Liability Company Operating

Agreement of ACCC dated July 15, 2012 identifies Intercontinental Financial Group,

LLC (IFG) as the Managing Member of ACCC and provides for investors to become

members of ACCC. Anshoo Sethi signed that LLC Agreement as the Managing Member

of IFG. A true and correct copy of that Limited Liability Company Operating

Agreement, and bearing the Bates-number SEC-USCIS-P-0000837 to -875, is being filed

along with this Declaration as Exhibit J to the Rill Declaration.

b. Intercontinental Regional Center Trust of Chicago, LLC, (IRCTC) filed as an

Illinois Limited Liability Company on July 16, 2010, with its principal office at 8201 W.

Higgins Road, Chicago, IL 60631, listing Anshoo Sethi, Ravinder Sethi, and Ranjna

Sethi as its managers. Anshoo Sethi is its Agent.

c. Intercontinental Financial Group, LLC, (IFG) filed as an Illinois Limited

Liability Company on January 19, 2011 with its principal office at 8201 W. Higgins

Road, Chicago, IL 60631, listing Anshoo Sethi and Ravinder Sethi as its members.

Anshoo Sethi is its Agent. Separately, the Offering Memorandum adds that IFG is owned

by Ravinder Sethi (as to 50% of membership interest) and Anshoo Sethi (as to a 50%

interest)." Exhibit E of ███ Declaration at SEC-USCIS-P-0000430. According to the

Offering Memorandum, IFG initially owned all of ACCC's membership interests. The

Offering Memorandum adds that after completion of its offering, IFG will hold 87.25%

the membership interests in ACCC. Exhibit E of Brokx Declaration at SEC-USCIS-P-

0000430.

3

6. Illinois online records found at

https://www.idfpr.com/licenselookup/licenselookup.asp also show that from 2002 to

2006, Anshoo Sethi was licensed as a pharmacy technician by that State of Illinois, and

that from 1980 to the present, Ravinder Sethi has been licensed as a pharmacist with two

periods of suspension.

7. A true and correct copy of a Subscription Agreement for the ACCC offering

(the "Subscription Agreement"), signed on July 15, 2012, and bearing the Bates-number

SEC-USCIS-P-0000469-81, is being filed along with this Declaration as Exhibit F to the

Brokx Declaration.

8. The Offering Memorandum and the Subscription Agreement instruct investors

to pay an administrative fee of $41,500 and provide that the administrative fee is fully

refundable if the Sponsors reject the subscription or if USCIS rejects the subscriber's I-

526 Petition, which is the application for a provisional immigration document through the

326 Petition, which is the application for a provisional immigration document through the

Case: 1:13-cv-00982 Document #: 16-1 Filed: 02/06/13 Page 62 of 225 PageID #:249

EB-5 Visa program. See Exhibit E of. Declaration at SEC-USCIS-P-000039I, -

393, -439-40 and Exhibit F to the Declaration at 474.

9. According to the Offering Memorandum and the Subscription Agreement, the

administrative fee of $41,500 may be kept and used by ACCC and/or IFG. SEC-USCIS-

P-0000474. The Offering Memorandum explains that the administrative fee may be used

for: (1) legal, escrow and related expenses; (2) to reimburse the Managing Member and

the LLC for the expenses of the offering; (3) to pay the Managing Member's fees; (4) to

compensate the Managing Member for its efforts associated with setting up the LLC and

conducting the offering; and (5) for marketing expenses or other fees to one or more

consultants, brokers, public relation managers, investment advisors, or other parties in

4

connection with the sale of interests pursuant to the offering. See Exhibit E of Brokx

Declaration at pages SEC-USCIS-P-0000391, -393, -440.

10. The Subscription Agreement directs the investor to wire his payment of $500,000 into

an escrow account at SunTrustBank in Richmond, VA. The subscription agreement then

instructs the investor to wire his payment of the administrative fee of $41,500 to a different

SunTrust account in the name of ACCC. That accounts bears the account number XX0659. See

Exhibit F to the R.b. Declaration at SEC-USCIS-P-0000472-474.

11. The Commission staff obtained wire transfer records for account number XX0659

from SunTrust. Anshoo Sethi and Ravinder Sethi are the two authorized signatories on the

account. A true and correct copy of the signature card is attached hereto as See Exhibit 1. (For

this and each exhibit, I have redacted full bank account and investor names (save for the first

letter of the first name and the first two letters of the second name), for privacy reasons.)

12. Based on a review of wire transfer records for that account, the following transactions

received 261 incoming wires of the approximate administrative fee for total investor deposits of

$10,726,466. Attached hereto as Exhibit 2 is a spreadsheet that lists the incoming wires and

amounts of administrative fees from investors in China related to the ACCC offering. (I can

provide the actual wire transfer slips upon request.)

13. According to SunTrust Bank, the account continues to receive incoming wires for

investments and administrative fees related to the ACCC offering.

14. From November 28, 2011 to December 18, 2012, ACCC made numerous wires out of

the account leaving a recent balance, according to SunTrust, of less than $1 million. These

outgoing wires varied in amount, but included a large number of wires to multiple entities or

5

individuals that appear to be promotional agents. The "Originator to Beneficiary" information (hereinafter "memo") for these payments typically noted the number of investors for which the payment is being made, but sometimes the notes indicate payment of marketing expenses, seminars, or "text messages."

15. Between December 30, 2011 and December 10, 2012 there were at least 23 outgoing wires to an account in Anshoo Sethi's personal name at HSBC Bank in Hong Kong, account number XX4888. The memo information for seven of the wires (between May 11, 2012 and July 27, 2012) described these as payments as "Expenses." One wire, dated March 26, 2012, has memo information that reads "For Investors." For the most part these wires are for $100,000 or more and they typically occur several times a month. On December 30, 2011, there was a large wire of nearly $500K to that account. These wires total over $2.5 million dollars. Attached hereto as Exhibit 3 is a spreadsheet

totaling these wire transfers with copies of the wire transfer slips attached to it.

16. According to the SunTrust wire transfers, ACCC account number XX0659 also made a number of wire transfers to account number XX0617 in the name of IRCTC at Cathay Bank, including wires in the amount of $75,000 on January 12, 2012 and $500,000 on March 21, 2012, and a wire back to the SunTrust ACCC account from the Cathay IRCTC account of $250,000 on March 22, 2012. True and correct copies of those three wires are attached hereto as Exhibit 4.

17. The staff obtained records from Cathay Bank for the IRCTC account number XX0617. Anshoo Sethi, Ravinder Sethi, and Ranjna Sethi were the signatories on that account. Attached hereto as Exhibit 5 is a signature card for Cathay Bank account XX0617.

6

18. Cathay Bank Account XX0617 appears to have commingled funds from different entities owned or controlled by members of the Sethi family, as it had also received checks or wires from a child development center, pharmacy and from a personal account of Ravinder Sethi. SEC-CATHAY-P-0000107, 109-110, 144, 155, 164, 180. (We can provide these documents to the Court on request.)

19. On June 28, 2011, Wyndham Hotels & Resorts, Inc. filed a lawsuit against Anshoo Sethi, Ravinder Sethi, and A&A Hospitality LLC for breach of a licensing agreement to operate a Wyndham Garden Hotel at 8201 West Higgins Road, the location of the purported IRCTC project. See Wyndham Hotels & Resorts, Inc. v. A&A Hospitality LLC, Civil Action No. 1:11-cv-4402 (N.D. Ill.) Dkts. 1 and 36.

20. In February 2012, Anshoo Sethi, Ravinder Sethi, and A&A Hospitality LLC entered into a confidential Settlement Agreement with Wyndham to settle that lawsuit. The settlement

called for an initial payment and installment payments, but the amounts were confidential. See
Case: 1:13-cv-00982 Document #: 10 Filed: 02/06/13 Page 68 of 225 PageID #:255
Id. Dkt 36.

21. On May 29, 2012, Ravinder Sethi wrote a check to "CASH" on the IRCTC Cathay

Bank account number XX0617 and used that cash to purchase a cashier's made out to

"Wyndham Resorts and Hotel" [sic] ("Wyndham") (SEC-CATHAY-P-0000037). Based on the

timing, it appears that Sethi used that check to satisfy the terms of that prior settlement. Neither

IRCTC nor ACCC were parties to that settlement. See excerpt from Cathay Bank records

attached hereto as Exhibit 6.

22. On June 29, 2007, Anshoo Sethi, acting as Managing Member of Upscale

Hospitality, LLC, signed a "New Build" license agreement with Westin Hotel Management,

L.P., a Starwood Brand, to develop and operate an Element Hotel at 8201 West Higgins Road,

7

Chicago, IL 60015 (the "Element" License"). The anticipated "open date" for this new

hotel was June 1, 2009. On October 22, 2008, the parties amended the Element License

to extend the anticipated open date to October 1, 2011 and to require that construction

begin before June 1, 2009. A true and correct copy of the Element License as produced

to the staff by Starwood is attached hereto as Exhibit 7.

23. Based on subsequent correspondence, it appears on June 29, 2007, Anshoo

Sethi also executed a license agreement with Sheraton LLC to construct and operate a

Four Points by Sheraton hotel at the same location (the "Four Points License").

24. On September 11, 2009, Westin terminated the Element License as of

September 14, 2009, in part based on the fact that construction of the hotel had not

begun. The letter specified that, "You should cease representation of the Hotel as an

Element hotel immediately, including but not limited to, referring to the Hotel as an

Element hotel in oral or written disclosures." A true and correct copy of the Westin letter

Case: 1:13-cv-00982 Document #: 10 Filed: 02/06/13 Page 70 of 225 PageID #:257
terminating the Element License as produced to the staff by Starwood is attached hereto

as Exhibit 8.

25. On November 19, 2009, Sheraton terminated the Four Points License as of

November 20, 2009, in part based on the fact that construction of the hotel had not begun.

A true and correct copy of the Sheraton letter terminating the Four Points License as

produced to the staff by Starwood is attached hereto as Exhibit 9.

26. On June 2, 2010, Sheraton and Westin sent Anshoo Sethi demand letters for

liquidated damages in the approximate total amount (for both the Element and Four

Points terminations) of $2.6 million. A true and correct copy of the letters seeking

8

liquidated damages for the terminations of the Element License and the Four Points License as produced to the staff by Starwood are attached hereto as Exhibit 10.

27. On December 30, 2008, Anshoo Sethi as President of Extended Hospitality, Inc. signed a license agreement with Holiday Hospitality Franchising, Inc. to operate a Staybridge Suites hotel at the intersection of Higgins Road and Cumberland Avenue, Chicago, IL 60631 (the "Staybridge License"). A true and correct copy of the Staybridge License as produced to the staff by Intercontinental Hotels Group (IHG) is attached hereto as Exhibit 11.

28. On June 23, 2010, IHG terminated the Staybridge License as of July 7, 2010, in part based on the fact that construction of the hotel had not begun. The termination letter from IHG specified that Sethi and Extended Hospitality, Inc. comply with the post-termination obligations of the Staybridge License (reference page 20 of Exhibit 11) which include "ceasing the use of any of Licensor's trademarks or service marks. . . ." A true and correct copy of the IHG letter

terminating the Staybridge License as produced to the staff by IHG is attached hereto as Exhibit

Case: 1:13-cv-00982 Document #: 10 Filed: 02/06/13 Page 72 of 225 PageID #:259
12.

29. On December 30, 2008, Anshoo Sethi as President of Boutique Hospitality

Investment, Inc. signed a license agreement with Holiday Hospitality Franchising, Inc. to operate

a Hotel Indigo at the intersection of Higgins Road and Cumberland Avenue, Chicago, IL 60631

(the "Indigo License"). A true and correct copy of the Indigo License as produced to the staff by

IHG is attached hereto as Exhibit 13.

30. On June 23, 2010, IHG terminated the Indigo License as of July 7, 2010, in part based

on the fact that construction of the hotel had not begun. The termination letter from IHG

specified that Sethi and Boutique Hospitality Investment, Inc. comply with the post-termination

obligations of the Indigo License (reference page 20 of Exhibit 13) which include "ceasing the

9

use of any of the Marks. . . ." of Hotel Indigo. A true and correct copy of the IHG letter

terminating the Indigo License as produced to the staff by IHG is attached hereto as

Exhibit 14.

31. On February 5, 2013, a member of the SEC staff working at my direction

received a the communication from the Qatar Investment Authority, attached hereto as

Exhibit 15 true and correct copy of that communication.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 5, 2013
Washington, DC

_____
Charles Joshua Felker

10

# Exhibit 1

Felker Declaration

11129668789

 **SUNTRUST**

**Business Account Signature Card**

**Account Title  A CHICAGO CONVENTION CENTER LLC**

**Region**         071
**Account Number**    ████████0659

---

Type of Organization                          Verification/Tax Identification No.   452780034

Authorized Signature(s)

✓ **Signature 1** _____         Name/Title   ANSHOO SETHI / MEMBER

✓ **Signature 2** _____         Name/Title   RAVINDER SETHI / MEMBER

**Signature 3** _____           Name/Title   _____

**Signature 4** _____           Name/Title   _____

**Signature 5** _____           Name/Title   _____

~~Signature 6~~ _____           ~~Name/Title~~ _____

---

Date Opened  11/22/2011        Date Revised   11/23/2011        Reason

Center       4438001           Officer Number  00015348         ID

                               Work Phone                        By    Joshua Michael Champagne

☑ New           ☐ Replacement                  ☐ Change

SunTrust Bank ("Bank")

It is agreed that all transactions between the Bank and the entity listed in the above Account Title ("Depositor") shall be governed by the rules and regulations for that account and the above signer(s) is/are authorized agent(s) of the Depositor hereby acknowledge(s) accepting such rules and regulations and the funds availability policy. The Depositor also acknowledges the funds availability policy has been explained.

**Check Appropriate Box:**

☐ Individual / Sole Proprietor      ☐ Corporation      ☐ Partnership

☒ Limited Liability Company

    Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) _____

☐ Other (See Instructions.) _____


☐ Exempt payee

**Certification—Under penalties of perjury, I, as authorized agent of the Depositor certify that:**

1) 452780394 _____ is the correct taxpayer identification number for the Depositor (or the Depositor is waiting for a number to be issued), and

2) The Depositor is not subject to backup withholding because: (a) the Depositor is exempt from backup withholding, or (b) the Depositor has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified the Depositor that it is no longer subject to backup withholding, and

3) The depositor is a U.S. citizen or other U.S. person (defined in the instructions).

**Certification Instructions.** You must cross out item 2 above if the depositor has been notified by the IRS that the depositor is currently subject to backup withholding because the depositor has failed to report all interest and dividends on the depositor's tax return.

✓ Signature of U.S: Person _____      ✓ Date 11.23.2011

SEC-SunTrust-P-0001012

Exhibit 2

Felker Declaration

| | | |
|---|---|---|
| 11/28/2011 | D Ze | $41,500.00 |
| 12/5/2011 | C Hu | $41,500.00 |
| 12/6/2011 | Q Zh & W Yo Pr P Pr | $41,465.00 |
| 12/7/2011 | L Li | $41,500.00 |
| 12/7/2011 | D Mi | $41,500.00 |
| 12/7/2011 | Q Sh | $41,500.00 |
| 12/7/2011 | Z Da | $41,500.00 |
| 12/8/2011 | X So | $41,500.00 |
| 12/12/2011 | L Xi Y | $41,439.26 |
| 12/12/2011 | Q Li | $40,980.00 |
| 12/13/2011 | H Yi | $41,500.00 |
| 12/13/2011 | L Ro | $41,480.00 |
| 12/14/2011 | Y Mi | $41,600.00 |
| 12/15/2011 | S Sh | $41,500.00 |
| 12/16/2011 | L Ji | $41,500.00 |
| 12/22/2011 | C We | $41,480.00 |
| 12/22/2011 | G Xi | $40,934.11 |
| 12/29/2011 | S Yo | $41,500.00 |
| 1/4/2012 | M Ba | $40,939.22 |
| 1/9/2012 | L Xi | $41,500.00 |
| 1/11/2012 | X Li | $41,000.00 |
| 1/12/2012 | T Le | $41,500.00 |
| 1/17/2012 | F Ho | $40,980.00 |

| | | |
|---|---|---|
| 1/17/2012 | P Ho | $40,980.00 |
| 1/18/2012 | Y Ji | $41,500.00 |
| 1/18/2012 | A Li J | $41,500.00 |
| 1/20/2012 | H Mi | $41,500.00 |
| 1/26/2012 | Z Ho | $41,439.18 |
| 1/30/2012 | Y Li | $41,500.00 |
| 1/31/2012 | Z We | $41,500.00 |
| 2/3/2012 | W Da | $41,000.00 |
| 2/7/2012 | L We | $41,510.00 |
| 2/7/2012 | H X | $40,980.00 |
| 2/9/2012 | M Ch Xi | $41,500.00 |
| 2/10/2012 | S Ch | $41,500.00 |
| 2/13/2012 | W Sh | $41,500.00 |
| 2/13/2012 | Y Li | $41,500.00 |
| 2/13/2012 | W Pi | $40,939.16 |
| 2/17/2012 | H Yo | $41,500.00 |
| 2/21/2012 | Y Ru | $40,934.00 |
| 2/23/2012 | F Xi | $41,500.00 |
| 2/23/2012 | M Ji | $40,980.00 |
| 2/27/2012 | L Yo | $41,465.00 |
| 2/28/2012 | Z Y | $41,525.00 |
| 2/28/2012 | W Fe | $41,510.00 |
| 2/29/2012 | L Ji | $41,500.00 |

| Date | Name | Amount |
|---|---|---|
| 2/29/2012 | W Da | $41,480.00 |
| 3/5/2012 | M Qi | $40,980.00 |
| 3/5/2012 | Ji | $29,985.00 |
| 3/6/2012 | Ji | $11,485.00 |
| 3/9/2012 | S Ya | $41,500.00 |
| 3/13/2012 | Y Ro Ya | $41,500.00 |
| 3/16/2012 | T Ya | $41,500.00 |
| 3/19/2012 | Z We | $41,539.20 |
| 3/19/2012 | L Hu | $41,500.00 |
| 3/20/2012 | C Hu | $41,500.00 |
| 3/26/2012 | S Li | $41,500.00 |
| 3/26/2012 | K Wa | $41,000.00 |
| 3/27/2012 | W Zh | $40,980.00 |
| 3/29/2012 | H We | $41,500.00 |
| 3/30/2012 | L Ro | $41,500.00 |
| 3/30/2012 | G Ji | $41,479.00 |
| 3/30/2012 | M Pe | $40,980.00 |
| 4/2/2012 | C Xi | $41,500.00 |
| 4/3/2012 | L Yi | $41,500.00 |
| 4/10/2012 | C Ha | $40,980.00 |
| 4/19/2012 | B Fu Ha | $41,500.00 |
| 4/20/2012 | G Zh | $41,500.00 |
| 4/20/2012 | Z Ji | $41,465.00 |
| 4/23/2012 | C Zh | $40,980.00 |

| | | |
|---|---|---|
| 4/23/2012 | W Hu | $40,980.00 |
| 4/24/2012 | W Zh | $41,500.00 |
| 4/24/2012 | L Ji | $41,500.00 |
| 4/25/2012 | X Mi | $41,480.00 |
| 4/26/2012 | H We | $41,500.00 |
| 4/27/2012 | D Me | $41,500.00 |
| 4/27/2012 | J Yi | $41,439.18 |
| 4/30/2012 | Y Yi | $41,500.00 |
| 5/3/2012 | F Mi | $41,500.00 |
| 5/7/2012 | C Ho | $41,500.00 |
| 5/7/2012 | H Xi | $40,980.00 |
| 5/8/2012 | F Wi S | $41,478.00 |
| 5/10/2012 | F Li | $40,980.00 |
| 5/14/2012 | Q Yi | $41,500.00 |
| 5/15/2012 | D Zh | $41,500.00 |
| 5/17/2012 | F Yo | $41,500.00 |
| 5/17/2012 | R Lu | $21,500.00 |
| 5/17/2012 | R Lu | $20,000.00 |
| 5/18/2012 | L Qi | $41,465.00 |
| 5/21/2012 | L La | $41,500.00 |
| 5/21/2012 | W Zh | $41,500.00 |
| 5/21/2012 | Y Ze | $41,500.00 |
| 5/21/2012 | Z Li | $41,480.00 |

| 5/22/2012 | Q Ro | $41,500.00 |
| 5/24/2012 | X Do | $41,580.00 |
| 5/25/2012 | X Ji | $41,500.00 |
| 5/29/2012 | H Yu Ji | $41,535.00 |
| 5/29/2012 | S Ji | $41,500.00 |
| 5/29/2012 | F Yu | $40,980.00 |
| 5/30/2012 | S Ju | $41,500.00 |
| 5/31/2012 | H Ch | $41,500.00 |
| 5/31/2012 | G Ga | $40,980.00 |
| 5/31/2012 | Z Ya | $30,115.00 |
| 6/4/2012 | D We | $41,500.00 |
| 6/4/2012 | Y Yi K | $41,500.00 |
| 6/4/2012 | C Ti | $41,500.00 |
| 6/6/2012 | L To Sh | $41,500.00 |
| 6/6/2012 | D Ho | $41,500.00 |
| 6/6/2012 | L We | $41,500.00 |
| 6/6/2012 | L Ho | $41,500.00 |
| 6/6/2012 | W Ge | $41,500.00 |
| 6/8/2012 | H Yi | $41,500.00 |
| 6/11/2012 | X Aq | $41,540.00 |
| 6/12/2012 | C Do | $41,500.00 |
| 6/12/2012 | S Xi | $40,980.00 |
| 6/12/2012 | P Yi | $40,980.00 |
| 6/13/2012 | W Ba | $41,500.00 |

| | | |
|---|---|---|
| 6/13/2012 | C Ka | $41,000.00 |
| 6/14/2012 | L Li | $41,520.00 |
| 6/14/2012 | Z Qi | $41,500.00 |
| 6/14/2012 | W Li | $41,500.00 |
| 6/14/2012 | W Ly | $40,980.00 |
| 6/18/2012 | C Yi | $41,500.00 |
| 6/19/2012 | W Yo | $41,500.00 |
| 6/19/2012 | L Ho | $41,500.00 |
| 6/20/2012 | W Yi | $41,600.00 |
| 6/20/2012 | W Sh | $41,500.00 |
| 6/20/2012 | Y Li | $41,500.00 |
| 6/20/2012 | Q Yu | $40,980.00 |
| 6/21/2012 | L Ya | $41,565.00 |
| 6/21/2012 | C Me | $41,500.00 |
| 6/22/2012 | X Qi | $41,500.00 |
| 6/22/2012 | B De | $41,500.00 |
| 6/22/2012 | Z Zi | $41,500.00 |
| 6/25/2012 | H We | $41,500.00 |
| 6/25/2012 | Q Xi | $41,465.00 |
| 6/26/2012 | Q Xi | $41,500.00 |
| 6/26/2012 | C Mi | $41,500.00 |
| 6/27/2012 | L Do | $42,500.00 |
| 6/28/2012 | S Ch | $41,515.00 |

| | | |
|---|---|---|
| 6/29/2012 | W Xi | $41,500.00 |
| 6/29/2012 | H Qi | $41,500.00 |
| 6/29/2012 | W We | $41,500.00 |
| 6/29/2012 | Y Li | $41,500.00 |
| 7/3/2012 | W Hu | $40,980.00 |
| 7/5/2012 | L Ha | $41,500.00 |
| 7/5/2012 | W Li | $40,980.00 |
| 7/6/2012 | W We | $41,580.00 |
| 7/6/2012 | H Xi | $41,500.00 |
| 7/9/2012 | H Xu | $41,500.00 |
| 7/9/2012 | S Qi | $41,500.00 |
| 7/9/2012 | S Ho | $41,500.00 |
| 7/9/2012 | W Ho | $41,500.00 |
| 7/9/2012 | Z Li | $41,500.00 |
| 7/11/2012 | X Hu | $41,500.00 |
| 7/11/2012 | L Bo | $41,480.00 |
| 7/12/2012 | L He | $41,500.00 |
| 7/13/2012 | L Co | $41,580.00 |
| 7/13/2012 | F Yu | $41,580.00 |
| 7/13/2012 | L Ju | $41,500.00 |
| 7/13/2012 | F Ju | $41,500.00 |
| 7/13/2012 | G Ya | $41,485.00 |
| 7/16/2012 | S Ji | $41,500.00 |
| 7/16/2012 | Z Hu | $41,480.00 |

| Date | Name | Amount |
|------|------|--------|
| 7/18/2012 | L Ji | $41,500.00 |
| 7/23/2012 | L Ha | $41,500.00 |
| 7/23/2012 | W Wa | $41,500.00 |
| 7/24/2012 | X Zh | $41,530.00 |
| 7/24/2012 | C Yu | $41,500.00 |
| 7/24/2012 | S We | $41,500.00 |
| 7/25/2012 | Y Gu | $41,505.00 |
| 7/25/2012 | C Sh | $41,500.00 |
| 7/26/2012 | S Xi | $41,500.00 |
| 7/30/2012 | Y Ta | $49,980.00 |
| 7/30/2012 | Z Xi | $41,500.00 |
| 7/30/2012 | L Li | $41,500.00 |
| 7/31/2012 | Z Zh | $41,500.00 |
| 7/31/2012 | L Ca | $41,479.00 |
| 8/2/2012 | C Qi | $41,500.00 |
| 8/2/2012 | X Wa | $41,480.00 |
| 8/3/2012 | J Xi | $41,500.00 |
| 8/8/2012 | Y Do | $41,500.00 |
| 8/9/2012 | C Ka | $41,500.00 |
| 8/9/2012 | M Ju | $40,980.00 |
| 8/13/2012 | Z Yi | $41,505.00 |
| 8/14/2012 | G Yu | $41,500.00 |
| 8/14/2012 | M Ji | $41,485.00 |

| | | |
|---|---|---|
| 8/15/2012 | H Qu | $41,520.00 |
| 8/15/2012 | H Hu | $41,483.00 |
| 8/16/2012 | X Zh | $41,600.00 |
| 8/16/2012 | C Xi | $40,980.00 |
| 8/17/2012 | W Ho | $41,500.00 |
| 8/17/2012 | L Xu | $41,500.00 |
| 8/20/2012 | Z Ho | $41,600.00 |
| 8/20/2012 | S Xu | $41,500.00 |
| 8/20/2012 | S Xi | $41,500.00 |
| 8/20/2012 | Z Gu | $41,500.00 |
| 8/20/2012 | W Zh | $41,500.00 |
| 8/21/2012 | L Ji | $41,500.00 |
| 8/21/2012 | H Ya | $41,465.00 |
| 8/22/2012 | L Yi | $41,500.00 |
| 8/27/2012 | B Me | $41,600.00 |
| 8/28/2012 | L Sh | $41,500.00 |
| 8/30/2012 | Q Li | $41,540.00 |
| 8/30/2012 | W Qi | $41,485.00 |
| 8/30/2012 | L Ha | $41,484.54 |
| 8/31/2012 | H Ji | $41,565.00 |
| 8/31/2012 | F Li | $41,500.00 |
| 8/31/2012 | F Gu | $41,480.00 |
| 9/4/2012 | J Zh | $41,500.00 |
| 9/4/2012 | Y Ka | $41,485.00 |

| Date | Name | Amount |
|------|------|--------|
| 9/5/2012 | L Xu | $41,500.00 |
| 9/7/2012 | H Zh | $41,500.00 |
| 9/7/2012 | H Xi | $40,980.00 |
| 9/12/2012 | L Xi | $41,540.00 |
| 9/12/2012 | Z Ji | $41,500.00 |
| 9/14/2012 | C Ya | $41,465.00 |
| 9/17/2012 | Y Ji | $40,980.00 |
| 9/19/2012 | Z Ji | $41,500.00 |
| 9/21/2012 | M Ji | $41,550.00 |
| 9/21/2012 | F Ju | $41,500.00 |
| 9/21/2012 | Z Ho | $40,980.00 |
| 9/24/2012 | Z Gu | $41,520.00 |
| 9/24/2012 | Y We | $41,500.00 |
| 9/24/2012 | B Wa | $41,500.00 |
| 9/25/2012 | Z Sh | $41,600.00 |
| 9/26/2012 | Z Qi | $40,980.00 |
| 9/28/2012 | W Sh | $41,500.00 |
| 9/28/2012 | Z Ji | $41,500.00 |
| 10/3/2012 | X Le | $41,500.00 |
| 10/3/2012 | W Ju | $40,980.00 |
| 10/5/2012 | Z Ch | $41,500.00 |
| 10/9/2012 | H Ji | $41,500.00 |
| 10/9/2012 | H Xi | $41,480.00 |

| | | |
|---|---|---|
| 10/10/2012 | J Yi | $41,500.00 |
| 10/11/2012 | G Ji | $41,540.00 |
| 10/15/2012 | Y Li | $41,500.00 |
| 10/16/2012 | Z Ho | $41,000.00 |
| 10/19/2012 | Y Re | $41,500.00 |
| 10/29/2012 | X Sh | $41,500.00 |
| 10/29/2012 | H Ji | $41,500.00 |
| 10/31/2012 | W Hu | $41,500.00 |
| 11/2/2012 | Z Yu | $41,600.00 |
| 11/2/2012 | K Ji | $40,980.00 |
| 11/9/2012 | L Xu | $41,500.00 |
| 11/9/2012 | D Ji | $41,500.00 |
| 11/13/2012 | H Li | $41,540.00 |
| 11/15/2012 | X Pe | $41,500.00 |
| 11/19/2012 | C We | $41,485.00 |
| 11/20/2012 | F Yo | $41,500.00 |
| 11/21/2012 | S Su | $41,460.00 |
| 11/23/2012 | Y Ji | $41,480.00 |
| 11/26/2012 | L Yu | $40,980.00 |
| 11/26/2012 | C Ju | $40,980.00 |
| 11/27/2012 | C Bi | $41,500.00 |
| 11/28/2012 | J So | $41,500.00 |
| 11/30/2012 | G We | $41,500.00 |
| 12/7/2012 | Z Ji | $41,500.00 |

| | | |
|---|---|---|
| 12/7/2012 | H Yi | $41,500.00 |
| 12/10/2012 | Z Fa | $41,500.00 |
| 12/11/2012 | N Ka | $40,980.00 |
| 12/18/2012 | X Mi | $41,500.00 |

**TOTAL**

**AMOUNT**

Exhibit 3

Felker Declaration



| Date | Amount | Note |
|------|--------|------|
| 12/30/2011 | $496,000.00 | |
| 3/26/2012 | $60,000.00 | For Investors |
| 3/30/2012 | $50,000.00 | |
| 4/17/2012 | $60,000.00 | |
| 5/11/2012 | $60,000.00 | Expense |
| 6/7/2012 | $100,000.00 | Expense |
| 6/18/2012 | $100,000.00 | Expenses |
| 7/9/2012 | $150,000.00 | Expenses |
| 7/12/2012 | $100,000.00 | Expenses |
| 7/20/2012 | $100,000.00 | Expenses |
| 7/27/2012 | $100,000.00 | Expenses |
| 8/13/2012 | $100,000.00 | |
| 8/21/2012 | $100,000.00 | |
| 9/7/2012 | $100,000.00 | |
| 9/24/2012 | $100,000.00 | |
| 10/11/2012 | $100,000.00 | |
| 10/15/2012 | $146,350.00 | |

| Date | Amount |
|------|--------|
| 10/23/2012 | $100,000.00 |
| 11/4/2012 | $100,000.00 |
| 11/9/2012 | $100,000.00 |
| 11/23/2012 | $100,000.00 |
| 11/29/2012 | $60,000.00 |
| 12/10/2012 | $120,000.00 |

**TOTAL**

**AMOUNT**

**Run Date:** 8-Jan-13
**Run Time:** 9:47 AM

<u>**Transaction Detail Report**</u>

**Page:** 1
**User Name:** TRAIL

**BNK:** 175   **SND DATE:** 111230     **VAL:** 111230     **TRN:** 111230-00005626
**AMT:** $496,000.00     **CUR:** USD     **FOR AMT:** 496,000.00
**SRC:** BRW   **ADV:** FED    **TYP:** FTR     **LOC:** MTRANS     **CHECK NUM:**

---

**DBT** ▉▉▉▉0659
**ACC** ▉▉▉▉0659
**DEPT:** 175
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:** B/1881210
1881210 ESCROW SERVICES
**SNDR REF NUM:**

**ON FILE:** Y
**CTRY:**

**CDT** ▉▉▉▉1088
**ACC** ▉▉▉▉1050
**DEPT:** 175
HSBC BANK USA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORP

**BNF BNK:** ▉▉▉▉888
ANSHOO SETHI
1314 S PLYMOUTH CT
CHICAGO IL 60605

**ON FILE:** N
**CTRY:**

**BK:** N

**Run Date:** 8-Jan-13
**Run Time:** 9:58 AM

**Transaction Detail Report**

**Page:** 1
**User Name:** TRAIL

**BNK:** 175   **SND DATE:** 120326
**AMT:** $60,000.00
**SRC:** COR   **ADV:** FED   **TYP:** FTR

**VAL:** 120326
**CUR:** USD
**LOC:** MTRANS

**TRN:** 120326-00013288
**FOR AMT:** 60,000.00
**CHECK NUM:**

---

**DBT** ███ 0659
**ACC** ███ 0659
**DEPT:** 175
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**ON FILE:** Y
**CTRY:**

**CDT** ███ 1088
**ACC** ███ 1050
**DEPT:** 175
HSBC BANK USA
BUFFALO, NY

**ON FILE:** N
**CTRY:**

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORP

**BNF BNK** ███ 4888
ANSHOO SETHI

**BK:** N

**ORIG TO BNF INFO:**
FOR INVESTORS

**Run Date:** 8-Jan-13
**Run Time:** 9:59 AM

**Transaction Detail Report**

**Page:** 1
**User Name:** TRAIL

**BNK:** 175  **SND DATE:** 120330
**AMT:** $50,000.00
**SRC:** COR  **ADV:** FED  **TYP:** FTR

**VAL:** 120330
**CUR:** USD
**LOC:** MTRANS

**TRN:** 120330-00024563
**FOR AMT:** 50,000.00
**CHECK NUM:**

---

**DBT** ████0659
**ACC:** ████0659
**DEPT:** 175
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**ON FILE:** Y
**CTRY:**

**CDT** ████1088
**ACC:** ████1050
**DEPT:** 175
HSBC BANK USA
BUFFALO, NY

**ON FILE:** N
**CTRY:**

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK** ████4888
ANSHOO SETHI
1314 S POIMOUTH CT
CHICAGO IL 60605

**BK:** N

**Run Date:** 8-Jan-13          <u>**Transaction Detail Report**</u                          **Page:** 1
**Run Time:** 10:11 AM                                                      **User Name:** TRAIL

**BNK:** 175    **SND DATE:** 120417              **VAL:** 120417        **TRN:** 120417-00012205
**AMT:** $60,000.00                              **CUR:** USD           **FOR AMT:** 60,000.00
**SRC:** COR    **ADV:** FED    **TYP:** FTR      **LOC:** MTRANS       **CHECK NUM:**

| | |
|---|---|
| **DBT:** ████0659 | **CDT:** ████1088 |
| **ACC:** ████0659          **ON FILE:** Y | **ACC:** ████1050          **ON FILE:** N |
| **DEPT:** 175          **CTRY:** | **DEPT:** 175          **CTRY:** |
| A CHICAGO CONVENTION CENTER LLC | HSBC BANK USA |
| 8201 W HIGGINS RD | BUFFALO, NY |
| CHICAGO IL 60631 | |
| | **BNF BNK:** S/HSBCHKHHHKH |
| | HONGKONG AND SHANGHAI BANKING CORP |
| | **BNF BNK:** ████4888          **BK:** N |
| | ANSHOO SETHI |

**Run Date:** 8-Jan-13  
**Run Time:** 10:17 AM

**Transaction Detail Report**

**Page:** 1  
**User Name:** TRAIL

**BNK:** 175    **SND DATE:** 120511      **VAL:** 120511      **TRN:** 120511-00015400  
**AMT:** $60,000.00                **CUR:** USD        **FOR AMT:** 60,000.00  
**SRC:** COR    **ADV:** FED      **TYP:** FTR      **LOC:** MTRANS    **CHECK NUM:**

---

**DBT:** ▮▮▮0659  
**ACC:** ▮▮▮0659           **ON FILE:** Y  
**DEPT:** 175               **CTRY:**  
A CHICAGO CONVENTION CENTER LLC  
8201 W HIGGINS RD  
CHICAGO IL 60631

**CDT:** ▮▮▮1088  
**ACC:** ▮▮▮1050           **ON FILE:** N  
**DEPT:** 175               **CTRY:**  
HSBC BANK USA  
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH  
HONGKONG AND SHANGHAI BANKING CORP

**BNF BNK:** ▮▮▮4888           **BK:** N  
ANSHOO SETHI

**ORIG TO BNF INFO:**  
EXPENSE

**Run Date:** 8-Jan-13           <u>**Transaction Detail Report**</u>           **Page:** 1
**Run Time:** 10:22 AM           **User Name:** TRAIL

**BNK:** 175     **SND DATE:** 120607       **VAL:** 120607       **TRN:** 120607-00008465
**AMT:** $100,000.00                **CUR:** USD       **FOR AMT:** 100,000.00
**SRC:** COR     **ADV:** FED     **TYP:** FTR       **LOC:** MTRANS       **CHECK NUM:**

| | |
|---|---|
| **DBT:** ███ 0659 | **CDT:** ███ 1088 |
| **ACC:** ███ 0659     **ON FILE:** Y | **ACC:** ███ 1050     **ON FILE:** N |
| **DEPT:** 175        **CTRY:** | **DEPT:** 175        **CTRY:** |
| A CHICAGO CONVENTION CENTER LLC | HSBC BANK USA |
| 8201 W HIGGINS RD | BUFFALO, NY |
| CHICAGO IL 60631 | |
| | **BNF BNK:** S/HSBCHKHHHKH |
| | HONGKONG AND SHANGHAI BANKING CORP |
| | |
| | **BNF BNK:** ███ 4888     **BK:** N |
| | ANSHOO SETHI |
| | |
| | **ORIG TO BNF INFO:** |
| | EXPENSE |

**Run Date:** 8-Jan-13
**Run Time:** 10:27 AM

**Transaction Detail Report**

**Page:** 1
**User Name:** TRAIL

**BNK:** 175 **SND DATE:** 120618
**AMT:** $100,000.00
**SRC:** COR **ADV:** FED **TYP:** FTR

**VAL:** 120618
**CUR:** USD
**LOC:** MTRANS

**TRN:** 120618-00012125
**FOR AMT:** 100,000.00
**CHECK NUM:**

---

**DBT:** ███0659
**ACC:** ███0659
**DEPT:** 175
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**ON FILE:** Y
**CTRY:**

**CDT:** ███1088
**ACC:** ███1050
**DEPT:** 175
HSBC BANK USA
BUFFALO, NY

**ON FILE:** N
**CTRY:**

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORP

**BNF BNK:** ███4888
ANSHOO SETHI

**BK:** N

**ORIG TO BNF INFO:**
EXPENSES

**Run Date:** 8-Jan-13
**Run Time:** 11:22 AM

**Transaction Detail Report**

**Page:** 1
**User Name:** TRAIL

**BNK:** 175     **SND DATE:** 120709          **VAL:** 120709          **TRN:** 120709-00007992
**AMT:** $150,000.00                              **CUR:** USD            **FOR AMT:** 150,000.00
**SRC:** COR     **ADV:** FED     **TYP:** FTR     **LOC:** MTRANS     **CHECK NUM:**

---

**DBT:** ▮▮▮0659
**ACC:** ▮▮▮0659                      **ON FILE:** Y
**DEPT:** 175                              **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**CDT:** ▮▮▮1088
**ACC** ▮▮▮1050                      **ON FILE:** N
**DEPT:** 175                              **CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORP

**BNF BNK** ▮▮▮4888                      **BK:** N
ANSHOO SETHI

**ORIG TO BNF INFO:**
EXPENSES

**Run Date:** 8-Jan-13                    **Transaction Detail Report**                    **Page:**
**Run Time:** 11:23 AM                                                              **User Name:** TRA1

**BNK:** 175    **SND DATE:** 120712              **VAL:** 120712         **TRN:** 120712-00008195
**AMT:** $100,000.00                              **CUR:** USD            **FOR AMT:** 100,000.00
**SRC:** COR    **ADV:** FED    **TYP:** FTR      **LOC:** MTRANS         **CHECK NUM:**

---

**DBT:** ⬛⬛0659                                    **CDT:** ⬛⬛1088
**ACC:** ⬛⬛0659            **ON FILE:** Y          **ACC** ⬛⬛1050                      **ON FILE:**
**DEPT:** 175              **CTRY:**               **DEPT:** 175                       **CTRY:**
A CHICAGO CONVENTION CENTER LLC                   HSBC BANK USA, NA
8201 W HIGGINS RD                                 BUFFALO, NY
CHICAGO IL 60631

                                                  **INTER BK:** S/HSBCHKHH
                                                  HONGKONG AND SHANGHAI BANKING CORPO

                                                  **BNF BNK:** S/HSBCHKHHHKH
                                                  HONGKONG AND SHANGHAI BANKING CORPO

                                                  **BNF BNK:** ⬛⬛4888                 **BK:**
                                                  ANSHOO SETHI

                                                  **ORIG TO BNF INFO:**
                                                  EXPENSES



**Run Date:** 8-Jan-13
**Run Time:** 11:24 AM

**Transaction Detail Report**

**Page:**
**User Name:** TRAI

**BNK:** 175 **SND DATE:** 120720
**AMT:** $100,000.00
**SRC:** COR **ADV:** FED **TYP:** FTR

**VAL:** 120720
**CUR:** USD
**LOC:** MTRANS

**TRN:** 120720-00009962
**FOR AMT:** 100,000.00
**CHECK NUM:**

**DBT:** ▓0659
**ACC:** ▓0659
**DEPT:** 175
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**ON FILE:** Y
**CTRY:**

**CDT:** ▓1088
**ACC:** ▓1050
**DEPT:** 175
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORP

**BNF BNK:** ▓4888
ANSHOO SETHI

**ORIG TO BNF INFO:**
EXPENSES

**ON FILE:**
**CTRY:**

**BK:**

**Run Date:** 8-Jan-13
**Run Time:** 11:25 AM

**Transaction Detail Report**

**Page:** 1
**User Name:** TRAIL

**BNK:** 175     **SND DATE:** 120727          **VAL:** 120727          **TRN:** 120727-00012391
**AMT:** $100,000.00                            **CUR:** USD            **FOR AMT:** 100,000.00
**SRC:** COR     **ADV:** FED     **TYP:** FTR     **LOC:** MTRANS       **CHECK NUM:**

---

**DBT:** ▬▬▬0659
**ACC:** ▬▬▬0659                    **ON FILE:** Y
**DEPT:** 175                           **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**CDT:** ▬▬▬1088
**ACC:** ▬▬▬1050                    **ON FILE:** N
**DEPT:** 175                           **CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORP

**BNF BNK:** ▬▬▬4888                    **BK:** N
ANSHOO SETHI

**ORIG TO BNF INFO:**
REF:EXPENSES

| | | |
|---|---|---|
| **Run Date:** 8-Jan-13 | **Transaction Detail Report** | **Page:** |
| **Run Time:** 11:26 AM | | **User Name:** TRAIN |

**BNK:** 175    **SND DATE:** 120813      **VAL:** 120813      **TRN:** 120813-00009776
**AMT:** $100,000.00      **CUR:** USD      **FOR AMT:** 100,000.00
**SRC:** SII    **ADV:** FED    **TYP:** FTR      **LOC:** MTRANS      **CHECK NUM:**

---

**DBT:** ▮▮0659
**ACC:** ▮▮0659      **ON FILE:** Y
**DEPT:** 175      **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:**
**SNDR REF NUM:** EXPENSE

**CDT:** ▮▮1088
**ACC:** ▮▮1050      **ON FILE:**
**DEPT:** 175      **CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK:** ▮▮4888      **BK:**
Anshoo Sethi

**Run Date:** 8-Jan-13
**Run Time:** 11:41 AM

**Transaction Detail Report**

**Page:**
**User Name:** TRA

| | | | | | |
|---|---|---|---|---|---|
| **BNK:** 175 | **SND DATE:** 120821 | | **VAL:** 120821 | **TRN:** 120821-00009234 | |
| **AMT:** $100,000.00 | | | **CUR:** USD | **FOR AMT:** 100,000.00 | |
| **SRC:** S11 | **ADV:** FED | **TYP:** FTR | **LOC:** MTRANS | **CHECK NUM:** | |

**DBT:** ~~0659~~
**ACC:** ~~0659~~      **ON FILE:** Y
**DEPT:** 175      **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:**
**SNDR REF NUM:** EXPENSE

**CDT:** ~~1088~~
**ACC:** ~~1050~~      **ON FILE:**
**DEPT:** 175      **CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK:** ~~4888~~      **BK:**
Anshoo Sethi

**Run Date:** 8-Jan-13
**Run Time:** 11:48 AM

**Transaction Detail Report**

**Page:** 1
**User Name:** TRAIL

**BNK:** 175     **SND DATE:** 120907     **VAL:** 120907     **TRN:** 120907-00011833
**AMT:** $100,000.00                      **CUR:** USD        **FOR AMT:** 100,000.00
**SRC:** SII     **ADV:** FED     **TYP:** FTR     **LOC:** MTRANS     **CHECK NUM:**

---

**DBT:** ████████0659
**ACC:** ████████0659                     **ON FILE:** Y
**DEPT:** 175                              **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:**
**SNDR REF NUM:** EXPENSE

**CDT:** ████████1088
**ACC:** ████████1050                     **ON FILE:** N
**DEPT:** 175                              **CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK:** ████████4888                  **BK:** N
Anshoo Sethi

**Run Date:** 8-Jan-13
**Run Time:** 11:50 AM

**Transaction Detail Report**

Page: 1
User Name: TRAIL

**BNK:** 175    **SND DATE:** 120924    **VAL:** 120924    **TRN:** 120924-00013218
**AMT:** $100,000.00    **CUR:** USD    **FOR AMT:** 100,000.00
**SRC:** SII    **ADV:** FED    **TYP:** FTR    **LOC:** MTRANS    **CHECK NUM:**

---

**DBT:** ▮▮▮▮0659
**ACC:** ▮▮▮▮0659    **ON FILE:** Y
**DEPT:** 175    **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:**
**SNDR REF NUM:** EXPENSE

**CDT:** ▮▮▮▮1088
**ACC:** ▮▮▮▮1050    **ON FILE:** N
**DEPT:** 175    **CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK:** ▮▮▮▮4888    **BK:** N
Anshoo Sethi

Run Date: 8-Jan-13
Run Time: 12:41 PM

**Transaction Detail Report**

Page
User Name: TRA

**BNK:** 175   **SND DATE:** 121011
**AMT:** $100,000.00
**SRC:** S11   **ADV:** FED   **TYP:** FTR

**VAL:** 121011
**CUR:** USD
**LOC:** MTRANS

**TRN:** 121011-00003633
**FOR AMT:** 100,000.00
**CHECK NUM:**

---

**DBT:** ███████0659
**ACC:** ███████0659
**DEPT:** 175
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:**
**SNDR REF NUM:** EXPENSE

**ON FILE:** Y
**CTRY:**

**CDT:** ███████1088
**ACC** ███████1050
**DEPT:** 175
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK** ███████4888
Anshoo Sethi

**ON FILE:**
**CTRY:**

**BK:**

**Run Date:** 8-Jan-13
**Run Time:** 12:42 PM

**Transaction Detail Report**

**Page:** 1
**User Name:** TRAIL

**BNK:** 175　　**SND DATE:** 121015
**AMT:** $146,350.00
**SRC:** S11　　**ADV:** FED　　**TYP:** FTR

**VAL:** 121015
**CUR:** USD
**LOC:** MTRANS

**TRN:** 121015-00009452
**FOR AMT:** 146,350.00
**CHECK NUM:**

---

**DBT:** ███████0659
**ACC:** ███████0659　　　　　**ON FILE:** Y
**DEPT:** 175　　　　　　　　　　　**CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:**
**SNDR REF NUM:** EXPENSE

**CDT:** ███████1088
**ACC:** ███████1050　　　　　**ON FILE:** N
**DEPT:** 175　　　　　　　　　　　**CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK:** ███████4888　　　　　**BK:** N
Anshoo Sethi

**Run Date:** 8-Jan-13
**Run Time:** 12:43 PM

**Transaction Detail Report**

Page: 1
User Name: TRAIL

**BNK:** 175    **SND DATE:** 121023
**AMT:** $100,000.00
**SRC:** S11    **ADV:** FED    **TYP:** FTR

**VAL:** 121023
**CUR:** USD
**LOC:** MTRANS

**TRN:** 121023-00013580
**FOR AMT:** 100,000.00
**CHECK NUM:**

---

**DBT:** ████0659
**ACC:** ████0659                    **ON FILE:** Y
**DEPT:** 175                        **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:**
**SNDR REF NUM:** EXPENSE

**CDT:** ████1088
**ACC:** ████1050                   **ON FILE:** N
**DEPT:** 175                        **CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK:** ████4888                 **BK:** N
Anshoo Sethi

**Run Date:** 8-Jan-13
**Run Time:** 12:44 PM

**Transaction Detail Report**

Page:
User Name: TRAI

**BNK:** 175    **SND DATE:** 121104
**AMT:** $100,000.00
**SRC:** S11    **ADV:** FED    **TYP:** FTR

**VAL:** 121105
**CUR:** USD
**LOC:** MTRANS

**TRN:** 121105-00002964
**FOR AMT:** 100,000.00
**CHECK NUM:**

---

**DBT:** ███████0659
**ACC:** ███████0659
**DEPT:** 175
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**ON FILE:** Y
**CTRY:**

**SEND:**
**SNDR REF NUM:** EXPENSE

**CDT:** █████1088
**ACC:** █████1050
**DEPT:** 175
HSBC BANK USA, NA
BUFFALO, NY

**ON FILE:** 
**CTRY:**

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK:** ██████4888
Anshoo Sethi

**BK:**

**Run Date:** 8-Jan-13
**Run Time:** 12:44 PM

<u>Transaction Detail Report</u>

Page: 1
User Name: TRAIL

**BNK:** 175    **SND DATE:** 121109      **VAL:** 121109      **TRN:** 121109-00013148
**AMT:** $100,000.00             **CUR:** USD       **FOR AMT:** 100,000.00
**SRC:** S11    **ADV:** FED    **TYP:** FTR      **LOC:** MTRANS      **CHECK NUM:**

---

**DBT:** ▓▓▓0659
**ACC:** ▓▓▓0659           **ON FILE:** Y
**DEPT:** 175           **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:**
**SNDR REF NUM:** EXPENSE

**CDT:** ▓▓▓1088
**ACC:** ▓▓▓1050           **ON FILE:** N
**DEPT:** 175           **CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK:** ▓▓▓4888           **BK:** N
Anshoo Sethi

**Run Date:** 8-Jan-13
**Run Time:** 12:45 PM

**Transaction Detail Report**

**Page:**
**User Name:** TRAIL

**BNK:** 175    **SND DATE:** 121123      **VAL:** 121123      **TRN:** 121123-00004734
**AMT:** $100,000.00              **CUR:** USD      **FOR AMT:** 100,000.00
**SRC:** S11    **ADV:** FED    **TYP:** FTR      **LOC:** MTRANS      **CHECK NUM:**

**DBT:** ▓▓▓▓0659
**ACC:** ▓▓▓▓0659              **ON FILE:** Y
**DEPT:** 175                  **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**SEND:**
**SNDR REF NUM:** EXPENSE

**CDT:** ▓▓▓▓088
**ACC:** ▓▓▓▓1050              **ON FILE:** N
**DEPT:** 175                  **CTRY:**
HSBC BANK USA, NA
BUFFALO, NY

**BNF BNK:** S/HSBCHKHHHKH
HONGKONG AND SHANGHAI BANKING CORPO

**BNF BNK:** ▓▓▓▓4888            **BK:** N
Anshoo Sethi

**Run Date:** 8-Jan-13        **Transaction Detail Report**        **Page:**
**Run Time:** 12:46 PM        **User Name:** TRAI

**BNK:** 175    **SND DATE:** 121129      **VAL:** 121129      **TRN:** 121129-00006081
**AMT:** $60,000.00                  **CUR:** USD        **FOR AMT:** 60,000.00
**SRC:** S11    **ADV:** FED    **TYP:** FTR      **LOC:** MTRANS      **CHECK NUM:**

---

**DBT:** ▮▮▮▮0659                      **CDT:** ▮▮▮▮1088
**ACC:** ▮▮▮▮0659      **ON FILE:** Y      **ACC:** ▮▮▮▮1050      **ON FILE:**
**DEPT:** 175              **CTRY:**      **DEPT:** 175             **CTRY:**
A CHICAGO CONVENTION CENTER LLC      HSBC BANK USA, NA
8201 W HIGGINS RD                      BUFFALO, NY
CHICAGO IL 60631

**SEND:**                               **BNF BNK:** S/HSBCHKHHHKH
**SNDR REF NUM:** EXPENSE             HONGKONG AND SHANGHAI BANKING CORPO

                                   **BNF BNK:** /043448174888      **BK:**
                                   Anshoo Sethi

**Run Date:** 8-Jan-13                        **Transaction Detail Report**                                 Page: 1
**Run Time:** 12:47 PM                                                                     User Name: TRAIL

**BNK:** 175    **SND DATE:** 121210          **VAL:** 121210          **TRN:** 121210-00006159
**AMT:** $120,000.00                          **CUR:** USD            **FOR AMT:** 120,000.00
**SRC:** S11    **ADV:** FED    **TYP:** FTR   **LOC:** MTRANS        **CHECK NUM:**

---

**DBT:** ⬛0659                                        **CDT:** ⬛1088
**ACC:** ⬛0659              **ON FILE:** Y            **ACC:** ⬛1050                   **ON FILE:** N
**DEPT:** 175               **CTRY:**                 **DEPT:** 175                     **CTRY:**
A CHICAGO CONVENTION CENTER LLC                       HSBC BANK USA, NA
8201 W HIGGINS RD                                     BUFFALO, NY
CHICAGO IL 60631

**SEND:**                                             **BNF BNK:** S/HSBCHKHHHKH
**SNDR REF NUM:** EXPENSE                             HONGKONG AND SHANGHAI BANKING CORPO

                                                      **BNF BNK:** ⬛4888                **BK:** N
                                                      Anshoo Sethi

Exhibit 4

Felker Declaration

**Run Date:** 8-Jan-13  
**Run Time:** 9:49 AM

**Transaction Detail Report**

**Page:** 1  
**User Name:** TRAIL

**BNK:** 175    **SND DATE:** 120112    **VAL:** 120112    **TRN:** 120112-00009299  
**AMT:** $75,000.00    **CUR:** USD    **FOR AMT:** 75,000.00  
**SRC:** COR    **ADV:** FED    **TYP:** FTR    **LOC:** MTRANS    **CHECK NUM:**

---

**DBT:** ████████0659  
**ACC:** ████████0659    **ON FILE:** Y  
**DEPT:** 175    **CTRY:**  
A CHICAGO CONVENTION CENTER LLC  
8201 W HIGGINS RD  
CHICAGO IL 60631

**CDT:** ████3950  
**ACC:** ████1050    **ON FILE:** N  
**DEPT:** 175    **CTRY:**  
CATHAY BANK  
EL MONTE, CA

**BNF BNK:** ████5979  
CATHAY BANK CHICAGO, IL

**BNF BNK:** ████0617    **BK:** N  
INTERCONTINENTAL REGINIAL CENTER  
TRUST OF CHICAGO  
8201 WEST HIGGINS ROAD  
CHICAGO IL 60631

**Run Date:** 8-Jan-13
**Run Time:** 9:58 AM

**Transaction Detail Report**

**Page:** 1
**User Name:** TRAIL

**BNK:** 175    **SND DATE:** 120321          **VAL:** 120321          **TRN:** 120321-00009719
**AMT:** $500,000.00                          **CUR:** USD            **FOR AMT:** 500,000.00
**SRC:** COR    **ADV:** FED    **TYP:** FTR    **LOC:** MTRANS        **CHECK NUM:**

---

**DBT:** ███████0659
**ACC:** ███████0659                    **ON FILE:** Y
**DEPT:** 175                           **CTRY:**
A CHICAGO CONVENTION CENTER LLC
8201 W HIGGINS RD
CHICAGO IL 60631

**CDT:** ██████3950
**ACC:** ██████1050                    **ON FILE:** N
**DEPT:** 175                           **CTRY:**
CATHAY BANK
EL MONTE, CA

**BNF BNK:** ██████5979
CATHAY BANK CHICAGO, IL

**BNF BNK** ██████0617                  **BK:** N
INTERCONTINENTAL REGIONAL CENTER
TRUST OF CHICAGO
8201 W HIGGINS RD
CHICAGO IL 60631

**Run Date:** 8-Jan-13                          **Transaction Detail Report**                          **Page:** 1
**Run Time:** 9:58 AM                                                                **User Name:** TRAIL

**BNK:** 175    **SND DATE:** 120322        **VAL:** 120322      **TRN:** 120322-00011827
**AMT:** $250,000.00                        **CUR:** USD         **FOR AMT:** 250,000.00
**SRC:** FED    **ADV:** LTR    **TYP:** FTR  **LOC:**            **CHECK NUM:**

---

**DBT:** ▉▉▉2927                                    **CDT:** ▉▉▉0659
**ACC:** ▉▉▉1050              **ON FILE:** N         **ACC:** ▉▉▉0659              **ON FILE:** Y
**DEPT:** 175                **CTRY:**               **DEPT:** 175                **CTRY:**
CATHAY BANK                                         A CHICAGO CONVENTION CENTER LLC
FLUSHING, NY                                        8201 W HIGGINS RD
                                                    CHICAGO IL 60631
**SEND:**
**SNDR REF NUM:** 1212920                            **BNF BNK:** ▉▉▉0659                **BK:** N
                                                    A CHICAGO CONVENTION CENTER,LLC
**ORIG BNK:**                                        RICHMOND VA
CATHAY BANK
**REF NUM:**

**ORIG:** /73720617
INTERCONTINENTAL REGIONAL CENT
8201 W. HIGGINS RD.
CHICAGO, IL 60631-
**REF NUM:** A731200116

Exhibit 5

Felker Declaration

73720617

| Account Holder Name(s): INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, L.L.C |
|---|
| Reporting SSN/TIN: 45-3657493 |
| Mailing Address: 8201 W. HIGGINS RD., CHICAGO, IL 80631 |
| Street Location: 8201 W. HIGGINS RD., CHICAGO, IL 80631 |
| Telephone Number: (312) 404-9275     Work #: (312) ████████ |
| Number of Signatures Required: 1     CIF Number: |

Signatures of Authorized Individuals. This Agreement is subject to all terms below.

| x ANSHOO SETHI, Member of INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, L.L.C | x RAVINDER K SETHI, Member of INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, L.L.C |
|---|---|
| RANJNA SETHI, Member of INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, L.L.C | XXXXXXXXXXXXXXXXXXXX |

(Signatures and printed names of each account signer)

The authorized Agent(s) signing above agree(s) that the Account Holder's Accounts will be governed by the terms set forth in the Deposit Account Agreement and Disclosure, the Time Certificate of Deposit or Confirmation of Time Deposit Agreement (if applicable), the Rate and Fee Schedule, the Funds Availability Policy Disclosure, the Substitute Check Policy Disclosure, and the Electronic Funds Transfer Agreement and Disclosure, if requested below, as amended by the Financial Institution from time to time. The authorized Agent(s) also acknowledge that they have received at least one copy of these deposit account documents.

Account Purpose: Non Consumer          EFT Services: No

| BUSINESS TYPE: Limited Liability Company |
|---|
| ACCOUNT TYPE BUSINESS CHECKING |

| ACCOUNT NUMBER ████████ | | | | | OPENED By R838 |
|---|---|---|---|---|---|
| Date Opened | Date Revised | Opening Deposit | ATM Card | Verified By | Account Formerly With |
| 10-24-11 | | $81,335.00 | N | OFAC/CHEX | |

| Date Closed | Closing Balance | Closed By | Reason For Closing | Statement Disposition | Service Chg Disposition |
|---|---|---|---|---|---|

DEPOSIT PRO. Ver. 8.30.00.004 Copr. Harland Financial Solutions, Inc. 1996, 2011. All Rights Reserved. IL - IL - L7030.34 TR-244454

SEC-CATHAY-P-0000003

The following information may be used to further identify individual(s) for telephone instructions, large transactions, or if a signature varies. MMN = Mother's Maiden Name

| | |
|---|---|
| Name: **RANJNA SETHI** | SSN: ████████20 |
| Street: ████ PLYMOUTH CT, CHICAGO, IL 60605 | |
| Mailing: | |
| Phone: (H): ██████-9275   (W): ████████-2596 | |
| Job: **OWNER, HAPPY DAY CARE** | |
| DOB: ██████████, SHIMLA | |
| ID: Drivers License ████████████55 | MMN: RAWAT |
| WAIVED 2ND ID | |

| | |
|---|---|
| Name: | SSN: |
| Street: | |
| Mailing: | |
| Phone: (H): (W): | |
| Job: | |
| DOB: | |
| ID: | MMN: |

SEC-CATHAY-P-0000005

The following information may be used to further identify individual(s) for telephone instructions, large transactions, or if a signature varies. MMN = Mother's Maiden Name

| | |
|---|---|
| Name: **ANSHOO SETHI** | SSN: ~~████████~~ |
| Street: ~~████~~ PLYMOUTH CT. , CHICAGO, IL 60605 | |
| Mailing: | |
| Phone: (H): (312) ~~████~~ (W): (312) ~~████~~ | |
| Job: HOTEL MANGEMENT, CHICAGO O'HARE GARDEN HOTEL | |
| DOB: ~~████~~, SHIMLA | |
| ID: Drivers License ~~████████~~ | MMN: **RAWAT** |
| WAIVED 2ND ID *(signature)* | |

| | |
|---|---|
| Name: **RAVINDER K SETHI** | SSN: ~~████████~~ |
| Street: 1314 S. PLYMOUTH CT, CHICAGO, IL 60605 | |
| Mailing: | |
| Phone: (H): (312) ~~████~~ (W): (312) ~~████~~ | |
| Job: PHARMACIST, EAST CALUMET RX | |
| DOB: ~~████~~ SHIMLA | |
| ID: Drivers License ~~████████~~063 | MMN: **GAMBHIR** |
| WAIVED 2ND ID *(signature)* | |

**CERTIFICATE OF AUTHORITY AND COMPANY RESOLUTIONS** Date: 10-24-2011

The individuals signing on the front side of this document certify that the Limited Liability Company ("Company") is organized, and is duly authorized to transact business under the laws of the state in which it is located and it is located at the address shown on the front side. The name of the Company shown on the front side is the complete and correct name of the Company. Excluding the company name, all registered assumed business names under which the company does business are as follows:

The individuals signing on the front side certify that all of the managers, members and Authorized Agents ("Agents") of the Company listed occupy the positions shown, and have signed on the front side.
The managers/members further represent and certify that the following resolutions were adopted at a duly convened meeting of the members or by other duly authorized action in lieu of a meeting and remain unmodified and in full force and effect:
e. That the Agents listed on the front side are authorized and empowered to act for and on behalf of the Company

to carry out and perform transactions under the terms and conditions of the Agreement. The named Agents are authorized and empowered to execute such other agreements and to perform such other acts as they deem reasonably necessary to carry out the provisions of the Agreement. The other agreements and other acts may not be contrary to the provisions contained in the Resolution.

b. That the Financial Institution is directed to accept and pay without further inquiry any item, bearing the following appropriate number of signature(s), drawn against any of the Company's accounts with the Financial Institution.

c. That any one of such Agents is expressly authorized to endorse all checks, drafts, notes, and other items payable to or owned by the Company for deposit with the Financial Institution, or for collection or discount by the Financial Institution; and to accept drafts and other items payable at the Financial Institution.

d. That the authority given to the Agents shall remain in full force until written notice of revocation is delivered and received by the Financial Institution at each location where an account is maintained. Any such notice shall not affect any items in process at the time notice is given. A manager, member or Agent of the Company will notify the Financial Institution of any change in the ownership of the Company, company name, any assumed business names, and any aspect of the Company affecting the relationship between the Company and the Financial Institution before it occurs.

e. That the number given on the reverse side as the Company Tax Identification Number (TIN) is correct.

(X) _____     X _____
(Signature of Certifying Manager/Member)     (*Signature of Other Authorized Manager/Member)

*NOTE: In the case the member or other certifying manager is designated by the

SEC-CATHAY-P-0000004

# Exhibit 6

Felker Declaration

**CATHAY BANK**

222 W. Cermak Rd., Chicago, IL 60616

CASHIER'S CHECK NO. _____44

AMOUNT: *****$35,000.00

FEE ASSESSMENT

DATE: 5/29/2012

PURCHASER'S SIGNATURE

TO THE ORDER OF

***WYNDHAM RESORTS & HOTEL***

PURCHASER'S ADDRESS

**CASHIER'S CHECK - BANK COPY**

REMITTER: A.SETHI

BUC 0073 343 08/00 00:46 AM 5/29/2012 $35,000.00 - 72720617

⑈000137844⑈ ⑆5021-0395⑆ ⑈_____03⑈ /00035000000/

Date:20120529 Check:000137844 Account:____03003 Amount:35000.00

827318562 85292012 >1222283358< CathayBank

Date:20120529 Check:000137844 Account:71003003 Amount:35000.00

---

INTERCONTINENTAL REGIONAL CENTER
TRUST OF CHICAGO LLC
8201 W HIGGINS RD.
CHICAGO, IL 60631

3-88/710

145

DATE 05-25-2012

PAY TO THE ORDER OF _____ Cash Cathay Bank _____ $ 35000

Thirty five Thousand & 00/100 _____ DOLLARS

**CATHAY BANK**

MEMO S.C. Wyn Dham

⑉07_____⑉0145 73 720 617⑉

Date:20120529 Check:0145 Account:____0617 Amount:35000.00

827318563 85292012 >_____< CathayBank

Date:20120529 Check:0145 Account:____0617 Amount:35000.00

SEC-CATHAY-P-0000037

Exhibit 7

Felker Declaration

PIN *3189*

Address: 8201 W. Higgins Road
Chicago, IL 60631
USA

**ELEMENT HOTELS**
**NEW BUILD LICENSE AGREEMENT**

**BETWEEN**

**WESTIN HOTEL MANAGEMENT, L.P.**

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

SHRW 00001

ELEMENT HOTEL
NEW BUILD LICENSE AGREEMENT

## TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS AND EXHIBITS ......................................................................................... 1
   1.1   Definitions. ................................................................................................................................ 1
   1.2   Exhibits. ..................................................................................................................................... 1

ARTICLE 2 GRANT OF RIGHTS ............................................................................................................ 1
   2.1   Grant of License. ...................................................................................................................... 1
   2.2   Limited Exclusivity. ................................................................................................................ 1
   2.3   Term and Renewal. .................................................................................................................. 4

ARTICLE 3 FEES ....................................................................................................................................... 4
   3.1   License Fee and License Fee Credit. ...................................................................................... 4
   3.2   System Programs and Services Charges. ............................................................................... 4
   3.3   Application Fee. ........................................................................................................................ 4
   3.4   Administrative Fees. ................................................................................................................ 4
   3.5   Expansion Fees. ........................................................................................................................ 4
   3.6   Interest. ...................................................................................................................................... 4
   3.7   Payment of Fees. ...................................................................................................................... 5
   3.8   Application of Payments. ........................................................................................................ 5
   3.9   Taxes. ........................................................................................................................................ 5
   3.10  Other Agreements. ................................................................................................................... 5

ARTICLE 4 SYSTEM PROGRAMS AND SERVICES ........................................................ 5
    4.1    System Programs and Services. ........................................................ 5
        Reservation System. ........................................................

ARTICLE 5 OPERATION OF THE HOTEL ........................................................ 7
    5.1    Standards and Policies. ........................................................ 7
    5.2    System Image. ........................................................ 8
    5.3    Compliance with Laws. ........................................................ 8
    5.4    Name of Hotel. ........................................................ 9
    5.5    Operate Solely as a Brand Hotel. ........................................................ 9
    5.6    Operating Hours. ........................................................ 9
    5.7    FF&E. ........................................................ 9
    5.8    Technology. ........................................................ 9
    5.9    Maintenance and Repair; Capital Improvements. ........................................................ 10
    5.10    Purchasing by Licensee; Approved Suppliers. ........................................................ 11
    5.11    Guest Relations. ........................................................ 12
    5.12    Inspections by Licensor. ........................................................ 12
    5.13    Personnel. ........................................................ 12
    5.14    Taxes and Indebtedness. ........................................................ 13
    5.15    Supplemental Assistance. ........................................................ 13
    5.16    Operation by Management Company. ........................................................ 13

ARTICLE 6 CONSTRUCTION OF HOTEL ........................................................ 14
    6.1    Design and Construction Criteria. ........................................................ 14
    6.2    Pre-Construction Obligations. ........................................................ 14
    6.3    Time for Completion. ........................................................ 15
    6.4    Pre-Opening Activities. ........................................................ 15
    6.5    Hotel Opening. ........................................................ 16
    6.6    FF&E. ........................................................ 17

i

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

SHRW 00002

6.7    Signage. ...........................................................................................................................................18

ARTICLE 7 INTELLECTUAL PROPERTY RIGHTS ...............................................................................18
7.1    Use of Licensed Marks by Licensee. ...........................................................................................18
7.2    New or Modified Licensed Marks. ...............................................................................................18
7.3    Acknowledgment of Rights. .........................................................................................................18
7.4    Infringement. .................................................................................................................................19
7.5    Legal Actions. ...............................................................................................................................19
7.6    Improvements to System. .............................................................................................................19
7.7    Survival. ........................................................................................................................................19

ARTICLE 8 CONFIDENTIAL INFORMATION; MANUALS ..................................................................19
8.1    Confidential Information. ..............................................................................................................19
8.2    Public Statements. .........................................................................................................................20
8.3    Manuals. ........................................................................................................................................20

ARTICLE 9 MARKETING ...........................................................................................................................21
9.1    Marketing and Sales Programs. ....................................................................................................21
9.2    SPG Program. ................................................................................................................................21
9.3    Administration of Marketing Program, Sales Program and SPG Program. ..................................21
9.4    Local Marketing. ...........................................................................................................................22
9.5    Internet Marketing.. .......................................................................................................................22
9.6    Property Websites. .........................................................................................................................22
9.7    Guest Data. ....................................................................................................................................23
9.8    Marketing Co-ops. .........................................................................................................................23
9.9    Promotion of Brand Hotels. ..........................................................................................................23
9.10   Opening Advertising. .....................................................................................................................23
9.11   Content. .........................................................................................................................................23

9.11 General ....................................................................................................................23
9.12 Rates.......................................................................................................................24

ARTICLE 10 STATEMENTS AND RECORDS.........................................................................24
10.1 Maintain Records. .....................................................................................................24
10.2 Audits. .....................................................................................................................24
10.3 Gross Rooms Sales and Financial Reports..................................................................24
10.4 Gross Rooms Sales Estimates. ...................................................................................24
10.5 Ownership of Licensee. .............................................................................................24

ARTICLE 11 ASSIGNMENTS AND TRANSFERS .................................................................. 25
11.1 Transfers by Licensor.................................................................................................25
11.2 Transfers by Licensee. ...............................................................................................25
11.3 Licensee's Financing or Securities Documents. ...........................................................27
11.4 No Condominium........................................................................................................27
11.5 Sublicense. ...............................................................................................................28
11.6 Dual Branding............................................................................................................28

ARTICLE 12 INSURANCE AND INDEMNIFICATION .............................................................. 28
12.1 Insurance..................................................................................................................28
12.2 Waiver of Liability......................................................................................................28
12.3 Indemnification. .........................................................................................................28

ARTICLE 13 MORTGAGES .................................................................................................. 29
13.1 Comfort Letters..........................................................................................................29

ARTICLE 14 BUSINESS INTERRUPTION ............................................................................. 29
14.1 Payment of Fees Due to Licensor. ..............................................................................29

ii

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts.  Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

**ARTICLE 15 CASUALTY OR CONDEMNATION** ........................................................................ 29
   15.1    Casualty. ...........................................................................................................................29
   15.2    Condemnation. ..................................................................................................................30

**ARTICLE 16 DEFAULTS AND TERMINATIONS.** ...................................................................... 30
   16.1    Licensor's Remedies for Default by Licensee. ...............................................................30
   16.2    Termination by Licensor. .................................................................................................31
   16.3    Termination by Licensee. .................................................................................................33
   16.4    Liquidated Damages. ........................................................................................................33
   16.5    Licensee's Post-Termination Obligations. ......................................................................34

**ARTICLE 17 DISPUTE RESOLUTION** ........................................................................................ 35
   17.1    Alternative Dispute Resolution Required. .......................................................................35
   17.2    Compensation of Mediator. .............................................................................................36
   17.3    Prevailing Party's Expenses. ...........................................................................................36
   17.4    Jurisdiction and Venue. ....................................................................................................37
   17.5    WAIVERS. ........................................................................................................................37
   17.6    Survival and Severance. ...................................................................................................37

**ARTICLE 18 REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENTS** ........................ 38
   18.1    Licensor's Representations and Warranties. ...................................................................38
   18.2    Licensee's Representations and Warranties. ...................................................................38
   18.3    LICENSEE'S ACKNOWLEDGEMENTS. ....................................................................39

**ARTICLE 19 GENERAL PROVISIONS** ....................................................................................... 40
   19.1    Governing Law. ................................................................................................................40
   19.2    Construction of Agreement. .............................................................................................41
   19.3    Limitation on Licensor's Liabilities. ...............................................................................42

| | | |
|---|---|---|
| 19.3 | Limitation on Licensor's Liabilities. | 42 |
| 19.4 | Waivers. | 43 |
| 19.5 | Notices. | 43 |
| 19.6 | Licensee's Representative. | 43 |
| 19.7 | Further Assurances. | 44 |
| 19.8 | Relationship of the Parties. | 44 |
| 19.9 | Force Majeure. | 44 |
| 19.10 | Notice of Material Developments. | 44 |
| 19.11 | Investigations by Licensor. | 44 |
| 19.12 | Terms of Other License Agreements. | 45 |
| 19.13 | Translations. | 45 |
| 19.14 | Execution of Guarantee. | 45 |
| 19.15 | Execution of Agreement. | 45 |
| | | |
| ARTICLE 20 SPECIAL STIPULATIONS. | | 45 |
| 20.1 | Confidential Information. | 45 |
| 20.2 | Site Control. | 45 |

iii

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

SHRW 00004

## LIST OF EXHIBITS

EXHIBIT A - HOTEL AND LICENSEE INFORMATION
EXHIBIT B - DEFINITIONS
EXHIBIT C - RESTRICTED AREA
EXHIBIT D - MANAGEMENT CONSENT LETTER
EXHIBIT E - LIFE SAFETY CERTIFICATION
EXHIBIT F - OPENING AND EXPIRATION DATE CONFIRMATION
EXHIBIT G - STATE RIDERS TO LICENSE AGREEMENT
EXHIBIT H - GUARANTEE

iv

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

SHRW 00005

## LICENSE AGREEMENT

This License Agreement (this "Agreement") is entered into as of the Effective Date between Westin Hotel Management, L.P., a Delaware limited partnership ("Licensor"), and Upscale Hospitality, LLC, an Illinois limited liability company ("Licensee"). Licensor and Licensee are sometimes referred to collectively in this Agreement as the "Parties" and individually as a "Party."

## RECITALS

A.    Licensor is an indirect, wholly-owned subsidiary of Starwood which directly and through its Affiliates, (i) owns, operates, and/or licenses hotels under the Brand, as well as Other Starwood Brands and third-party brands, (ii) owns, operates and/or licenses timeshare or interval ownership facilities, vacation clubs and residences under the Brand and Other Starwood Brands, and (iii) may own, operate, provide services and/or license other lodging and non-lodging facilities and businesses.

B.    Licensor owns, or has the right to license the use of, the Licensed Marks and System, the distinctiveness and value of which are acknowledged by Licensee.

C.    Licensee owns or leases for at least the Term the Premises on which the Hotel is or will be located as more particularly described in Exhibit A. Licensee has investigated and become familiar with the System, and desires to obtain a license to Operate the Hotel under the Brand at the Premises in accordance with the System and this Agreement.

## AGREEMENT

NOW THEREFORE in consideration of the recitals, promises and covenants of each Party to the other set forth in this Agreement, the Parties agree:

# ARTICLE 1
## DEFINITIONS AND EXHIBITS

1.1 **Definitions**. All capitalized terms used without definition in this Agreement shall have the meanings assigned to such terms in Exhibit B.

1.2 **Exhibits**. The exhibits listed in the table of contents and attached hereto are incorporated in, and are an integral part of, this Agreement.

# ARTICLE 2
## GRANT OF RIGHTS

2.1 **Grant of License**. Licensor grants to Licensee the non-exclusive right, and Licensee undertakes the obligation, to develop and operate the Hotel under the Brand at the Premises using the System pursuant to the terms of this Agreement (the "License"). Licensee agrees to operate the Hotel pursuant to this License for the Term and acknowledges the importance of operating the Hotel in strict conformance with the System and this Agreement to maximize public acceptance of, and demand for, all Brand hotels. Licensee shall not use the System or any component thereof or any Intellectual Property Rights therein or arising therefrom in connection with any other hotel, business or activities anywhere in the world at any time, except as expressly permitted in this Agreement. Licensee acknowledges and agrees that all duties, covenants and obligations of Licensee under this Agreement are material to Licensor as a condition of granting the License to Licensee.

2.2 **Limited Exclusivity.**

2.2.1 Restricted Area. During the Term ("Restriction Period"), neither Licensor, nor any Affiliate thereof (including Starwood) shall own, Operate, or license a Brand hotel (including a so-called "condo hotel" or similar transient lodging facility) that is located within the area described in Exhibit C hereto (the

1

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

SHRW 00006

"Restricted Area"), provided this restriction shall not apply to owning, Operating, or licensing any (i) Other Starwood Brand hotels located within the Restricted Area; (ii) time-share, interval ownership facilities, vacation clubs, or residences sold, marketed, or Operated under the Brand or any Other Starwood Brand and located within the Restricted Area, (iii) hotel(s) located in the Restricted Area that are part of another chain, franchise system, or portfolio of at least 4 hotels acquired by Licensor, or any Affiliate thereof (including Starwood) (whether through purchase, sale, merger, consolidation, or other transaction) and that is/are converted to a Brand hotel, provided, however, that if any such hotel is so converted, Licensee shall have the right to terminate this Agreement in accordance with Section 16.3.2, or (iv) Brand hotel(s) located within the Restricted Area on the Effective Date, or any substitution, replacement, expansion, or replacement of such existing hotel or facility, whether owned, managed, or licensed, provided, however, that any such substitution, replacement, expansion, or replacement does not increase the number of Guest Rooms in such hotel or facility by more than 30% of the number of Guest Rooms at such hotel or facility as of the Effective Date. Licensee agrees that any ownership, Operation, or licensing of Brand hotels, as well as Other Starwood Brand hotels, or any business located outside the Restricted Area is completely unrestricted.

2.2.2   Licensor's Reservation of Rights. Except as expressly provided in Section 2.2.1, Licensor and its Affiliates shall have the absolute right to own, Operate, and license any hotel or other lodging facilities or business activities, under any name, providing any level of amenities and guest services, in any geographic area and at any location (other than the Premises), including the ownership, Operation, and licensing of Brand hotels, Other Starwood Brand hotels, other lodging facilities, and other businesses at one or more locations which may be in direct competition with the Hotel, all without regard to any adverse effects of such activities on the business of Licensee and without any obligation or liability to Licensee. Licensee acknowledges and agrees that, except as expressly provided to the contrary in Section 2.2.1 hereof, Licensee's rights hereunder shall be non-exclusive. LICENSEE WAIVES, TO THE FULLEST EXTENT PERMITTED UNDER LAW, ALL CLAIMS, DEMANDS, OR CAUSES OF ACTION ARISING FROM OR RELATED TO ANY OF THE FOREGOING ACTIVITIES BY LICENSOR OR ITS AFFILIATES, AND FURTHER AGREES THAT SUCH ACTIVITIES WILL NOT GIVE RISE TO ANY LIABILITY OR DAMAGES FOR LICENSOR AND ITS AFFILIATES, INCLUDING LIABILITY OR DAMAGES FOR CLAIMS FOR UNFAIR COMPETITION, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING OR DIVIDED LOYALTY.

(a) Placement Programs. Notwithstanding anything to the contrary in this Agreement, Licensor shall have the right, from time to time, at Licensor's expense, to market, promote and/or sell any products or services offered by Licensor or any of its Affiliates or any other Person designated by Licensor or any of its Affiliates as a Brand vendor (a "Designated Brand Vendor") at the Hotel, including timeshare, fractional and other lodging, spa, or residential products or services (a "Placement Program"). Licensor shall have the right to use space, facilities, equipment, utilities, or personnel at the Hotel for such Placement Programs as reasonably required for the Placement Program; provided, however, that if any such Placement Program requires more than a de minimus use of space, facilities, equipment, utilities, or personnel, then the Parties shall negotiate in good faith to agree on an arm's length compensation for such use (the "Placement Charge"). If the Parties cannot agree on the appropriate facilities, equipment, utilities, or personnel to be used for a Placement Program, or the Placement Charge for a Placement Program (if applicable), within 30 days after Licensor notifies Licensee of such Placement Program, then either Party shall have the right to submit such matter and only such matter for resolution in accordance with Sections 2.2.3 (d) and (e) below.

(b) Competition with Placement Programs. In furtherance of Licensor's rights under Section 2.2.3(a) (the "Placement Rights"), Licensee shall not market, promote or sell or enter into any agreement or other arrangement to market, promote or sell, any products or services at the Hotel that, in Licensor's reasonable judgment, would compete with any products or services offered by Licensor or any of its Affiliates or a Designated Brand Vendor pursuant to a Placement Program. If Licensee has entered into any agreement or other legally binding arrangement to provide any such competitive products or services prior to the time that Licensor has provided Licensee with notice of the applicable Placement Program, then Licensor shall have the right to require Licensee to terminate such agreement or other arrangement at the earliest time at which it can be terminated without cost or penalty. Licensor also shall have the right to require such termination at a time that would result in a cost or penalty; provided, however, if such pre-existing agreement or arrangement is for a term of (i) no longer than one year or otherwise previously approved in writing by Licensor, then Licensor shall reimburse Licensee for any costs or

2

Element 03/2007
L:\03 - Applications\element IL Chicago O'Hare\Contract\License Agreement\2007 06 19 element License Agreement 2007 Chicago O'Hare.doc

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of          SHRW 00007
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

penalties (if any) to the Person providing such competitive products or services as a result of such termination, or (ii) longer than one year and was not previously approved in writing by Licensor, then Licensee shall be responsible for all costs or penalties required to be paid to the Person providing such competitive products or services as a result of such termination.

        (c)    <u>No Participation in Placement Programs</u>. Licensee acknowledges that (i) Licensee shall have no right to any revenues or other amounts derived from, or otherwise participate in, any Placement Programs, except for the Placement Charge, and (ii) Licensee shall not acquire any other right, title, or interest in any Placement Programs, or the products, services or goodwill associated with such Placement Programs. Licensee further acknowledges that the Placement Programs are intended to promote the goodwill and public image of the Brand, either directly or by association with a Designated Brand Vendor, but that neither Licensor, nor any Designated Brand Vendor, nor any of their respective Affiliates or designees, including with respect to Licensor, (Starwood), undertake any obligation in administering the Placement Programs to insure that any licensee or hotel benefits directly or pro rata from the Placement Program.

        (d)    <u>Arbitrator</u>. If any Party submits a matter under Section 2.2.3(a) for resolution, then the dispute shall be submitted by that Party to final and binding arbitration to the American Arbitration Association ("AAA"). If the AAA no longer exists or is unable to administer the arbitration of the dispute in accordance with this Section, and the Parties cannot agree on the identity of a substitute arbitration service provider within 10 days after notice by the complaining Party, then such Party shall petition a court of competent jurisdiction located in the state where Licensor's franchise office then has its principal place of business, to identify a substitute arbitration service provider, who will administer the dispute resolution process in accordance with this Section.

        (e)    <u>Arbitration Procedures</u>. The arbitration shall be governed exclusively by the United States Arbitration Act or any successor law, without reference to any state arbitration statutes. In any such arbitration proceeding, each Party shall submit or file any claim under this Section 2.2.3 that would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim that is not submitted or filed in such proceeding shall be

barred. Unless the Parties agree to a different number, one arbitrator will then be selected in accordance with the rules of the AAA to conduct the arbitration, provided that such arbitrator(s) must have experience in the hospitality industry and hotel franchising, and must not have any conflict of interest. The arbitration proceeding shall be held in New York, New York and shall be conducted in accordance with the then-current commercial arbitration rules of the AAA, except the Parties shall be entitled to limited discovery at the discretion of the arbitrator(s) who may, but are not required to, allow depositions. The Parties acknowledge that the arbitrator(s)' subpoena power is not subject to geographic limitations. The arbitration proceedings shall be conducted on an individual basis, and not on a multi-plaintiff, consolidated, collective, or class-wide basis. The arbitrator(s) shall have the right to award the relief that he or she deems proper, consistent with the terms of this Agreement, including compensatory damages (with interest on unpaid amounts from date due), specific performance, injunctive relief, legal fees and costs. The award and decision of the arbitrator(s) shall be conclusive and binding on all Parties, and judgment upon the award may be entered in any court of competent jurisdiction. Any right to contest the validity or enforceability of the award shall be governed exclusively by the United States Arbitration Act or any successor law.

   2.2.4 <u>Coordination With Other Systems</u>. Licensee acknowledges and agrees that in the operation of this System and the operation of, or contractual relationship with, other lodging chains, brands, or facilities, as well as any other business activity, Licensor may use or benefit from common reservations, hardware, software, communications equipment, services, sales offices, administrative systems, license application procedures or committees, marketing, advertising and customer loyalty programs, personnel, centralized purchasing, approved supplier lists, independent licensed sales representatives, other independent contractors and other components of the System (for example, Licensor or its Affiliates may permit the Reservation System and other Licensor Technology to be used by facilities operating under Other Starwood Brands or third party brands, or with no brand affiliation, or have joint advertising and marketing promotions or programs with other hotel brands or businesses). Any part of the System to be provided by Licensor under this Agreement may be provided by Licensor, any Affiliate (including Starwood), or by a third party designated by Licensor or an Affiliate thereof.

3

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00008

#### 2.3 Term and Renewal.

2.3.1 Term. This Agreement shall be for a period of time (the "Term") commencing on the Effective Date and expiring without notice on the Expiration Date, unless terminated sooner in accordance with the terms of this Agreement. There are no extension or renewal rights under this Agreement.

## ARTICLE 3
## FEES

#### 3.1 License Fee and License Fee Credit.

3.1.1 License Fee. Licensee shall pay the License Fee to Licensor each month, starting with the month of the Opening Date through the remainder of the Term.

3.1.2 License Fee Credit. Licensee acknowledges that since the System benefits from adherence to System Standards and Policies, and it costs Licensor less (i) if Licensor does not have to notify Licensee of a failure to adhere to System Standards and Policies or Licensee's failure to comply with Licensee's duties under this Agreement, whether or not a Notice of Default of this Agreement is sent by Licensor to Licensee for such failure or default, or (ii) to monitor a cure of such default or failure, Licensee may take a credit equal to 1% of Gross Rooms Sales from the License Fee for the month of the Term for which Licensee is paying the License Fee, if for that month or a period of time which includes that month, Licensee has not been notified by Licensor in writing that Licensee (A) is in default of the Agreement for any part of that month or (B) has failed to meet System Standards and Policies for any part of that month. Once Licensee receives notice of either (A) or (B) immediately above, Licensee shall not be entitled to such credit for that month or any subsequent month, until such failure or default has been cured by Licensee and a cure notice is received by Licensee from Licensor, and then Licensee may resume prospectively with the next month to take such credit unless the cure notice is received on the first day of the month, and then it may take such credit starting with that month. The burden shall be on Licensee to prove it is entitled to take this credit and the written notices to Licensee need not comply with Section 19.5 of this Agreement,

but may be by other means, including Guest Satisfaction Index results or results of hotel inspection by Licensor or its approved inspectors.

3.2  **System Programs and Services Charges.** Licensee shall pay all System Programs and Services Charges (as the same may be modified from time to time in accordance with Section 4.1.4) to Licensor or its Affiliate or designee each month during the Term for all (i) mandatory System Programs and Services for the Hotel for the immediately preceding month, including the Program Fee, Reservation Fee and SPG Fee, and (ii) optional System Programs and Services in which Licensee elects to participate during the period of such participation. Licensor shall apply the System Program and Services Charges received from Licensee to the applicable System Programs and Services as provided in this Agreement. Licensor has the right to modify the Program Fee, including the amount assessed, the scope of the services and/or programs covered by the Program Fee, and the allocation of monies from the Program Fee.

3.3  **Application Fee.** In connection with its application for this license, Licensee paid or agreed to pay the Application Fee to Licensor, all of which has been fully earned by Licensor. Any part of the Application Fee that is not paid as and when due in accordance with the Application shall be a default by Licensee under this Agreement.

3.4  **Administrative Fees.** Licensee shall pay to Licensor all administrative and other fees or charges required under this Agreement, including those described in Article 6 and Sections 5.9.3, 6.4.1, 11.2.2, 11.2.5 and 13.1.

3.5  **Expansion Fees.** Upon Licensor's approval of any Guest Rooms to be added at the Hotel, Licensee shall pay Licensor a non-refundable expansion fee of $500 per additional Guest Room to the Hotel.

3.6  **Interest.** If any fee or other amount due by Licensee to Licensor or its Affiliates or designees under this Agreement is not paid within 14 days after such payment is due, Licensee shall pay, in addition to the amount due, interest equal to the lesser of (i) the daily equivalent of 18% of such overdue amount per year, or (ii)

4

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00009

the highest rate then permitted by Applicable Law, for each day such amount is past due, which shall be compounded monthly, if permitted by Applicable Law.

### 3.7 Payment of Fees.

3.7.1 Due Dates. All fees calculated on the basis of Gross Rooms Sales to be paid by Licensee under this Agreement shall be due and payable monthly on the 10th day of the following month for which the calculation is made without notice or demand by Licensor. All other fees and amounts to be paid by Licensee under this Agreement shall be due and payable as applicable in accordance with the invoice submitted to Licensee, in accordance with Licensor's Standards and Policies or as directed by Licensor.

3.7.2 Statements from Licensee. No later than the 10th day of each month, starting with the month following the Opening Date through the remainder of the Term, Licensee shall deliver to Licensor on forms prescribed by Licensor, statements setting forth the fees due to Licensor or its Affiliates or designees on Gross Rooms Sales during the preceding month (or other applicable period) itemized by revenue producing activity as specified by Licensor, the Gross Rooms Sales at the Hotel for the prior month and such other information as Licensor may require, all signed and certified as true and correct by Licensee or Licensee's authorized agent.

3.7.3 No Offset. All payments by Licensee under this Agreement and all related agreements between the Parties or their respective Affiliates shall be made pursuant to independent covenants, and Licensee shall not set off any claim for damages or money due from Licensor or any of its Affiliates to Licensee.

3.7.4 Place and Means of Payment. All fees and other amounts due to Licensor or its Affiliates under this Agreement shall be paid in U.S. dollars, in immediately available funds, at the location(s) specified by Licensor from time to time. Licensor may require that any such payments be effected through electronic debit/credit transfer of funds programs specified by Licensor from time to time, and Licensee agrees to execute such documents (including independent transfer authorizations), pay such fees and costs and do such things as Licensor deems necessary to effect such transfers of funds.

3.8 **Application of Payments**. All payments by Licensee pursuant to this Agreement and all related agreements shall be applied as designated by Licensor. Licensee acknowledges and agrees that (i) Licensee may not designate the application of any fees tendered, and that Licensor may (ii) reject any payment that does not apply the fees in full; and that Licensor may (iii) accept fees paid pursuant to different instructions without any obligation to follow such instructions, even if such payment is made by its terms conditional on such instructions being followed. This provision may be waived only by written agreement signed by Licensor, which written agreement must be separate from the check or other document constituting payment. No restrictive endorsement on any check or in any communication accompanying or relating to any payment to Licensor or its Affiliates shall be binding, and acceptance of such payment shall not constitute an accord and satisfaction.

3.9 **Taxes**. Licensee shall pay to Licensor an amount equal to any sales, use, gross receipts, value added, excise or similar tax assessed against Licensor by any Governmental Authority that is calculated on payments required to be paid by Licensee under this Agreement, other than income or franchise taxes assessed against Licensor.

3.10 **Other Agreements**. Licensee shall pay all indebtedness and other amounts payable from time to time to Licensor or its Affiliates under any agreement or debt instrument in accordance with their terms.

## ARTICLE 4
## SYSTEM PROGRAMS AND SERVICES

4.1 **System Programs and Services**. Licensee acknowledges and agrees that (i) Licensor provides certain programs and services to all or substantially all of the Brand hotels licensed in North America or applicable geographic region as an integral part of the System (collectively, the "System Programs and Services"), and (ii) the System Programs and Services are an essential element in maintaining conformity among the hotels in the System.

Element 03/2007
L:\03 - Applications\element IL Chicago O'Hare\Contract\License Agreement\2007 06 19 element License Agreement 2007 Chicago O'Hare.doc

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00010

Any System Programs and Services to be provided under this Agreement may be provided by Licensor, or any Affiliate thereof (including Starwood), or by a third party designated by Licensor or any Affiliate thereof.

    4.1.1   Mandatory System Programs and Services. Licensee acknowledges and agrees that (i) the Hotel shall participate in all System Programs and Services applicable to Brand hotels, including the Reservation System, Marketing Program, and SPG Program, that are designated as mandatory in the Standards and Policies and Manuals, and (ii) Licensee shall pay all System Programs and Services Charges for, and comply with all terms and requirements of, such mandatory System Programs and Services.

    4.1.2   Optional System Programs and Services. Licensee shall have the right, but not the obligation, to participate in any System Programs and Services that Licensor, in its discretion, may make available to the Hotel as an optional System Program or Service. If Licensee elects to participate in any optional System Program or Service, Licensee shall provide notice to Licensor, in which case Licensor shall make such optional System Program or Service available to Licensee upon Licensee's purchase and installation of any equipment, software and training of Hotel Personnel and completion of all other requirements for participation, and Licensee shall pay all System Programs and Services Charges for, and comply with all terms and requirements of, such optional System Program or Service. If Licensee elects to terminate the Hotel's participation in any optional System Program or Service, Licensee shall provide at least 90 days written notice to Licensor prior to such termination.

    4.1.3   System Programs and Services Charges. The amounts charged to the Hotel for the System Programs and Services (the "System Programs and Services Charges") shall be determined on the same basis as such amounts are determined for substantially all Brand hotels licensed in North America or applicable geographic region that are participating in such System Programs and Services, and may include amounts reasonably calculated to cover the overhead and other costs incurred by Licensor and its Affiliates (as applicable) in providing (or arranging for the provision of) such System Programs and Services, including: (i) compensation and employee benefits of Corporate Personnel directly involved in providing the System Programs and Services, (ii) recovery of development costs and promotion costs for such System Programs and Services, (iii) costs of Technology employed in providing the System Programs and Services, and (iv) costs of operating, maintaining and upgrading the System Programs and Services. Licensor shall have the right to increase or decrease any or all of the System Programs and Services Charges from time to time, upon 60 days notice to Licensee, provided that any such

changes in the System Programs and Services Charges are applied to substantially all of the Brand hotels licensed in North America or applicable geographic region. Licensor, its Affiliates and their designees may realize a profit on System Programs and Services (other than the Marketing Program) and related products, services and programs (by way of a trademark license fee, a mark-up fee, rebate, commission or other form of compensation).

4.1.4    Modification of System Programs and Services. Licensee acknowledges that the System Programs and Services are an integral part of the System, and Licensor needs the flexibility to modify the System, including the System Programs and Services, to respond to market trends, customer demands, economic conditions, technological advances, Applicable Law and other factors affecting the System or operation of Brand hotels, as they may change from time to time. Accordingly, Licensee agrees that Licensor shall have the right to (i) modify the structure, scope, delivery, fees, costs and terms of any existing System Program and Service, (ii) add a new, modify a current or discontinue an existing, System Program and Service, and (iii) make a mandatory System Program and Service optional, or make an optional System Program and Service mandatory, as Licensor deems advisable from time to time, each such change to be implemented at Licensee's expense upon not less than 60 days notice to Licensee, provided that any such changes in the System Program and Service are similarly applied to substantially all of the Brand hotels licensed in North America or the applicable geographic region.

4.2    Reservation System.

4.2.1    Use of Reservation System Services. Licensee acknowledges that (i) the Reservation System is used to provide reservation services to Brand hotels and Other Starwood Brands and businesses, as contemplated by Section 2.2.4, and (ii) the Reservation System constitutes a mandatory System Program and Service, subject to the provisions of Sections 4.1.1, 4.1.3 and 4.1.4. Licensor or its Affiliates (including Starwood) shall provide the Hotel with such reservation services through the Reservation System as it offers from time to time to other Brand hotels subject to the terms of this Agreement. Licensee shall (i) offer the Guest Rooms for rent, (ii) make and accept reservations from Licensor, other Brand hotels and guests in full compliance with the System

6

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00011

(including all Standards and Policies), (iii) offer all meeting rooms and services (including spa, golf, health club and other stay-related activities), through the Reservation System (if and when available) and Global Sales Organization on at least as favorable terms as offered through any other system or means, and (iv) honor any discount or promotional programs offered to the public. Licensee acknowledges and agrees that the Reservation Fee does not cover all equipment or costs associated with or required to make reservations including transaction or segment fees payable to global distribution systems (GDS), fees related to third-party internet or "web-based" reservations and fees applicable to the use of group or meeting booking tools and other similar fees, which will be specified and separately billed from time to time by Licensor or its Affiliates and that it does not include commissions or other payments owed to travel agents and other third party sales organizations.

4.2.2 **Reservation Data.** Licensee shall load into the Reservation System all reservation data about the Hotel, including rate categories, rates, charges, taxes, type of accommodations, services, conditions, availability, Hotel descriptions, Content plus such other data as requested or specified by Licensor or any of its Affiliates (including in Standards and Policies) from time to time (the "Reservation Data"), and shall update such Reservation Data from time to time as necessary to maintain at all times the accuracy and completeness of the Reservation Data in the Reservation System. Licensee shall honor all reservations received from the Reservation System and all services booked through the Reservation System on the terms specified to the guest in the Reservation System at the time the reservation was made. Licensee acknowledges and agrees that: (a) neither Licensor nor any of its Affiliates have performed, or will perform, any verification of any of the Reservation Data included by Licensee in the Reservation System, (b) neither Licensor nor any of its Affiliates have made or will make any representation, warranty or guaranty to Licensee or any of its Affiliates, users of the Reservation System or any other Person as to the accuracy, quality, timeliness or completeness of the Reservation Data or the fulfillment of any reservation made, (c) neither Licensor nor any of its Affiliates shall have any obligation to monitor, review, correct, or edit any Reservation Data in the Reservation System, and (d) Licensee (and not Licensor or any of its Affiliates) shall be directly responsible to Reservation System users for (i) all Reservation Data in the Reservation System, (ii) all reservations and bookings offered and/or made through the Reservation System, and (iii) performing the services displayed in the Reservation System for all reservations made for the Hotel. Licensee shall comply with all practices, procedures and lead times of Licensor and its Affiliates, as changed from time to time, regarding loading and updating Reservation Data in the Reservation System.

5.1     Standards and Policies.

5.1.1     Compliance with Standards and Policies. Licensee acknowledges that the Standards and Policies are an integral part of the System and are essential to give distinctiveness to the Licensed Marks, and enhance the public image and reputation of the Brand hotels, and are intended to increase the demand for the Brand hotels. Accordingly, Licensee agrees at its expense to (i) Operate the Hotel in strict compliance with all Standards and Policies and Manuals, and (ii) implement all elements and components of the System in its Operation of the Hotel, including all mandatory System Programs and Services, and (iii) not permit any business establishment on the Premises that does not meet the standards for business establishments in the Standards and Policies, and (iv) provide Licensor with the Placement Rights and otherwise comply with the provisions of Section 2.2.3. Without limiting the generality of the foregoing, Licensee specifically agrees to comply strictly with Licensor's requirements to:

(a)     (i) purchase and install, at Licensee's expense, all FF&E, including indicia, logos and exterior signage, and Technology required by Licensor which meet the Standards and Policies and all other specifications and requirements for such items as Licensor may specify from time to time, or which Licensor may approve, (ii) not install, or permit to be installed, on or about or in connection with the Hotel, any such item not meeting the Standards and Policies and other specifications or requirements of Licensor, and (iii) as directed by Licensor from time to time, expend additional funds on new or modified FF&E and Technology required to meet the Standards and Policies;

(b)     maintain in sufficient supply and use only such products, materials, goods and services in the Operation of the Hotel that comply with the Standards and Policies and all other specifications and requirements for such items as Licensor may specify from time to time, or which Licensor may approve;

7

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of        SHRW 00012
Starwood Hotels and Resorts.  Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

(c) sell and offer for sale all such products, materials, goods and services as Licensor may require from time to time, and only those which Licensor may approve, and as directed by Licensor from time to time, expend additional funds on modified or new FF&E and Technology necessary to offer such new products, materials, goods or services;

(d) satisfy all guest service Standards and Policies and participate in all guest complaint resolution programs required by Licensor; and

(e) honor at the Hotel all credit cards specified in the Manuals.

5.1.2 <u>Modification and Variations of Standards and Policies</u>. Licensee acknowledges that the Standards and Policies are an integral part of the System, and Licensor needs the flexibility to modify the Standards and Policies and the System, to respond to market trends, customer demands, economic conditions, technological advances, Applicable Law and other factors affecting the System or the Operation of the Brand hotels or hotels in the Category applicable to the Hotel, as they may change from time to time. Accordingly, Licensee agrees that Licensor may modify, alter, change, delete or add to the Standards and Policies and the System from time to time, and Licensee acknowledges such right and agrees to comply with such revised Standards and Policies at Licensee's expense. Licensor shall have the right to vary Standards and Policies for Brand hotels or hotels in the applicable Category based on the characteristics of a particular location or circumstance, density of population, business potential, population of trade area, existing business practices, Applicable Law or any other conditions which Licensor in its sole and absolute discretion deems to be of importance to the Operation of a Brand hotel or hotels in the applicable Category. Licensee shall have no recourse against Licensor on account of any such variance granted to another hotel, and Licensee shall not be entitled to require Licensor to grant the same or similar variances to Licensee.

5.2 <u>System Image</u>. Licensee at its expense shall construct and Operate the Hotel (i) at a high moral and ethical standard and atmosphere, (ii) in a clean, orderly, safe and respectable manner, providing efficient, courteous and high-quality service to the public, and (iii) in a way which does not create, cause or perpetuate any labor or union controversy, dispute or informational issue, including but not limited to informational picketing or

handbilling for Licensor, its Affiliates, the Brand or the System anywhere. Licensee shall not construct or Operate the Hotel in any manner that adversely reflects on Licensor, the Brand, or the System (including the Licensed Marks) or the goodwill associated therewith.

### 5.3 Compliance with Laws.

5.3.1 Applicable Laws. Licensee at its expense shall construct and Operate the Hotel in accordance with all Applicable Laws and Approvals. If the Hotel at any time does not comply with, or violates, any Applicable Law, including any Approvals, then without prejudice to any of Licensor's rights or remedies under this Agreement, or at law or in equity, Licensee, at its expense, promptly shall bring the Hotel into compliance with, or cure the violation of, the Applicable Law or Approval.

5.3.2 No Gaming. Without limiting the generality of the foregoing in Section 5.3.1, Licensee shall not (i) Operate or permit the Operation of a casino or permit any gambling to take place at the Hotel even if such casino or gambling is or shall become permissible under any Applicable Law at any time during the Term (except for a limited number of reputable charitable events of short duration permitted by Applicable Law), or (ii) otherwise directly or indirectly associate with any gaming activity, in each case without the prior written consent of Licensor, which Licensor may withhold in its sole and absolute discretion.

5.3.3 Anti-Terrorism Laws. Without limiting the generality of the foregoing in Section 5.3.1, Licensee, at its expense, shall comply with all Anti-Terrorism Laws and assist Licensor to the fullest extent possible in Licensor's efforts to comply with such Anti-Terrorism Laws.

5.3.4 Modified System Program and Services. Without limiting the generality of the foregoing in Section 5.3.1, if Licensor determines that any System Programs and Services do not comply with, or violate, any Applicable Law, including any Approvals, Licensor, in its sole and absolute discretion, may modify the

8

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00013

relevant System Programs and Services, provide alternative System Programs and Services, or discontinue providing the relevant System Programs and Services to the Hotel. Licensee shall use best efforts to assist Licensor to cause the System Programs and Services to be implemented by the Hotel in compliance with, and to assist Licensor in curing the violation of, any Applicable Law. Licensee shall pay all expenses (including Claims) associated with Licensor's creation of, and Licensee's use of, any such modified or alternative System Programs and Services.

5.4     **Name of Hotel**. Licensee shall not identify the Hotel with any name not approved by Licensor, and Licensor reserves the right to change the approved name of the Hotel. The name of the Hotel, if approved as of the Effective Date, is listed in Exhibit A, and, if not approved as of the Effective Date, Licensor will advise Licensee in writing of the approved name. Licensee shall not use the designation "Conference Center", "Resort", "Spa" or other designation in conjunction with the Hotel, or approved name, unless approved in writing by Licensor as meeting its requirements for such designation.

5.5     **Operate Solely as a Brand Hotel**. Licensee shall use the Hotel solely for the Operation of the Hotel under the Brand as an upscale lodging facility and for related approved purposes in accordance with the Standards and Policies, and shall not use or permit the use of the Hotel for any other purpose or activity without Licensor's prior written consent. The right to grant or withhold such consent shall be in the sole and absolute discretion of Licensor.

5.6     **Operating Hours**. Licensee shall keep the Hotel open and Operate the Hotel 24 hours a day, 7 days a week, and staff the Hotel with the necessary number of trained personnel to Operate the Hotel in accordance with this Agreement.

5.7     **FF&E**. Licensee at its expense shall (i) purchase, lease, install, use, maintain, update, repair and replace any FF&E designated by Licensor for use as part of the System and on-site or remotely controlled ambiance (such as audio, visual and lighting) and/or security systems, of such kind and in such manner as may be specified in the Standards and Policies, or Manuals, and (ii) enter into and maintain service contracts on all such FF&E necessary to keep such items working properly. Licensee shall pay all fees and charges assessed by Licensor or third parties with respect to these systems.

### 5.8 **Technology.**

5.8.1   Purchase and Use.   Licensee at its expense shall (i) purchase, lease, install, use, maintain, update, repair and replace any Software, Hardware, systems, telecommunications connectivity (including for voice and data), and other technology (collectively, the "Technology") as Licensor may specify from time to time to Operate the Hotel in accordance with System requirements, which may include Technology for a property management system, a yield management system and communication systems, and (ii) enter into and maintain service and maintenance contracts on all such Technology necessary to keep it in good and satisfactory working condition.

5.8.2   Licensor Technology.   Licensee's use of any Technology that it obtains through Licensor or its Affiliates (including Starwood) (collectively, the "Licensor Technology") shall be on a non-exclusive basis in accordance with the terms set forth herein, the Standards and Policies, and any terms set forth in other documentation provided by Licensor or its Affiliates to Licensee from time to time hereunder. Licensor shall have the right to remove all such Licensor Technology from the Hotel on, before or after the effective date of the termination or expiration of this Agreement. Licensee shall not, and shall not permit any other Person to, (a) copy, modify, translate, disassemble, reverse engineer, decompile, create a derivative work based on, or merge with any other programs, any Licensor Technology, (b) use any Software obtained through Licensor or its Affiliates (including Starwood) on any hardware other than the Hardware approved by Licensor, and (c) use any Licensor Technology (including the Reservation System) for any purpose other than Operating the Hotel in strict compliance with Licensor's and its Affiliates' operating instructions, Standards and Policies and Manuals. Licensee further agrees to notify Licensor promptly if it has any suspicion or knowledge of any unauthorized use or misuse, copying, modification, disassembly, reverse engineering, decompilation of, or creation of a derivative based on, any Licensor Technology, by any Person, and to cooperate with Licensor in preventing or resolving any such matter.

9

Element 03/2007
L:\03 - Applications\element IL Chicago O'Hare\Contract\License Agreement\2007 06 19 element License Agreement 2007 Chicago O'Hare.doc

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00014

5.8.3 <u>Network Security</u>. Licensee at its expense shall take such actions and measures as required by Licensor or any of its Affiliates from time to time (including as set forth in Standards and Policies) to protect the integrity, confidentiality and security of the Licensor Technology (including networks made available by Licensor or its Affiliates to Licensee), and to protect the security of the data (including Reservation Data and Guest Data) and informational content stored on or communicated via such systems and networks, including by inserting "firewalls" and other security devices between such networks and other networks or interfaces or systems of Licensor or Affiliates. Licensor may make such inspections or tests as Licensor deems necessary to verify compliance with these requirements. Without limiting the foregoing, Licensee shall not cause or permit any attempt to breach the security of any of Licensor's or its Affiliates' (including Starwood's) networks, software or systems, or the disabling, avoidance or circumvention of any access control or security device, process or procedure established or required by Licensor or its Affiliates.

5.8.4 <u>Communication</u>. Except for notices and other communications required to be made pursuant to Section 19.5 of this Agreement, Licensee at its expense shall use such communication devices and methods for communication between the Licensor and the Licensee or Hotel personnel as Licensor may require from time to time, including email and the Internet. In connection with any electronic communications, Licensee agrees that (i) electronic reports and other communications shall be deemed to be in "writing," and shall be deemed for all purposes to have been signed and to constitute an original when printed from electronic files or records established and maintained by Licensor in the normal course of business, and (ii) Licensee will not contest the validity, enforceability or admissibility of any such reports or other communications, if introduced as evidence on paper in any judicial or arbitration proceedings.

### 5.9 <u>Maintenance and Repair; Capital Improvements</u>.

5.9.1 <u>Maintenance and Repair; Routine Capital Improvements</u>. Licensee at its expense shall perform all ordinary maintenance and repair, and make such Routine Capital Improvements and Building Capital Improvements, as necessary or advisable to (i) keep the Hotel in good working order and condition and in compliance with the Standards and Policies, and (ii) comply with, and cure or prevent the violation of, any Applicable Laws.

5.9.2 <u>Discretionary Capital Improvements</u>. Licensee shall not make any ROI Capital Improvements without the prior written consent of Licensor, in its sole and absolute discretion, in each instance.

5.9.3 <u>Renovations.</u> At any time in the 12 months after the 5th, 10th and 15th anniversaries of the Opening Date, Licensor shall have the right to require Licensee to make renovations to the Hotel to conform the Hotel's building trade dress, décor, FF&E, and improvements to then-current Standards and Policies and Brand design criteria ("Renovations"). Licensee, within 60 days after the 5th, 10th and 15th anniversaries of the Opening Date, shall submit to Licensor Licensee's proposed Renovation Plan for approval by Licensor, in accordance with Section 5.9.3, prior to commencing the Renovations. If the submitted plan is insufficient, Licensee shall make such modifications as are necessary to obtain Licensor's approval of the Renovation Plan, and, if approval has not been obtained by 120 days after each respective anniversary of the Opening Date, Licensor may prepare a PIP for the Hotel. Licensee shall promptly commence the approved Renovation Plan or PIP, as applicable, and complete same at its expense within the times provided in the approved Renovation Plan or PIP, as applicable. Licensee shall pay to Licensor at the time of each PIP under Section 5.9.3 a PIP fee of $6,500 (a "PIP Fee") for preparing the PIP and verifying completion of the work upon completion.

5.9.4 <u>Reserve Fund</u>. Licensee shall establish the Reserve Fund at an independent national or state chartered bank. By the 10th day of each month during the Term, starting with the month after the Opening Date, Licensee shall make the Reserve Fund Contribution for the immediately preceding month. Notwithstanding the foregoing, if Licensee's lender requires the establishment of a reserve in an amount no less than the Reserve Fund Contribution at any time to be used for substantially the same uses as provided in Section 5.9.5, then the lender's reserve shall satisfy the Licensee's obligations in this Section 5.9.4, provided the lender's reserve is funded at least annually as required and for as long as it is in effect. All interest earned in the Reserve Fund shall be added to the Reserve Fund, but shall not be credited against amounts required to be deposited in the Reserve Fund. At the end of each fiscal year, all amounts not expended from the Reserve Fund shall be carried forward to the next fiscal year, but shall not be credited against the amount of the Reserve Fund Contribution for any subsequent fiscal year.

10

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

SHRW 00015

Licensee acknowledges that setting aside the required amount of funds in the Reserve Fund does not guaranty that the Reserve Fund will supply sufficient funds to meet Licensee's obligations under this Agreement, and that Licensee shall remain responsible for providing any additional funds required to perform its obligations under this Section 5.9.

5.9.5    Use of Reserve Fund. Licensee shall use the Reserve Fund only for Routine Capital Improvements and Renovations pursuant to Section 5.9.3. Licensee must spend the funds in the Reserve Fund for these purposes and shall not accumulate funds in the Reserve Fund when Routine Capital Improvements or Renovations are required to be made under this Agreement. The Reserve Fund shall not be used for Conversion or any Building Capital Improvements or ROI Capital Improvements.

5.9.6    Remediation of Design or Construction Defect. If the design or construction of the Hotel is defective, and the defective condition causes or poses a risk of injury to persons or damage to the Hotel or other property, or results in non-compliance with any Standards and Policies or Applicable Law, then Licensee at its expense shall remedy such defect as expeditiously as possible. Licensee's obligation to proceed expeditiously shall apply regardless of whether or when insurance proceeds may be available to cover the necessary expenditures. Licensee shall not use funds in the Reserve Fund in remedying such defects, without Licensor's prior written consent.

5.9.7    Capital Budget. By December 10th of each year, Licensee shall prepare and submit to Licensor for its review and approval, (i) a written budget of the estimated expenditures necessary during the next calendar year from the Reserve Fund, and any other Routine Capital Improvements, Building Capital Improvements or ROI Capital Improvements required or permitted under this Agreement to be made during such calendar year, and (ii) written plans for the next five years with reasonably sufficient detail that (A) address Hotel modernization, replacements and renewals of FF&E and other capital assets of the Hotel required to comply with the Standards and Policies and Manuals, and (B) identify the source of funding for such capital expenditures.

5.10    Purchasing by Licensee; Approved Suppliers.

5.10.1    Specifications and Standards for Purchasing. Except as provided in Section 5.10.2,

5.10.1 Specifications and Standards for Purchasing. Except as provided in Section 5.10.2, Licensee may purchase all FF&E and Supplies from any supplier, provided such FF&E and Supplies conform to the specifications and standards set by Licensor for such FF&E and Supplies. If Licensee proposes to purchase any FF&E and Supplies not previously approved by Licensor as meeting its specifications and standards in any, Licensee may not make such purchase unless Licensor approves the request in writing. Licensee at its expense must submit a reasonable quantity (as determined by Licensor) of samples of the FF&E and Supplies to Licensor (which will not be returned) as part of its request, and provide all other information about the FF&E and Supplies that Licensor may request. Licensor may charge Licensee or the supplier for the costs of Licensor's evaluation.

5.10.2 Approved Suppliers. Licensor reserves the right to require Licensee to purchase any or all FF&E and Supplies solely from Approved Suppliers. If Licensor requires that such Supplies be purchased only from Approved Suppliers or pursuant to a Placement Program, Licensee may request in writing to purchase any items from an alternative supplier on previously unapproved items, and shall provide all information about the supplier and the items that Licensor may request to evaluate the supplier's continuing ability to meet Licensor's specifications and standards for such FF&E and Supplies, and the supplier's quality controls and capacity to supply Licensee's needs promptly and reliably. Licensor may charge Licensee or the supplier for the costs of Licensor's evaluation. Licensor has the right to approve or disapprove any proposed supplier and may approve a supplier conditionally. If Licensor disapproves a supplier that previously was an Approved Supplier, Licensee may not, after receipt of notice of disapproval, reorder from such supplier. Licensor may impose limits on the number of Approved Suppliers.

5.10.3 Designation of Approved Suppliers. In designating an Approved Supplier, Licensor shall use reasonable efforts to ensure the prices and terms of the FF&E and Supplies to be purchased under such supplier contracts are competitive with the prices and terms of goods and services of equal quality available from other suppliers. In making such determination, the prices and terms for the FF&E and Supplies will be compared to the prices and terms which would be charged by reputable and qualified unrelated third parties on an arm's length basis for similar FF&E and Supplies sold to similar companies in the hospitality industry, and may be grouped in

11

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00016

reasonable categories (such as weighted market baskets), rather than being compared item by item. Subject to this Section 5.10.3 and Section 5.10.4, Licensee acknowledges and agrees that (i) Licensor and/or its Affiliates may receive payments, fees, commissions or reimbursements from suppliers and third parties in respect of such purchases, (ii) Licensor and/or its Affiliates may own or have investments in such suppliers, and (iii) Licensor may profit from Licensee's purchases from Approved Suppliers. Licensor reserves the right to offer FF&E and Supplies for sale to licensees and other Persons and to designate itself and/or any of its Affiliates an Approved Supplier or sole Approved Supplier for any FF&E and Supplies.

5.10.4 <u>Purchasing Program</u>. Licensor or its Affiliates may make purchasing program(s) available to Licensee (whether on a national, regional or other basis), and Licensee agrees that Licensor and its Affiliates shall have the right to (i) modify the fees, costs or terms of any such purchasing program, including adding any FF&E and Supplies to, and deleting any FF&E and Supplies from, such purchasing program, (ii) terminate all or any portion of any such purchasing program, from time to time, upon 60 days notice to Licensee, and (iii) charge a fee for participation in the purchasing program, which may include a profit to Licensor.

5.10.5 <u>Placement Program</u>. In furtherance of Licensor's Placement Rights, Licensor reserves the right to require Licensee to purchase certain FF&E and Supplies from a designated vendor or supplier pursuant to a Placement Program, provided that Licensor shall use reasonable efforts to ensure the prices and terms of the FF&E and Supplies to be purchased under such Placement Program are comparable to the prices and terms for similarly situated Brand hotels.

5.11 <u>Guest Relations</u>. Licensee shall respond promptly to guest complaints and shall take such other steps, including the payment of any System Programs and Services Charges related to guest relations, as may be required to insure positive guest relations.

5.12 <u>Inspections by Licensor</u>. Licensee hereby grants to Licensor and its inspectors the right to enter the Hotel, without notice, at any time to conduct inspections of the Hotel, its Operations, its Technology, its books and records (including its computers and electronic storage media), and all leased and concession areas of the Hotel, if any, to ensure compliance with the Standards and Policies and the performance of Licensee's other obligations under this Agreement. Licensee shall provide such assistance as may be requested by Licensor's inspectors to

under this Agreement. Licensee shall provide such assistance as may be requested by Licensor's inspectors to facilitate such inspections. Licensee acknowledges that Licensor may use Corporate Personnel or retain a third-party inspection service to perform any of Licensor's inspections. If Licensor makes more than one quality assurance inspection in any 12 month period because of Licensee's failure to comply with the Standards and Policies, or failure to obtain a passing or acceptable inspection score or to verify that corrections have been made to failures noted in an inspection, Licensee shall reimburse Licensor for its actual costs for such additional inspections. Licensee shall provide complimentary lodging and reasonable food and beverage to Licensor's inspectors for all inspections. Licensee at its expense shall immediately take such actions as may be necessary to correct any deficiencies detected during such an inspection. Licensor shall have the right to publish or disclose the results of quality assurance inspections to other hotels in the System.

### 5.13 **Personnel**.

5.13.1 **Employees**. Except for Licensor's right to approve the Hotel's general manager, Licensee acknowledges and agrees that Licensor does not exercise any input, direction or control over the employment policies or employment decisions of Licensee whatsoever. Licensee shall be solely responsible for all employment decisions, regardless whether Licensee received advice with respect thereto by Licensor.

5.13.2 **General Manager**. From and after the Opening Date, Licensee (or Licensee's management company) shall employ at the Hotel at least one Individual who acts as the general manager who (i) is principally responsible for the Operation of the Hotel on a full-time basis, (ii) has attended and satisfactorily completed such training, retraining or refresher training program(s) as Licensor may require for general managers, at such times and places as Licensor may designate, and (iii) has been interviewed and approved by Licensor to manage the Hotel. Licensee shall pay all costs for its general manager's training. Licensor shall have the right to communicate directly with the general manager and executive personnel at the Hotel regarding the Operation of the Hotel.

12

Element 03/2007
L:\03 - Applications\element II. Chicago O'Hare\Contract\License Agreement\2007 06 19 element License Agreement 2007 Chicago O'Hare.doc

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00017

5.13.3 <u>Uniforms and Training of Personnel</u>. From and after the Opening Date, the Hotel shall be managed and staffed by personnel who have met Licensor's training requirements and who perform their functions in uniforms complying with Standards and Policies. Licensee's managerial personnel and staff shall complete, to Licensor's reasonable satisfaction, training programs that Licensor may designate as mandatory, and Licensee shall pay tuition and other training costs to Licensor or its designee teaching the training program. Licensee shall pay all expenses of training incurred by the personnel receiving such training, including cost of travel, room, board and wages of such personnel. In addition, Licensee at its expense shall conduct such training for personnel working at the Hotel as Licensor may require so at all times during the Term the Hotel shall be staffed by qualified and trained personnel.

5.13.4 <u>Conventions and Conferences</u>. Licensee may participate in global, national or regional conventions or conferences made available by Licensor for licensees of Brand hotels. Licensor, in its sole and absolute discretion, may impose a mandatory prorated charge on Licensee to cover the costs of such conventions or conferences, regardless of attendance by Licensee.

5.13.5 <u>Corporate Personnel</u>. All Corporate Personnel who travel to the Hotel to perform technical assistance or other services shall be permitted to stay at the Hotel and use its facilities (including food and beverage consumption), without charge to Licensor or such Corporate Personnel. All Corporate Personnel and other personnel of Starwood or any of its Affiliates shall be permitted to stay at the Hotel for business or non-business purposes at reduced rates in accordance with policies with respect to such stays in effect from time to time which are applicable to the Brand hotels.

5.14 <u>Taxes and Indebtedness</u>.

5.14.1 <u>Taxes</u>. Licensee shall promptly pay when due any and all federal, state and local taxes, assessments, duties, levies or charges imposed by any Governmental Authority, including all income, franchise, employment, sales, use, occupancy, value added and excise taxes, imposed with respect to business conducted, personnel employed, or products, materials, goods or services provided, used or licensed in the Operation of the Hotel. Licensor shall have no liability for any such taxes, assessments, duties, levies or charges. In the event of a bona fide dispute as to Licensee's liability for any such taxes, assessments, duties, levies or charges, Licensee may

bona fide dispute as to Licensee's liability for any such taxes, assessments, duties, levies or charges, Licensee may contest such liability in accordance with Applicable Law, provided, however, that in no event shall Licensee permit a tax sale seizure or attachment to occur against the Hotel or any of its assets.

5.14.2 **Debts.** Licensee agrees to accept full and sole responsibility for any and all debts, liabilities and obligations incurred in the Operation of the Hotel, including all accounts payable and leases and other agreements entered into for the Hotel, and Licensor shall have no liability therefor.

5.15 **Supplemental Assistance.** Subject to availability, Licensor may provide Licensee assistance at the Hotel, in addition to any other Licensor assistance provided under the Agreement, if (i) Licensee requests supplemental assistance from Licensor, or (ii) if Licensee is not meeting System requirements and Licensor deems Licensee requires such supplemental assistance; provided, however, that Licensor shall not provide legal counsel or advice as part of such service or otherwise. Licensee shall pay Licensor its then-current fees and charges for such assistance, which may include a per diem for Licensor's employees and reimbursement of reasonable expenses incurred by Licensor in connection with the assistance.

5.16 **Operation by Management Company.** Unless Licensor has approved Licensee to manage the Hotel, which will be indicated on Exhibit A if approved, Licensee shall retain a management company approved in writing by Licensor to manage the Hotel under a management agreement and, provided that (i) Licensee is in no way relieved or otherwise released from any of its obligations under this Agreement, (ii) if such management agreement conflicts with the terms of this Agreement, the terms of this Agreement shall control, (iii) Licensor approves the management company and the Hotel's general manager and any such operation with respect thereto, and (iv) Licensee and the management company duly execute and deliver to Licensor the Management Consent Letter in Exhibit D as a condition of Licensor's approval. If the management company does not Operate the Hotel in compliance with this Agreement, Licensor shall have the right to revoke its approval, and, as required by Licensor which may include conditions, require Licensee to Operate the Hotel directly or by using another Person approved by Licensor. If, after Licensor approves an independent, management company a Transfer of Control occurs with

13

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00018

respect to such management company, such Transfer of Control shall be deemed Licensee's employment of a new independent and Licensee must obtain Licensor's approval of such new management company on or before the date the Transfer of Control occurs. Licensor may refuse to approve any proposed, Hotel general manager, management company that (A) Licensor deems not to be financially capable or responsible, or Licensor, in its sole and absolute discretion, deems to be inexperienced or unqualified in managerial skills or operational capacity or capability or is otherwise unable to adhere fully to the operational obligations and requirements of this Agreement, (B) does not provide Licensor with all information that Licensor may reasonably request in order to reach such decision, (C) Licensor, in its sole and absolute discretion, determines might compromise the System, or (D) Licensor, in its sole and absolute discretion, deems is a Competitor.

## ARTICLE 6
## CONSTRUCTION OF HOTEL

6.1 **Design and Construction Criteria.** Licensor shall provide to Licensee a set of prototypical design and specifications for the development of a Hotel under the Brand. Licensee acknowledges and agrees that such documents and specifications shall not contain the requirements for any federal, state or local law, code or regulation, nor shall such plans contain the requirements of, or be used for, construction drawings or other documentation necessary to obtain Approvals to build the Hotel, nor shall they be adapted to any particular site or elevation. Licensee is fully responsible for developing its own architectural plans, drawings, engineering reports and other materials necessary to build, equip, obtain Approvals for, and Operate the Hotel, subject to the review and approval of Licensor, which review shall be solely for the purpose of ensuring compliance with the Licensor's Standards and Policies.

6.2 **Pre-Construction Obligations.**

Before commencing any construction (which shall mean the first to occur of excavation, poured footings, foundation, or finished building slab) of the Hotel, Licensee shall, at its expense:

6.2.1 **Site Selection.** Have selected and acquired a proposed site for the operation of the Hotel which shall comply with such site criteria as Licensor may prescribe.

which shall comply with such site criteria as Licensee may prescribe.

6.2.2    Submission of Plans to Licensor. Submit to Licensor for its approval as complying with Standards and Policies and the Manuals, all plans adapting the Brand Prototypical plans to your site, local conditions and codes, and with any proposed other changes, prepared by professionals acceptable to Licensor and final plans and specifications (including all approved changes and modifications). Such plans shall at a minimum include (i) a Conceptual Site Plan, (ii) Design Development Plans and (iii) Construction Plans, and in each case all necessary and supporting documents and other information. Two sets of the Construction Plans must be sent to Licensor for approval. If approved, one of the sets will be returned to Licensee stamped "APPROVED FOR COMPLIANCE WITH LICENSOR STANDARDS." An identical set must be retained at the job site. Licensee and its advisors are solely responsible for the plans, specifications and construction satisfying Applicable Laws and engineering and structural building requirements. All review of Licensee's Plans shall be conducted by Licensor at its headquarters or at such other location as Licensor shall determine in its sole and absolute discretion. Any request by Licensee for Licensor's representatives to attend meetings at the job site or any other location shall be considered on an individual basis and attendance shall be at Licensor's sole and absolute discretion. Licensee shall be responsible for the out of pocket costs of attending such meetings billed at one hundred twenty-five percent of cost, plus the hourly labor cost of such employee's time. Licensor's decision to not attend any such meeting shall in no way limit Licensor's rights to review and approve any and all plans and materials in accordance with the terms of this License Agreement.

6.2.3    Necessary Approvals. Licensee at its expense shall obtain all Approvals necessary to perform the work required for the construction prior to commencing such work, including construction permits, from all Governmental Authorities having jurisdiction over the Hotel and the business to be Operated therein, and maintain all such Approvals throughout the construction.

6.2.4    Lease. If Licensee does not own the Premises in fee simple, Licensee shall submit to Licensor a copy of any lease agreement for the Hotel or Premises, which is subject to approval by Licensor, and which shall (i) provide Licensee with the right to enter into this Agreement, (ii) provide Licensor the right to enter

14

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

SHRW 00019

the Hotel and the Premises to inspect the Premises and Hotel, to make any modification necessary to protect the Licensor IPR and exercise any other right of Licensor at the Premises under this Agreement, and (iii) be for a term which, with renewal options, if any, that may be exercised unilaterally by Licensee, is not less than the Term; and

6.2.5 <u>Insurance</u>. Licensee at its expense shall submit to Licensor evidence of insurance required under this Agreement prior to commencement of construction, and shall maintain such insurance throughout the construction.

6.2.6 <u>Financing</u>. Licensee shall submit to Licensor evidence of its complete financing program and all reasonable supporting materials, including copies of any financing commitments.

6.3 <u>Time for Completion</u>. Licensee shall begin construction, as defined in Section 6.2, on or before February 1, 2008 and diligently and continuously complete or arrange for the completion of the construction of the Hotel in accordance with the approved final plans and specifications and in compliance with Standards and Policies, the Manuals, and Applicable Law and Approvals, and open the Hotel to the public not later than the Anticipated Opening Date. Licensee shall secure for Licensor and its agents the right to inspect the construction at any reasonable time; shall correct, upon Licensor's request and at Licensee's expense, any deviation from the approved site layout and plan and final plans and specifications; and shall furnish to Licensor a copy of the certificate of completion from Licensee's architect that the Hotel was built in accordance with the approved final plans and specifications, and in compliance with the Americans With Disabilities Act and obtain Licensor's approval of the completed construction prior to opening all or any part of the Hotel for operation. Licensee acknowledges and agrees that Licensor's inspection will be limited to ensuring that the construction complies with the Standards and Policies and design and operational elements of the final plans and specifications, but shall not constitute an inspection for compliance with Applicable Laws, Approvals or any structural or engineering requirements or standards. In the event Licensee desires to obtain a 90 day extension of the time set forth in this Section 6.3 for the commencement or completion of construction, Licensee must make such request in writing to Licensor not later than 30 days prior to the time stated herein for such event setting forth the reason for such request and the status of the construction of the Hotel and such other information as Licensor shall require in order to be able to consider Licensee's request. Licensor may grant or deny any such request for extension in its sole and absolute discretion. If any such extension of time is granted, Licensee shall pay to Licensor a fee of $20,000 for the first 90 day extension

of either the commencement or completion date. If Licensee requests and is granted any subsequent 90 day extensions, the fee payable to Licensor shall be $40,000 for each subsequent extension.

### 6.4 Pre-Opening Activities.

6.4.1  Fees and Charges. Licensor or its Affiliates shall perform the activities described in this Section 6.4 (the "Pre-Opening Activities") prior to the Opening Date to assist Licensee in completing the construction and opening the hotel as a Brand hotel. Licensor shall not charge Licensee a fee for the Pre-Opening Activities (provided not more than 3 trips are required to the Hotel by Licensor's and its Affiliates designees prior to the Opening Date), but Licensee shall reimburse Licensor, its Affiliates and designees for the actual payroll and related employee benefits costs to Licensor, its Affiliates and designees for the personnel who perform the Pre-Opening Activities during such assignment, plus their travel costs and other direct out-of-pocket expenses in performing the Pre-Opening Activities. If more than 3 trips to the Hotel are required by representatives of Licensor, its Affiliates or designee prior to the Opening Date, Licensee shall pay Licensor (in addition to the reimbursements in the preceding sentence) a fee plus reasonable overhead expenses for all trips over 3. Licensee shall cooperate with Licensor and provide to Licensor all information and documents Licensor reasonably deems necessary to enable Licensor to perform the Pre-Opening Activities in a timely manner.

6.4.2  Licensor Review. Licensor shall review for compliance with the Standards and Policies and Manuals all design concepts, drawings and related documentation for the construction, equipping and furnishing of the Hotel and rooms before Licensee commences any construction. In the event Licensee's plans and specifications follow Licensor's prototypical plans, and utilize or follow Licensor's interior and exterior design guidelines for Guest Rooms, public areas, ancillary services and amenities, Licensor does not expect to charge an additional fee for Licensor's review of Licensee's plans. If, however, upon Licensor's review of Licensee's plans, Licensor determines that Licensee's proposed Hotel deviates substantially from Licensor's prototype plans, Licensor may at its discretion conduct a more extensive review, and may utilize or engage additional professionals to

15

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00020

determine whether the Hotel is expected to satisfy Licensor's Standards and Policies. If a more extensive review is conducted, Licensor may charge a Design Plan and Construction Review Fee for such additional services.

6.4.3    Pre-Opening Assistance. Licensor shall provide Licensee with a team, whose size and members Licensor will determine and select, to assist in Licensee's preparations for the Opening Date. Licensee shall allow the team members access to relevant Hotel personnel. The team members may spend such time at the Hotel as Licensor, in its sole and absolute discretion, deems appropriate to provide the assistance and to accomplish its inspections.

6.4.4    Initial Training. For a fee of $1,200 per trainee, Licensor shall provide initial orientation training for Licensee and the Hotel's general manager or other designee, and up to two additional Individuals at a location Licensor designates. This orientation will introduce Licensee to the System. Licensee shall pay the payroll and related employee benefits, travel costs and direct out-of-pocket expenses incurred for its trainees while in training.

6.4.5    Information Systems. Licensor shall provide information reasonably necessary to enable the Hotel to meet the Standards and Policies regarding connectivity, interface and operational performance of the telephone system and the software systems.

6.4.6    Life Safety Report. If the Hotel uses any part of an existing facility, Licensor shall have the right to obtain a Life Safety Report to determine what work Licensee must perform to alter, improve or repair the fire and life safety systems of the Hotel prior to the Opening Date in order to comply with the Standards and Policies and Manuals, and Licensee at its expense shall be required to complete all work in the Life Safety Report in accordance with the Standards and Policies and plans approved pursuant to Section 6.2.2.

6.4.7    Sales and Marketing Plan. Licensor shall review the sales and marketing plan developed by Licensee for the Hotel to enable Licensor to initiate those complementary sales and marketing activities that Licensor may deem appropriate. Licensee shall provide Licensor with a copy of the sales and marketing plan at least 90 days prior to the Opening Date to enable Licensor to perform such review.

### 6.5 **Hotel Opening.**

6.5.1 <u>Authorization to Open.</u> The Hotel shall be opened for business to the public after receipt of Licensor's written authorization to do so, which authorization must be requested by Licensee in writing at least 15 days in advance of the date Licensee desires to open the Hotel for business.

6.5.2 <u>Conditions to Opening.</u> Licensee may not open the Hotel for business using any part of the System, until each of the following conditions has been satisfied or, if a condition is not satisfied, Licensor determines in writing that Licensee's failure to satisfy the condition will not interfere with the occupancy and use of the Hotel in accordance with the Manuals and the Standards and Policies. If Licensee opens any part of the Hotel prior to satisfying each of these conditions, Licensee shall pay to Licensor on demand $5,000.00 per day for each day the Hotel is open, without prejudice to Licensor's right to terminate this Agreement or pursue any other rights or remedies as a result of such breach.

(a) Licensee's architects have issued a certificate to Licensor to the effect that the Hotel has been completed substantially in accordance with the final plans and specifications and Life Safety Report, if any;

(b) Licensee has obtained from the Governmental Authorities all Approvals for the legal use, occupancy, and Operation of the Hotel, including a certificate of occupancy;

(c) Licensor has received all certificates of insurance and copies of insurance policies required under this Agreement;

16

Element 03/2007
L:\03 - Applications\element IL Chicago O'Hare\Contract\License Agreement\2007 06 19 element License Agreement 2007 Chicago O'Hare.doc

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00021

(d)     Licensee has demonstrated to Licensor that all Hotel building systems and Technology are fully functional and ready for use in accordance with the Manuals, the Standards and Policies, the System Programs and Services, the final plans and specifications and the Life Safety Report (as the case may be);

(e)     Licensor has approved the Hotel's general manager and Licensee and the Hotel managerial personnel and staff have received sufficient training, and demonstrate sufficient competence, to permit Operation of the Hotel in accordance with the Manuals and the Standards and Policies, including (i) training in the use and operation of all Hotel equipment and systems, including the System Programs and Services, (ii) training in operational procedures and policies, and (iii) a minimum of one week's training for the staff who will have direct contact with Hotel guests, including front desk personnel;

(f)     Sufficient time has elapsed after construction of the service and administrative areas of the Hotel to allow these areas to be adequately prepared for Operation in accordance with the Manuals and the Standards and Policies;

(g)     The following facilities are completed, tested, furnished, fully functional, and ready for occupancy in accordance with the Manuals, the Standards and Policies, the final plans and specifications and Life Safety Report (as the case may be):

(i)     100% of all Guest Rooms of various types; and

(ii)    all public areas of the Hotel, including (A) Hotel front entry (including auto and pedestrian entrances and lobbies), restrooms, meeting rooms, ballrooms, restaurants, lounges and hospitality suites; (B) all exterior building work (including roads, parking areas, landscaping, recreational facilities, signage and lighting); (C) all elevators and escalators; and (D) all mechanical, electronic, electrical and plumbing systems, including fire and life safety systems.

(h)     If less than all of the work for the construction (including the Guest Rooms and meeting rooms) has been completed by the Opening Date, then Licensee has submitted, and Licensor has consented to a schedule describing how and by when the completion of such work will be accomplished after the Opening Date

to, a plan describing how and by when the completion of such work will be accomplished have ... [ ... ] ... without disturbance to guests;

      (i)    Licensee has installed all FF&E and Signage in accordance with Sections 6.6 and 6.7, respectively;

      (j)    Licensee has obtained and installed all Technology to Operate the Hotel in accordance with System requirements;

      (k)    Licensee has obtained all Supplies for the Hotel before the Opening Date as required by the Manuals;

      (l)    Licensee has executed and delivered to Licensor the Life Safety Certification in Exhibit E and the certificate of completion from Licensee's architect provided for in Section 6.2; and

      (m)    Licensor in it sole and absolute discretion determines that the construction has been satisfactorily and properly completed in accordance with the final plans and specifications approved by Licensor pursuant to Section 6.2.2, the Life Safety Report, the Standards and Policies and Manuals.

      6.5.3    <u>Confirmation of Opening Date</u>. Upon opening the Hotel for business under the Brand, Licensor and Licensee shall execute the Opening Date Confirmation in Exhibit F, to confirm the Opening Date and Expiration Date under this Agreement.

      6.6    **FF&E**. Licensee at its expense shall acquire and install all FF&E required for the construction. All FF&E for the Hotel selected by Licensee must meet the Standards and Policies, Manuals and other standards and specifications of Licensor, and be approved by Licensor prior to purchase and installation. If after Licensor has

17

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00022

approved the FF&E, the requirements in the Standards and Policies, Manuals or other standards and specifications change for such FF&E, the FF&E approved by Licensor may be installed at the Hotel by Licensee as part of the construction provided such FF&E has previously been ordered and cannot reasonably be changed by Licensee without incurring more than a small change charge by the supplier. If such FF&E has not been ordered or can be reasonably changed, Licensee shall change the FF&E to the then-current FF&E.

      6.7    **Signage.** Subject to compliance with Applicable Laws, Licensee at its expense shall acquire and install adequate signage to properly identify the Hotel from all directions. All signage must meet the Standards and Policies, Manuals and other standards and specifications of Licensor, and Licensee shall submit shop drawings for Licensor's review and approval prior to purchase and installation.

## ARTICLE 7
### INTELLECTUAL PROPERTY RIGHTS

      7.1    **Use of Licensed Marks by Licensee.** Licensee agrees to (i) Operate the Hotel only under the Licensed Marks expressly permitted to be used by Licensee under this Agreement and solely in the manner prescribed and approved by Licensor, and (ii) not to use any of the Licensed Marks or any marks, names, indicia, or Identifiers that are or may be confusingly similar to the Licensed Marks in Licensee's corporate or business name, or in any other manner not expressly authorized by Licensor. Notwithstanding the foregoing, Licensee may use the Licensed Marks prior to the Opening Date only after obtaining Licensor's prior written approval and as expressly permitted by the Manuals. Licensee shall file and maintain all required fictitious or similar name registrations and take such other actions as Licensor may reasonably request to protect the Licensed Marks and their enforceability. Licensee acknowledges and agrees its rights to use the Licensed Marks are non-exclusive, and Licensor has the right to grant licenses to others to use all or any aspect of the Licensed Marks and the System. Licensee will not display, publicize or otherwise use the Licensed Marks with regard to graphics, content (other than pricing), appearance, style and composition, except as expressly prescribed in the Standards and Policies or otherwise approved by Licensor in writing.

      7.2    **New or Modified Licensed Marks.** Notwithstanding anything to the contrary in this Agreement,

Licensor may designate one or more new, modified or replacement Licensed Marks, without Licensee's consent, including, without limitation, to reflect changes in the Brand identification or as may be necessary to comply with local license variants, settlement agreements or Applicable Laws, and may require Licensee to use any such Licensed Marks and/or change the name of the Hotel to conform to such new, modified or replacement Licensed Marks. Licensee shall pay all expenses associated with Licensee's use of any such new, modified or replacement Licensed Marks. Neither Licensor nor any of its Affiliates shall have any liability or obligation whatsoever with respect to any new, modified or replacement Licensed Mark, or the promotion thereof, other than as provided in Section 7.5.

7.3     **Acknowledgment of Rights.** Licensee acknowledges the rights of Licensor and its Affiliates (including Starwood) in and to the System (including the Licensed Marks and Reservation System) and all Intellectual Property Rights therein or arising therefrom (collectively, the "Licensor IPR") and agrees that (i) Licensee has not acquired, and that Licensee will not represent in any manner that Licensee has acquired, in any manner any ownership rights in the System or any component of the System or the Licensor IPR, (ii) Licensor may use and grant to others the right to use the System or Licensor IPR or any component of the System or the Licensor IPR, except as expressly provided otherwise in this Agreement, (iii) the requirements and limitations with respect to Licensee's use of the System under this Agreement and the Licensor IPR apply to all forms and formats, including print, video, electronic and other media and all other identifications and elements used in commerce, (iv) all the Licensor IPR (including the Licensed Marks), all components of the System, and all associated goodwill, are the property of Licensor and its Affiliates (including Starwood) and shall inure directly and exclusively to the benefit of Licensor and its Affiliates, and (v) upon the expiration or termination of this Agreement for any reason, no monetary amount shall be attributable to any goodwill associated with Licensee's use of the System or any Licensor IPR (including the Licensed Marks). In furtherance of the foregoing, Licensee agrees to (A) not use the Licensor IPR to perform any activity or to incur any obligation or indebtedness in such a manner as may, in any way, subject Licensor to liability, (B) observe all Applicable Laws with respect to the registration of trade names and assumed or fictitious names, (C) include in any such registration application a statement that Licensee's use of the Licensor IPR (including the Licensed Marks) and other components of the System is limited by the terms of this Agreement, and

18

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

SHRW 00023

immediately to provide Licensor with a copy of any such application and other registration document(s), and (D) observe such requirements with respect to trademark and service mark registrations and copyright notices as Licensor may require from time to time. Licensee further acknowledges that this Agreement does not give Licensee or the Hotel the right to sell, or to grant the right to lessees or concessionaires of space in the Hotel or others to sell, products bearing the Licensed Marks, and Licensee agrees not to sell, and to prevent any sales of, such products at the Hotel, unless Licensor authorizes the sales under a separate written trademark license agreement. Licensee shall not use the Licensed Marks on products or services obtained from any source other than Licensor or sources approved in writing by Licensor, except for products prepared or produced by Licensee pursuant to the Standards and Policies.

7.4    **Infringement**. Licensee agrees that Licensee shall not, directly or indirectly, infringe the Licensor IPR, or contest or aid others in contesting the validity or ownership and right to use the Licensor IPR, or take any other action in derogation of the Licensor IPR. Licensee shall promptly advise Licensor in writing of (i) any objections, demands, controversies, allegations or actions, involving the Licensor IPR (including the Licensed Marks), of which Licensee or its Affiliates or agents has knowledge that have been asserted by any third party against Licensee or any of its Affiliates or agents, and (ii) any potentially infringing or unauthorized uses of the Licensor IPR (including the Licensed Marks) by third parties of which Licensee has knowledge. Licensee shall assist Licensor in taking action as Licensor may request to stop such activities, but shall take no action nor incur any expenses on Licensor's behalf without Licensor's prior written approval. Licensor shall have the right to select legal counsel and shall have sole control over the protection, defense and registration of the Licensor IPR, including any objection, allegation, controversy, litigation, administrative proceeding, prosecution, negotiation and settlement with respect to the Licensor IPR. Licensee shall execute any and all documents and take or not take such other actions as may, in the opinion of Licensor's legal counsel, be reasonably necessary to carry out any such protection, defense or registration. Licensor shall reimburse Licensee for its actual out-of-pocket payments of money, including those with respect to taxes, reasonable expenses, including reasonable attorney's fees, court costs, deposition expenses and reasonable travel and living expenses it may incur in taking any such actions. Licensor shall retain all recovery from an infringement action. This Section 7.4 shall survive the expiration or termination of this Agreement.

7.5    **Legal Actions**. Licensor, at its sole and absolute discretion, shall have the right to prosecute, defend and/or settle any litigation or other legal action or proceeding arising out of Licensee's use of any Licensed

Mark, and if Licensor undertakes to prosecute, defend and/or settle any such matter, Licensor shall have no obligation to indemnify or reimburse Licensee for any fees or disbursements of any legal counsel retained by Licensee.

7.6     **Improvements to System**. All improvements to the System or any component of the System whether functional, design, or conceptual in nature that are developed or suggested by Licensee, any of its Affiliates, its agents, or any third party acting on its behalf (the "System Improvements") and all Intellectual Property Rights therein or arising therefrom are hereby irrevocably assigned by Licensee to Licensor and upon creation shall be and become the exclusive property of Licensor, and neither Licensee nor any of its Affiliates shall have any ownership rights in any System Improvements and all Intellectual Property Rights therein or arising therefrom. Licensor may incorporate any such System Improvements into the System and shall have the exclusive right to all Intellectual Property Rights (including patent, copyright, and industrial design rights) in and to the System Improvements, and to register and protect such System Improvements in Licensor's own name to the exclusion of Licensee, who shall have no rights to use such System Improvements except as specifically granted to Licensee under this Agreement. Licensee agrees to execute whatever assignment or other documents Licensor may request to evidence its ownership or to assist Licensor in securing Intellectual Property Rights to the System Improvements.

7.7     **Survival**. Section 7.3 through Section 7.7 shall survive the expiration or any termination of this Agreement.

### ARTICLE 8
### CONFIDENTIAL INFORMATION; MANUALS

8.1     **Confidential Information**. Licensee acknowledges that Licensor will provide certain Confidential Information to Licensee solely for its use in the Operation of the Hotel, and that such Confidential Information is proprietary to Licensor and its Affiliates, and includes trade secrets. Accordingly, during the Term

19

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of          SHRW 00024
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

and thereafter (i) Licensee shall not use the Confidential Information in any other business or capacity (Licensee acknowledges such use is an unfair method of competition), (ii) Licensee shall exert its best efforts to maintain the confidentiality of the Confidential Information, and not disclose any Confidential Information, except on a "need to know" basis to the Hotel personnel for the Operation of the Hotel, its legal counsel or its lenders or prospective lenders, (iii) Licensee may not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form, (iv) Licensee shall implement all reasonable procedures Licensor prescribes to prevent unauthorized use or disclosure of the Confidential Information, including the use of nondisclosure agreements with Licensee's shareholders, partners, members, trustees, beneficiaries, directors, officers, employees, agents and representatives, including legal counsel and advisors, and its lenders and investors, and deliver such agreements to Licensor, and (v) Licensee shall not make, and shall implement all reasonable procedures to prevent any of its shareholders, partners, members, trustees, beneficiaries, directors, officers, employees, agents and representatives from making, any public statements (including postings on websites) regarding Starwood's corporate or operating standards, policies or programs, financial performance or stock price. In furtherance of the foregoing, the restrictions on the use and disclosure of the Confidential Information shall apply to any officers, employees, agents, representatives of Licensee or any of its Affiliates who have primary responsibility for the management of hotels or other lodging products that are competitive with the Brand hotels. Notwithstanding the foregoing, the restrictions on disclosure and use of Confidential Information shall not apply (A) to information or techniques which are or become generally known in the lodging industry (other than through Licensee's own disclosure), provided Licensee obtains Licensor's prior written consent to such disclosure or use, or (B) to the extent such disclosure is required under Applicable Laws, including reporting requirements applicable to public companies. Licensee shall exert its best efforts to lawfully limit such disclosure, such as redaction of Confidential Information from publicly filed documents. Licensee acknowledges that the disclosure or unauthorized use of any Confidential Information will cause irreparable injury to Licensor and/or its Affiliates, for which monetary damages would not provide an adequate remedy. This Section 8.1 shall survive the expiration or termination of this Agreement.

8.2     **Public Statements.** The Parties shall cooperate with each other on all press releases and other public statements relating to the Hotel to be developed and Operated by Licensee hereunder, and neither Party shall issue any press release or other public statement relating thereto without the prior written approval of the other Party, except for any public statement required by Applicable Law. With respect to any public statement required under Applicable Law, the issuing Party shall provide the other Party with a reasonable opportunity to review and

under Applicable Law, the issuing Party shall provide the Other Party with a copy of the proposed statement and the opportunity to comment upon any such statement prior to its issuance.

Case: 1:13-cv-00982 Document #: 10 Filed: 02/06/13 Page 214 of 225 PageID #:401

8.3 **Manuals.**

      8.3.1 <u>Maintain Current Manuals</u>. Licensor reserves the right to provide the Manuals in hard copy, electronic or such other form as it may select, and charge a reasonable fee for lending the Manuals or making the Manuals available to Licensee. Licensee at its expense shall have the necessary equipment at the Hotel to receive and use the Manuals in their various forms. Licensee shall insure that Licensee's copy of each of the Manuals that Licensor has loaned or made available to Licensee is kept current and up to date, and a copy in the form provided by Licensor is maintained at the Hotel. In the event of any dispute as to the contents of the Manuals, the contents of the master copy of the Manuals maintained by Licensor at its office shall control.

      8.3.2 <u>Modification of Manuals</u>. Licensee acknowledges that the Manuals are an integral part of the System, and Licensor needs the flexibility to modify the System, including the Manuals, to respond to market trends, customer demands, economic conditions, technological advances and other factors affecting the System, as they may change from time to time. Accordingly, Licensee acknowledges and agrees that Licensor shall have the right to amend, modify, expand, delete or replace all or any portion of the Manuals from time to time, and Licensee agrees to comply with all mandatory requirements in the Manuals, as amended, modified, expanded, deleted or replaced, from time to time.

20

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00025

## ARTICLE 9
## MARKETING

### 9.1    Marketing and Sales Programs.

9.1.1    Marketing Program.    Licensee acknowledges that (i) the Marketing Program is intended to promote the goodwill and public image of the Brand hotels and customer loyalty to the Brand either as a separate brand or in conjunction with Other Starwood Brands and businesses, as contemplated by Section 2.2.4, and (ii) the Marketing Program constitutes a mandatory System Program and Service, subject to the provisions of Section 4.1, including Section 4.1.3. Licensor, Starwood or any of their Affiliates or designees shall have the exclusive right to maintain, govern and administer the Marketing Program, and to direct and determine all marketing, advertising, promotions, market research and public relations for the Brand hotels, including concepts, programs, materials and media and to use funds in the Marketing Program for such purposes as it deems appropriate, including expenditures for (A) television, radio, directories, pamphlets, newsprint, magazines, Internet and other electronic media and other forms of advertising, marketing or promotion, (B) technical and professional marketing advice and services, including media planning and buying services, (C) advertising commissions, (D) research and guest surveys, field marketing services, the Global Sales Organization, Global Preference Program, and (E) all other similar expenditures that Licensor deems advisable for the purpose of such marketing, advertising, promotion, market research and public relations, whether nationally, regionally or locally or for co-op advertising or promotional programs. Licensee acknowledges and agrees that the Marketing Program is intended to enhance general public recognition and acceptance of the Licensed Marks for the benefit of the Brand hotels, and that neither Licensor, Starwood, nor any of their Affiliates or designees, undertakes any obligation in administering the Marketing Program to insure that any licensee or hotel benefits directly or pro rata from the Marketing Program. Licensor reserves the right to terminate the Marketing Program, and in such event will use all remaining funds for the Marketing Program as contemplated by this Agreement.

9.1.2    Sales Program.    Licensee acknowledges that (i) the Sales Program solicits and sells group, corporate, transient, and leisure business under terms and conditions set by Licensor to promote Brand hotels and Other Starwood Brands and businesses, as contemplated by Section 2.2.2, and (ii) the Sales Program is one of the mandatory System Programs and Services, subject to the provisions of Section 4.1, including Section 4.1.3.

Licensor, Starwood or any of their Affiliates or designees shall have the exclusive right to maintain, govern and administer the Sales Program, including all concepts and expenditures of the Sales Program, including the Global Sales Organization and Global Preference Program. Licensee acknowledges and agrees that the Sales Program is intended to promote the Licensed Marks, Brand hotels and Other Starwood Brands and businesses, and that neither Licensor, Starwood, nor any of their Affiliates or designees, undertakes any obligation in administering the Sales Program to insure that any licensee or hotel benefits directly or pro rata from the Sales Program. Licensor reserves the right to combine or separate the Marketing Program and Sales Program or to terminate the Sales Program and in such event will use all remaining funds of the Sales Program as contemplated by this Agreement.

9.2     **SPG Program.** Licensee acknowledges that (i) the frequent guest and customer loyalty program of Licensor and its Affiliates seeks to promote the goodwill and public image of the Brand and Other Starwood Brands and businesses, and (ii) the SPG Program constitutes a mandatory System Program and Service, subject to the provisions of Section 4.1, including Section 4.1.3. Licensor, Starwood or any of their Affiliates or designees shall have the exclusive right to create, maintain and administer the SPG Program. Licensee acknowledges and agrees that the SPG Program is owned by Starwood and is intended to enhance general public recognition of the Licensed Marks and other marks for the benefit of Brand hotels and the Other Starwood Brand hotels, and neither Licensor, Starwood, nor any of their Affiliates or designees, undertakes any obligations in administering the SPG Program to insure that any licensee or hotel benefits directly or pro rata from the SPG Program. Licensor reserves the right to terminate the SPG Program and in such event will use all remaining funds in the SPG Program as contemplated by this Agreement. So long as the SPG Program is in effect, Licensee shall not create or participate in a similar program for itself nor participate in a similar program sponsored or administered by a third party unless required or permitted by the Standards and Policies.

9.3     **Administration of Marketing Program, Sales Program and SPG Program.** Licensor has the sole right to use the Program Fee, or any part of it, to pay for or defray the cost of the Marketing and Sales Programs. Such allocations, which may be modified by Licensor from time to time, are deemed to be a "Marketing

21

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of     SHRW 00026
Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

Fee" and Sales Fee, respectively. All Marketing Fees, Sales Fees and SPG Fees paid by Licensee pursuant to Section 3.2, or allocated by Licensor from the Program Fee, shall be part of the Marketing, Sales and SPG Programs, respectively, and deposited in accounts under the control of Licensor, Starwood or any of their respective Affiliates or designees; Licensor reserves the right to administer the Global Sales Organization and Global Preference Program as part of or separate from the Marketing Program and Fund. The Marketing Fee and SPG Fee (as well as GSO and Global Preference Program fees, if administered separately) shall be separately accounted for, with separate books and records, but may be commingled with Licensor's other funds or kept in a separate account. Licensor shall make available, upon request from Licensee, annual un-audited statements of contributions collected and expenses incurred for the Marketing Program, Sales Program, and the SPG Program. Licensor may elect to accumulate funds in the Marketing Program, Sales Program, and SPG Program for such periods of time as Licensor deems necessary or appropriate, with no obligation to expend all funds received in any fiscal year during such fiscal year. Licensor shall be entitled to all interest, if any, earned on funds in the Marketing Program, Sales Program and SPG Program. Licensor may advance monies to the Marketing Program, Sales Program and SPG Program and charge the Marketing Program, Sales Program and SPG Program interest on such advances at one percent above the prime rate then designated by a major bank selected by Licensor (or if no such rate is then so being designated, at such rate as reasonably determined by Licensor) and may authorize repayment of such advances from the Marketing Program, Sales Program and SPG Program, all in accordance with such terms as Licensor deems appropriate. Except as otherwise expressly provided in Article 9, Licensor assumes no direct or indirect liability or obligation with respect to the direction or administration of the Marketing Program, Sales Program or SPG Program (or GSO and Global Preference Program, if administered separately). Licensor does not act as trustee or in any other fiduciary capacity with respect to the Marketing Program, Sales Program or SPG Program (or GSO and Global Preference Program, if administered separately), and the Parties do not intend that the Marketing Program or SPG Program (or GSO and Global Preference Program, if administered separately) constitute a trust.

9.4 **Local Marketing**. Licensee, at its expense and in addition to the Marketing Fee, shall conduct local advertising, marketing, promotional and public relations programs and activities for the Hotel, subject to the terms of this Agreement, including the provisions regarding Licensee's use of the Licensed Marks. Without limiting the generality of the foregoing, Licensee, at its expense and in addition to the Marketing Fee, shall obtain and maintain (i) listings of the Hotel in appropriate directories, directory listing and any special promotional materials of the kind and size as Licensor and its Affiliates may require for Brand hotels, including such directories, listing and

materials that also feature Other Starwood Brand hotels and businesses, and (ii) listings (of the kind and size specified by Licensor) in appropriate classified telephone and trade directories that advertise the Brand's toll-free reservation number and website as the exclusive reservation number and website for the Hotel. In addition, Licensor may offer to Licensee from time to time, at Licensor's prices and terms, advertising and marketing materials, including newspaper mats, radio commercial tapes, merchandising materials, sales aids and special promotions materials, for use in Licensee's local advertising and marketing. Licensor shall have the right to require Licensee to submit to Licensor or its designee for review and approval (except with respect to prices charged), at least 10 days prior to use, samples of advertising and marketing materials, including paper, film, video, digital electronics and computerized materials or formats, to be used by Licensee in its local advertising and marketing that have not been provided or previously approved by Licensor.

9.5     **Internet Marketing**. Licensee may promote the Hotel through the Internet only in accordance with this Agreement, the Standards and Policies and all Applicable Laws.  Licensee shall not, without the prior written consent of Licensor, (i) bid on or purchase placement rights for any keywords or adwords that incorporate any of the Licensed Marks or anything confusingly similar thereto, or (ii) use any advertising method that creates or overlays links or banners on websites by using the Licensed Marks or anything confusingly similar thereto.  Any use of the Licensed Marks on the Internet shall inure to the benefit of Licensor pursuant to Article 7.

9.6     **Property Websites**. Licensee acknowledges and agrees that, if it creates a website, or has a website created on its behalf, to promote the Hotel (the "Property Website"), Licensee shall do so in accordance with this Agreement, the Standards and Policies (including all Brand website design standards), and all Applicable Laws.  Licensee agrees that the Property Website (i) shall not be operated under an Internet domain name or uniform resource locator (URL) that uses any of the Licensed Marks or anything confusingly similar thereto, without Licensor's written consent, (ii) shall not include content that infringes third party Intellectual Property Rights or is objectionable, abusive or otherwise inappropriate or illegal, (iii) shall have as its exclusive online booking functionality a hyperlink to one or more websites operated by Licensor or its Affiliates (including Starwood), (iv)

22

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of
Starwood Hotels and Resorts.  Please contact Therese Pritchard at (202) 508-6252
should any request be made for production of this document.

SHRW 00027

shall be hosted by a reputable service provider, (v) shall contain prominent terms of use that include Licensee's privacy policy and an express disclaimer of responsibility on the part of Licensor's and its Affiliates (including Starwood), (vi) shall not collect personal information without Licensor's approval and if approved, may only be used for marketing communications if scrubbed against Licensor's and its Affiliates (including Starwood's) central database to suppress individuals who have opted out of receiving communications, and (vii) shall not include metatags (information embedded in the website code) that incorporate any of the Licensed Marks or anything confusingly similar thereto without Licensor's written consent. If Licensee owns or has registered (or has had a third party do so on its behalf) any domain name or URL that uses any of the Licensed Marks or anything confusingly similar thereto, Licensee shall promptly assign such domain name or URL to Licensor (or an Affiliate thereof if so directed by Licensor).

9.7     **Guest Data**. Licensee shall not either during or after the Term use Guest Data (including in marketing programs) in a manner which violates the terms of this Agreement, any Applicable Law, contractual restrictions of Licensor or its Affiliates, or any privacy, spamming and security policies of Licensor or its Affiliates, as in effect from time to time. In addition, any use of Guest Data by Licensee shall signify Licensee's acceptance of the terms and conditions of Licensor's and its Affiliates' contact management and marketing programs and policies, as in effect from time to time. Licensee acknowledges and agrees that Licensor is subject to Starwood's information management policies as well as requirements set forth in various global data privacy programs, which may include for example the United States Department of Commerce Safe Harbor framework and the European Commission's Directive on Data Privacy. Among other things, Licensor is required under its information management policies and the global data privacy programs to destroy personally identifiable information about individuals, including information that is stored on Hotel related systems and databases housing Guest Data. Licensee may not create any copies of Guest Data without Licensor's prior written consent.

9.8     **Marketing Co-ops**. Licensee shall join, and remain a member in good standing of, such advertising and marketing cooperative groups as Licensor may require from time to time. Licensor shall have the right to establish rules of governance for all such advertising and marketing cooperative groups; provided however, that no such cooperative advertising or marketing programs shall require Licensee to adhere to any specific prices. The terms required for participation in any such advertising or marketing programs shall be as specified in the Manuals and the Standards and Policies, and may include requirements for Licensee to contribute funds to such

Manuals and the Standards and Policies, and may include cooperative groups which shall be in addition to the Program Fee and/or Marketing Fee.

9.9    **Promotion of Brand Hotels**. Licensee at the Hotel shall promote, in the manner set forth in the Manuals, the use of all other Brand hotels and Other Starwood Brand hotels, including displaying brochures for all such hotels. Neither Licensee nor any Person affiliated or associated with Licensee nor any of its Affiliates, nor the Hotel, shall (i) divert any business from the Hotel to any other facility, (ii) build or sell any condominium, timeshare, interval ownership or similar lodging product at or next to the Premises, or (iii) promote, market or advertise, at or in connection with the Operation of the Hotel, including by displays or sales materials at the Hotel, any (A) hotels, other than Brand hotels and Other Starwood Brand hotels, (B) time-share or interval ownership facilities, vacation club or other lodging or residence products, except at Licensor's request such lodging or residence products of Starwood or its Affiliates, or (C) any non-lodging business that would compete with any products or services offered by Licensor or any of its Affiliates or a Designated Brand Vendor pursuant to a Placement Program or would be in violation of Section 5.2. In furtherance of the foregoing, Licensee shall not (1) use any Guest Data or other Confidential Information in promoting, advertising or marketing any hotel, condominium, timeshare, interval ownership or other lodging product prohibited under this Section 9.9, nor (2) require guests or wholesalers to patronize, or to attend any sales presentations for, other hotels, timeshare, interval ownership, vacation clubs or other lodging products as a condition to Licensee's acceptance of reservations or other business at the Hotel.

9.10    **Opening Advertising**. In connection with the initial opening of the Hotel under the Brand, Licensee at its expense shall conduct an advertising and marketing campaign as submitted by Licensee and approved by Licensor.

9.11    **Content**. Licensor shall have the right to obtain, or at the request of Licensor, Licensee at its expense shall obtain and provide to Licensor photographs, descriptive content and other media, such as video and floor plans, of the Hotel (collectively, "Content") from time to time in accordance with the Standards and Policies

23

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00028

(including Licensor's specifications for Content). All Content used or submitted by Licensee to Licensor and any of its Affiliates (including Starwood) must be complete and accurate, Licensee must have all necessary rights thereto (including all necessary Intellectual Property Rights thereto), and for the purpose of reservations, such content must comply with the Reservation Data required under this Agreement. Licensee shall ensure that any such Content (including any Content obtained from a third party) includes unlimited and perpetual usage rights for the benefit of Licensor.

9.12    <u>Rates</u>. All rates and prices to be charged for Guest Rooms and services to be provided at the Hotel will be determined in compliance with Applicable Laws. Licensee shall communicate and state all rates and prices in compliance with Applicable Laws.

### ARTICLE 10
### STATEMENTS AND RECORDS

10.1    <u>Maintain Records</u>. Licensee will maintain at the Hotel accounting books and records for the Hotel's business in accordance with GAAP and the Uniform System, subject to this Agreement and accounting standards that Licensor may specify from time to time. Licensee shall maintain these records in chronological order and retain them for at least 5 years. The immediately preceding sentence shall survive the expiration or termination of this Agreement. Upon Licensor's request, Licensee shall compile and provide to Licensor any statistical or financial information regarding the Operation of the Hotel, the products and services sold by it, or data of a similar nature, as specified by Licensor in the Manuals, including any financial data that Licensor believes that it needs or elects to compile or disclose in connection with the sale of franchises. All data provided to Licensor under this Section 10.1 shall belong to Licensor and may be used and published by Licensor in connection with the System, provided that any such publication shall be in a form whereby the Hotel is not specifically identified, unless required under Applicable Law.

10.2    <u>Audits</u>. Licensor and its designated agents shall have the right, without notice, to examine, audit and photocopy the Hotel's business records, accounts, books and data at all reasonable times to insure that Licensee is complying with the terms of this Agreement. If such inspection discloses that the Gross Rooms Sales during any scheduled reporting period actually exceeded by 2% or more the amount of Gross Rooms Sales reported by

scheduled reporting period actually exceeded by 2% or more the amount of Gross Rooms Sales reported by Licensee, or if the audit reveals that the accounting procedures or records are insufficient to determine the accuracy of the amount reported, Licensee shall pay for the cost of such inspection and audit, and in all events Licensee shall pay immediately to Licensor any such deficiency with interest in accordance with Section 3.6. Licensee shall fully cooperate with Licensor and its designated agents in connection with any such audits.

10.3 **Gross Rooms Sales and Financial Reports**. Within 90 days following the end of Licensee's fiscal year, Licensee shall submit to Licensor a report certified by a certified public accountant showing Licensee's monthly Gross Rooms Sales for each month during the fiscal year. Licensee shall provide such other financial reports and statements as requested by Licensor or required by the Standards and Policies or Manuals.

10.4 **Gross Rooms Sales Estimates**. Licensee shall prepare and provide to Licensor, on or before the first day of each calendar quarter of each year, an estimate of Gross Rooms Sales for the Hotel and fees payable to Licensor under this Agreement for each of the next four quarters. Licensee also shall furnish to Licensor such other estimates at the time and in the manner Licensor reasonably requests.

10.5 **Ownership of Licensee**. Licensee shall maintain a current list of all of the Equity Owners and Parent Companies, if any, and the nature and amount of each Person's Ownership Interests. Licensee shall notify Licensor within 10 days if (i) any information in Exhibit A changes regarding Licensee, the Equity Owners or Parent Companies, if any, (ii) any of Licensee's general partners, managing members or managers cease to hold such interest, or executive officers or directors cease to serve in such capacity, (iii) any Person becomes a general partner, managing member or manager, or any Individual is elected an executive officer or director, of Licensee, (iv) the management company Operating the Hotel, or the general manager for the Hotel, changes. Licensee shall provide to Licensor such additional information as Licensor may request from time to time regarding the Equity Owners and Parent Companies, if any.

24

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00029

## ARTICLE 11
## ASSIGNMENTS AND TRANSFERS

11.1     **Transfers by Licensor**. This Agreement and any or all rights, duties and obligations of Licensor hereunder may be freely delegated, assigned or transferred by Licensor, in whole or in part, without Licensee's consent, to any Person, including a Competitor that assumes Licensor's duties under this Agreement. Licensee agrees that such delegation, assignment or transfer shall be a release and novation of Licensor with respect to any duties and obligations under this Agreement assumed by such Person. This Agreement shall be binding upon and inure to the benefit of Licensor's successors and assigns with respect to those rights, duties and obligations delegated, assigned or transferred, including any Person that acquires all or a portion of Licensor's capital stock or any Person resulting from or participating in an initial public offering, merger, consolidation, or reorganization in which Licensor is involved, and to which Licensor's rights, duties and obligations hereunder are delegated, assigned or transferred, in whole or in part.

11.2     **Transfers by Licensee.**

11.2.1   _Prohibited Transfers_. Licensee acknowledges that the rights and obligations of Licensee created by this Agreement are personal to Licensee and, if Licensee is an Entity, the Equity Owners and Parent Companies, if any, and that Licensor has granted this License in reliance on the individual or collective character, skill, aptitude and business and financial capacity of Licensee and, if Licensee is an Entity, the Equity Owners and Parent Companies, if any, and Guarantors, if any. Accordingly, except as expressly permitted under Section 11.2, Licensee and, if Licensee is an Entity, the Equity Owners and Parent Companies, if any, shall not make nor permit to be made any Transfer, and any such purported Transfer shall be null and void and shall constitute a default of this Agreement.

11.2.2   _Transfers Subject to Licensor's Approval_

(a)     Notwithstanding Section 11.2.1, as long as Licensee and its Affiliates are not in default under this Agreement or any other agreement with Licensor or any of its Affiliates, Licensee may request but

shall not effect or permit to be effected a Transfer, without the prior written approval of Licensor, which approval may be withheld by Licensor in its sole and absolute discretion.

(b)    If Licensee or any of the Equity Owners or Parent Companies intends to effect any Transfer, Licensee shall provide written notice to Licensor specifying in reasonable detail the nature of the Transfer, including an updated Exhibit A showing all of the Equity Owners and Parent Companies, if any, both prior to and after such proposed Transfer and the nature and extent of their respective Ownership Interests. Licensee also shall provide to Licensor all completed transfer forms, questionnaires and other documents and information (including proposed transfer and related documents) as Licensor may request. Licensee acknowledges that Licensor has legitimate reasons to evaluate the qualifications of potential transferees (and their owners), including financial capability and suitability as a licensee or holder of an Ownership Interest in Licensee and the effect on Licensor's compliance with Gaming Laws and Anti-Terrorism Laws. Accordingly, Licensee (i) agrees that Licensor's contact with proposed transferees (and their owners) or other Persons for the purpose of seeking information about a proposed transferee (and their owners) or to give the proposed transferee information concerning the Hotel, does not constitute improper, actionable or unlawful conduct, and (ii) expressly authorizes Licensor to investigate the qualifications of any proposed transferees and their owners, and analyze and communicate Licensor's views on the proposed purchase terms with the proposed transferee.

(c)    Licensor shall have the right to impose conditions on its approval of any proposed Transfer, including (i) the implementation of a new Property Improvement Plan for the Hotel, (ii) the transferee executing Licensor's then current standard form of license agreement and related documents (which may provide for different rights and obligations than provided under this Agreement), (iii) the transferor executing a general release of Licensor and other Persons in form and substance satisfactory to Licensor, (iv) the transferor executing a subordination agreement in form and substance satisfactory to Licensor, whereby the transferor agrees to subordinate any obligations from transferee to the obligations of transferee to Licensor, and (v) the payment to Licensor of all accrued fees and fee estimates through the transfer date. If Licensor approves the proposed Transfer,

25

Confidential treatment requested pursuant to FOIA by Bryan Cave LLP on behalf of Starwood Hotels and Resorts. Please contact Therese Pritchard at (202) 508-6252 should any request be made for production of this document.

SHRW 00030

as a condition of such approval, Licensee shall (i) pay $10,000 as an administrative fee to Licensor, and (ii) provide a copy of all fully executed documents effecting such Transfer.

(d)     Licensee, for itself and for the Equity Owners and Parent Companies, if any, acknowledges and agrees that Licensor's approval of any proposed Transfer shall not constitute (i) a representation, warranty or guaranty as to the fairness of the terms of the proposed Transfer, (ii) a release or waiver of any claims against Licensee or any of the Equity Owners or Parent Companies or Guarantors, if any, nor (iii) an approval of any subsequent Transfer, but shall apply only to the specific Transfer proposed in Licensee's notice to Licensor.

11.2.3  Permitted Transfers. Notwithstanding Section 11.2.1 or Section 11.2.2, as long as Licensee and its Affiliates are not in default under this Agreement or any other agreement with Licensor or any of its Affiliates, Licensor shall not withhold its approval with respect to the following Transfers:

(a)     Any Transfer of Ownership Interests that by itself or collectively with one or more related or unrelated Transfers or other transactions would not result in a Transfer of Control, provided that the proposed transferee (and its owners) in Licensor's judgment (i) is not a person of poor business or moral reputation or who would adversely affect Licensor's compliance with Gaming Laws and Anti-Terrorism Laws, and (ii) is not a Competitor; or

(b)     Transfers of Ownership Interests by a natural person (i) to members of that person's immediate family (spouse, children, parents, and siblings), or (ii) to a trust or trusts for the benefit of that person's immediate family, without in either case causing a Transfer of Control.

The provisions of Sections 11.2.2(b) and (d) shall be applicable to any Transfer under this Section 11.2.3.

11.2.4  Death or Incapacity. Upon the death or mental or physical incompetency (as reasonably determined by an independent third party such as a licensed doctor) of any Individual who is the Licensee or one of the Equity Owners, the executor, administrator or personal representative of such Individual shall transfer his or her interest in this Agreement, or his or her Ownership Interest, to a third party within 1 year after the death or finding