apply for a Hotel Indigo brand License Agreement, or is not approved for such a License Agreement in the exercise of Licensor's sole business judgment, Licensee shall be liable to Licensor for liquidated damages pursuant to paragraph 12.E hereof due to premature termination of the License.

15.     **SPECIAL STIPULATIONS:**

A.      **Site Control.**

Licensee expressly understands and agrees that control of the Location by Licensee is a condition precedent to the granting of the license and the final ratification of this License by Licensor. Accordingly, the license is granted and this License is provided only on a conditional basis, subject to Licensor's receipt of satisfactory evidence of Licensee's control of the Location in accordance with the provisions of this paragraph. Unless Licensor receives and Licensee delivers a copy of the recorded deed or other documentary evidence satisfactory to Licensor that Licensee has fee simple title to the Location or an executed lease of the Location for the term of the License within ninety (90) days from the Term Commencement Date, Licensor shall have the right to terminate the License by written notice to Licensee. Such right shall expire upon Licensor's receipt and acceptance of a copy of the fully executed lease or recorded deed showing such leasehold interest or fee simple title in Licensee.

B.      **Management Designation.**

Notwithstanding Paragraph 10.J. of this License, the Hotel shall at all times be operated by a management company acceptable to Licensor. Licensor shall

SEC-IHG-E-0000073

have the right to approve any proposed management company and to approve any contract with respect to the operation of the Hotel, and such management company's policies and procedures must comply with Licensor's brand standards and the requirements of this License. The management of the Hotel by an acceptable management company must be continuous and uninterrupted during the term of the License. Licensee shall be in default under this paragraph if any of the preceding conditions are not met. Notwithstanding that the management company must be acceptable to Licensor, Licensee acknowledges and agrees that it is solely responsible for the selection, conduct and performance of the management of the Hotel and Licensor has no responsibility or obligation in connection with such selection, conduct or performance. The management contract between Licensee and the management company must be acceptable to Licensor and executed **at least 180 days prior to the opening of the Hotel in the System.** If any approved management company stops operating the Hotel for the Licensee for any reason, Licensee must notify Licensor immediately.

## C.  Cross Default

Notwithstanding anything else herein to the contrary, it is a condition of this License and Licensee acknowledges that if the License is placed in default, then License for the Staybridge Suites hotel to be located at the intersection of Higgins Road and Cumberland Avenue, Chicago, IL 60631/ #14536 will be placed in immediate default also. Once Licensee has cured the default under the License, the default for license agreement for the Staybridge Suites hotel to be located at the intersection of Higgins Road and Cumberland Avenue, Chicago, IL 60631/ #14536 will also be cured. Should the default under the License not be cured, the whole

the default under the License not be cured, then the license agreement for the hotel to be located at the intersection of Higgins Road and Cumberland Avenue, Chicago, IL 60631 also shall be subject to termination.

## D. Licensee's Option for Extension of Term.

Licensee may submit a written request to Licensor, between the **eighth** and **ninth** anniversary of the opening of the Hotel in the System requesting Licensor to provide and deliver to Licensee a Product Improvement Plan ("PIP") or the then current equivalent of a PIP. Provided Licensee is not then in default and has no outstanding amounts owed to Licensor and its affiliates under this License, Licensor will prepare and deliver the PIP to Licensee within 120 days of receipt of such written request and Licensor will bill Licensee the then-current fee for preparation of the PIP. Licensee must then notify Licensor in writing by no later than 60 days following the receipt of the PIP as to whether or not Licensee intends to complete the PIP. If Licensee chooses to complete the PIP, then the License term will be extended to 15 years from the date of opening of the Hotel under the System and the PIP will become an Addendum to this License and will set forth reasonable renovation and upgrading requirements applicable to entering conversion hotels at that time. Upon execution of the Addendum, Licensee shall be required to take such steps as may be necessary to complete the items on the PIP within the time period specified. Licensee's failure to complete the PIP in accordance with its terms and the Addendum shall be considered a default under this License, which may be terminated pursuant to Paragraph 12.C in the event of such default. If Licensee fails to submit a request within the timeframe permitted or Licensee chooses not to complete the PIP, the License will expire as set forth in Paragraph 12.A.



27

INDG08

SEC-IHG-E-0000074

**IN WITNESS WHEREOF**, the parties have executed this License, as of the date first stated above.

Licensee:

**BOUTIQUE HOSPITALITY INVESTMENT, INC.**

By: _____
    Anshoo Sethi
    ~~Managing Member~~ President

Attest: _____
    Secretary (or any other corporate officer)

Licensor:

**HOLIDAY HOSPITALITY FRANCHISING, INC.**

By: _[signature]_

Vice President
Franchise Administration

Attest: _[signature]_
Assistant Secretary

28

INDG08

SEC-IHG-E-0000075

### Addendum To The
### Holiday Hospitality Franchising, Inc.
### Hotel Indigo License Agreement
### Pursuant To The Illinois Franchise Disclosure Act


Notwithstanding anything to the contrary set forth in the above License Agreement ("License"), the following provisions shall supersede and apply to this License (and, have generally been made applicable by execution of a similar Addendum to each license for all Hotel Indigo brand Hotels, respectively, issued in, or for properties in, the State of Illinois):

1.    Notice Required By Law: The terms and conditions under which your License can be terminated and your rights upon non-renewal may be affected by Illinois law, 815 ILCS 705/19 and 705/20.

2.    Under this License, there is no requirement that litigation between the parties take place in Georgia. You may institute litigation against us in Illinois or in any other court having jurisdiction over the parties and the dispute. The provisions of the License concerning jurisdiction and the application of Georgia law do not deprive you of any rights and/or causes of action established by the Illinois Franchise Disclosure Act, 815 ILCS 705/4 and 41, which, for reference, are reproduced at the bottom of this page.[1] In addition, if any of the provisions of this License are inconsistent with any other applicable Illinois statutes, then such Illinois statutes shall apply to the extent such application is constitutional and valid as applied.

the provisions of Federal Bankruptcy law (11 U.S.C.A. sec. 101, et seq.), paragraph 12. C (1)(d) of the License shall be amended to include the following language: "Enforceability of this provision is a matter governed by Federal Bankruptcy Law and enforceability or nonenforceability is subject to that law and rulings of a court of competent jurisdiction."

4.       Licensee must pay additional Frequency Club Marketing Contributions equal to 5% of qualifying Full Folio Revenue (paid by or on behalf of each member who stays at the Hotel) monthly and a one time charge of $10.00 per room with the first Royalty payment.

---

[1] 705/4 JURISDICTION AND VENUE. §4. Any provision in a franchise agreement that designates jurisdiction or venue in a forum outside of this State is void, provided that a franchise agreement may provide for arbitration in a forum outside of this State.

705/41 WAIVERS VOID. §41. Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act or any other law of this State is void. This Section shall not prevent any person from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of this Act, nor shall it prevent the arbitration of any claim pursuant to the provisions of Title 9 of the United States Code.

29

INDG08

SEC-IHG-E-0000076

Date: _____

Licensee:

**BOUTIQUE HOSPITALITY INVESTMENT, INC.**

By: _____

Anshoo Sethi

~~Managing Member~~ President

Attest: _____

Secretary (or any other corporate officer)

Licensor:

**HOLIDAY HOSPITALITY FRANCHISING, INC.**

By: _____

By:

Jenny Tidwell
Vice President
Franchise Administration

Attest:

Assistant Secretary

**Illinois Addendum**

30

INDG08

SEC-IHG-E-0000077

## **GUARANTY**

As an inducement to Holiday Hospitality Franchising, Inc. ("Licensor") to execute the License Agreement dated _December 30, 2008_ between Licensor and Boutique Hospitality Investment, Inc., ("Licensee"), for the Hotel Indigo® branded hotel located at the intersection of Courtland Ave. and Higgins Road, Chicago, IL 60631, ("License"), the undersigned (sometimes referred to as the "guarantor(s)"), jointly and severally, hereby unconditionally warrant to Licensor and its successors and assigns that all of Licensee's representations in the License and the application submitted by Licensee to obtain the License are true, and guarantee that all of Licensee's obligations under the License, including any amendments thereto whenever made (all hereafter collectively referred to as the "License"), will be punctually paid and performed.

Upon default by the Licensee and notice from Licensor, the undersigned will immediately make each payment and perform each obligation required of Licensee under the License. Without affecting the obligations of the undersigned under this Guaranty, Licensor may, without notice to the undersigned, extend, modify or release any indebtedness or obligation of Licensee, or any of the guarantor(s), or settle, adjust or compromise any claims against Licensee or any of the guarantor(s). The undersigned waive notice of amendment of the License and notice of demand for payment or performance by Licensee.

Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of the other guarantors will continue in full force and effect.

The Guaranty constitutes a guaranty of payment and performance and not of collection, and each of the guarantors specifically waives any obligation of Licensor to proceed against Licensee or any money or property held by Licensee or by any other person or entity as collateral security, by way of set off or otherwise. The undersigned further agree that this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment of any of the guaranteed obligations is rescinded or must otherwise be restored or returned by Licensor upon the insolvency, bankruptcy or reorganization of Licensee or any of the undersigned, all as though such payment had not been made.

This Guaranty shall become valid as of the Term Commencement Date of the License, which is _____ December 30, 2008 . It shall be deemed made and entered into in the State of Georgia, and the undersigned agree that this Guaranty and the obligations provided for hereunder shall be governed and construed in all respects by the internal laws and decisions (except any conflicts of law provisions) of the State of Georgia, including all matters of construction, validity, enforceability and performance.

To the extent permitted by law, the undersigned (i) consent and submit, at Licensor's election and without limiting Licensor's rights to commence an action in any other jurisdiction, to the personal jurisdiction and venue of any courts (federal, superior or state) situated in the County of DeKalb, State of Georgia; (ii) waive any claim, defense or objection in any such proceeding based on lack of personal jurisdiction, improper venue, forum non conveniens or any similar

INDG08

SEC-IHG-E-0000078

basis; and (iii) expressly waive personal service of process and consent to service by certified mail, postage prepaid, directed to the last known address of the undersigned, which service shall be deemed completed within ten (10) days after the date of mailing thereof.

The undersigned agree to pay Licensor all expenses, including reasonable attorneys' fees and court costs, incurred by Licensor, its parents, subsidiaries, affiliates, and their successors and assigns, to remedy any defaults of or enforce any rights under this Guaranty or the License, effect termination of this Guaranty or the License, or collect any amounts due under this Guaranty or the License.

**IN WITNESS WHEREOF,** each of the undersigned has signed this Guaranty under Seal, as of this _____ 11 _____ date of _____ DEC. _____ , 2002

Witnesses:                          Guarantors:

_____          _____
                                    Ravinder Sethi
                                    Address: 1314 Plymouth Ct.
                                              Chicago, IL 60631
                                    SSN: 109 60 1663

Anshoo Sethi
Address: 1314 Plymouth Ct.
            Chicago, IL 60631
SSN: 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

32

SEC-IHG-E-0000079

AS
gp

## ATTACHMENT "A"

Facilities and Services (paragraph 1):

Site-Area and general description:  19 Floor, Interior Corridor

Fee owners (names and addresses):  RASS Hospitality, LLC
Address: _1314 S. Plymouth Ct._
_Chicago, IL 60605_

Leases (parties, terms, etc.) if any:  Lease Agreement dated _____
between RASS Hospitality, LLC. ("Lessor") and ~~Extended Hospitality, Inc.~~ ("Lessee")
for the duration of the License and set to expire on _____
_Bourque_
_Hospitality_
_Investment Inc._

Number of approved guest rooms:                                209

Restaurants and lounges (number, seating capacity, names and description):

                                                Golden Bean/Phi Bar

Gift shop or other concessions ...

Grit shop or other concessions or shops: N/A

Parking facilities (number of spaces, description): 209+

Swimming pool: Yes

Other facilities and services: 700 sq. ft. meeting space, 8,500 sq. ft. meeting space adjacent to basement, fitness Center

Ownership of Licensee (paragraph 10):

**BOUTIQUE HOSPITALITY INVESTMENT, INC.** 100%
    Anshoo Seith, ~~managing member~~ Shareholder 50%
    Ravinder Seith, ~~managing member~~ Shareholder 50%

33

INDG08

SEC-IHG-E-0000080

## ATTACHMENT "B"
## THE WORK

On or before **August 1, 2009**, Licensee shall submit preliminary plans. On or before **November 1, 2009** Licensee shall submit final plans, specifications and drawings for the Hotel, including its proposed equipment, furnishings, facilities and signs with such detail and containing such information as Licensor may request (collectively "Plans"). The Plans as submitted to Licensor shall conform to then prevailing System standards, including the construction standards set forth in the Manual. Construction shall not begin unless and until Licensor has approved the Plans. Thereafter, no change shall be made to the Plans without the advance consent of Licensor. Notwithstanding the foregoing, after the Plans have been approved, if in the course of actual construction any change in the Plans occurs, Licensee shall notify Licensor promptly. Licensee shall cause the Hotel to be constructed according to the Plans approved by Licensor, and Licensor shall determine whether construction has been completed in accordance with the Plans.

Construction of the Hotel shall commence on or before **March 1, 2010**. Commencement of construction shall mean excavation and poured footings with a finished building slab. Once the construction has commenced, it shall continue uninterrupted (except for interruption by reason of events constituting force majeure) until construction is completed. Notwithstanding the occurrence of any events constituting force majeure, or any other cause, construction shall be completed and the Hotel shall be furnished, equipped and shall otherwise be made ready to open for business in accordance with the License not later than **March 1, 2011**.

for business in accordance with the License not later than ~~March 1, 2011~~. *July* *2012*

Extension requests for commencement of construction of a new development for each Hotel Indigo brand may be considered on a basis of monthly increments up to a six-month period for any one extension. Requests for less than six months must be accompanied by a sum equal to the then current standard minimum Application Fee for the proposed number of rooms for the Hotel, prorated according to the period of time requested. Requests for a six-month extension must be accompanied by a sum equal to 1/2 of the then current standard minimum Application Fee. Approval of extension requests is not automatic. The Licensee will be responsible for any expenses which may be incurred by Licensor in the processing of an extension request.

For a new development of a Hotel Indigo, if an extension request is approved and construction is commenced within the extension period, the extension fee paid will be refunded, without interest, less the expenses incurred in processing the extension request. If construction does not commence within the extension period, Licensor may refund or retain the extension fee at its sole discretion.

The Hotel shall not be opened for business as a Hotel Indigo branded hotel unless and until:

(i) Licensor has approved and accepted, in advance, in writing (a) the construction of the Hotel in accordance with the Plans and Licensor's requirements; (b) the installation of all items of equipment, furniture, signs, computer terminals and related supplies and other items; and (c) the staffing and training of such staff necessary to operate the Hotel in accordance with Licensor's requirements;

34

INDG08

(ii) no accounts are past due to Licensor, its parents, divisions, subsidiaries or affiliated companies by Licensee;

(iii) Licensee is in full compliance with all of the terms of this License Agreement.

Notwithstanding anything else herein to the contrary, Licensor may authorize Licensee to open and operate the Hotel as a Hotel Indigo, even though Licensee has not fully complied with the terms of this License, provided that Licensee agrees to fulfill all remaining terms of this License on or before the dates designated by Licensor.

35

INDG08

SEC-IHG-E-0000082

Exhibit 14

Felker Declaration



InterContinental Hotels Group

June 23, 2010

**VIA OVERNIGHT COURIER**

Boutique Hospitality Investment, Inc
Attn: Mr. Anshoo Sethi
1314 S. Plymouth Ct.
Chicago, IL 60605

Three Ravinia Drive
Suite 100
Atlanta, GA 30346-2149
www.ihg.com

**RE:  LICENSE AGREEMENT DATED DECEMBER 30, 2008 (AS SAME MAY HAVE
BEEN AMENDED, THE "LICENSE") BETWEEN BOUTIQUE HOSPITALITY
INVESTMENT, INC ("LICENSEE") AND HOLIDAY HOSPITALITY FRANCHISING,
INC. ("LICENSOR") FOR THE HOTEL INDIGO® HOTEL TO BE LOCATED AT
CHICAGO O'HARE AIRPORT, IL/#14554 (THE "HOTEL")**

Dear Mr. Sethi:

By letter dated April 27, 2010, Licensor issued a notice of default and termination based on
Licensee's failure to commence construction by March 1, 2010 and established a termination date
of June 14, 2010. To date, Licensor has not received any evidence that commencement of
construction has occurred and that the default has been cured; therefore, the above License will

...will terminate effective at 3:00 p.m. Eastern time on **July 7, 2010**.

Please comply immediately with all of the Post-Termination Obligations set forth in Paragraph 12.D of the License.

This notice in no way supersedes or extends any earlier termination date established in a Default and Termination Notice, if any, issued by Licensor relative to the subject Hotel.

Licensor reserves the right to exercise all rights or remedies it may have under the License or otherwise with respect to the License or the termination, including without limitation liquidated damages pursuant to the License.

Should you have any questions, please let us know.

Sincerely,

Jenny Tidwell
Vice President
Franchise Licensing and Compliance

    

SEC-IHG-E-0000041

Mr. Anshoo Sethi
June 22, 2010
Page 2

bcc:    Bob Ekman
        Brian Quinn
        Nimesh Patel

SEC-IHG-E-0000042

Exhibit 15

Felker Declaration

## Donlon, Mika M.

| | |
|---|---|
| **From:** | Ian R. Kellow <ikellow@qia.qa> |
| **Sent:** | Tuesday, February 05, 2013 3:24 AM |
| **To:** | Donlon, Mika M. |
| **Cc:** | Hassan Althawadi; Haywood Blakemore |
| **Subject:** | RE: Urgent Request from U.S. Securities and Exchange Commission, HO-12015 |
| **Attachments:** | 2013-01-31 letter QIA SEC Enquiry (HB).pdf |

| | |
|---|---|
| **Importance:** | High |
| **Sensitivity:** | Confidential |

Dear Mika Donlon,

I refer to your email dated January 29, 2013 (and its attachments) addressed to Mr. Hassan Al-Thawadi, General Counsel. Please find attached a letter in response to the Commission on his behalf.

Regards,
**Ian R. Kellow**
Head of Compliance
*Compliance is everyone's business*
**Qatar Investment Authority / Qatar Holding LLC** (QFC #00004)
Q-Tel Tower, Diplomatic Area Street, West Bay, P.O. Box: 23224, Doha, Qatar
**T: +974-4499-5893** | F: +974-4499-5990
E: ikellow@qia.qa | Website: www.qia.qa | Gen: legal@qia.qa



Building the Future with Global Vision

---

**From:** Donlon, Mika M. [mailto:DonlonM@sec.gov]
**Sent:** Tuesday, January 29, 2013 5:11 PM
**To:** Legal Department
**Cc:** Felker, Charles
**Subject:** Urgent Request from U.S. Securities and Exchange Commission, HO-12015
**Importance:** High
**Sensitivity:** Confidential

To the Attention of Hassan Al Thawadi
General Counsel, Qatar Investment Authority
Re: *In the Matter of Intercontinental Regional Center Trust of Chicago*, HO-12015


Dear Mr. Thawadi –

The staff of the Securities and Exchange Commission is conducting a **confidential, non-public** investigation in the matter identified above. In relation to this investigation the staff **urgently** requests that Qatar Investment Authority ("QIA") please provide us with information regarding the authenticity of the document attached hereto electronically. Additionally we ask that you verify whether an individual by the name of Scott H. Brett

1

(identified in attached letter) is, or was, an employee of your organization, in particular in late September of 2012, as indicated in the attached document.

**Again, please note that this is a confidential, non-public investigation, and as such, the staff requests that QIA maintains the confidentiality of the existence of the investigation.** I have also attached for your information, a copy of the Commission's form 1662, which governs the routine uses of information gathered by the staff.

Please feel free to contact me via email or at the number below, or Josh Felker, Assistant Director, via email or at 202-551-4960.

Thank you in advance for your prompt and professional attention to this matter.

Best regards -

Mika M. Donlon
Senior Counsel
Division of Enforcement
U.S. Securities & Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-5546
Direct: (202) 551-4564
Fax: (202) 772-9286
donlonm@sec.gov

PRIVILEGED & CONFIDENTIAL: This e-mail message (and any attachments) is for the exclusive use of the intended recipient(s) and may contain confidential and privileged information. Please do not disseminate without prior consent. If you are not the intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this email in error, please notify the sender immediately by return e-mail and promptly delete this message and its attachments from your computer system. Be advised that no privileges are waived by the transmission of this message.

This e-mail communication is confidential and is intended exclusively for those individuals and entities addressed above and any other persons who have been specifically authorized to receive it. If you are not such an intended recipient, please do not copy, use or disclose to others the contents of this communication. Instead, please notify us that you have received this e-mail in error by sending a reply email to this message (together with any attachments). Please then delete the e-mail and any attachments and destroy any copies of it. We regret any inconvenience resulting from erroneous delivery of this message and thank you for your cooperation.

Please note that none of the Qatar Investment Authority, Qatar Holding LLC nor any of their respective subsidiaries will have any liability for any incorrect or incomplete transmission of the information contained in this e-mail nor for any delay in its receipt. Any views or opinions expressed in this email are solely those of the author and do not necessarily represent those of the Qatar Investment Authority, Qatar Holding LLC or any of their respective subsidiaries.



جهـــــاز قطـــــر للاستثــــمـــار
QATAR INVESTMENT AUTHORITY

Building the Future with Global Vision

31 January 2013

<u>**BY EMAIL:**</u> <u>DonlonM@sec.gov</u>

QIA/7/1/ 287/2013

Securities and Exchange Commission
Division of Enforcement
100 F Street, N.E.
Washington, D.C. 20549-5546
United States of America

<u>For the attention of: Mika M. Donlon, Senior Counsel</u>

Sir,

### Re. <u>*In the Matter of Intercontinental Regional Centre Trust of Chicago*, HO-12015</u>

I refer to your email dated 29 January 2013 and its attachments addressed to the General
Counsel, Mr. Hassan Al-Thawadi.

We have reviewed the document attached electronically to your email (attached hereto for reference). We hereby confirm that the document is not authentic and was not issued by or on the authority of Qatar Investment Authority ("**QIA**"). We further confirm that QIA does not nor has ever employed a person by the name of 'Scott H. Brett'.

Please do not hesitate to contact me again if we may be of further assistance.

Thank you.

Haywood Blakemore
Deputy General Counsel



(         €

## جهــــاز قطـــــر للإستثــــمـــار
## QATAR INVESTMENT AUTHORITY

Date: 27/09/2012

Mr.Anshoo Sethi,CEO
A Chicago Convention Center LLC
8201 W Higgins Road
Chicago,IL 60631

Transmitted by e-mail: akdss@aurefincorp.com

Funding Approval: A Chicago Convention Center Senior Debt Funding: US$340 million approx.

Dear Mr. Sethi,

Our lending group is prepared to move forward with the funding of the above referenced transaction, subject to your acceptance of, and in conformity with, loan documentation and procedure requirements of our funding institution. The initial indicative terms and conditions specified below for this loan will be finalized after final due diligence has been conducted with reasonable acceptance.

| | |
|---|---|
| Amount | US$ 340 Million |
| Term | Up to 8 years with option to roll over |
| Interest Rate | US Prime+ margin of 300 to 500 basis points |

**Grace Period**
**Repayment Schedule**
2 years
To be calculated based on projected cash flow

1. ... margin of use as 500 basis points
   in favor of the Lender
2. First Charge over the assets of the project including
   land, equipment, machinery, etc. (collectively "assets")
3. Assignment by way of security of the benefit of any
   insurance policies relating to the assets
4. Any other security to be determined after conducting due
   diligence

The following factors will be considered in determining the total loan for this transaction:

1. Ability to raise full Equity and current level of Equity
2. Status of EB-5 Funding
3. Borrower's financial strength and credit rating
4. Merits and viability of the project

The final Due Diligence work will commence within 30 days of receipt of accepted terms. The due diligence work is estimated to require about 8weeks maximum. Funding of the loan will occur at the soonest possible after the due diligence work will have been satisfactorily completed and security agreements are in place.

With warmest regards,

*Scott H. Brett*

Scott H. Brett
Head-Corporate Banking(North-America)
Qatar Investment Authority

AGREED AND ACCEPTED