## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION )

      Plaintiff,

      v.

A CHICAGO CONVENTION CENTER, )
LLC, ANSHOO R. SETHI, and )
INTERCONTINENTAL REGIONAL )
CENTER TRUST OF CHICAGO, LLC )
      )
      )
      Defendants. )
      )

**13CV982**
**JUDGE ST. EVE**
**MAG. JUDGE ROWLAND**

FILED

FEB X 6 2013

CLERK, U.S.
THOMAS G.

# Exhibits 2-4

# EXHIBIT 2

UNITED STATES SECURITIES     )
AND EXCHANGE COMMISSION    )
                           )
       Plaintiff,       )
                           )
       v.         )
                           )
                           )
A CHICAGO CONVENTION CENTER,  )
LLC, ANSHOO R. SETHI, and   )
INTERCONTINENTAL REGIONAL   )
CENTER TRUST OF CHICAGO, LLC  )
                           )
                           )
       Defendants.     )
                           )

## **DECLARATION OF ANA L. RILI**

I, ANA L. RILI, pursuant to 28 U.S.C. 1746, declare as follows:

1.      I am a Supervisory Immigration Services Officer in the EB-5 Unit within

the California Service Center for the United States Citizenship and Immigration Services

("USCIS"), an agency of the United States Department of Homeland Security. I have

been serving in this capacity since October of 2012. My current business address is

24000 Avila Road, Laguna Niguel, CA 92677.

2.      I am of adult age and competent to testify.

3.      As a Supervisory Immigration Services Officer, it is my responsibility to

review petitions filed for the purposes of immigration benefits. Specifically, I am

responsible for determining the eligibility of petitions filed under USCIS' EB-5 Program.

I concentrate my review on petitions filed with Form I-924, Application For Regional

Center Under the Immigrant Investor Pilot Program. As a supervisor in the EB-5 Unit, I

am familiar with USCIS' EB-5 Program and the agency's policies and practices in

administering the EB-5 program, including the agency's standards and policies in

adjudicating I-924 petitions.

    4.    The USCIS EB-5 program is based on the Immigration and Nationality

Act of 1990, section 203(b)(5), 8 U.S.C. Section 1153(b)(5) which created a preference

allocation of visas for foreign nationals who have invested, or are in the process of

investing, a designated amount of lawfully obtained capital in commercial enterprises,

and can demonstrate the investment will create ten or more jobs for qualified United

States workers. Under this program, qualified investors may obtain lawful permanent

residence for themselves and their dependents. Investors must file Form I-526, Immigrant

Petition by Alien Entrepreneur, in order to establish qualification for an immigrant visa.

Once Form I-526 is approved, investors can either apply to adjust status to lawful

permanent resident if they are presently in the United States, or apply for an immigrant

visa to obtain lawful permanent resident if they are outside the United States. The

standard of proof for Forms I-924 and I-526 is a preponderance of evidence.

    5.      The Immigrant Investor Pilot Program ("Pilot Program") was created by

Section 610 of Public Law 102-395 (October 6, 1992), and has been extended through

September 30, 2015. The Pilot Program allows for investment into a USCIS approved

Regional Center. A Regional Center is defined as any economic entity involved with the

promotion of economic growth, improved regional productivity, job creation and

increased domestic capital investment. Regional Centers may pool investments from

multiple investors.

    6.      Entities seeking the Regional Center designation from USCIS must submit

a proposal, supported by economically or statistically valid forecasting tools. The

proposal must show how the regional center plans to focus on a geographical region within the United States. The proposal must explain how the regional center will promote economic growth in that region. The proposal must show how, in verifiable detail (using economic models in some instances), jobs will be created directly or indirectly through capital investments made in accordance with the Regional Center's business plan. The proposal must show the amount and source of capital committed to the regional center and the promotional efforts made and planned for the business project. The proposal must also show how the regional center will have a positive impact on the regional or national economy.

7.    Intercontinental Regional Center Trust of Chicago ("IRCTC"), was established in 2010 in Illinois and is structured as a Limited Liability Company. USCIS approved the Regional Center for participation in the Pilot Program on June 09, 2011.

8.    IRCTC is seeking for approval to their designation and branch

project, A Chicago Convention Center, LLC (the "Company"). Amendments to regional

centers are also filed using Form I-924. The investment project (the "Project") is based

on the construction of a convention center. The Company will also operate the

convention center and hotels. The Project calls for a $249.5 million of foreign investment

in the construction of the convention center. Immigrant investors will make the

qualifying EB-5 program investment into the proposed project as a limited liability

partners. A total of 499 limited liability partnerships will be sold for this project.

9.    There is no statutory or regulatory requirement for investment funds to be

held in escrow. However, investors commonly enter into private agreements with

Regional Centers to hold their investment funds in escrow to be released into the project

upon I-526 approval. Investors in the IRCTC project have entered into a similar escrow
agreement.

10.     In their amendment filing, IRCTC submitted a proposed business plan,
economic impact analysis and other documents in support of claim that the project would
create 8,495 jobs. The documents indicated that the project was to begin in Summer of
2012.

11.     IRCTC's submission indicated that several hotel chains have already
agreed to participate in the project.

12.     On June 7, 2012, USCIS served IRCTC a Request For Evidence issued in
connection with issues raised in the adjudication of the filed amendment. The request
sought evidence substantiating IRCTC's claims concerning anticipated job creation,
clarity of the timeline for capital infusion into the project, issues with project related

contracts and the commitment of funds, among other evidence to substantiate project claims. No final decision has been made on the case.

13.     Should IRCTC fail to resolve the issues raised in the request for evidence, the petition is subject to denial.

14.     Additionally, material misrepresentations are grounds for application denial, referral to law enforcement and regulatory authorities, and other appropriate action. Any misrepresentations about the project, including the involvement in and commitment of hotel chains in the Project, will have an adverse bearing on the adjudication and other consequences.

15.     When USCIS receives petitions from third parties such as IRCTC, we assign a control number to the petition. The control number is stored in a records

database. Each file has a record with identifying information such as who currently has the file, where the file is located, and what documents have been interfiled with it. In connection with preparing this declaration, I examined the attached Exhibits A through O to compare these documents to documents found within USCIS' files. The documents are true and correct copies (but for the addition of Bates number stamps) of documents maintained in USCIS' files. These records (a) are documents received from IRCTC or its representatives, or (b) are documents kept in the regular course of conduct and activity of USCIS recorded at or near the time of the act, event, or transaction described in the records.

16. The document in **Exhibit A** bearing the Bates number SEC-USCIS-P-0000002-4 is a true and correct copy of the 6/9/11 Regional Center Designation Letter submitted by IRCTC to USCIS.

17. The document in **Exhibit B** bearing the Bates number SEC-USCIS-P-

0000013-19 is a true and correct copy of Organization Documents and Member Resumes

submitted by IRCTC to USCIS.

18. The document in **Exhibit C** bearing the Bates number SEC-USCIS-P-

0000036-77 is a true and correct copy of Wright Johnson Economic Analysis submitted

by IRCTC to USCIS.

19. The document in **Exhibit D** bearing the Bates number SEC-USCIS-P-

0000375-78 is a true and correct copy of ACCC corporate organization documents

submitted by IRCTC to USCIS.

20.    The document in **Exhibit E** bearing the Bates number SEC-USCIS-P-0000383-468 is a true and correct copy of 12/13/11 Offering Memo submitted by IRCTC to USCIS.

21.    The document in **Exhibit F** bearing the Bates number SEC-USCIS-P-0000469-81 is a true and correct copy of a subscription agreement submitted by IRCTC to USCIS.

22.    The document in **Exhibit G** bearing the Bates number SEC-USCIS-P-0000482-93 is a true and correct copy of an escrow agreement submitted by IRCTC to USCIS.

23.    The document in **Exhibit H** bearing the Bates number SEC-USCIS-P-0000743-85 is a true and correct copy of a Business Plan for Investment in ACCC dated December 13, 2011 submitted by IRCTC to USCIS.

24.    The document in **Exhibit I** bearing the Bates number SEC-USCIS-P-

0000786-832 is a true and correct copy of an economic impact analysis by Evans, Carroll

& Associates, Inc., dated June 6, 2011 submitted by IRCTC to USCIS.

25.    The document in **Exhibit J** bearing the Bates number SEC-USCIS-P-

0000837-75 is a true and correct copy of a limited liability company operating agreement

between ACCC and IFG dated July 15, 2012 submitted by IRCTC to USCIS.

26.    The document in **Exhibit K** bearing the Bates number SEC-USCIS-P-

0000985-95 is a true and correct copy of a Request for Evidence Response dated August

23, 2012 submitted on behalf of IRCTC to USCIS.

27.    The document in **Exhibit L** bearing the Bates number SEC-USCIS-P-0000997-0001072 is a true and correct copy of a Business Plan for Investment in ACCC dated August 23, 2012 submitted by IRCTC to USCIS.

28.    The document in **Exhibit M** bearing the Bates number SEC-USCIS-P-0001098-1109 is a true and correct copy of Starwood, IHG and Hyatt letters submitted by IRCTC to USCIS.

29.    The document in **Exhibit N** bearing the Bates number SEC-USCIS-P-0001110-36 is a true and correct copy of Chicago Planning Commission zoning approvals dated January 30, 20009 submitted by IRCTC to USCIS.

· 30.    The document in **Exhibit O** bearing the Bates number SEC-USCIS-P-0001528-33 is a true and correct copy of a Request for Evidence Response dated December 4, 2012 submitted on behalf of IRCTC to USCIS attaching letters from Loop

Capital Markets, Inc. dated November 13, 2012 and Qatar Investment Authority dated

September 27, 2012.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 5, 2013:

Ana L. Rili
Supervisory Immigration Services Officer
United States Citizenship and Immigration Services

# EXHIBIT

A



**U.S. Department of Homeland Security**
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677

**U.S. Citizenship
and Immigration
Services**

June 9, 2011

Intercontinental Regional Center Trust of Chicago, LLC
c/o Mr. Anshoo Sethi
8201 Higgins Road
Chicago, IL   60631

| | |
|---|---|
| Application: | Request for Designation as a Regional Center |
| Applicant(s): | Mr. Anshoo Sethi |
| Re: | Intercontinental Regional Center Trust of Chicago |
| | RCW1031910085(formerly W09002640) |

Pursuant to Section 610 of the Appropriations Act of 1993, as amended, on October 1, 2010, Mr. Anshoo Sethi

submitted a proposal seeking approval and designation by U.S. Citizenship and Immigration Services (USCIS) of the Intercontinental Regional Center Trust of Chicago.

Case: 1:13-cv-00982 Document #: 11 Filed: 02/06/13 Page 22 of 167 PageID #:723

USCIS hereby designates Intercontinental Regional Center Trust of Chicago as a Regional Center within the Immigrant Investor Pilot Program and approves the request as described below:

## GEOGRAPHIC AREA:

The Intercontinental Regional Center Trust of Chicago shall have a geographic scope which includes the State of Illinois, Lake County, in the state of Indiana and the counties of Dane, Kenosha, Milwaukee, Racine, and Rock, in the State of Wisconsin.

## FOCUS OF INVESTMENT ACTIVITY:

As depicted in the economic model, the general proposal, business plan and associated economic analysis, the Regional Center will engage in the following economic activity: the financing and development of projects and commercial enterprises in the three target categories of economic activity within the approved "IRCTC" geographic area.

The Regional Center shall focus on offering EB-5 compliant capital investment opportunities into new commercial enterprises in the following three (3) target industry economic categories:

1. NAICS 721000     Accommodations
2. NAICS 722000     Food Service & Drinking Places
3. NAICS 561920     Convention and Trade Show Organizers

www.uscis.gov

SEC-USCIS-P-0000002

Intercontinental Regional Center Trust of Chicago/RCW 10319 10085 (formerly W09002640)
Page 2


Note: If any investment opportunities arise that are beyond the scope of the approved industry categories, then an amendment would be required to add that category.

Aliens seeking immigrant visas through the Immigrant Investor Pilot Program may file individual petitions with USCIS for capital investments in new commercial enterprises located within and affiliated with the approved Regional Center area.

For any alien requesting the reduced threshold of $500,000 based upon an investment in a Targeted Employment area, the alien must establish at the time of filing of the I-526 petition that either the investment will be made in a TEA designated area or was made in a TEA designated area at the time of the alien's initial investment into the enterprise.

## EMPLOYMENT CREATION

Immigrant investors who file petitions for capital investments in new commercial enterprises located within and affiliated with the Regional Center area must fulfill all of the requirements set forth in INA 203(b)(5), 8 CFR 204.6, and 8 CFR 216.6, except that the petition need not show that the new commercial enterprises created ten new jobs directly as a result of the immigrant investor's investment. The determination whether the alien investor has met the job creation requirements will be established by a review of the required initial evidence at 8 CFR 204.6(j) and 8 CFR 216.6(a)(4) for the Form I-526 and Form I-829 petitions, respectively. The capital investment and job creation activities outlined in the individual petitions must fall within the bounds of the final economic analysis that is contained as part of the approved Regional Center proposal and its indirect job creation model and multipliers contained within the final approved Regional Center application package. The immigrant investor must show at the time of removal of conditions that they performed the activities described in Form I-526 petition, and the activities must be based on the approved regional center

methodology for demonstrating job creation. The regional center has identified IMPLAN Pro v3.0 input/output model to establish indirect job creation.

In addition, where job creation is claimed based on multipliers rooted in revenue generated by businesses occupying space and/or estimated project costs expenditures, the immigrant investor's individual I-526 petition affiliated with your Regional Center, should include as supporting evidence:

- A comprehensive detailed business plan with supporting financial, marketing and related data and analysis providing a reasonable basis for projecting creation of indirect and/or induced jobs to be achieved/realized within two years pursuant to 8 CFR 204.6(j)(4)(B) and reasonable methodologies pursuant to 8 CFR 204.6(m)(7)(ii).

An alien investor's I-829 petition to remove the conditions which was based on an I-526 petition approval that involved the creation of new indirect jobs based on multipliers tied to job creation inputs such as revenue generated by businesses occupying space and/or estimated project expenditures costs, needs to be supported by evidence showing the space is occupied by such businesses and that the funds were expended in the job-creating activity. Such evidence may include reasonable methodologies like multiplier tables, feasibility studies, and other economically or statistically valid forecasting devices which indicate the likelihood that the alien's investment has resulted in increased employment.

## Additional Guidelines for individual Immigrant Investors Visa Petition (I-526)

Each individual petition, in order to demonstrate that it is associated with the Regional Center, in conjunction with addressing all the requirements for an individual immigrant investor petition, shall also contain as supporting evidence relating to this Regional Center designation, the following:

1. A copy of this letter, the Regional Center approval and designation.

SEC-USCIS-P-0000003

Intercontinental Regional Center Trust of Chicago/RCW 10319 10085 (formerly W09002640)
Page 3

2. A copy of the Regional Center narrative proposal and relevant business plan.

3. A copy of the job creation methodology required in 8 CFR 204.6(j)(4)(iii), as contained in the final Regional Center economic analysis which has been approved by USCIS, which reflects that investment by an individual immigrant investor will create not fewer than ten (10) full-time employment positions, either directly or indirectly, per immigrant investor. If the approval of the plan for capital investments in a given industry economic category is based upon an exemplar capital investment project, then the immigrant investor petition must also be supported by an analysis and evidence that shows that the actual capital investment in the Form I-526 petition comports to the exemplar capital investment project approved in the regional center designation and that it is otherwise EB-5 compliant.

4. A legally executed copy of the USCIS approved:

   a. Subscription Agreement                    (Draft submitted October 1, 2010)
   b. Limited Partnership Agreement             (Draft submitted October 1, 2010)
   c. Private Placement Memorandum              (Draft submitted October 1, 2010)
   d. Escrow Agreement                          (Draft submitted October 1, 2010)

## DESIGNEE'S RESPONSIBILITIES INHERENT IN CONDUCT OF THE REGIONAL CENTER:

The law, as reflected in the regulations at 8 CFR 204.6(m)(6), requires that an approved Regional Center in order to maintain the validity of its approval and designation must continue to meet the statutory requirements of the Immigrant Investor Pilot Program by serving the purpose of promoting economic growth, including increased export sales (where applicable), improved regional productivity, job creation, and increased domestic capital investment. Therefore, in order for USCIS to determine whether your Regional Center is in compliance

with the above cited regulation, and in order to continue to operate as a USCIS approved and designated Regional Center, your administration, oversight, and management of your Regional Center shall be such as to monitor all investment activities under the sponsorship of your Regional Center and to maintain records, data and information in order to provide the information required on the Form I-924A supplement. Form I-924A, Supplement to Form I-924 is available in the "Forms" section on the USCIS website at www.uscis.gov.

Effective November 23, 2010, the failure to timely file a Form I-924A Supplement for each fiscal years in which the regional center has been designated for participation in the Immigrant Investor Pilot Program will result in the issuance of an intent to terminate the participation of the regional center in the Pilot Program, which may ultimately result in the termination of the approval and designation of the regional center.

Note: The requirement for the filing of Form I-924A Supplement commences in fiscal year 2011. Each regional center that remains designated for participation in the pilot program as of September 30, 2011 must submit the Form I-924A Supplement with the required supporting documentation on or before December 29, 2011.

If you have any questions concerning the Regional Center approval and designation under the Immigrant Investor Pilot Program, please contact the USCIS by Email at USCIS.ImmigrantInvestorProgram@dhs.gov.

Sincerely,

Rosemary Langley Melville
Director
California Service Center

cc: Joseph C. McCarthy, Esq.

SEC-USCIS-P-0000004

# EXHIBIT

B



## EXHIBIT B ORGANIZATION DOCUMENTS & MEMBER RESUMES

## INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO

The Intercontinental Regional Center Trust of Chicago, LLC ("Company") is an Illinois corporation with its principal place of business at:

INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO
8201 W. Higgins Rd. | Chicago, Illinois 60631
Phone (312) 404-9275 | Inquiry@irctc-eb5.com | www.irctc-eb5.com

The Company filed its Article of Incorporation with the Illinois Secretary of State on July 16th, 2010. A Certificate of Good Standing dated August 16th, 2010 issued by Jesse White, the Illinois Secretary of State, is attached to this Exhibit. USCIS will be notified of any changes to the membership of the proposed Regional Center. A short biography of the members is as follows:

### Members

#### Anshoo R. Sethi

Mr. Anshoo R. Sethi has over fifteen years of experience in real estate development and management, specifically in the lodging arena. In the development and operations of such ventures, Mr. Sethi has acquired formidable proficiency in global finance, specifically in the management and acquisition of working and institutional capital, respectively. Mr. Sethi is the founding member and Chief Executive



Officer of Intercontinental Regional Center Trust of Chicago, LLC. and Chief Executive Officer of UPGROWTH, LLC. He is intimately acquainted with the business of hotel development as his family has been working in this arena for over thirty years. Mr. Sethi is recognized as an innovator, creating strategies in all aspects of the pre- and post-real estate development process. Given Mr. Sethi's insight and proven results in real estate and lodging innovation, he has been able to grow his family's business exponentially. It is the goal of Mr. Sethi and his associated businesses to develop large-scale hotels that are truly pioneering and will be industry leaders in their design, environmental sustainability, and profitability.

Mr. Sethi has executed several corporate acquisitions and divestitures in his career -- working with both private and public domestic and foreign funding (Equity, Mezzanine, & / or Senior Debt). His interaction with hundreds of investors, comprising of corporations, banks, investment trusts, private equity, and venture capitalists, has additionally enabled him to focus on providing real estate analytical and financial advisory services to developers, builders, investors, lenders, early-stage, and not-for-profit corporations.

Mr. Sethi was raised in Chicago, Illinois and graduated from University of Illinois at Chicago with a degree in International Finance and Marketing. Mr. Sethi has completed several graduate professional development programs (PDP). In addition to his extensive education, Mr. Sethi holds is a Certified Lodging Owner (CLO), Certified Hotel Administrator (CHA), Certified Hospitality Technology Professional



Intercontinental Regional Center Trust of Chicago | Organization Docs & Resumes

B-1

SEC-USCIS-P-0000015



(CHTP), and expected to finalize his LEED° Professional Accreditation (LEED° AP) from the U.S. Green Building Council (USGBC).

Mr. Sethi is a member of numerous organizations ranging in areas related to global finance, alternative investments, real estate development and management, sustainability and renewable energy, asset management, and entrepreneurialism. In addition, Mr. Sethi serves on the boards of numerous not-for-profit, social, and educational organizations.

### Ravinder Sethi

Ravinder Sethi the principal share holder in the Company. He is married with 2 children. He has been in the U.S.A. since 1977 as a pharmacist (obtaining a bachelors and masters degree) and enjoyed a professional career since 1981 as a pharmacist and owner of numerous medical center clinics throughout the Chicagoland area since 1951.

His non-medical businesses are in Real Estate hospitality developments specifically in general contracting major hotels branded and the Child Care Business. They Own and operate 3 Day care centers that are located around the Chicagoland area since 1995, with a total licensed capacity for 304 (among 3 daycares), running at 95% capacity with age group from 6 weeks to 12 years.

In his native country of India, his other business activities are also Real Estate hospitality developments for over 20 years and most recently for the past 5 years in development of full-fledged Universities with dormitories. (Business administration, masters of business administration, bachelors in education, masters in education, masters in computer administration) and soon to be International Medical

**Advisors**

### Anjan Chatterji

Mr. Anjan Chatterji's professional and academic experience has been focused on transactional advisory and restructuring services, ranging various industries, including finance, real estate, bio-technology, and manufacturing. Mr. Chatterji's experience has been chiefly derived from his work with globally recognized consulting and law firms, as well as boutique think-tank consulting outfits. Over the course of his career, Mr. Chatterji has mainly advised multinational private equity and hedge fund clients on transactions involving global organizational restructuring, efficient tax and transfer pricing planning, valuations, cash-flow modeling, and capital sourcing. Mr. Chatterji has also worked with the Washington offices of his previous employers, in conjunction with the United States Treasury Department, on major global dispute resolution cases.

Mr. Chatterji conducts research with the University of Chicago in ranging areas of law and economics – Antitrust & Competition, Public Finance, and Tax Regulations. In addition to receiving his Master of Business Administration and Juris Doctor, Mr. Chatterji also received a Master of Law in Taxation (LL.M.) from Northwestern University School of Law and Kellogg School of Management.

Intercontinental Regional Center Trust of Chicago | Organization Docs & Resumes

B-2

SEC-USCIS-P-0000016

**Ted Mandigo**

Ted Mandigo is a 38 year veteran of hospitality consulting with projects in new development feasibility, acquisitions, operational analysis, expert witness work and a variety of related services. He has been responsible for over 1,500 market studies over his career including the Ritz-Carlton Hotel in Chicago early in his career in 1972, with the market study for the Wit Hotel in 2008 in Chicago among the most recent studies.

Integrated with 38 years of hospitality consulting Ted Mandigo joined the faculty at Kendall College's Glion Hospitality program, bringing field and operational experience to the classroom. He teaches programs in a wide range of topics from food and beverage control to feasibility studies, working real-life projects into the curriculum. He has responsibility for a series of senior level courses in Yield and Revenue Management, Finance, Management Strategies, Managerial Accounting and Labor Relations, integrating field trips and visiting lecturers into the program, using the Chicago area hotels and hospitality organizations as a resource.

Ted is a licensed CPA, active in the industry, serving as president of the Illinois CPA Society in 1999 and 2000, and as a member of the national council of the AICPA. He was a member of the Accreditation Committee for the ABV designation as that certification program was initiated. He is an active member of the Illinois Hotel and Lodging Association and annually prepares and presents analyses and forecasts for hotel management groups including the Downtown Hotel Managers of Chicago and the DuPage CVB. He is an invited speaker and panelist on industry conferences including service on the advisory panel of

the New York Hospitality Investment Conference, speaker at the Illinois Mortgage Bankers Association, and the American Institute of Real Estate Appraisers.

Case: 1:13-cv-00982 Document #: 1-1 Filed: 02/06/13 Page 34 of 167 PageID #:735

His career included 24 years within the accounting profession, with partnership in two national firms, 6 years in the airline food service industry as regional controller and 13 years of ownership of his own hospitality consulting firm.

He is an organizer and founding member of the International Society of Hospitality Consultants starting with correspondence and an organizational meeting in 1988 to establish the structure of that organization and served on the board and various officer positions during the initial years of the society.

At Kendall, Ted is willing to fill in or provide assistance in identifying guest lecturers, participation as an advisor on student projects and tutorial programs. His continuing operation of his 15 year consulting practice brings fresh projects and issues to the classroom. He shares his insight and analysis of market trends, developments and issues across the many programs of the school.

Ted Mandigo is a 1966 graduate of the Cornell University Hotel School, has an MBA from Loyola University of Chicago. He holds certification as MHS and CHRM through the AHLA.

SEC-USCIS-P-0000017





### Albert Grace

Albert "Al" R. Grace Jr. co-founded Loop Capital Markets in 1997 with the aim to create a firm that would be, in his words, "a provider of creative capital solutions – an unusually resourceful partner who will find ways to 'make it happen'."

Mr. Grace has over 30 years of experience in the capital markets, money management and law. Before the formation of Loop Capital Markets, he was Vice President at the Northern Trust Company. Prior to that, he was President and Chief Operating Officer of Selected Financial Services, an investment advisory and broker/dealer subsidiary of Kemper Corporation. Previously, Mr. Grace was legal counsel to the investment and trading departments of Kemper Financial Services, Inc., CIGNA Corporation and American Express Financial Services, Inc. specializing in securities and commodities law.

Since co-founding Loop Capital Markets in 1997, along with James Reynolds, Mr. Grace has promoted the vision of creating an uncompromising standard of excellence in the most responsive, client-focused firm comprised of some of the most capable and experienced professionals in the industry.

Mr. Grace serves on the boards of Chicago Communities in the Schools, where he is Chairman of the Program Committee; Chicago United, where he serves as Secretary of the organization and a member of its Executive Committee; and the University of Wisconsin, La Crosse Foundation. He is also a member of the Securities Industry Association's National Institutional Brokerage Committee.



Mr. Grace holds a JD from the University of Wisconsin Law School and a Bachelor of Science in History from the University of Wisconsin, La Crosse. He completed additional study at the University of Hartford and the University of Wisconsin Graduate School of Business. His licenses include Series 3, 6, 7, 24, 26, 27, 55 and 63.

<u>Attachments:</u>  Certificate of Good Standing – Intercontinental Regional Center Trust of Chicago, LLC, Office of Secretary of State of Illinois



Intercontinental Regional Center Trust of Chicago | Organization Docs & Resumes

B-4

SEC-USCIS-P-0000018

THIS PAGE IS INTENTIONALLY LEFT BLANK



Intercontinental Regional Center Trust of Chicago | Organization Docs & Resumes

B-5

SEC-USCIS-P-0000019

# EXHIBIT

C

# WRIGHT JOHNSON

## *professional authors and analysts*

## Economic Analysis—Final Report

prepared for

Intercontinental Regional Center Trust of Chicago

By

# Wright Johnson, LLC
September 8, 2010

AN ECONOMIC ANALYSIS FOR A REGIONAL CENTER FOR THE
STATE OF ILLINOIS; LAKE COUNTY, INDIANA; AND THE WISCONSIN
COUNTIES OF DANE, KENOSHA, MILWAUKEE, RACINE, AND ROCK

205 Worth Ave⟩ • (561) 602-1992 • info@wrightjohnsonllc.com

1

SEC-USCIS-P-0000036



# TABLE OF CONTENTS

1. Executive Summary | 3
   1-1 Introduction | 3
   1-2 Approach | 4
   1-3 Utilities, Maintenance, and Business Services | 4
   1-4 Definitions | 4

2. Background | 6
   2-1 Regional Model Baseline | 6
   2-2 Output Per Worker | 6
   2-3 Regional Final Demand | 6
   2-4 Top Ten Regional Industries | 7
   2-5 Geography | 7
   2-6 Infrastructures | 8
   2-7 Demographics | 9
   2-8 Economy | 10
   2-9 Unemployment | 10
   2-10 Unemployment Trends by County | 12
   2-11 Consumer Price Index | 15
   2-12 Location Quotients | 15

**3. Methods & Assumptions** | 18

3-1 Assumptions | 18

3-2 Data Inputs | 19

3-3 ABOUT IMPLAN | 20

**4. Results** | 23

4-1 Economic Results Definitions | 23

4-2 Summary of Hotel Impact | 25

4-3 Summary of Restaurant Impact | 26

4-4 Summary of Convention Center Impact | 27

**EXHIBIT 1** | 28

**EXHIBIT 2** | 30

SEC-USCIS-P-0000037



# I. EXECUTIVE SUMMARY

## I-I INTRODUCTION

Wright Johnson, LLC.(WJ) has been retained by the Intercontinental Regional Center Trust of Chicago, LLC ("IRCTC") to perform an economic assessment of the following three target industry economic clusters:

1. Accommodations—NAICS 721
2. Food Service & Drinking Places—NAICS 722
3. Convention and Trade Show Organizers—NAICS 56192

Sample analysis has been independently performed for each of the target industry economic clusters in the proposed geographic area of the Regional Center. WJ utilized IMPLAN Pro v3.0 with specific details for the counties of Lake in Indiana; Dane, Kenosha, Milwaukee, Racine, and Rock in Wisconsin; and all counties within the state of Illinois.

The focus of the study is analyzing the Regional Center impacts of construction and/or operation of a hotel, food, and beverage service and convention center.

Expenditures during the construction phase and employment during the operational phase differed by type of proposed use. WJ used IMPLAN to model the total economic impact associated with various levels of site investment and operational employment. To quantify the net economic impact (direct, indirect and induced) of such developments, IMPLAN modeled the following direct effects:

- Effects of construction on employment and output
- Effects of operational employment and output

WJ examined the above scenarios using a multi-industry sector, segregated-region model. Using this model, WJ was able to develop independent forecasts for the proposed uses of hotel, food and beverage service, and convention center. This segregation of forecasts allowed WJ/IMPLAN to capture the total net effects of each proposed target industry. By analyzing the regional developments with different underlying assumptions for the specific industry and Region, WJ established a realistic prediction of potential outcomes.

The IMPLAN economic model employed for the economic and job creation impact assessment study, forecasts the economic impact a specific event will generate throughout a determined area—in this case the state of Arizona. Over time, competitive pressures emerge and then tend to revert back to equilibrium. The process, in that way, depicts the so-called "ripple-effect" the impacts of economic changes have on a region. The initial economic stimulation reverberates through the IRCTC economy spreading outward from the site of the new investment and business activity. Eventually the new waves of the economic activity are absorbed into the larger economy creating a new level of economic equilibrium. In the long run, the project will materially alter the regional economy by the substantial amount of new investment and related business development activities, including a corresponding higher level of output, taxation, investment, employment and income in the regional economy.



SEC-USCIS-P-0000038

## IRCTC Employment Impacts

### Hotel Employment

|  | Direct | Indirect | Induced | Total |
|---|---|---|---|---|
| Construction |  | 69.1 | 109.9 | 179 |
| Operations | 275 | 74.6 | 150 | 499.7 |
| Total | 275 | 169.6 | 259.9 | **678.7** |

### Restaurant Employment

|  | Direct | Indirect | Induced | Total |
|---|---|---|---|---|
| Construction |  | 5.8 | 9.2 | 15 |
| Operations | 108.6 | 15 | 21.5 | 145.1 |
| Total | 108.6 | 20.8 | 30.7 | **160.1** |

### Convention Center Employment

|  | Direct | Indirect | Induced | Total |
|---|---|---|---|---|
| Construction |  | 105.9 | 165 | 270.9 |
| Operations | 126 | 50.3 | 58.8 | 235.1 |
| Total | 126 | 156.2 | 223.8 | **506** |

## I-2 APPROACH

Hypothetical project business plans have been provided to WJ from IRCTC. These attached business plans provide the details used in preparing the econometric analysis. All proposed projects are located within TEA designated areas. The attached plans are as follows:

1. Hotel: A 300-room, 250,000-square-foot Hotel located in Chicago, IL.
2. Restaurant: A 15,000–sq. ft. restaurant located in Chicago, IL.
3. Convention Center: A 500,000–sq. ft. convention center located in Chicago, IL.

## I-3 UTILITIES, MAINTENANCE, AND BUSINESS SERVICES

The regional center will create demand for business services. The impact of these activities total (a) Chicago Hotel $86,885 annually (b) Chicago Restaurant $16,482 annually (c) Chicago Convention Center $73,302

annually.

Utilities include services such as electricity, natural gas, and water and sewer facilities. The economic impact on utility services totals (a) Chicago Hotel $880,112 annually (b) Chicago Restaurant $343,962 annually (c) Chicago Convention Center $175,745 annually.

Maintenance and repair services include building and construction activity on existing buildings. The regional center would create an economic impact from these services of (a) Chicago Hotel $280,140 annually (b) Chicago Restaurant $138,128 annually (c) Chicago Convention Center $39,070 annually.

## 1-4 DEFINITIONS

**Accommodations—NAIC code 721:** Industries in the Accommodation subsector provide lodging or short-term accommodations for travelers, vacationers, and others. There is a wide range of establishments in these industries. Some provide lodging only; while others provide meals, laundry services, and recreational facilities, as well as lodging. Lodging establishments are classified in this subsector even if the provision of complementary services generates more revenue. The types of complementary services provided vary from establishment to establishment. Sample analysis was completed for both a hotel and motel. NAIC code 721.

**Food Service & Drinking Places—NAICS code 722:** Industries in the Food Services and Drinking Places subsector prepare meals, snacks, and beverages to customer order for immediate on-premises and off-prem-

SEC-USCIS-P-0000039

ises consumption. There is a wide range of establishments in these industries. Some provide food and drink only; others provide various combinations of seating space, waiter/waitress services and incidental amenities, such as limited entertainment. The industries in the subsector are grouped based on the type and level of services provided. The industry groups are full-service restaurants; limited-service eating places; special food services, such as food service contractors, caterers, and mobile food services; and drinking places.

**Convention and Trade Show Organizers—NAIC code 56192:** This industry comprises establishments primarily engaged in organizing, promoting, and/or managing events, such as business and trade shows, conventions, conferences, and meetings

**Construction—NAICS code 23:** The construction sector comprises establishments primarily engaged in the construction of buildings or engineering projects (e.g., highways and utility systems). Establishments primarily engaged in the preparation of sites for new construction and establishments primarily engaged in subdividing land for sale as building sites also are included in this sector. Construction work done may include new work, additions, alterations, or maintenance and repairs. Activities of these establishments generally are managed at a fixed place of business, but they usually perform construction activities at multiple project sites. Production responsibilities for establishments in this sector are usually specified in (1) contracts with the owners of construction projects (prime contracts) or (2) contracts with other construction establishments (subcontracts).

**[THIS SECTION INTENTIONALLY LEFT BLANK]**

Intercontinental Regional Center Trust of Chicago | Economic Analysis      5



SEC-USCIS-P-0000040

# 2. BACKGROUND

## 2-1 REGIONAL MODEL BASELINE

| | |
|---|---|
| Gross Regional Product | $769,642,115,441 |
| Total Personal Income | 638,661,400,000 |
| Total Households | 5,967,199 |
| Total Employment | 8,894,632 |
| Number of Industries | 425 |
| Land Area | 58,860 |
| Populations | 15,355,580 |
| Average Household Income | $107,029 |

## 2-2 OUTPUT PER WORKER

| Output Per Worker—IRCTC vs. U.S. | | |
|---|---|---|
| *Industry* | *IRCTC* | *U.S.* |
| Accommodations | $106,672 | $102,427 |
| Food & Beverage | $56,845 | $56,529 |
| Convention Center | $147,339 | $151,208 |

## 2-3 REGIONAL FINAL DEMAND

| | |
|---|---|
| Households | $537,790,400,000 |
| State/Local Government | $111,929,300,000 |

| | |
|---|---|
| State/Local Government | $111,521,500,000 |
| Federal Government | $26,981,440,000 |
| Capital | $122,436,600,000 |
| Exports | $499,434,800,000 |
| Imports | ($488,123,800,000) |
| Institutional Sales | ($40,800,940,000) |
| **Total Final Demand** | **$769,642,100,000** |

SEC-USCIS-P-0000041

## 2-4 TOP TEN REGIONAL INDUSTRIES

### Top Ten Industries (ranked by employment)—IRCTC

| Description | Employment | Labor Income | Output |
|---|---|---|---|
| *Employment & Payroll (Sector 438) | 546,267 | $27,434,460,000 | $31,073,240,000 |
| Food Services and Drinking Places | 522,920 | $11,534,030,000 | $31,982,810,000 |
| Wholesale trade businesses | 372,018 | $29,717,680,000 | $77,823,770,000 |
| *Employment & Payroll (Sector 437) | 359,694 | $23,390,810,000 | $26,493,260,000 |
| Employment Services | 292,347 | $8,113,469,000 | $11,470,120,000 |
| Real Estate Establishments | 285,566 | $9,622,532,000 | $57,403,170,000 |
| Private Hospitals | 274,868 | $15,611,390,000 | $31,136,210,000 |
| Offices of Physicians, dentists, & health care | 216,285 | $16,066,150,000 | $27,038,940,000 |
| Retail Stores—General Merchandise | 157,118 | $3,801,631,000 | $8,728,072,000 |
| Construction-new nonresidential commercial | 151,420 | $22,035,970,000 | $27,168,800,000 |

## 2-5 GEOGRAPHY





The Northeastern border of Illinois is Lake Michigan. Its eastern border with Indiana is the Wabash River. Its northern border is with Wisconsin. Its western border with Missouri and Iowa is the Mississippi River. Its southern border is with Kentucky and runs along the northern shoreline of the Ohio River. Illinois also borders Michigan, but only via a water boundary in Lake Michigan.

SEC-USCIS-P-0000042

Illinois has three major geographical divisions. The first is Northern Illinois, dominated by the Chicago metropolitan area, including the city of Chicago, its suburbs, and the adjoining exurban area into which the metropolis is expanding. As defined by the federal government, the Chicago metro area includes a few counties in Indiana and Wisconsin and stretches across much of northeastern Illinois. It is a cosmopolitan city, densely populated, industrialized, and settled by a wide variety of ethnic groups. The city of Rockford, the fourth largest metropolitan area and the state's third largest city, sits along Interstates 39 and 90 some 75 miles (121 km) northwest of Chicago.

Southward and westward, the second major division is Central Illinois, an area of mostly prairie. Known as the Heart of Illinois, it is characterized by small towns and mid-sized cities. Agriculture, particularly corn and soybeans, as well as educational institutions and manufacturing centers, figure prominently. Cities include Peoria, the third largest metropolitan area in Illinois at 370,000; Springfield, the state capital; Quincy; Decatur; Bloomington-Normal; and Champaign-Urbana.

The third division is Southern Illinois, comprising the area south of U.S. Route 50, and including Little Egypt, near the juncture of the Mississippi River and Ohio River. This region can be distinguished from the other two by its warmer climate, different variety of crops (including some cotton farming in the past), more rugged topography (the southern tip is un-glaciated with the remainder glaciated during the Illinoisan Stage and earlier ages), as well as small-scale oil deposits and coal mining. The area is a little more populated than the central part of the state with the population centered in two areas. First, the Illinois suburbs of St. Louis comprise the second most populous metropolitan area in Illinois with nearly 600,000 inhabitants, and are known collectively as the Metro-East. The second area is Williamson County, Jackson County, Franklin County, Saline County and Perry County. It is home to around 210,000 residents and is known collectively as Metro Lakeland.

The region outside of the Chicago Metropolitan area is often described as "downstate Illinois." However, residents of central and southern Illinois view their regions as geographically and culturally distinct.

## 2-6 INFRASTRUCTURES

Because of its central location and its proximity to the Rust Belt and Grain Belt, Illinois is a national cross-



roads for air, auto, rail and truck traffic.

Chicago's O'Hare International Airport (ORD) is one of the busiest airports in the world, with 59.3 million domestic passengers annually, along with 11.4 million international passengers in 2008. It is a major hub for United Airlines and American Airlines, and a major airport expansion project is currently underway. Chicago Midway International Airport (MDW) is the secondary airport in the Chicago metropolitan area, a major hub for Southwest Airlines. It served 17.3 million domestic and international passengers in 2008.

Illinois has an extensive passenger and freight rail transportation network. Chicago is a national Amtrak hub and in-state passengers are served by Amtrak's Illinois Service, featuring the Chicago-to-Carbondale *Illini* and *Saluki*, the Chicago-to-Quincy *Carl Sandburg* and *Illinois Zephyr*, and the Chicago-to–St. Louis *Lincoln Service*. Currently there is trackwork on the Chicago–St. Louis line to bring the maximum speed up to 110 mph (180 km/h) which would reduce the trip time by an hour and a half. Nearly every North American railway meets at Chicago, making it one of the largest and most active rail hubs in the world. Extensive commuter rail is provided in the city proper and some immediate suburbs by the Chicago Transit Authority's "L" system. The largest suburban commuter rail system in the United States, operated by Metra, uses existing rail lines to provide direct commuter rail access for hundreds of suburbs to the city and beyond.

Major U.S. Interstate highways crossing the state include: I-24, I-39, I-55, I-57, I-64, I-70, I-72, I-74, I-80, I-88, I-90, and I-94. Its central location is the reason that Illinois carries the distinction of having the most primary (2-digit) Interstates pass through it among the 50 states.

---

SEC-USCIS-P-0000043

In addition to the state's rail lines, the Mississippi River and Illinois River provide major transportation routes for the state's agricultural interests. Lake Michigan gives Illinois access to the Atlantic Ocean by way of the Saint Lawrence Seaway.

## 2-7 DEMOGRAPHICS

As of 2008, Illinois has an estimated population of 12,901,563, which is an increase of 75,754 from the prior year and an increase of 481,903 or 3.9%, since the year 2000. This includes a natural increase since the last census of 644,967 people; that is, 1,505,709 births minus 860,742 deaths and a decrease due to the net migration of 159,182 people out of the state. International immigration to the state resulted in an increase of 425,893 people and domestic migration produced a loss of 585,075 people.

| Population | Illinois | USA |
|---|---|---|
| Population 2009 estimate | 12,910,409 | 307,006,550 |
| Population, % change 2000–2009 | 4.00% | 9.10% |
| Persons under 5 years olds | 6.90% | 6.90% |
| Persons under 18 years old | 24.60% | 24.30% |
| Persons 65 years old | 12.40% | 12.90% |

| Demographics | Illinois | USA |
|---|---|---|
| White persons | 79.00% | 79.60% |
| Black persons | 14.90% | 12.90% |
| American Indian | 0.40% | 1% |
| Asian persons | 4.40% | 4.60% |



Population per sq mile
<1
1-10
10-25





25–50
50–100
210–500
500–1,000
1,000–2,500
2,500–5,000
>5,000

Source: U.S. Census Bureau
Census 2000 Summary File 1
population by census tract.

SEC-USCIS-P-0000044

## 2-8 ECONOMY

The **economy of Illinois** includes many industries. The Chicago metropolitan area is home to many of the nation's largest companies, including Boeing, McDonalds, Motorola, and United Airlines. The Chicago-area economy headquarters a wide variety of financial institutions, and is home to the largest futures exchange in the world, the Chicago Mercantile Exchange.

The 2004 total gross state product for Illinois was $528 billion, placing it fifth in the nation. The 2003 per capita income was $32,965. The state's industrial outputs include machinery, food processing, electrical equipment, chemical products, publishing, fabricated metal products, transportation equipment, petroleum and coal.

Most of the state of Illinois lies outside of the Chicago urban area and inside the North American Corn Belt. Corn, soybeans, and other large-field crops are grown extensively. These crops and their products account for much of the state's economic output outside of Chicago.

As of 2004, the leading manufacturing industries in Illinois, based upon value-added, were chemical manufacturing ($16.6 billion), food manufacturing ($14.4 billion), machinery manufacturing ($13.6 billion), fabricated metal products ($10.5 billion), plastics and rubber products ($6.8 billion), transportation equipment ($6.7 billion), and computer and electronic products ($6.4 billion).

By the early 2000s, Illinois's economy had moved toward a dependence on high-value-added services such as financial trading, higher education, logistics, and medicine. In some cases, these services clustered around institutions that hearkened back to Illinois's earlier economies. For example, the Chicago Mercantile Exchange, a trading exchange for global derivatives, had begun its life as an agricultural futures market.

## 2-9 UNEMPLOYMENT

According to the Bureau of Labor Statistics, Illinois's unemployment peaked in late 2009 and is slowly reversing its course decreasing from 11.6% in February to an estimated 10.6% in July of 2010. Illinois entered the current recession later than the nation and is expected to recover faster than the economy as a whole. The chart below represents the current unemployment rate in the State.

The chart below represents the current unemployment rate in the state.



**Unemployment rate**

The percent of the labor force that is unemployed, not seasonally adjusted.

Illinois
**10.6%**
Jun 2010

SEC-USCIS-P-0000045



## Illinois Unemployment Rate by Metropolitan Statistical Areas
### July 2010—Not Seasonally Adjusted

Rockford MSA
15.7%

Lake-Kenosha IL-WI Metro Div. (IL Part)
10.7%

Chicago-Joliet-Naperville IL Metro. Div.
10.5%

Davenport-Moline-Rock Island MSA (IL Part)
9.2%

Kankakee-Bradley MSA
13.5%

Peoria MSA
10.5%

Bloomington-Normal MSA
6.4%

Danville MSA
12.4%

Champaign-Urbana MSA
9.8%

Springfield MSA
8.5%

Decatur MSA
12.4%

Unemployment Rates

Not
Seasonally    Seasonally
Adjusted       Adjusted



**Unemployment Rate**

- <= 5.0%
- 5.1% – 6.5%
- 6.6% – 8.0%
- >= 8.1%

SEC-USCIS-P-0000046

## 2-10 UNEMPLOYMENT TRENDS BY COUNTY

### Recent Unemployment Trends by County

| County | Current | | Year Ago | |
| --- | --- | --- | --- | --- |
| | July 2010 Rate | July 2010 | July 2009 Rate | July 2009 Rank |
| Adams | 7.9 | 98 | 7.9 | 91 |
| Alexander | 13.1 | 10 | 13.9 | 6 |
| Bond | 10.3 | 53 | 9.6 | 62 |
| Boone | 16.4 | 1 | 15.7 | 2 |
| Brown | 5.9 | 102 | 4.3 | 102 |
| Bureau | 11.2 | 29 | 10.2 | 52 |
| Calhoun | 10.2 | 57 | 9.2 | 75 |
| Carroll | 11.1 | 31 | 11.2 | 26 |
| Cass | 7.8 | 99 | 6.8 | 99 |
| Champaign | 9.8 | 68 | 8.9 | 82 |
| Christian | 9.8 | 68 | 10.3 | 47 |
| Clark | 13.0 | 11 | 12.7 | 12 |
| Clay | 12.5 | 17 | 15.2 | 4 |
| Clinton | 8.4 | 91 | 8.0 | 87 |
| Coles | 10.8 | 36 | 9.8 | 58 |
| Cook | 10.8 | 36 | 11.1 | 27 |
| Crawford | 9.8 | 68 | 10.0 | 55 |
| Cumberland | 10.0 | 61 | 9.5 | 67 |
| De Kalb | 10.4 | 51 | 10.4 | 44 |
| De Witt | 9.3 | 80 | 9.1 | 77 |
| Douglas | 9.7 | 72 | 9.0 | 80 |
| Du Page | 8.9 | 85 | 9.2 | 75 |

| | | | | |
|---|---|---|---|---|
| Du Page | 8.9 | 89 | 9.2 | 73 |
| Edgar | 11.2 | 29 | 10.3 | 47 |
| Edwards | 9.9 | 63 | 9.1 | 77 |
| Effingham | 8.4 | 91 | 7.7 | 93 |
| Fayette | 11.5 | 25 | 10.2 | 52 |
| Ford | 10.4 | 51 | 9.9 | 57 |
| Franklin | 14.5 | 3 | 14.2 | 5 |
| Fulton | 11.8 | 22 | 12.6 | 13 |
| Gallatin | 10.8 | 36 | 10.5 | 41 |
| Greene | 10.1 | 59 | 8.1 | 86 |
| Grundy | 12.9 | 13 | 12.8 | 11 |
| Hamilton | 10.2 | 57 | 9.3 | 72 |
| Hancock | 11.5 | 25 | 11.1 | 27 |
| Hardin | 12.6 | 16 | 11.7 | 23 |
| Henderson | 9.9 | 63 | 9.0 | 80 |
| Henry | 8.7 | 89 | 9.3 | 72 |
| Iroquois | 9.9 | 63 | 8.9 | 82 |
| Jackson | 9.0 | 84 | 8.0 | 87 |
| Jasper | 10.6 | 45 | 9.6 | 62 |

Intercontinental Regional Center Trust of Chicago  |  Economic Analysis  12

SEC-USCIS-P-0000047



| County | Current | | Year Ago | |
|---|---|---|---|---|
| | July 2010 Rate | July 2010 | July 2009 Rate | July 2009 Rank |
| Jefferson | 10.5 | 47 | 9.6 | 62 |
| Jersey | 9.9 | 63 | 9.5 | 67 |
| Jo Daviess | 8.0 | 96 | 8.6 | 85 |
| Johnson | 12.1 | 20 | 11.1 | 27 |
| Kane | 10.5 | 47 | 11.0 | 31 |
| Kankakee | 13.5 | 5 | 11.8 | 21 |
| Kendall | 10.7 | 42 | 11.4 | 24 |
| Knox | 9.8 | 68 | 10.0 | 55 |
| Lake | 10.7 | 42 | 9.6 | 62 |
| La Salle | 13.3 | 7 | 11.9 | 20 |
| Lawrence | 10.0 | 61 | 10.4 | 44 |
| Lee | 11.3 | 28 | 10.5 | 41 |
| Livingston | 10.5 | 47 | 10.8 | 33 |
| Logan | 9.9 | 63 | 9.6 | 62 |
| McDonough | 9.4 | 77 | 9.5 | 67 |
| McHenry | 9.6 | 74 | 10.1 | 54 |
| McLean | 8.4 | 91 | 7.7 | 93 |
| Macon | 12.4 | 18 | 13.9 | 6 |
| Macoupin | 10.7 | 42 | 10.5 | 41 |
| Madison | 10.6 | 45 | 10.3 | 47 |
| Marion | 12.8 | 15 | 12.4 | 15 |
| Marshall | 9.5 | 75 | 12.1 | 18 |
| Mason | 13.3 | 7 | 13.1 | 9 |
| Massac | 11.1 | 31 | 9.8 | 58 |
| Menard | 7.7 | 100 | 7.1 | 98 |

| | | | | |
|---|---|---|---|---|
| Menard | 7.7 | 100 | 7.1 | 98 |
| Mercer | 9.7 | 72 | 9.4 | 70 |
| Monroe | 8.1 | 97 | 7.9 | 91 |
| Montgomery | 13.4 | 6 | 11.1 | 27 |
| Morgan | 9.4 | 77 | 7.6 | 95 |
| Moultrie | 9.1 | 82 | 9.7 | 60 |
| Ogle | 13.8 | 4 | 12.5 | 14 |
| Peoria | 11.0 | 34 | 13.4 | 8 |
| Perry | 12.9 | 13 | 12.3 | 16 |
| Piatt | 8.8 | 87 | 9.3 | 72 |
| Pike | 9.1 | 82 | 8.0 | 87 |
| Pope | 11.9 | 21 | 10.8 | 33 |
| Pulaski | 13.0 | 11 | 12.0 | 19 |
| Putnam | 11.4 | 27 | 15.3 | 3 |
| Randolph | 9.5 | 75 | 9.4 | 70 |
| Richland | 10.9 | 35 | 10.6 | 39 |
| Rock Island | 9.3 | 80 | 9.1 | 77 |
| St. Clair | 11.8 | 22 | 11.4 | 24 |
| Saline | 10.8 | 36 | 10.4 | 44 |

SEC-USCIS-P-0000048



| | Current | | Year Ago | |
| County | July 2010 Rate | July 2010 | July 2009 Rate | July 2009 Rank |
| --- | --- | --- | --- | --- |
| Sangamon | 8.5 | 90 | 7.6 | 95 |
| Schuyler | 7.6 | 101 | 6.1 | 101 |
| Scott | 8.8 | 87 | 6.5 | 100 |
| Shelby | 10.1 | 59 | 10.3 | 47 |
| Stark | 10.3 | 53 | 11.0 | 31 |
| Stephenson | 11.7 | 24 | 12.3 | 16 |
| Tazewell | 10.5 | 47 | 12.9 | 10 |
| Union | 13.2 | 9 | 10.7 | 37 |
| Vermilion | 12.4 | 18 | 11.8 | 21 |
| Wabash | 10.8 | 36 | 10.6 | 39 |
| Warren | 8.9 | 85 | 7.5 | 97 |
| Washington | 8.4 | 91 | 8.0 | 87 |
| Wayne | 10.3 | 53 | 10.7 | 37 |
| White | 9.4 | 77 | 8.8 | 84 |
| Whiteside | 11.1 | 31 | 10.8 | 33 |
| Will | 10.8 | 36 | 10.8 | 33 |
| Williamson | 10.3 | 53 | 9.7 | 60 |
| Winnebago | 15.6 | 2 | 16.1 | 1 |
| Woodford | 8.0 | 96 | 10.3 | 47 |

Source: Illinois Department of Employment Security, Economic Information and Analysis

## The Employment Situation (Bureau of Labor Statistics)—August 2010

Nonfarm payroll employment changed little (–54,000) in August, and the unemployment rate was about unchanged at 9.6 percent, the U.S. Bureau of Labor Statistics reported today. Government employment fell,

as 114,000 temporary workers hired for the decennial census completed their work. Private-sector payroll employment continued to trend up modestly (+67,000).

## Household Survey Data

The number of unemployed persons (14.9 million) and the unemployment rate (9.6 percent) were little changed in August. From May through August, the jobless rate remained in the range of 9.5 to 9.7 percent.

## Metropolitan Division Nonfarm Employment (Not Seasonally Adjusted)

Nonfarm payroll employment data were available in July for 32 metropolitan divisions, which are essentially separately identifiable employment centers within a metropolitan area. Seventeen of the 32 metropolitan divisions reported year-over-year employment losses, while 14 reported gains and 1 remained unchanged.

The largest year-over-year decrease in the metropolitan divisions occurred in Chicago-Joliet-Naperville, Ill. (–58,200), followed by Los Angeles–Long Beach–Glendale, Calif. (–23,500), Oakland-Fremont-Hayward, Calif. (–23,000), and San Francisco–San Mateo–Redwood City, Calif. (–19,800). The largest year-over-year employment increases in the metropolitan divisions were registered in Washington-Arlington-Alexandria, D.C.-Va.-Md.-W.Va. (+39,100), Dallas-Plano-Irving, Texas (+26,100), Boston-Cambridge-Quincy, Mass. (+10,400), and Santa Ana–Anaheim-Irvine, Calif. (+8,800).

SEC-USCIS-P-0000049

The largest year-over-year percentage decrease in employment among the metropolitan divisions was reported in Lake County–Kenosha County, Ill.–Wis. (–3.4 percent), followed by Oakland-Fremont-Hayward, Calif. (–2.4 percent), San Francisco–San Mateo–Redwood City, Calif. (–2.1 percent), and Warren-Troy–Farmington Hills, Mich. (–1.7 percent. The largest year-over-year percentage increases in employment among the metropolitan divisions were posted in Haverhill–North Andover–Amesbury, Mass.-N.H. (+3.4 percent), Brockton-Bridgewater-Easton, Mass. (+2.7 percent), Washington-Arlington-Alexandria, D.C.-Va.-Md.-W.Va. (+1.6 percent), and Dallas-Plano-Irving, Texas (+1.3 percent).

## Kyser Center for Economic Research—Economic Forecast, May 2010

Overall, the U.S. economy will grow by +2.6% in 2010 and by +3.1% in 2011 after plunging by –2.4% during 2009. Inflation is unlikely to be a problem in the near term, though the potential for higher energy prices is always cause for concern. Monetary policymakers acknowledge the inflation risk they are creating by their actions, but continue to be focused on restoring the health of the nation's economy and the financial sector. Thus, short-term rates are likely to remain at current extremely low levels for a while longer. The outlook for long-term rates is more uncertain. Given the Fed's current activist policy stance, they are unlikely to increase much until late in 2010.

## 2-11 CONSUMER PRICE INDEX

A consumer price index (CPI) measures the average price of consumer goods and services purchased by households. The CPI measures a price change for a constant market basket of goods and services from one period to the next within the same area (city, region, or nation). The CPI is determined by measuring the price of a standard group of goods meant to represent the typical market basket of a typical urban consumer. The percent change in the CPI is a measure of inflation. The CPI can be used to index (i.e., adjust for the effect of inflation on the real value of money: the medium of exchange) wages, salaries, pensions, and regulated or contracted prices. In the United States, the CPI is, along with the population census and the National Income and Product Accounts, one of the most closely watched national economic statistics. The following chart is the consumer price index for Illinois.

| **Consumer Price Index** | |
|---|---|
| 2005 | 194.2 |
| 2000 | 174.6 |

## 2-12 LOCATION QUOTIENTS

### Economic Tools

The Location Quotient is a tool developed by the U.S. Bureau of Labor Statistics that creates tables of private sector employment data by industry as measured by the Quarterly Census of Employment and Wages Program. The calculator can facilitate the comparison of employment levels in the United States (as a whole), individual states, counties, and metropolitan statistical areas.

Location Quotients (LQs) are ratios that allow an area's distribution of employment by industry to be compared to a reference or base area's distribution. The reference area is usually the United States, but it can also be a state or metropolitan area. The reference or base industry is usually the all-industry total, for example, total manufacturing. LQs are calculated by first dividing local employment by industry by the local all-industry employment total. Next, industry employment in the reference area is divided by the all-industry total for the reference area. Finally, the local ratio is divided by the reference area ratio.




Intercontinental Regional Center Trust of Chicago  |  Economic Analysis          15

SEC-USCIS-P-0000050

The location quotients were calculated for each industry as follows:

$$LQ = \frac{(E_i/E_c)}{(E_{ni}/E_{nt})}$$

Where:

$E_i$ = Employment in the regional center's industry;
$E_c$ = Total employment in the regional center;
$E_{ni}$ = National employment in the industry;
$E_{nt}$ = Total national (or regional) employment

This tool is typically used to measure how specialized the local economy is. A community highly special-ized in a given industry sector is likely exporting goods or services. This is an indication of economic "self-sufficiency." A community is considered economically "dependent" when any industry sector that cannot produce enough goods or services to meet local demand is highly represented. It may be useful to compare the local LQ to the state LQ by industry sector. If the local LQ is greater than 1.0 and it exceeds the state-wide average, the local area may have a regional, as well as a national competitive advantage in that sector. An LQ less than 1.0 provides a key indicator for developing an import substitution strategy locally.

Location Quotient analysis is useful for understanding current economic situations.

**Location Quotients calculated from Quarterly Census of Employment and Wages Data**

| Industry | Illinois—Statewide |
|---|---|
| Base Industry: Total, all industries | 1.00 |
| NAICS 11 Agriculture, forestry, fishing and hunting | 0.31 |
| NAICS 21 Mining, quarrying, and oil and gas extraction | 0.33 |
| NAICS 22 Utilities | 0.95 |
| NAICS 23 Construction | 0.83 |
| NAICS 31-33 Manufacturing | 1.11 |
| NAICS 42 Wholesale trade | 1.19 |

| NAICS 42 Wholesale trade | |
|---|---|
| NAICS 44-45 Retail trade | 0.93 |
| NAICS 48-49 Transportation and warehousing | 1.20 |
| NAICS 51 Information | 0.86 |
| NAICS 61 Educational services | 1.21 |
| NAICS 62 Health care and social assistance | 0.96 |
| NAICS 71 Arts, entertainment, and recreation | 0.91 |
| NAICS 52 Finance and insurance | 1.17 |
| NAICS 53 Real estate and rental and leasing | 0.86 |
| NAICS 54 Professional and technical services | 1.05 |
| NAICS 55 Management of companies and enterprises | 1.16 |
| NAICS 56 Administrative and waste services | 1.08 |
| NAICS 72 Accommodation and food services | 0.90 |
| NAICS 81 Other services, except public administration | 1.02 |
| NAICS 99 Unclassified | 0.92 |

Location Quotient: Ratio of analysis-industry employment in the analysis area to base-industry employment in the analysis area divided by the ratio of analysis-industry employment in the base area to base-industry employment in the base area.

SEC-USCIS-P-0000051

The Accommodations sector shows Illinois is 10% below the national average indicating an opportunity for additional hotel space within the geographic region of the Regional Center.

**Location Quotients calculated from Quarterly Census of Employment and Wages Data**

| Industry | Cook County, Illinois |
|---|---|
| Base Industry: Total, all industries | 1.00 |
| NAICS 11 Agriculture, forestry, fishing and hunting | 0.02 |
| NAICS 21 Mining, quarrying, and oil and gas extraction | 0.05 |
| NAICS 22 Utilities | 0.39 |
| NAICS 23 Construction | 0.64 |
| NAICS 31-33 Manufacturing | 0.88 |
| NAICS 42 Wholesale trade | 0.95 |
| NAICS 44-45 Retail trade | 0.80 |
| NAICS 48-49 Transportation and warehousing | 1.38 |
| NAICS 51 Information | 0.97 |
| NAICS 61 Educational services | 1.72 |
| NAICS 62 Health care and social assistance | 1.00 |
| NAICS 71 Arts, entertainment, and recreation | 0.89 |
| NAICS 52 Finance and insurance | 1.41 |
| NAICS 53 Real estate and rental and leasing | 1.10 |
| NAICS 54 Professional and technical services | 1.32 |
| NAICS 55 Management of companies and enterprises | 1.27 |
| NAICS 56 Administrative and waste services | 1.16 |
| NAICS 72 Accommodation and food services | 0.89 |
| NAICS 81 Other services, except public administration | 1.12 |
| NAICS 99 Unclassified | 1.21 |

The Accommodations sector shows Cook County 11% below the national average, indicating an opportunity for additional hotel capacity within the Greater Chicago area and elaborating the Accommodations percentage of Illinois as a whole.

SEC-USCIS-P-0000052

# 3. METHODS & ASSUMPTIONS

## 3-1 ASSUMPTIONS

For this project, WJ examined the economic effects of site development and operations of the nine target industry economic clusters. WJ systematically reviewed each set of assumptions used to properly customize the 440 sector outputs that make up the set matrices. In the following assumptions WJ applied specific sector data resulting in a very detailed, realistic and logical range of likely outcomes. WJ/IMPLAN-modeled simulations were based on the following assumptions:

1. The construction employment simulations are based upon scenarios for the year 2010.
2. 100% of construction demand will be supplied from the local region. No market displacement.
3. Operational employment demand will remain constant throughout the simulation horizon.
4. In all retail simulations, WJ assumed that operational employment will not have in-region displacement.

The definition of "direct jobs" used in this report should not be confused with the concept of direct job creation measurable by Forms I-9, payroll records or other similar documentation as set forth in 8 C.F.R. § 204.6(i)(4)(i)(A). That section contemplates jobs created by the actual employees of the new commercial enterprise, specifically in the non-regional center context

When economists use the term "direct" jobs in the context of an econometric methodology such as IMPLAN, what is meant are jobs created directly by revenues (which in the EB-5 Pilot program results from an immigrant investor's investment). For example, where a regional center-based new commercial enterprise comprised of immigrant investors renovates a building it purchases, the employees of the various unaffiliated tenants of that building would be considered "direct" jobs in the context of an econometric report. However, those jobs are not "direct" in the sense set forth in 8 C.F.R. §204.6(i)(4)(i)(A) where the new commercial enterprise is itself the employer that can provide Form I-9 or other similar documentation

on its own employees. The tenants' employees are not "direct" employees of the regional center-based new commercial enterprise.

To be clear, this report does set forth the number of jobs that are likely to be created by the new commercial enterprises. However, as 8 C.F.R. § 204.6(i)(4)(iii) clearly states, the proof of job creation in the context of regional centers is not Forms I-9, payroll records or similar documentation, but rather "reasonable methodologies" such as this report.

In keeping with the EB-5 guidelines, the number of construction jobs for all types of buildings is based on "hard costs" of construction activity and does not include "soft costs" architectural and engineering fees, permits and construction fees, contingency allowances, sales commissions, financing, legal, insurance costs associated with the construction activity, overhead and profits. Also, purchases of furniture, fixtures, equipment, telecommunications and computers are not included in any of the calculations, because these purchases will generally be made from manufacturers and suppliers outside the area. In many cases, the land on which these buildings will be constructed has previously been purchased and is not part of the cost estimates; however, average land costs are generally included when determining the relative contributions that could be made by EB-5 investors.




SEC-USCIS-P-0000053

## 3-2 DATA INPUTS

The relevant information and data was obtained from management of the IRCTC and their consultants. The data used includes an estimated construction timeline, expected development costs and a variety of industry and marketing information as well as public information from U.S. Government sources. Additional research and analysis was performed by WJ to substantiate client provided data for reasonableness.

Industry and project related metrics such as output and employment were compared to national and regional data sources.

Quality control checks and data sources provided were found to be reasonable for this economic and job creation impact assessment analysis within the proposed geographic area of the Regional Center applicant.

Information from the attached business plans for each proposed industry cluster were provided by IRCTC and such information within the plans was evaluated and then incorporated into this analysis for area specific background and demographic purposes.

Based on the data provided and corroborated, inputs were created for use in the IMPLAN system to model the economic impact of the construction and operations phases of each project.

The relevant information and data used to develop the model inputs, including the timing and operational build out of each project were provided by the IRCTC.

The tables within this analysis show the expected spending for the construction phase of the project as well as direct employment for ongoing operations. Additionally, dollar output generated and local state and federal tax revenues.

Per USCIS guidelines, only the Hard Cost of construction was used to estimate job creation.

A summary of each hypothetical project follows (hypothetical business plans are attached to the analysis):

**Hotel**—Up to $21.5 million of EB-5 investment would be used to help fund the hard construction costs of $31,418,950.00 of the total projected costs of $40,812,555.00. There is also projected $8 million in debt financing and $11.5 million in bond financing. 678.7 jobs will be created from the proposed 250,000 square-

financing and $11.5 million in bond financing. 678.7 jobs will be created from the proposed 250,000-square-foot, 300-room full-service hotel. The Chicago location, as does all of Illinois, shows continuing increases in overall population as well as increased tourism and convention attendance, making a hotel project highly attractive.

**Convention Center**—$21 million of EB-5 investment would be used to help fund the hard construction costs of $89,320,000.00 of the total projected costs of $120,135,460.00. Additional funds would come from debt financing of $20 million and bond investment of $80 million. 736.3 jobs will be created from the proposed 500,000-square-foot convention center. O'Hare airport is expanding by 40% and the expansion is to be completed in 2012, increasing flight volume by 60% and an increase of 40 million passengers to 110 million passengers annually. This is expected to create significant opportunities and need for a new convention center in the greater Chicago market.

**Restaurant**—$4.5 million of EB-5 investment would be used to totally fund the hard construction costs of $2,625,545.00 as well as the total project costs of $4,369,875.00. 160.1 jobs will be created from the proposed 15,000 square foot restaurant. The project will be located in Chicago, Illinois.

The relevant information and data used to develop the model inputs, including the timing and operational build out of the project were obtained from IRCTC. The data describes the development timeline, estimated staffing, expected revenues for the various project components, and initial business plans provided by IRCTC consultants.

---

SEC-USCIS-P-0000054

The table below shows the expected spending for the construction phase of the projects as well as direct employment for ongoing operations. Construction is expected to take 9 -12 months for each project. Operations will begin in year two. Staffing will continue to increase dramatically in the second year. Per USCIS guidelines, only the hard cost of construction was used to estimate job creation.

| **Model Inputs** | | | |
|---|---|---|---|
| **Construction** | *Hotel* | *Restaurant* | *Convention* |
| Hard Construction | $14,025,150.00 | $942,374.00 | $340,500.00 |
| Soft Construction | $3,289,600.00 | $87,000.00 | $2,146,725.00 |
| FF&E | $4,570,000.00 | $447,500.00 | $945,550.00 |
| **Total Construction Spending** | $21,884,750.00 | $1,476,874.00 | $3,432,776.00 |
| **Operations** | | | |
| Hotel | 148.5 | | |
| Food Services | | $3,504,225.00 | |
| Convention Center | | | 126 |

## Industry Sales/Employment

Construction of each econometric industry cluster is modeled as a completed process in a single year (2010). Operational employment is modeled as a constant in the region/local employment model based upon 2008 data and deflated to reflect operations beginning in the year 2011. **IMPLAN** Pro v3.0 software provides insights allowing interactive flexibility within this complex economic forecasting tool enabling the user to enter situation specific changes to the variables that impact the models/matrices as a whole. The application of the Industry Sales and Industry Employment variables allow for changes in production of goods and services without local displacement effects. The decision to model without local competition for labor and market share in the region was made based upon the belief that latent demand for shopping opportunities exist and the developments are satisfying existing market gaps.

## 3-3 ABOUT IMPLAN

IMPLAN has long been accepted by the USCIS (and many other governmental agencies) as a valid economic methodology that satisfies the requirements of 8 CFR § 204.6(j)(4), 8 CFR § 204.6(m)(3)(iv) and 8 CFR § 204.6(m)(3)(v).

The **IMPLAN** system is a menu-driven microcomputer program that performs complex calculations in the methods and assumptions used to generate social accounts and input/output multipliers. The software performs the necessary calculations, using the study area data, to create the models. The system allows users to make in-depth examinations of regional, state, multi-county, county or sub-county economies.

The **IMPLAN** data and accounts closely follow the accounting conventions used in the "Input/Output Study of the U.S. Economy" by the Bureau of Economic Analysis and the rectangular format recommended by the United Nations.

Comprehensive and detailed data coverage of the entire U.S. by county and the ability to incorporate user supplied data at each stage of the model building process provides a high degree of flexibility both in terms of geographic coverage and model formulation.

IMPLAN is based on the concept of a production function, which determines the quantities of inputs that are required to produce a unit of output. The basic data are collected by the Commerce Department from a variety of sources, such as the Annual Survey of Manufacturers and various annual surveys of the service

SEC-USCIS-P-0000055

sector. The data are benchmarked to the Economic Census figures once every five years and then updated annually. These figures comprise a national input/output model.

All of this data is contained within the **IMPLAN** software developed by the Minnesota **IMPLAN** Group, Inc. The "processes and calculations" are thus embedded within the programming of the software which renders an "output" based on any "input" in the way a calculator contains mathematical rules for generating output based on data input. To fully understand the complexity of the IMPLAN software and the mathematical models utilized to generate output data requires a deep knowledge of applied economic theory.

The **IMPLAN** model has certain similarities with the RIMS (Regional Input/Output Modeling system) model developed by the Department of Commerce, but is generally thought to contain several superior features besides its greater ease and flexibility of use. These improvements can be summarized as follows:

1.  The Commerce Department is not permitted to publish data in any category where there are less than three organizations in a given economic area. **IMPLAN** has developed an algorithm to fill in the missing numbers.

2.  **IMPLAN** has introduced improved methods of accounting for flows of goods and services among counties.

3.  **IMPLAN** permits aggregation of any subset of industries for calculation and tabular purposes. This is useful when results are desired for, say, 1-digit industries instead of the 509 industries actually found in the input/output table.

4.  As seen in the tables throughout this analysis, **IMPLAN** estimates three separate effects, labeled "direct," "indirect" and "induced." The direct effects are those entered by the user. The Indirect and induced represent the multiplier effects, but they are usually combined in other input/output models. Briefly, the *indirect* effect represents purchases made by businesses when their sales rise. For example, a restaurant might order more food produced or sold in the region or an automobile plant might order more steel. The *induced* effect represents the additional household spending because income has risen. For example, casino workers would spend their paychecks on various goods and services, some of which are produced in the region. In general, the larger the region

under consideration, the larger the multipliers would be.

The following material, taken from the IMPLAN manual, describes the input/output process in more detail.

Input/output analysis is a means of examining relationships within an economy, between businesses and between businesses and final consumers. It captures all of the monetary market transactions for consumption in a given time period. The resulting mathematical formulae allow examination of the effects of a change in one or several economic activities on an entire economy.

A descriptive model includes information about local economic interactions known as regional economic accounts. These describe a local economy in terms of the flow of dollars from purchasers to producers within the region. The initial IMPLAN data details all purchases, including imported goods and services. When regional economic accounts are created, imports to the region are removed from the initial data, allowing examination of local inter-industry transactions and final purchases.

The regional economic accounts are used to construct local level multipliers. Multipliers describe the response of the economy to a stimulus (a change in demand or production). The multipliers represent the Predictive Model.

Purchases for final use (final demand) drive an input/output model. Industries producing goods and services for consumption purchase goods and services from other producers. These other producers, in turn,

SEC-USCIS-P-0000056

purchase goods and services. These indirect purchases (or indirect effects) continue until leakages from the region (imports, wages, profits, etc.) stop the cycle.

The indirect effects and the effects of increased household spending (induced effects) can be mathematically derived as sets of multipliers. The derivation is called the Leontief inverse. The resulting sets of multipliers describe the change of output for each industry caused by a one dollar change in final demand for any given industry.

The input/output analysis framework is similar to a financial accounting framework that tracks purchases of and expenditures on goods and services in dollars. Input/output accounting traces the flow of dollars between businesses and between businesses and final consumers.

Final Consumption (or final demand) drives input/output models. Industries respond to meet demand directly or indirectly, by supplying goods and services to industries responding directly. Each industry that produces goods and services generates demands for other goods and services, and so on. Multipliers describe these iterations.

To assist the reader in understanding the "processes and calculations," WJ has attached as Exhibit 1, a discussion of the many determinants that are used to derive the figures upon which economic decisions are based.

Further, this econometric study provides information related to job creation and the "overall economic impact" of the regional center by quantifying 1) the total increase in output as a result of a project and 2) the total increase in labor income.

The **IMPLAN** model used in this econometric study generates output data in the form of job creation and economic impact numbers. The **IMPLAN** software derives monetary predictions based on various input data. The USCIS has long recognized that an economic report provides two data sets of information, "job creation" and "economic impact," both within the geographic scope of the regional center.

Also included in this study is impact analysis on indirect business taxes and employee compensation. This information is provided to illustrate the increased benefits to the local community and region in general.

Finally, to further assist the reader in understanding the economic benefits to the local, regional and national economies, we attached Exhibit 2 entitled "Identifying the Regional Benefits Clusters of the Robstown Improvement Development Corporation EB-5 Regional Center to the Overall Economy through Impact Analysis.

SEC-USCIS-P-0000057

# 4. RESULTS

The econometric analysis calculates the permanent increase in employment, output, and labor income by industry classifications for each of these three industry economic clusters. The number of permanent new jobs created consists of the following components:

1. Indirect and induced jobs (but not direct jobs) from construction of the new facilities. The underlying estimates of direct jobs—which are not included in the total job count but are used as the basis to determine indirect and induced jobs—are based on the number of square feet, construction costs for the indicated county, and output per construction worker for each county.

2. Direct new jobs for the operation of each of the new facilities. For office buildings and laboratories, these are based on the number of square feet for each facility divided by the number of square feet per employee. For manufacturing facilities, these are based on the total investment cost, the capital/output ratio for that industry, and output per employee for each industry and region. For retail and service facilities, they are based on the number of square feet per employee taken from national surveys.

3. Indirect and induced new jobs from the operation of each facility, as calculated with the IMPLAN model, using multipliers for the county groups.

The analysis then turns to the actual calculation of the permanent increases in employment, output, and labor income for each of the three economic industry clusters.

## 4-1 ECONOMIC RESULTS DEFINITIONS

As shown in the following results tables, a range of results occur across the various economic industry clusters associated with the level of sales and operational employment. The direct employment stimulus leads to additional job creation through indirect effects.

Direct Effects



## Direct Effects

Represents the impacts for the expenditures and/or production values specified as direct final demand changes.

## Indirect Effects

The iterative effect on the local economy—as local firms enjoy higher revenues, they in turn demand more from their intermediary suppliers. These indirect effects are captured in our model.

## Induced Effects

Induced effects are defined as the effects of household spending on the local economy. It is important to delineate the positive contribution that new workers provide to the increase in area household income and the corresponding effect these increases have on job creation. The econometric study has estimated the effects separately to allow the analyst to pre-determine how much income actually goes into the economy and thus the overall economic effect.

## Output

The Output of an economy is the amount of production in dollars, including all intermediate goods purchased as well as value-added (labor, capital and profit). We can also think of output as sales for both final

Intercontinental Regional Center Trust of Chicago | Economic Analysis                           23

SEC-USCIS-P-0000058

goods and services and intermediate goods and services. Output is dependent upon consumption in the area, state government spending, investment and exports of the industries in the region.

## Employment

The Employment variable in the WJ/**IMPLAN** matrix is made up of historical data from the Bureau of Economic Analysis (BEA).

## Population

Population is a key variable in the WJ/**IMPLAN** regional analysis that affects the potential labor force, government spending and consumption.

[THIS SECTION INTENTIONALLY LEFT BLANK]

SEC-USCIS-P-0000059

## 4-2 SUMMARY OF HOTEL IMPACT

|  | YEAR 1:<br>*Construction, 2011* | YEAR 2:<br>*Operations, 2012* | *TOTAL* |
|---|---|---|---|
| **Construction Input** | | | |
| Soft Costs | $3,728,355 | | $3,728,355 |
| Hard Costs | $31,418,950 | | $31,418,950 |
| FF&E | $5,665,250 | | $5,665,250 |
| | $40,812,555 | | $40,812,555 |
| **Total Output** | | | |
| Total U.S. Economy | | | |
| Output | $36,093,974 | $86,764,904 | |
| Labor Income | $1,023,062 | $34,167,904 | |
| Indirect Business Taxes | $10,190,063 | $5,284,548 | |
| IRCTC Regional Center | | | |
| Output | $59,389,932 | $65,113,832 | |
| Labor Income | $20,979,464 | $28,674,494 | |
| Indirect Business Taxes | $1,576,729 | $4,525,525 | |
| **Employment Summary** | | | |
| Direct Jobs[1] | | 275.0 | |
| Indirect Jobs | 69.1 | 74.6 | |
| Induced Jobs | 109.9 | 150.0 | |
| Total Regional Center Employment | 354.0 | 499.7 | |
| Balance of the U.S. | 175.5 | 123.5 | |



| Total U.S. FT Jobs | | 529.5 | 623.2 | | |

## Direct to Indirect Multiplier Chart

| | Direct (a) | Indirect (b) | Induced (c) | Total Jobs (a+b+c) | Multiplier [(b+c)/a] |
|---|---|---|---|---|---|
| Accommodations—NAICS 721 | 275 | 74.6 | 150.0 | 499.7 | 0.45 |

## Indirect Job Multiplier Per $1MM

| | Input/ $1MM (a) | Indirect (b) | Induced (c) | | Multiplier [(b+c)/a] |
|---|---|---|---|---|---|
| Construction—NAICS 23 | 31.41895 | 69.1 | 109.9 | | 5.7 |

---

[1] Consistent with current USCIS guidance and interpretation, only indirect and induced jobs from construction of the twelve independent economic clusters are counted.

---

Intercontinental Regional Center Trust of Chicago | Economic Analysis                          25

SEC-USCIS-P-0000060

## 4-3 SUMMARY OF RESTAURANT IMPACT

|  | YEAR 1: Construction, 2011 | YEAR 2: Operations, 2012 | TOTAL |
|---|---|---|---|
| Construction Input |  |  |  |
| Soft Costs | $498,975 |  | $498,975 |
| Hard Costs | $2,625,545 |  | $2,625,545 |
| FF&E | $1,245,355 |  | $1,245,355 |
|  | $4,369,875 |  | $4,369,875 |
| Total Output |  |  |  |
| Total U.S. Economy |  |  |  |
| Output | $4,856,320 | $9,539,677 |  |
| Labor Income | $2,045,713 | $2,663,345 |  |
| Indirect Business Taxes | $500,241 | $456,707 |  |
| IRCTC Regional Center |  |  |  |
| Output | $4,962,958 | $12,637,002 |  |
| Labor Income | $1,753,162 | $4,119,634 |  |
| Indirect Business Taxes | $131,761 | $668,247 |  |
| Employment Summary |  |  |  |
| Direct Jobs[2] |  | 108.6 |  |
| Indirect Jobs | 5.8 | 15 |  |
| Induced Jobs | 9.2 | 21.5 |  |
| Total Regional Center Employment | 29.3 | 145.1 |  |
| Balance of the U.S. | 15 | 30.9 |  |

**Direct to Indirect Multiplier Chart**

|  | Direct (a) | Indirect (b) | Induced (c) | Total Jobs (a+b+c) | Multiplier [(b+c)/a] |
|---|---|---|---|---|---|
| Food & Bev—NAICS 722 | 108.6 | 15.0 | 21.5 | 145.1 | 0.34 |

**Indirect Job Multiplier Per $1MM**

|  | Input / $1MM (a) | Indirect (b) | Induced (c) | Total Indirect Jobs | Multiplier [(b+c)/a] |
|---|---|---|---|---|---|
| Construction—NAICS 23 | 2.625545 | 5.8 | 9.2 | 15.0 | 5.7 |

---

[2] Consistent with current USCIS guidance and interpretation, only indirect and induced jobs from construction of the twelve independent economic clusters are counted.

---

Intercontinental Regional Center Trust of Chicago | Economic Analysis                                        26

SEC-USCIS-P-0000061

## 4-4 SUMMARY OF CONVENTION CENTER IMPACT

|  | YEAR 1:<br>Construction, 2011 | YEAR 2:<br>Operations, 2012 | YEAR 3:<br>Operations, 2013 | TOTAL |
|---|---|---|---|---|
| Construction Input |  |  |  |  |
| Soft Costs | $6,244,750 | $6,244,750 |  | $12,469,500 |
| Hard Costs |  |  |  | $89,320,000 |
| FF&E | $9,176,480 | $9,176,480 |  | $18,325,960 |
|  | $60,081,230 | $60,081,230 |  | $120,135,460 |
| **Total Output** |  |  |  |  |
| Total U.S. Economy |  |  |  |  |
| Output | $5,524,635 | $10,041,372 | $10,041,372 |  |
| Labor Income | $1,559,717 | $3,294,831 | $3,294,831 |  |
| Indirect Business Taxes | $156,592 | $914,682 | $914,682 |  |
| IRCTC Regional Center |  |  |  |  |
| Output | $119,358,928 | $85,564,864 | $35,658,436 |  |
| Labor Income | $43,945,680 | $31,503,352 | $11,224,802 |  |
| Indirect Business Taxes | $2,424,232 | $2,284,128 | $976,891 |  |
| **Employment Summary** |  |  |  |  |
| Direct Jobs |  | 257.5 | 126.0 |  |
| Indirect Jobs |  | 105.9 | 50.3 |  |
| Induced Jobs |  | 165.0 | 58.8 |  |
| Total Regional Center Employment |  | 528.4 | 235.1 |  |
| Balance of the U.S. | 237 | 221.6 | 67.9 |  |

| | | | |
|---|---|---|---|
| Total U.S. FT Jobs | 784.9 | 750.0 | 303.0 |

**Direct to Indirect Multiplier Chart**

| | Direct (a) | Indirect (b) | Induced (c) | Total Jobs (a+b+c) | Multiplier [(b+c)/a] |
|---|---|---|---|---|---|
| Convention Ctr—NAICS 56192 | 126 | 50.3 | 58.8 | 235.1 | 0.87 |

**Indirect Job Multiplier Per $1MM**

| | Direct (a) | Indirect (b) | Induced (c) | Total Jobs (a+b+c) | Multiplier [(b+c)/a] |
|---|---|---|---|---|---|
| Construction—NAICS 23 | 257.5 | 105.9 | 165.0 | 528.4 | 1.05 |



SEC-USCIS-P-0000062

the Chicago Council on Global Affairs, and comes two years after the inaugural ranking by these same parties.

The top four cities retained their hold over the two-year period, though the ranking also showed growing momentum in Asia and the Pacific, with five of the 10 cities deemed most global. In addition to Tokyo and Hong Kong, those cities included Singapore, Sydney and Seoul.

The ranking analyzed data ranging from numbers of major company headquarters to the size of capital markets and the flow of goods through airports and ports, Foreign Policy magazine stated. Other factors included numbers of embassies, think tanks, political organizations and museums.

The Chicago Council on Global Affairs is expected to present an A.T. Kearney analysis on what contributed to Chicago's upward move in early September. Among the contributing factors, according to an A.T. Kearney overview, were increases in major corporate headquarters, as well as in business and international conferences. Also cited were better rankings in air freight and in visual and performing arts.

In 2008, Chicago's strengths included the presence of major capital markets, a highly educated work force, an ability to attract international students to its universities, the presence of a number of Fortune 500 company headquarters, and the size and diversity of its immigrant population

## CHICAGO'S ECONOMIC HEALTH IS STILL FRAGILE, BUT SLOWLY IMPROVING

August 17, 2010

Given that Chicago's June unemployment rate – 10.6% – is more than a full percentage point above the national average of 9.5%, it is clear that the Windy City's economic health is still fragile and that a full recovery is months away.

Having said this, the fact that total employment in the metro area shrank considerably slower in June (-1.8% year over year) than in August 2009 (-6.2% year over year) does suggest that the metro area's economic health may be slowly improving.

Based on preliminary, unseasonably adjusted data, Chicago added 101,000 new jobs in the second quarter of 2010, more than twice the 46,400 gain recorded during the same period in 2009.

Significant job gains occurred in professional services (+20,900); transportation and trade (+12,600); construction (+18,000); and manufacturing (+4,600).

9

Despite this evidence of stronger job growth, however, home sales in Chicago dropped sharply following the expiration of the homebuyer tax credit in April.

Given the increase in hiring plans – as reflected by the most recent Manpower Outlook Survey – housing demand should gradually strengthen through the second half of 2010 and into 2011.

The Chicago Institute of Supply Management's latest (July) Chicago Report drew attention to marked increases in production, new orders, order backlogs and inventories. The Institute also noted continued growth in employment.

## Employment growth – Chicago, IL vs. total U.S.



*"Year over year" is each month versus the same month of the previous year.

10

SEC-USCIS-P-0000064

**U.S. & Chicago Hotel Statistics for August**

**STR reports U.S. hotel performance for week ending 7 August 2010**





The U.S. hotel industry reported increases in all three key performance measurements during the week of 1-7 August 2010, according to data from STR. In year-over-year measurements, the industry's occupancy increased 6.7 percent to 70.2 percent. Average daily rate rose 1.6 percent to US$99.13. Revenue per available room increased 8.4 percent to US$60.27.

All Top 25 Markets reported occupancy and RevPAR increases for the week.

Detroit, Michigan, achieved the largest occupancy increase, rising 26.1 percent to 69.1 percent. Three other top markets posted occupancy increases of more than 15 percent: Norfolk-Virginia Beach, Virginia (+17.0 percent to 87.5 percent); Tampa-St. Petersburg, Florida (+15.6 percent to 62.4 percent); and Chicago, Illinois (+15.5 percent to 78.9 percent). San Francisco/San Mateo, California (+0.3 percent to 91.1 percent), and Orlando, Florida (+0.2 percent to 68.4 percent) ended the week virtually flat in occupancy.

New York, New York, experienced the only double-digit ADR increase, rising 12.4 percent to US$215.63, followed by Boston, Massachusetts (+6.6 percent to US$137.34), and San Francisco/San Mateo (+6.5 percent to US$143.51). Nashville, Tennessee, reported the largest ADR decrease, falling 5.3 percent to US$80.45.

SEC-USCIS-P-0000065

Detroit increased 22.8 percent in RevPAR to US$52.08, reporting the largest increase in that metric, followed by Chicago (+20.3 percent to US$91.13) and Anaheim-Santa Ana, California (+19.9 percent to US$110.17).

## INFRASTRUCTURE CHANGES WILL POSITIVELY AFFECT TOURISM

The **Chicago O'Hare International Airport** or simply **O'Hare**, serves as the primary and largest hub for United Airlines and as a hub for American Airlines. It is operated by the City of Chicago Department of Aviation.

In 2008, the airport had 881,566 aircraft operations, an average of 2,409 per day. O'Hare is the world's busiest airport in terms of takeoffs and landings. O'Hare International Airport is the fourth busiest airport in the world with 64,397,782 passengers passing through the airport in 2009. O'Hare has a strong international presence, with flights to more than 60 foreign destinations. O'Hare is the fourth busiest international gateway in the United States with only John F. Kennedy International Airport in New York City, Los Angeles International Airport and Miami International Airport serving more international passengers.

O'Hare International Airport has been voted the "Best Airport in North America" for 10 years by two separate sources: Readers of the U.S. Edition of *Business Traveler Magazine* and *Global Traveler Magazine*.

Most of O'Hare Airport is in Cook County, but a section of the southwest part of the airport is in DuPage County.

O'Hare is presently going through a significant expansion program, to be completed by 2013, that will increase the size of the airport by 60% allowing over 110 million people to visit the Chicagoland area. This expansion will dramatically increase the need for additional hotel rooms and convention space. The IRCTC will be able to take advantage of the impending demand by the development of the hotel/convention center complex.

City management has committed to a $6 billion capital investment plan. This plan was approved by the FAA in October 2005 and involves a reconfiguration of the airfield and additional terminal space. The plan includes the addition of four runways, the lengthening of two existing runways, and the decommissioning of two existing runways in order to give the airfield six parallel runways in a configuration similar to that in Dallas and other large modern hub airports.

12

The Modernization Plan is now being implemented; an additional runway and Air Traffic Control Tower were commissioned on November 20, 2008. With the new runway's opening, O'Hare's maximum aircraft arrival capacity increased from 96 planes per hour to 112 planes per hour;

Design efforts are underway for the remainder of the program, which includes three runway projects, a new western terminal complex and an automated people mover system. The O'Hare Modernization Program submitted an application to the Federal Aviation Administration to use approximately $180 million in Passenger Facility Charges to fund design work, which began in early 2009.

The second new runway is currently under construction.

The program will expand the airport's capacity to over 3,800 operations per day, up from the present capacity of 2,700 and will vastly increase passenger throughput. It will also improve the ability of very large aircraft such as the A380 to land at O'Hare.

- **Professional Backing:** Hotel management groups that have expressed interest in partnering with the IRCTC include Hilton; International Hotel & Resorts and the Global Hotel group Dorint Hotel & Resorts.

**Population Forecast for Greater Chicago Metropolitan Area**

The Northeastern Illinois Planning Commission projects the following:

The forecasts show continued steady growth through the three decades to 2030. Over the 30 year span, population in the six county areas will increase by 1.9 million, reaching a total slightly over 10 million people. Jobs will increase by 1.2 million, reaching a 2030 total of 5.6 million. A large part of this increase will be the result of increases in the Hispanic population. By 2030, this group will account for 1/3 of the region's total population. At the same time, with the aging of the baby boom population, approximately 22% of the population will be over the age of 60. These two factors will combine to generate a 2030 average household size that is nearly identical to the 2000 household size.

With population forecasts showing significant increases for the overall population as well as continued tourism increases in the upcoming years, the need for additional hotel space is well documented to serve the ever growing and changing Greater Chicago Metropolitan Statistical Area.

13

SEC-USCIS-P-0000067

**Economic Tools**

The Location Quotient is a tool developed by the U.S. Bureau of Labor Statistics that creates tables of private sector employment data by industry as measured by the Quarterly Census of Employment and Wages Program. The calculator can facilitate the comparison of employment levels in the United States (as a whole), individual states, counties, and metropolitan statistical areas.

Location Quotients (LQs) are ratios that allow an area's distribution of employment by industry to be compared to a reference or base area's distribution. The reference area is usually the
United States, but it can also be a state or metropolitan area. The reference or base industry is usually the all-industry total, for example, total manufacturing. LQs are calculated by first dividing local employment by industry by the local all-industry employment total. Next, industry employment in the reference area is divided by the all-industry total for the reference area. Finally, the local ratio is divided by the reference area ratio.

The location quotients were calculated for each industry as follows:

$$LQ = \frac{\left(E_i/E_c\right)}{\left(E_{ni}/E_{nt}\right)}$$

Where:

$E_i$ = Employment in the regional center's industry;

$E_c$ = Total employment in the regional center;

This tool is typically used to measure how specialized the local economy is. A community highly specialized in a given industry sector is likely exporting goods or services. This is an indication of economic "self-sufficiency." A community is considered economically "dependent" when any industry sector that cannot produce enough goods or services to meet local demand is highly represented. It may be useful to compare the local LQ to the state LQ by industry sector. If the local LQ is greater than 1.0 and it exceeds the statewide average, the local area may have a regional, as well as a national competitive advantage in that sector. An LQ less than 1.0 provides a key indicator for developing an import substitution strategy locally.

14

SEC-USCIS-P-0000068

Location Quotient analysis is useful for understanding current economic situations.

Location Quotients **calculated from Quarterly Census of Employment and Wages Data**

| **Industry** | **Illinois -- Statewide** |
| --- | --- |
| **Base Industry: Total, all industries** | 1.00 |
| **NAICS 11 Agriculture, forestry, fishing and hunting** | 0.31 |
| **NAICS 21 Mining, quarrying, and oil and gas extraction** | 0.33 |
| **NAICS 22 Utilities** | 0.95 |
| **NAICS 23 Construction** | 0.83 |
| **NAICS 31-33 Manufacturing** | 1.11 |
| **NAICS 42 Wholesale trade** | 1.19 |
| **NAICS 44-45 Retail trade** | 0.93 |
| **NAICS 48-49 Transportation and warehousing** | 1.20 |
| **NAICS 51 Information** | 0.86 |
| **NAICS 61 Educational services** | 1.21 |
| **NAICS 62 Health care and social assistance** | 0.96 |
| **NAICS 71 Arts, entertainment, and recreation** | 0.91 |
| **NAICS 52 Finance and insurance** | 1.17 |
| **NAICS 53 Real estate and rental and leasing** | 0.86 |
| **NAICS 54 Professional and technical services** | 1.05 |

| | |
|---|---|
| **NAICS 55 Management of companies and enterprises** | 1.16 |
| **NAICS 56 Administrative and waste services** | 1.98 |
| **NAICS 72 Accommodation and food services** | 0.90 |
| **NAICS 81 Other services, except public administration** | 1.02 |
| **NAICS 99 Unclassified** | 0.92 |

Location Quotient: Ratio of analysis-industry employment in the analysis area to base-industry employment in the analysis area divided by the ratio of analysis-industry employment in the base area to base-industry employment in the base area.

The Accommodations sector shows Illinois is 10% below the national average indicating an opportunity for additional hotel space within the geographic region of the Regional Center.

SEC-USCIS-P-0000069

Location Quotients **calculated from Quarterly Census of Employment and Wages Data**

| **Industry** | **Cook County, Illinois** |
| --- | --- |
| **Base Industry: Total, all industries** | 1.00 |
| **NAICS 11 Agriculture, forestry, fishing and hunting** | 0.02 |
| **NAICS 21 Mining, quarrying, and oil and gas extraction** | 0.05 |
| **NAICS 22 Utilities** | 0.39 |
| **NAICS 23 Construction** | 0.64 |
| **NAICS 31-33 Manufacturing** | 0.88 |
| **NAICS 42 Wholesale trade** | 0.95 |
| **NAICS 44-45 Retail trade** | 0.80 |
| **NAICS 48-49 Transportation and warehousing** | 1.38 |
| **NAICS 51 Information** | 0.97 |
| **NAICS 61 Educational services** | 1.72 |
| **NAICS 62 Health care and social assistance** | 1.00 |
| **NAICS 71 Arts, entertainment, and recreation** | 0.89 |
| **NAICS 52 Finance and insurance** | 1.41 |
| **NAICS 53 Real estate and rental and leasing** | 1.10 |
| **NAICS 54 Professional and technical services** | 1.32 |

| | |
|---|---|
| **NAICS 55 Management of companies and enterprises** | 1.27 |
| **NAICS 72 Accommodation and food services** | 0.89 |
| **NAICS 81 Other services, except public administration** | 1.12 |
| **NAICS 99 Unclassified** | 1.21 |

Location Quotient: Ratio of analysis-industry employment in the analysis area to base-industry employment in the analysis area divided by the ratio of analysis-industry employment in the base area to base-industry employment in the base area.

The Accommodations sector shows Cook County 11% below the national average, indicating an opportunity for additional hotel space within the Greater Chicago area and corroborating the Accommodations percentage of Illinois as a whole.

16

## 3. Project Development Timeline

Construction of the proposed hotel will be continuous over the course of 26 months.

Project milestones to be completed during the development timeline:

- Full zoning approvals obtained from the City and County where the hotel will be located
- Entitlements for the project site to be completed.
- Franchise agreement to be executed for the hotel.

Construction Milestones

- Complete civil engineering design (geotechnical service, soil investigation, hydrology study, precise grading plan, and street/utility improvement plan)
- Complete building design (including architectural, structural engineering and mechanical, electrical and plumbing designs)
- Obtain permits and approvals (dry utilities approval, construction drawing permit, conditional use permit, building permit) and pay city fees (including permit fees, impact fees, and school fees)
- Begin Stage 1 site work: construction fencing, rough grading, soil excavation/import/compaction, and underground wet and dry utilities. Obtain pad certification and compaction report approval.
- Begin shell building construction: includes framing, roofing, glass and glazing, utility installation, and stucco and painting.
- Begin Stage 2 site work (trash enclosure, curb, gutter and hardscape, back

fill and finish grade, landscaping, grade base and pave, and signage)
- Complete shell and core for the hotel
- Complete interior construction (includes installation of insulation, drywall, and security and communication systems, interior painting, ceramic tile, doors and hardware, millwork/cabinet, wall covering, floor coverings)
- **Hotel open for business (at 26 to 28 months)**

### 4. Project Development Costs

It is projected that $31,418,950.00 will be required to fund the hard costs of construction of the hotel. The following table provides a breakdown of the projected construction costs:

17

PROJECT
D...l...

| CONSTRUCTION COSTS SUMMARY | |
|---|---|
| 250,000 sq. ft. Hotel in Chicago, Illinois | |
| ITEM | AMOUNT |
| 1 Hard Costs & Site Work | $31,418,950.00 |
| 2 Soft Costs | $3,728,355.00 |
| 3 FF&E | $5,665,250.00 |
| TOTAL Construction Costs | $40,812,555.00 |

## 5. Project Capitalization

The proposed hotel will be fully capitalized through a combination of EB-5 investment, debt financing and domestic investment.

| CAPITALIZATION OVERVIEW | |
|---|---|
| 250,000 sq. ft. hotel | |
| Funding Source | Funding Amount |

|   | Funding Source     | Amount        |
|---|--------------------|---------------|
| 1 | EB-5 Investment    | $21.5 million |
| 2 | Debt Financing     | $8 million    |
| 3 | Domestic Investment| $11.5 million |
|   | TOTAL              | $41 million   |

## 6. Project Job Creation

The following chart delineates the jobs projected to occur from the construction and operations of the hotel.

18

SEC-USCIS-P-0000072

| | JOB CREATION OVERVIEW 250,000 sq. ft. hotel | |
|---|---|---|
| | **Job Type** | **Number of Jobs** |
| 1 | Construction - NAICS 236220 | 179.0 Jobs |
| 2 | Hotel Operations – NAICS 72110 | 499.7 Jobs |
| | TOTAL | 678.7 Jobs |

19

SEC-USCIS-P-0000073

# EXHIBIT I

## A Summary of the Processes and Calculations Used within the IMPLAN Program to Perform the Econometric Studies

Final consumption drives input-output models. Industries respond to meet demands directly or indirectly. Each industry that produces goods and services generates demands for other goods and services and so on. *Multipliers* describe these repetitive actions. There are two different multipliers developed for predictive modeling: Type I and Type II. We start with deriving a matrix by dividing each industry element by the total of all industry elements. This matrix is known as the *A Matrix*. The A Matrix then provides us with *production functions*. A production function shows where an industry spends and in what proportions to generate each dollar of output.

Through imbedded algorithmic computations within the A Matrix, IMPLAN derives the multipliers. The resulting equation is the *predictive model*:

$$X = (I-A)-1 \times Y$$

Where:

$X$ = Total industry output
$I$ = Identity matrix
$A$ = A Matrix
$Y$ = Final Demand.

This can also be interpreted as:

$$\Delta X = (I-A)-1 \times \Delta Y \text{ or Change in Total Industry Output} = (I-A)-1 \times \text{Change in Final Demand.}$$

The predictive model shows how output will change with a given change in final demand.

Multipliers report the effects on economic activity through three components:

1. *Direct effects* are the changes in the industries to which a final demand change was

1. *Direct effects* are the changes in the industries to which a final demand change was
made.

2. *Indirect effects* are the changes in inter-industry purchases as they respond to the new
demands of the directly affected industries.

3. *Induced effects* typically reflect changes in spending from households as income
increases or decreases due to the changes in production.

The *Type I multiplier* measures the direct and indirect effects of a change in economic activity. It captures the inter-industry effects only, i.e. industries buying from local industries.

A *Type II multiplier* captures direct and indirect effects. In addition to the inter-industry effects, the Type II also takes into account the income and expenditures of households. The household income and the household expenditures are treated as industries. This internalizes the household sector, including the induced or household spending effects. The Type II multiplier is calculated by dividing household expenditures by the total of all household incomes. The Type II multiplier says that for a one dollar change in final demand for an industry, increases occur in inter-industry economic activity (as in Type I). But it also says the incomes of people employed producing the output of that industry increase. These people spend their increased income on personal consumption, which leads to demands from local industries. Households that live in the region, make consumption expenditures with only disposable income as well as making payments to taxes as well as savings. These refined calculations result in a more complete and realistic presentation of total economic activity.

Intercontinental Regional Center Trust of Chicago | Economic Analysis                                28

SEC-USCIS-P-0000074

Income multipliers are derived from the relationship between income and output. In the IMPLAN study area data there is total industry output and total income for each sector. From this data we can calculate income per dollar of output. An employment multiplier is created in the same manner as the income multiplier, but using output per worker ratios instead of output per dollar of income.

Input-output modeling is based on several assumptions:

- Constant Returns to Scale
- No Supply Constraints
- Fixed Commodity Input Structure
- Homogenous Sector Output
- Industry Technology Assumption

The first assumption is that the *production functions* (an industry's list of expenditures) are assumed to *have constant returns to scale*. This means the production functions are considered linear; if additional output is required, all inputs increase proportionately.

*No supply constraints* means supplies are unlimited. An industry has unlimited access to raw materials and its output is limited only by the demand for its products.

A *fixed commodity input structure* implies that price changes do not cause a firm to buy substitute goods. This structure assumes that changes in the economy will affect the industry's output but not the mix of commodities and services it requires to make its products.

The fourth assumption is that there is *homogeneous sector output*. In other words: the proportions of all the commodities produced by that industry remain the same, regardless of total output. An industry won't increase the output of one product without proportionately increasing the output of all its other products.

The *industry technology assumption* assumes that an industry uses the same technology to produce all its products.

Economic impact analysis involves applying a final demand change to a predictive economic input-output

Economic impact analysis involves applying a final demand change to a predictive economic input-output model, and then analyzing the resulting changes in the economy. A concise definition of impact analysis is:

> **An assessment of change in overall economic activity as a result of some change in one or several economic activities.**

In practice, economic impact analysis can mean many different things. It might measure the impacts of a new factory moving into an area. It might involve estimating the local impacts of a professional football team moving into an area or the effects of tourist spending. Governments use impact analysis for policy decisions and planning.

Researchers use impact analysis to study relationships of different elements in an economy. An impact analysis begins by converting a *project* to a set of economic issues and those elements involved with the impact. Once the issues have been identified, the elements involved can be identified and their actions converted to a set of expenditures. These expenditures are the initial changes that stimulate further economic activity. The actions and the economic activity they stimulate are the impact.

If the expenditure dollars are for a year different than the model's data, a *deflator* is applied. Deflators account for the changes in actual value of the dollar over the years. Price changes need to be accounted for otherwise the impacts will be estimated incorrectly.

Please review the following sample computations to further illustrate the calculations involved. These calculations are employment calculation examples applied to each industry cluster in the economic report.

SEC-USCIS-P-0000075

# EXHIBIT 2

## Multi-regional Analysis

The IMPLAN v3.0 modeling system allows for analysis of 2 customized regions to show the impacts within the region associated with an event, as well as the impacts of a larger region. The direct effects are realized within the initial region and indirect and induced effects "ripple" across the larger region. These impacts are reflected in the results.

The initial region analysis was the 108 county IRCTC. The ripple effects for the rest of the United States were modeled as the secondary region. The results of both analyses are reflected in the summary charts located in sections 4-2 through 4-4 of this analysis.

Economic impacts are the many different areas of new spending within an economic region as a result of investing in, constructing and operating a new enterprise. Economists measure the economic benefits to the region in terms of increased employment and output resulting from the project. These effects are measured in three distinct categories.

*Direct Effects*—Actual value of construction outlays, operating expenses, associated on-site and off-site spending by visitors to the project.

*Indirect Effects*—Monetary and employment flows generated as a result of the direct demand for resources created by the new project.

For example: Regional demand would increase for restaurant equipment if a new restaurant were to open in a given area. This increased demand for restaurant equipment would create employment and increased output for regional restaurant equipment suppliers. Further, national restaurant equipment manufacturers benefit from the increased demand.

*Induced Effects*—Investment flows within the community and region due to increased spending by employees of the new project.

For example: Local and regional economies benefit by the increased household spending created by a new

For example. Local and regional economies benefit by the increased household spending created by a new restaurant when the restaurant manager and employees spend their compensation throughout the region.

Economic impacts result during the construction phase of the project as the direct outlays associated with construction expenditures occurring throughout the local and regional economies.

The construction phase reflects benefits directly related to hard construction costs of the project. These economic benefits will be visible and measurable as increased monetary flows, new jobs and additional personal earnings for local residents. These initial economic benefits occur only during the construction phase of the project; that is, they are short term impacts.

The operations phase of the project benefits the local, regional and national economy on a long term basis. Economists refer to these impacts as "on-going."

In addition to employment generation and increased output within the regional center, significant tax revenues are generated benefiting the community. Indirect business taxes consist of excise taxes, property taxes, fees, licenses and sales tax paid by the businesses. These taxes occur during the normal operation of business. Indirect business tax numbers are derived from U.S. Bureau of Economic Analysis Gross State Product data.

Included within this study are indirect tax revenue estimates for construction and ongoing operations within each industry cluster.

SEC-USCIS-P-0000076

Indirect tax revenues are used to fund regional governmental projects, infrastructure investments and many other community projects. Road construction, utilities, police and school services are funded through tax revenues paid by businesses throughout the region.

Further, employee compensation reports predict the total compensation to be received by future employees of projects in these industry clusters. Employee compensation is wage and salary payments as well as benefits including: health and life insurance, retirement payments and any other non cash compensation. This new compensation created by the regional center projects will be spent locally, regionally and nationally benefiting the region and the nation.

The entire country benefits from the increased federal tax revenue collected directly from the operations of the project, as well as from the increased federal income tax collected from the employees of the project. Federal taxes benefit the nation as a whole through programs such as wealth distribution, national infrastructure projects, social security and educational services.

SEC-USCIS-P-0000077

# EXHIBIT

D

# ATTACHMENT
# 1-A

SEC-USCIS-P-0000375




| Form **LLC-5.5** | **Illinois**<br>**Limited Liability Company Act**<br>**Articles of Organization** | **FILE # 03490424** |
|---|---|---|
| Secretary of State Jesse White<br>Department of Business Services<br>Limited Liability Division<br>www.cyberdriveillinois.com | Filing Fee: $500<br>Expedited Fee: $100<br>Approved By: JMD1 | **FILED**<br>**JAN 24 2011**<br>**Jesse White**<br>**Secretary of State** |

1. Limited Liability Company Name: <u>A CHICAGO CONVENTION CENTER, LLC</u>

2. Address of Principal Place of Business where records of the company will be kept:
   <u>8201 W  HIGGINS RD</u>

   <u>CHICAGO, IL 60631</u>

3. Articles of Organization effective on the filing date.

4. Registered Agent's Name and Registered Office Address:

   ANSHOO SETHI
   1314 S PLYMOUTH CT
   CHICAGO, IL 60605-2717                          COOK

5. Purpose for which the Limited Liability Company is organized:
   "The transaction of any or all lawful business for which Limited Liability Companies may be organized under this Act."

6. The LLC is to have perpetual existence.

7. The Limited Liability Company has management vested in the member(s).

   SETHI, ANSHOO
   1314 S PLYMOUTH CT, CHICAGO, IL 60605

8. **Name and Address of Organizer**
   I affirm, under penalties of perjury, having authority to sign hereto, that these Articles of Organization are to the best of my knowledge and belief, true, correct and complete.

   Dated: JANUARY 24, 2011

   ANSHOO SETHI
   1314 S. PLYMOUTH CT.
   CHICAGO, IL 60605

   This document was generated electronically at www.cyberdriveillinois.com

SEC-USCIS-P-0000376

# ATTACHMENT
# 1-B

SEC-USCIS-P-0000377



*File Number*       0349042-4



### To all to whom these Presents Shall Come, Greeting:

*I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that*

A CHICAGO CONVENTION CENTER, LLC, HAVING ORGANIZED IN THE STATE OF
ILLINOIS ON JANUARY 24, 2011, APPEARS TO HAVE COMPLIED WITH ALL
PROVISIONS OF THE LIMITED LIABILITY COMPANY ACT OF THIS STATE, AND AS OF
THIS DATE IS IN GOOD STANDING AS A DOMESTIC LIMITED LIABILITY COMPANY IN
THE STATE OF ILLINOIS.



***In Testimony Whereof,*** *I hereto set*

*my hand and cause to be affixed the Great Seal of*

*the State of Illinois, this*   16TH

*day of*      DECEMBER     *A.D.*     2011    .

Authentication #: 1135001468

Authenticate at: http://www.cyberdriveillinois.com

Jesse White

SECRETARY OF STATE

SEC-USCIS-P-0000378

# EXHIBIT

E

# ATTACHMENT
# 2-B

SEC-USCIS-P-0000383

Dated: _____ \_\_, 20\_\_

Name: _____

No.: \_\_\_\_ of 499



# A CHICAGO CONVENTION CENTER

### CONFIDENTIAL PRIVATE OFFERING MEMORANDUM

### UP TO 499

### MEMBERSHIP INTERESTS

### OF

# A Chicago Convention Center, LLC

## AN ILLINOIS LIMITED LIABILITY COMPANY

$249,500,000 MAXIMUM (499 INTERESTS)

OF

LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS

$500,000 PER INTEREST

MINIMUM INVESTMENT OF 1 INTEREST ($500,000.00)

Contact:

INTERCONTINENTAL FINANCIAL GROUP, LLC

8201 West Higgins Road, Chicago, IL 60631

Telephone: (312) 442-0062

Attn: Mr. Anshoo Sethi

12/13/2011                    A CHICAGO CONVENTION CENTER | PPM                    1

SEC-USCIS-P-0000384

**CONFIDENTIAL PRIVATE OFFERING MEMORANDUM**
**UP TO 499 LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS OF**
**A CHICAGO CONVENTION CENTER, LLC**
**An Illinois Limited Liability Company**

This Confidential Private Offering Memorandum (this **"Memorandum"**) is submitted on a confidential basis for use by a limited number of potential non-"U.S. person" investors (hereinafter, **"Investors," "Investor Members,"** or **"Subscribers"**) solely in consideration of the acquisition of the above-captioned securities in a private placement. The acceptance of this Memorandum constitutes agreement on the part of the recipient hereof and its representatives to maintain the confidentiality of the information contained herein. This Memorandum may not be reproduced in whole or in part, and its use for any purpose other than an investment in the securities described herein is not authorized and is prohibited. All dollar amounts contained herein are in currency of the United States.

A Chicago Convention Center, LLC, an Illinois limited liability company (variously hereinafter, the **"Offeror,"** the **"LLC,"** or the **"Company"**), hereby offers (the **"Offering"**) a maximum of $249,500,000, of limited liability company membership interests (**"Interests"**) in Offeror. The LLC has been formed pursuant to the Illinois Limited Liability Company Act for the purpose of financing and developing the ground-up construction and management of "A Chicago Convention Center," The World's First Zero Carbon Platinum LEED®-certified and 100% Allergen Free convention center and hotel complex, including convention and meeting space, five upper-upscale hotels, and amenities including restaurants, lounges, bars, and entertainment facilities as described in further detail in this Memorandum, below. The LLC's undertaking of these activities is referred to hereinafter as the **"Project."**

| | |
|---|---|
| Securities: | Limited Liability Company Membership Interests |
| Interest Price: | $500,000 |

| Maximum Offering | $249,500,000 |
| Minimum Investment | 1 Interest ($500,000) |
| Administrative Fee[1] | $41,500 |

[1] (per subscription, *in addition* to investment)

The Managing Member of the LLC (the **"Managing Member"**) is Intercontinental Financial Group, LLC ("**IFG**"), an Illinois limited liability company with its principal place of business located at 8201 W. Higgins Rd., Chicago, Illinois 60631.

Once commenced, the Offering shall continue until all of the Interests are sold, or until the Managing Member closes the Offering. The proceeds from the subscriptions to the Offering ($500,000) will be deposited into an escrow, and the Administrative Fee will be deposited into the Administrative account. On the approval of each investor's I-526 petition for a conditional green card, the funds held in escrow for that investor will be delivered to the Offeror. If the Offering is terminated, then total subscription and administrative Offering fee amounts deposited will be refunded to the Subscribers without interest or deduction.

The Managing Member and the Offeror reserve the right to accept or reject any subscription for any reason. Any subscriptions not accepted will be returned without interest or deduction. There is no firm commitment by any person to purchase or sell any Interests, and there is no assurance that any of the Interests will be sold.

THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND ARE BEING OFFERED AND SOLD ONLY TO A LIMITED NUMBER OF QUALIFIED INVESTORS IN RELIANCE ON AN EXEMPTION FROM REGISTRATION UNDER SECTION 4(2) OF THE SECURITIES ACT, REGULATION D, AND/OR REGULATION S PROMULGATED THEREUNDER AND APPLICABLE STATE SECURITIES ("**BLUE SKY**") LAWS.

SEC-USCIS-P-0000385

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**COMMISSION**"), NOR HAS THE COMMISSION, OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, PASSED UPON THE ACCURACY OR ADEQUACY OF THESE OFFERING MATERIALS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SALE OF THESE INTERESTS HAS NOT BEEN QUALIFIED WITH THE ILLINOIS SECURITIES DEPARTMENT AND/OR ANY OTHER STATE, AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SHARES IS EXEMPT FROM QUALIFICATION BY THE LAWS OF OTHER STATES. IN THE EVENT OF SALES TO RESIDENTS OF ANY STATE, THE RIGHTS OF ALL PARTIES TO THE SUBSCRIPTION AGREEMENT ATTACHED HERETO ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

THE SECURITIES OFFERED HEREBY SHALL NOT BE REGISTERED UNDER THE ACT OR UNDER ANY BLUE SKY LAWS, AND MAY ONLY BE OFFERED OR SOLD IN THE UNITED STATES (OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, A U.S. PERSON) PURSUANT TO THE PROVISIONS OF REGULATION S, OR PURSUANT TO REGISTRATION UNDER THE ACT, OR PURSUANT TO AN AVALABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS. HEDGING TRANSACTIONS INVOLVING THESE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT.

CERTIFICATES REPRESENTING THE INTERESTS SOLD HEREBY SHALL BEAR A LEGEND RECITING THAT TRANSFER OF SAID INTERESTS IS PROHIBITED EXCEPT IN ACCORDANCE WITH REGULATION S, OR PURSUANT TO AN

AVAILABLE EXEMPTION FROM REGISTRATION, AND THAT HEDGING TRANSACTIONS INVOLVING THE INTERESTS MAY ONLY BE CONDUCTED IN COMPLIANCE WITH THE ACT.

THIS IS A PRIVATE OFFERING INVOLVING A HIGH DEGREE OF RISK. OFFERS WILL BE MADE ONLY TO INVESTORS WHO ARE "ACCREDITED INVESTORS" AS DEFINED IN REGULATION D PROMULGATED UNDER THE ACT, AND PERSONS MEETING THE CONDITIONS SET FORTH BELOW UNDER THE SECTION ENTITLED "SUBSCRIPTION." INVESTORS WILL BE REQUIRED TO REPRESENT THAT THEY ARE FAMILIAR WITH AND UNDERSTAND THE TERMS, RISKS, AND MERITS OF THIS OFFERING.

EACH SUCH INVESTOR MUST HAVE SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT SUCH INVESTOR IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF THIS INVESTMENT AND MUST BE ABLE TO BEAR THE ECONOMIC RISKS OF THIS INVESTMENT. NO OFFER IS BEING MADE HEREBY TO ANY PERSON WHO DOES NOT DEMONSTRATE BY THE INFORMATION SUCH PERSON PROVIDES TO THE OFFEROR THAT THE PERSON MEETS THE SUITABILITY STANDARDS FOR THIS OFFERING.

THE TRANSFERABILITY OF THE MEMBERSHIP INTERESTS DESCRIBED HEREIN IS HIGHLY RESTRICTED. IN THE EVENT AN INVESTOR SHOULD DESIRE TO DO SO, THE INVESTOR WILL PROBABLY BE UNABLE TO LIQUIDATE THE INVESTMENT QUICKLY OR ON ACCEPTABLE TERMS, IF AT ALL. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE INTERESTS HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT OR ANY BLUE SKY LAW, AND THEREFORE CANNOT BE SOLD, TRANSFERRED, OR PLEDGED IN THE ABSENCE OF SUCH REGISTRATION OR THE AVAILABILITY OF AN EXEMPTION THEREFROM. THERE IS NO PUBLIC OR OTHER MARKET FOR THE INTERESTS, AND NO SUCH MARKET IS EXPECTED TO DEVELOP. THE TRANSFERABILITY OF INTERESTS ALSO IS RESTRICTED BY THE OFFEROR'S LIMITED LIABILITY COMPANY OPERATING AGREEMENT (THE "OPERATING AGREEMENT"). SEE "RISK FACTORS," BELOW. ACCEPTANCE OF ANY SUBSCRIPTION TO

SEC-USCIS-P-0000386

PURCHASE MEMBERSHIP INTERESTS HEREUNDER IS SUBJECT TO THE OFFEROR'S APPROVAL AND THE SATISFACTORY COMPLETION AND EXECUTION OF THE SUBSCRIPTION DOCUMENTS ACCOMPANYING THIS MEMORANDUM.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX CONSEQUENCES FROM AN INVESTMENT IN THE COMPANY. NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY TO THE COMPANY OR ITS MEMBERS.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS LEGAL, TAX, BUSINESS, OR ECONOMIC ADVICE. EACH INVESTOR SHOULD CONSULT HIS OWN COUNSEL AND ACCOUNTANT FOR ADVICE CONCERNING THE VARIOUS LEGAL, TAX, BUSINESS, AND ECONOMIC CONSIDERATIONS RELATING TO HIS INVESTMENT.

THE MANAGING MEMBER RESERVES THE RIGHT TO ACCEPT OR REJECT ANY SUBSCRIPTION TO PURCHASE UNITS. THIS OFFERING WILL CONTINUE UNTIL TERMINATED BY THE MANAGING MEMBER, WHICH MAY BE BEFORE SUBSCRIPTIONS FOR THE MAXIMUM OFFERING HAVE BEEN SECURED.

INVESTORS IN THIS OFFERING WILL INVEST GREATER AMOUNTS AND RECEIVE A PROPORTIONATELY SMALLER INTEREST IN THE PROFITS AND DISTRIBUTIONS OF THE PARTNERSHIP THAN THE MANAGING MEMBER.

A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR THE INTERESTS UNLESS SATISFIED THAT HE HAS, OR HE AND HIS INVESTMENT REPRESENTATIVE HAVE, ASKED FOR AND RECEIVED ALL INFORMATION WHICH WOULD ENABLE HIM, OR BOTH OF THEM, TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT.

THE COMPANY SHALL MAKE AVAILABLE TO EACH INVESTOR, OR HIS INVESTMENT REPRESENTATIVE OR AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY INTERESTS, THE OPPORTUNITY TO ASK QUESTIONS

DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY INTERESTS, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE MANAGING MEMBER OR ITS REPRESENTATIVES CONCERNING ANY ASPECTS OF THE COMPANY AND ITS PROPOSED BUSINESS, AND TO OBTAIN ANY ADDITIONAL RELATED INFORMATION TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

THE STATEMENTS CONTAINED HEREIN ARE BASED ON INFORMATION BELIEVED TO BE RELIABLE. NO WARRANTY CAN BE MADE AS TO THE ACCURACY OF SUCH INFORMATION OR THAT CIRCUMSTANCES HAVE NOT CHANGED SINCE THE DATE SUCH INFORMATION WAS SUPPLIED. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF DOCUMENTS RELATING TO THE BUSINESS OF THE OFFEROR AND THE PURCHASE OF SECURITIES. SUCH SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXTS OF THE ORIGINAL DOCUMENTS WHICH ARE EITHER ATTACHED AS EXHIBITS HERETO, OR ELSE AVAILABLE UPON REQUEST.

THIS MEMORANDUM CONTAINS "FORWARD-LOOKING" STATEMENTS BASED ON THE MANAGING MEMBER'S EXPERIENCE AND EXPECTATIONS ABOUT THE COMPANY'S BUSINESS PLAN. THOSE STATEMENTS ARE SOMETIMES INDICATED BY WORDS SUCH AS "EXPECTS," "BELIEVES," "SEEKS," "ANTICIPATES," "MAY," "INTENDS," "ATTEMPTS," "WILL," AND SIMILAR EXPRESSIONS. SUCH FORWARD-LOOKING STATEMENTS ARE NOT GUARANTEES OF FUTURE PERFORMANCE, AND ARE SUBJECT TO MANY RISKS, UNCERTAINTIES, AND ASSUMPTIONS THAT ARE DIFFICULT TO PREDICT. THEREFORE, AS A RESULT OF VARIOUS FACTORS ACTUAL RETURNS COULD DIFFER MATERIALLY AND ADVERSELY FROM THOSE EXPRESSED OR IMPLIED IN ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. THE SECTION IN THIS MEMORANDUM ENTITLED "RISK FACTORS" DISCUSSES SOME OF THE IMPORTANT RISK FACTORS THAT MAY AFFECT THE COMPANY'S RETURNS. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THOSE RISKS, IN ADDITION TO OTHER INFORMATION IN THIS MEMORANDUM, BEFORE DECIDING WHETHER TO INVEST IN THE COMPANY.

SEC-USCIS-P-0000387

NEITHER THE MANAGING MEMBER, NOR THE COMPANY, UNDERTAKES ANY OBLIGATION TO REVISE OR UPDATE ANY FORWARD-LOOKING STATEMENT FOR ANY REASON.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO YOU UNLESS YOUR NAME AND IDENTIFICATION NUMBER APPEAR ON THE FRONT COVER, AND DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR JURISDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM SHALL BE EMPLOYED IN THE OFFERING OF THESE INTERESTS OTHER THAN THIS MEMORANDUM (INCLUDING THE EXHIBITS HERETO) AND THE DOCUMENTS REFERRED TO HEREIN. NO PERSON OTHER THAN THE MANAGING MEMBERHAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THESE INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR OTHERWISE SUPPLIED BY THE MANAGING MEMBER MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE OFFEROR OR ANY OF ITS MEMBERS. DO NOT CONSIDER ANY INFORMATION WHICH HAS BEEN DESCRIBED ORALLY. PLEASE MAKE SURE THAT YOU INVEST SOLELY ON THE BASIS OF THE INFORMATION IN THIS MEMORANDUM.

THE OFFEREE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN IT AND ALL RELATED DOCUMENTS TO THE MANAGING MEMBERIF THE OFFEREE DOES NOT SUBSCRIBE FOR INTERESTS.

NO OFFER IS BEING MADE HEREBY TO ANY PERSON WHO HAS NOT FURNISHED TO THE MANAGING MEMBERCOMPLETED AND SIGNED SUBSCRIPTION MATERIALS ATTACHED AS EXHIBITS TO THIS MEMORANDUM, AND WHO IS NOT SHOWN BY SUCH INFORMATION TO MEET THE SUITABILITY STANDARDS FOR THIS OFFERING.

ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS PROHIBITED.

Contact Mr. Anshoo Sethi, a member of Intercontinental Financial Group, LLC (the Company's Manager), at
(312) 442-0062 or via email at Anshoo.Sethi@Chicago-RCI.com with questions or a request for information.

Case: 1:13-cv-00982 Document #: 11 Filed: 02/06/13 Page 148 of 167 PageID #:849

* * * * *

SEC-USCIS-P-0000388

**TABLE OF CONTENTS**

**Page**

1.  COVER PAGE ..... 1

2.  INTRODUCTION AND SECURITIES DISCLOSURES ..... 2

3.  SUMMARY OF OFFERING TERMS ..... 7

4.  DESCRIPTION OF THE PROJECT ..... 12

5.  MANAGEMENT, ADVISORS, AND CONSULTANTS BIOGRAPHIES AND INTERRELATIONS ..... 36

6.  CONFLICTS OF INTEREST ..... 47

7.  FINANCIAL CONSIDERATIONS ..... 49

8.  THE OFFERING ..... 53

9.  TAX CONSIDERATIONS ..... 59

10. EB-5 IMMIGRATION DISCLOSURES AND RISK FACTORS ..... 60

11. RISK FACTORS ..... 64

12. SUBSCRIPTION ..... 74

13. LIST OF EXHIBITS ..... 76

Exhibit A  –  Limited Liability Company Operating Agreement
Exhibit B  –  Subscription Agreement

Exhibit C  —  Investor Eligibility Questionnaire
Exhibit D  —  Subscription Escrow Agreement
Exhibit E  —  Business Plan for EB-5 Investment in A Chicago Convention Center
Exhibit F  —  Economic Impact of Development of a Hotel and Convention Center
                    Complex Near Chicago O'Hare International Airport in Chicago, IL, as
                    Part of an Existing EB-5 Regional Center
Exhibit G  —  Letter from the State of Illinois Department of Commerce and
                    Economic opportunity designating project location 8201 W. Higgins Rd.
                    Chicago, IL 60605 as a "target employment area," July 7, 2011

SEC-USCIS-P-0000389

## SUMMARY OF OFFERING TERMS

The following is only a summary of certain of the information contained in this Memorandum, and is qualified in its entirety by reference to the more detailed discussions contained in this Memorandum below, as well as to the Exhibits hereto (all of which are incorporated fully herein by this reference). In the case of any conflict between the summary, below, and the more detailed discussion in the body of the Memorandum, the latter shall control. Similarly, this Memorandum, its exhibits, and certain other documents related thereto have been initially written in the English language; in the event of any conflict between the original English versions and any translations into other languages, the former shall control.

| | |
|---|---|
| **The Company ("Offeror")** | A Chicago Convention Center, LLC is an Illinois limited liability company established on January 19, 2010 with its principal place of business located at 8201 W. Higgins Road, Chicago, Illinois 60631. |
| **Managing Member** | The Managing Member of the LLC is Intercontinental Financial Group, LLC, an Illinois limited liability company with its principal place of business located at 8201 W. Higgins Road, Chicago, Illinois 60631. |
| **EB-5 Regional Center Designation** | The Project is sponsored by the Intercontinental Regional Center Trust of Chicago, LLC ("IRCTC"), which previously received approval to establish, and now operates, the "Intercontinental Regional Center Trust of Chicago" (the "**Regional Center**") which is IRCTC's fictitious business name. The Regional Center is a "regional center" as authorized by the United States Citizenship & Immigration Service ("**USCIS**") under the "EB-5 Immigrant Investor Pilot |

Case: 1:13-cv-00982 Document #: 1-1 Filed: 02/06/13 Page 152 of 167 PageID #:853

foreign investors under the EB-5 Pilot Program. The Project is believed to be a qualifying investment under the EB-5 Pilot Program. The geographic scope of the Regional Center encompasses the entirety of the State of Illinois, plus Lake County in the State of Indiana and Dane, Kenosha, Milwaukee, Racine, and Rock Counties in the State of Wisconsin (collectively, the "**Regional Center Territory**").

**The Project**

The LLC has been organized for the purposes of accomplishing the Project, specifically, the ground-up construction and management of "A Chicago Convention Center," a convention center and hotel complex, including convention and meeting space, five upper-upscale hotels, and amenities including restaurants, lounges, bars, and entertainment facilities.

The proposed convention center will be the World's First Zero Carbon Emission Platinum LEED®-certified and 100% Allergen Free convention center/hotel complex. In addition, the hotel and guest room technology is state-of-the-art, including Biometric Self-Service Check-in, Digital Door Viewer, automated entertainment and room control capability, the latest audio/visual equipment, and many more amenities. The Company believes its facilities are designed as "the guest room of the future," in terms of energy control and usability.

Furthermore, the Project is additionally enhanced by the expected completion of the currently-ongoing $15 billion modernization expansion of the nearby Chicago O'Hare International Airport. The O'Hare modernization expansion of

SEC-USCIS-P-0000390

doubling its runways will dramatically increase traffic by 60% to the area serviced by the Project, and the Project will be well positioned to benefit from this increased traffic.

**Minimum Investment**          $500,000 (each, a "**Capital Contribution**").

**Maximum Aggregate Offering**          $249,500,000

**Use of Proceeds**          The LLC intends to use the proceeds of this Offering to finance a portion of the Project as described herein. See also "Use of Proceeds," below. The proceeds of this Offering shall be invested in the Project Company in one or more tranches, with each tranche referred to as a "Disbursement" and the date of the last tranche referred to herein as the "Final Disbursement Date."

**Escrow of Capital Contributions**          All Capital Contributions will be held in escrow pursuant to the Escrow Agreement attached hereto as Exhibit D. Capital Contributions on account of each Investor will be distributed to the LLC from escrow in exchange for Interests upon approval of the Investor's I-526 Petition by USCIS. Capital Contributions will be returned to an Investor only as set forth herein. See also "Subscription," below.

**Administrative Fee**          In addition to the subscription funds constituting the Capital Contribution, the LLC will receive from each subscribing Investor an administrative fee of $41,500 (the "Administrative Fee"). The Administrative Fee shall be used to reimburse the Managing Member and the LLC for the expenses of the Offering and to otherwise compensate the Managing Member for its efforts associated with

setting up the LLC and conducting the Offering. The Administrative Fee shall be deposited in the Escrow Account pursuant to the Subscription Agreement attached hereto as Exhibit B. The Administrative Fee is fully refundable in the event (1) the subscription is not accepted, or (2) if the subscriber's I-526 or visa application is rejected by USCIS.

**Investor Qualification**    This Offering is made pursuant to an exemption from registration provided by Section 4(2) of the Act, and/or Regulations D and/or S promulgated thereunder, and exemptions available under applicable state securities laws and regulations. Persons desiring to invest in the Interests will be required to represent and warrant to the LLC that they are not "U.S. persons," as defined in Regulation S, that they qualify as an "accredited investor," as defined by the Act, and to other matters described in the Subscription Agreement (see Exhibit B) to purchase Interests.

**Capital Accounts**    Each Capital Contribution is credited to the contributing investing Member's Capital Account in exchange for the subscribed Interests. As of the date of this Memorandum, there is only one class of Membership Interests. Terms governing the maintenance of Capital Accounts are set forth in the Operating Agreement. See Exhibit A.

**Additional Capital Contributions**    Except as provided for in the Operating Agreement, no member is under any obligation to make additional Capital Contributions to the LLC. See Exhibit A.

12/13/2011    A CHICAGO CONVENTION CENTER | PPM    8

SEC-USCIS-P-0000391

 

**Control (Limited Partner Voting)**

All management and other powers relating to day-to-day control of the Company will be held and exercised by the Managing Member, to the maximum extent permitted by law. Investor Members will have the rights described in the Operating Agreement (see Exhibit A) and as provided for in the Illinois Limited Liability Company Act of 1994, but will generally have limited involvement in the management and little control over the actions of the LLC.

**Transfer Restrictions; No Resale**

Interests may not be transferred without the consent of the Managing Member, and then only in compliance with applicable securities laws and regulations. There are other substantial restrictions on transferring Interests. No market for the Interests exists, and no market is expected to develop. See "Risk Factors," below.

**Allocation of Profits and Losses**

Except as otherwise required by the Internal Revenue Code, profits and losses of the LLC shall be allocated to the Investor Members as provided in the Operating Agreement (see Exhibit A). Subject to applicable laws, the Managing Member has broad discretion to adjust the application and allocation of the net proceeds of this Offering and of profit and losses of the LLC.

**Distributions**

Generally speaking, starting in 2014, the LLC intends to make distributions from net cash flow of the Company on an annual basis, dating from the release of each Investor's subscription proceeds to the LLC. The Company expects to commence distributions to the Members in the calendar quarter coinciding with the opening of the Project, presently estimated to occur in 2014. Such distributions shall be made first to the Investor Members in proportion to, and to the extent of, the Investor Members' unpaid preferred return (as next

defined), and then the balance shall be distributed to the Managing Member. Provided the Investor Members receive the return of their Capital Contribution prior to the fifth anniversary of the Final Disbursement Date (the "Maturity Date"), the Investor Members' preferred return is One Percent (1%) per year (the "Preferred Return"), in all cases assuming the Company has sufficient funds from operations to make the payments. None of such payments shall be made out of Investors' Capital Contributions. See "The Offering," below.

Upon receipt of proceeds from the Project, the LLC intends to distribute them internally first to the appropriate Investor Members in proportion to, and to the extent of, the Investor Members' unpaid Preferred Return, and then, if appropriate, toward their unrecovered Capital Contribution. Finally, the balance of any proceeds from the Project will be distributed to the Managing Member and the Investor Members in accordance with their pro rata share of the LLC. See "The Offering," below.

In the event the LLC does not return all of the Capital Contributions of the Investor Members by the Maturity Date, the Preferred Return shall increase to fifteen percent (15%) per year during the subsequent five-year period following the Maturity Date until repaid in full.

Additionally, in the event that five years following the Maturity Date the Managing Member has not paid all of the aggregate Preferred Return then due to all of the Investor Members, then the Managing Member's membership interest in the Company shall automatically be transferred to the Investor

SEC-USCIS-P-0000392

 



Members, each of whom shall receive such pro rata portion of the Managing Member's membership interest as the ratio of the individual Investor Member's membership interest bears to all Investor Members' membership interests, calculated prior to the transfer.

If the Company declares a dividend, the Investor Members shall be entitled to a pro rata share of such dividend, which may thereafter be distributed to the Members as provided in the Operating Agreement. Further, upon the sale of all or substantially all of the Company's assets, the sale of the Company's membership interests, the merger of the Company with and into another company, or some other liquidity event, the Members may be entitled to a distribution of certain of the net proceeds received by the Company from any such liquidity event.

Each of the foregoing distributions is subject to certain restrictions, and assumes receipt of sufficient funds to make these payments. None of these payments shall be paid out of the proceeds of this Offering. See "The Offering," below. There is no guarantee that any such distributions shall be made. See "Risk Factors," below.

**Fees and Expenses**    The LLC may pay marketing expenses or other fees to one or more consultants, brokers, public relation managers, investment advisors, or other parties in connection with the sale of Interests pursuant to this Offering, as allowed by law. Any such marketing expenses or other fees paid to any party in connection with the sale of Interests pursuant to this Offering shall not be paid out of the proceeds of Capital Contributions of Investor Members. The LLC intends to pay such marketing expenses, if any, from proceeds of the Administrative Fee.

**Tax Risks**

Investment in the Company involves substantial tax risks. The LLC has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, the LLC, or their businesses. This tax discussion is not tax advice to Investor Members. Each Investor is advised to consult with his or her own tax advisor regarding the tax consequences of investing in the LLC. See "Risk Factors" and "Tax Considerations," below.

**Risk Factors**

An investment in Interests of the Company involves substantial risks, including reliance on management, general market risks, limited transferability of Interests, reliance on the services of third parties, and other matters. There is no guarantee that an investor shall receive either a return *of* his or her investment, or a return *on* his or her investment. See "EB-5 Immigration Disclosures and Risk Factors" and "Risk Factors," below, for a discussion of some of these risks.

**Financial Reports**

Members will receive annual financial statements and K-1 statements reflecting their allocable share of the Company's profits and losses.

**Immigration Risk**

Neither the LLC nor the Managing Member guarantees that any EB-5 Investor Member will be granted conditional or permanent residency in the United States as a result of their purchase of Interests of the LLC. Each Investor must evaluate and accept the risk that he/she may not be granted residency in the United States after making their Capital Contribution and being admitted as an Investor Member of the LLC. See "EB-5 Immigration Disclosures and Risk

12/13/2011                    A CHICAGO CONVENTION CENTER | PPM                    10

SEC-USCIS-P-0000393



Factors" and "Risk Factors," below.

**Subscription**

Investors may subscribe for Interests by executing and delivering the documents referenced in the Section entitled "Subscription," below. Acceptance of subscriptions is not guaranteed, and is subject to a number of conditions. The LLC will have the right to accept or reject any subscription at any time at or prior to the closing of the Offering, or at such later date as the Managing Member may determine. In the event that a subscription is not accepted, or in the event the conditions necessary to close the Offering are not satisfied or waived, the subscription amount shall be returned to the subscriber. In addition, if an investor's I-526 or visa application is rejected, the Administrative Fee, will be refunded. No interest will be paid to the subscriber on subscription amounts or the Administrative Fee. See "Subscription," below.

**Indemnification**

Neither the Managing Member, nor officers or employees of the Company, will be liable to the Company for any act or omission performed or omitted by them in the absence of willful malfeasance or bad faith, or for losses due to the negligence of employees or other agents of the Company. The Company will respectively indemnify and hold harmless the Managing Member, its officers and employees, and officers, and employees of the Company for any loss or damage incurred by them on behalf of the Company or in furtherance of its business, or arising out of or in connection with the Company, except for losses incurred by the Managing Member, its officers and employees, or officers or employees of the Company arising from their own willful malfeasance or bad faith. See "Operating Agreement," below.

12/13/2011       A CHICAGO CONVENTION CENTER | PPM       11

SEC-USCIS-P-0000394

## DESCRIPTION OF THE PROJECT

### INTRODUCTION

The Project involves construction and management of a facility for a convention center and hotel complex that will offer convention and meeting space, and also include five upper-upscale hotels, along with amenities including restaurants, lounges, bars, and entertainment facilities. The Project will be located in Chicago, Illinois near to the city's international airport, O'Hare.

### Project Overview

"A Chicago Convention Center" will attract national and international business by providing beautifully appointed convention and hotel facilities that are supplied by proven brand leaders. The complex will feature five upper-upscale hotel brands spread across three atrium towers. In total, there are planned to be 797 suites and 198 rooms (totaling 995 keys) throughout the complex.

The Convention Center will offer four floors of convention space totaling 24,000 square meters, all of which will be connected across the lower levels of all three towers. The complex will further contain 15 conference suites on the upper floors, along with an additional 4,200 square meters allocated for restaurants, lounges, and bars located throughout the structure. The focus of the convention center development will have two distinct advantages in attracting national and regional groups to the facility: First, the design of the space will be tailored to meet the needs of technologically-savvy organizations, and second, the development of the property as the World's First Zero Carbon Platinum LEED® Allergen Free facility will position it to receive priority consideration in the process of bidding for desirable convention space. (LEED® is an acronym signifying Leadership in Energy & Environmental Design, as discussed in detail below.)

In addition, the development will feature the largest guest-accessible hotel "green-roof complex" in the United

States, with over an acre of rooftop space allocated for a spa, a yoga studio, a bar/lounge area, and a glass walk atrium roof floor. Finally, a 1,720-space parking structure will sit below the convention center, primarily utilizing valet parking services.

Hotels that have executed franchise agreements to locate at the site include Element by Westin (a Starwood Hotel brand), Hotel Indigo and Staybridge Suites (Intercontinental Hotel Group brands) and Hyatt Place and Hyatt Summerfield Suites (Hyatt Brands). These proposed hotel properties tap into the upper tier upscale market (Hotel Indigo) and also the upper-upscale transient, extended stay, and all-suite markets (Element, Staybridge Suites, Hyatt Place and Summerfield Suites), which the Company considers to be among the most robust hotel market segments in the Project's area. Accordingly, the Project should benefit from hosting five brand-name reservation systems and three popular loyalty programs to feed the hotel properties. The Project facility will be one of the few to offer a majority of suite accommodations, which outperform the typical hotel property in both occupancy and Average Daily Rate ("ADR") due to their increase in appeal.[1] The multiple properties address a wide range of price points and market segments, appealing to a broader market than can a single property.

The Company anticipates the Project's being the World's First Zero Carbon Platinum LEED®-certified 100% Allergen Free convention center hotel complex, which should foster a strong pre-opening due to the anticipated favorable international press coverage and marketing opportunities afforded by this certification. The expansive press and marketing contemplated by the Company should translate into widespread consumer awareness and advance bookings for the hotel brands. This expected advance booking should not only enable the Project to stabilize at opening, but additionally, due to all of its synergetic advantages, it should generate an above-average market penetration. The hotels' marketing departments can aggressively pursue

---

[1] T.R. Mandigo Market Research Report

SEC-USCIS-P-0000395

environmentally-conscious businesses and consumers, who surveys indicate are usually willing to pay a premium to stay at a property they feel is more responsible toward the environment. At present, this segment is fairly small, but the Company believes this market is expanding significantly. Entering into the convention center/hotel marketplace now with a green strategy will enable the Project to establish an early relationship with green consumers, and potentially earn itself a reputation that will grow as the segment continues to grow.

Many large companies currently prefer that their employees or groups stay at LEED® certified hotels, and national, state, and local governments have acted to require that government employees or contractors stay at green hotels. Furthermore, a growing number of states are prioritizing eco-friendly service providers and vendors, positioning the Project property to capture a greater share of government business than area competitors.

The Company believes the market advantages of the proposed convention center complex can be summarized as follows:

- The Company anticipates being the World's First Zero Carbon Platinum LEED® certified 100% Allergen Free convention center hotel complex in the world, representing the most sustainable business center of its kind.
- The state-of-the-art Information Technology and sound system that is to be installed, the Company believes, will provide the most advanced technologies for effective business solutions and supporting the convention, conference, and meeting functions of visiting businesses in the World.
- Overall, "A Chicago Convention Center" will feature five reservation systems and five corporate branded hotel leads, which will provide the complex with five times the exposure and the enhanced ability to attract new business compared to competing hotels. Furthermore, the hotels will benefit from three major and popular "loyalty programs." These attributes translate into a higher potential occupancy rate and ADR, thus yielding an expected significantly higher Revenue Per Available Room

("RevPAR").

- The initial investment in the Project's sustainable attributes necessary for achieving Zero Carbon Platinum LEED® certification Allergen Free is expected to translate to substantial operational and maintenance cost saving advantages in the long term, namely, an estimated 80%-90% cost savings across all utilities.

### *Use of Offering Proceeds; Underlying Property; Other Financing*

Assuming the subscription for up to 499 Interests offered for purchase through the Offering, and thus up to $249,500,000 of proceeds to be received by the Company from Investor Members, the Company intends to utilize those proceeds in combination with proceeds from managing member previous investments, tax-exempt bond financing and government grants to cover the demolition, construction, build-out, and initial operation of the Project. RASS Hospitality, LLC., an affiliate of the Company (owned by the managing members) already holds title to the Project property, and has pledged the property to A Chicago Convention Center, LLC and will transfer title before the closing of the Offering or simultaneously with the balance of the Project financing from all other sources in addition to the Offering..

The underlying property, approximately three acres in size, currently holds an older hotel. The contribution of the property will constitute a portion of the Company's direct investment in the overall Project. The property recently has been separately appraised by both T.R. Mandigo & Co. and Integra Realty Resources at a net valuation of $177,547,465. The Company's management believes Integra Realty Resources to be an independent industry leader, with over 650 skilled employees focused on commercial real estate valuation, appraisal, and counseling services. The existing hotel will be demolished by the Company at the time of the Project's launch. The Project will be developed at an estimated hard cost of $686,365,381 and soft cost of

SEC-USCIS-P-0000396

$48,589,790 together totaling $734,955,171, which, added to net land valuation of $177,547,465, amounts to an aggregate cost of $912,502,636.

The Project bond financing will consist of a bond-based energy efficiency "green" loan derived from tax-exempt "moral obligation" bonds issued by the State of Illinois Finance Authority. The Project will qualify for such State of Illinois financing because of the commitment by the Project's principals to develop and operate the Project in a manner that results in quantifiable and verifiable reductions in energy usage. In addition, the Company believes it will be eligible for and able to obtain additional government bond financing through various other state and federal "energy and environmental" initiatives. For example, the Company expects to take advantage of United States Qualified Energy Conservation Bonds, which the Company can obtain via the State of Illinois acting as a conduit. The Company believes it will be able to raise an estimated $339,818,621 of loan proceeds derived from the various available federal and state bonds.

The availability of tax exempt bond financing allows private project developers such as the Company to obtain financing on terms better than those available through most commercial financing. Because the bonds are tax exempt, bond holders are willing to accept lower interest rates as compared to traditional bond or other financing. Please see "Financial Considerations," below, for a more detailed description of the tax-exempt bond financing.

Finally, the Company expects to be eligible for a variety of state tax exemptions and credits, as a result of the size of the Project investment, its creation of jobs, and the fact that the Project will be located in an "enterprise zone." Management estimates that the LLC will be able to raise $48,496,970 from loans generated from federal and state tax credits, and $97,139,580 from federal, state, and municipal grants. Combined with the $339,818,621 of bond financing, the Managing Member anticipates that the collective sum of $485,455,171 should be raised for the Project's development (not including the proceeds from the Offering).

Please see "Financial Considerations," below, for a more detailed description of the entire financing structure

for the Project, including additional specifics regarding the bonus, tax exemptions, and credits targeted for use in the Project.

Case: 1:13-cv-00982 Document #: 11 Filed: 02/06/13 Page 166 of 167 PageID #:867

*Project Development*

The Company has engaged the developer, Upgrowth, LLC, an Illinois limited liability company (the "Development Company"), to develop the Project. The Development Company's Managing Member's team has over 150 years of extensive expertise in the development, construction, and management of hotels and convention centers and multiple mid- and high-rise buildings, and has been engaged to develop and manage the design and construction of the Project. Upon completion of construction, the Company will engage the Hotel Franchisors or their respective preferred management companies to professionally manage and operate the Project. See "Management, Advisors, and Consultants Biographies and Interrelations -- Material Relationships and Agreements," below.

Current economic conditions have resulted in a significant decrease in commercial and residential construction and a depression of construction costs as materials once in short supply have become readily available and as contractors bid aggressively on projects to keep their development activity moving. Accordingly, the Company believes that market conditions will enable the Project to be competitively bid at development cost levels that contribute to the overall economic feasibility of the Project.

In developing and constructing the Project, the Company and the Development Company intend to comply with and satisfy the requirements to become the first Zero Carbon Emission Platinum LEED® certified Allergen Free convention center hotel complex in the world. Please see "The Environmental Advantage," below, for a more detailed description of the energy and environmental conservation features of the Project, and for a description of the LEED® certification process.

SEC-USCIS-P-0000397

*Project Development Schedule*

Construction on the Project is scheduled to start in the summer of 2012, with occupancy of the first of the three towers to begin in early spring of 2014. Construction of the proposed convention center hotel complex will be continuous over the course of two years, with three opening dates to allow for immediate cash flow and stabilization. Tower One, which will include Element by Westin, is expected to open 18 months after the start of construction. However, the core structures for all three towers will be built concurrently, so that 95% of construction disturbance will be completed prior to opening of the Convention Center and Tower One. The second tower will be comprised of, among other things, Hotel Indigo and Staybridge Suites, and will open three months after the opening of Tower One. Tower Three, which will house Hyatt Place and Hyatt Summerfield Suites, will be completed and occupied three months following the opening of the second.

*Project Milestones Already Completed*
- Full zoning approvals have been obtained from the City of Chicago.
- Entitlements for the Project site are complete.
- Franchise agreements have been executed for the hotels to be located at the Project site.

The Business Plan, entitled, BUSINESS PLAN for EB-5 INVESTMENT IN "A CHICAGO CONVENTION CENTER, January 2011" (the "**Business Plan**"), presents a table summarizing the construction and development schedule for the Project. See Exhibit E.

*Project Development Stages*

Some of the work described below shall be sequential, while other work shall be overlapping, since the three towers will be built along similar schedules but commencing some months apart. It is the Company's goal to complete construction of the Project approximately two years after the ground-breaking, which itself is