tentatively scheduled to occur in the second quarter of 2012.

Case: 1:13-cv-00982 Document #: 11-1 Filed: 02/06/13 Page 1 of 116 PageID #:869

Administrative Phase (already completed) – the Administrative Phase, covering the completion of entitlement, design, civil engineering, permit securing, and fee payments for the Project property has been completed. During the Administrative Phase, the Development Company assisted the Company in completing necessary preliminary steps in the entitlement and civil engineering process for the Project site. Contractor agreements have also been signed, and building permits were obtained by the Development Company and/or the Company.

Site Work Period (1-2 months) – after permits are secured, contractors engaged, and fees paid, the Site Work Period begins. The first phase includes demolition of the existing structure on the Property, securing a soil engineer and land surveyor, erection of construction fencing, rough grading, and soil excavation/import/compaction. Major milestones for the Site Work Period include pad certification and compaction report approval, after which building construction may begin. The second phase of site work, which is concurrent with building construction, includes tasks such as erecting trash enclosures, curbs, gutters, and hardscape, back fill and finish grading, landscaping, grade base and paving, monument and signage installation, and stripping.

Building Construction Period (10-14 months) – the Building Construction Period begins after pad certification is obtained and the compaction report is complete, about two months into the site work process. Tasks include excavation and foundation, underground rough plumbing and electricity, pour and form slab/curb, framing, rough electrical, rough plumbing, fire sprinkler, roofing, glass and glazing, stucco, set HVAC units, painting, fire alarm installation, system start-ups, and clean and punch list. Major milestones in the Building Construction Period include laying the foundation, roofing, and stuccoing.

SEC-USCIS-P-0000398

Interior Construction Period (12-16 months) – tasks included in the Interior Construction Period may begin when the building has a roof and waterproofing, about two or more months into the Building Construction Process.  Tasks include finishing mechanical, electrical, and plumbing, insulation, drywall, security installation, tap and finish, elevator, painting, ceramic tile, doors and hardware, millwork/cabinetry, wall covering, floor covering, and communication systems.

**Market Profile - The Neighborhood Profile and Location Advantages**

"A Chicago Convention Center" will be constructed in Chicago, Illinois, on a 2.77-acre property off Highway I-90 near Chicago O'Hare International Airport. This particular site has been familiar to millions of travelers en route to O'Hare Airport during the past 5 decades. It is accessed via the first exit with lodging facilities approaching O'Hare, and the last exit prior to accessing a network of expressways west (Interstate I-90 to Rockford), and north- and south-bound (Interstate I-294).  Conversely, this makes the site the last exit for lodging choices prior to reaching Downtown Chicago. According to the Illinois Department of Transportation, in 2009, the annualized traffic count for Interstate I-90 (The Kennedy Expressway) was 308,400 vehicles per day, with Higgins Road posting 23,500 daily.   See Illinois Department of Transportation website, http://www.gettingaroundillinois.com/default.htm.

The site location is also within close proximity (0.20 miles) to the Cumberland Blue Line train stop.  The Blue Line is a long trunk line of the Chicago Transit Authority's rapid transit system which extends from the Chicago O'Hare International Airport terminal, through the City of Chicago (and in/around the Chicago Loop/CBD), all the way towards the western suburb of Forest Park.  The close proximity of the Cumberland stop enables hotel guests to utilize rapid transit to reach their destination (in most cases, the airport if departing, or the City of Chicago if arriving) without the need for arranging for a rental vehicle.  The Project intends to further take advantage of this feature by offering a short-distance shuttle service between the Cumberland Blue Line Station and the Project property.

An additional advantage of proximity to the Blue Line is the Project property's access to the metropolitan area

An additional advantage of proximity to the Blue Line is the Project property's access to the metropolitan area employment base for hiring and staffing of the businesses operating as the Project. Convenience and low costs of commuting to and from the Project property is expected to give the facility an advantage in recruiting and retaining high quality employees to meet the service standards of the Project complex.

The visibility of the Project should be exceptional, with the triple high rise structure presenting variations on the design theme across the width of the Project, presenting a unique streetscape profile that provides for enhanced identification of the brands represented at the site. With an expected annualized traffic count of at least 2009's 308,400 vehicles travelling daily along The Kennedy Expressway (I-90), the Digital LED Billboards to be situated atop the Project complex will entice additional demand for all revenue streams of the complex.

Access to the Project property is easy, especially given hotel parking integrated into the facility – with guests able to simply turn off Higgins Road directly into the property's automated parking structure or valet area. To reach the site location, guests arriving from the O'Hare Airport exit the expressway onto Higgins Road at the Cumberland Avenue exit and turn directly into the Project property. Guests traveling from Chicago via I-90 towards O'Hare take the 79B exit, just past "A Chicago Convention Center," turning right onto Higgins Road and entering the Project property a short distance from the interchange.

The Project property is expected to also serve as an "overflow" facility when commercial activities, events, and special occasions fill other downtown and suburban hotels. The Project's central location and key positioning on the confluence of the interstate system providing easy access should encourage the capture of much of this overflow business as it is the closest hotel market to downtown Chicago.

Management believes that its particular location will allow the Project to capture demand not only from the Chicago O'Hare International Airport, but also surrounding commercial demand from the various office parks

SEC-USCIS-P-0000399

located near the site location. The area east of O'Hare features an abundance of office parks and complexes, peppering the area surrounding the site location. These include the Cumberland Metro Office Park, located less than a mile from the subject property, and the O'Hare Lake Office Park located 2 miles from the Project property – both with easy access to the Project complex. Major corporations with offices near the Project property include US Cellular, Bally Total Fitness Holding Corporation, Alcan Global Pharmaceutical Packaging, John Robert Powers Modeling, and Anheuser-Busch Company. Given the Project property's anticipated Zero Carbon Platinum LEED® certification Allergen Free, any area business with a corporate policy that prioritizes green lodging should be favorably inclined to utilize the Project complex. Furthermore, the surrounding office parks and complexes also generate enhanced potential for a local consumer base to develop for the non-hotel businesses located within the Project's facility, such as the spa, yoga studio, bar/lounge area, and the automatic robotic parking structure. Local patrons may also frequent the glass walk atrium roof floor of the convention center. According to prominent commercial real estate broker CB Richard Ellis' 2010 year-ending data, the O'Hare area office market features 15,335,637 square feet of office space, with a direct vacancy rate of 22.6%. Net absorption for the year was 310,402 square feet– the greatest in the Chicago suburbs.[2]

The Project site is in a cluster of hotel developments that have been long standing, with primarily older properties along Higgins Road to the west and along River Road, Cumberland Road, and West Bryn Mawr to the south. Competing hotels clustered near the area of the Airport proper are estimated to derive roughly 50% of their demand from local businesses and conference activity, and not directly from air travelers.[3] The majority of these hotels are older properties, typically exceeding 20 years old, with varying degrees of need for constant refurbishment. The Company does not believe that these properties will be able to compete with the Project's technological advantages and amenities. Furthermore, several of these properties, such as the InterContinental Hotel, are located too far south from I-90 to provide easy access to both airport and commercial travelers, while other properties that cluster around the Donald E. Stevens Convention Center are located 2 miles south, in a concentration of office and commercial development along Mannheim Road, North River Road, and along the I-90 corridor, all of which provide access but at longer travel times to both airport and commercial travelers.

Finally, the Chicago O'Hare International Airport itself is expected to increase airport operations by 60% by 2013, based on the anticipated completion of the currently-ongoing $15 billion Chicago O'Hare Airport Modernization Expansion plan. In 2008, the airport handled 881,000 flights, representing an average of 2,409 flights per day, and 70 million passengers. When the Chicago O'Hare Airport Modernization Expansion reaches its full capacity upon completion in 2013, traffic is projected to increase by sixty percent (60%) to over 3,800 flights and 110 million passengers per year. The opportune timing is strategic for new hotel developments such as the Project. For additional details of the ongoing revitalization of Chicago O'Hare International Airport, please see "Chicago O'Hare International Airport Revitalization and Development Activity," below.

A primary source of supporting demand for the Project complex includes air passenger traffic. An analysis by T.R. Mandigo and Company in 2010 of the volume of traffic versus the demand accommodated at the existing O'Hare Airport properties indicates that the hotels in the area "capture" only 7% to 10% of the total traffic now served by the Airport. The expansion of the Airport, including new runways and ground control facilities, together with ongoing construction to further improve aircraft movement at the Airport, have resulted in a lifting of flight limits during peak periods that were previously imposed to reduce delays and improve on-time performance. The lifting of these caps permits additional air traffic, with a resulting anticipated increase in passenger traffic, as current economic conditions improve. Increasing the capture to 10% to 15% of this traffic, together with the increase in aircraft movement, would potentially provide demand for increases in room supply of 20% to 25%, or growth of 6,000 additional rooms over the next five to seven years in addition to those supplied upon the Project's completion.

---

[2] T.R. Mandigo Market Research Report
[3] T.R. Mandigo Market Research Report

SEC-USCIS-P-0000400

**Feasibility Analysis Demographics**

In 2011, current airport passenger demand in the Chicago O'Hare upper-upscale hotel market sustains an occupancy level of 77.1% with the average room rate of $186, and from the completion of Chicago O'Hare Airport expansion in 2013, the increased demand from the passenger traffic forecast for the upper-upscale hotel occupancy to increase to 86.5% with the average room rate of $222 in 2014.

The chart below indicates historical and projected market performance for the O'Hare area lodging market.

# O'Hare Market Projections: Supply and Demand





The Project will be located in the O'Hare International Airport submarket of the Chicago metropolitan area. This upscale and upper-upscale submarket of the city presently includes 12,614 rooms in 49 properties serving the Airport and commercial developments throughout the area.

During the past year, along with the overall hotel market, performance numbers in area properties declined, exacerbated by aircraft operating caps imposed by the United States Federal Aviation Administration to improve on-time performance and limit congestion and traffic hazards at O'Hare, dropping it from the busiest airport in the U.S. to second place behind Atlanta, Georgia. With the completion of the Airport improvements discussed above, these caps are being lifted to permit expansion of service and deployment of new and more efficient aircraft to serve the Chicago market area. As a result, Chicago O'Hare International Airport is expected to regain its position as the busiest passenger traffic airport in the world.

The Airport area reflected the same declines in occupancy, with moderate decreases in Average Daily Rate during the recessionary period. Among sub-markets, the Airport area experienced less dramatic rate discounting than the city's central business district and surrounding suburban areas, reporting an ADR still above $141 for the total sub-market (upper-upscale, upscale, economy, and budget) with its mix of vintage, established chains and new construction properties. For the first six months of 2010, the occupancy improved by 18.7 percent over the same period of 2009, according to *Smith Travel Research, Projections: TR Mandigo & Company.*

Reviewing the history of performance of O'Hare area properties during the last recessionary period (2001 to 2004), the area market exhibited strong resiliency, quickly recapturing demand and exceeding the performance of the downtown Chicago market through that prior recession's recovery period. With the

SEC-USCIS-P-0000401

current completing expansion of Chicago O'Hare International Airport, new commercial development along the Tri-State Corridor, and the stronger office market performance in the area, management expects the area sub-market to not only follow, but to exceed, this same historic pattern of recovery.

The current recovery period for the Chicago metro area and the O'Hare market area is forecast to continue through 2011, with "A Chicago Convention Center" Project entering the market after the recovery period, including absorption of the newest developments in the market.

### Ownership of the Project Company and Revenue Sharing

The Company is owned by (1) Intercontinental Financial Group, LLC , an Illinois limited liability company (the Managing Member), also by (2) the Investor Members, as next described. The Company's Managing Member affiliate company, Rass Hospitality, LLC, already holds title to the Project property and has pledged the property to A Chicago Convention Center and will transfer title before the closing of the Offering or simultaneously with the receipt of the balance of the Project financing from all other sources in addition to the Offering.

Following consummation of the Offering, the Investors will be admitted as additional members in consideration of their investment of the Offering proceeds in the Company. Assuming full subscription for all offered Interests, the Investor Members will collectively hold twelve and three-quarters percent (12.75%) of the Company's membership interests, with the balance owned by the Managing Member. As the Company's managing member, IFG is responsible for the day-to-day management of the Company's operations and its business (including the Project).

Over time, following completion of the Offering, funds available for distribution by the Company shall be paid as follows, subject to the Managing Member's discretion regarding reserving a portion for LLC purposes: first, to the Investor Members, pro rata based upon their respective percentage interests in the LLC, in proportion to, and to the extent of, the Investor Members' unpaid Preferred Return; second, to their unrecovered Capital

Contributions; and third, pro rata to all of the Members in accordance with their ownership interests in the LLC. See Exhibit A for more details.

### THE HOTEL BRAND ADVANTAGE

The Project will consist of three towers. Tower One will house the 17-story Element hotel by Westin (a Starwood hotel brand) with 336 suites; the four lower levels of the convention center; and the four lower levels of the parking garage. Tower Two will house the 19-story Hotel Indigo and Staybridge Suites (both InterContinental Hotel Group brands), with 209 rooms and 154 suites between them. Tower Three will house the 14-story Hyatt Place and Hyatt Summerfield Suites with 148 suites for each of the Hyatt Place and Hyatt Summerfield Suites facilities, totaling 296 suites. Accordingly, a total of 797 Suites and 198 rooms (totaling 995 keys) shall be located throughout the complex.

These brands are all believed by the Company to be strong in the upscale and upper-upscale categories. Four of the five brands are also well positioned in the "all-suite and extended stay" segment of the hotel market. Every year from 2000 through 2006, the Extended Stay segment has outperformed the overall hotel industry and each individual segment[4]. More current information is not available to the Company; however, the Company believes that the trend of Extended Stay growth is ongoing.

### Expected Resident Brands

The following descriptions are based on information authored by the respective hospitality brands themselves and obtained by the Managing Member from these third parties, whom the Managing Member believes are

---

[4] Source: Smith Travel Research, Feb. 2007.

SEC-USCIS-P-0000402

reliable, setting forth information available online on the World Wide Web at sites including, without limitation, the following: http://development.starwoodhotels.com, http://www.hyattdevelopment.com, and http://development.ihg.com. While the Company believes the information set forth below to be credible, it has conducted no independent investigation as to the veracity, accuracy, or currency of that information, which is presented here for general informational purposes only. Additional detailed information may be secured from the individual hotel brand owners themselves, if desired.



Starwood Hotels is believed to be one of the leading hotel and leisure companies in the world, with 1,041 hotels reaching across nearly 100 countries through nine world-class brands, backed by the dedication of 145,000 employees. Starwood is a fully-integrated owner, operator, and franchisor of hotels, resorts, and residences with the following internationally celebrated brands: St. Regis®, The Luxury Collection®, W®, Westin®, Le Méridien®, Sheraton®, Four Points by Sheraton®, and the recently launched Aloft$^{SM}$ and Element$^{SM}$. Starwood Hotels also owns Starwood Vacation Ownership, Inc., one of the premier developers and operators of high quality interval ownership resorts.

*Sales & Marketing.*
The Company selected a Starwood property due to expected benefits as a result of its worldwide sales and marketing expertise. The Company believes cutting-edge technology, targeted database networking and innovative sales training programs propel the growth and success of every Starwood brand.

The Starwood sales and marketing efforts feature both a top-down (global) and bottom-up (local) approach to ensure that new demand opportunities are generated from the greatest number of sources possible. Included in this strategy is its award-winning Starwood Preferred Guest® (SPG) loyalty program, world-class Global and Field Sales teams, and its powerful Central Marketing Channels helping to ensure every sales opportunity is realized.

### Starwood Preferred Guest®

Attracting loyal guests, Starwood Preferred Guest® ("SPG") is the industry's most honored loyalty program. SPG drives revenue and profit, with members returning more often and spending more during their stay. Globally, SPG members occupy half of all Starwood rooms, paying an attractive rate premium compared to non-SPG guests accompanied by substantially elevated food and beverage premiums. Property owners have access through SPG to a richly targeted database for one-to-one marketing and innovative hotel promotions. Strong industry recognition has honored SPG with more industry awards than any other travel program.

### Starwood Sales Organization

The Company believes Starwood's sales teams will drive business and revenues from both new and existing customers. Starwood claims to build preferred relationships with the largest sectors of global customers. Backed by "world-class" sales teams and proprietary programs, Starwood's 33 international offices are expected to deliver business, group, and leisure travelers to the Project from corporations, travel agents, and third-party online providers. Over $3.4 Billion in revenue was driven to Starwood hotels globally through 16 million bookings in 2009. In addition, Starwood's network of 4,500+ property-level sellers works with local and regional customers to drive bookings and increase loyalty, complementing their global sales executives that focus on major accounts of their largest corporate and leisure clients. In 2009, hotel-to-hotel property level referrals generated $210 million in revenues throughout the Starwood system.

SEC-USCIS-P-0000403

*Centralized Marketing Channels*

Starwood propels business "24/7" through a synergy of state-of-the-art booking technology, customer contact centers, and compelling online vehicles. The Company expects Starwood-branded websites to showcase the Project with stunning photography and detailed information. Starwood's skilled call center agents are expected to showcase personalized Project and Chicago-area highlights to potential guests, describing everything from room features to weather conditions to the most enticing area attractions. Starwood Centralized Marketing Channels propel 45% of total room revenue globally, and provide unrivaled cross-sell and up-sell opportunities. Starwood claims to be the only major hotel company to offer brand-dedicated support at its Customer Contact Centers, which handled over 18 million telephone calls and guest interactions in 2008, providing global, toll-free phone services 24/7 in 24 languages.





According to Starwood, "element is inspired by the guiding principles that made Westin hotels known among the global leaders in the upper upscale hospitality industry for quality and its delivery of a personal, instinctive

and renewing experience to each customer." element aspires to achieve a similar positioning in the upper upscale all-suite extended stay segment that Westin enjoys today in the upper upscale, full service segment. According to Starwood, element provides a modern, upper upscale, and intuitively designed hotel experience that allows guests to live, and feel, in control.

element is believed to promote balance through a thoughtful, upscale environment. According to Starwood, each room in an element hotel is custom-designed with an inviting, open flow, and luxury features, such as the Westin Heavenly Bed®, oversize spa shower, and modular work space. Believed to be decidedly modern with an emphasis on nature, element attempts intuitively to blend construction with an efficient use of space that encourages guests to stay connected, feel alive, and thrive while they are away. Starwood is attempting to position element as the "the smart renewing haven" for extended stay travel.

According to Starwood, the three core values of element are "smart," "renewing," and "haven:"

- Smart – element's contemplated smart design allows effortless organization and productivity. State of the art fitness facilities, healthy food options and elevated public areas allow guests to relax, rejuvenate, socialize, and renew.
- Renewing – element is designed to be a place where guests can feel balanced, in control, and able to live their best life while on the road.
- Haven – element is designed to be a refreshing haven for guests who are away from home for days or weeks. A personal refuge with all the space and amenities for guests to be in control and at ease whether they're working or relaxing.

Starwood also recognizes the benefits of being environmentally friendly from the ground up. According to Starwood, its design teams streamline certification and incorporate cost-effective eco-friendly materials in element's construction, furnishings, and energy conservation. The Company believes that Starwood's

SEC-USCIS-P-0000404



innovation backed by their global sales and marketing network will have broad appeal. Over 30 element properties are expected to open by 2012 from Manhattan to the United Arab Emirates.



## InterContinental Hotels Group

InterContinental Hotels Group ("IHG") is the world's largest hotel group by number of rooms. According to IHG, it franchises, leases, manages, or owns, through various subsidiaries, over 4,400 hotels and approximately 650,000 guest rooms in 100 countries and territories around the world. The Group owns a portfolio of hotel brands believed to be well recognized and respected including InterContinental® Hotels & Resorts, Hotel Indigo®, Crowne Plaza® Hotels & Resorts, Holiday Inn® Hotels and Resorts, Holiday Inn Express®, Staybridge Suites®, and Candlewood Suites® and also manages the world's largest hotel loyalty program, Priority Club® Rewards, with 56 million members worldwide. IHG is a public company, listed on the London and New York stock exchanges.

### IHG today
IHG's operating system is made up of all the things the Company anticipates it will do to drive demand for IHG-branded hotels in the Project. This includes IHG's advertising and marketing campaigns, its 10 global call centers, 13 local language websites, an 8,000-strong sales force, Priority Club Rewards – the world's largest hotel loyalty scheme with 56 million members – and all the advantages that IHG's global hotel distribution and scale brings to brand awareness. According to IHG, its total gross revenue in 2010 was $18.7 Billion, at constant currency rates.

### InterContinental Hotels Group – Hotel distribution

IHG has over 4,400 hotels in 100 countries and territories around the world. Its brands are in 15 of the 20

increasing the demand for hotels that operate under IHG's brands around the world.

*Priority Club Rewards - Loyalty program*

Priority Club Rewards ("PCR") is the largest hotel loyalty program in the industry, with over 56 million members. The PCR program was responsible for 34% of total room revenue in 2007, or $5.72 billion. PCR members drive 36% more stays than non-members, and they drive the rate premium. This award-winning program is among the fastest growing, with a membership that has doubled over the last four years.

*IHG Brand Advertising and marketing*

Each year, IHG franchisees pay a fee into a central fund, which is used for marketing and promotions to drive guest demand for IHG brands. According to IHG, this fund is used for brand sponsorships, television and print advertising campaigns, and public relations activities around the globe. In addition, IHG utilizes a "PartnerConnect" program, which the Company believes generates expanded hotel-to-hotel bookings. IHG hotel "partners" earn a percentage of hotel bookings generated from their website or customized links that each hotel partner sends to its contacts. The Company anticipates increased bookings by partnering with other popular IHG hotel brands, including InterContinental Hotels & Resorts®, Crowne Plaza®, Hotel Indigo®, Holiday Inn®, Holiday Inn Express®, Staybridge Suites® and Candlewood Suites®.

*Web presence*

The Company anticipates benefiting from IHG's ubiquitous presence online. Its thirteen (13) local language websites take over 7.4 million bookings a year – they are "shop windows" for IHG's hotels across the world, 365 days a year. IHG's websites operate in the following languages: Arabic, Chinese, Dutch, English, French, German, Hebrew, Italian, Japanese, Korean, Portuguese and Spanish.

SEC-USCIS-P-0000405

*Reservation system*

IHG's ten (10) global reservation offices are available to take hotel bookings from guests 24 hours a day in 12 languages including Arabic, Cantonese, English, French, German, Hindi, Italian, Japanese, Portuguese, Spanish and Tagolog. According to IHG, its agents focused on gathering revenue by turning inquiries into reservations. A Market Area strategy is employed for major markets, capturing cross-sell revenue when possible. IHG also leverages the power of third party agencies and internet sites through its $1.5 billion Global Distribution System.

*Sales force*

IHG has a global sales force of more than 8,000 professionals throughout the world, constantly talking about, and selling the booking of, hotels under its brands to individuals and companies.





InterContinental Hotels Group

Hotel Indigo is owned by the InterContinental Hotels Group. Hotel Indigo is the industry's first "Branded Boutique" hotel. As it highlights in its promotional materials, Hotel Indigo has found the "sweet spot" on the

competitive playing field. IHG believes the hotel combines the convenience and confidence of a globally

Case: 1:13-cv-00082 Document #: 111-1 Filed: 02/06/18 Page 17 of 116 PageID #:885

The Company believes each Indigo property to be distinctly different, reflecting its local neighborhood with local murals and images, a vibrant color palette, and locally sourced and seasonal menu items. According to IHG, Hotel Indigo is committed to creating memorable experiences by delivering special touches to each guest. IHG states that Indigo supports its guests through:

- Intimate service – Approachable welcoming service is a standout for every guest, and a brand hallmark.
- Enlightened Moments – An enlightening and enlightened experience, reflecting both social and environmental awareness and an enriching environment.
- Reliable Amenities – Business services remain the price of entry, and a key differentiator between boutique and branded boutique.
- Inviting Vibe – Style without pretense, where guests can relax and recharge… and feel just a little bit hip.

Interpret Indigo® is the innovative design platform for Hotel Indigo. According to IHG, the Interpret Indigo platform will allow the Company the opportunity to creatively interpret the Project design in order to capture local references and character of Chicago's O'Hare neighborhood while maintaining the Hotel Indigo brand experience its guests expect, appreciate, and pay for.

The Hotel Indigo brand is rapidly expanding across the globe, with 38 Hotel Indigo properties open worldwide, and more than 60 hotels in the pipeline.

SEC-USCIS-P-0000406

**HOTEL INDIGO
ROUND-UP**

4,364
rooms globally

37
hotels globally

59
hotels in the pipeline



hotels
35
rooms
4,254
hotels in pipeline
46

EUROPE, MIDDLE
EAST AND AFRICA

hotels
2
rooms
110
hotels in pipeline
8

ASIA PACIFIC

hotels
–
rooms
–
hotels in pipeline
5





InterContinental Hotels Group

Also an IHG brand, Staybridge Suites is considered to be an innovative extended-stay brand designed for travelers who want the best of home and hotel, whether for business, relocation, or vacations. According to IHG, Staybridge Suites caters to affluent business travelers across corporate, government, and professional services markets. Staybridge guests are believed to enjoy an average of 8 days per stay – a highly coveted achievement throughout the industry.

The Staybridge Suites extended-stay model drives profitability with:

- A low ratio of staff to guests for increased operating margins;
- Higher premium hotel occupancy rates;
- Backyard sales with a definable customer base;
- Premium room rates;
- Focused guest services;
- Distinctive brand amenities;
- The systems and support of IHG

SEC-USCIS-P-0000407

STAYBRIDGE SUITES
ROUND-UP

**20,413**
rooms globally

**185**
hotels globally

**114**
hotels in the pipeline

AMERICAS
hotels
181
rooms
19,848
hotels in pipeline
106

EUROPE, MIDDLE
EAST AND AFRICA
hotels
4
rooms
565
hotels in pipeline
8

Staybridge Suites was the first
upscale extended-stay hotel
to offer guests free access to
wireless high-speed internet
anywhere in the property and
is still the only one that does

# HYATT

Hyatt Hotels Corporation is a global hospitality company with industry-leading brands and a proud heritage of making guests feel more than welcome.

Headquartered in Chicago, Hyatt and its subsidiaries own, operate, manage or franchise 434 hotels and resorts under the Hyatt®, Park Hyatt®, Andaz®, Grand Hyatt®, Hyatt Regency®, Hyatt Place®, Hyatt Summerfield Suites® and Hyatt Resorts™ brand names.

Hyatt asserts a focus on enhancing its brand preference by continuously improving the performance of its existing hotels and successfully expanding the presence of its brands in select markets worldwide. Smart

existing hotels and successfully expanding the presence of its brands in select markets worldwide. Smart growth and development is considered fundamental to achieving Hyatt's aims. According to Hyatt, its team will work closely with its development partners such as the company, to ensure projects disclose through innovative and efficient design, operational excellence, and effective sales and marketing strategies. Hyatt claims to be focused on the role of development within the organization, and to have formed a dedicated and experienced global development team.

*Hyatt Gold Passport®*

According to Hyatt, its Gold Passport program is designed to deliver a superior level of service, recognition, communication, and customer experience to its most loyal and valuable guests. Through sophisticated analytics and modeling of stay behavior and preferences, Hyatt believes that it has targeted a valuable niche in the hospitality loyalty marketplace. The Gold Passport program has grown to over 9 million members as of June 2009. During the first half of 2009, these members represented 23% of total room nights. Hyatt believes the size of the Gold Passport program allows it to be more nimble and targeted in delivering benefits and messaging that are highly relevant to its members. On average, Gold Passport members spend 16% more than nonmembers per stay. Gold tier members generate average annual revenue of $900 per member. Platinum tier members generate average annual revenue of $6,000 per member. Diamond tier members generate average annual revenue of $16,000 per member.

*Corporate Sales Force*

According to Hyatt, its chain sales efforts include the Worldwide Sales Force (WWSF), focused on selling multiple brands to approximately 1,800 highly valued customers, and a separate National Sales Force (NSF) focused on prospective customers with whom Hyatt believes significant business could be developed over time. Hyatt asserts that its exclusive sales automation application, "Envision," allows its WWSF and NSF to have a seamless, direct connection to functionality, including researching availability and booking business at all properties. With the addition of Hyatt Place and Hyatt Summerfield Suites, the dedicated Business and

SEC-USCIS-P-0000408

Leisure Travel Sales Force within Hyatt's WWSF now focuses on corporate, wholesale, and leisure accounts. The Hyatt network includes offices in New York, Chicago, Los Angeles, San Francisco, Washington D.C., Mexico City, London, Mainz, Sydney, Melbourne, Riyadh, Tokyo, Hong Kong, Singapore, Beijing, Shanghai, Pune, Bangalore, New Delhi, and Mumbai, as well as additional coverage throughout Continental Europe. Additional support is provided to its hotels with dedicated resources managing programs, such as Virtuoso and American Express Fine Hotels & Resorts.

A recent independent survey of key account customers conducted by Maritz Research identified Hyatt as the "Best Hotel Brand" based on relationships with its WWSF and NSF for contract coordination. This same survey indicated that these key accounts signed more multi-meeting contracts with Hyatt than with its competitors in the past 12 months, thereby demonstrating strong brand loyalty.

The Company believes Hyatt to be among the premier operators of conference hotels in primary and secondary cities around the globe. Benefiting from its NSF, Hyatt claims that large, full-service conference hotels capitalize on advance-booking cycles and associated substantial catering revenue. According to Hyatt, professional meeting planners continually rate Hyatt among their most preferred hotel partners. Planner Rewards, Hyatt's specialized loyalty program for meeting planners, is a vital strategy for building and leveraging relationships with key customers across the network.

*Central Reservation System*
Hyatt asserts that its Central Reservation System is an important contributor to the performance of its hotels system-wide. The system booked 11.8 million room-nights in 2008, representing approximately $2.3 billion in room department revenue. Reservation centers are located in the United States, Australia, India, the UAE, Germany, Japan, and China to provide 24/7 access to prospective guests.

The Company expects Hyatt to work closely with it to ensure that the Project maximizes market share across all channels. These include traditional travel agencies (e.g., American Express, Carlson Wagonlit), online travel

agencies (e.g., Expedia, Travelocity, Orbitz, and multiple regional agencies, etc.), opaque agencies (e.g.,
Priceline, Hotwire), and multiple user-generated sites that link back to Hyatt.com (e.g., Trip Advisor). Hyatt
Case: 1:13-cv-00982 Document #: 11-1 Filed: 02/06/13 Page 23 of 116 PageID #:891
also claims to have extensive marketing partnerships with all global and regional airlines.



According to Hyatt, Hyatt Place combines style and innovation to create a completely new hotel experience, an experience that offers an array of services and features designed to meet the evolving needs of today's travelers, ensuring that guests feel more relaxed, productive, and fulfilled. Hyatt believes that Hyatt Place has redefined every aspect of the guest experience, and continues to raise the bar in the select-service hotel

SEC-USCIS-P-0000409

category. Hyatt Place has an existing nationwide footprint of more than 160 hotels, with over 55 additional locations opening soon.

Designed for the busy lifestyle of today's multi-tasking business traveler, Hyatt believes that it features a selected range of services aimed at providing casual hospitality in a well-designed, high-tech, and contemporary environment. According to Hyatt, property sizes range from 125 to 200 rooms, and are located in urban, airport, and suburban areas. Signature features of Hyatt Place include "The Gallery," which offers a coffee and wine bar, a 24 hours a day, seven days a week guest kitchen with freshly prepared snacks and entrees, and daily complimentary continental breakfasts. Hyatt believes that Hyatt Place guests are business travelers as well as families.

According to Hyatt, the Hyatt Place hotel boasts of:

- Contemporary décor that blends distinctive architecture with stylish furnishings and unexpected touches to create an atmosphere of casual hospitality.
- Welcoming and open central gathering areas featuring registration kiosks, an intimate coffee and wine café, and inviting dining areas.
- An efficient cross-utilized staffing model elevating the guest experience, essential for economic strength in this hotel category.
- Spacious, comfortable guestrooms containing more room than traditional hotels, plush Hyatt Grand Beds™, and flexible work space that meets the needs of today's business clientele.



# HYATT
## SUMMERFIELD
## SUITES™



Also a Hyatt brand, the Hyatt Summerfield Suites is positioned by Hyatt to be an innovative, upscale extended-stay hotel concept. Hyatt asserts that the Summerfield Suites' contemporary décor and stylish furnishings bring unexpected touches to create an atmosphere of casual hospitality, including a large kitchen area, contemporary kitchen, and spa-style bathroom.

Hyatt Summerfield Suites is an extended-stay brand that Hyatt believes offers individual travelers a warm and comfortable welcome. The 125- to 200-room, all-suite properties are believed to provide the feel of a modern condominium, where guests can maintain their business activities, prepare their own meals, relax, and socialize in a residential setting. Guests enjoy complimentary daily full breakfast and an Evening Social on weekday evenings. Hyatt Summerfield Suites are located in urban, airport, and suburban locations, and serve

SEC-USCIS-P-0000410

the individual transient or extended stay guest. Hyatt believes the Summerfield Suites to be ideal for corporate clients seeking to place their employees on extended assignment. Hyatt Summerfield Suites is also believed to be a good choice for small corporate/executive meetings. Hyatt Summerfield Suites has an existing nationwide footprint of 35 hotels, with over 55 additional locations opening soon.

According to Hyatt, spacious studio, one-, and two-bedroom suites offer a functional and comfortable bedroom that includes the plush Hyatt Grand Bed™ and flexible work space. In addition, Hyatt offers flexible group meeting spaces equipped with state-of-the-art technologies. The Hotel's recreational areas include outdoor and indoor pools, garden and grill areas, meeting terraces, and dining patios.

SEC-USCIS-P-0000411

### *THE ENVIRONMENTAL ADVANTAGE*

The proposed "A Chicago Convention Center" is designed to be the World's first Zero Carbon Emission Platinum LEED® accredited Allergen Free convention center hotel complex in the world. This certification requires compliance with the highest standards of green building initiatives. For a description of the LEED® certification process, see "LEED Certification" below. The Company believes that the additional labor and expense involved with obtaining this Zero Carbon Platinum LEED® status will be more than offset in the long term in two primary ways: (i) the free media attention and public relations benefits that will allow the Company to spend less in marketing, and (ii) the energy cost savings in operating the building complex.



### *Marketing, Promotion, and Sales*

As of April of 2009, there were 18 LEED-certified hotels worldwide. Along with increasing global awareness of environmental issues, the media has paid significant attention to LEED-certified hotel openings in recent years. Additionally, internet-based travel agencies such as Expedia, Orbitz, and Travelocity have created Green Hotels and Eco-Tourism services to help environmentally-conscious travelers find hotels that align with their preferences. The resulting marketing benefits for LEED-certified hotels are substantial. For instance, Yuan-Sing Chang, Vice President of Atman Hospitality Group, Inc., in charge of the green development wing for the Gaia Napa Valley—the first LEED® Gold hotel—calculated that the Gaia received over $2 million in free advertising

as a result of the numerous articles about the hotel and his company in the media."



## Premium quality carbon credits

Another marketing advantage from LEED certification that the Project will enjoy is the ability to be the World's first convention center hotel complex to provide Gold Standard Foundation carbon emission credits to corporate guests and convention and conference attendees. The Gold Standard Foundation is a non-profit organization under Swiss law that operates a certification procedure for premium carbon credits. The Gold Standard Foundation registers projects that reduce greenhouse gas emissions in ways that contribute to sustainable development, and certifies their carbon credits for sale on both compliance offset markets established by the Kyoto Protocol, and in non-Kyoto voluntary offset markets. The Foundation maintains that projects that are registered with the Gold Standard have undergone a strict technical scrutiny which assures high quality and low risk, yet the procedures involved are relatively simple. Consequently, the Foundations and the Company's management believe that Gold Standard certified credits are preferred by a range of government and private actors. Additionally, private sector firms that make certain commitments to the Foundation that further the Gold Standard mission can list their company profile in the Foundation's website, and, under specified conditions, can also acquire the right to display the Gold Standard logo.

---

[5] "LEED Certification for Hotels, Part I," by P. Ling, Uptake, October 28, 2008.
http://www.uptake.com/blog/travel_industry/leed-certification-hotels_719.html

SEC-USCIS-P-0000412

The Company believes that while all other convention centers and hotels must buy credits to offset their carbon emissions, guests utilizing the Project facility can receive credits, as absolutely no emissions whatsoever will be emitted by the Project complex. These credits will be available as a result of the Company's commitment to the Gold Standard Foundation's mission evidenced by the Project's utilizing green-focused alternative energy sources, sustainable products and processes, and environmental conservation. Energy usage and conservation will be addressed in every aspect of the Project's structure, from zoning for heating and cooling to lighting systems, as well as the use of solar control glass to minimize heat load and maximize heat retention. For more details, see "Energy Conservation Features and Cost Savings," below.

The Company also expects its commitment to environmental programs to provide a distinctive degree of difference for meeting and event planners and other persons desiring to submit bids to hold conventions, conferences, and other events at the Project. Major corporations have begun to attempt to differentiate their brands and reputations by focusing on environmentally-friendly products and services. The first Question (check-box) section on all Requests for Proposals ("RFPs" or bid) forms for larger group meetings is the section on "Green Initiative" (which the Project will vastly exceed). The Company intends to take advantage of this trend in its marketing and promotional materials. The Company's management not only expects its corporate customers to recognize the inherent "Green" benefits the Project provides, it also believes that corporate customers will prefer to patronize the Project's facilities in order to promote an "environmentally-conscious" image internally to its employees, and externally to its customers. Incorporated into the Project's environmental technology will be an "exhibit center" presenting to the public the development and ongoing operating programs within the Project complex, along with demonstrating monitoring equipment that illustrate the energy and environmental benefits of the facility's "green" features on an ongoing basis. Ultimately, the Company believes that green meetings deliver environmental benefits, cost savings, competitive advantages, improved image, and the most satisfying attendee and guest experiences.

Incorporated within the LEED® program is a design program that will also address and remove allergens and particulates from the daily operations of the Project complex. The design and operating standards as planned

will significantly reduce air pollutants, off-gassing, particulates, and odors that adversely impact guests with burdened or compromised respiratory conditions. The system is expected to open the Project property to comfortably serve this underserved market segment, creating further publicity and marketing opportunities by being the World's first convention center hotel complex to be completely allergen-free.

Amid growing concern over environmental-friendly services, a rapidly arriving majority of travelers now prefer Green and Eco lodgings. Recent surveys by trade associations such as the Travel Industry Association and online retailers like Yahoo revealed that nearly seventy percent (70%) of tourists are willing to pay extra in order to stay at environmentally-friendly lodgings. These surveys further revealed that these guests will pay anywhere from a 9% to 10% premium on already-advertised prices. These developments should enable the Company to gain market share by targeting environmentally-conscious guests.

*Energy Conservation Features and Cost Savings*
Much of the LEED® certification relies on technology to control energy costs, recover and reuse waste water, monitor the performance of the Project property, and provide guest information. The incorporation of significant energy savings in the design and development of the Project will substantially reduce the operating energy costs of the Company. The Company anticipates the savings in this area will directly benefit the Project's performance, adding an estimated 6% to 8% profitability to the net income of the Project complex. The design of the Project is expected to optimize energy efficiency and generation through the following strategies:

Sustainable Site Strategies
- Use of Hybrid Zero Emission Fuel Cell Shuttle Vans--Exclusively utilizing hybrid fuel cell vehicles will set the tone for the Project property, and marketing this characteristic through vehicle signage will generate additional exposure and appreciation of the design characteristics of the complex.

SEC-USCIS-P-0000413

- State-of-the-art underground automated parking system to save on space and energy usage for personal vehicle storage.
- 100% Green Roof - Heat Island Effect - with Water Features—the largest guest-accessible hotel Green roof complex in the world)

Water Efficiency
- Saving the use of potable water by over 75% by rainwater collection and recycling, a pervious pathway, underground storm water retention along with reused grey water from the building itself used to flush all the dual-flush toilets at the site, use of low-flow showerheads and low-flow faucets with automatic controls. Further, planting foliage native to Illinois' terrain, and installing satellite irrigation technology, which automatically schedules irrigation based on landscape needs and local weather conditions.

Energy and Atmosphere
- Hydrogen Fuel Cell Plant--Generating 100% of the Project complex's energy needs while producing zero carbon emissions.
- 100% Geothermal Heating & Cooling Pump System with Loop Field—under the automated parking garage.
- Natural day lighting in all units is maximized to reduce the loads on electronic lighting, optimized through building fenestration and the atriums in all three towers.
- High Efficiency Hybrid Regenerative-drive elevators—generating electricity as the lifts descend from braking action, providing much of the energy needed for reuse in ascent.
- Energy Efficient Control System—the first room system to register all energy consumption, utilizing an Internet-based, remotely controlled automation and entertainment technology that will control lighting, room temperature, room status, and television, music, and video systems, and enable guests to schedule wake-up calls and make requests for room service and other services such as valet, housekeeping, spa, and more.

Although current economic conditions are putting pressure on all investors and development decisions, in the long run the Company expects investment in sustainable hotel development such as the Project to take firm hold. As that happens, the Company anticipates that a clear advantage will emerge for those hotels that meet both the environmental expectations of guests, and the best practices of operational efficiency in function and design. That advantage will be reflected in the value and attractiveness of those assets to investors—and purchasers.

### LEED° Certification

Achieving a Zero Carbon Platinum LEED° certification is not a simple task. Currently, the only two hotels in the United States that meet the stringent requirements for Platinum LEED° are the Bardessono in Napa Valley, California, and the Proximity Hotel in North Carolina; however, unlike the Project they did not achieve Platinum status based upon energy generation, and again unlike the Project, these properties are not Carbon Neutral or Allergen-Free. Upon achieving Platinum status, the Project will be the largest and the first complex of its type in the world to hold a Zero Carbon Platinum LEED° certification.

The LEED° rating systems are designed for rating new and existing commercial, institutional, and residential buildings. The ratings are based on accepted energy and environmental principles, and strike a balance between known, established practices and emerging concepts. Each rating system is organized into five (5) environmental categories: (i) Sustainable Sites – which generally addresses the site selection, design, development, available transportation alternatives for the site, etc.; (ii) Water Efficiency – which generally addresses water use reduction, water efficient landscaping, and innovative wastewater technologies; (iii) Energy and Atmosphere – which generally addresses energy performance, refrigerant management, on-site renewable energy, measurement and verification, etc.; (iv) Materials and Resources – which generally addresses storage and collection of recyclables, construction waste management, materials reuse, rapidly

SEC-USCIS-P-0000414

renewable materials, etc.; and (v) Indoor Environmental Quality – which generally addresses air delivery monitoring, increased ventilation, chemical and pollutant source control, controllability of lighting and thermal systems, etc. There are two additional categories that allow properties to obtain bonus points: (i) Innovation in Design – which addresses sustainable expertise, as well as design measures not covered under the five primary categories; and (ii) Regional Priority – which acknowledges the importance of local conditions in determining best environmental design and construction practices.

The LEED® certification process is measured against a scale of 100 possible points, and is broken up into certified, silver, gold, and platinum. A property must score at least 40 points to be LEED® certified. The threshold scores for Silver and Gold status under the LEED certification program are 50 points and 60 points, respectively. Platinum properties need to score over 80 points to qualify. The Project "A Chicago Convention Center" is currently designed to achieve 98 points out of the maximum of 100 points available.

### THE TECHNOLOGICAL ADVANTAGE

#### Convention Center and Hotel Technology

The Company believes the Project will rank among the most technologically-advanced convention center and hotels in the world. The meeting spaces will be designed to be able to change their look, feel, and functionality at a moment's notice. Lighting, furniture, and meeting tools will be changeable to accommodate the various differing users of the spaces in assisting them in reaching the goals of special differentiation and flexibility. The Project's objective is that people, technology, information, and the meeting place will all be much better integrated.

The Project property will provide "4G" internet service, with all rooms wired with fiber-optic communication links tied into major distribution networks to support the planned capacity, with transmission speeds approaching 14 Terabits. This is greater than the capacity of most computer installations today, and will offer distinct advantages. The Project's wireless network will be able to integrate any or all meeting rooms and sub-

distinct advantages. The Project's wireless network will be able to integrate any or all meeting rooms and sub-divided sections of the main convention spaces, permitting simultaneous voice and video transmission on a real-time basis, and will also provide for parallel computer link-ups to exchange on-line data during video conferences. This will appeal to corporate meeting planners who are challenged to reduce meeting costs yet still produce effective meetings. The technology suite can accommodate national link-ups for announcements, presentations, and general session activities through teleconferencing. The integration of wireless technology into the physical place of meetings will provide seamless and effortless links back into knowledge bases of information.

All meeting rooms will have computer-controlled lighting, zoned in each space so lighting can be set at an appropriate level, including tinting for specialized events. This will enable lights near A/V equipment to be dimmed while the lighting in the general audience area is maintained at a level where notes can be taken and interactive discussion conducted.

Sound systems will also be computer-controlled, with the ability to zone and regulate speakers and isolate areas, permitting flexibility in the use of rooms and in subdividing space.

Conference spaces will also include key card security that will permit a group to control access to their meeting space and track and regulate staff and contractors who access the space. This will be a very strong benefit to organizations concerned with corporate espionage, and companies with prototype product roll-outs and sensitive products, such as seasonal releases of new product lines.

Convention services for the Project complex user organization will also be state-of-the-art, with compatible registration and meeting services hardware at the property to back-up meeting planner systems, including registration, name tag generation, attendance control, and event and cost tracking, with computer/technology

SEC-USCIS-P-0000415

support services on call. Announcement boards and message boards will be incorporated into key traffic areas to provide message centers for attendees and the meeting planners.

All of this space will be controlled through a banquet and convention sales and management software solution that will also maximize space utilization, tracking opportunities to combine space, shift groups for greater efficiencies, and free under-utilized space that can be marketed for additional revenue generation.

In summary, the planning and design of the space will position "A Chicago Convention Center" as the most technologically advanced and environmentally friendly facility in operation. The facilities built into this space will be extremely difficult for competitors to retrofit into their existing operations; therefore the Company believes the Project will remain highly competitive for an extended period.

**Hotel In-Room Technology**

The technological advances will not stop at the guest's door. The Project maintains its commitment to the utilization of technology to complement and supplement the hotel guest's experience. The Company anticipates that this Project will inspire other facilities and serve as a reference for a number of new and ongoing hospitality projects. The hotel and guest room technology is designed as the guest room of the future in both aspects of energy control and usability. The following are key components planned for the Project's guest room of the future:

- **Biometric Self-Service Check-in**





In each hotel lobby, guests will be able to avoid long lines at the registration desk and check-in via biometric scanners. This will greatly reduce the congestion and long lines that often occurs at large corporate and industry conventions. Guests can quickly and conveniently check in, obtain their room keys, and begin the process of unwinding from their travels and preparing for the convention ahead.

SEC-USCIS-P-0000416

- **Digital Door Viewer**



Once inside, a guest can get a clear view of who is on the other side of the door with **First View Security's Digital Door Viewer™**. The LCD screen displays live video feed from a miniature camera mounted to the door.

- **Power Mat**



thing to pack. An early example is the **PowerMat™**, which charges electronic devices simply by laying them down upon the mat.

- **Control4® Suite Systems**



A standards-based automation and entertainment control technology platform that provides an enhanced guest experience and energy management capabilities. This technology integrates with hotel property management systems and hotel networks, enabling guests to select lighting, temperature, multi-media, and concierge services. Control4 solutions are based on Ethernet, Wi-Fi, and ZigBee technology standards, and are environmentally-focused, delivering LEED certification

SEC-USCIS-P-0000417

points in most cases. In addition, the Control4 Hotel Management Console and Hospitality Dashboard enable global viewing and monitoring of Project property guestrooms.

- **My IC Phone**



Using this phone, designed as a multimedia hub for the guestroom, guests have instant and easy access to a variety of hotel services, communication options, entertainment choices, room controls, and Web applications, all through an intuitive, high-resolution touch-screen interface. From this interactive phone, guests can control their in-room environment to achieve greater comfort in the hotel, whether adjusting lighting and temperature controls, or setting the room status to "Do Not Disturb." Designed to enable new innovative applications, the My IC Phone platform is fully customizable, delivering second-to-none technology to guests craving an exceptional hospitality experience.

- **SmartTouch**





An in-room touch screen that provides hotel guests with direct access to all hotel services, including room service, spa, concierge, bellman, valet, and more. Operating on a wireless local area network, each touch screen communicates directly with the Project's on-site, secure server. The multi-lingual software is configured to each individual property, and the application can be custom-designed to match the hotel's brand.

In addition, the Company anticipates [each hotel room] to also be equipped with the following innovative electronic amenities:

- 3D LED TV with 3D Blu-Ray Player - High Impact Movie Viewing.
- Sound Focusing Speakers.
- In-Room Massage Chair
- Media Hub.

The Project development is expected to demonstrate how future guestrooms can encompass high-tech touches with a "soft-touch delivery" to make a guest's stay the ultimate experience. It is planned to reach all

SEC-USCIS-P-0000418

possibilities by showcasing new and upcoming technologies for the modern eco hotel room, while providing specific solutions to the needs of guests.

\* \* \* \* \*

Case: 1:13-cv-00982 Document #: 11-1 Filed: 02/06/13 Page 43 of 116 PageID #:911

SEC-USCIS-P-0000419

## CHICAGO O'HARE INTERNATIONAL AIRPORT AREA
## REVITALIZATION AND DEVELOPMENT ACTIVITY

Following is a snapshot of some of the important projects currently underway or recently completed in the Chicago O'Hare International Airport submarket of the Chicago Metropolitan area.

A new $445 Million casino and entertainment complex is currently under construction in nearby Des Plaines, Illinois, along the Tri-State Highway at I-294 near Devon Avenue, less than two miles from the Project site location. This complex will be LEED® Certified (the base level of LEED® certification). The first phase of construction will feature 45,000 square feet of gaming space within a single-level casino, with 1,200 gambling positions.

The Project site location is also located near the Donald E. Stephens Convention Center, featuring 840,000 square feet of exhibition space marked by exposed steel columns and concrete floors, rather than finished meeting space. The existence of this convention facility evidences a demand for projects of this type. On the other hand, the Company's management believes that the Project will compete favorably with the existing facility for a variety of reasons. For example, the Company believes a rapidly growing number of convention and meeting contracts are requiring a higher measure of "green" stipulated in their contracts, therefore meeting and convention planners who require green lodging will be well served by the Project property's Zero Carbon Platinum LEED® certification Allergen-Free design.

The $15 Billion Chicago O'Hare International Airport Modernization Expansion is projected to increase airport operations by 60% in 2013, reclaiming the Chicago O'Hare International Airport's prior status as the world's busiest. Based on the historic performance of the current Chicago O'Hare market area, significant support is believed to exist for the proposed Project complex. In 2008, the Airport handled 881,000 flights, representing an average of 2,409 flights per day, and 70 million passengers per year. In contrast, the Chicago O'Hare International Airport Modernization Expansion will reach its full capacity in 2013, when traffic is projected to increase by 60% to over 110 million passengers per year.

increase by 60% to over 110 million passengers per year.

The ongoing Chicago O'Hare International Airport modernization expansion will enable the Airport to better serve the next generation of large passenger aircraft (such as the Airbus A380 and Boeing 787 "Dreamliner"), in addition to increasing flight capacity. The expansion projects include a new western gateway terminal and access highway. Overall, when completed, the modernization expansion program will result in expanding the Airport's capacity by 60% to over 3,800 operations a day, up from the present capacity of 2,700. The four new runway configurations are expected to allow fewer runways to be closed during poor weather conditions, enabling greater flight throughput during poor flight conditions.

Management believes the plans of the Illinois Department of Transportation ("IDOT") to improve the west corridor access to O'Hare should open new sources of business for O'Hare area properties, linking the Centex industrial park to the Kennedy Expressway and Rosemont area properties. Centex, in Elk Grove Village, is home to the largest consolidated business park in North America. Over 3,800 businesses are located in its 5.4-square-mile (14 square-kilometers) business park adjacent to Chicago O'Hare International Airport.

\* \* \* \* \*

SEC-USCIS-P-0000420

**MANAGEMENT, ADVISORS, AND CONSULTANTS**
**BIOGRAPHIES AND INTERRELATIONS**

*BIOGRAPHIES*

**Ravinder Sethi**

Mr. Ravinder Sethi is one of the founding members of A Chicago Convention Center, LLC, Intercontinental Financial Group, LLC, Upgrowth, LLC, and RASS Hospitality, LLC, which are the managing member of the Company and the Development Company, respectively.

Mr. Sethi has over thirty years of experience in real estate development and management, specifically in the lodging, pharamaceutical, and educational arenas.

His non-medical businesses are engaged in real estate hospitality and educational developments specifically in general contracting major hotel brands and education businesses in the United States and India.

In his native country of India, Mr. Sethi's other business activities are also in real estate hospitality development for over twenty years, and most recently, for the past 10 years, in development of full-fledged universities with dormitories. These universities grant degrees in business administration (both undergraduate and MBA's), education (bachelors and masters), and masters in computer administration, and are soon to add medicine, pharmacy, and nursing at the International Medical University in India.

Mr. Sethi was raised in India, and graduated from the University of Punjab, Chandigarh, India, with a Masters Degree in Pharmacy.

He is a member of numerous organizations focusing in areas related to global finance, alternative investments, real estate development and management, sustainability and renewable energy, asset management, and

entrepreneurism.  In addition, Mr. Sethi serves on the boards of numerous not-for-profit, social, and educaional organizations.

### Anshoo R. Sethi

Mr. Anshoo R. Sethi is the co-founding member of A Chicago Convention Center, LLC, Intercontinental Financial Group, LLC, Upgrowth, LLC, and RASS Hospitality, LLC, which are the Company and the Development Company, respectively.

Mr. Sethi has over fifteen years of experience in real estate development and management, specifically in the lodging arena.  In the development and operation of such ventures, Mr. Sethi has acquired formidable proficiency in global finance, specifically in the management and acquisition of working and institutional capital, respectively.  He is intimately acquainted with the business of hotel development, as his family has been working in this arena for over thirty years.  Mr. Sethi is recognized as an innovator, creating strategies in all aspects of the pre- and post-real estate development process.  Given Mr. Sethi's insight into and proven results in real estate and lodging innovation, he has been able to grow his family's business exponentially.  It is the goal of Mr. Sethi and his associated businesses to develop large-scale hotels that are truly pioneering industry leaders in their design, environmental sustainability, and profitability.

Mr. Sethi has executed several corporate acquisitions and divestitures in his career, working with both private and public domestic and foreign funding (equity, mezzanine, and/or senior debt).  His interaction with hundreds of investors, comprised of corporations, banks, investment trusts, private equity, and venture capitalists, has additionally enabled him to develop a focus on providing analytical and financial advisory services to real estate developers, builders, investors, lenders, and early-stage and not-for-profit entities.  Mr. Sethi's unwavering commitment to his internal philosophy has led his passion for ingenuity to the pursuit of high performance developments in his pursuit of excellence.

SEC-USCIS-P-0000421

Mr. Sethi was raised in Chicago, Illinois, and graduated from the University of Illinois at Chicago with a degree in International Finance and Marketing. He has completed several graduate professional development programs. In addition to his extensive education, Mr. Sethi holds Certified Lodging Owner (CLO), Certified Hotel Administrator (CHA), and Certified Hospitality Technology Professional (CHTP) certification, and expects shortly to finalize his LEED° Professional Accreditation (LEED° AP) from the U.S. Green Building Council ("USGBC").

Mr. Sethi is a member of numerous organizations focusing in areas related to global finance, alternative investments, real estate development and management, sustainability and renewable energy, asset management, and entrepreneurism. In addition, Mr. Sethi serves on the boards of numerous not-for-profit, social, and educational organizations.

 Loop Capital

**Loop Capital Market, LLC / Albert "Al" R. Grace Jr.**

Loop Capital Market, LLC, an Illinois limited liability company, (http://www.loopcap.com), is a creative and highly client-focused provider of a broad range of integrated capital solutions for corporate, governmental, and institutional entities. Through the entire range of market cycle and evolving client needs since its founding in 1997, Loop Capital's uncompromising service has produced uninterrupted growth in each of its three wholly-owned businesses.

Loop Capital Markets is one of the nation's fastest growing investment bank and broker-dealers. Loop Capital

Loop Capital Markets is one of the nation's fastest-growing investment bank and broker-dealers. Loop Capital
Markets serves clients in public and corporate finance and taxable, tax-exempt, and global equity securities
Case: 1:13-cv-00982 Document #: 11-1 Filed: 02/06/13 Page 49 of 116 PageID #:917

Loop Capital Markets . . . *an agile, fast-growing investment bank and broker-dealer*

Loop Financial Products . . . *a leading swap counterparty to our clients*

Loop Financial Futures . . . *a proven source of effective hedging strategies*

Through these businesses, Loop Capital delivers integrated capital solutions and broad financial resources to a growing base of institutional clients across the globe. Headquartered in Chicago, Loop Capital also maintains offices in Baltimore, Charlotte, Cleveland, Dallas, Denver, Detroit, Hartford, Houston, Indianapolis, Los Angeles, Newark, New Orleans, New York City, Orlando, San Francisco, San Antonio, Tampa, Washington, D.C and West Palm Beach. Our staff of over 100 experienced professionals is known for its uncompromising commitment to individualized client service and for the exceptional results that commitment produces.

Since our founding in 1997, Loop Capital Markets has been involved in several trillion dollars of underwritings in the equity, tax-exempt, and taxable fixed income capital markets, and has earned a reputation as a dedicated, resourceful partner with new ideas and avenues of distribution.

Loop Capital Markets provides both global equity and fixed income brokerage services exclusively to institutional investors. We trade equity, taxable and tax-exempt debt extensively with over 600 institutions including mutual funds, asset managers, insurance companies, corporations and governmental entities, ranging in size from less than $100 million in assets under management to over $2 trillion in assets under management.

SEC-USCIS-P-0000422

We believe – and our clients report – that four key strengths distinguish us from the competition: our people, distribution, underwriting abilities and capital.

**People.** Experience and a strong client-focus are the two common traits of all our sales, trading and underwriting professionals. On average, each of our professionals has 22 years of institutional experience. They have joined Loop Capital from virtually all of the big name financial services firms with the belief that the best way to succeed is to first make certain your client succeeds. Our rapidly growing staff is now nearing the 150-person mark.

**Distribution.** We provide our clients the finest distribution capabilities and coverage, effectively broadening the base of high-quality investors and providing access to new avenues of demand. Our institutional sales force – one of the most experienced in the industry – provides direct coverage of over 600 first, second, third, and fourth tier institutional accounts.

**Underwriting.** Loop Capital has the prerequisite expertise to lead transactions and the financial resources to commit to the key areas we underwrite. We are known for providing innovative solutions in challenging situations through a process that includes: meticulous development of market and investor intelligence; underwriting bonds; providing secondary market support on all underwritten issues; creating an open line of communication with investors and credit dynamics; and broadening retail and institutional distribution for underwritten deals.

**Capital.** Financial strength is key to the effectiveness of any investment banking and brokerage firm. At Loop Capital, we are extensively capitalized, with a capital base including significant equity capital, subordinated debt and secured bank lines of credit. As a result, we are well prepared to support our clients' financing and investment activities with capital.

Mr. Albert "Al" R. Grace, Jr., will be providing financial expertise regarding the structuring and implementation of the Company's contemplated government and commercial bond issuances.

Mr. Grace has over 30 years of experience in the capital markets, money management and law. Prior to the formation of Loop Capital Markets, he was Vice President at the Northern Trust Company. Earlier, he served as President and Chief Operating Officer of Selected Financial Services, an investment advisory and broker/dealer subsidiary of Kemper Corporation. Previously, Mr. Grace was legal counsel to the investment and trading departments of Kemper Financial Services, Inc., CIGNA Corporation, and American Express Financial Services, Inc., specializing in securities and commodities law.

Since co-founding Loop Capital Markets in 1997 along with James Reynolds, Mr. Grace has promoted the vision of creating an uncompromising standard of excellence in the most responsive, client-focused firm comprised of some of the most capable and experienced professionals in the industry.

Mr. Grace serves on the boards of Chicago Communities in the Schools, where he is Chairman of the Program Committee; Chicago United, where he serves as Secretary of the organization and a member of its Executive Committee; and the University of Wisconsin, La Crosse Foundation. He is also a member of the Securities Industry Association's National Institutional Brokerage Committee.

Mr. Grace holds a JD from the University of Wisconsin Law School and a Bachelor of Science in History from the University of Wisconsin, La Crosse. He completed additional study at the University of Hartford and the University of Wisconsin Graduate School of Business. His licenses include Series 3, 6, 7, 24, 26, 27, 55 and 63.

SEC-USCIS-P-0000423

# **MJL** Consulting Services

### Mr. Anjan Chatterji MBA, JD, LLM

Mr. Chatterji, though his company, MJL Consulting Services, LLC, an Illinois limited liability company, will provide transactional and structuring services.

Mr. Anjan Chatterji's professional and academic experience has been focused on transactional advisory and restructuring services ranging across various industries, including finance, real estate, bio-technology, and manufacturing. Mr. Chatterji's experience has been chiefly derived from his work with globally-recognized consulting and law firms, as well as boutique think-tank consulting organizations. Over the course of his career, Mr. Chatterji has mainly advised multinational private equity and hedge fund clients on transactions involving global organizational restructuring, efficient tax and transfer pricing planning, valuations, cash-flow modeling, and capital sourcing. Mr. Chatterji has also worked, with the Washington offices of his previous employers, in conjunction with the United States Treasury Department on major global dispute resolution cases.

Mr. Chatterji conducts research with the University of Chicago in broad-ranging areas of law and economics, Antitrust & Competition, Public Finance, and Tax Regulations. In addition to receiving his Master of Business Administration and Juris Doctor, Mr. Chatterji also received a Master of Law in Taxation (LL.M.) from Northwestern University School of Law and the Kellogg School of Management.

**TR Mandigo & Company**
Over 35 Years of Hospitality Experience

Mr. Mandigo, though his company, TR Mandigo & Company, Inc., an Illinois corporation (http://www.trmandigo.com) ("TRM"), will be providing hospitality advisory services.

Mr. Theodore Mandigo is a 38-year veteran of hospitality consulting, with projects in new development feasibility, acquisitions, operational analysis, expert witness work, and a variety of related services. He has been responsible for over 1,500 market studies over his career, including The Ritz-Carlton Hotel in Chicago early in his career in 1972, and with the market study for the Wit Hotel in 2008 in Chicago among his most recent studies.

Mr. Mandigo joined the faculty at Kendall College's Glion Hospitality Program, bringing field and operational experience to the classroom. He teaches programs in a wide range of topics, from food and beverage control to feasibility studies, working real-life projects into the curriculum. He has responsibility for a series of senior level courses in Yield and Revenue Management, Finance, Management Strategies, Managerial Accounting, and Labor Relations, integrating field trips and visiting lecturers into the program, using the Chicago area hotels and hospitality organizations as a resource.

Mr. Mandigo is a licensed Certified Public Accountant, and active in the industry, serving as president of the Illinois CPA Society in 1999 and 2000, and as a member of the national council of the AICPA. He was a member of the Accreditation Committee for the ABV designation as that certification program was initiated. He is an active member of the Illinois Hotel and Lodging Association, and annually prepares and presents analyses and forecasts for hotel management groups including the Downtown Hotel Managers of Chicago and the DuPage Convention and Visitors Bureau. He is a frequent speaker and panelist at industry conferences including

SEC-USCIS-P-0000424

service on the advisory panel of the New York Hospitality Investment Conference, and speaker at the Illinois Mortgage Bankers Association and the American Institute of Real Estate Appraisers.

His career includes 24 years within the accounting profession (with partnership in two national firms), six years in the airline food service industry as regional controller, and 13 years of ownership of his own hospitality consulting firm.

Mr. Mandigo is an organizer and founding member of the International Society of Hospitality Consultants, starting with correspondence and an organizational meeting in 1988 to establish the structure of that organization and served on the board and various officer positions during the initial years of the society.

At Kendall College, Mr. Mandigo both fills in or provides assistance in identifying guest lecturers, and participates as an advisor on student projects and tutorial programs.

His continuing operation of his consulting practice yields fresh projects and issues to be brought to the classroom. He shares his insights and analysis of market trends, developments and issues across the many programs of the school.

Ted Mandigo is a 1966 graduate of the Cornell University Hotel School and has an MBA from Loyola University of Chicago. He holds certifications as a Master Hotel Supplier and a Certified Hospitality Revenue Manager through the American Hotel & Lodging Association.

Schain Burney
Banks & Kenny

Case: 1:13-cv-00982 Document #: 11-1 Filed: 02/06/13 Page 55 of 116 PageID #:923

The law firm of Schain, Burney, Banks & Kenny, Ltd., an Illinois law corporation ("SBBK") (http://www.sbbklaw.com), will be providing legal counsel in the areas of real estate development law.

A number of the founding partners of SBBK have practiced together for over 30 years in the areas of government relations, zoning, land use, and municipal law. The formation of SBBK brings together attorneys with additional expertise in the areas of commercial litigation, business law, state and local sales tax, real estate taxation, real estate law, condemnation, loan documentation, work-outs, environmental law, and renewable energy.

The SBBK leadership consists of a unique group of attorneys who combine the legal depth and strength of a larger firm with the flexibility, efficiency, personalized counsel, and competitive pricing advantage of a smaller firm.

With extensive experience successfully representing clients in both the private and public sectors, the attorneys of Schain, Burney, Banks & Kenny bring an in-depth understanding of both government and business perspectives, with a proven history of providing quality representation that meets its clients' strategic objectives.

William Banks **is** a partner with Schain, Burney, Banks & Kenny, Ltd. where he counsels clients on matters relating to land use, zoning, real estate development, real estate tax reduction, litigation strategy, developer incentives and state, county and federal governmental relations and approvals.

SEC-USCIS-P-0000425

Prior to joining the firm, Mr. Banks was Alderman of the 36th Ward, Chairman of the City Council's Committee on Zoning, and Chairman of the Mayor's Zoning Reform Commission which was responsible for updating and rewriting the City of Chicago Zoning Ordinance.

Prior to his election as Alderman, Mr. Banks served as Chief Research Aide and Legal Counsel to U.S. Congressman Morgan F. Murphy. Mr. Banks later handled over 10,000 cases in his position as Assistant Corporation Counsel for the City of Chicago.

He is the current 36th Ward Democratic Committeeman and Treasurer of the Cook County Democratic Party.

Practice areas:    Land use, zoning, real estate development, real estate tax reduction, litigation strategy, developer incentives and state, county and federal government relations and approvals.

Education:  JD, 1975, DePaul University College of Law   BA, 1971, DePaul University

Bar Admissions:  Illinois and United States Supreme Court

Professional and Civic Affiliations:
   Chicago Bar Association, Chicago Shriner's Hospital, Board Member, The Fraternal Order of Police

HONORS AND AWARDS - *MORE THAN 600 AWARDS FOR PROFESSIONAL AND CIVIC ACHIEVEMENTS*:
September 9, 2009 Congratulatory Resolution - Passed by Mayor Richard M. Daley and the Chicago City Council in recognition of Mr. Banks' retirement from City Council
July 28, 2009 Recognition in the Congressional Record - Presented by Congressman Michael Quigley in a speech before the United States Congress honoring Mr. Banks' retirement from Chicago's City Council
2006 Recognition Award for Veterans' Rights Work - Presented by the Secretary of the U.S. Army 2006
Presidents Community Service Award - Presented by the Chicago Association of Realtors in recognition of his

dedicated efforts to reform Chicago's Zoning Ordinance.

2005 Friends of Downtown Award - Best Planning Document of the Year - Presented by the Friends of
   Downtown in recognition of Alderman Banks' leadership in rewriting the City's Zoning Code

2005 Person of the Year Award - Presented by the Illinois Political Fund

2005 Person of the Year Award - Presented by the United Food and Commercial Workers Union

2004 Recognition in the Congressional Record - Presented by Congressman Rahm Emmanuel and approved by
   the United States Congress for achievement in rewriting the Chicago Zoning Ordinance

2004 President's Award - Presented by Local 150 and the International Union of Operating Engineers



**Torrence Capital Advisors Pvt. Ltd.**

Torrence Capital Advisors Private Limited Pvt. Ltd., a private limited company organized and existing under the laws of India ("Torrence") (http://www.torrencecapital.com), will be serving as the investment bankers to the Company.

SEC-USCIS-P-0000426

Torrence is a global investment banking firm that provides strategic advisory, financial advisory and capital-raising services to corporations, partnerships, and institutions.

Cutting across all geographical barriers, Torrence helps business enterprises, having scalable and sustainable business models, to realize their full potential by integrating Torrence's advisory and fund-raising capabilities.

Torrence combines superior execution capabilities, meticulous research, rich transaction experience, and a network of global partnerships to help its clients close a variety of strategic and financial transactions.

Founded in 2010, Torrence has already signed mandates to raise funds in the amount of over $2 Billion, both via equity and debt routes, for business in India and abroad in varied industries.

Torrence is also intensely committed to being an active and value-added financial service provider to those desirous to build world-class businesses in their respective fields. More importantly, Torrence's focused business model allows it to dedicate the necessary senior-level attention to clients

The Torrence management team has about 100 years of combined experience, and fully understands the complexities of the Indian financial sector. The team members have worked in India and abroad, and have exemplary business relationships with reputed multinational companies around the world. The team believes in delivering world-class, high quality services to its clients in a competent, professional, and ethical manner. The team comprises professionals of the highest caliber drawn from accounting, business advisory and consulting services, banking, and fund management.

# NANGIA & CO.

**Nangia & Co.**

Nangia & Co. Chartered Accountants, Pvt. Ltd., a private limited company organized and existing under the laws of India ("NCCA"), will be providing the Company with certified public accounting services.

NCCA achieved a special milestone in 2009, the year in which it completed 25 years of practice. Looking back, the journey reflects a story of sheer grit and positivity converting thoughts into reality. The firm was founded in 1984 by Mr. Rakesh Nangia, who has ably led it from the front in the course of his own professional career, now spanning almost 30 years. From a humble beginning, the firm has grown to today's multi-city presence, world-wide client base, and a huge family of professional and staff support. The firm today is one of the largest Indian accountancy firms in the oil & gas industry, known for its impeccable track record of delivering consistently for its clients, where it matters.

NCCA believes its highly talented pool of personnel today is the heart of the firm's strength.

Nangia & Co. Chartered Accountants provides diverse professional services, and pursues a multi-disciplinary practice. The firm offers real-world solutions to the complex business matters of its clients. The firm has a clearly-laid down service philosophy, which guides each member of the firm with single-minded purpose in performance of services to its clients.

Over the years, the firm has gained significant experience in working for a number of multinational clients, as well as for several reputable Indian clients. This includes both privately- as well as publicly-held businesses.

SEC-USCIS-P-0000427



**Carolyn Grisko & Associates Inc.**

Carolyn Grisko & Associates Inc. ("CG&A"), an Illinois corporation, will be providing public relations and marketing services to the Company and the Project.

CG&A is a strategic communications firm that provides public relations, public affairs, and marketing services. CG&A helps its clients achieve their goals by delivering targeted messages through media, grassroots, or marketing campaigns.

CG&A believes itself uniquely positioned to tailor solutions for both the public and private sectors, as well as bridge the gaps between them. Whether it is to build grassroots support, launch a business or service, or just stir awareness, CG&A's comprehensive approach delivers results. Its clients run the gamut from Fortune 500 corporations, to government agencies and nonprofit organizations. Since its founding, CG&A has been consistently recognized in local and national awards for its creativity, innovation, and success.

Carolyn Grisko, the firm's president, founded the firm in 1995 after a fifteen-year career in broadcast journalism (primarily reporting for and managing the news operation at Chicago's public radio station, WBEZ) and six years working for Chicago Mayor Richard M. Daley as deputy press secretary, mayoral aide, and campaign manager.

Ms. Grisko is co-chair of the Chicago committee of Human Rights Watch, a Leadership Greater Chicago fellow,



## Intercontinental Financial Group, LLC - The Company's Managing Member

Principals of the Managing Member of A Chicago Convention Center, LLC collectively possess over 150 years of combined construction project management and have also served in the same capacity for the property managers for multiple mid-rise and high-rise structures in downtown Chicago.

Those principals of the Company's Managing Member have a wide range of experience managing major projects from concept through completion, having built over 250+ hotel developments from coast to coast for prestigious clients in all hotel brands. Through these principals, the Project Company is expert in every aspect of new hotel construction, from initial site planning and conceptual budgeting, to the property's opening. Its hotel renovation projects are coordinated with property managers to minimize disruption to hotel operations.

SEC-USCIS-P-0000428

It also works with owners on rebranding and Property Improvement Plans (PIPs) from conceptual estimates through full design and construction.

Innovative, customer-focused processes with an emphasis on experienced, accurate pre-construction planning and detailed project management are the Managing Member's daily routine. The company strives to help ensure completion of a project that reflects the design concepts and timely delivery that its customers have come to expect.



### Upgrowth, LLC - The Development Company

With more than 35 years of experience, the Development Company, Upgrowth, LLC, has earned a reputation as a premier nationwide hotel general contractor providing a full range of services to the hospitality industry in both new construction and renovation for all hotel brands (including Marriott, Starwood, Intercontinental Hotels Group, Choice Hotels, and Accor Hotels). The Development Company's services also include construction management and value engineering with a focus on helping clients reduce costs and improve quality.

Over the years the Development Company understands it has earned substantial reputations for the ethics of its business practices, the candor of its input, the value of its preconstruction services, and the quality of its construction. The Development Company provides full service capabilities for both pre-construction planning and construction phases of a project. The Development Company utilizes a variety of delivery methods, from the traditional plans and specs approach, to full service design/build.

As Upgrowth drives to reach its goals through the relationships that it has attained with its clients by establishing its core business model that drives its culture into its Pillars of Success. Achieving growth, building bands, strengthening loyalty, and attaining operational excellence—these objectives are the heart of Upgrowth's Business Karma.

Upgrowth has been approved as qualified by all relevant governmental financing agencies.

**Economic Analysis**

Evans, Carroll & Associates, Inc. ("Evans, Carroll") is a business consulting and planning firm with an econometrics division that specializes in RIMS II software. Within the EB-5 arena, Evans, Carroll has, over the past five years, successfully prepared over 150 economic studies to evaluate and summarize the job-creation and economic benefits attributed to regional center designation and individual EB-5 projects. The firm has authored numerous economic analyses to demonstrate the local employment and economic impacts of various projects to local, state, and federal agencies. Based on prior government projects and peer-review,

SEC-USCIS-P-0000429

including EB-5 job-creation studies, Evans, Carroll's methodologies and economic research are well-vetted, and considered to be in accordance with the practices and standards of professional economists nationwide.



INTERCONTINENTAL
REGIONAL CENTER TRUST
OF CHICAGO

### Intercontinental Regional Center Trust of Chicago, LLC - The Regional Center

Intercontinental Regional Center Trust of Chicago, LLC is the entity that received USCIS approval on June 9, 2011 to create and operate the Intercontinental Regional Center Trust of Chicago. USCIS rules and regulations relating to the EB-5 Pilot Program require that, in order to maintain the validity of its approval and designation, an approved regional center must continue to meet the statutory requirements of the EB-5 Pilot Program by serving the purpose of promoting economic growth, improving regional productivity, creating jobs, and increasing domestic capital investment. USCIS thus requires regional centers to monitor all investment activities under their sponsorship, and to maintain records, data, and information on a quarterly basis in order to report to USCIS, upon request, year-to-date information for each Federal fiscal year. Such records, data, and information include, but are not limited to, the regional center's administration, oversight, and management plan; biographical and other relevant investor data; and total regional center investment and job creation totals. IRCTC actively performs for the Regional Center the necessary administrative requirements described above, and consequently, the Regional Center remains in good standing with USCIS.

### MATERIAL RELATIONSHIPS AND AGREEMENTS

### A Chicago Convention Center, LLC (the Offeror, or the Company)

Upon completion of the Offering, the Offeror intends to deploy its capital provided by the Investor Members for the construction and development of the Project. Hence the Company will be the EB-5 "Capital Investment Project" that will receive and utilize the Offering's EB-5 capital and create the corresponding number of jobs.

The Managing Member (IFG) currently owns all of the Company's membership interests; after the receipt of Offering proceeds hereunder, IFG will hold eighty-seven and one-quarter percent (87.25%) of those interests, with the Investors holding the balance. Consequently, the Company is affiliated with the Managing Member, the Development Company, and the Regional Center. IFG is owned by Mr. Ravinder Sethi (as to a 50% membership interest) and Mr. Anshoo Sethi (as to a 50% interest).

**Intercontinental Financial Group, LLC (the Managing Member)**
The Offeror's Managing Member is Intercontinental Financial Group, LLC. Anshoo Sethi is a manager of IFG. Accordingly, Intercontinental Financial Group, LLC, and Anshoo Sethi as manager, will have control of the day-to-day operations, management, and all actions of the LLC. Under the Offeror's Operating Agreement (Exhibit A), Investor Members' rights are limited to those set forth in the Operating Agreement and granted to Investor Members under the Act. Consequently, the Managing Member is affiliated with the Company, the Development Company, and the Regional Center

**Upgrowth, LLC (the Development Company)**
Upgrowth, LLC is the Development Company. The Managing Member has entered into a "Design/Build Guaranteed Maximum Price Contract" with Upgrowth, providing that Upgrowth shall act as the Developer/Designer/Builder to oversee and manage the design, development, construction, equipping, furnishing, and completion of the Project. A "Guaranteed Maximum Price" contract involves setting a maximum price for a developer's handling all of the oversight and management just described, and while

SEC-USCIS-P-0000430

guaranteeing the developer's payment, effectively places a ceiling on the developer's compensation. Unforeseen expenses and cost overrides exceeding the ceiling shall be borne by the developer.

IFG has assigned this contract to the Company prior to the commencement of any work by Upgrowth under the GMP contract. Mr. Anshoo Sethi is the owner of sixty percent (60%) of the Development Company's membership interests, and Mr. Ravinder Sethi holds the balance; thus, the Development Company is affiliated with the Company, the Managing Member, and the Regional Center.

**The Regional Center**
Intercontinental Regional Center Trust of Chicago is the entity that received USCIS approval on June 9, 2011 to create and operate an EB-5 regional center, and has been engaged to perform advisory as well as sponsorship activities for the Project. Mr. Anshoo Sethi holds 50% of the ownership interests in the Regional Center, with the remaining interests held by Mr. Ravinder Sethi; thus, the Regional Center is affiliated with the Company, the Managing Member, and the Development Company.

USCIS rules and regulations relating to the EB-5 Pilot Program require that, in order to maintain the validity of its approval and designation, an approved regional center must continue to meet the statutory requirements of the EB-5 Pilot Program by serving the purpose of promoting economic growth, improving regional productivity, creating jobs, and increasing domestic capital investment. USCIS thus requires regional centers to monitor all investment activities under their sponsorship, and to maintain records, data, and information on a quarterly basis in order to report to USCIS, upon request, year-to-date information for each Federal fiscal year. Such records, data, and information include, but are not limited to, the regional center's administration, oversight, and management plan; biographical and other relevant investor data; and total regional center investment and job creation totals. The Company is informed and believes that the Regional Center actively performs the necessary administrative requirements described above in order to remain in good standing with USCIS.

SEC-USCIS-P-0000431

**CONFLICTS OF INTEREST**

Because of shared ownership and commonality of financial interest, any transaction between the Offeror and (a) the Managing Member, (b) the Development Company, (c) the Regional Center, and (d) the owners, managers, directors, officers, or employees of any of the foregoing, may be entered into without the benefit of "arms-length" bargaining, and as detailed below may involve actual or potential conflicts of interest— including, without limitation, the deployment of Offering proceeds for furtherance of the Project. Except and to the extent that specific limitations on self-dealing may be set forth in the Operating Agreement, the Investor Members will be relying on the general fiduciary standards which apply to a manager and a co-member of a limited liability company under law to prevent overreaching by the Managing Member in any transaction with or involving the Offeror. (See Paragraph 4, "Fiduciary Responsibility of the Managing Member," below.) The following constitutes a summary of important areas in which the interests of the Managing Member or its members, managers, or officers may conflict with those of the Offeror:

    **1.**    **Lack of Independent Representation.** The Offeror has not been represented by independent counsel. The attorneys that provide services relating to the Offeror perform their services for the Managing Member and at its direction. There is no attorney-client relationship or legal representation of the Offeror.

    **2.**    **Control of Offeror.** Subject to significantly limited oversight by the Investors as non-managing members of Offeror, the Managing Member will be solely responsible for making all decisions of the Offeror pertaining to the deployment of the Offering proceeds and the results therefrom. Additionally, the Managing Member is generally responsible by the terms of the Operating Agreement for the operations of the Offeror, including carrying out the specific authorization to deploy the Offering proceeds on behalf of the Offeror in the Project. The Managing Member's financial commitment for the development and operation of the Project and the management of the Offeror may otherwise be affected as described herein.

    **3.**    **Offeror Opportunities.** The members, managers, officers, and affiliates of the Managing

Member have previously had presented to them opportunities to launch, and have launched, other real estate development projects or vehicles for the pursuit of other development or funding opportunities, both under the EB-5 Program, and otherwise. Additionally, by reason of the Managing Member's management of the Offeror, including in particular the successful raise and application of investment proceeds contemplated by this Memorandum, the Managing Member and its members, managers, and officers may have presented to it or to them in the future additional opportunities to launch other investment projects or vehicles for the pursuit of other investment or funding opportunities, and to participate in other real estate development projects, both under the EB-5 Program, and otherwise, which might not otherwise have been made available to it or to them. Each Investor should recognize that the Managing Member (or another legal entity formed by the Managing Member and/or its members directly) intends to investigate such opportunities, and may, in consequence, undertake to manage, participate in, develop, own, or acquire other future investment projects, as well as continue those same activities with regard to existing investment projects, all whether or not similar to the Project, and conceivably competitive therewith, for its own account, or for the account of others. Any investment projects so managed, developed, owned, or acquired by or participated in by the Managing Member or its affiliates (or continuing to be managed, developed, owned, or acquired by or participated in by any of them) will not constitute any part of the assets, properties, or rights of the Offeror, and neither the Managing Member, nor its members, managers, or officers, will have any obligation to offer such opportunities to the Offeror or its Investor Members.

4.  **Fiduciary Responsibility of the Managing Member**. The Managing Member has a fiduciary responsibility to conduct the affairs of the Company in the best interests of the LLC (duty of loyalty), and must exercise good faith and reasonable prudence in managing the Company's business (duty of care). On the other hand, the Managing Member may not be liable to the LLC or the Investor Members for errors in judgment or other acts or omissions, as described in "Risk Factors," below. Therefore, Investors may have a more limited right of action than they would have absent these limitations in the Operating Agreement. In addition, the

SEC-USCIS-P-0000432

burden of proving a breach of fiduciary duty by a manager, and all or any portion of the expense of such lawsuit, would have to be borne by the non-managing investor member(s) bringing such action, unless a derivative action were successfully prosecuted.

5.     **Other Activities; Competition**. The Managing Member does not have any duty to account to the Offeror for profits derived from other than Company activities, and is under no duty, other than the duty as a fiduciary, to engage in such activities in a manner which does not affect the Offeror's investments. In addition, the Managing Member is required to devote to the Offeror's affairs only as much time as the Managing Member deems necessary. The Managing Member shares common ownership and control with the Development Company, the entity which shall actually utilize the proceeds of the Offering upon the consummation of the Offering. As such, it is possible that the Managing Member may have potential conflicts of interest with the Offeror. See "Risk Factors" and "Conflicts of Interest," above.

6.     **Compensation**. The Managing Member is expected to receive a substantial economic benefit from the Project and the Company. In addition to the Company's ability to retain the Administrative Fee to reimburse itself for its costs and expenses incurred in the course of setting up the Project and conducting the Offering, the Managing Member will retain a higher percentage of the profits of the LLC in excess of the Investors' Preferred Return, recovered Capital Contributions, and distributions of proceeds (if any). Assuming a full subscription for all offered Interests, the Investors will collectively own twelve and three-quarters percent (12.75%) of the Company, and the Managing Member will own eighty-seven and one-quarter percent (87.25%) of the LLC's membership interests. Therefore, it is conceivable that after the LLC's investment in the Project is repaid upon a refinancing or a sale of or other exit from the Project (or a portion thereof), the Managing Member stands to earn a disproportionate amount of the profit (if any) realized by the LLC after it pays the Preferred Return to the Investors, repays their Capital Contributions as required by the Offering, and distributes their pro-rata share of any proceeds of such refinancing or sale. Additionally, assuming a successful close of the Offering, as a result of shared ownership and control with other Project participants, the Managing Member and/or its principals could earn, directly or indirectly, a share of any profit realized from a sale of the

SEC-USCIS-P-0000433

## FINANCIAL CONSIDERATIONS

The financial discussion presented herein contains "forward-looking statements" based on the Managing Member's experience and expectations, and are subject to a number of risk factors. Please review carefully the section of this Memorandum entitled "Risk Factors," below.

### *In General*

The Company expects that the Project will generate revenues through multiple profit streams after completion of construction and the start of operation of the Project.

### *Project Construction Cost Estimates*

The LLC estimates that the total capital required to finance the Project is approximately $912,502,636, including the value of the underlying real property (title to which is already held and has pledged property to A Chicago Convention Center, LLC by an affiliate of the Company (RASS Hospitality, LLC.) and will be transferred to the Company as described herein), plus development costs, including construction costs, site development, asset purchases, fixtures, equipment, labor, operating and financial reserves, and leasing costs.

### *Pro Forma Financial Projections*

The Managing Member has drafted on behalf of the Company a Business Plan describing the Project generally. The Business Plan, attached hereto as Exhibit E, includes three versions of compiled pro forma financial projections for the Project.

The Business Plan was undertaken to: (i) examine the current and potential future demand for the World's first Zero Carbon Platinum LEED® Certified Allergen Free convention center hotel complex with five upper-upscale branded hotels in the market area for the Project; (ii) assess the existing and potential future supply of convention facilities and upscale hotel lodging, and (iii) evaluate the share of the market that could be

reasonably attained by the proposed Project, as well as to summarily describe the Project itself. As in all studies of this type, the estimated results are based upon various assumptions, such as competent and efficient management, and that there shall be no significant change in the competitive market from that set forth in the Business Plan. Since the Business Plan predictions are based upon estimates and assumptions that are subject to change, the Company does not represent these predictions as results that will actually be achieved. It is expressly understood that the scope of the Business Plan and the projections contained therein do not include the possible impact of zoning or environmental regulations, licensing requirements, or other restrictions concerning the Project, except where any such matters may be expressly addressed and disclosed in the Business Plan.

With input from other consultants, the Managing Member estimated construction, and marketing costs based upon its development experience. These estimates were used in generating the three alternative pro forma financial projections included in the Business Plan, all as more fully described therein.

### *Economic Analysis / Job Creation*

Evans, Carroll was retained to conduct an analysis of the Project. Its report of that analysis, entitled "Economic Impact of Development of a Hotel and Convention Center Complex Near Chicago O'Hare International Airport in Chicago, IL, as Part of an Existing EB-5 Regional Center" (the "**Economic Analysis**"), is attached hereto as Exhibit F.

Evans, Carroll estimated demand, market share, and job creation based upon the participants' experience with similar projects both in the Project's area, and in other areas deemed sufficiently similar for comparison purposes. The Project's area for purposes of the Economic Analysis is not identical to the Regional Center Territory, rather it is smaller and more targeted, and is described in the Economic Analysis as Cook, Lake, Will, and DuPage counties in Illinois and Lake County in Indiana.

12/13/2011                     A CHICAGO CONVENTION CENTER | PPM                     51

SEC-USCIS-P-0000434

The Economic Analysis was undertaken to determine the current and potential future demand for convention, conference, meeting, and upscale hotel lodging in the market area for the Project, evaluate the share of the market that could be reasonably attained by the Project assuming the utilization of all financing received (including, but not limited to, the Offering proceeds) in its development as planned, and assess the potential future creation of jobs (including indirect and induced jobs) linked to the development and operation of the Project. As in all studies of this type, the estimated results are based upon assuming competent and efficient management, and additionally presume no significant change in the competitive market from that set forth in the Economic Analysis. Since the Economic Analysis results are based upon estimates and assumptions that are subject to change, the consulting firm does not represent them as results that will actually be achieved. It is expressly understood that the scope of the study and the report thereon do not include the possible impact of zoning or environmental regulations, licensing requirements, or other restrictions concerning the Project, except where such matters are expressly addressed and disclosed in the Economic Analysis. See "EB-5 Immigration Disclosures and Risk Factors – Jobs," below.

### Additional Capital Sources

The Project will be only partially funded by the Offering proceeds received by the Company. Further financing for the Project's total costs will be sourced from the following additional sources:

The Project has been qualified for energy efficiency "Green" bonds (the "Bonds") issued by the State of Illinois Finance Authority pursuant to an Illinois program supporting renewable energy projects undertaken within the State. The structure, covenants, and terms of the Bonds are expected to be determined by Loop Capital Markets (a company owned by Albert R. Grace, and a consultant to the Project as described in "Management, Advisors, and Consultants Biographies and Interrelations," above) in consultation with both the Company and the State of Illinois as to the terms mutually acceptable to all parties based on market conditions at the time of the arrangement and the sale or placement.

Based upon the currently contemplated structure, the Bonds would be secured by a first position lien on the Company's assets, including the Project property (once transferred to the Company), and by the "moral obligation" of the State of Illinois. It is envisioned that the Bonds will be tax-exempt at the state level, and have a maturity between 20 and 30 years, depending on the appetite of the market at the time of issuance. A "moral obligation" bond not only gives investors the state tax exemption benefits inherent in a municipal bond, but also provides an additional moral pledge of commitment by the State against default. The issuing body's commitment is supported by a reserve fund established to meet any debt service costs that the state government may be unable to pay.

Furthermore, the Company believes that the Project will also qualify for additional federal, state, and city financing programs. Pursuant to the Energy Improvement and Extension Act of 2008, later amended by the American Recovery and Reinvestment Act of 2009, the United States Congress authorized up to $3.2 billion for Qualified Energy Conservation Bonds ("QECBs"). Up to 30% of the total $3.2 billion QECBs allocation may be issued to a non-state, municipality, or tribal government as "private activity bonds." On July 12, 2010, the State of Illinois enacted a law authorizing the aggregation of unused volume under several federal bond initiatives, including the QECB program, that were originally allotted to Illinois counties and cities, and the application of that volume towards qualified private projects. The Company's management believes that the Project shall fit within the definition of a qualified project. The State's goal is to make sure that it takes full advantage of these federal resources. The State of Illinois is expected to serve as a conduit between the federal government and the Company to issue the QECB bonds, subject to the 30% volume cap.

In addition, the State of Illinois issues tax-exempt "Industrial Revenue Bonds" and "Energy Industrial Revenue Bonds" on behalf of manufacturing companies located in the State to finance the acquisition of fixed assets such as land, buildings, and equipment. Bond proceeds also may be used for either new construction or

SEC-USCIS-P-0000435

renovation. The Company believes it would be eligible to take advantage of these bond funds, as well as various other bond programs offered by the federal and state governments.

In total, the Company believes it will able to secure up to $388,315,596 from a combination of two federal and state government loan sources. The first loan source, consisting of the Bond financing detailed above, is anticipated to be in the principal amount of $339,818,621. The Bonds are anticipated to have a term of 30 years, with an interest rate estimated to be between 2.9% and 3.3% annually. The second loan source, in the form of tax credit financing, is anticipated to be in the principal amount of $48,496,970, also with a term of 30 years, and an interest rate estimated to be between 1.5% and 2.5% annually. Further, the Project's attorneys and consultants have filed an application for, and following numerous in-depth discussions with the relevant government departments, the Company's management strongly anticipates the Project will qualify for, an award of $97,139,580 in federal, state, and municipal grants. Therefore, the Company believes it will secure a total of $485,455,171 in funding from, collectively, federal, state, and municipal government sources.

All of the debt financing obtained for the Project by the LLC, namely, the Bond financing and the tax credit financing, will be secured by liens, in the same order of priority, on the Company's assets, including the Project property. Specifically, the Bond financing will obtain a first priority lien on those assets, and the tax credit financing will be granted a second position lien on the Company's assets.

In addition, because the Project is located in an Illinois Enterprise Zone, the State of Illinois also provides numerous tax incentives that the Company and the Project expect to utilize, that in effect apply to help finance the Project as if actual funding. In summary, these incentives are expected to include:

- Investment Tax Credit – The Company expects to be entitled to a 0.5% credit against the state's income tax for its investment in an enterprise zone property, which can be carried forward for up to five years;

- Sales Tax Deduction – Retailers from whom the Company expects to buy building materials, may deduct the state's sales tax from the overall purchase price, when the materials are to be incorporated into a property located in an enterprise zone (such as the Project).

- EZ Manufacturing Machinery and Equipment Sales Tax Exemption – As a result of investing at least $5 million and creating at least 200 jobs, the Company expects to be entitled to a 6.25% state sales tax exemption on all personal property which is used or consumed within an enterprise zone in the process of manufacturing or assembly of personal property for wholesale or retail sale, or lease.

- Utility Tax Exemption - As a result of investing at least $5 million and thereby creating at least 200 jobs, the Company expects to be entitled to (i) a 5% state tax exemption on gas and electricity, (ii) to an exemption from the Illinois Commission 1% administrative charge, and (iii) from excise taxes related to telecommunications.

- Jobs Tax Credit – The LLC believes it will be eligible for a tax credit of $500 for every employee it hires who is certified as an economically disadvantaged or dislocated worker, which can be carried forward for up to five years.

- Property Tax Incentives – The Company expects to receive tax abatement from the Cook County clerk, with respect to the new improvements to be constructed on the enterprise zone property.

- Dividend Deduction – Because the Company conducts substantially all of its operations in an enterprise zone, the Company believes it will be able to deduct from its taxable income all of the dividends paid to it.

SEC-USCIS-P-0000436

The Company believes that from these sources, it will successfully raise all of the additional capital necessary to fund the Project. It is possible, however, that the Company will fail to raise the additional capital, or that the proceeds from the Offering, plus the additional capital raised via the tax-exempt Bonds and government grants, will be inadequate to satisfy all of the Project's capital requirements, or that such financing may not untimely be procured, requiring the Company to obtain alternative financing, including short- and long-term debt financing, or equity financing, in addition to the Offering proceeds, the government bonds, the government grants, and the tax incentives. The terms of such alternative financing may be better or worse for the Company than the terms of the contemplated financing, and may result in subsequent investors in the Company having superior rights to those of the Investor Members.

*   *   *   *   *

SEC-USCIS-P-0000437

## THE OFFERING

The Offering consists of a maximum of 499 Interests at a per Interest price of $500,000 (for an aggregate maximum investment of $249,500,000), and is offered on a "best-efforts" private placement basis only to accredited investors. Each subscription must be for a minimum of one (1) Interest (for a minimum investment of $500,000). The LLC will not accept subscriptions for fractional Interests, investments in an amount less than $500,000 per Interest, or investments that do not satisfy the minimum individual investment requirement of $500,000. The LLC may accept or reject any subscription in its sole and absolute discretion.

Offers are made only by the Company's delivery of this Memorandum and in a manner which meets the requirements for a non-public offering of securities under Section 4(2) of the Securities Act and the applicable rules and regulations promulgated thereunder, and/or under other applicable securities laws and regulations of the United States and/or applicable U.S. state or country, and/or exemptions therefrom. No offering of the Interests shall be made to a "U.S. Person" (as defined under Regulation S promulgated under the Act), nor by any advertisement, article, or other communication published in a newspaper, magazine, internet, or similar media, or broadcast over television or radio or online, or at a seminar or meeting attended by persons who have been invited by a general solicitation or general advertising; and shall be made only pursuant to registration under the Act, or in accordance with the provisions of Rules 903 or 904 thereunder, and/or pursuant to another available exemption from the registration requirements of the Act.

The offering of the Interests is designed to be exempt from registration under the Securities Act pursuant to Regulation D thereunder. Investors generally must be "accredited investors" within the meaning of Regulation D under the Securities Act of 1933. For this purpose, all equity owners of private investment companies and certain other entities must meet these requirements. The Managing Member may apply additional standards for admission to the LLC. The Subscription Agreement attached as Exhibit B and the Investor Questionnaire attached as Exhibit C set forth conditions and detail the standards for "accredited investors." In addition, prospective investors must make certain representations in the Subscription Agreement relating to securities law compliance, and must provide their taxpayer identification numbers.

Subscribers must represent that they are not U.S. Persons, and that they are purchasing the Interests (i) for themselves, and not for the account or benefit of any U.S. Person; and (ii) for investment purposes only, and not with a view toward resale or distribution. Subscribers must further represent that they shall resell the Interests only in accordance with the provisions of Regulation S under the Act, and not in the United States or to U.S. Persons except pursuant to registration under the Act, or pursuant to an available exemption from registration; and that they shall not engage in hedging transactions with regard to the Interests unless in compliance with the Act. Transfer of the Interests is subject to U.S. federal and state securities laws and the securities laws of any applicable country, the requirements of prior approval of the Managing Member in accordance with the terms of the Operating Agreement, and other substantial restrictions on transfer set forth in the Operating Agreement. See "Risk Factors," below.

The LLC may, in its sole and absolute discretion, cancel, terminate, close, or extend the Offering at any time, and from time to time. In the event the Offering is canceled or terminated, the Managing Member shall return total subscription amounts to the subscribers. Once the Offering has been fully subscribed at 499 Interests for an aggregate maximum investment of $249,500,000, it shall be automatically closed, and only re-opened as necessary to allow the LLC to offer the maximum.

SEC-USCIS-P-0000438

The table below presents a summary of the investment proceeds.

|  | Price to Investor [1] | Estimated Expenses of the Offering [2] | Proceeds to the Offeror [3] |
|---|---|---|---|
| **PER SUBSCRIPTION: (assuming single investor)** | | | |
| Minimum investment (1 Interest) | $ 541,500 | $ 41,500 | $ 500,000 |
| Maximum Offering (499 Interests) | $249,541,500 | $ 41,500 | $249,500,000 |
| **TOTAL: (assuming each investor subscribes for 1 Interest)** | | | |
| Minimum Investment (1 Interest) | $ 541,500 | $ 41,500 | $ 500,000 |
| Maximum Offering (499 Interests) | $270,208,500 | $20,708,500 | $249,500,000 |

*Table Notes:*

(1) The minimum investment is 1 Interest at $500,000 per Interest. No fractional Interests will be sold. For the purposes of this table, the Administrative Fee is included to show the total price to each investor, although the Administrative Fee will not be used to purchase any Interests.

(2) The Interests are being offered on a "best-efforts" basis by the Offeror. Expenses associated with the Offering, including legal, escrow, and related expenses and Managing Member's fees, are estimated to be an aggregate $41,500 per Investor.

(3) The Offeror may accept subscriptions for up to the Maximum Offering amount of $249,500,000.

Once commenced, the Offering shall continue until all of the unsold Interests are sold, or until the Managing Member closes the Offering. The proceeds from the subscriptions to the Offering ($500,000) will be deposited into an escrow and the Administrative Fee will be deposited into the Administrative account. On the approval of each investor's I-526 petition for a conditional green card, the funds held in escrow for that investor will be delivered to the Offeror. If the Offering is terminated, then total subscription and administrative Offering fee amounts deposited will be refunded to the Subscribers without interest or deduction.

The Offeror reserves the right to accept or reject any subscription, in whole or in part, for any reason in its sole and exclusive discretion. Any subscriptions not accepted will be returned without interest or deduction. There is no firm commitment by any person to purchase or sell any Interests, and there is no assurance that any of the Interests will be sold. Subscribers have no right to obtain a return of their subscriptions unless the subscription is not accepted, or a closing does not occur.

### Administrative Fee

In addition to the minimum investment of $500,000, each individual Subscriber is required to pay the Administrative Fee of $41,500. The Administrative Fee is used to reimburse the Managing Member and the LLC for the expenses of the Offering, and to otherwise compensate the Managing Member for its efforts associated with setting up the LLC and conducting the Offering. The Administrative Fee is deposited in the Administrative Account. The Administrative Fee is fully refundable in the event the subscription is not accepted, the Offering is terminated, or if the Subscriber's I-526 or visa application is rejected.

SEC-USCIS-P-0000439

### Fees and Expenses

The LLC may pay marketing expenses or other fees to one or more consultants, brokers, public relation managers, investment advisors, or other parties in connection with the sale of Interests pursuant to this Offering, as allowed by law. Any such marketing expenses or other fees paid to any party in connection with the sale of Interests pursuant to this Offering shall not be paid out of the proceeds of Capital Contributions of Investor Members. The LLC intends to pay such marketing expenses, if any, from proceeds of the Administrative Fee.

### Use of Proceeds / Allocation

The net Offering proceeds will be utilized by the Company for the ground up construction, development, and operation of "A Chicago Convention Center," the World's first Zero Carbon Platinum LEED® certified Allergen Free convention center and hotel complex, located in Chicago, Illinois.

Subject to applicable laws, the Managing Member has broad discretion to adjust the application and allocation of the net proceeds of this Offering and profit and losses of the LLC. There is a risk that the Internal Revenue Service may attempt to disallow the manner in which the Managing Member proposes to allocate profit and losses. A reallocation of profit and losses by the Internal Revenue Service could cause severe adverse consequences to the Investors.

### Return on Investment – Net Distributable Cash from Operations.

In consideration of their investments, each individual Investor Member shall individually acquire a membership interest representing ownership of just over twenty-five one-thousandths percent (0.0255511%) of the Company's total membership interests. Thus, assuming a full subscription for all 499 Interests offered through this Offering, the Investor Members will collectively acquire direct ownership of twelve and three quarters

this Offering, the Investor Members will collectively acquire direct ownership of twelve and three-quarters percent (12.75%) of the Company.

Case: 1:13-cv-00982 Document #: 11-1 Filed: 02/06/13 Page 85 of 116 PageID #:953

To the extent the Company generates revenue from net distributable cash from operations (not including any proceeds from a sale or refinancing of the Project), the LLC may, in its sole discretion, distribute such net distributable cash, first to the Investor Members, pro rata based upon their respective percentage interests in the LLC, in proportion to, and to the extent of, the Investor Members' unpaid Preferred Return; and second, the balance of the net distributable cash shall be distributed to the Managing Member.

In the event that five years following the Maturity Date the Managing Member has not paid all of the aggregate Preferred Return then due to all of the Investor Members, then the Managing Member's membership interest in the Company shall automatically be transferred to the Investor Members, each of whom shall receive such pro rata portion of the Managing Member's membership interest as the ratio of the individual Investor Member's membership interest bears to all Investor Members' membership interests, calculated prior to the transfer.

### Return of Investment - Net Distributable Cash from Capital Events

As stated above, internally within the Company itself, assuming the Company receives subscriptions for all Interests offered through the Offering, the Investor Members will own an aggregate twelve and three-quarters percent (12.75%), and the Managing Member eighty-seven and one-quarter percent (87.25%), of the LLC's total membership interests. In the event of (a) the sale, transfer, or other disposition of all or any portion of the Project; (b) the refinancing of the Project; and (c) any similar transaction with respect to the Project, proceeds from such capital event will be distributed, subject to the Managing Member's discretion regarding reserving a portion for LLC purposes: first to the Investor Members, pro rata based upon their respective

SEC-USCIS-P-0000440

percentage interests in the LLC, in proportion to, and to the extent of, the Investor Members' unpaid Preferred Return; and third, pro rata in accordance with the members' (including all of the Investor Members and the Managing Member) ownership interests in the LLC. Please see Article 5 of the Operating Agreement for exceptions and further details.

### *Timing of Return of Investment*

No portion of an Investor's original Capital Contribution may be repaid to the Investor (if any portion is repaid at all) until after that Investor's I-829 application for removal of conditions on permanent residence related to the LLC has been adjudicated. See "Exit Strategy," below, and Exhibit E. Proceeds derived from any sale or refinancing of the Project, or any portion thereof (which the LLC will use commercially reasonable efforts to avoid so long as any Investor's I-829 application for removal of conditions on permanent residence related to the LLC remains to be filed by the applicable Investor or, if filed, has not yet been be adjudicated), would be distributable following consummation of the event. Notwithstanding the foregoing, the Operating Agreement and applicable laws may delay or prohibit distributions both of net cash flow, and net cash proceeds from sales or refinancing by the Company or the Project, or any portion thereof.

Within 100 days after the approval of each Investor's I-829 application, assuming sufficient funds received from operations, the LLC intends to repay the Investor ten percent (10%) of his principal investment, which is the sum of Fifty Thousand Dollars ($50,000.00). On the one year anniversary of this first partial principal repayment, the LLC intends to repay each Investor an additional ten percent (10%) of his principal investment, an additional sum of Fifty Thousand Dollars ($50,000.00). This means that each Investor is expected to receive the return of twenty percent (20%) of his Capital Contribution's invested principal in Years 3 and 4 of the Project.

### *No Assurance of Return*

An investment in the LLC and in the Project Company is highly speculative, and subject to substantial risk throughout the lifetime of the investment. While having at-risk capital is a requirement to qualify for the EB-5 Pilot Program, it is also possible that the Investor Members will not receive some or any distributions. Furthermore, it is possible that the Investor Members could lose some, or the entirety, of their investment.

### Exit Strategies

The Company intends to repay the Investors' investments from proceeds generated through its operation of the Project, and from the sale of all or substantially all of the Company's assets, the sale of the Company's membership interests, a refinancing of the Project, the merger of the Company with and into another company, or some other liquidity event. There is no guaranty that the operation of the Project will generate adequate proceeds to repay the Investors, or that a sale, merger, or refinancing will be consummated on acceptable terms, if at all. The purchase of the Interests is a long-term investment.

Management believes that the LLC should have sufficient funds to redeem the Investor Members at the time of the Project's conclusion (or, conceivably, earlier, but in no case before the adjudication of each Investor Member's I-829 petition) so long as the Project is sold for the profit projected in the Business Plan, or refinanced or otherwise liquidated in an aggregate amount equal to all indebtedness existing at the time of a refinance plus all other funds invested in the Project (including the Investors'). If, however, the Company is unable to sell, liquidate, or refinance (on the terms just described) the Project, and as a result the LLC has inadequate funds to redeem the Investor Members, then the LLC will evaluate its options at that point.

The Company anticipates exiting from the Project through either a sale, merger, or other event, or securing the funds necessary to permit the return of Investor Capital Contributions through a refinancing, at some point after Year 5, most likely at some time after a successful repayment of all borrowed funding is accomplished

SEC-USCIS-P-0000441

upon completion of the Project's construction and launch of operations (although it is conceivable that an exit could occur simultaneously with, or as a means of accomplishing, the repayment of all indebtedness). As described above, assuming a full subscription for all Interests offered through the Offering, the Investor Members shall at that time own individual portions of an aggregate equity membership interest in the Company of twelve and three-quarters percent (12.75%). This membership interest entitles the Investor Members to share in a proportionate degree in the net profits received by the Company upon a sale or other disposition of the Project. The balance of the Project Company's membership interests are owned by IFG, hence the latter entity shall receive eighty-seven and three-quarters percent (87.25%) of the Company's distributable net profits, again assuming a full subscription for all offered Interests.

After the Company has received its net profits from the Project's disposition, the LLC shall distribute the balance of those profits internally, after deduction of necessary expenses and payment of outstanding liabilities of the LLC. The net profits distributed internally shall be paid to the Company's members in accordance with each member's ownership interest in the LLC; the Investor Members, holders of an aggregate (assuming a full subscription for all offered Interests) twelve and three-quarters percent (12.75%) of the LLC's interests, will accordingly receive, distributed equally among all Investor Members, twelve and three-quarters percent (12.75%) of the net profits distributed by the LLC, and the Managing Member, holder of eighty-seven and three-quarters percent (87.25%) of the Company's Interests, will accordingly receive the remaining eighty-seven and three-quarters percent (87.25%) of the net profits distributed by the LLC. Each Investor Member's share of such net profit distributions, beyond the return of the Investor Member's Capital Contribution, shall amount to the Investor Member's return on investment, above and beyond the Preferred Return on the Investor Member's Capital Contribution.

Following is an example of how a hypothetical exit scenario might play out. Assumptions underlying this scenario are presented along with an explanation of the mechanics of the exit. The reader is cautioned that this scenario is hypothetical, based upon the assumptions presented, and is provided for illustration purposes only; it is not a guarantee, promise, or assurance that the projected exit scenario set forth below will actually

be realized.

*Hypothetical Exit Scenario*

Total planned investment is $912,502,636, comprised of land value of $177,547,465, plus projected development financing, from all sources (detailed next below), of $734,955,171.

The $734,955,171 of Development expenditures is to be paid from all funds raised from developer sources, comprised of $339,818,621 of Bond (debt) financing, plus $48,496,970 of tax credit (debt) financing (for a total of $388,315,591 of loan financing from government sources). This loan financing shall be added to $97,139,580 of government grant funding, plus $249,500,000 received from the deployment of an assumed maximum subscription for this Offering, for a total of $346,639,580 of non-loan funding.

A sale of the Project is posited to occur after Year 5 (dated from Project launch at ground-breaking).

By the end of Year 5, the Project principal debt outstanding is projected to have been reduced by principal reduction payments by a total of $112,503,860 repaid on the government loans. Accordingly, the total Project principal debt remaining after Year 5 would be $275,811,731 remaining on the government loans. This would represent a reduction of the Project's $388,315,596 of total principal debt by twenty-nine percent (29.0%).

Utilizing a six percent (6%) cap rate, the Project's management estimates a potential future value for the Project after Year 5 (three years of operation following the opening) of $1,950,916,663. A projected sale price as per appraisal would be $1,193,311,111.

SEC-USCIS-P-0000442

Subtraction of total debt outstanding of $325,711,737 from a $1,193,311,111 sales price, yields total profit of $867,599,374 that would be realized by the Company.

Then, subtracting from this total profit the sum of $199,600,000 to repay the Investors' Capital (balance after repaying 10% ($24,950,000) in year 3 and 10% ($24,950,000) in year 4) Contributions yields a total net profit of $667,999,374 to the Company

Assuming no Preferred Return payments or other expense payments are owing, then accordingly, of the $667,999,374 of net profits realized by the Company, then an aggregate twelve and three-quarters percent (12.75%), or $85,169,920, would be payable to all of the Investor Members, and the $582,829,454 balance to the Managing Member.

To the $85,169,920 of net profits received (collectively) by the Investor Members from the projected sale of the Project would be added an estimated $32,822,420, representing twelve and three-quarters percent (12.75%) of a total of $257,430,745 received by the LLC from projected operating profit expected to be generated by the Project over the three years of its operation following the completion of the two years of construction. Thus, the total return received by the Investors on account of their collective share of the equity ownership of the Company would be $117,992,340.

Divided by 499 Investors, under this hypothetical exit scenario with all of its assumptions, each Investor would receive $236,458 profit from equity. Added to the one percent (1%) per year Preferred Return on account of the Loan, this would amount to $261,458 of profit to each Investor over five years (again, assuming an exit after Year 5). Accordingly, total return on investment for five years would be 52.3%, hence the annual ROI would be approximately ten and one-half percent (10.5%) per annum.

\* \* \* \* \*

SEC-USCIS-P-0000443

## TAX CONSIDERATIONS

Each potential Investor should carefully consider the income tax consequences of an investment in the Offeror and the effect such consequences may have on the Investor's economic return. The following is a summary of certain U.S. federal income tax considerations relevant to an investment in the LLC. The discussion is based on current provisions of the Internal Revenue Code of 1986, as amended; the applicable U.S. Treasury Regulations promulgated thereunder; and judicial authority and current administrative rulings and practice, all of which are subject to change, possibly on a retroactive basis. This discussion does not purport to address (i) all aspects of U.S. federal income taxation that may be relevant to any particular Investor in light of such Investor's individual tax attributes and status; (ii) except as otherwise noted, the U.S. federal income tax consequences to certain types of Investors subject to special treatment (for example, tax exempt organizations, non-U.S. persons, or others); or (iii) any applicable state, local, or foreign tax laws in connection with an investment in the Company.

PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR PERSONAL TAX ADVISERS REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES ARISING FROM THE PURCHASE, OWNERSHIP, AND SALE OF INTERESTS.

It is intended that the Company will be classified and treated as a partnership for U.S. federal income tax purposes. There can be no assurance that the relevant law will not be changed during the life of the Company, or that the Operating Agreement will not be amended in a manner that might cause the LLC to be taxed other than as a partnership.

As a partnership for U.S. federal income tax purposes, the LLC itself is not subject to federal income tax. Each Member, however, will be required to report on his or her U.S. federal income tax or information return each year his or her distributive share, whether or not actually distributed, of the income, gains, losses, deductions, or credits of the Company. Although the Managing Member may attempt to cause the LLC to make

distributions to the Members sufficient to enable them to pay their U.S. income tax liabilities arising out of the Company's operations.

If the Company were not treated as a partnership for U.S. federal income tax purposes, but were taxed as a corporation in any year, its taxable income would be taxable to the LLC and not to the Members, and distributions by the Company to the Members would, to the extent of the Company's earnings and profits, be taxable to the Members as dividend income.

* * * * *

SEC-USCIS-P-0000444

## EB-5 IMMIGRATION DISCLOSURES
## AND RISK FACTORS

The U.S. Congress created the employment-based fifth preference ("**EB-5**") immigrant visa category in 1990 for immigrants who invest in and manage U.S. commercial enterprises that benefit the U.S. economy. Each investment needs to create or save at least 10 full-time jobs for U.S. workers.

The minimum amount required to invest is $1 million, although that amount is reduced to $500,000 if the investment is made in a high unemployment area or qualifying rural area ("**Targeted Employment Area**" or "**TEA**"). The Managing Member has received a letter dated June 30, 2010 from the Illinois Department of Commerce and Economic Opportunity (the Illinois state agency responsible for designating TEAs within that State) certifying that the census tract in which the Project is located qualifies as a TEA. This letter is set forth as Exhibit G hereto.

To stimulate interest in the EB-5 program, in 1992 the U.S. Congress enacted an EB-5 Immigrant Investor Pilot Program ("**Pilot Program**"). The Pilot Program allows public and private entities to apply to the U.S. Citizenship and Immigration Services ("**USCIS**") for regional center designation.

A description of the requirements and processes of the Pilot Program is based on information obtained by the Company from third parties whom the LLC believes are reliable. However, there can be no assurance that such information is accurate or current, or that it includes all of the risks relating to U.S. immigration laws or to the Pilot Program (as defined below). See "Risk Factors," below.

Investors in this Offering who have subscribed for Interests with the intention of applying for U.S. permanent residence on account of investment in the LLC should be aware of certain risk factors relating to immigration to the United States and to the Pilot Program and its administration. An Investor who is interested in purchasing Interests with the intention of obtaining first conditional, and thereafter permanent, residence is

encouraged, along with his or her advisors, to make his or her own independent review of the Pilot Program and the various important factors relating to the process of obtaining a conditional, and thereafter permanent, residence and residency status to determine if an investment in the Interests is a suitable approach for him or her.

THE PARTNERSHIP MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND CONCERNING WHETHER AN INVESTMENT IN THE PARTNERSHIP WILL MEET THE REQUIREMENTS OF THE PILOT PROGRAM OR OTHER U.S. IMMIGRATION REQUIREMENTS. NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN THE PARTNERSHIP WILL RESULT IN AN IMMIGRANT INVESTOR RECEIVING AN EB-5 VISA OR CONDITIONAL OR PERMANENT RESIDENT STATUS.

*General Immigration Risks.* Congress and/or USCIS may change the law, regulations, or interpretations of the law, including the Pilot Program, without notice and in a manner that may be detrimental to an Investor and/or the Company. Investors who obtain conditional or permanent residence status must intend to make the United States their primary residence. Permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status. The process of obtaining conditional and permanent resident status involves numerous factors and circumstances which are not within the control of the LLC, or the scope of this Memorandum. These include, but are not limited to, an immigrant Investor's particular personal history, and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status under the Pilot Program.

*Regional Center Designation.* Intercontinental Regional Center Trust of Chicago, LLC was designated as a regional center by USCIS authorized to participate in the Pilot Program in 2011. Accordingly, the Regional Center has limited experience in administering a regional center pursuant to the requirements of the Pilot Program, which could lead to delays for Investors in the process of obtaining a conditional or permanent green

SEC-USCIS-P-0000445

card, or even possible loss of regional center designation, thereby preventing Investors from successfully completing the visa process through the Pilot Program.

*Regional Center Expiration.* The expiration date for all regional centers, including the Regional Center sponsoring this Project, is currently September 30, 2012. It is believed that the U.S. Congress will extend the Pilot Program after that date; however, there can be no assurance that the Pilot Program's term will be extended, or that applications submitted before the Pilot Program's termination will be adjudicated by the USCIS.

*Use of Immigration Attorney and Processing Time.* The filing of an I-526 Petition by an Investor with USCIS should be done by a qualified U.S. immigration attorney. As of the date of this document, the Managing Member has been advised that the USCIS is taking approximately six (6) months to approve (or deny) an I-526 Petition. It is impossible to predict USCIS processing times. Once approved, the case will either be forwarded to the U.S. State Department's National Visa Center and then to a U.S. Consulate selected by the Investor for processing, or, if the Investor is already in the U.S., the Investor may adjust his or her status to that of conditional permanent resident. Depending on which option the Investor chooses, it may take an additional six (6) months or longer for a U.S. Consulate to process the I-526 Petition, or for the USCIS to adjust an Investor's status, and issue a conditional green card. Investors should not physically move to the United States until their visa has been issued.

*Jobs.* The capital investment Project falls within the scope of the Regional Center's approved activities, namely to qualify investments from foreign investors under the Pilot Program within the Regional Center Territory directly into businesses in the following industries: (1) Accommodations (including hotel-affiliated food/dining uses); (2) Lessors of Non Residential Buildings; and (3) Construction. USCIS requires proof that each investor's investment resulted in creating ten (10) direct, indirect and/or induced jobs as part of the removal of conditions required for obtaining permanent residency status. Based upon independent economic analysis commissioned by the Managing Member and required as part of its application for designation as a regional

Based upon the analysis contained in the Economic Analysis, management estimates that the Project will create a total of approximately eight thousand, four hundred ninety-five (8,495) direct (but excluding direct construction), indirect, and induced U.S. jobs. Each Investor in the Company who will petition for permanent residency in the U.S. under the EB-5 Pilot Program based on an investment in this Offering must demonstrate that the Project created at least ten (10) direct or indirect U.S. jobs on account of that Investor's investment in order to qualify for permanent residency status under the EB-5 Pilot Program.

The analysis set forth in the Economic Analysis is based upon the LLC's proposed activity, the amount of capital that will be spent in the local economy, and general assumptions regarding the national economy, the regional economy of the applicable Regional Center Territory, and other circumstances of this Project. As stated above, the Economic Analysis estimates that the Project will create a total of eight thousand, four hundred ninety-five (8,495) direct (again, excluding direct construction), indirect, and induced U.S. jobs. This estimate projects that the job creation by the Project will exceed the I-526 job creation requirement by over 70%, assuming 499 Investors in the Offering. However, there can be no assurance that this preliminary economic analysis contained in the Economic Analysis, or the assumptions upon which it is based, is or are accurate, or that the actual number of direct employees and indirect job creation will be close to the number predicted in such analysis. Depending upon any disparity actually realized, there may be insufficient employment to remove conditional visa status, resulting in a delay, or denial, of permanent residency for an Investor.

***Proving Lawful Source of Funds.*** As part of the I-526 Petition, an Investor must present to USCIS clear documentary evidence of the source of the funds invested, and that those funds belong to the Investor. Generally, the Investor can satisfy the source of funds requirement by submitting documents showing that he

SEC-USCIS-P-0000446

or she has a level of income from legal sources that would yield sufficient funds for the investment. USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For Investors who do not have such records, there may be other records that can be provided to USCIS by an Investor to demonstrate that the investment funds came from legal sources. All such matters regarding the Investor's I-526 Petition should be discussed with his or her immigration counsel.

***Policymaking Position.*** The Pilot Program requires an Investor to hold a policymaking or management position within the Company. The LLC believes, but cannot guarantee, that as a member in the LLC, each Investor is provided with the powers and duties under the Operating Agreement sufficient to meet the USCIS requirement that an Immigrant Investor is actively participating in policymaking or management of a new commercial enterprise.

***At-Risk Investment.*** An Investor's investment must be "at risk" to qualify for the Pilot Program. As part of the green card application, an Investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. The Company believes that an investment in the Interests will place an Investor's investment in the LLC at risk, because as described herein there is no assurance that the business of the LLC will be able to return any Investor's investment in the Interests at any time, if ever. However, purchase of an Interest does not guarantee conditional or permanent residency in the United States. Furthermore, no assurance can be given that conditions to residency under the Pilot Program will be removed.

THE PARTNERSHIP MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND CONCERNING WHETHER AN INVESTMENT IN THE PARTNERSHIP WILL MEET THE REQUIREMENTS OF THE PILOT PROGRAM OR OTHER U.S. IMMIGRATION REQUIREMENTS. NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN THE PARTNERSHIP WILL RESULT IN ANY INVESTOR RECEIVING A VISA OR CONDITIONAL OR PERMANENT RESIDENT STATUS.

**Admissible to the U.S.:**  Foreign persons applying for a U.S. Green Card must demonstrate that they are admissible to the U.S. Section 212 of the Nationality and Immigration Act sets forth various grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving a green card or entering the U.S. Foreign individuals who are ineligible to receive a Green Card or be admitted to the U.S. include, but are not limited to, an individual who (1) is determined to have a communicable disease of public health significance, which shall include infection with the etiologic agent for acquired immune deficiency syndrome; (2) is determined to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the individual or others; (3) is determined to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the individual or others, and which behavior is likely to recur or to lead to other harmful behavior; (4) is determined to be a drug abuser or addict; (5) has been convicted of committing, or who admits having committed, acts which constitute the essential elements of a crime involving moral turpitude (other than a purely political offense), or a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance; (6) has been convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more; (7) is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so; (8) is the spouse, son, or daughter of an alien inadmissible under clause (7) and has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that

SEC-USCIS-P-0000447

the financial or other benefit was the product of such illicit activity; (9) is coming to the U.S. solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, admission, or adjustment of status; (10) directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, admission, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution, or receives or (within such 10 year period) received, in whole or in part, the proceeds of prostitution; (11) is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution; (12) has committed in the U.S. a serious criminal offense, regardless of whether such offense was prosecuted as a result of diplomatic immunity; (13) is excludable from the U.S. on grounds relating to national security, related grounds, or terrorist activities; (14) is excludable from the U.S. on grounds relating to foreign policy; (15) is or has been a member of or affiliated with the Communist or any other totalitarian party or who has participated in Nazi prosecutions or genocide; (16) is likely to become a public charge at any time after entry; (17) by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the U.S.; (18) illegally entered into the U.S.; or (19) has at any time knowingly encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the U.S. in violation of law.

* * * * *

SEC-USCIS-P-0000448

## RISK FACTORS

AN INVESTMENT IN THE PARTNERSHIP HAS CERTAIN ELEMENTS OF RISK DIFFERENT FROM AND/OR GREATER THAN THOSE ASSOCIATED WITH OTHER INVESTMENTS. THE HIGHER DEGREE OF RISK MAKES AN INVESTMENT IN THE PARTNERSHIP SUITABLE ONLY FOR INVESTORS (i) WHO HAVE A CONTINUING LEVEL OF ANNUAL INCOME AND A SUBSTANTIAL NET WORTH, (ii) WHO CAN AFFORD TO BEAR THOSE RISKS, (iii) WHO HAVE PREVIOUSLY MADE INVESTMENTS OF THE NATURE AND RISK LEVEL OF THIS OFFERING, AND (iv) WHO HAVE NO NEED FOR LIQUIDITY FROM THESE INVESTMENTS. EACH INVESTOR SHOULD CONSIDER CAREFULLY THE RISK FACTORS ASSOCIATED WITH THIS INVESTMENT, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX, AND FINANCIAL ADVISORS WITH RESPECT THERETO. INVESTORS UNABLE OR UNWILLING TO ASSUME THE FOLLOWING RISKS, AMONG OTHERS, MUST NOT CONSIDER AN INVESTMENT IN THE PARTNERSHIP.

*Incorporation of "First Page" Legends.* Investors in this Offering should carefully read the legends and disclosures that appear and begin on the first page of this Memorandum, and those legends and disclosures are incorporated into these Risk Factors in their entirety.

*EB-5 Immigrant Investor Pilot Program Risks.* Investors in this Offering who have subscribed for Interests with the intention of applying for approval of an I-526 Petition through the EB-5 Pilot Program should be aware of certain risk factors involving the EB-5 Pilot Program and its administration. A description of the risks below are based on information obtained by the Managing Member from third parties whom the Managing Member believes are reliable. However, there can be no assurance that such information is accurate or current, or that it includes all of the risks relating to the EB-5 Pilot Program for such Investors. The Managing Member and the Regional Center have no experience administering the EB-5 Pilot Program, which could lead to delays for Investors in the process of obtaining a conditional or permanent green card, or even failure to successfully complete the visa process through the Pilot Program.

***Risks Due to Investors Failing the Visa Process.*** Investors who fail the I-526 process or other visa process may request a refund of their investment. Though the Company intends to replace any such withdrawing Investors with other Investors, there is no assurance that the LLC will be able to do so, which may result in a failure to raise desirable or adequate amounts of capital needed to fund the Project. Even if the LLC is able to seek a replacement Investor, the lengthy timing of the visa process may delay the Project.

***Lack of Operating History.*** The Company is in the process of being formed for the specific purpose of investing the Offering Proceeds in the Project. Accordingly, the LLC has no operating history. The LLC has described certain aspects of and projections for this Project in this Memorandum which are based primarily on its own knowledge and its experience, which is limited, and has not been verified.

***Financial Projections.*** Since the Company itself has no operating history and is currently being formed, no balance sheet or income statement based on actual operations of the LLC is available. Each of the three alternate scenarios' Pro Forma Financial Projections included in the Business Plan are based upon what the Company believes to be reasonable assumptions concerning certain factors affecting probable future operations of the Project Company. Despite these future projections, no assurances can be made that these projections will prove to be accurate, and Investors are cautioned against placing excessive reliance on such projections in deciding whether to invest in the LLC. In particular, construction, fuel, food, beverage, and capital costs are volatile, and may cause the Company to seek additional capital or alternative forms of capital. In turn, this could result in a dilution of an Investor's ownership interest in the LLC.

***Arbitrary Offering Price.*** The offering price of $500,000 per Interest has been arbitrarily set by the Company and is not based upon earnings, operating history, assets, book value, or any other recognized criteria of value. No independent opinion has been obtained in the determination of the offering price.

SEC-USCIS-P-0000449

***Significant Risk.*** The Investors will provide significantly all, if not all, of the initial capital to be used on the Project, while the Managing Member will receive a substantial and controlling interest in the Company without a direct cash investment of its own for such interest. Therefore, Investor Members will bear a substantially disproportionate share of the risk of capital investment in the Company than will the Managing Member.

***General Risks of Convention Facility Ownership.*** There can be no assurances that the Project will be successful in attracting frequent and/or large conventions. The Company's investment in the Project will be subject to the risks generally incident to the operation of convention and meeting facilities, including, without limitation, the following: uncertainty of cash flow to meet fixed obligations; adverse changes in general or local economic conditions; excessive convention or exhibition facility openings resulting in an over-supply; relative appeal of particular types of facilities to patrons, customers, and vendors; reduction in the cost of operating competing businesses; decreases in employment, reducing the demand for business meetings and/or recreation in the area; the possible need for unanticipated renovations; adverse changes in interest rates and availability of funds and other changes in operating expenses; changes in governmental rules and fiscal policies; acts of God, including earthquakes, which may cause uninsured losses; the financial condition of patrons and customers of the Project; environmental risks; loss to or condemnation of any of the towers or hotel properties; and other factors which are beyond the control of the LLC and the Managing Member. Any necessary liquidation or dissolution of the LLC may be delayed until the Project Company has been sold, if applicable. Decreases in actual Project income from anticipated amounts, or increases in operating expenses, among other factors, could result in the Company's inability to meet all its cash obligations. Any decrease in Project income received by the LLC may reduce, and possibly eliminate, the amount of cash available for distribution to Investors, since operating expenses, such as taxes, utility costs, maintenance, and insurance are unlikely to decrease significantly, and other expenses such as food, labor, advertising, and promotion may increase. If the income from operation of the Project is not sufficient to meet operating expenses, the LLC may have to dispose of the Project on disadvantageous terms in order to raise needed funds.

***General Hotel Risks.*** The presence of the hotel brands within the Project presents an additional set of risks

*General Hotel Risks.* The presence of the hotel brands within the Project presents an additional set of risks, which include the following: (a) a decrease in travel, both for business and pleasure, resulting from a variety of factors, including, without limitation, general economic conditions, travel patterns, the regional economy, and reduced consumer spending; (b) competition within the hotel industry itself for guests and patrons, which competition is intense and highly competitive, with some competitors of the Project's hotel brands possessing substantially greater marketing and financial resources that may be used to increase marketing as well as to improve their facilities or reduce price; (d) a decline in the reputation and attractiveness of the Project's hotel brands, which will be outside the Company's control; (e) the risk of seasonality of the hotel brands' attraction to guests and visitors to the Project complex; (f) a decline in the attractiveness and maintenance of the Project's hotel brands as first-class properties that could result from a lack of available capital to maintain technology, physical plant, and adequate employee staffing; and (g) regulatory issues unique to the hotel industry, which affect the Project's hotel brands, and which would be outside the Company's control. Furthermore, levels of tourism are highly dependent upon gasoline prices, airline fares, and other costs, and the condition of the national economy. Because hotel rooms are rented for relatively short periods of time compared to most commercial properties, hotels are highly impacted much more quickly by adverse economic conditions and competition than other commercial properties that are rented for longer periods of time.

*General Economic Conditions and Business Climate.* The Company is subject to any general negative economic conditions existing in the convention, lodging, travel, and tourism industries, as well as the local and national economy as a whole. These risks would include, without limitation, any potential wage and price freezes or other restrictions imposed by governmental authorities; changes in federal, state, or local tax laws applicable to the Company; availability of skilled labor; availability of capital for future needs; and changes in consumer purchasing habits and trends. The Company may not have sufficient capitalization to enable the Project to survive extended work stoppages, strikes, lack of market acceptance, and economic exigencies in general. The convention and travel business in particular are sensitive to general economic conditions. If the downturn in the United States economy which resulted in the deterioration that led to the recent recession

SEC-USCIS-P-0000450

persists, then the reduction in consumer spending levels which occurred during such downturn and has not yet returned to prior levels could have a material adverse effect on the Project.

***Risks Due to Failure to Raise Adequate Capital.*** Failure of the Company to raise the maximum amount of $249,500,000, and to loan such amount to the Project Company, could negatively impact the Project Company's ability to finance and develop the Project. If the LLC fails to raise the maximum amount of $249,500,000 and is therefore unable to invest such full amount into the Project, then to secure the balance of any funds required for the Project, the Company would be required to seek a larger than expected amount from alternative capital sources, including institutional lenders and non-EB-5 investors, among others. While the Company believes it can obtain alternate financing in the event it is only able to raise less than the maximum offering amount of $249,500,000, it is possible that the Company will fail to raise additional necessary capital in the form of the planned tax-exempt Federal and State of Illinois Bond financing, Federal and State of Illinois tax credit financing, and any other government financing, or that, even if the LLC succeeds in raising the maximum amount of $249,500,000 and invests such amount into the Project, such proceeds, plus the additional capital raised, will be inadequate to satisfy all capital requirements, or that such financing may be untimely procured, requiring the Company to obtain alternative financing, including short- and long-term debt or equity financing in addition to the tax-exempt Federal and State of Illinois Bond financing, federal and State of Illinois tax credit financing, and any other government financing. The terms of such alternative financing may be better or worse for the Company than the terms of the Offering, and may result in subsequent investors in the Company having superior rights to those of the Investors.

***Risks Related to Foreclosure and Alternative Exit Strategies.*** In the event the Company is unable to repay the loans on the Project, the lenders may choose to foreclose on the Company's assets. Any such action may or may not be successful. Priority on the Company's assets, such as the Project property or bank accounts or cash and cash equivalents, is expected to be ceded to the government or State of Illinois pursuant to the terms of the tax-exempt Bond and tax credit financing. Furthermore, it is possible that another party may perfect a security interest (such as other mortgages or deeds of trust in the case of the Project property) that it holds or

obtains, in which case its security interest would have higher priority than the Members' equity interests. In such an event the LLC's actions could be subject to another person's higher priority lien, in addition to any first-position security interest held pursuant to the tax-exempt Bond financing. In a foreclosure situation, or if the Company uses the proceeds from a sale or refinancing of the Project to repay the indebtedness on the Project, any remaining balance of such proceeds may be less than the amount of the Investor Members' unrecovered Capital Contributions. With all of these exit strategies, and with any and all others that the LLC or the Investor Members may propose, there may be other risks which the Investors should carefully consider.

*Seasonality Causing Quarterly Revenue Fluctuations.* The hotel industry is seasonal in nature. Generally, hotel revenues are greater in the second and third calendar quarters than in the first and fourth calendar quarters. This seasonality can be expected to cause quarterly fluctuations in the Project Company's revenues.

*No Guarantee of Platinum LEED® Certification*. The LEED certification process is complex, and certain criteria are determined in the discretion of the LEED® examiner assigned to the Project. The Company believes that it will satisfy more than the required criteria to qualify for Platinum LEED® certification under the LEED® Program; however no assurances can be given that the Company will be successful in obtaining Platinum LEED® Certification. This certification is only given after the project is constructed. If the Company is unsuccessful in securing Platinum LEED® Certification, there will be a materially adverse impact on the Company's ability to market and promote the Project. The Company may not be able to take advantage of the anticipated media attention and anticipated bookings from eco-friendly clientele. Although there are lower LEED certifications, such as Gold and Silver, which the Company may be eligible to meet, there can be no assurance that such lower certifications will generate the same interest from the media and potential customers. Furthermore, even if the Company is successful in obtaining Platinum certification, there can be no assurances that this will translate into the heightened media attention and increased sales revenue that the Company anticipates.

SEC-USCIS-P-0000451

***Incomplete Control of Project.*** The Company may be unable to fully control the Project to the extent necessary to ensure that the operation of the Project will adhere to current plans. The Company's success will substantially depend on its ability to deal successfully with the problems, expenses, and delays frequently associated with ongoing hotel and convention operations. The viability of the Project is dependent upon the ability of the Company to maintain high rates of occupancy and/or patronage, as well as the LLC's ability to attract and maintain quality employees to work throughout the Project over an extended period of time. There can be no assurance that the Project will be profitable, in which case Investors could suffer a total loss of their investment.

***Leverage and Other Factors Relating to Financing.*** The Company plans to finance a significant portion of the Project through the assumption of substantial debt. The use of secured indebtedness to finance a portion of development costs and/or working capital is referred to as "leveraging." Leveraging increases the risk of loss of the LLC's return on (or of) principal to the extent that the Company elects to pursue financing through indebtedness for the Project. In addition, to the extent cash flow from a leveraged investment is not sufficient to pay debt service, cash from other sources would be required. Unless the Project generates such cash, the Company might be required to raise additional equity investment or to borrow additional funds for such purpose, and there can be no assurance that such equity investment, or such loans, will be available on favorable terms, if at all. Similarly, even if the Project generates such cash, the Company may nevertheless elect to raise or borrow additional funds. In such event, the LLC might be required to sell the Project on disadvantageous terms, or security agreements or guarantees securing any of the Company's debt may be foreclosed and the Project sold by priority lenders to repay the debts owing them. This would have a materially adverse effect on the LLC and its Investors.

***Risks Related to Credit Crisis.*** Questionable lending practices during recent years have led to an excessive number of over-leveraged borrowers and an increasing number of loan defaults. These circumstances have forced lenders to implement extremely stringent underwriting standards, or to file for bankruptcy. Although the U.S. Department of the Treasury and the Federal Reserve have undertaken a number of measures to

improve the availability of credit, such measures have not had an immediate impact on the capital markets. Access to credit continues to remain limited, and some experts believe it will take years for the capital markets to return to normalcy. Accordingly, there are no assurances that the Company will be able to obtain all of the financing necessary to carry out its plans for the Project, or for other purposes. In the event the LLC is able to secure necessary debt financing, the current credit crisis may increase the cost of borrowing, or require the Company to accept onerous financing terms. Any of the foregoing may materially and adversely affect the cash flow and financial condition of the Project, and could adversely affect the Net Cash Flow or Distributable Cash (as those terms are defined in the Operating Agreement) of the Company. If the Company fails to receive revenues from operations of the Project post-opening, Investors could see a substantial, if not total, loss of their investment.

*Risks Related to State and Municipal Bonds.* National and regional conditions have impacted the federal government as well as the state and local governments of many states, including Illinois. These states are having difficulty meeting their general obligations, and may face substantial problems, such as insolvent pension funds. Although no state has yet to become insolvent, there is discussion regarding several states' budgetary issues at the federal level, although no bailout or other mechanism has yet been determined upon, or implemented. If a state were to ever become insolvent, or if Congress were to pass a law allowing for states to declare bankruptcy, a negative impact on the bond markets in all states could be suffered. The effect on the bond market in Illinois could be severe, as Illinois is recognized as a state with significant budgetary concerns. These circumstances could make it very difficult for the Company to find investors for its State of Illinois Bonds and/or make it difficult for the Company to negotiate favorable or even acceptable terms for such Bonds. The Company anticipates a bond rating of "A1" from Moody's on the State of Illinois moral obligation bonds; however, there can be no assurance that, at the time of the Bond financing, the factors set forth above, or other factors, will not cause the rating agencies to assign a lower rating to the Illinois Bonds. A lower rating may make it more difficult for the Company to sell the Bonds, and may cause the Bonds to carry a higher

SEC-USCIS-P-0000452



interest rate than is currently contemplated. Accordingly, there are no assurances that the LLC will be able to obtain all of the financing necessary to carry out its plans for the Project, or for other purposes. Any of the foregoing may materially and adversely affect the cash flow and financial condition of the Project, and could result in the Company's failure to pay the Preferred Return, or repay the Capital Contributions received from the Investors. In such case, Investors could see a substantial, if not total, loss of their investment.

***Future Market Value of the Project.*** The economic future of the Regional Center Territory, future construction activity, interest rates, demographic changes, changes in tax laws, and numerous other factors will determine the future market value of the Company and its assets, including the Project. There is no assurance that the LLC will increase in value, or even maintain its current value.

***Distributions from Operations.*** Because distributions are related to market conditions affecting patronage of destination venues, such as hotels and convention centers, vacancy factors, costs of operating the Project, and numerous other factors, there can be no assurance that there will be cash from LLC operations available for distribution to Investor Members as Preferred Returns or otherwise. Investors who borrowed all or part of their capital contribution must understand that business cash flow is subject to market forces, and cannot be relied upon as a guaranteed source of funds to repay such obligations.

***General Tax Risks.*** Investment in the Company involves substantial tax risks. Although the primary motive of investors should be for long-term appreciation, state and federal legislatures and tax authorities may alter and change the permissible deductions that may be taken with respect to the Project and its income, and may change the current tax rates to less favorable rates. In addition, state and federal tax authorities may be more likely to audit taxpayers with higher incomes, or with partnership income or loss. Since Investors generally fall into this category, the LLC also has an increased risk of being audited. Such an examination could result in adjustments to items that are related to the Company. Investors may incur legal or other professional expenses in connection with such audit or the adjustments resulting from such audit. The LLC has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, the

obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, the Company, or its business. The tax risks include, without limitation, the following: (i) changes in federal income tax laws; (ii) partnership status; (iii) taxable income in excess of distributions; (iv) allocation of tax items among partners; (v) allocation of purchase price; (vi) partnership termination; (vii) at-risk limitations; (viii) risk of audit; (ix) profit objective; and (x) limitations on passive losses. The tax discussions set forth here, and elsewhere in this Memorandum, are not tax advice to Investors. Each Investor is advised to consult with his or her own tax advisor regarding the tax consequences of investing in the LLC. The Company has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, the LLC, or its business. Each Investor must consult his/her own accountant or tax advisor with respect to the tax consequences of an investment in the Interests.

*Illiquidity (Limited Transferability of Interests)*. The Interests offered for sale hereby are a highly illiquid asset, in that they cannot be readily sold or pledged as collateral for a loan or other obligation. Those Interests have not been, and will not be, registered under the Act, or under any state securities law, in reliance upon certain exemptions provided thereunder. An Investor Members may not assign, sell, or transfer his or her Interests to another party without the Managing Member's consent, and then only as provided for in the Operating Agreement and otherwise only in accordance with available exemptions under all applicable securities laws. There is no present plan to register the Interests in the future. Accordingly, the Interests must be acquired for investment purposes only, and not with a view to resale or other distribution. In addition, the Operating Agreement (Exhibit A) contains additional restrictions on the transfer of Interests. For such reasons, it is likely that an Investor would not be able to sell or otherwise dispose of Interests even if he or she wished and was permitted to do so. Finally, there is no public market for sale of the Interests, and it is not anticipated that a market will develop for their purchase or sale. Consequently, Investor Members may not be able to liquidate their investment in the Company in the event of their desire or need to do so.

SEC-USCIS-P-0000453

*Limitation of Managing Member's Liability*. The Operating Agreement (Exhibit A) provides that the Managing Member shall not be liable to the other Partners for any loss or liability incurred in connection with the affairs of the Company, so long as such loss or liability did not result from willful misconduct or gross negligence. Therefore, Investor Members may have a more limited right of action against the Managing Member than they would have had absent these provisions in the Operating Agreement.

*Indemnification of Managing Member*. The Operating Agreement provides that the Managing Member shall be indemnified for any loss or liability incurred in connection with the affairs of the Company to the extent allowed by law. (See Exhibit A.)

*Limited Right to Participate in Management*. Although the Investor Members will participate in policymaking and certain Company decisions as expressly provided in the Operating Agreement (see Exhibit A), they will not participate in the active day-to-day management of the LLC or the decisions made by the Managing Member.

*No Independent Counsel*. No independent counsel has been retained to represent the interest of the Investor Members or the Offeror. The Operating Agreement has not been reviewed by an attorney on behalf of the Investor Members or the Offeror, but only by and on behalf of the Managing Member. Each Investor is therefore urged to consult with his or her own counsel as to the terms and provisions of the Operating Agreement and all other documents relating thereto, as well as his or her own accountant as to the final information and projections provided.

*Uninsured Losses; Casualty Insurance*. Certain risks in connection with the Project are either uninsurable, or not insurable at commercially reasonable rates, and could have a detrimental effect on the Company. Examples of uninsurable losses are those arising from flood, earthquakes, war, and acts of God, among others. Should such an uninsurable loss occur, the LLC could suffer a loss of some or all of the capital invested in the Project, as well as the loss of any potential profits from the Project.

***Environmental Risks***.  Investing in businesses operated on real property involves risks relating to hazardous and toxic contamination of such property or adjacent properties, including subsurface and underground water contamination.  Such contamination can result from the actions of tenants, contractors, patrons, visitors, and other parties, including adjacent property owners, over whom the Company could exercise little or no control, and could have a materially adverse effect on the LLC. The Company could be required to participate financially in the clean up or other abatement of such contamination, which could cause the LLC to suffer a loss of some or all of its capital loaned to the Project as well as the loss of any potential profits from the Project. Although the Company has conducted a Phase I environmental report and has also done geo-technical boring tests to a depth of approximately 100 feet, the results of which have been satisfactory, no assurances can be given that there will not be any environmental issues in the future.

***Potential Conflict of Interest***.  The obligations of the Managing Member to the Company are not exclusive, and the Managing Member need only devote so much time to the LLC's affairs as the Managing Member, in its sole discretion, determines to be necessary to manage the Company's business. The Managing Member and/or its affiliates may, from time to time, be involved in the development of other properties that may compete with the Project.  Commitments undertaken by the Managing Member and/or its affiliates in connection with such other properties may materially adversely affect its ability to manage the Project and the profitability of the Project and any investment in the Interests.

***Construction Risks***.  The Project development involves significant construction activity. Commercial development typically requires substantial capital outlay during the construction period, and several years could pass before positive cash flows can be generated, if ever. The time and costs required to complete a convention center, hotel, or combined property development may be substantially increased by many factors, including shortages of materials, equipment, technical skills and labor, adverse weather conditions, natural disasters, labor disputes, disputes with contractors, accidents, changes in government priorities and policies,

SEC-USCIS-P-0000454

delays in obtaining the requisite licenses, permits, and approvals from the relevant authorities, and other unforeseeable problems and circumstances. These problems may delay construction, which in turn would delay the Company's ability to generate cash flow, and increase costs, which can significantly reduce projected rates of return. Obtaining building permits is a time-consuming process, and it is virtually impossible to predict how long it shall take to receive final building permits in any given case, including the Company's. Currently, the City of Chicago's incentive for Platinum LEED® grants expedited permitting in less than 31 days; however, there can be no assurances that this expedited permitting incentive will still be in place when the Company is ready to begin construction. This uncertainty could result in construction delays and increased costs associated with the Project. The costs of construction materials and labor may change to the detriment of the Company during the course of construction and obtaining required building permits and other governmental approvals. **Unanticipated cost increases may require the Company to raise or borrow additional capital to complete construction of the Project.** In addition, failure to complete Project development according to the Project's original specifications or schedule, if at all, may give rise to potential liabilities and, as a result, an Investor's return on investment in the Interests being different than originally expected.

*No Firm Commitments to Purchase Interests.* No commitment has been extended by anyone to purchase all, or any portion, of the Interests being offered hereby. The Company can give no assurance that the Maximum Offering of the Interests will be sold. As a result, there can be no assurance that the LLC shall raise sufficient funds in this Offering to carry out its business plan as currently proposed, or that the net proceeds from the initial subscriptions for Interests shall be in an amount sufficient to enable the Company to continue operations in any meaningful manner. In the event insufficient subscriptions are received and accepted by the LLC, it may be forced to curtail or cease its activities, which would likely result in the loss to Investors of all or a substantial portion of their investments.

*Lack of Diversification.* The Company will have all of its resources initially invested in a single category investment, namely, the investment of all subscription proceeds into the Project. The investment will lack diversification of risk with respect to local economic, social, or environmental problems and other similar

materially adverse results, including an Investor's loss of his or her entire investment.

***Dependence on Management and Personnel.*** The Company's success is and will continue to be principally dependent on its current management personnel for the operation of its business and the extension of its Loan to the Project. The Company is dependent upon the continued involvement of the Intercontinental Financial Group, LLC and its members, affiliates, and joint venturers in this Project personally. The loss of IFG's services (or those of its members, affiliates, or joint venturers) could have a material adverse effect on the Company's business, financial condition, and results of operations.

The Project Company will also be required to hire and retain skilled employees at all levels of operations in a market where such qualified employees are in high demand and are subject to receiving competing offers. Any inability to hire needed employees on a timely basis, and/or the inability to retain those that are so hired, could have a material adverse effect on the Project's ability to generate projected results from operations.

***Competition.*** Competition in the hotel and convention center business is intense. The industry is highly competitive with respect to (i) price and/or discounts, (ii) quality of establishment, food, and service, (iii) customer loyalty, and (iv) location. Competition includes hotel and convention facilities that are seasoned concerns with substantially greater financial and other resources than the Company and its hotel tenants. In particular as the immediate surrounding O'Hare International Airport neighborhood continues redevelopment, at a future date similar developments may be constructed in the vicinity of the Project. The Project will operate in a highly fragmented and competitive environment. Customers have many options for meeting space and lodging. The Project must not only compete against other similar operations, but also against virtual meetings, internet based conferencing technology, webinars, and other electronic means of real-time

SEC-USCIS-P-0000455

communication that reduces the need for business travel or group meeting venues. Further, the Project will compete with other establishments for qualified management personnel and other employees. Although the Company will endeavor to compete in this market, and the Project's hotel brands have successfully done so in other markets within the industry, no assurances can be given to investors that the Project will be able to compete effectively and successfully. Instead, all this competition may materially reduce revenues and net income.

The LLC cannot assure any Investor that it will be successful in addressing the risks it may encounter, and its failure to do so could have a material adverse effect on business, and the financial condition and results of operations. The future of the LLC depends on successfully marketing to business travel and tourism patrons who have many options from which to choose. There can be no assurance that the Project's operational methods and procedures will be successful.

***Employees and Unions.*** The Project will incorporate five national hotel chains which have numerous properties throughout the United States. Because of the prominence and size of the Project's hotel brands, employees of properties managed under such brands may be union members, and non-union employee staffs in various areas may be subject to union organization activities. Hotel worker unions are prominent throughout the United States. While the Project has taken collective bargaining costs into account for the operation and construction of the Project, and has an executed Project Labor Agreement (PLA) with the Chicago & Cook County Building and Construction Trades Council, there can be no assurance that the unions will abide by the terms of the PLA, if any union deems certain aspects of the PLA unfair or if certain employees are not covered by the PLA. The Project could suffer work stoppages or "slow-downs" as a result. In such event, it is likely that the employee costs of the Project will be higher than presently projected for the continuation of the Project, since union workers would have compensation and benefits that are generally higher than non-union workers in the same hotel and convention industry jobs. The Company will have no control over whether one or more unions determine to target the Project.