*Adequacy of Capital.* Management has based the present Offering on certain assumptions regarding the costs and timing of launching and then completion of the Project. Although not anticipated, the successful launch and then completion of the Project could require additional capital beyond the capital raised from the sale of all Interests and other financing as presently planned. No assurance can be given that such capital would be available from banks or other sources. The Company has reserved the right to raise additional capital, which could adversely impact repayment of the Investor Members' Preferred Return or Capital Contributions.

*Impact of Consumer Spending.* The success of the Company's operations depends, to a significant extent, upon a number of factors affecting disposable income, both domestic and foreign, including economic conditions, and diverse factors such as employment, business conditions, interest rates, taxation, global oil prices, and terrorism. There can be no assurance that the LLC's business, results of operations, and financial condition will not be adversely affected by changes in consumer spending. A downturn in the U.S. or world economy could affect discretionary spending, which could adversely affect sales and the anticipated exit strategy.

*Delay of Profit Distribution.* There can be no assurance that completing the Project will result in sufficient revenues to enable the Project to operate at profitable levels or to generate positive cash flow with which to repay the Loan, let alone honor the Project Company's other financial commitments. The LLC has formulated an exit strategy plan, detailed in "Financial Considerations," above, but there is no assurance that the exit strategy and/or the anticipated/projected return are feasible or likely to be achieved.

*Government Regulation.* The Project, as well as the Company's activities, are and will be subject to various federal, state, and local laws and regulations, as well as court decisions, affecting the Project and the LLC's business. Difficulties or failures in obtaining required licenses or other regulatory approvals could delay securing the necessary permanent Certificates of Occupancy or otherwise hamper opening and operating the Project, which could also occur in any of the individual Project's hotel brands. The suspension of, or inability to

SEC-USCIS-P-0000456

renew, a license or permit could interrupt operations at any or all of the Project's hotels and at the convention center. The Project and its tenants will continue to be subject to federal, state, and local laws establishing minimum wages, unemployment taxes, and sales taxes, and regulating overtime, other working conditions, and similar matters over which the Company will have little if any control. The Project will be subject to federal, state, and local regulations, including regulatory provisions relating to sanitation, health, safety, and liquor licensing. All of these laws, regulations, and court decisions could have both a positive, and/or negative, impact on the Project and financial results from those operations and on the Project's ability to compete. Suspension of the Company's or any tenant hotel company's ability to operate by any regulatory agency would have a material adverse effect on the profitability of the Project, and ultimately of the LLC. Increased regulation of various aspects of the Project, or of the Company itself, should this occur, could also have an adverse effect on the LLC's financial position. Additionally, the LLC will be under substantial scrutiny by the USCIS.

***Ability to Obtain Requisite Permits.*** Prior to securing final Certificates of Occupancy for the Project's hotel brands and the convention center, certain building and safety, handicapped, and other permits may need to be obtained. Additionally, public health, fire and safety, liquor, and other licenses may also need to be obtained. While the Company believes that there should be no impediments to securing any necessary permits and licenses or obtaining any consents or approvals, no assurance can be made that they will all be obtained. See "EB-5 Immigration Disclosures and Risk Factors – Commercial Enterprise," above. The Company continues to consult with industry consultants to advise it regarding licensing matters, and has confirmed that it will continue to do so as and when necessary.

***Prevention of Money Laundering.*** The USA Patriot Act requires that financial institutions establish and maintain compliance programs to guard against money laundering activities. It has been announced that a U.S. Treasury agency is likely to enact regulations which would subject certain pooled investment vehicles to enact anti-money laundering policies, which regulations, if and when enacted, might require the LLC, acting through its Managing Member, to share information with U.S. government authorities with respect to its

Investor Members. The Company has reserved the right in its Subscription Agreement to obtain information from its Members to comply with the USA Patriot Act and the regulations that might be promulgated thereunder.

***Foreign Governmental Action.*** The government of the People's Republic of China, the expected home country source of all or most Investors, as well as other foreign governments (each, a "Sovereignty"), may restrict or suspend entirely participation by its nationals in the EB-5 Program as violative of (a) the Sovereignty's Securities Laws, (b) the Sovereignty's foreign exchange controls, and/or (c) the current prohibition on such Sovereignty's nationals investing overseas in an individual capacity, rather than through enterprises. Moreover, a Sovereignty may promulgate new laws or regulations in the future that restrict or prohibit participation in the EB-5 Program. Finally, no Sovereignty has not approved this private placement; although in the past it has been assumed that a lack of action on particular offerings by a Sovereignty is tantamount to its tacit approval, it cannot be assured that in the future, a Sovereignty will not restrict or prohibit foreign private placements in general, or the Offering in particular.

***Targeted Employment Area Designation.*** Demographic shifts could cause the loss of the "high unemployment" designation affording Targeted Employment Area (TEA) status to the census tract where the Project is located. Although EB-5 Investors who subscribed in the Project when it was located in a TEA zone needed only invest $500,000 in the Project, if the Project's TEA status is lost during the course of the Offering, subsequent Investors who subscribe thereafter would need to invest $1,000,000 to qualify for the EB-5 program. As a result, if the census tract's TEA status is lost before the Offering closes, it could become difficult or impossible for the LLC to raise additional funds from EB-5 Investors.

***Forward-looking Statements May Prove Materially Inaccurate.*** The statements contained in this Memorandum that are not historical facts are forward-looking statements within the meaning of the Federal

SEC-USCIS-P-0000457

securities laws. These forward-looking statements are based on current expectations, beliefs, assumptions, estimates, and projections about the industry and locale in which the Convention Center and Hotel Complex are operated. Words such as "expect," "anticipate," "intend," "plan," "believe," "seek," and "estimate," variations of such words, and other similar expressions, identify such forward-looking statements. Forward-looking statements contained in this Memorandum, or other statements made for or on behalf of the Offering either orally or in writing from time to time, are expressly not guarantees of future performance, and involve certain risks, uncertainties, and assumptions which are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements.

Investors should not rely on forward-looking statements because they involve known and unknown risks, uncertainties, and other factors which are, in some cases, beyond the LLC's control and may cause its actual results, performance, or achievements to differ materially from anticipated future results, or the performance or achievements expressed or implied by such forward-looking statements. Among the important factors that could adversely affect the Fund's performance are:

- Changes in general economic conditions;
- Changes in financial markets and interest rates;
- The effect of increased or unexpected competition; and
- Each of the other matters described in this Memorandum.

While forward-looking statements in this Memorandum reflect the Company's estimates and beliefs, they are not guarantees of future performance. The LLC does not promise to update any forward-looking statements to reflect changes in the underlying assumptions or factors, new information, future events, or other changes.

The LLC cannot assure any Investor that it will be successful in addressing the risks it may encounter, and its failure to do so could have a material adverse effect on the Company's financial condition. The future of the Project Company depends on acquiring proper funding and, upon commencing operations, successful

marketing, and establishing high rates of customer loyalty and extended visits at the Project. There can be no

\* \* \* \* \*

SEC-USCIS-P-0000458

**SUBSCRIPTION**

*Who May Subscribe*

This Offering is only available as a private placement to "accredited investors," as such term is defined in Regulation D under the Act, and not "U.S. Persons," as such term is defined in Regulation S under the Act. By subscribing for the Offering, the Investor represents and warrants, among other items set forth in the Subscription Agreement (Exhibit B), (1) that he or she meets one or more of the requirements to qualify as an "accredited investor,"(2) that the offering was private, and (3) that the Investor is not a U.S. Person.   If a potential Investor has received this Memorandum or investment package in error, or if such person does not qualify as an accredited investor or qualified purchaser or is a U.S. Person, please notify the Offeror immediately.

*Subscription Process*

Investors may subscribe for Interests by executing and delivering to the Company, the Operating Agreement (Exhibit A), Subscription Agreement (Exhibit B), Investor Questionnaire (Exhibit C), and optional Escrow Agreement (Exhibit D), and also providing both his or her subscription amount and the Administrative Fee. The subscription amount and the Administrative Fee may be sent to the LLC in separate check or separate wire.

In addition to the subscription process, a foreign Investor may need to complete the necessary steps to prepare and submit his or her immigration application to the USCIS.  Such Investor should consult in depth with a qualified U.S. immigration attorney regarding the probability of success of any such EB-5 case, and, more importantly, potential issues and problems of the Investor's individual case, as well as how to best structure or tailor such EB-5 case.

The Offeror does not purport to provide immigration advice, and the following procedural outline is provided

based on information believed to be reliable. An Investor should work with immigration counsel to prepare the evidentiary documents needed to satisfy the requirements of the I-526 immigrant petition to be submitted to the California Service Center. Assuming the I-526 petition is approved, the Investor should thereafter consult with immigration counsel whether to complete I-485 processing, or Immigrant Visa processing through the American Embassy or Consulate located at the Investor's home country, in order to obtain conditional green cards. It may be appropriate to consider making this determination prior to submission of the I-526 petition. After Conditional Permanent Resident status is granted, whether obtained upon approval of the I-485, or upon first entry into the United States after an Immigrant Visa is issued by the American Embassy, the Investor must wait for twenty-one (21) or twenty-four (24) months (whichever is applicable) before applying for an I-829 condition removal application to change the "conditional" green card into a "permanent" green card. Again, the Investor should consult with immigration counsel well in advance to timely and correctly prepare an I-829 application. If the I-829 application is approved, the Investor is granted Lawful Permanent Resident status.

### Acceptance of Subscription

Acceptance of any subscription to purchase Interests is subject to (i) acceptance of the subscription in the Managing Member's sole discretion; (ii) the determination of the qualification or availability of exemptions therefrom for each proposed Investor; (iii) receipt of all documentation required by the Offeror to be executed and received; and (iv) availability and accuracy of all documentation and information provided. The Offeror will have the right to accept or reject any subscription at any time at or prior to the closing of the Offering or such later date as it may determine, in its sole and exclusive discretion.

SEC-USCIS-P-0000459

### Escrow

All subscription amounts will be held in escrow pursuant to the Escrow Agreement attached hereto as Exhibit D. An Investor's subscription amount will remain in escrow until his/her I-526 Petition is approved, and as otherwise provided in the Escrow Agreement. Upon execution of the Subscription Agreement and delivery of the subscription amount, an Investor shall be admitted into the Company pending the adjudication of his/her I-526 Petition. Upon approval of an Investor's I-526 Petition, his/her subscription will be closed and the Escrow Agent will release his/her subscription funds to the LLC in consideration of the subscribed Interests.

In the event that a subscription is not accepted, or in the event the conditions necessary to close the Offering are not satisfied or waived, the affected Investor shall automatically withdraw as a limited partner from the LLC and his/her subscription amount shall be returned to him or her. In addition, the Administrative Fee will be refunded if the Investor's I-526 or visa application is rejected by USCIS. No interest will be paid to the Subscriber on subscription amounts or on the Administrative Fee.

In the event the Offering is canceled or terminated, the Managing Member shall return escrowed subscription and Administrative Fee amounts to the Investors.

### Representations

Any offer of the Interests is made only through and pursuant to this Memorandum, and this Memorandum supersedes all prior correspondence and information, written and oral, concerning the matters described herein, and any other matters involving this Offering, the Company, and the Project. Neither the Managing Member, nor any other person or entity acting in any capacity whatsoever with respect to this Offering, has any authority to provide any information, or make any representation or warranty, express or implied, other than any information, representation, or warranty which is set forth in the Memorandum and the documents attached hereto as exhibits or schedules.

The Offeror is not subject to the information disclosure requirements of any federal or state securities law, and thus has no reports, proxy statements, or other information publicly available. Prospective Investors and their representatives are invited to review any materials available to the Managing Member relating to this Offering or anything referred to in or accompanying this Memorandum, provided such review takes place during normal business hours after reasonable prior notice. Such information is available at the Offices of the Managing Member. The telephone number of the Managing Member is (312) 442-0062, and its e-mail address is Anshoo.Sethi@Chicago-RC.com.

Furthermore, the Managing Member will answer any appropriate inquiries from prospective Investors and their representatives concerning the Offeror and any other matters relating to the Offering, and will afford prospective Investors and their representatives the opportunity to obtain any additional information within the Offeror's possession, or reasonable ability to obtain, which is necessary to verify the accuracy of any assumptions, representations, or information set forth in this Memorandum.

* * * * *

SEC-USCIS-P-0000460



## LIST OF EXHIBITS

### EXHIBIT A
### LLC OPERATING AGREEMENT

### EXHIBIT B
### SUBSCRIPTION AGREEMENT

### EXHIBIT C
### INVESTOR ELIGIBILITY QUESTIONNAIRE

### EXHIBIT D
### SUBSCRIPTION ESCROW AGREEMENT

### EXHIBIT E
### BUSINESS PLAN FOR EB-5 INVESTMENT IN
### A CHICAGO CONVENTION CENTER

### EXHIBIT F
### ECONOMIC IMPACT OF DEVELOPMENT OF A HOTEL AND CONVENTION CENTER COMPLEX NEAR CHICAGO
### O'HARE INTERNATIONAL AIRPORT IN CHICAGO, IL, AS PART OF AN EXISTING EB-5 REGIONAL CENTER

### EXHIBIT G
### LETTER FROM THE STATE OF ILLINOIS
### DEPARTMENT OF COMMERCE AND ECONOIC OPPORTUNITY
### DESIGNATING PROJECT LOCATION 8201 W. HIGGINS RD., CHICAGO, IL 60631

SEC-USCIS-P-0000461

## EXHIBIT A

### LLC OPERATING AGREEMENT

*[Please see attached]*

SEC-USCIS-P-0000462

## EXHIBIT B

### SUBSCRIPTION AGREEMENT

*[Please see attached]*

SEC-USCIS-P-0000463

## EXHIBIT C

### INVESTOR ELIGIBILITY QUESTIONNAIRE

*[Please see attached]*

SEC-USCIS-P-0000464

## EXHIBIT D

### SUBSCRIPTION ESCROW AGREEMENT

*[Please see attached]*

SEC-USCIS-P-0000465

**EXHIBIT E**

**BUSINESS PLAN FOR EB-5 INVESTMENT IN
A CHICAGO CONVENTION CENTER**

*[Please see attached]*

SEC-USCIS-P-0000466

**EXHIBIT F**

**ECONOMIC IMPACT OF
DEVELOPMENT OF A HOTEL AND CONVENTION CENTER COMPLEX
NEAR CHICAGO O'HARE INTERNATIONAL AIRPORT IN CHICAGO, IL,
AS PART OF AN EXISTING EB-5 REGIONAL CENTER**

*[Please see attached]*

SEC-USCIS-P-0000467

## EXHIBIT G

**LETTER FROM THE STATE OF ILLINOIS
DEPARTMENT OF COMMERCE AND ECONOIC OPPORTUNITY
DESIGNATING PROJECT LOCATION 8201 W. HIGGINS RD., CHICAGO, IL 60631
AS A "TARGET EMPLOYMENT AREA," JULY 7, 2011**

*[Please see attached]*

SEC-USCIS-P-0000468

# EXHIBIT

F

# ATTACHMENT
## 2-C

SEC-USCIS-P-0000469





# A Chicago Convention Center, LLC
## An Illinois Limited Liability Company

**Limited Liability Company Membership Interests**

---

**Subscription Agreement**

---

*If you decide not to participate in this offering, please return the Private Offering Memorandum (together with all amendments, appendices, and supplements thereto), this Subscription Agreement, and any copies of the aforementioned documentation (and any portions thereof) to:*



*Intercontinental Financial Group, LLC*
*8201 West Higgins Road, Chicago, IL 60631*
*Telephone: (312) 442-0062*

**Copy No. _____ of 499**

SEC-USCIS-P-0000470

## A Chicago Convention Center, LLC
### Subscription Instructions

1. **Please complete, date, and sign the Subscription Agreement.** By signing, you agree to abide by the Limited Liability Company Operating Agreement of A Chicago Convention Center, LLC, an Illinois limited liability company (the "Company"), and to the terms and conditions of this Subscription Agreement. **Please keep a signed copy of all completed and signed documents for your records.**

2. **Please send the original of your completed, dated and signed Subscription Agreement to:**

> A Chicago Convention Center, LLC
> 8201 West Higgins Road, Chicago, IL 60631

Please pay the subscription amount of US$500,000 by check or wire transfer, to the Company's escrow account. Additionally, please pay the administrative fee of US$41,500 by separate check or wire transfer, also to the Company's Administrative account. If you prefer to pay by check, please make each check payable to "A Chicago Convention Center, LLC." You may also pay by wire transfer according to the instructions on the following page. To ensure proper processing, please call Ms. Tara Fox at +1 888-637-1031 & (Direct) +1 312-803-7512 to confirm your wire transfer. **PLEASE NOTE THAT ALTHOUGH FUNDS IN THE ESCROW ACCOUNT OR ADMINISTRATIVE ACCOUNT MAY BEAR INTEREST, YOU WILL NOT RECEIVE NOR BE ENTITLED TO SUCH INTEREST.**

3. **If your subscription is accepted,** the Managing Member will countersign your Subscription Agreement to

confirm your admission to the Company and will send you a copy of the countersigned signature page.

**QUESTIONS: please contact**

Intercontinental Financial Group, LLC
8201 West Higgins Road, Chicago, IL 60631
Telephone: (312) 442-0062
Fax: (312) 878-1340
Attn: Mr. Anshoo Sethi

SEC-USCIS-P-0000471

### WIRING INSTRUCTIONS
### FOR DEPOSITING FUNDS
### INTO ESCROW ACCOUNT
*[If utilized]*

#### INBOUND WIRING INSTRUCTIONS

**Escrow Agent:**   NES Financial Corp.

**LLC:**   A Chicago Convention Center, LLC

**Subscriber Representative:**   Intercontinental Financial Group, LLC

**Administrative Agent:**   SunTrust Bank

**Funds should be wired directly pursuant to the following instructions:**

1. Transfer $500,000 USD to Project's Escrow Account:

| To: | SunTrust Bank |
|-----|---------------|

|  | 919 East Main Street, 7th Flr<br>Richmond VA 23219<br>ABA # 061 000 104<br>SWIFT Code: SNTRUS3A<br>Ph: +1 804-782-7182<br>Fax: +1 804-782-7855 |
|---|---|
| Credit To: | Escrow Services<br>Account # 9443001321 |
| Further Credit To: | SunTrust Bank as Escrow Agent for<br>A Chicago Convention Center, LLC,<br>Intercontinental Financial Group, LLC and<br>NES Financial Corp.<br>Subscription Escrow Account # 7944261 |

SEC-USCIS-P-0000472

2. Transfer $41,500 USD to Project's Administrative Account:

| To: | SunTrust Bank<br>919 East Main Street, 7th Flr<br>Richmond VA 23219<br>ABA # 061 000 104<br>SWIFT Code: SNTRUS3A<br>Ph: +1 804-782-7182<br>Fax: +1 804-782-7855 |
|---|---|
| Credit To: | A Chicago Convention Center, LLC<br>Account # 1000144670659 |
| Further Credit To: | |

Additional info:     [*Subscriber name, outbound bank info, etc.:*]

CONFIDENTIALITY NOTE: The information contained in this document is legally privileged and confidential information intended only for the addressee(s) named above. If the reader of this document is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of the document is strictly prohibited. If you have received this document in error, please immediately notify us by telephone and return the document to us at the address below via US Mail. We will reimburse any reasonable cost you incur in notifying us and returning the document to us. Thank you.

2

SEC-USCIS-P-0000473

Intercontinental Financial Group, LLC
8201 West Higgins Road, Chicago, IL 60631
Telephone: (312) 442-0062
Attention: Mr. Anshoo Sethi

> Re:    A Chicago Convention Center, LLC – Subscription for Limited Liability
> Company Interests

Ladies and Gentlemen:

The undersigned (the "Investor") hereby subscribes to purchase limited liability company membership interests ("Interests"), in the investment amount (the "Investment Amount") of Five Hundred Thousand United States Dollars (US$500,000), in A Chicago Convention Center, LLC, an Illinois limited liability company (the "Company"), and hereby pays an additional Forty One Thousand Five Hundred United States Dollars (US$41,500) as an administrative fee (the "Administrative Fee"), all in immediately available funds, to be kept and used by the Company and/or Intercontinental Financial Group LLC, the managing member of the Company (the "Managing Member"). The Investor understands that the Company and/or the Managing Member may reject this subscription for any reason, in either of their sole and exclusive discretions. If this subscription is rejected, then the Investment Amount shall be returned to the Investor without interest. The Administrative Fee is fully refundable in the event (1) the subscription is rejected, or (2) the subscriber's I-526 Petition is rejected by USCIS.

The Investor acknowledges that the information contained herein is being furnished to determine whether the Investor's Subscription Agreement complies with the requirements of various securities laws, including Section 4(2) of the Securities Act of 1933, as amended (the "Federal Act"), Rule 506 of Regulation D ("Regulation D") and Rule 902 of Regulation S ("Regulation S") as well as the requirements of certain state securities laws. The Investor understands that the Managing Member and the Company will rely upon the information contained herein for purposes of such determination.

For purposes of such investment in the Company, the Investor hereby represents, warrants, and agrees as follows:

1.     **General Representations and Warranties.**     The Investor hereby represents and warrants as follows to the Company and the Managing Member:

    (a)     *General Information.*  The general information regarding the Investor previously submitted, submitted hereby, or to be submitted in the future to the Company, including, but not limited to the Investor Eligibility Questionnaire, is and shall be true, complete, and correct.

    (b)     *Accredited Investor Status.*  The Investor has reviewed the definition of "accredited investor" as such term is defined in Rule 501 of Regulation D, and the Investor meets one or more of the requirements to qualify as an "accredited investor."

**Subscription Agreement**

SEC-USCIS-P-0000474

(c)     *Regulation S Compliance.* The Investor has delivered to the Company a copy of an IRS Form W-8 completed by the Investor and the Investor represents and covenants that:

    (i)     The Investor is not a U.S. Person, as such term is defined in Regulation S.

    (ii)     No offer or sale of the Interests was made to the Investor in the United States.

    (iii)     The Investor is not purchasing Interests for the account or on behalf of any U.S. Person.

    (iv)     The Investor has not made any pre-arrangement to transfer Interests to a U.S. Person or to return Interests to the United States securities markets (which includes short sales in the United States within the applicable "distribution compliance period," as defined in Regulation S (hereinafter referred to as the "restricted period") to be covered by delivery of Interests) and is not purchasing Interests as part of any plan or scheme to evade the registration requirements of the Federal Act.

    (v)     All offers and sales of Interests by the Investor in the United States or to U.S. Persons or otherwise whether prior to the expiration or

after the expiration of the applicable restricted period shall be made only pursuant to a registration of the Interests under the Federal Act or an exemption from registration. The Investor also understands that the Company will require from the Investor certain written representations to indicate that the sale of Interests was made in a transaction that complies with the provisions of Regulation S.

(vi)    The Investor is not a "distributor," as defined in Regulation S. However, if the Investor should be deemed to be a distributor prior to reselling Interests to a non-U.S. Person during the restricted period, the Investor will send a notice to each new subscriber of Interests that such new subscriber is subject to the restrictions of Regulation S during the restricted period.

(vii)    The Investor is not an officer, director or "affiliate" (as that term is defined in Rule 405 under the Federal Act) of the Company or an "underwriter" or "dealer" (as such terms are defined in the Federal Act), and the purchase of Interests by the Investor is not a transaction (or part of a series of transactions) that is part of any plan or scheme to evade the registration provisions of the Federal Act.

**Subscription Agreement**

SEC-USCIS-P-0000475

(viii)    The Investor does not have a short position in any Interests and will not have a short position in such securities at any time prior to the expiration of the restricted period.

(ix)    If at any time after the expiration of the restricted period, the Investor wishes to transfer or attempts to transfer Interests to a U.S. Person, the Investor agrees to notify the Company if at such time it is an "affiliate" of the Company or is then acting as an "underwriter," "dealer" or "distributor" as to such Interests (as such terms are defined in the Federal Act or the regulations promulgated thereunder, including, but not limited to, Regulation S), or if such transfer is being made as part of a plan or scheme to evade the registration provisions of the Federal Act.

(x)    The Investor acknowledges that the Investor may only be able to resell such Interests pursuant to the provisions of Regulation S and that it may not be possible for the Investor to liquidate its investment in the Interests. The Investor is prepared, therefore, to hold its Interests indefinitely.

(d)    *Knowledge and Experience.* The Investor has such knowledge and experience in financial, tax, and business matters that it is capable of evaluating the merits and risks of acquisition of the Interests and of making an informed investment decision with respect to such investment.

(e)     *Investment Intent.* The Investor is acquiring the Interests for its own account for investment purposes only, and not with a view to the resale or other distribution thereof, in whole or in part. The Investor understands that the Interests have not been registered under federal or state securities laws and that transfer of the Interests in the Company and withdrawal from the Company are restricted except as set forth in the Company's Limited Liability Company Operating Agreement (the "LLC Agreement") and permitted under applicable laws. The Investor further understands that no federal or state agency or securities or commodities exchange has reviewed the Company's Private Offering Memorandum (the "Memorandum"), the LLC Agreement, or the private placement of the Interests, or made any finding or determination as to the fairness of an investment in the Company.

(f)     *Review of Investment.* The Investor has investigated the purchase of Interests in the Company to the extent it has deemed necessary or desirable and has determined that the Interests are a suitable investment for the Investor. In that connection, (i) the Investor has carefully reviewed the LLC Agreement, (ii) the Investor has read and is familiar with the Memorandum related to the Company, (iii) the Investor has consulted with its own legal, accounting, tax, investment and other advisers to the extent the Investor has deemed necessary, and (iv) the Investor has been given the opportunity to ask questions of and receive answers from the Managing Member and the Company concerning the terms and

3

**Subscription Agreement**

conditions of the LLC Agreement and the Memorandum and other matters pertaining to an investment in the Company and to obtain such additional information as it deemed desirable to verify the accuracy of such information and to evaluate the merits and risks of the purchase of the Interests.

2.   Notwithstanding the foregoing, Investor acknowledges and agrees that no representation, warranty, or statement made in or in connection with the Memorandum or this offering of limited liability company interests, whether by the Company, the Managing Member or any of their respective authorized affiliates, officers, partners, members, agents, or representatives will be deemed to be a representation, warranty, or statement of or by any other member of the Company or any other party, and that all statements by the Company, the Managing Member, or any of their agents in connection with this offering of limited liability company interests in the Company, are solely attributable to and made by the Company, the Managing Member, or such authorized agent, and no Investor may hold any other party responsible or liable for statements made by Company, the Managing Member, or such authorized agent.

(a)   *Ability to Bear Risks*. The Investor is able to bear the economic risks associated with an investment in the Company. The Investor has adequate means of providing for current needs and personal contingencies, and is aware that an investment in the Interests is highly speculative and subject to substantial risks. The Investor is capable of bearing the high degree of economic risk and burden of this investment, including, but not limited to, the possibility of the complete loss of all contributed capital and the limited transferability of the Interests.

(b) *Private Offer.* The Investor is subscribing to purchase the Interests outside the United States pursuant to Section 1(d), and the Company's offer of Interests was privately communicated to the Investor. At no time has the Investor received information concerning such offer of the Company from any newspaper, magazine, television or radio broadcast, leaflet, or other advertisement, public promotional meeting, or any other form of general advertising or general solicitation.

(c) *Taxpayer Identification.* Under penalty of perjury, the Investor certifies that the taxpayer identification number supplied to the Company is or will be the Investor's correct taxpayer identification number and that the Investor is not subject to backup withholding under section 3406(a)(1)(c) of the Internal Revenue Code, as amended (the "IRC"). The Investor shall promptly provide the Company with a taxpayer identification number at the request of the Managing Member or the Company.

(d) *Compliance.* Investor acknowledges that the Company will not accept the investment of funds by any Investor acting, directly or indirectly, in contravention of any applicable anti-money laundering regulations or conventions of the United States or any applicable international jurisdictions, or on behalf of terrorists, terrorist organizations or narcotics traffickers, including those persons or entities that are included on any relevant lists maintained by the United Nations, North

4 **Subscription Agreement**

SEC-USCIS-P-0000477

Atlantic Treaty Organization, Financial Action Task Force on Money Laundering of Organization for Economic Cooperation and Development, Office of Foreign Assets Control of U.S. Department of the Treasury, U.S. Securities and Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, or U.S. Internal Revenue Service, all as may be amended from time to time ("Prohibited Investments"). Investor's subscription for the Interests is not a Prohibited Investment.

(e) *English Language.* THE INVESTOR EITHER READS AND UNDERSTANDS ENGLISH OR HAD THIS SUBSCRIPTION AGREEMENT, THE LLC AGREEMENT, THE MEMORANDUM, AND SUCH OTHER MATERIALS AS THE INVESTOR DEEMS NECESSARY TRANSLATED BY A TRUSTED ADVISOR INTO A LANGUAGE THAT THE INVESTOR DOES UNDERSTAND.

3. EB-5 Investors.

(a) <u>Independent Counsel</u>. The Investor shall hire an independent counsel for immigration processing and other legal matters. The Investor shall be responsible for payment of legal fees and costs associated therewith. The Managing Member reserves the right to approve the Investor's choice of counsel to insure that such counsel has experience processing EB-5 regional center visa petitions.

(b) <u>Filing the Immigration Petition</u>. The Managing Member shall use reasonable

efforts to assist the Investor's counsel with the filing of Investors I-526 and I-829 petitions, and verifying required direct and indirect employment until the removal of the Investor's conditional permanent residency. The Managing Member shall not charge additional fees to assist with the Investor's permanent residence application.

(c) <u>Visa Denial</u>. If the Investor's I-526 Petition with no cure, including adjustment of status or consular interview processing, is denied, the Company shall return the Investor's Investment Amount and all of the Administrative Fee within ninety days of the Investor's written request.

4. **Notice of Changes**. The Investor will promptly notify the Managing Member in writing of any changes in the representations, warranties, and covenants it makes under this Subscription Agreement. Absent any such notice, such representations shall be deemed made by the Investor at the time of each investment by it in the Company, and may be relied upon as complete and correct by the Managing Member and the Company.

5. **Additional Information**. The Investor acknowledges that the Company and the Managing Member may require other documentation in addition to this Subscription Agreement, and the Company and the Managing Member reserve the right to request such documentation prior to deciding whether or not to accept this subscription.

6. **Adoption of LLC Agreement**. Effective upon the acceptance of this Subscription Agreement by the Company, the Investor hereby accepts, adopts and agrees to be bound

SEC-USCIS-P-0000478

by each and every provision contained in the LLC Agreement, and agrees to become an Investing Member, as defined therein.

7.  **Power of Attorney.** The Investor, by its execution hereof, hereby irrevocably makes, constitutes and appoints the Managing Member as its true and lawful agent and attorney-in-fact, with full power of substitution and full power and authority in its name, place, and stead to make, execute, sign, acknowledge, swear to, record, and register (i) all certificates and other instruments deemed advisable by the Managing Member to carry out the provisions of the LLC Agreement and applicable law; (ii) all instruments that the Managing Member deems appropriate to reflect a change or modification of the LLC Agreement in accordance with the LLC Agreement; (iii) all conveyances and other instruments or papers deemed advisable by the Managing Member in connection with the Company, including, without limitation, those to effect the dissolution and termination of the Company; and (iv) all other instruments or papers which may be required or permitted by law to be filed on behalf of the Company.

The Investor authorizes such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite to be done in and about the foregoing as fully as such Investor might or could do if personally present, and hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. The forgoing power of attorney is hereby declared to be irrevocable and a power coupled with an interest, and it shall survive the death of the Investor and extend to the

coupled with an interest, and it shall survive the death of the Investor and extend to the Investor's heirs, legal representatives, successors and assigns. The Investor hereby agrees to be bound by any representation made by such representative and attorney-in-fact acting in good faith pursuant to such power of attorney, and hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of such representative and attorney-in-fact taken in good faith pursuant to such power of attorney.

8. **Indemnification.** The Investor agrees to indemnify and hold harmless the Managing Member, each other owner of Interests, and the Company from and against any and all losses, liabilities, claims, damages and expenses (including any expense reasonably incurred in investigating, preparing or defending against any claim whatsoever) related to any false representation or breach of any warranty or agreement contained herein. If instructions are given by the undersigned by facsimile, the undersigned undertakes to send the original letter of instructions by courier delivery service to the Managing Member and the Company and agrees to keep each of them indemnified against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon facsimile instructions. The Managing Member and the Company may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons.

9. **Successors of the Investor.** The representations, warranties, covenants, and agreements in this Subscription Agreement shall be binding on the Investor's successors, permitted

6

Subscription Agreement

SEC-USCIS-P-0000479

A Chicago Convention Center, LLC
Subscription Agreement

assigns, heirs and legal representatives and shall inure to the benefit of the respective successors and assigns of the Managing Member and the Company.

10. **Privacy**. The Investor agrees that information supplied in this Subscription Agreement and otherwise in connection with his or her subscription for the Interests may be retained by the Company or the Managing Member and will be used for the purposes of processing the subscription. Such information may also be used for the purpose of carrying out Investor instructions or responding to any inquiry purported to be given by or behalf of the Investor. Investor authorizes the Company and the Managing Member to disclose and transfer such information to each other, including any of their employees, officers, directors, and agents and/or their subsidiaries and/or affiliates, to any third party employed or retained to provide administrative, computer, or other services or facilities, or to any governmental or regulatory authority.

11. **Confidentiality**. The Investor understands that this Subscription Agreement and all other documents delivered to the Investor in connection with this private placement of the Interests are confidential documents prepared solely for the benefit of qualified investors acceptable to the Company. The Investor agrees that he or she will not reproduce or distribute any of such documents in whole or in part and if this subscription is rejected he or she will promptly return the subscription materials and any copies thereof to the Company.

12. **Counterparts and Delivery**. This Subscription Agreement may be executed in any number of counterparts, each of which shall be considered an original. Delivery of

number of counterparts, each of which shall be considered an original. Delivery of a copy of this Subscription Agreement bearing an original signature by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

13. **Applicable Law and Jurisdiction**. Except to the extent covered by applicable United States federal law, this Subscription Agreement and the rights and obligations of the parties hereto with respect to the subscription shall be interpreted and enforced in accordance with, and governed by, the laws of the State of Illinois applicable to agreements made and to be performed wholly within that jurisdiction.

14. **Entirety of Agreement; Amendment**. This Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements (whether oral or written), and may not be amended, modified, terminated or revoked except by written agreement of the parties. In the event of any conflict between the LLC Agreement and this Subscription Agreement, the LLC Agreement will prevail.

*[ Balance of page intentionally left blank;*

*signature page follows. ]*

SEC-USCIS-P-0000480

A Chicago Convention Center, LLC
Subscription Agreement

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement as

of _____ July _____ 15 , 20 12 .

SIGNATURE FOR INVESTOR

By:_____沈涛_____ ←

(Signature)

Mr. SHEN Tao

(Print Name)

ACCEPTANCE

Intercontinental Financial Group, LLC, as managing member of the Company, hereby accepts

the above subscription to acquire Interests.

Dated: ___July___ 15, 2012

INTERCONTINENTAL FINANCIAL GROUP, LLC
An Illinois Limited Liability Company

By: _____

Name:___Anshoo Sethi_____

Title:___Managing Member_____

**Execution Page**                    **Subscription Agreement**

SEC-USCIS-P-0000481

# EXHIBIT

G

# ATTACHMENT
## 2-D

SEC-USCIS-P-0000482

## SUBSCRIPTION ESCROW AGREEMENT

This Subscription Escrow Agreement (the "Agreement") effective as of November 10, 2011 by and among **A Chicago Convention Center, LLC,** an Illinois limited liability company (the "LLC"), **Intercontinental Financial Group, LLC** , an Illinois limited liability company (the "Subscriber Representative"), **NES Financial Corp.,** a California corporation ("Administrative Agent"), and **SUNTRUST BANK,** a Georgia banking corporation ( the "Escrow Agent") (collectively the "Parties").

### WITNESSETH:

**WHEREAS,** the LLC proposes to offer for sale (the "Offering") one unit of interest in the LLC (the "Interests"), at a subscription purchase price of Five Hundred Thousand Dollars ($500,000.00) per unit of Interest ("Subscription Proceeds") payable in cash pursuant to subscription agreements ("Subscription Agreements"); and

**WHEREAS,** the Interests in the LLC are proposed to be offered for sale to investors (the "Subscribers") under the terms of the EB-5 visa program administered by the U.S. Citizenship and Immigration Service ("USCIS"), an agency of the United States government;

**NOW THEREFORE,** in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

   (a)  The LLC shall deposit or cause to be deposited with the Escrow Agent, to be held in escrow under the terms of this Agreement, all Subscription Proceeds received from Subscribers ("Subscription Proceeds"). The Escrow Agent shall have no responsibility for Subscription Proceeds until such proceeds are actually received, clear through normal banking channels and constitute collected funds. The Escrow Agent shall have no duty to collect or seek to compel payment of any Subscription Proceeds, except to place such proceeds or instruments representing such proceeds for deposit and payment through customary banking channels. Checks for Subscription Proceeds furnished by Subscribers shall be made payable to: "SunTrust Bank, as Escrow Agent for A Chicago Convention Center, LLC – Subscription Only".

   (b)  The LLC shall deliver to the Escrow Agent, in a form acceptable to the Escrow Agent, schedules disclosing the name, address and Tax Identification Number of each of the Subscribers, the number of Interests subscribed for by each Subscriber, the amount of Subscription Proceeds received from each Subscriber, and such other information as will enable the Escrow Agent to attribute to a particular Subscriber all Subscription Proceeds received by the Escrow Agent.

SEC-USCIS-P-0000483

2.    Rejection or Withdrawal of Subscription Agreement.

(a)    Any Subscription Agreement may be rejected by the LLC in whole or in part. The LLC shall promptly notify the Escrow Agent in writing in the event of any such rejection. Upon the receipt of a written notice of rejection pertaining to any Subscription Agreement, the Escrow Agent shall return to the Subscriber signing the rejected Subscription Agreement the Subscription Proceeds tendered by such Subscriber, without deduction or payment of interest; provided such Subscriber's Subscription Proceeds constitute collected funds.

(b)    In the event the Escrow Agent receives written notice from the LLC that a Subscription Agreement has been withdrawn by a Subscriber and that Section 3 of this Agreement does not apply, the Escrow Agent shall return to such Subscriber who signed the withdrawn Subscription Agreement the Subscription Agreement (if then in the Escrow Agent's possession) and the Subscription Proceeds tendered therewith, without deduction or payment of interest.

3.    Disbursements.

(a)    At such time as the Escrow Agent has received written notice from the LLC and the Subscriber Representative that a Subscriber's Form I-526 Immigration Petition has been approved by the USCIS, the Escrow Agent shall, subject to the receipt of such funds, disburse the Subscriber's Subscription Proceeds to the account of the LLC in accordance with written directions provided by the LLC and Subscriber Representative. At such time as all Subscribers' Form I-526 applications have been either approved, denied or otherwise processed

by the USCIS and all Subscription Proceeds have been either returned to the Subscriber or disbursed in accordance with directions provided by the LLC and the Offering is withdrawn or closed, this Agreement (except as otherwise provided herein) shall terminate.

Case: 1:13-cv-00982 Document #: 11-2 Filed: 02/06/13 Page 61 of 213 PageID #:1045

(b)    In the event the Escrow Agent receives written notice from the LLC that a Subscriber's Form I-526 Immigration Petition (including adjustment of status or consular interview processing) has been denied by the USCIS and such denial was not due to such Subscriber's failure to submit a complete and accurate petition or any other documentation or fees required by the USCIS, the Escrow Agent shall return to the Subscriber the Subscription Agreement (if then in the Escrow Agent's possession) and the Subscription Proceeds tendered therewith, without deduction or payment of interest.

(c)    In the event the Escrow Agent receives written notice from the LLC that a Subscriber's Form I-526 Immigration Petition (including adjustment of status or consular interview processing) has been denied by the USCIS and such denial was due to such Subscriber's failure to submit a complete and accurate petition or any other documentation or fees required by the USCIS), the Escrow Agent shall return to the Subscriber the Subscription Proceeds in accordance with written directions provided by the LLC and Subscriber Representative.

(d)    The LP shall provide a copy of this Agreement to each Subscriber and each Subscriber shall execute it acknowledging its terms.

4.    Investment of Subscription Proceeds.

SEC-USCIS-P-0000484

The Parties further covenant, warrant and agree that the Escrow Agent shall invest all Subscription Proceeds, at the written direction of the LLC, in a SunTrust Bank non-interest-bearing deposit account.

    5.    Escrow Administration.

All taxes in respect of any earnings on the Subscription Proceeds shall be the obligation of the Subscriber to the extent of its pro rata share thereof, which pro rata shares will be in the same proportion of the amounts deposited by each into the Escrow Account. The Subscriber Representative, as agent for the Subscribers and tax owner of record of the Subscription Proceeds, shall furnish the Escrow Agent with a completed Form W-9 for the Subscriber Representative. The Subscriber Representative and the Subscribers have agreed pursuant to a separate agreement that the Administrative Agent shall perform the sub-accounting services necessary for maintaining proper ownership records with respect to the Subscription Proceeds and shall issue IRS Form 1099s to the Subscribers with respect to their earnings, if any, on the Subscription Proceeds. The Administrative Agent and the Subscriber Representative understand that, if such tax reporting documentation is not so certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, to withhold a portion of any interest or other income earned on the investment of monies or other property held by the Escrow Agent pursuant to this Agreement. The parties shall provide to Escrow Agent such information as Escrow Agent may reasonably require to enable Escrow Agent to comply with its obligations under the USA PATRIOT Act. Escrow Agent shall not credit any amount of interest or investment proceeds earned on the Subscription Proceeds, or make any payment of all or a portion of the Subscription Proceeds, to any person unless and until such person has provided to Escrow Agent such documents as Escrow Agent may require to enable Escrow

Agent to comply with its obligations under such Act.

6.    Duties of Escrow Agent: Indemnification.

(a)    The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no additional duties or obligations shall be implied hereunder.  In performing its duties under this Agreement, or upon the claimed failure to perform any of its duties hereunder, the Escrow Agent shall not be liable to anyone for any damages, losses or expenses which may be incurred as a result of the Escrow Agent's so acting or failing to so act; provided, however, that the Escrow Agent shall not be relieved from liability for damages arising from the Escrow Agent's proven gross negligence or willful misconduct.  The Escrow Agent shall in no event incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of legal counsel, which may be counsel to either party hereto, given with respect to any question relating to the duties and responsibilities of the Escrow Agent hereunder, or (ii) any action taken or omitted to be taken in reliance upon any instrument delivered to the Escrow Agent and believed by it to be genuine and to have been signed or presented  by the proper party or parties.

(b)    To its knowledge, the LLC warrants to and agrees with the Escrow Agent that there is no security interest in the Subscription Proceeds or any part of the Subscription Proceeds; no financing statement under the Uniform Commercial Code of any jurisdiction is on file in any jurisdiction claiming a security interest in or describing, whether specifically or generally, the Subscription Proceeds or any part of the Subscription Proceeds; and the Escrow Agent shall have no responsibility at any time to ascertain whether or not any security interest exists in the Subscription Proceeds or any part of the Subscription Proceeds or to file any

SEC-USCIS-P-0000485

financing statement under the Uniform Commercial Code of any jurisdiction with respect to the Subscription Proceeds or any part thereof.

(c)     As an additional consideration for and as an inducement for the Escrow Agent to serve as escrow agent hereunder, it is understood and agreed that, in the event of any disagreement resulting in adverse claims and demands being made in connection with or for any money or other property involved in or affected by this Agreement, the Escrow Agent shall be entitled, at the option of the Escrow Agent, to refuse to comply with the demands of any parties that conflict with the terms of this Agreement so long as such disagreement shall continue. In such event, the Escrow Agent shall deliver such portion of the Subscription Proceeds as are not affected by the disagreement. Anything herein to the contrary notwithstanding, so long as such failure does not violate Escrow Agent's duties and obligations under this Agreement, the Escrow Agent shall not be or become liable to such parties or any of them for the failure of the Escrow Agent to comply with the conflicting or adverse demands of such parties. So long as such action or inaction does not violate Escrow Agent's duties and obligations under this Agreement, the Escrow Agent shall be entitled to continue to refrain and refuse to deliver or otherwise dispose of the subscription proceed or any part thereof or to otherwise act hereunder, as stated above, unless and until:

(i)     the rights of such parties have been finally settled or duly adjudicated in a court having jurisdiction of the parties and the Subscription Proceeds and the Escrow Agent, has received written instructions as to disbursement thereof; or

(ii)     the parties have reached an agreement resolving their differences and have notified the Escrow Agent in writing of such agreement and have provided the Escrow

Agent with indemnity reasonably satisfactory to the Escrow Agent against any liability, claims or damages resulting from compliance by the Escrow Agent with such agreement.

In the event of a disagreement as described above, the Escrow Agent shall have the right, in addition to the rights described above and at the option of Escrow Agent, to tender into the registry or custody of any court having jurisdiction, all money and property comprising the Subscription Proceeds and may take such other legal action as may be appropriate or necessary, in the opinion of Escrow Agent or its legal counsel. Upon such tender, the Escrow Agent shall be discharged from all further duties under this Agreement; provided, however, that the filing of any such legal proceedings shall not deprive the Escrow Agent of its compensation hereunder earned prior to such filing and discharge of the Escrow Agent of its duties hereunder.

(d)     The Parties (other than the Escrow Agent) agree that in the event any controversy arises under or in connection with this Agreement or the Subscription Proceeds or the Escrow Agent is made a party to or intervenes in any litigation pertaining to this Agreement or the Subscription Proceeds, to pay to the Escrow Agent reasonable compensation for its extraordinary services and to reimburse the Escrow Agent for all costs and expenses, including reasonable legal fees and expenses associated with such controversy or litigation.

(e)     The Escrow Agent may resign at any time from its obligations under this Agreement by providing written notice to the LLC. Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than ninety (90) days after such written notice has been given. In the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to

SEC-USCIS-P-0000486

tender into the custody of any court of competent jurisdiction all assets then held by it hereunder and shall thereupon be relieved of all further duties and obligations under this Agreement; provided however, the Escrow Agent shall be entitled to its compensation earned prior thereto. The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder.

(f)     The Escrow Agent shall have no obligation to take any legal action in connection with this Agreement or its enforcement, or to appear in, prosecute or defend any action or legal proceeding which would or might involve the Escrow Agent in any cost, expense, loss or liability unless security and indemnity reasonably satisfactory to the Escrow Agent, shall be furnished.

(g)     The Parties (other than the Escrow Agent) jointly and severally agree to indemnify the Escrow Agent and each of its officers, directors, employees and agents and to save the Escrow Agent and each of its officers, directors, employees and agents harmless from and against any and all Claims (as hereunder defined) and Losses (as hereinafter defined) which may be incurred by the Escrow Agent or any of such officers, directors, employees or agents as a result of Claims asserted against Escrow Agent or any of such officers, directors, employees or agents directly or indirectly as a result of or in connection with Escrow Agent's serving in the capacity of escrow agent under this Agreement; provided, however, that the Escrow Agent shall not be relieved from liability for damages arising from the Escrow Agent's gross negligence or willful misconduct. For the purposes hereof, the term "Claims" shall mean all claims, lawsuits, causes of action or other legal actions and proceedings of whatever nature brought against (whether by way of direct action, counterclaim, cross action or interpleader) the Escrow Agent or any such officer, director, employee or agent, even if groundless, false or fraudulent, so long as

the claim, lawsuit, cause of action or other legal action or proceeding is alleged or determined, directly or indirectly to arise out of, result from, relate to or be based upon, in whole or in part, (a) the acts or omissions of the LLC, or (b) the appointment of the Escrow Agent as escrow agent under this Agreement, or (c) the performance by the Escrow Agent of its powers and duties under this Agreement. The term "Losses" shall mean all losses, costs, damages, expenses, judgments and liabilities of whatever nature (including but not limited to attorneys', accountants' and other professionals' fees, litigation and court costs and expenses and amounts paid in settlement), directly or indirectly resulting from, arising out of or relating to one or more Claims. Upon the written request of the Escrow Agent or any such officer, director, employee or agent (each referred to hereinafter as an "Indemnified Party"), the Parties (other than the Escrow Agent) agree to assume the investigation and defense of any Claim, including the employment of counsel acceptable to the applicable Indemnified Party and the payment of all expenses related thereto and, notwithstanding any such assumption, the Indemnified Party shall have the right, and the Parties (other than the Escrow Agent) agree to pay the costs and expense thereof, to employ separate counsel with respect to any such Claim and to participate in the investigation and defense thereof in the event that such Indemnified Party shall have been advised by legal counsel that there may be one or more legal defenses available to such Indemnified Party which are different from or additional to those available to the Parties (other than the Escrow Agent) agree. The Parties (other than the Escrow Agent) hereby agree that the indemnifications and protections afforded Escrow Agent and the other Indemnified Parties in this section shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

(h)    The Parties (other than the Escrow Agent) acknowledge that the Escrow Agent is serving as escrow agent for the limited purposes set forth herein and represent, covenant and warrant to the Escrow Agent that no statement or representation, whether oral or in writing,

SEC-USCIS-P-0000487

has been or will be made to any Subscriber to the effect that the Escrow Agent has investigated the desirability or advisability of investment in the Interests or approved, endorsed or passed upon the merits of such investment or is otherwise involved in any manner with the transactions contemplated hereby, other than as Escrow Agent under this Agreement. It is further agreed that the Parties (other than the Escrow Agent) shall not use or permit the use of the name "SunTrust," "SunTrust Bank," "SunTrust Banks, Inc." or any variation thereof in any sales presentation, placement or offering memorandum or literature pertaining directly or indirectly to the offering except strictly in the context of the duties of the Escrow Agent as escrow agent under this Agreement. Any breach or violation of the paragraph shall be grounds for immediate termination of this Agreement by the Escrow Agent.

   (i) The Escrow Agent shall have no duty or responsibility for determining whether the Interests or the offer and sale thereof conform to the requirements of applicable Federal or state securities laws, including but not limited to the Securities Act of 1933 or the Securities Exchange Act of 1934 (both as amended). The LLC represents and warrants to the Escrow Agent that the Interests and the Offering will comply in all respects with applicable Federal and state securities laws and further represents and warrants that the LLC has obtained and acted upon the advice of legal counsel with respect to such compliance with applicable Federal and state securities laws. The LLC acknowledges that the Escrow Agent has not participated in the preparation or review of any sales or offering material relating to the Offering or the Interests. In addition to any other indemnities provided for in this Agreement, the LLC agrees to indemnify and hold harmless the Escrow Agent and each of its officers, directors, agents and employees from and against all claims, liabilities, losses and damages (including attorneys' fees) incurred by the Escrow Agent or such persons and which directly or indirectly result from any violation or alleged violation of any Federal or state securities laws, except to the

result from any violation or alleged violation of any Federal or State securities laws, except to the extent due to or arising out of Escrow Agent's gross negligence or willful misconduct.

7. Notices.

Any notices, elections, demands, requests and responses thereto permitted or required to be given under this Agreement shall be in writing, signed by or on behalf of the party giving the same, and addressed to the other party at the address of such other party set forth below or at such other address as such other party may designate in writing in accordance herewith. Any such notice, election, demand, request or response shall be addressed as follows and shall be deemed to have been delivered upon receipt by the addressee thereof:

        (a)    If to the LLC:

        A Chicago Convention Center, LLC
        8201 W. Higgins Rd.
        Chicago, IL 60631
        Attn: Mr. Anshoo Sethi
        Phone: (312) 442-0062
        Fax: (312) 878-1340
        Email: Anshoo.Sethi@Chicago-RC.com

        (a)    If to the Subscriber Representative:

        Intercontinental Financial Group, LLC
        8201 W. Higgins Rd.

SEC-USCIS-P-0000488

Chicago, IL 60631
Attn: Mr. Anshoo Sethi
Phone: (312) 442-0062
Fax: (312) 878-1340
Email: Anshoo.Sethi@Chicago-RC.com

With a copy to:

Homeier & Law, P.C.
15233 Ventura Boulevard, Suite 605
Sherman Oaks, California 91403
Attn: Michael G. Homeier, Esq.
Fax: (818) 907-7876
Email: michael@homeierlaw.com

(c)     If to the Administrative Agent:

NES Financial Corp.
50 W. San Fernando Street
Suite 300
San Jose, CA 95113
Attn: Kelly E. Alton, General Counsel
Phone: 800-339-1031
Fax: 866-704-1031
Email: kalton@nesf.com

If to the Escrow Agent:

SunTrust Bank
Escrow Services
919 E Main Street, 7th Floor
Richmond, VA 23219
Attn: Matt Ward
Phone: 804-782-7182
Fax: 804-782-7855

8.    Successors and Assigns; Amendment.

The rights created by this Agreement shall inure to the benefit of and the
obligations created hereby shall be binding upon the successors and assigns of the Escrow Agent
and the other Parties; provided, however, that neither this Agreement nor any rights or
obligations hereunder may be assigned by any Party hereto without the express written consent
of the other Party hereto. Any purported assignment absent such consent shall be null and void
and of no force or effect. This Agreement may not be amended without the prior written consent
of all Parties in writing.

9.    Construction.

This Agreement shall be construed and enforced according to the laws of
the State of Illinois.

SEC-USCIS-P-0000489

10.   Authorized Signatures.

Contemporaneously with the execution and delivery of this Agreement and, if necessary, from time to time thereafter, each of the Parties to this Agreement (other than the Escrow Agent) shall execute and deliver to the Escrow Agent a Certificate of Incumbency substantially in the form of Exhibit A hereto (a "Certificate of Incumbency") for the purpose of establishing the identity and authority of persons entitled to issue notices, instructions, or directions to the Escrow Agent on behalf of each such Party. Until such time as the Escrow Agent shall receive an amended Certificate of Incumbency replacing any Certificate of Incumbency theretofore delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on the most recent Certificate of Incumbency furnished to the Escrow Agent. Whenever this Agreement provides for joint written notices, joint written instructions, or other joint actions to be delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on any joint written notice, instructions, or action executed by persons named in such Certificate of Incumbency."

11.   Counterparts.

This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of executed signature pages by facsimile or electronic transmission will constitute effective and binding execution and delivery of this Agreement and have the same effect as the delivery of an original executed counterpart. This Agreement shall become effective when each party to this Agreement shall have received a counterpart of this Agreement

signed by each other party hereto.

12.     <u>Term</u>.

This Agreement shall terminate and the Escrow Agent shall be discharged of all responsibilities hereunder at such time as the Escrow Agent shall have disbursed all Subscription Proceeds in accordance with the provisions of this Agreement and the Offering is withdrawn or closed; provided, however, that the provisions of Sections 6(g) and 6(i) hereof shall survive any termination of this Agreement and any resignation or removal of the Escrow Agent.

SEC-USCIS-P-0000490

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

"LLC"
A Chicago Convention Center, LLC

By: _____

Name: _Mr. Anshoo Sethi_____

Title: _Managing Member_____


"SUBSCRIBER REPRESENTATIVE"
Intercontinental Financial Group, LLC

By: _____

Name: _Mr. Anshoo Sethi_____

Title: _Managing Member_____


"ADMINISTRATIVE AGENT"

NES Financial Corp.

By: *[signature]*
Name: Kell Alton
Title: General Counsel

"ESCROW AGENT"

SUNTRUST BANK

By: *[signature]*
Name: Nickida Dooley
Title: Assistant Vice President

ACKNOWLEDGED:

"Subscriber"

By: *[signature]*   ←

Name:     Mr. SHEN Tao

SEC-USCIS-P-0000491

## EXHIBIT A

### Certificate of Incumbency
(List of Authorized Representatives)

Client Name:  A Chicago Convention Center, LLC

As an Authorized Officer of the above referenced entity, I hereby certify that the each person
listed below is an authorized signor for such entity, and that the title and signature appearing
beside each name is true and correct.

| Name | Title | Signature | Contact Number |
|------|-------|-----------|----------------|
| Anshoo Sethi | Managing Member | | (312) 442-0062 |
| Ravinder Sethi | Managing Member | | (312) 442-0062 |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer by:

By:_____          Date:_November 10, 2011_

Title:_Managing Member_____

10

SEC-USCIS-P-0000492

# EXHIBIT B

### SunTrust Bank, as Escrow Agent

### A Chicago Convention Center, LLC/ NES Financial Corp.

### Schedule of Fees & Expenses

**Acceptance/Legal Review Fee:**      **$500.00** – one time only payable at the time of signing the escrow agreement
**Waived**

The Legal Review Fee includes review of all related documents and accepting the appointment of Escrow Agent on behalf of SunTrust Bank. The fee also includes setting up the required account(s) and accounting records, document filing, and coordinating the receipt of funds/assets for deposit to the Escrow Account. This is a one-time fee payable upon execution of the Escrow Agreement. <u>As soon as SunTrust Bank's attorney begins to review the escrow agreement, the legal review fee is subject to payment regardless if the parties decide to appoint a different escrow agent or a decision is made that the escrow agreement is not needed.</u>

**Administration Fee:**     $2,500 – payable at the time of signing the escrow agreement and on the
    anniversary date thereafter, if applicable

**Waived**

The Administration Fee includes providing routine and standard services of an Escrow Agent. The fee includes administering the escrow account, performing investment transactions, processing cash transactions (including wires and check processing), disbursing funds in accordance with the Agreement (note any pricing considerations below), and providing trust account statements to applicable parties for a twelve (12) month period. If the account remains open beyond the twelve (12) month term, the parties will be invoiced each year on the anniversary date of the execution of the Escrow Agreement. Additional fees will be billed for processing claim notices and/or objections. Extraordinary expenses, including legal counsel fees, will be billed as out-of-pocket. The Administration Fee is due upon execution of the Escrow Agreement.

**Out-of-Pocket Expenses:**        **At Cost**

Out-of-pocket expenses such as, but not limited to, postage, courier, overnight mail, insurance, money wire transfer, long distance telephone charges, facsimile, stationery, travel, legal (out-of-pocket to counsel) or accounting, will be billed at cost.

**Note: This fee schedule is based on the assumption that the escrowed funds will be invested in SunTrust Bank's Non-Interest Deposit Option.**

SunTrust Bank
Steve Miles
804-782-7084
s.miles@suntrust.com

Subscription Escrow Agreement 8/20/09

SEC-USCIS-P-0000493

# EXHIBIT

# H

# ATTACHMENT
# 4-A

SEC-USCIS-P-0000743

# Business Plan for EB-5 Investment in



# A CHICAGO CONVENTION CENTER





**DECEMBER 13 2011**

INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO

8201 W. HIGGINS RD. | CHICAGO, IL 60631

D | 312.442.0062     F | 312.878.1340

www.Chicago-RC.com

SEC-USCIS-P-0000744

# A CHICAGO CONVENTION CENTER, LLC

| 1.0 | Executive Summary | 3 |
|------|-------------------|---|
| 2.0 | Organization and Management | 4 |
| 2.1 | Investment Structure | 4 |
| 2.2 | Material Relationships and Agreements | 4 |
| 2.3 | Management Profiles | 6 |
| 2.4 | Consultants and Advisors | 6 |
| 3.0 | Investment Project Description | 7 |
| 3.1 | Overview | 7 |
| 3.2 | Building Specifications | 8 |
| 3.3 | Design Features | 10 |
| 3.4 | Tenants | 11 |
| 3.5 | Location | 13 |
| 4.0 | Project Development Schedule | 14 |
| 5.0 | Project Costs and Capitalization | 16 |

5.1 Project Development Costs................................................................... 16

5.2 Project Capitalization.......................................................................... 17

6.0 Job Creation ..................................................................................... 21

6.1 Economic Analysis ........................................................................... 21

6.2 Economic Model Inputs and Verifiable Detail ................................. 22

7.0 Market Profile ................................................................................... 23

7.1 Neighborhood Profile and Location Advantages.............................. 23

7.2 Demand Drivers ................................................................................ 24

8.0 Feasibility Analysis........................................................................... 25

9.0 Advantages for EB-5 Investors......................................................... 28

10.0 Appendices........................................................................................ 30

10.1 Advisor and Consultant Profiles ...................................................... 30

10.2 A Chicago Convention Center Design Detail ................................... 33

10.3 Area Revitalization and Development Activity Detail ...................... 40

10.4 Operating Income Projections........................................................... 41

SEC-USCIS-P-0000745

## 1.0 EXECUTIVE SUMMARY

A potential EB-5 investment target within Intercontinental Regional Center Trust of Chicago, a USCIS-approved Regional Center (RCW1031910085), will involve construction and management of a facility for a convention center that will offer convention and meeting space, five upper-upscale hotels, and amenities including restaurants, lounges, bars, and entertainment facilities. This new development, A Chicago Convention Center, will be located in Chicago, Illinois. Up to $249.5 million of EB-5 investor capital will be applied to $735 million in development costs for the facility, and 8,495 new jobs will be created. Direct jobs will be created in connection with operations of the convention center, hotels, and amenities, and through indirect and induced impacts of these new enterprises in the regional area.

| *Investment Required* | *Use of Funds* | *Verifiable Detail* | *Result* |
|---|---|---|---|
| •$735 million including domestic financing and $249,500,000 million of EB-5 capital. | •Demolition, construction, build-out, and initial operation of A Chicago Convention Center. | •Occupancy of the facility by job-creating hospitality and related tenants. | •8,495 total jobs including jobs created indirectly |



*Conceptual rendering of the proposed new development in Chicago, IL.*
*The three towers will house five hotels as well as providing convention space.*

SEC-USCIS-P-0000746

## 2.0  ORGANIZATION AND MANAGEMENT

### 2.1  INVESTMENT STRUCTURE

The proposed A Chicago Convention Center project will receive funding from a variety of sources, including EB-5 investment of up to $249.5 million, which will be raised through Intercontinental Regional Center Trust of Chicago (IRCTC). IRCTC was designated as a Regional Center under the Immigrant Investor Pilot Program of U.S. Citizenship and Immigration Services on June 9, 2011.

EB-5 investors will deposit qualifying capital contributions in A Chicago Convention Center, LLC (ACCC, LLC), the Illinois Limited Liability Company incorporated on January 24, 2011, which will develop and manage the convention center project. EB-5 investors will be subscribed as members in ACCC, LLC, which is both the New Commercial Enterprise and the Capital Investment Project. ACCC, LLC will also receive funding from other sources, including government subsidies, to cover total project development costs estimated at approximately $735 million.

### 2.2  MATERIAL RELATIONSHIPS AND AGREEMENTS

| | |
|---|---|
| **The Company ("Offeror")** | A Chicago Convention Center, LLC is an Illinois limited liability company incorporated on January 24, 2011 with its principal place of business located at 8201 W. Higgins Road, Chicago, Illinois 60631. |
| **Managing Member** | The Managing Member of the LLC is Intercontinental Financial Group, LLC, an Illinois limited liability company with its principal place of business located at 8201 W. Higgins Road, Chicago, Illinois 60631. |
| **EB-5 Regional Center Designation** | The Project is sponsored by the Intercontinental Regional Center Trust of Chicago, LLC ("**IRCTC**"), which previously received approval to establish, and now operates, the "Intercontinental Regional Center Trust of Chicago" (the "**Regional Center**") which is IRCTC's fictitious business name. The Regional Center is a "regional center" as authorized by the United States Citizenship & Immigration Service ("**USCIS**") under the "EB-5 Immigrant Investor Pilot Program" (the "**EB-5 Pilot Program**") to establish and solicit investment from foreign investors under the EB-5 Pilot Program. The Project is believed to be a qualifying investment under the EB-5 Pilot Program. The geographic scope of the Regional Center encompasses the entirety of the State of Illinois, plus Lake County in the State of Indiana and Dane, Kenosha, |

SEC-USCIS-P-0000747

Milwaukee, Racine, and Rock Counties in the State of Wisconsin (collectively, the "**Regional Center Territory**").

**Limited Partner Role**

All management and other powers relating to day-to-day control of the Company will be held and exercised by the Managing Member, to the maximum extent permitted by law. Investor Members will have the rights described in the Operating Agreement (see Exhibit A) and as provided for in the Illinois Limited Liability Company Act of 1994, but will generally have limited involvement in the management and little control over the actions of the LLC.

**The Project Company:** *A Chicago Convention Center, LLC*

The principals of A Chicago Convention Center, LLC (including Mr. Anshoo R. Sethi and Mr. Ravinder Sethi) collectively possess over 150 years of combined construction project management and have also served in the same capacity for the property managers for multiple mid-rise and high-rise structures in downtown Chicago. They have a wide range of experience managing major projects from concept through completion, having built over 250+ hotel developments from coast to coast for prestigious clients in all hotel brands. Through these principals, the Project Company is expert in every aspect of new hotel construction, from initial site planning to the property's opening. Its hotel renovation projects are coordinated with property managers to minimize disruption to hotel operations. It also works with owners on

rebranding and Property Improvement Plans (PIPs) from conceptual estimates through full
design and construction.

Case: 1:13-cv-00982 Document #: 11-2 Filed: 02/06/13 Page 93 of 213 PageID #:1077

**The Development Company:** *Upgrowth, LLC*

With more than 35 years of experience, the Development Company Upgrowth, LLC has earned a reputation as a premier nationwide hotel general contractor providing a full range of services to the hospitality industry in both new construction and renovation for all hotel brands (including Marriott, Starwood, Intercontinental Hotels Group, Choice Hotels, and Accor Hotels). The Development Company's services also include construction management and value engineering with a focus on helping clients reduce costs and improve quality. The Development Company provides full service capabilities for both pre-construction planning and construction phases of a project. The Development Company utilizes a variety of delivery methods, from the traditional plans and specs approach, to full service design/build. Upgrowth has been approved as qualified by all relevant governmental financing agencies. Upgrowth, LLC was co-founded and is currently managed by Mr. Anshoo R. Sethi and Mr. Ravinder Sethi.

**The Regional Center:** *Intercontinental Regional Center Trust of Chicago*

Intercontinental Regional Center Trust of Chicago is the entity that received USCIS approval to create and operate an EB-5 regional center, and has been engaged to perform advisory as well as

SEC-USCIS-P-0000748

sponsorship activities for the Project. Mr. Anshoo Sethi holds 50% of the ownership interests in the Regional Center, with the remaining interests held by Mr. Ravinder Sethi; thus, the Regional Center is affiliated with the Project Company and the Development Company.

## 2.3   MANAGEMENT PROFILES

**Anshoo R. Sethi**

Mr. Anshoo R. Sethi is the co-founding member of A Chicago Convention Center, LLC and Upgrowth, LLC, as well as the majority owner of Intercontinental Regional Center Trust of Chicago. Mr. Sethi, who graduated from the University of Illinois at Chicago with a degree in International Finance and Marketing, has over fifteen years of experience in real estate development and management, specifically in the lodging arena. Mr. Sethi has executed several corporate acquisitions and divestitures in his career, working with both private and public domestic and foreign funding. Mr. Sethi holds Certified Lodging Owner (CLO), Certified Hotel Administrator (CHA), and Certified Hospitality Technology Professional (CHTP) certification, and expects shortly to finalize his LEED® Professional Accreditation (LEED® AP) from the U.S. Green Building Council ("USGBC"). He is a member of numerous organizations focusing in areas related to estate development and management, sustainability and renewable energy, asset management, and entrepreneurism. In addition, Mr. Sethi serves on the boards of numerous not-

for-profit, social, and educational organizations.

**Ravinder Sethi**

Mr. Ravinder Sethi is one of the founding members of A Chicago Convention Center, LLC and Upgrowth, LLC. Mr. Sethi, who graduated from the University of Punjab, Chandigarh, India, with a Masters Degree in Pharmacy, has over thirty years of experience in real estate development and management, specifically in the lodging, pharamaceutical, and educational arenas. His non-medical businesses are engaged in real estate hospitality and educational developments specifically in general contracting major hotel brands and education businesses in the United States and India. He is a member of numerous organizations focusing in areas related to global finance, alternative investments, asset management, and entrepreneurism. In addition, Mr. Sethi serves on the boards of numerous not-for-profit, social, and educaional organizations.

## 2.4   CONSULTANTS AND ADVISORS

Please see Section 10.1 for detailed profiles of the consultants and advisors who will be involved in development, operation, and management of A Chicago Convention Center.

SEC-USCIS-P-0000749

## 3.0 INVESTMENT PROJECT DESCRIPTION

### 3.1 OVERVIEW

A Chicago Convention Center will attract national and international business by providing beautifully appointed convention and hotel facilities that are supplied by proven brand leaders. The complex will feature five upper-upscale hotel brands spread across three atrium towers. In total there are planned to be 797 suites and 198 rooms (totaling 995 keys) throughout the complex.

The Convention Center will offer four floors of convention space totaling 290,000 square feet, all of which will be connected across the lower levels of all three towers. The complex will further contain 15 conference suites on the upper floors, with 55,000 square feet allocated for restaurants, lounges, and bars throughout the structure. The five hotels in the complex will offer a total of 995 rooms and suites. Finally, a parking structure offering about 1,720 spaces will sit below the lower level convention center.

Hotels that have expressed an interest or executed franchise agreements to locate at the site include Element by Westin (a Starwood Hotel brand), Hotel Indigo and Staybridge Suites (Intercontinental Hotel Group brands), and Hyatt Place and Hyatt Summerfield Suites.



*Conceptual rendering of the proposed convention center in Chicago, IL. The complex will include a parking garage, four levels of convention center space, and three towers housing five hotels (a total of 995 rooms).*

SEC-USCIS-P-0000750

### 3.2 BUILDING SPECIFICATIONS

The following table summarizes the specifications for the A Chicago Convention Center building, based on most current design plans. Exact square footage for each use may vary in practice.

| A Chicago Convention Center Project Specifications | | | | | | |
|---|---|---|---|---|---|---|
| | | Hotel | | Convention and Meeting Space | Food and Beverage | Parking |
| Building Element | Primary Tenant (hotel brand) | Suites | Rooms | (approximate building area in square feet) | | |
| Tower 1 | Starwood Element | 336 | | 102,000 | 19,000 | |
| Tower 2 | Hotel Indigo | | 209 | 94,000 | 17,700 | |
| | Staybridge | 154 | | | | |
| Tower 3 | Hyatt Place | 148 | | 94,000 | 18,300 | |
| | Summerfield Suites | 148 | | | | |
| Subtotal | | 786 | 209 | | | |
| Lower Level | Parking Structure | | | | | 591,000 (1,720 spaces) |
| | TOTALS | 995 | | 290,000 | 55,000 | 591,000 |

Conceptual renderings for the new development illustrate how the three hotel towers will be built

Conceptual renderings for the new development illustrate how the three hotel towers will be built on a common base. The lower floors will feature convention center space, amenities, and parking, while the upper floors will provide hotel rooms and suites in a variety of brand options to meet the needs of diverse guests at one location.



*Source:* A Chicago Convention Center, LLC

SEC-USCIS-P-0000751

The following sample floor plan (for the first floor) illustrates how one of the shared floors will be divided between hotel lobby and conference and meeting space and restaurants and amenties.



A sample floor plan for the upper levels shows how the towers will be divided into hotel rooms and suites.

Case: 1:13-cv-00982 Document #: 11-2 Filed: 02/06/13 Page 101 of 213 PageID #:1085



Intercontinental Regional Center Trust of Chicago — A Chicago Convention Center

SEC-USCIS-P-0000752

### 3.3    DESIGN FEATURES

The proposed "A Chicago Convention Center" will distinguish itself from the competition by a combination of environment-friendly construction and innovative service technology.

The Project will be designed to be the World's first Zero Carbon Emission Platinum LEED® accredited Allergen Free convention center hotel complex in the world. Achieving a Zero Carbon Platinum LEED® certification is not a simple task, but the Company believes that the additional labor and expense involved with obtaining this Zero Carbon Platinum LEED® status will be offset in the long term in two primary ways: the free media attention and public relations benefits that will allow the Company to spend less in marketing, and the energy cost savings in operating the building complex.

With regard to public relations, the media has paid significant attention to LEED-certified hotel openings in recent years. Internet-based travel agencies such as Expedia, Orbitz, and Travelocity have created Green Hotels and Eco-Tourism services. LEED certification will allow the Project to provide Gold Standard Foundation carbon emission credits to corporate guests and convention and conference attendees. Major corporations have begun to attempt to differentiate their brands and reputations by focusing on environmentally-friendly products and services. Recent surveys by trade associations such as the Partnership Travel Industry Association and online retailers like Yahoo revealed that nearly seventy percent (70%) of tourists are willing to pay extra in order to stay at environmentally-friendly lodgings.

Energy usage & conservation will be addressed in every aspect of the Project's structure, from zoning for heating and cooling to lighting systems, as well as the use of solar control glass to minimize heat load and maximize heat retention. The Company anticipates the savings in this area will directly benefit the Project's performance, adding an estimated 6% to 9% profitability to the net income of the Project complex. Sustainable site strategies include:

- 100% Green Roof - Heat Island Effect - with Water Features
- Saving the use of potable water by over 75% by rainwater collection and recycling
- Hydrogen Fuel Cell Plant--Generating 100% of the Project complex's energy
- 100% Geothermal Heating & Cooling Pump System with Loop Field
- Natural day lighting in all units is maximized to reduce the loads on electronic lighting
- Energy Efficient Control System -- the first room system to register all energy consumption

The Company believes the Project will rank among the most technologically-advanced convention centers and hotels in the world. The meeting spaces will be designed to be able to change their look, feel, and functionality at a moment's notice. Lighting, furniture, and meeting tools will be changeable to accommodate the various differing users of the spaces in assisting them in reaching the goals of special differentiation and flexibility. Key features includes:

SEC-USCIS-P-0000753

- "4G" internet service, with transmission speeds approaching 14 Terabits.
- Computer-controlled lighting, zoned for each space
- Computer-controlled sound-systems, with the ability to zone and regulate speakers
- Key card security that will permit a group to track and control access to their meeting space
- Biometric scanners for guest check-in
- First View Security's Digital Door Viewer™
- Control4® Suite Systems, a standards-based entertainment control technology platform
- My IC Phone™, a multimedia hub for the guestroom
- SmarthTouch™, an in-room touchscreen that provides guests with access to all hotel services

Please see Section 10.2 for additional details related to the proposed conference center design and Zero Carbon Platinum LEED® certification.

### 3.4 TENANTS

A Chicago Convention Center will provide space for five hotels, which will together offer a full range of price and amenity options to business and leisure travelers. Franchise agreements have been negotiated with brands believed by the Company to be strong in the upscale and upper-

upscale categories.  Four of the five brands are specifically positioned in the "all-suite and extended stay" segment of the hotel market.

### Element by Westin (Starwood Hotels)



First opened in 2006, Element by Westin, a brand of Starwood Worldwide, is a chain of environmentally conscious hotels. Each building is eco-friendly from the ground-up, with floors and carpets fashioned from recycled material, energy efficient lighting, Energy Star-rated appliances, and low-volatility paint. Silverware and glassware are used instead of wasteful plastic utensils and paper cups. Each room is standard-equipped with paper and glass recycling bins.  The studio, 1-bedroom, and 2-bedroom guest rooms are influenced by nature, promoting balance through flowing, multi-purpose spaces, allowing guests to customize the space to match their personal needs. There are seven Elements by Westin throughout the United States, including Denver, Las Vegas, Houston, and Dallas.

### Hotel Indigo (Intercontinental Hotel Group)

Hotel Indigo, an Intercontinental Hotel Group brand, combines the localized experience of an independent boutique hotel with the convenience and reliability of a chain. The retail-inspired design concepts will vary from hotel to hotel, not only depending on the neighborhood, but also depending on the time of year. The public spaces and

SEC-USCIS-P-0000754

the guest rooms are seasonally customized, and across all the senses, from the aromas and ambient music to the artwork and signage. Since 2004, Hotel Indigo has expanded to 37 properties in North America, Europe, and Asia, with 63 more in the pipeline.

 **Staybridge Suites (Intercontinental Hotel Group)**

The all-suite, "residential-style" extended stay brand of the International Hotel Group, Staybridge Suites is the fastest chain in its market class ever to have reached 100 locations. As of May 2011, there are 189 Staybridge locations in North America, South America, and across the globe, with another 99 already in the development process. It's no wonder: in 2009, Staybridge ranked highest in the extended stay segment by a JD Power and Associates survey. Its hotels are designed with the comforts of home in mind. They include such amenities as fitness centers, complimentary wireless, fully-equipped kitchens, an hospitable Great Room with fireplace, and "evening receptions" throughout the week.

 **Hyatt Place (Hyatt)**

Formerly Amerisuites, Hyatt Place is Hyatt's brand of mid-sized hotels intended for families and the 24/7 lifestyle of today's multi-tasking business

travelers. Meeting facilities are available, as well, for modestly-sized corporate conferences. There are over 160 locations across the United States located in urban, airport, and suburban areas. Signature features of Hyatt Place include a coffee and wine bar, 24-hour room service, and complimentary continental breakfast. The guestrooms feature contemporary decor and 42" high-definition flat-panel televisions. Wireless internet is complimentary at all locations.



### Hyatt Summerfield Suites (Hyatt)

Hyatt Summerfield Suites is an extended-stay brand of Hyatt, with 29 locations across the United States in urban, airport and suburban settings, with 4 more in the pipeline. Summerfield Suites provide the feel and flexibility of a modern residential condominium. Complimentary full breakfasts are offered every morning and evening socials are held every weekday evening. A Guest Market offers a variety of snacks, upscale frozen entrees and grocery items. Each location includes a fitness center, pool, and recreational area, as well as a barbecue and laundry facilities. All guest suites come equipped with free and secure high-speed internet access.

SEC-USCIS-P-0000755

## 3.5 LOCATION

A Chicago Convention Center will be constructed in Chicago, on a three-acre property off Highway I-90 near Chicago O'Hare International Airport in Chicago, Illinois. The location provides excellent exposure to I-90, also known as the Kennedy Expressway, with a daily traffic count of over 308,400 vehicles, and is situated right off the last exit on the highway prior to the airport terminals. The site is in a cluster of hotel development that has been long standing with older properties along Higgins Road to the West, along with River Road and Cumberland Road to the South and West Bryn Mawr to the west. The majority of these hotels are older properties, typically exceeding 20 years old, with varying degrees of need for constant refurbishment. The following map marks the proposed Convention Center location, at address 8201 W. Higgins, Chicago, Illinois.



**Subject Property Status**

The underlying property, approximately three acres in size, currently holds an older hotel building. The Project Company owns this property, having purchased the property in 2003. The existing hotel building will be demolished by the Project Company at the time of the Project's launch.

SEC-USCIS-P-0000756

## 4.0 PROJECT DEVELOPMENT SCHEDULE

Construction of the proposed convention center complex will be continuous over the course of two years, with three opening Dates to allow for immediate cash flow and stabilization.

The core structures for all towers will be built together so that 95% of construction disturbance will be finalized prior to opening of the conference center and the first hotel. The second and third towers will be completed and occupied in stepwise fashion in the following months.

Project Milestones Completed

The Chicago Convention Center project is shovel-ready as of July 2011.

- Entitlements for the project site are complete. The Project Company owns this property, having purchased it in 2003.
- Full zoning approvals have been obtained from the City of Chicago.
- Site studies for the subject property have been completed.
- Franchise agreements have been executed for the hotels to be opened in the newly constructed buildings.

Project Construction Schedule

A Chicago Convention Center project is currently shovel ready, and ground-breaking is tentatively scheduled to occur in the second quarter of 2012. Tower One is projected to open 18 months after the start of construction. At this point the core and shell of the remaining two structures will also be complete, thus 95% of the construction disturbance will be finalized prior to opening the Element by Westin Hotel in the first tower. Tower Two will open 3 months after Tower One. Tower Three will open 3 months after Tower Two. The construction schedule is summarized as follows.

| A Chicago Convention Center Construction Schedule | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Year 1 | | | | Year 2 | | | |
| | Q1 | Q2 | Q3 | Q4 | Q5 | Q6 | Q7 | Q8 |
| Tower 1 | | | | | | | | |
| Tower 2 | | | | | | | | |
| Tower 3 | | | | | | | | |

As illustrated by the chart, A Chicago Convention Center is expected to be open and operational two years following ground-breaking. The following page provides a detailed schedule of the construction process foreseen. Note that the exact dates may vary depending on the timing of EB-5 investment among other factors.

SEC-USCIS-P-0000757

| A Chicago Convention Center Development Schedule | | | |
|---|---|---|---|
| **MILESTONES** | | | |
| GC / CONSTRUCTION MANAGER | COMPLETED | | COMPLETED |
| ARCHITECT/ENGINEER | COMPLETED | | COMPLETED |
| GMP AGREED | COMPLETED | | COMPLETED |
| PERMITS ISSUED | 4 WEEKS | 4 1 12 | 5 1 12 |
| START CONSTRUCTION | | 5 10 12 | 6 6 14 |
| INITIAL OCCUPANCY | | 1 1 14 | 6 6 14 |
| SUBSTANTIAL COMPLETION | | 1 1 14 | 6 6 14 |
| **PRECONSTRUCTION** | | | |
| **DESIGN TASKS** | 10 WEEKS | 1 1 11 | 6 10 12 |
| **SCHEMATIC DESIGN** | | COMPLETED | |
| GENERAL SCHEMATIC DESIGN DRAWING | ..... | COMPLETED | |
| FACADE SD INFO | ..... | COMPLETED | |
| VERTICAL TRANSPORTATION SD INFO | ..... | COMPLETED | |
| **DESIGN DEVELOPMENT** | 4 WEEKS | 3/24/12 | 4/19/12 |
| GENERAL DESIGN DEVELOPMENT DOCU | ..... | COMPLETED | |
| FOUNDATION PACKAGE | ..... | | |
| STRUCTURAL PACKAGE | ..... | | |
| FACADE PACKAGE | ..... | | |
| VERTICAL TRANSPORTATION PACKAGE | ..... | | |
| MEP PACKAGE | ..... | | |
| **CONSTRUCTION DOCUMENTS** | 5 WEEKS | 4/19/12 | 6/13/12 |
| GENERAL CONSTRUCTION DOCUMENTS | .— | | |
| FOUNDATION/STRUCTURAL PACKAGE | ..... | | |
| MEP PACKAGE | ..... | | |
| FACADE/STOREFRONT PACKAGE | ..... | | |
| VERTICAL TRANSPORTATION PACKAGE | ..... | | |
| FINISHES PACKAGE | ..... | | |
| FOUNDATION PERMIT SET | ..... | | |
| BUILDING PERMIT SET | ..... | | |

| PERMITS | 4 WEEKS | 4/1/12 | 5/1/12 |
|---|---|---|---|
| FOUNDATION PERMIT | 1 WEEK | | |
| BUILDING PERMIT | | | |
| **PROGRAM TASKS** | ..... | COMPLETED | |
| PROGRAM IDENTIFIED | ..... | COMPLETED | |
| CIVIL/UTILITY REQUIREMENTS DEFINED | ..... | COMPLETED | |
| SITE SURVEY PRODUCED | ..... | COMPLETED | |
| PD/PRELIMINARY LANDSCAPING DEFINED | ..... | COMPLETED | |
| GEOTECHNICAL STUDY IMPLEMENTED | ..... | COMPLETED | |
| CONFIRM LEED REQUIREMENTS | ..... | COMPLETED | |
| CONFIRM CITY REQUIREMENTS | ..... | COMPLETED | |
| **PROCUREMENT** | **15 WEEKS** | **4/19/12** | **8/1/12** |
| FOUNDATIONS - BID/AWARD | 3 WEEKS | | |
| SUPERSTRUCTURE - BID/AWARD | 6 WEEKS | | |
| FAÇADE - BID/AWARD | 6 WEEKS | | |
| MEP SYSTEMS - BID/AWARD | 10 WEEKS | | |
| VERTICAL TRANSPORTATION - BID/AWARD | 4 WEEKS | | |
| FINISHES - BID/AWARD | 10 WEEKS | | |
| **DEMOLITION / SITE PREPARATION** | **6 WEEKS** | **5/10/12** | **6/24/12** |
| DEMOLISH EXISTING STRUCTURES | 4 WEEKS | 5/10/12 | 5/6/12 |
| SITE PREPARATION | 2 WEEKS | 5/1/12 | 6/24/12 |
| **CONSTRUCTION HOTELS & PARKING GARAGE** | **80 WEEKS** | **5/10/12** | **6/6/14** |
| FOUNDATIONS | 37 WEEKS | 5/10/12 | 1/1/13 |
| SUPERSTRUCTURE | 20 WEEKS | 12/15/12 | 5/15/13 |
| ENCLOSURE SYSTEMS | 20 WEEKS | 5/15/13 | 9/10/13 |
| VERTICAL TRANSPORTATION | 20 WEEKS | 5/15/13 | 9/10/13 |
| MEP SYSTEMS | 50 WEEKS | 4/28/13 | 3/15/14 |
| FINISHES | 50 WEEKS | 6/28/13 | 6/6/14 |
| LANDSCAPING / SITEWORK | 25 WEEKS | 1/10/13 | 6/6/14 |
| | **DURATION** | **START** | **FINISH** |

SEC-USCIS-P-0000758

# 5.0 PROJECT COSTS AND CAPITALIZATION

## 5.1 PROJECT DEVELOPMENT COSTS

It is projected that approximately $735 million, or $421/building square foot, will be required to fund the development of the proposed A Chicago Convention Center. Project costs are detailed as follows. Note that the total hard cost of $686,365,381 ($343,182,691/year for two years) is the input used to calculate the indirect and induced job creation impact of the construction phase.

| A CHICAGO CONVENTION CENTER | $/Key | $738,648 |
|---|---|---|
| Development Budget | $/SF | $421.30 |
| | *Total Project Costs* | |
| PARAMETER | Cost/GSF | Total |
| Building Area (gross square feet) | 1,744,510 SF | |
| Demolition | 0.70 | 1,217,567 |
| Sitework | 3.58 | 6,237,582 |
| Deep Excavation & Foundations | 47.06 | 82,091,334 |
| Structure | 53.01 | 92,476,708 |
| Roofing & Waterproofing | 13.36 | 23,306,633 |
| Landscaping & Green Roof | 4.70 | 8,193,426 |

| | | |
|---|---|---|
| Exterior Wall | 21.50 | 37,511,986 |
| Partitions & Finishes | 44.32 | 77,347,348 |
| Advanced Energy Generation Equipment | 51.95 | 90,626,636 |
| Signage | 4.27 | 7,454,776 |
| Vertical Transportation | 32.71 | 57,064,983 |
| Plumbing | 32.71 | 57,067,721 |
| HVAC | 41.92 | 73,136,453 |
| Fire Protection | 10.66 | 18,588,309 |
| Electrical | 28.04 | 48,922,497 |
| Special Systems | 2.95 | 5,151,322 |
| **Total Hard Costs** | **$ 393.44** | **$ 686,365,381** |
| FF&E / IT | 17.20 | 29,997,889 |
| Design & Engineering | 1.00 | 1,744,510 |
| Legal & Accounting | 0.14 | 240,000 |
| Pre-Opening Marketing Budget | 0.57 | 1,000,000 |
| 24-Month Capitalization Interest Fund | 5.79 | 10,107,391 |
| Lender & Underwriter Closing Fee | 3.15 | 5,500,000 |
| **Total Soft Costs** | **$ 27.85** | **$ 48,589,790** |
| **Total Project Development Budget** | **$ 421.30** | **$ 734,955,171** |

SEC-USCIS-P-0000759

| AGGREGATE PROJECT COSTS<br>A Chicago Convention Center | |
|---|---|
| 1   Total Project Development Costs | $734,955,171 |
| 2   Developer Equity (Land Valuation) | $177,547,465 |
|      TOTAL | $912,502,636 |

1. **Project Development Costs** include construction hard and soft costs as detailed in the table above.

2. **Land Valuation:** The Project Company owns this property, having purchased it in 2003. The contribution of the property will constitute a portion of the Project Company's own direct investment in the overall Project. The property recently has been separately appraised by both TR Mandigo & Co. and Integra Realty Resources at $177,547,465. Integra Realty Resources is an independent industry leader, with over 650 skilled employees focused on commercial real estate valuation, appraisal, and counseling services.

## 5.2   PROJECT CAPITALIZATION

The proposed convention center will be fully capitalized through a combination of EB-5 investment and construction loans or other domestic sources.

| CAPITALIZATION OVERVIEW | |
|---|---|
| **Convention Center with Five Hotels in Chicago, IL** | |
| **Source** | **Amount** |
| 1 EB-5 investment | $249,500,000 |
| 2 Developer's direct investment | $177,547,465 |
| 3 Government financing | $485,455,171 |
| • Bond financing: $339,818,621 | |
| • Loans generated from federal & state tax credits: $48,496,970 | |
| • Federal, state, and municipal grants: $97,139,580 | |
| **TOTAL** | **$912,502,636** |

NOTES

1. **EB-5 investment** will be raised from up to 499 EB-5 investors. The project will generate a total of 8,495 permanent new jobs, according to economic analysis by Evans, Carroll and Associates, which would translate into 17 jobs per EB-5 investor.

2. **Developer's direct investment** reflects the developer's contribution of the subject property land, currently appraised at $177,547,465.

Intercontinental Regional Center Trust of Chicago — A Chicago Convention Center

SEC-USCIS-P-0000760

3. **Financing based on government assistance** is expected to include bond financing, loans generated from tax credits, and grants. The first loan source, consisting of the Bond financing is expected to be in the principal amount of $339,818,621. The Bonds are anticipated to have a term of 30 years, with an interest rate estimated to be between 2.9% and 3.3% annually. The second loan source, in the form of tax credit financing, is expected to be in the principal amount of $48,496,970, also with a term of 30 years, and an interest rate estimated to be between 1.5% and 2.5% annually. Further, the Project's attorneys and consultants have filed an application for, and following numerous in-depth discussions with the relevant government departments, the Company's management strongly anticipates the Project will qualify for, an award of $97,139,580 in federal, state, and municipal grants. Therefore, the Company believes it will secure a total of $485,455,171 in funding from, collectively, federal, state, and municipal government sources.

**Government Bond and Tax Credit Financing Detail**

a. The Project has been qualified for energy efficiency "Green" bonds ("Bonds") issued by the State of Illinois Finance Authority pursuant to an Illinois program supporting renewable energy projects undertaken within the State. The structure, covenants, and terms of the Bonds are expected to be determined by Loop Capital Markets (a company owned by Albert R. Grace, and a consultant to the Project as described in "Management, Advisors, and Consultants Biographies and Interrelations," above) in consultation with both the Project Company and the State of Illinois as to the terms mutually acceptable to all parties based on market

conditions at the time of the arrangement and the sale or placement. Based upon the currently contemplated structure, the Bonds would be secured by a first position lien on the Project Company's assets, including the Project property, and by the "moral obligation" of the State of Illinois. It is envisioned that the Bonds will be tax-exempt at the state level, and have a maturity between 20 and 30 years, depending on the appetite of the market at the time of issuance. A "moral obligation" bond not only gives investors the state tax exemption benefits inherent in a municipal bond, but also provides an additional moral pledge of commitment by the State against default. The issuing body's commitment is supported by a reserve fund established to meet any debt service costs that the state government may be unable to make.

b. Furthermore, the Company believes that the Project would also qualify for additional federal, state and city financing programs. Pursuant to the Energy Improvement and Extension Act of 2008, later amended by the American Recovery and Reinvestment Act of 2009, the United States Congress authorized up to $3.2 billion for Qualified Energy Conservation Bonds ("QECBs"). Up to 30% of the total $3.2 billion allocation may be issued to a non-state, municipality, or tribal government as "private activity bonds." On July 12, 2010, the State of Illinois enacted a law authorizing the aggregation of unused volume under several

SEC-USCIS-P-0000761

federal bond initiatives, including the QECB program, that were originally allotted to Illinois counties and cities, and the application of that volume towards qualified private projects. The State's goal is to make sure that it takes full advantage of these federal resources. The State of Illinois is expected serve as a conduit between the federal government and the Project Company to issue the QECB bonds, subject to the 30% volume cap.

c. In addition, the State of Illinois issues tax-exempt "Industrial Revenue Bonds" and "Energy Industrial Revenue Bonds" on behalf of manufacturing companies located in the State to finance the acquisition of fixed assets such as land, buildings, and equipment. Bond proceeds also may be used for either new construction or renovation. The Company believes it would be eligible to take advantage of these bond funds, as well as various other bond programs offered by the federal and state governments.

d. In addition, because the Project is located in an Illinois Empowerment Zone, the State of Illinois also provides numerous tax incentives that the Company and the Project expect to utilize. In summary, these incentives are expected to include:

- Investment Tax Credit – The Company expects to be entitled to a 0.5% credit against the state's income tax for its investment in an enterprise zone property, which can be carried forward for up to five years;
- Sales Tax Deduction – Retailers, from whom the Project Company expects to buy building materials, may deduct the state's sales tax from the overall

buy building materials, may deduct the state's sales tax from the overall purchase price, when the materials are to be incorporated into a property located in an enterprise zone (such as the Project).

- EZ Manufacturing Machinery and Equipment Sales Tax Exemption – As a result of investing at least $5 million and creating at least 200 jobs, the Project Company expects to be entitled to a 6.25% state sales tax exemption on all personal property which is used or consumed within an enterprise zone in the process of manufacturing or assembly of personal property for wholesale or retail sale, or lease. Utility Tax Exemption - As a result of investing at least $5 million and creating at least 200 jobs, the Project Company expects to be entitled to a 5% state tax exemption on gas and electricity, to an exemption from the Illinois Commission 1% administrative charge, and from excise taxes related to telecommunications.

- Jobs Tax Credit – The Project Company believes it will be eligible for a tax credit of $500 for every employee it hires who is certified as an economically disadvantaged or dislocated worker, which can be carried forward for up to five years.

- Property Tax Incentives – The Project Company expects to receive a tax abatement from the Cook county clerk, with respect to the new improvements to be constructed on the enterprise zone property.

SEC-USCIS-P-0000762

- Dividend Deduction – Because the Project Company conducts substantially all of its operations in an enterprise zone, the Company believes it will be able to deduct from its taxable income all of the dividends paid to it by the Project Company.

It is believed that all necessary capital will be raised to fund the Project. It is possible, however, that the Project Company will fail to raise the additional capital, or that the proceeds from the EB-5 offering, plus the additional capital raised via the tax-exempt Bonds and government grants, will be inadequate to satisfy all of the Project's capital requirements, or that such financing may not untimely be procured, requiring the Project Company to obtain alternative financing, including short- and long-term debt financing, or equity financing, in addition to the EB-5 investment, the government bonds, the government grants, and the tax incentives.

SEC-USCIS-P-0000763

## 6.0 JOB CREATION

### 6.1 ECONOMIC ANALYSIS

The economic impact of the proposed project was analyzed by Dr. Michael Evans of Evans, Carroll & Associates, Inc. in his report "Economic Impact of Development of a Hotel and Convention Center Complex Near Chicago O'Hare International Airport in Chicago, IL, as Part of an Existing EB-5 Regional Center" (June 6, 2011). The results of this analysis are summarized as follows (quoted from pages 3-4 of the report):

---

### 1. Executive Summary

• The developer of the project will be "A Chicago Convention Center, LLC", which will build a hotel and convention center complex near Chicago O'Hare International Airport in Chicago, Illinois, at 8201 W. Higgins Rd. Chicago, IL 60631. This report analyzes the economic impact of the construction of the project and the economic activity from the hotel, restaurants, convention center, and parking garage.

• All economic impact calculations in this report are based on the RIMS II final demand multipliers for Cook, Lake, Will, and DuPage counties in Illinois and Lake County in Indiana.

• Total construction costs, according to the developer, will be $343,182,691 per year for two

---

years. The RIMS II final demand multiplier for construction for this area is 17.49, so that activity would create a total of 6,000 new jobs: a direct jobs figure counted 2,753 average even though the construction period is expected to last at least two years, we have taken a conservative approach and counted only the indirect and induced employment, which totals 3,247 jobs.

• The estimated revenues generated by this project in the first full year of operation have been supplied by the developer's market feasibility research report. These figures show $96 million in revenues from hotel room rates, $117.3 million in food and beverage revenues, and $10 million in other hotel revenues. The food and beverage revenues are further subdivided as follows: $25.6 million is food served to hotel patrons, $41.25 million is food served in the restaurant, and $50.48 million is food served at the convention center. These are treated differently because they all have different final demand multipliers. Also, the convention center generates about $20 million in revenues, and parking garage revenues generate $20 million.

• **Thus the total project, including indirect and induced jobs form construction, and all jobs from hotel, restaurant, convention center, and parking garage operations, will generate a total of 8,495 permanent new jobs. These figures are summarized in Table A.**

SEC-USCIS-P-0000764

## 2. Tabulation of Principal Results

The actual results for the final demand multipliers for each project are summarized in Table A. The employment multipliers exclude the direct jobs as we have taken a conservative approach and counted only the indirect and induced effects from construction employment. However, direct, indirect, and induced jobs are counted for hotel, restaurant, convention center, and parking garage operations. All figures in Table A represent permanent new jobs created.

| Table A. Summary of Employment Effects for Construction and Operations of Hotel and Convention Center Complex | | | | |
|---|---|---|---|---|
| Activity | Expenditure/ Revenue ($ millions) | RIMS II Final Demand Multiplier | Number of Total New Jobs | NAICS Code |
| Construction * | 343 | 9.468 | 3,247.6 | 236 |
| Hotel | 128 | 18.692 | 2,392.6 | 721 |
| Restaurant | 41.25 | 30.181 | 1,245.0 | 722 |
| Convention Center | 70.48 | 18.710 | 1,318.7 | 5619 |
| Parking Garage | 20 | 14.575 | 291.5 | 8129 |



| Total | 602.73 | 8,495.4 |
|---|---|---|

All calculations based on
unrounded numbers
* indirect and induced jobs only

## 6.2 ECONOMIC MODEL INPUTS AND VERIFIABLE DETAIL

The job creation analysis, as summarized above, uses expenditure and revenue projections as inputs to the RIMS II model. These projections, listed in Table A of the economic analysis, are taken from Section 5.1 "Project Development Costs" and Section 10.4 "Operating Income Projections" in this business plan. The figures in this business plan are projections provided by and based on the experience of the project developers and supported by an independent market research feasibility report by TR Mandigo & Co.. Because the project has not yet been developed and job creation has not yet occurred, actual expenditure and revenue data cannot yet be verified. Actual costs and revenue will be verified through audited financial statements at the I-829 stage as the basis for verifying job creation.

SEC-USCIS-P-0000765

# 7.0  MARKET PROFILE

## 7.1  NEIGHBORHOOD PROFILE AND LOCATION ADVANTAGES

"A Chicago Convention Center" will be constructed in Chicago, Illinois, on a three-acre property off Highway I-90 near Chicago O'Hare International Airport. This particular site has been familiar to millions of travelers en route to O'Hare Airport during the past 5 decades. It is accessed via the first exit with lodging facilities approaching O'Hare, and the last exit prior to accessing a network of expressways west (Interstate I-90 to Rockford), and north- and south-bound (Interstate I-294). Conversely, this makes the site the last exit for lodging choices prior to reaching Downtown Chicago. According to the Illinois Department of Transportation, in 2009, the annualized traffic count for Interstate I-90 (The Kennedy Expressway) was 308,400 vehicles per day, with Higgins Road posting 23,500 daily.[1]

The site location is also within close proximity (0.20 miles) to the Cumberland Blue Line train stop. The Blue Line is a long trunk line of the Chicago Transit Authority's rapid transit system which extends from the Chicago O'Hare International Airport terminal, through the City of Chicago (and in/around the Chicago Loop/CBD), all the way towards the western suburb of Forest Park. The close proximity of the Cumberland stop enables hotel guests to utilize rapid transit to reach their destination (in most cases, the airport if departing, or the City of Chicago if arriving) without the need for arranging for a rental vehicle. The Project intends to further take

An additional advantage of proximity to the Blue Line is the Project property's access to the metropolitan area employment base for hiring and staffing of the businesses operating as the Project. Convenience and low costs of commuting to and from the Project property is expected to give the facility an advantage in recruiting and retaining high quality employees to meet the service standards of the Project complex.

The visibility of the Project should be exceptional, with the triple high rise structure presenting variations on the design theme across the width of the Project, presenting a unique streetscape profile that provides for enhanced identification of the brands represented at the site. With an expected annualized traffic count of at least 2009's 308,400 vehicles travelling daily along The Kennedy Expressway (I-90), the Digital LED Billboards situated atop the Project complex will entice additional demand for all revenue streams of the complex.

Access to the Project property is simple, especially given hotel parking integrated into the facility – with guests able to simply turn off Higgins Road directly into the property's automated parking structure or valet area.   To reach the site location, guests arriving from the O'Hare

---

[1] Illinois Department of Transportation http://www.gettingaroundillinois.com/default.htm

SEC-USCIS-P-0000766

Airport exit the expressway onto Higgins Road at the Cumberland Avenue exit and turn directly into the Project property. Guests traveling from Chicago via I-90 towards O'Hare take the 79B exit, just past "A Chicago Convention Center," turning right onto Higgins Road and entering the Project property a short distance from the interchange.

The Project property is expected to also serve as an "overflow" facility when commercial activities, events, and special occasions fill other downtown and suburban hotels. The Project's central location and key positioning on the confluence of the interstate system providing easy access should encourage the capture of much of this overflow business as it is the closest hotel market to downtown Chicago.

## 7.2  DEMAND DRIVERS

Management believes that its particular location will allow the Project to capture demand not only from the Chicago O'Hare International Airport, but also surrounding commercial demand from the various office parks located near the site location. The area east of O'Hare features an abundance of office parks and complexes, peppering the area surrounding the site location. These include the Cumberland Metro Office Park, located less than a mile from the subject property, and the O'Hare Lake Office Park located 2 miles from the Project property – both with easy access to the Project complex.  Major corporations with offices near the Project property

include US Cellular, Bally Total Fitness Holding Corporation, Alcan Global Pharmaceutical Packaging, John Robert Powers Modeling, and Anheuser-Busch Company. Given the Project property's anticipated Zero Carbon Platinum LEED® certification Allergen Free, any area business with a corporate policy that prioritizes green lodging should be favorably inclined to utilize the Project complex. Furthermore, the surrounding office parks and complexes also generate enhanced potential for a local consumer base to develop for the non-hotel businesses located within the Project's facility, such as the spa, yoga studio, bar/lounge area, and the automatic robotic parking structure. Local patrons may also frequent the glass walk atrium roof floor of the convention center.

The Chicago O'Hare International Airport itself is expected to increase airport operations by 60% by 2013, based on the anticipated completion of the currently ongoing $15 billion Chicago O'Hare Airport Modernization Expansion plan. In 2008, the airport handled 881,000 flights, representing an average of 2,409 flights per day, and 70 million passengers. When the Chicago O'Hare Airport Modernization Expansion reaches its full capacity in 2013, traffic is projected to increase by sixty percent (60%) to over 3,800 flights and 110 million passengers per year. The opportune timing is strategic for new hotel developments such as the Project.

SEC-USCIS-P-0000767

## 8.0 FEASIBILITY ANALYSIS

A detailed feasibility study for the proposed A Chicago Convention Center project has been prepared by TR Mandigo & Company, a hotel consulting firm specializing in market feasibility studies, impact analysis, litigation support, asset management, financial analysis, and acquisition due-diligence for hotels, resorts, and F&B operations.

This study is provided as an appendix under the title: "Summary Report on Market Research to Determine the Potential Market for the Proposed Construction of a Chicago Convention Center Zero Carbon Emission Platinum LEED® Convention Center Hotel Complex -- Staybridge Suites, Hotel Indigo, Element by Westin, and Hyatt Place and Hyatt Summerfield Suites -- in Chicago Near O'Hare International Airport" (Market research conducted during February, August, September 2008, May 2009, and January 2011)

The following are highlights drawn from the TR Mandigo & Company report:

> The Project site is in a cluster of hotel developments that has been long standing, with primarily older properties along Higgins Road to the west, and along River Road, Cumberland Road, and West Bryn Mawr to the South. Competing hotels clustered near the area of the Airport proper are estimated to derive roughly 50% of their demand from local businesses and conference activity, and not directly from air travelers. The majority

of these hotels are older properties, typically exceeding 20 years old, with varying degrees of need for constant refurbishment. The Company does not believe that these properties will be able to compete with the Project's technological advantages and amenities. Furthermore, several of these properties, such as the InterContinental Hotel, are located too far south from I-90 to provide easy access to both airport and commercial travelers, while other properties that cluster around the Donald E. Stevens Convention Center are located 2 miles south, in a concentration of office and commercial development along Mannheim Road, North River Road, and along the I-90 corridor, all of which provide access but at longer travel times to both airport and commercial travelers.

The analysis by TR Mandigo and Company of the volume of traffic versus the demand accommodated at the existing O'Hare Airport properties indicates that the hotels in the area "capture" only 7% to 10% of the total traffic now served by the Airport. The expansion of the Airport, including new runways and ground control facilities together with ongoing construction to further improve aircraft movement at the Airport, have resulted in a lifting of flight limits during peak periods that were previously imposed to reduce delays and improve on-time performance. The lifting of these caps permits additional air traffic, with a resulting anticipated increase in passenger traffic, as current economic conditions improve. Increasing the capture to 10% to 15% of this traffic,

SEC-USCIS-P-0000768

together with the increase in aircraft movement, would potentially provide demand for increases in room supply of 20% to 25%, or growth of 6,000 additional rooms over the next five to seven years in addition to those supplied upon the Project's completion.

In 2011, current airport passenger demand in the Chicago O'Hare upper-upscale hotel market sustains an occupancy level of 77.1% with the average room rate of $186, and from the completion of Chicago O'Hare Airport expansion in 2013, the increased demand from the passenger traffic forecast for the upper-upscale hotel occupancy to increase to 86.5% with the average room rate of $222 in 2014.

The chart below indicates historical and projected market performance for the O'Hare area lodging market.



## O'Hare Market Projections: Supply and Demand



*Source: Smith Travel Research, Projections: TR Mandigo & Company.*

The Project will be located in the O'Hare International Airport submarket of the Chicago metropolitan area. This upscale and upper-upscale submarket of the city presently includes 12,614 rooms in 49 properties serving the Airport and commercial developments throughout the area.

During the past year, along with the overall hotel market, performance numbers in area properties declined, exacerbated by aircraft operating caps imposed by the United States Federal Aviation Administration to improve on-time performance and limit congestion and traffic hazards at O'Hare, dropping it from the busiest airport in the U.S. to second place behind Atlanta, Georgia. With the completion of the Airport improvements

SEC-USCIS-P-0000769

discussed above, these caps are being lifted to permit expansion of service and deployment of new and more efficient aircraft to serve the Chicago market area. As a result, Chicago O'Hare International Airport is expected to regain its position as the busiest passenger traffic airport in the world.

The Airport area reflected the same declines in occupancy, with moderate decreases in Average Daily Rate during the recessionary period. Among sub-markets, the Airport area experienced less dramatic rate discounting than the city's central business district and surrounding suburban areas, reporting an ADR still above $141 for the total sub-market (upper-upscale, upscale, mid-scale, and economy) with its mix of vintage, established chains and new construction properties. For the first six months of 2010, the occupancy improved by 18.7 percent over the same period of 2009, according to *Smith Travel Research, Projections: TR Mandigo & Company.*

Reviewing the history of performance of O'Hare area properties during the last recessionary period (2001 to 2004), the area market exhibited strong resiliency, quickly recapturing demand and exceeding the performance of the downtown Chicago market through that prior recession's recovery period. With the current completing expansion of Chicago O'Hare International Airport, new commercial development along the Tri-State Corridor, and the stronger office market performance in the area, management expects the area sub-market to not only follow, but to exceed, this same historic pattern of recovery.

The 2008-2009 recovery period for the Chicago metro area and the O'Hare market area is forecast to continue through 2011, with "A Chicago Convention Center" Project entering the market after the recovery period, including absorption of the newest developments in the market.

For detailed analysis and citations please refer to the original TR Mandigo & Company report included with this application.

SEC-USCIS-P-0000770

## 9.0  ADVANTAGES FOR EB-5 INVESTORS

**Financial Advantages**

- The Government Loans are collectively at a very low interest rate, anticipated to be in a range of 2.90% - 3.30%.
- Use of Aggressive Depreciation, given the Zero Carbon Platinum LEED certification.
- The cost of utilities has been lowered by 80% - 90% due to the Zero Carbon emission engineering design.
- Payroll efficiencies are achieved as only one executive level team is required to manage all 5 hotels and convention center.
- Government Financial Incentive of freezing the project's Real Estate Property Tax at the current base amount of $123,000 per year for the next 23 years. This is a yearly savings of $14.50 million per year.
- Enterprise Zone/HIB (High Impact Business) Incentives such:
  - o Sales Tax exemption on Utilities.
  - o No State Tax on Dividend Income.
  - o No State Tax on interest received from Loans.
- Breakeven occupancy level below 42%.
- The synergetic advantages allow the property to outperform its competitors in the marketplace and resulting in higher occupancy, ADR (average daily room rate), RevPar

marketplace and resulting in higher occupancy, ADR (average daily room rate), RevPar (revenue per available room), profit and valuation.
- Based on studies performed by Government accredited feasibility experts and appraisal, the project stabilizes in 2017 with a conservative value greater than $1.19 billion dollars.

## Marketing

- Being the first Zero Carbon Convention Center Hotel Complex in the world, the project will receive millions of dollars in free advertising. This allows for a very strong pre-sale and therefore financially stabilizing at opening with above average market penetration.
- Additional demand will be created at the Chicago O'Hare International Airport Modernization Expansion completion in 2013. The project will open in a rising market, positioned to take advantage of the recovering demand.
- Combining five major hotel brands in one location will allow attracting a wide clientele.

## EB-5 Advantages

- Project is expected to generate a significant number of new jobs.
- The borrower has experience in creating and reporting jobs.
- The project is situated within a targeted employment area so conditional and permanent residency can be pursued with an investment of $500,000.

SEC-USCIS-P-0000771

- The proceeds from the EB-5 capital will be invested alongside funding by government entities.
- The Developer has contingency equity and financing available to support any shortfall of capital from either Government financing or EB-5 investors.
- Our economic study indicates that our job creation will exceed the I-829 requirements by 70%, equating to over 17 jobs per EB-5 investor.
- The investor receives equity in the project.

**Security of Investment**

- Investors are secured by equity and debt rights to the land, all hotels and convention center.
- Certified appraisals prepared by government certified experts project value of $1.19 billion upon stabilization in 2017.
- Certified appraisals prepared by government certified experts project an "as built" land value of $690 million.

SEC-USCIS-P-0000772

## 10.0 APPENDICES

### 10.1 ADVISOR AND CONSULTANT PROFILES

**Loop Capital Market, LLC** / Albert "Al" R. Grace Jr.

**Loop Capital**

Mr. Albert "Al" R. Grace, Jr., will be providing financial expertise regarding the structuring and implementation of the Company's contemplated government and commercial bond issuances. Mr. Grace has over 30 years of experience in the capital markets, money management, and law. Prior to the formation of Loop Capital Markets, he was Vice President at the Northern Trust Company and a legal counsel specializing in securities and commodities law. Mr. Grace serves on the boards of Chicago Communities in the Schools, Chicago United, and the University of Wisconsin, La Crosse Foundation. He is also a member of the Securities Industry Association's National Institutional Brokerage Committee. Loop Capital Market, LLC, an Illinois limited liability company, provides a broad range of integrated capital solutions for corporate, governmental, and institutional entities. Since its founding in 1997, Loop Capital has produced uninterrupted growth in each of its three wholly-owned businesses.

**MJL** CONSULTING SERVICES    Mr. Anjan Chatterji  MBA, JD, LLM

Mr. Chatterji, though his company, MJL Consulting Services, LLC, an Illinois limited liability company, will provide transactional and structuring services. Mr. Anjan Chatterji's professional and academic experience has been focused on transactional advisory and restructuring services ranging across various industries, including finance, real estate, bio-technology, and manufacturing. Over the course of his career, Mr. Chatterji has advised multinational private equity and hedge fund clients on transactions involving global organizational restructuring, efficient tax and transfer pricing planning, valuations, cash-flow modeling, and capital sourcing. Mr. Chatterji has also worked, with the Washington offices of his previous employers, in conjunction with the United States Treasury Department. Mr. Chatterji conducts research with the University of Chicago in broad-ranging areas of law and economics, Antitrust & Competition, Public Finance, and Tax Regulations.

**TR Mandigo & Company**
Over 35 Years of Hospitality Experience
**TR Mandigo & Company** / Mr. Theodore R. Mandigo

Mr. Mandigo, though his company, TR Mandigo & Company, Inc., will be providing hospitality advisory services. Mr. Theodore Mandigo is a 38-year veteran of hospitality consulting, with projects in new development feasibility, acquisitions, operational analysis, and expert witness work. He has been responsible for over 1,500 market studies over his career, beginning with the Chicago Ritz-Carlton Hotel in 1972. Mr. Mandigo is a licensed Certified Public Accountant and

SEC-USCIS-P-0000773

served as president of the Illinois CPA Society in 1999 and 2000. He is also a member of the national council of the AICPA. Mr. Mandigo is a founding member of the International Society of Hospitality Consultants, starting with correspondence and an organizational meeting in 1988. He is a frequent speaker and panelist at industry conferences including service on the advisory panel of the New York Hospitality Investment Conference, and speaker at the Illinois Mortgage Bankers Association and the American Institute of Real Estate Appraisers.

Schain Burney
Banks & Kenny

**Schain, Burney, Banks & Kenny, Ltd.**

The law firm of Schain, Burney, Banks & Kenny, Ltd. (SBBK), an Illinois law corporation, will be providing legal counsel in the areas of real estate development law. A number of the founding partners of SBBK have practiced together for over 30 years in the areas of government relations, zoning, land use, and municipal law. The formation of SBBK brings together attorneys with additional expertise in the areas of commercial litigation, business law, state and local sales tax, real estate taxation, real estate law, condemnation, loan documentation, work-outs, environmental law, and renewable energy. With extensive experience successfully representing clients in both the private and public sectors, the attorneys of Schain, Burney, Banks & Kenny bring an in-depth understanding of both government and business perspectives, with a proven history of providing quality representation that meets its clients' strategic objectives.

**Torrence Capital Advisors Pvt. Ltd.**

Torrence Capital Advisors Private Limited Pvt. Ltd. ("Torrence"), a private limited company organized and existing under the laws of India, will be serving as the investment bankers to the Company. Torrence is a global investment banking firm that provides strategic advisory, financial advisory, and capital-raising services to corporations, partnerships, and institutions. Torrence combines superior execution capabilities, meticulous research, rich transaction experience, and a network of global partnerships to help its clients close a variety of strategic and financial transactions. Founded in 2010, Torrence has already signed mandates to raise funds in the amount of over $2 Billion, both via equity and debt routes, for business in India and abroad in varied industries. Torrence's focused business model allows it to dedicate the necessary senior-level attention to clients. The Torrence management team has about 100 years of combined experience, and fully understands the complexities of the Indian financial sector.

## ■ NANGIA & CO.
*Chartered Accountants*

**Nangia & Co.**

Nangia & Co. Chartered Accountants, Pvt. Ltd. (NCCA), a private limited company organized and existing under the laws of India, will be providing the Company with certified public accounting services. NCCA was founded in 1984 by Mr. Rakesh Nangia.

SEC-USCIS-P-0000774

The firm has grown to today's multi-city presence, world-wide client base, and a huge family of professional and staff support. The firm today is one of the largest Indian accountancy firms in the oil & gas industry, known for delivering consistently for its clients, where it matters. NCCA believes its highly talented pool of personnel today is the heart of the firm's strength. NCCA provides diverse professional services, and pursues a multi-disciplinary practice. The firm offers real-world solutions to the complex business matters of its clients. Over the years, the firm has gained significant experience in working for a number of multinational clients, as well as for several reputable Indian clients. This includes both privately- as well as publicly-held businesses.

### Carolyn Grisko & Associates Inc.

Carolyn Grisko & Associates Inc. (CG&A), an Illinois corporation, will be providing public relations and marketing services to the Company and the Project. CG&A is a strategic communications firm that provides public relations, public affairs, and marketing services. CG&A helps its clients achieve their goals by delivering targeted messages through media, grassroots, or marketing campaigns. Its clients run the gamut from Fortune 500 corporations, to government agencies and nonprofit organizations. CG&A has been consistently recognized in local and national awards for its creativity, innovation, and success. Carolyn Grisko, the firm's president, founded the firm in 1995 after a fifteen-year career in broadcast journalism and six years as an aide to Chicago Mayor Richard M. Daley. Ms. Grisko is co-chair of the Chicago committee of Human Rights Watch, a Leadership Greater Chicago fellow, and is active in IPREX, a public relations corporation made up of leading independent

**Evans, Carroll & Associates, Inc.**

Dr. Evans is the Chairman of Evans, Carroll & Associates (formerly Evans Economics), which has been providing economic forecasting and consulting to clients since 1981. The firm, based in Boca Raton, Florida, specializes in economic analysis for EB-5 programs, economic impact studies of development projects and new construction, models of state and local tax receipts, impact of current and proposed government legislation, and construction of econometric models for individual industries and companies. As Chief Economist for the American Economics Group from 2000 to the present, Dr. Evans has also built a comprehensive state modeling system that provides economic analysis for a variety of consulting projects. Previously Dr. Evans was founder and president of Chase Econometric Associates (1970-1980), and served as Clinical Professor of Economics at Kellogg Graduate School of Management, Northwestern University (1996-99) and Assistant and Associate Professor of Economics, Wharton School, University of Pennsylvania (1964- 69). Dr. Evans holds a Ph. D. in Economics from Brown University.

SEC-USCIS-P-0000775

## 10.2 A CHICAGO CONVENTION CENTER DESIGN DETAIL

### THE ENVIRONMENTAL ADVANTAGE

The proposed "A Chicago Convention Center" is designed to be the World's first Zero Carbon Emission Platinum LEED® accredited Allergen Free convention center hotel complex in the world. This certification requires compliance with the highest standards of green building initiatives. For a description of the LEED® certification process, see "LEED Certification" below. The Company believes that the additional labor and expense involved with obtaining this Zero Carbon Platinum LEED® status will be more than offset in the long term in two primary ways: (i) the free media attention and public relations benefits that will allow the Company to spend less in marketing, and (ii) the energy cost savings in operating the building complex.

As of April of 2009, there were 18 LEED-certified hotels worldwide. Along with increasing global awareness of environmental issues, the media has paid significant attention to LEED-certified hotel openings in recent years. Additionally, internet-based travel agencies such as Expedia, Orbitz, and Travelocity have created Green Hotels and Eco-Tourism services to help environmentally conscious travelers find hotels that align with their preferences. The resulting marketing benefits for LEED-certified hotels are substantial. For instance, Yuan-Sing Chang, Vice President of Atman Hospitality Group, Inc., in charge of the green development wing for the Gaia Napa Valley—the first LEED® Gold hotel—calculated that the Gaia received over $2 million in free advertising as a result of the numerous articles about the hotel and his company in

the media.[2]

Another marketing advantage from LEED certification that the Project will enjoy is the ability to be the World's first convention center hotel complex to provide Gold Standard Foundation carbon emission credits to corporate guests and convention and conference attendees. The Gold Standard Foundation is a non-profit organization under Swiss law that operates a certification procedure for premium carbon credits. The Gold Standard Foundation registers projects that reduce greenhouse gas emissions in ways that contribute to sustainable development, and certifies their carbon credits for sale on both compliance offset markets established by the Kyoto Protocol, and in non-Kyoto voluntary offset markets. The Foundation maintains that projects that are registered with the Gold Standard have undergone a strict technical scrutiny which assures high quality and low risk, yet the procedures involved are relatively simple. Consequently, the Foundations and the Company's management believe that Gold Standard certified credits are preferred by a range of government and private actors. Additionally, private sector firms that make certain commitments to the Foundation that further the Gold Standard mission can list their company profile in the Foundation's website, and, under specified conditions, can also acquire the right to display the Gold Standard logo.

---

[2] "LEED Certification for Hotels, Part I," by P. Ling, Uptake, October 28, 2008.
http://www.uptake.com/blog/travel_industry/leed-certification-hotels_719.html

SEC-USCIS-P-0000776

The Company believes that while all other convention centers and hotels must buy credits to offset their carbon emissions, guests utilizing the Project facility can receive credits, as absolutely no emissions whatsoever will be emitted by the Project complex. These credits will be available as a result of the Company's commitment to the Gold Standard Foundation's mission evidenced by the Project's utilizing green-focused alternative energy sources, sustainable products and processes, and environmental conservation. Energy usage and conservation will be addressed in every aspect of the Project's structure, from zoning for heating and cooling to lighting systems, as well as the use of solar control glass to minimize heat load and maximize heat retention.

The Company also expects its commitment to environmental programs to provide a distinctive degree of difference for meeting and event planners and other persons desiring to submit bids to hold conventions, conferences, and other events at the Project. Major corporations have begun to attempt to differentiate their brands and reputations by focusing on environmentally-friendly products and services. The first Question (check-box) section on all Request for Proposals ("RFPs" or bid) forms for larger group meetings is the section on "Green Initiative" (which the Project will vastly exceed). The Company intends to take advantage of this trend in its marketing and promotional materials. The Company's management not only expects its corporate customers to recognize the inherent "Green" benefits the Project provides, it also believes that corporate customers will prefer to patronize the Project's facilities in order to promote an "environmentally-conscious" image internally to its employees, and externally to its customers. Incorporated into the Project's environmental technology will be an "exhibit center"

presenting to the public the development and ongoing operating programs within the Project complex, along with demonstrating monitoring equipment that illustrate the energy and environmental benefits of the facility's "green" features on an ongoing basis. Ultimately, the Company believes that green meetings deliver environmental benefits, cost savings, competitive advantages, improved image, and the most satisfying attendee and guest experiences.

Incorporated within the LEED® program is a design program that will also address and remove allergens and particulates from the daily operations of the Project complex. The design and operating standards as planned will significantly reduce air pollutants, off-gassing, particulates, and odors that adversely impact guests with burdened or compromised respiratory conditions. The system is expected to open the Project property to comfortably serve this underserved market segment, creating further publicity and marketing opportunities by being the World's first convention center hotel complex to be completely allergen-free.

Amid growing concern over environmental-friendly services, a rapidly arriving majority of travelers now prefer Green and Eco lodgings. Recent surveys by trade associations such as the Partnership Travel Industry Association and online retailers like Yahoo revealed that nearly seventy percent (70%) of tourists are willing to pay extra in order to stay at environmentally-friendly lodgings. These surveys further revealed that these guests will pay anywhere from a 9%

SEC-USCIS-P-0000777

to 10% premium on already-advertised prices. These developments should enable the Company to gain market share by targeting environmentally-conscious guests.

ENERGY CONSERVATION FEATURES AND COST SAVINGS

Much of the LEED® certification relies on technology to control energy costs, recover and reuse waste water, monitor the performance of the Project property, and provide guest information. The incorporation of significant energy savings in the design and development of the Project will substantially reduce the operating energy costs of the Company. The Company anticipates the savings in this area will directly benefit the Project's performance, adding an estimated 6% to 9% profitability to the net income of the Project complex. The design of the Project is expected to optimize energy efficiency and generation through the following strategies:

SUSTAINABLE SITE STRATEGIES

- Use of Hybrid Zero Emission Fuel Cell Shuttle Vans--Exclusively utilizing hybrid fuel cell vehicles will set the tone for the Project property, and marketing this characteristic through vehicle signage will generate additional exposure and appreciation of the design characteristics of the complex.
- State-of-the-art underground automated parking system to save on space and energy usage for personal vehicle storage.
- 100% Green Roof - Heat Island Effect - with Water Features—the largest guest-accessible hotel Green roof complex in the world)

- **Water Efficiency**
    - o Saving the use of potable water by over 75% by rainwater collection and recycling, a pervious pathway, underground storm water retention along with reused grey water from the building itself used to flush all the dual-flush toilets at the site, use of low-flow showerheads and low-flow faucets with automatic controls. Further, planting foliage native to Illinois' terrain, and installing satellite irrigation technology, which automatically schedules irrigation based on landscape needs and local weather conditions.
- **Energy and Atmosphere**
    - o Hydrogen Fuel Cell Plant--Generating 100% of the Project complex's energy needs while producing zero carbon emissions.
    - o 100% Geothermal Heating & Cooling Pump System with Loop Field—under the automated parking garage.
    - o Natural day lighting in all units is maximized to reduce the loads on electronic lighting, optimized through building fenestration and the atriums in all three towers.
    - o High Efficiency Hybrid Regenerative-drive elevators—generating electricity as the lifts descend from braking action, providing much of the energy needed for reuse in ascent.

SEC-USCIS-P-0000778

o Energy Efficient Control System–the first room system to register all energy consumption, utilizing an Internet-based [confirm], remotely controlled automation and entertainment technology that will control lighting, room temperature, room status, and television, music, and video systems, and enable guests to schedule wake-up calls and make requests for room service and other services such as valet, housekeeping, spa, and more.

Although current economic conditions are putting pressure on all investment and development decisions, in the long run the Company expects investment in sustainable hotel development such as the Project to take firm hold. As that happens, the Company anticipates that a clear advantage will emerge for those hotels that meet both the environmental expectations of guests, and the best practices of operational efficiency in function and design. That advantage will be reflected in the value and attractiveness of those assets to investors—and purchasers.

## LEED® CERTIFICATION

Achieving a Zero Carbon Platinum LEED® certification is not a simple task. Currently, the only two hotels in the United States that meet the stringent requirements for Platinum LEED® are the Bardessono, in Napa Valley, and the Proximity Hotel in North Carolina; however, unlike the Project they did not achieve Platinum status based upon energy generation, and again unlike the Project, these properties are not Carbon Neutral or Allergen-Free. Upon achieving Platinum status, the Project will be the largest and the first complex of its type in the world to hold a Zero

Carbon Platinum LEED® certification.

The LEED® rating systems are designed for rating new and existing commercial, institutional, and residential buildings. The ratings are based on accepted energy and environmental principles, and strike a balance between known, established practices and emerging concepts. Each rating system is organized into five (5) environmental categories: (i) Sustainable Sites – which generally addresses the site selection, design, development, available transportation alternatives for the site, etc.; (ii) Water Efficiency – which generally addresses water use reduction, water efficient landscaping, and innovative wastewater technologies; (iii) Energy and Atmosphere – which generally addresses energy performance, refrigerant management, on-site renewable energy, measurement and verification, etc.; (iv) Materials and Resources – which generally addresses storage and collection of recyclables, construction waste management, materials reuse, rapidly renewable materials, etc.; and (v) Indoor Environmental Quality – which generally addresses air delivery monitoring, increased ventilation, chemical and pollutant source control, controllability of lighting and thermal systems, etc. There are two additional categories that allow properties to obtain bonus points: (i) Innovation in Design – which addresses sustainable expertise, as well as design measures not covered under the five primary categories; and (ii) Regional Priority – which acknowledges the importance of local conditions in determining best environmental design and construction practices.

SEC-USCIS-P-0000779

The LEED® certification process is measured against a scale of 100 possible points, and is broken up into certified, silver, gold, and platinum. A property must score at least 40 points to be LEED® certified. The threshold scores for Silver and Gold status under the LEED certification program are 50 points and 60 points, respectively. Platinum properties need to score over 80 points to qualify. The Project "A Chicago Convention Center" is currently designed to achieve 98 points out of the maximum of 100 points available, not including bonus points.

## THE TECHNOLOGICAL ADVANTAGE

### CONVENTION CENTER AND HOTEL TECHNOLOGY

The Company believes the Project will rank among the most technologically-advanced convention center and hotels in the world. The meeting spaces will be designed to be able to change their look, feel, and functionality at a moment's notice. Lighting, furniture, and meeting tools will be changeable to accommodate the various differing users of the spaces in assisting them in reaching the goals of special differentiation and flexibility. The Project's objective is that people, technology, information, and the meeting place will all be much better integrated.

The Project property will provide "4G" internet service, with all rooms wired with fiber-optic communication links tied into major distribution networks to support the planned capacity, with transmission speeds approaching 14 Terabits. This is greater than the capacity of most computer installations today, and will offer distinct advantages. The Project's wireless network will be able to integrate any or all meeting rooms and sub-divided sections of the main convention

spaces, permitting simultaneous voice and video transmission on a real-time basis, and will also provide for parallel computer link-ups to exchange on-line data during video conferences. This will appeal to corporate meeting planners who are challenged to reduce meeting costs yet still produce effective meetings. The technology suite can accommodate national link-ups for announcements, presentations, and general session activities through teleconferencing. The integration of wireless technology into the physical place of meetings will provide seamless and effortless links back into knowledge bases of information.

All meeting rooms will have computer-controlled lighting, zoned in each space so lighting can be set at an appropriate level, including tinting for specialized events. This will enable lights near A/V equipment to be dimmed while the lighting in the general audience area is maintained at a level where notes can be taken and interactive discussion conducted.

Sound systems will also be computer-controlled, with the ability to zone and regulate speakers and isolate areas, permitting flexibility in the use of rooms and in subdividing space.

Conference spaces will also include key card security that will permit a group to control access to their meeting space and track and regulate staff and contractors who access the space. This will be a very strong benefit to organizations concerned with corporate espionage, and

SEC-USCIS-P-0000780

companies with prototype product roll-outs and sensitive products, such as seasonal releases of new product lines.

Convention services for the Project complex user organization will also be state-of-the-art, with compatible registration and meeting services hardware at the property to back-up meeting planner systems, including registration, name tag generation, attendance control, and event and cost tracking, with computer/technology support services on call. Announcement boards and message boards will be incorporated into key traffic areas to provide message centers for attendees and the meeting planners.

All of this space will be controlled through a banquet and convention sales and management software solution that will also maximize space utilization, tracking opportunities to combine space, shift groups for greater efficiencies, and free under-utilized space that can be marketed for additional revenue generation.

In summary, the planning and design of the space will position "A Chicago Convention Center" as the most technologically advanced and environmentally friendly facility in operation. The facilities built into this space will be extremely difficult for competitors to retrofit into their existing operations, therefore the Company believes the Project will remain highly competitive for an extended period.

HOTEL IN-ROOM TECHNOLOGY

The technological advances will not stop at the guest's door. The Project maintains its commitment to the utilization of technology to complement and supplement the hotel guest's experience. The Company anticipates that this Project will inspire other facilities and serve as a reference for a number of new and ongoing hospitality projects. The hotel and guest room technology is designed as the guest room of the future in both aspects of energy control and usability. The following are key components planned for the Project's guest room of the future:

BIOMETRIC SELF-SERVICE CHECK-IN

In each hotel lobby, guests will be able to avoid long lines at the registration desk and check-in via biometric scanners. This will greatly reduce the congestion and long lines that often occur at large corporate and industry conventions. Guests can quickly and conveniently check in, obtain their room keys, and begin the process of unwinding from their travels and preparing for the convention ahead.

DIGITAL DOOR VIEWER

Once inside, a guest can get a clear view of who is on the other side of the door with First View Security's Digital Door Viewer™. The LCD screen displays live video feed from a miniature camera mounted to the door.

SEC-USCIS-P-0000781

### POWER MAT

This will be a key feature to guestrooms as it becomes widely available, making power cords one less thing to pack. An early example is the PowerMat™, which charges electronic devices simply by laying them down upon the mat.

### CONTROL4® SUITE SYSTEMS

A standards-based automation and entertainment control technology platform that provides an enhanced guest experience and energy management capabilities. This technology integrates with hotel property management systems and hotel networks, enabling guests to select lighting, temperature, multi-media, and concierge services. Control4 solutions are based on Ethernet, Wi-Fi, and ZigBee technology standards, and are environmentally-focused, delivering LEED certification points in most cases. In addition, the Control4 Hotel Management Console and Hospitality Dashboard enable global viewing and monitoring of Project property guestrooms.

### MY IC PHONE

A multimedia hub for the guestroom. Guests have instant and easy access to a variety of hotel services, communication options, entertainment choices, room controls, and Web applications, all through an intuitive, high-resolution touch-screen interface. From this interactive phone, guests can control their in-room environment to achieve greater comfort in the hotel, whether adjusting lighting and temperature controls, or setting the room status to "Do Not Disturb."

Designed to enable new innovative applications, the My IC Phone platform is fully customizable, delivering second-to-none technology to guests creating an exceptional hospitality experience.

SMARTTOUCH

An in-room touchscreen that provides hotel guests with direct access to all hotel services, including room service, spa, concierge, bellman, valet, and more. Operating on a wireless local area network, each touchscreen communicates directly with the Project's on-site, secure server. The multi-lingual software is configured to each individual property, and the application can be custom-designed to match the hotel's brand. In addition, the Company anticipates [each hotel room] to also be equipped with the following innovative electronic amenities:

- 3D LED TV with 3D Blu-Ray Player - High Impact Movie Viewing
- Sound Focusing Speakers.
- In-Room Massage Chair
- Media Hub.

The Project development is expected to demonstrate how future guestrooms can encompass high-tech touches with a "soft-touch delivery" to make a guest's stay the ultimate experience.

SEC-USCIS-P-0000782

## 10.3 AREA REVITALIZATION AND DEVELOPMENT ACTIVITY DETAIL

A number of important projects are currently underway or recently completed in the Chicago O'Hare International Airport submarket of the Chicago Metropolitan area.

A new $445 Million casino and entertainment complex is currently under construction in nearby Des Plaines, Illinois, along the Tri-State at I-294 near Devon Avenue, less than two miles from the Project site location. This complex will be LEED® Certified (the base level of LEED® certification). The first phase of construction will feature 45,000 square feet of gaming space within a single-level casino, with 1,200 gambling positions.

The Project site location is also located near the Donald E. Stephens Convention Center, featuring 840,000 square feet of exhibition space marked by exposed steel columns and concrete floors, rather than finished meeting space. The existence of this convention facility evidences a demand for projects of this type. A rapidly growing number of convention and meeting contracts are requiring a higher measure of "green" stipulated in their contracts, therefore meeting and convention planners who require green lodging will be well served by the Project property's Zero Carbon Platinum LEED® certification Allergen-Free design.

The $15 Billion Chicago O'Hare International Airport Modernization Expansion is projected to increase airport operations by 60% in 2013, reclaiming the Chicago O'Hare International Airport's prior status as the world's busiest. Based on the historic performance of the current

Chicago O'Hare market area, significant support is believed to exist for the proposed Project complex. In 2008, the Airport handled 881,000 flights, representing an average of 2,400 flights per day, and 70 million passengers per year. In contrast, the Chicago O'Hare International Airport Modernization Expansion will reach its full capacity in 2013, when traffic is projected to increase by 60% to over 3,800 flights and 110 million passengers per year. The ongoing Chicago O'Hare International Airport modernization expansion will enable itself to better serve the next generation of large passenger aircraft (such as the Airbus A380 and Boeing 787 "Dreamliner"), in addition to increasing the flight capacity. The expansion efforts include a new western gateway terminal and access highway. Overall, when complete, the efforts will result in expanding the Airport's capacity by 60% to over 3,800 operations a day, up from the present capacity of 2,700. The four new runway configurations are expected to allow fewer runways to be closed during poor weather conditions, enabling greater flight throughput.

Management believes the plans of the Illinois Department of Transportation ("IDOT") to improve the west corridor access to O'Hare should open new sources of business for O'Hare area properties, linking the Centex industrial park to the Kennedy Expressway and Rosemont area properties. Centex, in Elk Grove Village, is home to the largest consolidated business park in North America. Over 3,800 businesses are located in its 5.4-square-mile (14 square-kilometer) business park adjacent to Chicago O'Hare International Airport.

SEC-USCIS-P-0000783

## 10.4 OPERATING INCOME PROJECTIONS

A Chicago Convention Center, LLC will manage the convention center and hotels property but not necessarily operate all the business to locate within the convention center. However, the projected operating income and expenses for these businesses are provided as a reference.

**A Chicago Convention Center: Hotel Proforma Income Projections**

|  | Jan - Dec 2014 1 | Jan - Dec 2015 2 | Jan - Dec 2016 3 | Jan - Dec 2017 4 | Jan - Dec 2018 5 |
|---|---|---|---|---|---|
| REVENUES: |  |  |  |  |  |
| ROOMS | 96,060,000 | 97,711,000 | 101,373,000 | 105,077,000 | 109,036,000 |
| FOOD | 86,386,000 | 88,085,000 | 90,728,000 | 93,451,000 | 96,255,000 |
| BEVERAGE | 30,943,000 | 31,552,000 | 32,499,000 | 33,474,000 | 34,478,000 |
| TELEPHONE | 506,000 | 509,000 | 524,000 | 541,000 | 556,000 |
| RENTALS & OTHER INCOME | 2,902,000 | 2,990,000 | 3,079,000 | 3,171,000 | 3,267,000 |
| OTHER OPERATED DEPTS | 6,619,000 | 6,702,000 | 6,904,000 | 7,111,000 | 7,325,000 |
| TOTAL REVENUE | 223,416,000 | 227,549,000 | 235,107,000 | 242,825,000 | 250,917,000 |
| DEPARTMENTAL EXPENSES: |  |  |  |  |  |
| ROOMS | 20,960,000 | 21,547,000 | 22,194,000 | 22,861,000 | 23,546,000 |
| FOOD & BEVERAGE | 79,304,000 | 81,353,000 | 83,794,000 | 86,309,000 | 88,899,000 |
| TELEPHONE | 625,000 | 636,000 | 656,000 | 675,000 | 696,000 |

| | | | | | |
|---|---|---|---|---|---|
| TELEPHONE | 625,000 | 656,000 | 656,000 | 675,000 | 696,000 |
| OTHER OPERATED DEPTS | 3,424,000 | 3,488,000 | 3,593,000 | 3,700,000 | 3,811,000 |
| TOTAL | 104,313,000 | 107,024,000 | 110,237,000 | 113,545,000 | 116,952,000 |
| TOTAL OPERATING INCOME | 119,103,000 | 120,525,000 | 124,870,000 | 129,280,000 | 133,965,000 |
| | | | | | |
| UNDISTRIBUTED EXPENSES: | | | | | |
| ADMINISTRATIVE & GENERAL | 3,911,000 | 4,017,000 | 4,137,000 | 4,261,000 | 4,388,000 |
| MANAGEMENT FEE | 3,351,000 | 3,414,000 | 3,527,000 | 3,642,000 | 3,763,000 |
| MARKETING | 3,575,000 | 3,671,000 | 3,781,000 | 3,895,000 | 4,012,000 |
| FRANCHISE FEES | 4,324,000 | 4,398,000 | 4,562,000 | 4,729,000 | 4,907,000 |
| PROPERTY OPERATION & MAINT. | 1,118,000 | 1,175,000 | 1,211,000 | 1,247,000 | 1,285,000 |
| ENERGY | 444,000 | 453,000 | 466,000 | 480,000 | 495,000 |
| TOTAL | 16,723,000 | 17,128,000 | 17,684,000 | 18,254,000 | 18,850,000 |
| INCOME BEFORE FIXED CHARGES | 102,380,000 | 103,397,000 | 107,186,000 | 111,026,000 | 115,115,000 |
| | | | | | |
| FIXED CHARGES: | | | | | |
| REAL ESTATE & PROPERTY TAXES | 153,000 | 157,000 | 162,000 | 163,000 | 169,000 |
| BUILDING & CONTENTS INSURANCE | 606,000 | 625,000 | 644,000 | 663,000 | 683,000 |
| TOTAL | 759,000 | 782,000 | 806,000 | 826,000 | 852,000 |
| NET OPERATING INCOME | 101,621,000 | 102,615,000 | 106,380,000 | 110,200,000 | 114,263,000 |

SEC-USCIS-P-0000784

**Note:** The economic analysis by Evans, Carroll, and Associates uses revenue projections from independent market research feasibility report prepared by TR Mandigo & Co for revenue projections taken from Year 1 2014 in the proforma income statement copied above. The following table shows how the projections in the economic analysis align with data provided by the independent sources of TR Mandigo and Co.

| | *Economic Analysis Input* | *Data supplied by the project developer (pro forma income statement Year 1 2014)* |
|---|---|---|
| Hotel Room Revenue | $96 million | $96,060,000 |
| Food and Beverage Revenue | $117.3 million | $86,386,000 + $30,943,000 = **$117,329,000** |
| Other Revenue | $10 million | $506,000 + $2,902,000 + $6,619,000 = **$10,027,000** |

For detailed analysis, please see "Economic Impact of Development of a Hotel and Convention Center Complex Near Chicago O'Hare International Airport in Chicago, IL, as Part of an Existing EB-5 Regional Center" by Evans, Carroll, and Associates (June 6, 2011).

SEC-USCIS-P-0000785

# EXHIBIT

# ATTACHMENT
# 4-B

SEC-USCIS-P-0000786

1

# Economic Impact of Development of a Hotel and Convention Center Complex Near Chicago O'Hare International Airport in Chicago, IL, as Part of an Existing EB-5 Regional Center

**Prepared for:**

**Intercontinental Regional Center Trust of Chicago, LLC**

**A Chicago Convention Center, LLC**

**8201 W. Higgins Rd.**

**Chicago, IL 60631**

**(312) 404-9275**

**Prepared by:**

**Prepared by:**

# Evans, Carroll & Associates, Inc.

**2785 N.W. 26th St.**

**Boca Raton, FL  33434**

**(561) 470-9035**

**mevans@evanscarrollecon.com**

**June 6, 2011**

SEC-USCIS-P-0000787

2

# Table of Contents

| | |
|---|---|
| 1. Executive Summary | 3 |
| 2. Tabulation of Principal Results | 4 |
| 3. Introduction and Scope of Work | 7 |
| 4. Brief Discussion of RIMS II Multipliers | 8 |
| 5. Location and Scope of Project | 12 |
| 6. Economic Impact of Construction Expenditures | 14 |
| 7. Economic Impact of Hotel Operations | 18 |
| 8. Economic Impact of Restaurant Operations | 23 |
| 9. Economic Impact of Convention Center Operations | 25 |
| 10. Economic Impact of Parking Garage Operations | 28 |
| 11. Economic Impact of Total Project | 30 |

SEC-USCIS-P-0000788

3

# 1. Executive Summary

- The developer of the project will be "A Chicago Convention Center, LLC", which will build a hotel and convention center complex near Chicago O'Hare International Airport in Chicago, Illinois, at 8201 W. Higgins Rd. Chicago, IL 60631. This report analyzes the economic impact of the construction of the project and the economic activity from the hotel, restaurants, convention center, and parking garage.

- All economic impact calculations in this report are based on the RIMS II final demand multipliers for Cook, Lake, Will, and DuPage counties in Illinois and Lake County in Indiana.

- Total construction costs, according to the developer, will be $343,182,691 per year for two years. The RIMS II final demand multiplier for construction for this area is 17.49, so that activity would create a total of 6,000 new jobs if direct jobs were counted. However, even though the construction period is expected to last at least two years, we have taken a conservative approach and counted only the indirect and induced employment, which totals 3,247 jobs.

- The estimated revenues generated by this project in the first full year of operation have been supplied by the developer's market feasibility research report. These figures show $96 million in revenues from hotel room rates, $117.3 million in food and beverage revenues, and $10 million in other hotel revenues. The food and beverage revenues are further subdivided as follows: $25.6 million is food served to hotel

patrons, $41.25 million is food served in the restaurant, and $50.48 million is food served at the convention center. These are treated differently because they have different final demand multipliers. Also, the convention center generates about $20 million in revenues, and parking garage revenues generate $20 million.

- **Thus the total project, including indirect and induced jobs form construction, and all jobs from hotel, restaurant, convention center, and parking garage operations, will generate a total of 8,495 permanent new jobs. These figures are summarized in Table A.**

- The total annual increase in output from this project will be about $994 million, and the total annual increase in earnings will be about $274 million.

SEC-USCIS-P-0000789

4

## 2. Tabulation of Principal Results

The actual results for the final demand multipliers for each project are summarized in Table A. The employment multipliers exclude the direct jobs as we have taken a conservative approach and counted only the indirect and induced effects from construction employment. However, direct, indirect, and induced jobs are counted for hotel, restaurant, convention center, and parking garage operations. All figures in Table A represent permanent new jobs created.

| Table A. Summary of Employment Effects for Construction and Operations of Hotel and Convention Center Complex | | | |
|---|---|---|---|
| Activity | Expenditure/ Revenue ($ millions) | RIMS II Final Demand Multiplier | Number of Total New Jobs | NAICS Code |
| Construction * | 343 | 9.468 | 3,247.6 | 236 |
| Hotel | 128 | 18.692 | 2,392.6 | 721 |
| Restaurant | 41.25 | 30.181 | 1,245.0 | 722 |
| Convention Center | 70.48 | 18.710 | 1,318.7 | 5619 |
| Parking Garage | 20 | 14.575 | 291.5 | 8129 |

| | | |
|---|---|---|
| | 502.73 | 9,495.4 |

All calculations based on
unrounded numbers
* indirect and induced jobs only

When the hotel and convention center are operating at normal rates, the economic impact as measured by household earnings, demand for business services, utilities, maintenance and repair, and new supplier and vendor services would be as shown in Table B.

SEC-USCIS-P-0000790



5

| Table B. Summary Measures of Economic Impact for Construction and Operations of Hotel and Convention Center Complex | |
| --- | --- |
| All figures in thousands of dollars | |
| Household Income from: | |
| Construction | $122,259 |
| Hotel | $77,030 |
| Restaurant | $26,276 |
| Convention Center | $39,990 |
| Parking Garage | $8,304 |
| | |
| Total | $273,859 |
| | |
| Demand (output) for: | |
| Utilities | $14,413 |
| Maintenance and repair construction | $5,436 |
| Supplier/vendor links with manufacturers | $129,294 |
| Professional and business support services | $191,110 |
| | |
| Total these 4 categories | $340,253 |

*Household Earnings (Labor Income)*

The jobs created by the construction and operations of the hotel and convention center complex will subsequently create new sources of household income. The household income from the indirect and induced effects of construction is about $122.2 million. The household income from hotel operations is about $77.0 million, from restaurant operations is about $26.3 million, from convention center operations about $40.0 million, and from the parking garage is about $8.3 million, for a total gain of about $273.9 million in household income.

These income calculations come from the RIMS II input-output model, which measures the average income per job by industry. The model calculations are based on the types of jobs that will be created by these facilities, with indirect/induced impacts allocated based on the types of commodity inputs required by the businesses that would potentially locate in the regional center.

SEC-USCIS-P-0000791

6

### *Demand for Business Services, Utilities, Maintenance and Construction, and New Supplier/Vendor Relationships Created with Manufacturers*

The total economic impact of the regional center from the supplier purchases and business relationships for the operations of hotel and convention center complex will create approximately $340.3 million in additional economic activity across the region. These supplier purchases are calculated from the indirect increase in output generated by the RIMS II model. Some of these supplier industries might potentially locate within the regional center, and their economic output is included in this total.

The estimate of supplier purchases is based on the commodity data in the RIMS II input-output model. This data specifies the amount and type of commodity input needed to maintain specific types of business operations. The model estimates the supplier purchases based on the types of jobs and number of jobs that will be created within the regional center. In addition, the model allocates the supplier purchases to businesses within the region, based on trade flow data from the U.S. Bureau of Economic Analysis.

Utilities include services such as electricity, natural gas, and water and sewer facilities. The economic impact on utility services totals about $14.4 million.

Maintenance and repair services include some building and construction activity. The project would create an economic impact of about $5.4 million within these sectors in the region. Since the buildings are new, the economic impact for maintenance and

repair services is minimal for the first two years of operation.

New supplier/vendor relationships with manufacturers would create an economic impact of about $129.3 million. These purchases from manufacturers primarily represent purchases of locally produced goods and services that are used in construction.

The various facilities in this project will create demand for business services including professional services, and business services and support services. The impact of this activity totals about $191.1 million annually.

SEC-USCIS-P-0000792

7

## 3. Introduction and Scope of Work

The developer of the project will be "A Chicago Convention Center, LLC", which will build a hotel and convention center complex near Chicago O'Hare International Airport in Chicago, Illinois, at 8201 W. Higgins Rd. Chicago, IL 60631. This report analyzes the economic impact of the construction of the project and the economic activity from the hotel, restaurants, convention center, and parking garage.

Section (4) contains a brief description of the RIMS II input/output model and its multipliers. Section (5) describes the location and scope of the hotel and convention center complex in greater detail.

The remaining sections consist of the economic impact tables for the various components of the project. In all cases, the increase in employment, output, household earnings, and the average level of output and earnings per new worker are presented for the 20 major industrial classifications in the RIMS II model.

Section (6) contains the tables for the construction jobs; even though the project will take more than two years to complete, we have taken a conservative approach and included only the indirect and induced effects from construction. Section (7) presents the economic impact of the hotel operations. Section (8) shows similar information for the restaurant. Section (9) provides the results for the convention center, which includes both food and beverage services and exhibition fees. Section (10) contains the

economic impact tables for the parking garage revenues. Section (11) contains the summary tables for the overall project.

Case: 1.13-cv-00982 Document #: 11-2 Filed: 02/06/13 Page 185 of 213 PageID #:1169

SEC-USCIS-P-0000793

8

# 4. Discussion of RIMS II Final Demand Methodology

The following material has been condensed from the RIMS II User Handbook

### *Introduction and General Comments*

Effective planning for public- and private-sector projects and the State and local levels requires a systematic analysis of the economic impacts of these projects and programs on affected regions. In turn, systematic analysis of economic impacts must account for the inter-industry relationships within regions because these relationships largely determine how regional economies are likely to respond to project and program changes. Thus, regional input-output (I-O) multipliers, which account for inter-industry relationships within regions, are useful tools for conducting regional economic impact analysis.

In the 1970s, the Bureau of Economic Analysis (BEA) developed a method for estimating regional I-O multipliers known as RIMS (Regional Industrial Multiplier System), which was based on the work of Garnick and Drake. In the 1980s, BEA completed an enhancement of RIMS, known as RIMS II (Regional Input-Output Modeling System), and published a handbook for RIMS II users. In 1992, BEA published a second edition of the handbook in which the multipliers were based on more recent data and improved methodology. In 1997, BEA published a third edition of the handbook that provides more detail on the use of the multipliers and the data sources and methods for estimating them.

RIMS II is based on an accounting framework called an I-O table. For each industry, an I-O table shows the industrial distribution of inputs purchased and outputs sold. A typical I-O table in RIMS II is derived mainly from two data sources: BEA's national I-O table, which shows the input and output structure of nearly 500 U.S. industries, and BEA's regional economic accounts, which are used to adjust the national I-O table to show a region's industrial structure and trading patterns.

Using RIMS II for impact analysis has several advantages. RIMS II multipliers can be estimated for any region composed of one or more counties and for any industry, or group of industries, in the national I-O table. The accessibility of the main data sources for RIMS II keeps the cost of estimating regional multipliers relatively low. Empirical tests show that estimates based on relatively expensive surveys and RIMS II-based estimates are similar in magnitude.

BEA's RIMS multipliers can be a cost-effective way for analysts to estimate the economic impacts of changes in a regional economy. However, it is important to keep in mind that, like all economic impact models, RIMS provides approximate order-of-magnitude estimates of impacts. RIMS multipliers are best suited for estimating the impacts of small changes on a regional economy. For some applications, users may want to supplement RIMS estimates with information they gather from the region

SEC-USCIS-P-0000794

9

undergoing the potential change. To use the multipliers for impact analysis effectively, users must provide geographically and industrially detailed information on the initial changes in output, earnings, or employment that are associated with the project or program under study. The multipliers can then be used to estimate the total impact of the project or program on regional output, earnings, and employment.

RIMS II is widely used in both the public and private sector. In the public sector, for example, the Department of Defense uses RIMS II to estimate the regional impacts of military base closings. State transportation departments use RIMS II to estimate the regional impacts of airport construction and expansion. In the private-sector, analysts and consultants use RIMS II to estimate the regional impacts of a variety of projects, such as the development of shopping malls and sports stadiums.

### *RIMS II Methodology*

RIMS II uses BEA's benchmark and annual I-O tables for the nation. Since a particular region may not contain all the industries found at the national level, some direct input requirements cannot be supplied by that region's industries. Input requirements that are not produced in a study region are identified using BEA's regional economic accounts.

The RIMS II method for estimating regional I-O multipliers can be viewed as a

three-step process. In the first step, the producer portion of the national I-O table is made region-specific by using six-digit NAICS location quotients (LQs). The LQs estimate the extent to which input requirements are supplied by firms within the region. RIMS II uses LQs based on two types of data: BEA's personal income data (by place of residence) are used to calculate LQs in the service industries; and BEA's wage-and-salary data (by place of work) are used to calculate LQs in the non-service industries.

In the second step, the household row and the household column from the national I-O table are made region-specific. The household row coefficients, which are derived from the value-added row of the national I-O table, are adjusted to reflect regional earnings leakages resulting from individuals working in the region but residing outside the region. The household column coefficients, which are based on the personal consumption expenditure column of the national I-O table, are adjusted to account for regional consumption leakages stemming from personal taxes and savings. In the last step, the Leontief inversion approach is used to estimate multipliers. This inversion approach produces output, earnings, and employment multipliers, which can be used to trace the impacts of changes in final demand on affected industries.

SEC-USCIS-P-0000795

10

## *Accuracy of RIMS II*

Empirical evidence suggests that RIMS II commonly yields multipliers that are not substantially different in magnitude from those generated by regional I-O models based on relatively expensive surveys. For example, a comparison of 224 industry-specific multipliers from survey-based tables for Texas, Washington, and West Virginia indicates that the RIMS II average multipliers overestimate the average multipliers from the survey-based tables by approximately 5 percent. For the majority of individual industry-specific multipliers within these states, the difference between RIMS II and survey-based multipliers is less than 10 percent. In addition, RIMS II and survey multipliers show statistically similar distributions of affected industries.

## *Advantages of RIMS II*

There are numerous advantages to using RIMS II. First, the accessibility of the main data sources makes it possible to estimate regional multipliers without conducting relatively expensive surveys. Second, the level of industrial detail used in RIMS II helps avoid aggregation errors, which often occur when industries are combined. Third, RIMS II multipliers can be compared across areas because they are based on a consistent set of estimating procedures nationwide. Fourth, RIMS II multipliers are updated to reflect the most recent local-area wage-and-salary and personal income data.

*Overview of Different Multipliers*

RIMS II provides users with five types of multipliers: final demand multipliers for output, for earnings, and for employment; and direct-effect multipliers for earnings and for employment. These multipliers measure the economic impact of a change in final demand, in earnings, or in employment on a region's economy.

The final demand multipliers for output are the basic multipliers from which all other RIMS II multipliers are derived. In this table, each column entry indicates the change in output in each row industry that results from a $1 change in final demand in the column industry. The impact on each row industry is calculated by multiplying the final demand change in the column industry by the multiplier for each row. The total impact on regional output is calculated by multiplying the final demand change in the column industry by the sum of all the multipliers for each row except the household row.

RIMS II provides two types of multipliers for estimating the impacts of changes on earnings: final demand multipliers and direct effect multipliers. These multipliers are derived from the table of final demand output multipliers.

SEC-USCIS-P-0000796

11

The final demand multipliers for earnings can be used if data on final demand changes are available. In the final demand earnings multiplier table, each column entry indicates the change in earnings in each row industry that results from a $1 change in final demand in the column industry. The impact on each row industry is calculated by multiplying the final demand change in the column industry by the multipliers for each row. The total impact on regional earnings is calculated by multiplying the final demand change in the column industry by the sum of the multipliers for each row.

### Employment Multipliers

RIMS II provides two types of multipliers for estimating the impacts of changes on employment: final demand multipliers and direct effect multipliers. These multipliers are derived from the table of final demand output multipliers.

The final demand multipliers for employment can be used if the data on final demand changes are available. In the final demand employment multiplier table, each column entry indicates the change in employment in each row industry that results from a $1 million change in final demand in the column industry. The impact on each row industry is calculated by multiplying the final demand change in the column industry by the multiplier for each row. The total impact on regional employment is calculated by multiplying the final demand change in the column industry by the sum of the multipliers for each row.

The direct effect multipliers for employment can be used if the data on the initial changes in employment by industry are available. In the direct effect employment multiplier table, each entry indicates the total change in employment in the region that results from a change of one job in the row industry. The total impact on regional employment is calculated by multiplying the initial change in employment in the row industry by the multiplier for the row.

### Choosing a Multiplier

The choice of multiplier for estimating the impact of a project on output, earnings, and employment depends on the availability of estimates of the initial changes in final demand, earnings, and employment. If the estimates of the initial changes in all three measures are available, the RIMS II user can select any of the RIMS II multipliers. In theory, all the impact estimates should be consistent. If the available estimates are limited to initial changes in final demand, the user can select a final demand multiplier for impact estimation. If the available estimates are limited to initial changes in earnings or employment, the user can select a direct effect multiplier.

SEC-USCIS-P-0000797

12

## 5. Location and Scope of Project

The hotel and convention center complex will be located at 8201 W. Higgins Rd. Chicago, IL 60631, in close proximity to Chicago O'Hare International airport. The complex will include 290,000 square feet (26,700 square meters) of convention center and meeting space, 55,000 square feet (5,100 square meters) of restaurant space, and five upper-upscale hotels. This unique co-branding approach is ideally suited to exploit the natural growth of demand and meet the needs of increased traffic that will result from the completed $15B modernization expansion of Chicago O'Hare International Airport in 2013.

The Convention Center will offer four floors of convention space totaling 483,000 square feet (44,700 square meters) constructed of which the core meeting space will be 290,000 square feet (26,700 square meters), all of which will be connected across the lower levels of all three towers. The complex will further contain 15 conference suites on the upper floors, with 55,000 square feet (5,100 square meters) allocated for restaurants, lounges, and bars throughout the structure.

In addition, the development will feature the largest guest accessible hotel green-roof complex in the country with over an acre allocated for a spa, a yoga studio, a bar/lounge area, and a glass walk atrium roof floor. Finally, a parking space with approximately 1,720 spaces will sit below the convention center.

A Chicago Convention Center will attract national and international business by providing beautifully appointed convention and hotel facilities that are supplied by proven brand leaders. The complex will feature five upper-upscale hotel brands spread across three atrium towers.

The 24-month Construction period is continuous with three opening dates to allow for immediate cash flow and stabilization.

Tower One, which will house the 17-story Element by Westin, a Starwood hotel brand with 336 suites, the four lower levels of the convention center, and the four lower-levels of parking garage. This first opening date is projected to open 18 months after the start of construction. The core and shell of the remaining two structures will also be complete, thus 95% of the construction disturbance will be finalized prior to opening tower one.

Tower Two will house the 19-story Hotel Indigo and Staybridge Suites, an InterContinental Hotel Group brands, with 209 rooms and 154 suites will open 3 months after Tower One.

SEC-USCIS-P-0000798

13

Tower Three, will house the 14-story Hyatt Place and Hyatt Summerfield Suites with 148 suites each, will open 3 months after Tower Two. Together, the hotels will contain 995 keys of consisting of 797 Suites & 198 rooms,

SEC-USCIS-P-0000799

14

## 6. Discussion and Calculation of Construction Jobs

USCIS has determined that if the construction project takes more than two years, the direct, indirect and induced jobs stemming from construction activity can all be counted. The expenditure model permits the contractor to present cancelled checks and other evidence of payment as verifying the amount spent on the project; the RIMS II model is then used to determine the number of indirect and induced jobs that are created. **THE PROJECT WILL NOT COUNT DIRECT CONSTRUCTION JOBS.** In particular, it recently stated that:

[1] USCIS does not accept or credit creation of direct temporary "construction jobs" within a business plan or economic job creation forecasts activities which involve a limited duration construction phase of less than 2 years unless the scope, complexity, and the ongoing construction phase must be fully sustained for all the construction phase jobs for 2 years or more with respect to the size, scope, nature, engineering/technology challenges and breadth of the project--for example a massive-scale nuclear power facility, or major Dam or a giant oil refinery, or similar type of massive and expansive and major engineering project. Shorter term construction jobs less than three years in duration have been determined to be of such a short term in nature as to not be sustained and to decrease and disappear as the initial construction activities wind down to completion. Such shorter term construction jobs in many locations are seasonal at best. Nevertheless, for all capital investment expenditures for the construction phase, all capital-induced "down-stream" support activities and "indirect" jobs impacted and associated with the construction activities such as suppliers, transportation, engineering and architectural services, maintenance and repair services, interior design services, manufacturing of components and materials, etc., may be factored into the

calculations for creation of indirect jobs.

Purchases of any furniture, fixtures, equipment, telecommunications, and computers are not included in any of the calculations, because these purchases will generally be made from manufacturers and suppliers outside the area. In many cases, the land on which these buildings will be constructed has previously been purchased and is not part of the cost estimates; however, average land costs are generally included when determining the relative contributions that could be made by EB-5 investors. According to figures submitted by the developer, the total hard construction cost is $686,365,381 million spread over two years, or $343,182,691 million per year.

The construction cost budget is given in Table 6-1.

SEC-USCIS-P-0000800

15

## Table 6-1.  Hard and Total Construction Cost Budget

| A CHICAGO CONVENTION CENTER | $/Key | 738,648 |
| --- | --- | --- |
| **Development Budget** | $/SF | 421.30 |
| | **Total Project Costs** | |
| **PARAMETER** | **Cost/GSF** | **Total** |
| Building Area | 1,744,510 | GSF |
| Demolition | 0.70 | 1,217,567 |
| Sitework | 3.58 | 6,237,582 |
| Deep Excavation & Foundations | 47.06 | 82,091,334 |
| Structure | 53.01 | 92,476,708 |
| Roofing & Waterproofing | 13.36 | 23,306,633 |
| Landscaping & Green Roof | 4.70 | 8,193,426 |
| Exterior Wall | 21.50 | 37,511,986 |
| Partitions & Finishes | 44.32 | 77,317,448 |
| Advanced Energy Generation Equipment | 51.95 | 90,626,636 |
| Signage | 4.27 | 7,454,776 |
| Vertical Transportation | 32.71 | 57,064,983 |

| | | |
|---|---|---|
| Plumbing | 32.71 | 57,067,721 |
| HVAC | 41.92 | 73,136,453 |
| Fire Protection | 10.66 | 18,588,309 |
| Electrical | 28.04 | 48,922,497 |
| Special Systems | 2.95 | 5,151,322 |
| **Total Hard Costs** | **393.44** | **686,365,381** |
| | | |
| FF&E / IT | 17.20 | 29,997,889 |
| Design & Engineering | 1.00 | 1,744,510 |
| Legal & Accounting | 0.14 | 240,000 |
| Pre-Opening Marketing Budget | 0.57 | 1,000,000 |
| 24-Month Capitalization Interest Fund | 5.79 | 10,107,391 |
| Lender & Underwriter Closing Fee | 3.15 | 5,500,000 |
| **Total Soft Costs** | **27.85** | **48,589,790** |
| | | |
| **Total Project Budget** | **421.30** | **734,955,171** |

SEC-USCIS-P-0000801

16

The results by major industry classification are given in Tables 6-1 and 6-2. Please note that in these and succeeding tables, output and earnings are given in thousands of dollars per year.

| Table 6-1. Increase in Employment, Output, and Earnings for $343 Million in Construction Activity, Indirect and Induced Effects Only | | | |
|---|---|---|---|
| Industry group | Employment | Output | Earnings |
| Agriculture, forestry, fishing, | 0.6 | 69 | 0 |
| Mining | 7.6 | 2,607 | 480 |
| Utilities | 13.2 | 7,100 | 1,235 |
| Construction | 22.0 | 2,744 | 940 |
| Manufacturing | 335.7 | 93,913 | 17,287 |
| Wholesale trade | 132.8 | 27,303 | 8,163 |
| Retail trade | 554.7 | 38,931 | 12,554 |
| Transportation and warehousing | 160.9 | 20,477 | 6,620 |
| Information | 77.5 | 21,952 | 4,562 |
| Finance and insurance | 199.2 | 46,374 | 13,240 |
| Real estate and rental and leasing | 170.6 | 56,424 | 4,459 |
| Professional and scientific services | 278.7 | 39,822 | 17,150 |
| Management of companies | 44.3 | 11,491 | 4,253 |
| Admin and waste mgmt services | 315.3 | 15,435 | 6,448 |

| | | | |
|---|---|---|---|
| Educational services | 56.5 | 3,704 | 1,475 |
| Health care and social assistance | 315.6 | 27,234 | 12,362 |
| Arts, entertainment, and recreation | 70.7 | 3,876 | 1,406 |
| Accommodation | 34.2 | 3,259 | 960 |
| Food services and drinking places | 239.1 | 11,113 | 3,430 |
| Other services | 182.9 | 16,430 | 4,905 |
| Household | 35.5 | 0 | 309 |
| | | | |
| Total | 3,247.6 | 450,256 | 122,259 |

Table 6-1 shows there will be a total of 3,247 permanent new indirect & induced jobs created by construction activity. Total annual output is expected to rise about $450 million, with household earnings increasing by $122 million per year. Table 6-2 shows that the average output per construction worker is about $124,600, with annual earnings about $42,700. For all new workers, the comparable figures are $138,600 for output and $37,600 for earnings.

SEC-USCIS-P-0000802

17

| Table 6-2. Output and Earnings Per New Worker Generated by $343 Million in Construction Activity, Indirect and Induced Activity Only | | | |
|---|---|---|---|
| Industry group | Employment | Output/Empl | Earnings/Empl |
| Agriculture, forestry, fishing, | 0.6 | 117.6 | 0.0 |
| Mining | 7.6 | 342.3 | 63.1 |
| Utilities | 13.2 | 536.3 | 93.3 |
| Construction | 22.0 | 124.6 | 42.7 |
| Manufacturing | 335.7 | 279.8 | 51.5 |
| Wholesale trade | 132.8 | 205.6 | 61.5 |
| Retail trade | 554.7 | 70.2 | 22.6 |
| Transportation and warehousing | 160.9 | 127.3 | 41.2 |
| Information | 77.5 | 283.3 | 58.9 |
| Finance and insurance | 199.2 | 232.8 | 66.5 |
| Real estate and rental and leasing | 170.6 | 330.7 | 26.1 |
| Professional and scientific services | 278.7 | 142.9 | 61.5 |
| Management of companies | 44.3 | 259.5 | 96.0 |
| Admin and waste mgmt services | 315.3 | 49.0 | 20.5 |
| Educational services | 56.5 | 65.5 | 26.1 |
| Health care and social assistance | 315.6 | 86.3 | 39.2 |
| Arts, entertainment, and recreation | 70.7 | 54.8 | 19.9 |
| Accommodation | 34.2 | 95.4 | 28.1 |
| Food services and drinking places | 239.1 | 46.5 | 14.3 |

| | | | |
|---|---|---|---|
| Other services | 182.9 | 89.9 | 26.8 |
| Household | 35.5 | 0.0 | 8.7 |
| Total | 3,247.6 | 138.6 | 37.6 |

SEC-USCIS-P-0000803

18

## 7. Economic Impact of Hotel Operations

According to the plans submitted by the developer, there will be 995 keys in the hotel. The total hotel space will be 615,510 square feet, or just over 640 square feet per room including common space. Taking the common area ratios into account, that would be an average of 425 square feet per key.

The cost of the entire project has been estimated to be $734,955,171. Some of this represents the cost of infrastructure, and some of the cost includes the hotel, convention center, restaurant, and parking garage. The cost of the building will be about $686,365,181. As noted above the hotel space would be 615,510 square feet, the total convention center would be 483,000 square feet (44,700 square meters) of which the core meeting space will be 290,000 square feet (26,700 square meters), the restaurant would be 55,000 square feet (5,100 square meters) which is , and the parking garage would be 591,000 square feet (55,000 square meters). However, the cost per square foot of building the parking garage is much lower than the rest of the building; we estimate that at one-third the cost of the rest of the complex. Hence the number of square-feet equivalents would equal 1,153,510   plus 591,000/3, , or 1,350,510 square feet. Based on a building cost of $686,365,181, that would be about $508 per square foot. Since each hotel room plus common area space will be about 640 square feet, that would indicate a hard cost per room of $325,000.

Table 7-1 shows the average hard construction costs for different grades of hotels; the luxury figure is $345,000. However, that is a national average. According to

hotels, the luxury figure is $646,000. However, that is a national average. According to the figures from *R. S. Means, Square Foot Costs, 31st Annual Edition (2010)*, the regional differential for commercial construction costs in the Chicago area is 1.16, which means the $332,000 figure should be divided by 1.16 to translate into a national average figure. That would be about $287,000 per room. That would put these hotel rooms above the full-service level, but not at the true luxury level, as discussed next.

| Table 7-1  Hotel Costs per Room by Type of Hotel. 2010 Survey | | | | | | |
|---|---|---|---|---|---|---|
| **Hotel Category** | Land | Hard Constr | Soft Constr | FF&E | Working Capital | Total |
| **Budget/Economy** | | | | | | |
| Average | $11,700 | $50,800 | $4,400 | $8,100 | $3,200 | $65,200 |
| Median | $11,200 | $46,200 | $2,200 | $8,100 | $2,900 | $52,700 |
| **Extended Stay** | | | | | | |
| Average | $12,200 | $79,000 | $11,300 | $12,600 | $3,300 | $131,600 |
| Median | $10,900 | $69,300 | $9,900 | $13,000 | $2,400 | $105,500 |

SEC-USCIS-P-0000804

19

| | | | | | | |
|---|---|---|---|---|---|---|
| **Mid-scale w/o food&bev** | | | | | | |
| Average | $23,400 | $71,400 | $11,100 | $9,500 | $4,100 | $98,000 |
| Median | $12,200 | $63,100 | $8,100 | $9,200 | $2,800 | $82,100 |
| **Mid-scale w/ food & bev** | | | | | | |
| Average | $13,900 | $76,800 | $13,200 | $12,000 | $3,800 | $117,300 |
| Median | $10,200 | $63,300 | $10,400 | $11,300 | $3,000 | $100,600 |
| **Full-Service** | | | | | | |
| Average | $16,800 | $122,900 | $22,200 | $22,000 | $6,900 | $208,100 |
| Median | $13,200 | $111,600 | $14,000 | $18,100 | $5,700 | $156,200 |
| **Luxury** | | | | | | |
| Average | $86,700 | $345,700 | $133,800 | $54,000 | $20,800 | $598,500 |
| Median | $88,600 | $299,800 | $88,600 | $57,700 | $18,700 | $538,200 |

Source: HVS Associates 2010 Hotel Survey

Evans, Carroll & Associates has calculated the likely breakdown of the 61 employees per 100 hotel rooms for a standard hotel with a 75% occupancy rate, which is the national average; these figures can then be adjusted upward to reflect hiring practices at luxury hotels. The maid service figure is based on each maid cleaning 12 rooms per day; in some hotels, the figure is as high as 15 rooms per day, but that is

rooms per day; in some hotels, the figure is as high as 15 rooms per day, but that is unusual. This figure declines as the size of the room increases, and is estimated to be 8.5 rooms per day for luxury establishments. The front desk figure for a standard hotel assumes 4 people for each of 3 shifts; this figure also includes receptionists and people who answer the phone.

A recent survey of luxury hotel chains in the U.S., including the Mandarin Oriental, St. Regis Hotel, Ritz Carlton, and Four Seasons chains, found an average hotel room of 430 square feet, and an average of 1.7 employees per room except for the Ritz Carlton, which is slightly less luxurious at a rate of 1.2 employees per room. It is assumed that at a luxury hotel there are 6 people per shift at the front desk, and the addition of concierge and bellhop personnel throughout the day and night. The food service figures have been expanded to include room service and an extensive trade in meeting and banquet facilities. Three employees are available on each shift for customer relations instead of one. Similarly, three employees instead of two are available per shift for management, security, engineering, and inside maintenance, and janitorial services and outside maintenance, In addition, two employees per shift are added for reservations and for meeting and banquet facilities. All these results are summarized in Table 7-2.

SEC-USCIS-P-0000805

20

| Category | Budget | Standard | Upscale | Semi Luxury | True Luxury |
|---|---|---|---|---|---|
| Maid Service | 6 | 8 | 10 | 11 | 12 |
| Front Desk | 6 | 12 | 15 | 18 | 18 |
| Doormen | 0 | 3 | 3 | 4 | 6 |
| Bellhops | 1 | 0 | 4 | 6 | 8 |
| Parking Valets | 0 | 0 | 3 | 6 | 8 |
| Concierge | 0 | 0 | 3 | 6 | 6 |
| Food Service | 3 | 14 | 20 | 30 | 45 |
| Customer relations | 3 | 3 | 6 | 7 | 9 |
| Management | 3 | 6 | 6 | 7 | 9 |
| Security | 3 | 6 | 6 | 7 | 9 |
| Engineering/inside maint | 4 | 6 | 6 | 7 | 9 |
| Janitor/outside maint | 3 | 3 | 6 | 7 | 9 |
| Reservations | 0 | 0 | 3 | 6 | 6 |
| Meeting & Banquet | 0 | 0 | 0 | 3 | 6 |
| Total | 32 | 61 | 91 | 120 | 160 |

Table 7-2. Hotel Employees Per 100 Rooms

Based on the hard construction cost per room, we would put this hotel midway between the semi-luxury and true luxury class, which means there would be an average of 1.4 employees per room. We now use this figure to calculate the probable room rate.

According to the RIMS II data for this region, the average output per hotel worker – a figure that includes sales of ancillary goods and services but is adjusted for occupancy rates – is $95,400, as shown in Table 7-4. If there are 1.4 employees per room, that would be indicate annual revenue per room of about $133,500. On that basis, the average revenue per room would be about $366, which includes sales of food and beverages and other ancillary revenues. When those are excluded, and the adjustment is made for an assumed 87% occupancy rate the first year, this figure is reduced to an ADR of $304.

If the ADR is $304, the occupancy rate is 87%, and sales of food and beverages and other ancillary goods and services are 1/3 of the room rate, as based on the surveys of the hotel industry, that would indicate annual revenues of $128 million per year, which is the figure entered into the RIMS II model. The industry details are shown in Tables 7-3 and 7-4.

SEC-USCIS-P-0000806

21

| Table 7-3. Increase in Employment, Output, and Earnings for $128 Million in Hotel Operations and Ancillary Services | | | |
|---|---|---|---|
| Industry group | Employment | Output | Earnings |
| Agriculture, forestry, fishing, | 0.2 | 26 | 0 |
| Mining | 0.1 | 38 | 13 |
| Utilities | 8.2 | 4,314 | 781 |
| Construction | 13.0 | 1,626 | 563 |
| Manufacturing | 51.4 | 15,002 | 2,624 |
| Wholesale trade | 25.7 | 5,274 | 1,574 |
| Retail trade | 112.1 | 7,859 | 2,534 |
| Transportation and warehousing | 55.0 | 6,144 | 2,432 |
| Information | 42.0 | 10,637 | 2,458 |
| Finance and insurance | 69.5 | 16,218 | 4,582 |
| Real estate and rental and leasing | 65.4 | 19,635 | 1,549 |
| Professional and scientific services | 81.3 | 11,469 | 5,235 |
| Management of companies | 30.6 | 7,962 | 2,944 |
| Admin and waste mgmt services | 146.2 | 7,693 | 3,008 |
| Educational services | 18.3 | 1,203 | 474 |
| Health care and social assistance | 100.9 | 8,704 | 3,955 |
| Arts, entertainment, and recreation | 34.2 | 1,792 | 653 |
| Accommodation | 1,355.1 | 129,216 | 38,298 |
| Food services and drinking places | 109.7 | 5,094 | 1,587 |

| | | | |
|---|---|---|---|
| Other services | 62.3 | 5,581 | 1,664 |
| Total | 2,392.6 | 265,485 | 77,030 |

Table 7-3 shows there will be a total of 2,392 permanent new jobs created by the hotel operations. Total annual output is expected to rise about $265 million per year, with household earnings increasing by $77 million per year. Table 7-4 shows that the average output per new hotel worker is about $95,400, with annual earnings about $28,300. For all new workers, the comparable figures are $110,000 for output and $32,200 for earnings.

SEC-USCIS-P-0000807