22

| Table 7-4. Output and Earnings Per New Worker Generated by $128 Million in Hotel and Ancillary Operations | | | |
|---|---|---|---|
| Industry group | Employment | Output/Empl | Earnings/Empl |
| Agriculture, forestry, fishing, | 0.2 | 133.3 | 0.0 |
| Mining | 0.1 | 333.3 | 111.1 |
| Utilities | 8.2 | 523.3 | 94.7 |
| Construction | 13.0 | 124.6 | 43.2 |
| Manufacturing | 51.4 | 292.0 | 51.1 |
| Wholesale trade | 25.7 | 205.5 | 61.3 |
| Retail trade | 112.1 | 70.1 | 22.6 |
| Transportation and warehousing | 55.0 | 111.7 | 44.2 |
| Information | 42.0 | 253.4 | 58.5 |
| Finance and insurance | 69.5 | 233.4 | 66.0 |
| Real estate and rental and leasing | 65.4 | 300.1 | 23.7 |
| Professional and scientific services | 81.3 | 141.1 | 64.4 |
| Management of companies | 30.6 | 259.8 | 96.1 |
| Admin and waste mgmt services | 146.2 | 52.6 | 20.6 |
| Educational services | 18.3 | 65.9 | 25.9 |
| Health care and social assistance | 100.9 | 86.3 | 39.2 |
| Arts, entertainment, and recreation | 34.2 | 52.4 | 19.1 |
| Accommodation | 1,355.1 | 95.4 | 28.3 |
| Food services and drinking places | 109.7 | 46.4 | 14.5 |

| | | | |
|---|---|---|---|
| Other services | 62.3 | 89.6 | 26.7 |
| Household | 11.4 | 0.0 | 9.0 |
| | | | |
| Total | 2,392.6 | 111.0 | 32.2 |

SEC-USCIS-P-0000808

23

## 8. Economic Impact of Restaurant Operations

The figures supplied by the developer's market research feasibility report by T.R. Mandigo & Co. show total food and beverage revenues of $117.33 million in the first year of operation. However, those are generated from three separate sources. First, it is assumed that food and beverage service to hotel patrons represent 20% of total hotel room revenues (i.e. 26.67% of the room rate), which would be $25.6 million; that figure has already been included in the calculations shown in the previous section. Second, the complex contains 55,000 square feet (5,100 square meters) of restaurant space, with average sales per square foot assumed to be $750, for a total of $41.25 million. Third, the remaining food and beverage sales, which are $117.33 - $25.6 - $41.25, which is $50.48 million. This figure is included in the calculations for convention center activity shown in Section (9). The two tables in this section show the industry detail for $41.25 million of restaurant sales in 55,000 square feet of restaurant space.

| Table 8-1. Increase in Employment, Output, and Earnings for $41.25 Million of Revenue in Restaurant Operations | | | |
| --- | --- | --- | --- |
| Industry group | Employment | Output | Earnings |
| Agriculture, forestry, fishing, | 0.1 | 12 | 0 |
| Mining | 0.0 | 17 | 4 |
| Utilities | 2.5 | 1,291 | 231 |
| Construction | 3.3 | 417 | 144 |

| | | | |
|---|---|---|---|
| Manufacturing | 27.2 | 8,300 | 1,341 |
| Wholesale trade | 14.6 | 880 | 287 |
| Retail trade | 40.3 | 2,826 | 912 |
| Transportation and warehousing | 20.8 | 2,421 | 924 |
| Information | 11.9 | 3,094 | 693 |
| Finance and insurance | 23.1 | 5,391 | 1,518 |
| Real estate and rental and leasing | 30.1 | 8,056 | 701 |
| Professional and scientific services | 23.8 | 3,304 | 1,506 |
| Management of companies | 10.5 | 2,723 | 1,002 |
| Admin and waste mgmt services | 36.7 | 1,869 | 759 |
| Educational services | 6.2 | 404 | 161 |
| Health care and social assistance | 34.4 | 2,970 | 1,349 |
| Arts, entertainment, and recreation | 13.2 | 619 | 227 |
| Accommodation | 4.4 | 421 | 124 |
| Food services and drinking places | 918.4 | 42,640 | 13,229 |
| Other services | 19.8 | 1,778 | 532 |
| Household | 3.9 | 0 | 33 |
| | | | |
| Total | 1,245.0 | 91,526 | 26,276 |

SEC-USCIS-P-0000809

24

Table 8-1 shows there will be a total of 1,245 permanent new jobs created by the restaurant operations as described above. Total annual output is expected to rise about $91.5 million, with household earnings increasing by $26.3 million. Table 8-2 shows that the average output per new restaurant worker is about $46,400, with annual earnings about $14,400 (this figure excludes most tips). For all new workers, the comparable figures are $73,500 for output and $21,100 for earnings.

### Table 8-2. Output and Earnings Per New Worker for $41.25 Million of Revenue in Restaurant Operations

| Industry group | Employment | Output/Empl | Earnings/Empl |
|---|---|---|---|
| Agriculture, forestry, fishing, | 0.1 | 125.0 | 0.0 |
| Mining | 0.0 | 363.6 | 90.9 |
| Utilities | 2.5 | 524.3 | 93.8 |
| Construction | 3.3 | 124.4 | 43.1 |
| Manufacturing | 27.2 | 305.4 | 49.3 |
| Wholesale trade | 14.5 | 205.6 | 61.3 |
| Retail trade | 40.3 | 70.2 | 22.6 |
| Transportation and warehousing | 20.8 | 116.5 | 44.5 |
| Information | 11.9 | 260.9 | 58.4 |
| Finance and insurance | 23.1 | 233.4 | 65.7 |

| | | | |
|---|---|---|---|
| Real estate and rental and leasing | 30.1 | 267.2 | 23.3 |
| Professional and scientific services | 23.8 | 138.7 | 63.2 |
| Management of companies | 10.5 | 260.0 | 95.7 |
| Admin and waste mgmt services | 36.7 | 50.9 | 20.7 |
| Educational services | 6.2 | 65.4 | 26.0 |
| Health care and social assistance | 34.4 | 86.3 | 39.2 |
| Arts, entertainment, and recreation | 13.2 | 47.1 | 17.3 |
| Accommodation | 4.4 | 95.1 | 28.0 |
| Food services and drinking places | 918.4 | 46.4 | 14.4 |
| Other services | 19.8 | 89.7 | 26.9 |
| Household | 3.9 | 0.0 | 8.5 |
| | | | |
| Total | 1,245.0 | 73.5 | 21.1 |

SEC-USCIS-P-0000810

25

# 9. Economic Impact of Convention Center

The revenue inputs for the convention center stem from two sources. One is the food revenue of slightly over $50 million, which is based on data supplied by the developer. The other is the revenue earned by the convention center based on exhibitor fees, for which the developer did not supply estimates. We have calculated these fees at about $20 million, as explained next.

The comparison is made with McCormack Place, which has had the following annual revenues as shown in Figure 9-1.

**Figure 9-1. Annual Revenues for Metropolitan Pier and Exposition Authority**

### Losing Business
Operating revenues for
Chicago's Metropolitan Pier and
Exposition Authority, in millions

$250

200

150





Estimate; Note. Fiscal year ends June 30
Source: Chicago's MPEA

McCormick Place has about 2.6 million square feet of exhibition space; by comparison, this new convention center will have 290,000 square feet (26,700 square meters), or slightly more than 10% as much. Based on this metric, we would assume that the revenue of the new convention center would also be about 10% of McCormack Place. We have used a figure of $200 million for comparison, rather than the $170 million figure for FY 2010 shown in the above graph, on the grounds that (a) the economy will recover and convention business will pick up and (b) the new convention center will not be saddled with as many outmoded work rules as McCormack Place.

On this basis, then, the economic impact of the new convention center is calculated based on revenues of $50.48 million for food and $20 million for other convention center fees. The industry details are shown in the next two tables.

SEC-USCIS-P-0000811

26

## Table 9-1. Increase in Employment, Output, and Earnings for $70.48 Million Revenues from Convention Center Operations, Including Food Services

| Industry group | Employment | Output | Earnings |
|---|---|---|---|
| Agriculture, forestry, fishing, | 0.1 | 7 | 0 |
| Mining | 0.0 | 14 | 0 |
| Utilities | 2.7 | 1,403 | 254 |
| Construction | 4.1 | 507 | 176 |
| Manufacturing | 37.4 | 9,966 | 1,896 |
| Wholesale trade | 14.6 | 3,009 | 902 |
| Retail trade | 58.5 | 4,109 | 1,325 |
| Transportation and warehousing | 32.5 | 3,602 | 1,304 |
| Information | 21.0 | 5,667 | 1,247 |
| Finance and insurance | 42.0 | 9,747 | 2,763 |
| Real estate and rental and leasing | 39.7 | 11,108 | 951 |
| Professional and scientific services | 47.1 | 6,449 | 2,953 |
| Management of companies | 9.2 | 2,389 | 881 |
| Admin and waste mgmt services | 815.3 | 76,062 | 20,594 |
| Educational services | 9.6 | 634 | 247 |
| Health care and social assistance | 52.7 | 4,553 | 2,065 |
| Arts, entertainment, and recreation | 21.6 | 1,050 | 381 |
| Accommodation | 8.5 | 818 | 240 |

| | | | |
|---|---|---|---|
| Food services and drinking places | 66.0 | 3,066 | 951 |
| Other services | 30.0 | 2,742 | 803 |
| Household | 5.9 | 0 | 56 |
| | | | |
| Total | 1,318.7 | 146,901 | 39,990 |

Table 9-1 shows there will be a total of 1,319 permanent new jobs created by the convention center operations as described above. Total annual output is expected to rise about $147 million, with household earnings increasing by $40 million. Table 9-2 shows that the average output per new convention center worker is about $93,300, with annual earnings about $25,300. For all new workers, the comparable figures are $111,400 for output and $30,300 for earnings.

SEC-USCIS-P-0000812

| Table 9-2. Output and Earnings Per New Worker for $70.48 Million Revenues from Convention Center Operations, Including Food Services | | | |
|---|---|---|---|
| Industry group | Employment | Output/Empl | Earnings/Empl |
| Agriculture, forestry, fishing, | 0.1 | 76.9 | 0.0 |
| Mining | 0.0 | 285.7 | 0.0 |
| Utilities | 2.7 | 526.5 | 95.2 |
| Construction | 4.1 | 125.2 | 43.5 |
| Manufacturing | 37.4 | 266.1 | 50.6 |
| Wholesale trade | 14.6 | 205.6 | 61.6 |
| Retail trade | 58.5 | 70.2 | 22.6 |
| Transportation and warehousing | 32.5 | 110.7 | 40.1 |
| Information | 21.0 | 269.4 | 59.3 |
| Finance and insurance | 42.0 | 232.1 | 65.8 |
| Real estate and rental and leasing | 39.7 | 280.0 | 24.0 |
| Professional and scientific services | 47.1 | 136.8 | 62.7 |
| Management of companies | 9.2 | 260.2 | 95.9 |
| Admin and waste mgmt services | 815.3 | 93.3 | 25.3 |
| Educational services | 9.6 | 65.9 | 25.6 |
| Health care and social assistance | 52.7 | 86.4 | 39.2 |
| Arts, entertainment, and recreation | 21.6 | 48.7 | 17.7 |
| Accommodation | 8.5 | 95.6 | 28.0 |

| | | | |
|---|---|---|---|
| Food services and drinking places | 66.0 | 46.5 | 14.4 |
| Other services | 30.0 | 81.3 | 26.8 |
| Household | 5.9 | 0.0 | 9.5 |
| Total | 1,318.7 | 111.4 | 30.3 |

SEC-USCIS-P-0000813

# 10. Economic Impact of Parking Garage

According to the developer, there would be 591,000 square feet (55,000 square meters) of parking space. The developer has also indicated there will be 1,720 parking spaces, or an average of 344 square feet per vehicle. The total daily rate (including some spaces being used by more than one vehicle) is expected to be about $30/day, or about $1,100 per year. Hence total annual revenues would be about $20 million. The industry details are shown in the next two tables.

| Table 10-1. Increase in Employment, Output, and Earnings for Parking Garage with 2,000 Spaces | | | |
|---|---|---|---|
| Industry group | Employment | Output | Earnings |
| Agriculture, forestry, fishing, | 0.0 | 2 | 0 |
| Mining | 0.0 | 4 | 0 |
| Utilities | 0.6 | 306 | 54 |
| Construction | 1.1 | 142 | 48 |
| Manufacturing | 7.7 | 2,114 | 398 |
| Wholesale trade | 3.7 | 756 | 226 |
| Retail trade | 12.6 | 884 | 284 |
| Transportation and warehousing | 7.7 | 864 | 320 |
| Information | 7.2 | 2,116 | 424 |

| | | | |
|---|---|---|---|
| Finance and insurance | 10.3 | 2,450 | 676 |
| Real estate and rental and leasing | 12.9 | 3,012 | 288 |
| Professional and scientific services | 14.0 | 1,876 | 864 |
| Management of companies | 2.1 | 546 | 202 |
| Admin and waste mgmt services | 48.7 | 2,022 | 946 |
| Educational services | 2.0 | 130 | 50 |
| Health care and social assistance | 10.9 | 940 | 426 |
| Arts, entertainment, and recreation | 5.5 | 334 | 110 |
| Accommodation | 1.6 | 150 | 44 |
| Food services and drinking places | 10.3 | 478 | 148 |
| Other services | 131.3 | 20,720 | 2,784 |
| Household | 1.2 | 0 | 12 |
| | | | |
| Total | 291.5 | 39,846 | 8,304 |

Table 10-1 shows there will be a total of 291 permanent new jobs created by the parking garage operations as described above. Total annual output is expected to rise about $39.8 million, with household earnings increasing by $8.3 million. Table 10-2 shows that the average output per new parking garage worker is about $157,800, with

SEC-USCIS-P-0000814

29

annual earnings about $21,200. For all new workers, the comparable figures are $136,700 for output and $28,500 for earnings.

| Table 10-2. Output and Earnings Per New Worker for Parking Garage with 2,000 Spaces | | | |
|---|---|---|---|
| Industry group | Employment | Output/Empl | Earnings/Empl |
| Agriculture, forestry, fishing, | 0.0 | 111.1 | 0.0 |
| Mining | 0.0 | 333.3 | 0.0 |
| Utilities | 0.6 | 529.4 | 93.4 |
| Construction | 1.1 | 125.0 | 42.3 |
| Manufacturing | 7.7 | 273.4 | 51.5 |
| Wholesale trade | 3.7 | 205.5 | 61.4 |
| Retail trade | 12.6 | 70.2 | 22.6 |
| Transportation and warehousing | 7.7 | 112.0 | 41.5 |
| Information | 7.2 | 294.3 | 59.0 |
| Finance and insurance | 10.3 | 237.3 | 65.5 |
| Real estate and rental and leasing | 12.9 | 233.5 | 22.3 |
| Professional and scientific services | 14.0 | 133.6 | 61.5 |
| Management of companies | 2.1 | 260.0 | 96.2 |
| Admin and waste mgmt services | 48.7 | 41.5 | 19.4 |

| | | | |
|---|---|---|---|
| Educational services | 2.0 | 66.1 | 25.4 |
| Health care and social assistance | 10.9 | 88.3 | 39.0 |
| Arts, entertainment, and recreation | 5.5 | 61.1 | 20.1 |
| Accommodation | 1.6 | 95.3 | 28.0 |
| Food services and drinking places | 10.3 | 46.5 | 14.4 |
| Other services | 131.3 | 157.8 | 21.2 |
| Household | 1.2 | 0.0 | 9.7 |
| | | | |
| Total | 291.5 | 136.7 | 28.5 |

SEC-USCIS-P-0000815

30

# 11. Economic Impact of Total Project

The following two tables summarize the results given in the previous five sections; the individual cells are just the sums (or averages) of those figures, and are presented for ease of exposition.

| Table 11-1. Increase in Employment, Output, and Earnings for Construction and Operation of Hotel and Convention Center Complex | | | |
|---|---|---|---|
| Industry group | Employment | Output | Earnings |
| Agriculture, forestry, fishing, | 1.0 | 116 | 0 |
| Mining | 7.8 | 2,680 | 497 |
| Utilities | 27.2 | 14,413 | 2,554 |
| Construction | 43.6 | 5,436 | 1,872 |
| Manufacturing | 459.4 | 129,294 | 23,546 |
| Wholesale trade | 191.2 | 39,316 | 11,753 |
| Retail trade | 778.2 | 54,608 | 17,609 |
| Transportation and warehousing | 276.9 | 33,508 | 11,600 |
| Information | 159.5 | 43,465 | 9,384 |
| Finance and insurance | 344.1 | 80,180 | 22,779 |
| Real estate and rental and leasing | 318.8 | 98,234 | 7,949 |
| Professional and scientific services | 444.9 | 62,920 | 27,708 |

| | | | |
|---|---|---|---|
| Management of companies | 96.7 | 25,110 | 9,283 |
| Educational services | 92.5 | 6,076 | 2,406 |
| Health care and social assistance | 514.5 | 44,401 | 20,177 |
| Arts, entertainment, and recreation | 145.1 | 7,671 | 2,777 |
| Accommodation | 1,403.8 | 133,863 | 39,665 |
| Food services and drinking places | 1,343.5 | 62,392 | 19,346 |
| Other services | 426.3 | 47,250 | 10,688 |
| Household | 58.0 | 0 | 512 |
| | | 0 | 0 |
| Total | 8,495.3 | 994,014 | 273,860 |

Table 11-1 shows there will be a total of 8,495 permanent new jobs created by the construction and operation of hotel and convention center complex. The total increase in output will be about $994 million, and the increase in household earnings will be about $274 million. Table 11-2 shows that average output per new worker will be about $117,000, while average annual earnings will be about $32,200.

SEC-USCIS-P-0000816

31

| Table 11-2. Output and Earnings Per New Worker for Construction and Operation of Hotel and Convention Center Complex | | | |
|---|---|---|---|
| Industry group | Employment | Output/Empl | Earnings/Empl |
| Agriculture, forestry, fishing, | 1.0 | 117.5 | 0.0 |
| Mining | 7.8 | 342.0 | 63.4 |
| Utilities | 27.2 | 530.1 | 94.0 |
| Construction | 43.6 | 124.7 | 42.9 |
| Manufacturing | 459.4 | 281.4 | 51.2 |
| Wholesale trade | 191.2 | 205.6 | 61.5 |
| Retail trade | 778.2 | 70.2 | 22.6 |
| Transportation and warehousing | 276.9 | 121.0 | 41.9 |
| Information | 159.5 | 272.4 | 58.8 |
| Finance and insurance | 344.1 | 233.0 | 66.2 |
| Real estate and rental and leasing | 318.8 | 308.2 | 24.9 |
| Professional and scientific services | 444.9 | 141.4 | 62.3 |
| Management of companies | 96.7 | 259.7 | 96.0 |
| Admin and waste mgmt services | 1,362.2 | 75.7 | 23.3 |
| Educational services | 92.5 | 65.7 | 26.0 |
| Health care and social assistance | 514.5 | 86.3 | 39.2 |
| Arts, entertainment, and recreation | 145.1 | 52.9 | 19.1 |
| Accommodation | 1,403.8 | 95.4 | 28.3 |
| Food services and drinking places | 1,343.5 | 46.4 | 14.4 |

| | | | |
|---|---|---|---|
| Other services | 426.3 | 110.8 | 25.1 |
| Household | 58.0 | 0.0 | 8.8 |
| Total | 8,495.3 | 117.0 | 32.2 |

This project would serve as an important step in reestablishing Chicago as a major convention center; as noted earlier in this report, attendance and participation of major trade shows in the Chicago area has slipped significantly over the past several years. The new state-of-the art convention center, together with the five 5-star hotels and close proximity to Chicago O'Hare International airport, is expected to attract much of this lost business. In addition, the program will provide almost 8,500 permanent new jobs to an area that has been hard hit by the recent recession.

SEC-USCIS-P-0000817

32

# Appendix:  Resume of Dr. Michael K. Evans

mevans@evanscarrollecon.com

## *CURRENT AND PREVIOUS POSITIONS*

• Chairman, *Evans, Carroll & Associates, Inc.*, 1980-present  (previously Evans Economics)

Economic consulting firm specializing in EB-5 immigration analysis, economic impact studies of development projects and new construction, models of state and local tax receipts, impact of current and proposed government legislation, and construction of econometric models for individual industries and companies.

• Chief Economist, *American Economics Group*, 2000-present.

Built a comprehensive state modeling system that provides economic analysis for a variety of consulting projects (see below).

• Clinical Professor of Economics, Department of Managerial Economics and Decision Sciences (MEDS), Kellogg Graduate School of Management, Northwestern University, 1996-99.

Taught courses in macroeconomics and business forecasting.  Wrote textbooks for both courses.

• Winner of Blue Chip Economic Indicator Award for most accurate macroeconomic

- Founder and President, *Chase Econometric Associates*, 1970-1980

- Assistant and Associate Professor of Economics, Wharton School, University of Pennsylvania, 1964-69. Co-developer of the original Wharton Model.

- Visiting Professor, Radford University, (Radford, VA), 1987

  Chairman of Institute for International Economic Competitiveness

- Visiting Lecturer, Hebrew University (Jerusalem), 1966-67

  Built econometric model of the Israeli economy

Ph. D. in Economics, Brown University. Dissertation, "A Postwar Quarterly Model of the United States Economy, 1948-1962". A. B. in Mathematical Economics, Brown University

SEC-USCIS-P-0000818

33

## *PREVIOUS ACTIVITIES AND EDUCATION*

• Contributing Editor, *Industry Week*

Wrote a column in each issue on economic and financial trends as they impact the manufacturing sector.

• Editor, *The Evans Report*

Weekly newsletter discussing economic trends and financial markets. Pioneered the concept of the Monthly Tracking Model to incorporate recent economic releases into the overall economic forecast, including methods to predict these economic data.

• Consultant, *National Printing Equipment and Supply Association*

Prepares quarterly forecasts of shipments of printing equipment and graphic arts supplies by product line, based on an econometric model constructed for NPES. Also prepares analysis and forecasts of exports and imports by principal product line.

• Consultant, *APICS -- The Educational Society for Resource Management,*

In 1993, designed and developed the *APICS Business Outlook Index*, which uses survey data collected by the Evans Group to measure current production, production plans, shipments, employment, new orders, unfilled orders, inventory stocks, and the

comparison of the actual to desired inventory/sales ratio to predict short-term changes in manufacturing sector activity. The results of this survey appeared every month in *APICS: The Performance Advantage*

Case: 1-13-cv-00982 Document #: 11-3 Filed: 02/06/13 Page 24 of 205 PageID #:1221

• Consultant, *American Hardware Manufacturing Association*

Wrote a separate weekly edition of the Evans Report analyzing recent trends in the hardware and housing industries, including forecasts of the hardware industry based on an econometric model developed for AHMA.

• Board of Economists, *Los Angeles Times*

Wrote column every 6 weeks (5 other economists on the Board)

• Columnist, *United Press International*

Wrote twice-weekly column, "Dollars and Trends"

• Consultant, Senate Finance Committee,

Built the first large-scale supply-side model of the U. S. economy

SEC-USCIS-P-0000819

34

- Consultant, Environmental Protection Agency and Council on Environmental Quality

Estimated inflationary impact of government regulations

- Consultant, National Aeronautics and Space Administration

Estimate impact of R&D spending on productivity growth

- Consultant, U. S. Treasury

Estimated impact of investment tax credit and accelerated depreciation on capital spending by industry

- Consultant, U. S. Department of Agriculture

Built large-scale econometric model of agricultural sector of U. S. economy

- Consultant, Organization of Economic Cooperation and Development

Built econometric model of the French economy

## *SAMPLE OF RECENT CONSULTING PROJECTS*

## A. Economic Impact of EB-5 Immigrant Investor Programs and New Markets Tax Credits

For more information on these projects, see www.evanseb5.com

List is current as of April 1, 2010. Totals to date are 87 new regional centers, 58 extensions, and 7 new markets tax credits, for a total of 152 projects

## A. Economic Impact of EB-5 Immigrant Investor Programs and New Markets Tax Credits

E● Calculated the economic impact of construction and operation of a new automobile assembly plant in Petersburg, VA

N● Calculated the economic impact of operating a call center for the U.S. government in Muskogee, OK

N● Calculated the economic impact of developing a mixed-use commercial and residential center in Scottsdale, AZ

SEC-USCIS-P-0000820

35

N● Calculated the economic impact of constructing and operating a "Green Box" facility in New Jersey to process waste material on a pollution-free basis.

N● Calculated the economic impact of constructing and operating a "Green Box" facility in Washington State to process waste material on a pollution-free basis.

E● Calculated the economic impact of constructing and operating a new hotel in Coral Gables, FL

E● Calculated the economic impact of developing a new residential community in Brevard County, and retail stores and restaurants in St. Lucie County, FL

N ● Calculated the economic impact of a new business to store and process field crops in Madison, MS

N● Calculated the economic impact of operating food service establishments and assisted living centers in 40 counties in Texas.

E● Calculated the economic impact of developing a mixed-use commercial center in Miami, FL

N● Calculated the economic impact of renovating a theater in New York City to show film highlights of previous Broadway hits.

N● Calculated the economic impact of renovating and operating distressed buildings in the San Francisco Bay area.

E● Calculated the economic impact of a mixed-use commercial center in Montgomery County, TX

E• Calculated the economic impact of expanding a manufacturing facility to produce more energy-efficient lighting in Sarasota, FL

N• Calculated the economic impact of developing facilities for amateur sporting events in northern GA

N• Calculated the economic impact of developing a mixed-use commercial center in Missoula, MT

N• Calculated the economic impact of operating call centers in Las Vegas, NV, and other western Nevada counties

E• Calculated the economic impact of constructing and operating a proton cancer treatment center in Boca Raton, FL

E• Calculated the economic impact of constructing and operating a "Green Box" facility in Detroit to process waste material on a pollution-free basis.

E• Calculated the economic impact of renovating and expanding commercial property in Lower Manhattan

N• Calculated the economic impact of constructing student housing and retail stores in Davie, FL

SEC-USCIS-P-0000821

36

E● Calculated the economic impact of constructing residential housing near Harvard University

E● Calculated the economic impact of developing mixed-use commercial centers in Broward County, FL

E● Calculated the economic impact of renovating a Dallas apartment building

E● Calculated the economic impact of renovating and operating a nursing home in Las Vegas, NV

E● Calculated the economic impact of constructing a hotel and shopping center in Miami, FL

E● Calculated the economic impact of developing a design center in Miami/Dade county, FL

E● Calculated the economic impact of developing and operating a chain of children's playrooms and party facilities in South Florida

E● Calculated the economic impact of developing a new stadium for the Nets basketball team, to be located in Brooklyn, NY

E● Calculated the economic impact of developing a Marriott hotel in Washington, D.C.

E● Calculated the economic impact of developing and operating a casino for foreign patrons in Las Vegas, NV

E● Calculated the economic impact of operating a series of yogurt fast-food restaurants in South Florida

E• Calculated the economic impact of constructing steel homes and commercial buildings in South Florida

N• Calculated the economic impact of construction and operation of a farm distillery in Vermont

N• Calculated the economic impact of purchase and renovation of deeply discounted residential properties in South Florida

N• Calculated the economic impact of a hotel to be built near LaGuardia Airport in Queens, NY

N• Calculated the economic impact for several mixed-use commercial and residential properties for a regional center covering southern Wisconsin and northern Illinois.

N• Calculated the economic impact for mixed-use commercial project in Flushing, NY

E• Calculated the economic impact for major new hotel near the Washington, D. C. conference center

N• Calculated the economic impact of renovating and operating an assisted living center in suburban Atlanta, GA

SEC-USCIS-P-0000822

37

N• Calculated the economic impact of an office tower in mid-town Manhattan for the diamond trade

N• Calculated the economic impact of three mixed-use commercial and residential projects in Santa Clara County, CA

N• Calculated the economic impact of six mixed-use commercial and residential projects in Los Angeles, Orange, Riverside, and San Bernardino counties

N• Calculated the economic impact of operating a chain of pizza restaurants in southern Florida.

N• Calculated the economic impact of constructing and operating an assisted living facility in Atlanta, GA

E• Calculated the economic impact of constructing and operating an expansion of University Hospital in Cleveland, OH

E• Calculated the economic impact of a wastewater treatment plant in Victorville, CA

N• Calculated the economic impact of drilling for geothermal energy and constructing and operating power plants in several counties in Nevada

E• Calculated the economic impact of a vacation club operation in Orlando, FL

E• Calculated the economic impact of constructing and operating an extended-stay hotel in Boston, MA

E• Calculated the economic impact of constructing and operating an assisted living facility in Walton County, FL

N• Calculated the economic impact of manufacturing and constructing residential and commercial steel modular buildings in Lee County, FL

E• Calculated the economic impact of a chain of yogurt and juice stores and restaurants in southern Florida

E• Calculated the economic impact of two mixed-use commercial developments in Orange County, CA.

E• Calculated a Targeted Employment Area by census tracts for six counties in the Houston, TX metropolitan area

E• Calculated the expansion of new hybrid car manufacturing facility from Mississippi to Tennessee and Virginia.

E• Calculated the economic impact of construction and operation of a skilled nursing facility in Las Vegas, NV.

N• Calculated the economic impact of construction and operation of a proton cancer treatment center and medical offices buildings in Los Angeles County, CA.

E• Determined the economic impact of improving facilities at the Port of Baltimore in order to attract more shipping from the Panama Canal when the locks are widened.

SEC-USCIS-P-0000823

38

N• Calculated the economic impact of a major hotel and resort area in Ft. Lauderdale, FL.

N• Calculated the economic impact of building steel homes in South Florida, including the local manufacture of steel fabricated parts.

E• Calculated the economic impact of constructing and operating a hotel at Times Square in New York City.

N• Calculated the economic impact of a mixed-used residential and commercial project in Atlanta, GA.

E• Calculated the economic impact of expanding and opening new restaurants in Dallas, TX. In a separate project, calculated the economic impact of renovating, refurbishing, and operating a boutique hotel in Dallas, TX.

E• Calculated the economic impact of building and operating low-income housing in Boston, MA.

N• Calculated the economic impact of constructing and operating assisted living facilities in eight rural Texas counties.

N• Calculated the economic impact of a mixed-use commercial project in Riverside County, CA.

E• Calculated the economic impact of opening a manufacturing plant for "green" motor vehicles in the Detroit, MI area. APPROVED

E• Calculated the economic impact of constructing and operating hotels and

restaurants in Columbus, MS.

Case 1:10-cv-00283-RC Document 1-6 Filed 02/06/10 Page 34 of 205 Page ID #1231

Calculated the economic impact of operating 16 restaurants or 205 hotels in Hollywood, CA.

N• Calculated the economic impact of a mixed-use commercial project in McCook, IL (suburban Chicago).

N• Calculated the economic impact of constructing and operating a water-based amusement facility in San Diego, CA.

N• Calculated the economic impact of a mixed-use commercial facility in suburban Cincinnati, OH (project is in KY).

E• Calculated the economic impact of constructing and operating a casino, hotel, and restaurant in Las Vegas, NV.

N• Calculated the economic impact of a new academic institution for alternative energy in Santa Clarita, CA.

N• Calculated the economic impact of several mixed-used projects in San Francisco, Alameda County, Santa Clara County, and Fresno County.

N• Calculated the economic impact of a super energy store and solar farm in Riverside County, CA.

SEC-USCIS-P-0000824

N• Calculated the economic impact of a prostate cancer treatment center in South Carolina.

E• Calculated the economic impact of refurbishing and expanding retail space at the George Washington Bridge in New York City.

E• Calculated the economic impact of building Atlantic Yards, new stadium for the New York Nets, in Brooklyn, NY  APPROVED

N• Calculated the economic impact of an assisted living center and several mixed-use commercial facilities in the Reno, NV area.

E• Calculated the economic impact of buying residential properties at deep discount prices, refurbishing and selling them, in South Florida.

N• Calculated the economic impact for a fractional-ownership marina in Port Charlotte, FL, plus office space, retail stores, restaurants, and a home brokerage office. APPROVED

N• Calculated the economic impact of construction and operation of four retirement homes in Vermont.

E• Calculated the economic impact of an upscale retail shopping center in Vail, CO. and a medical office building in Edwards, CO (both in Eagle County).  APPROVED

E•    Calculated economic impact of a wind turbine manufacturing plant in Larimer County, CO  APPROVED

N•   Calculated economic impact of a hotel, retail stores, restaurants, office buildings,

and bank facilities in Pasadena, CA

N• Calculated economic impact of a luxury hotel and condominiums in Destin, FL

N• Calculated economic impact of constructing and operating a mixed-use commercial project in Jupiter, FL APPROVED

E• Determined whether 17 possible restaurant locations in Miami/Dade and Broward Counties qualified as Targeted Employment Areas.

E• Determined the economic impact of opening and operating a slot-machine casino in Hanover, MD, as part of a proposed EB-5 regional center for the Baltimore metropolitan area.

N• Calculated the economic impact of renovating and expanding a restaurant on Martha's Vineyard, MA, as part of an EB-5 regional center in that state.

N• Determined the economic impact of assembling and installing solar panels for residences in the state of LA.

E• Determined a Targeted Employment Area for Dallas, TX as part of a proposed EB-5 regional center for the Dallas area. APPROVED

N• Calculated the economic impact for various mixed used projects for a proposed regional center for the entire State of Texas, including shopping centers, office

SEC-USCIS-P-0000825

buildings, restaurants, assisted living centers, medical technology facilities, and other personal and business services.

N• Calculated the economic impact for the construction and operation of several fast-food restaurants in 10 counties in central California.

N• Calculated the economic impact for the renovation and expansion of a shopping mall in Greenville, SC.

E• Calculated the economic impact of buying existing apartment buildings at deep discount prices, renovating and operating them, in 21 counties in FL.

N• Calculated the economic impact of building and operating an institute for proton cancer therapy for a proposed EB-5 regional center in Brooklyn, NY. APPROVED

N• Calculated the economic impact of building and operating a mixed-use facility with medical offices, hotels, and apartments for a proposed EB-5 regional center in Queens, NY. APPROVED

E• Determined a Targeted Employment Area for Philadelphia, PA as part of a proposed EB-5 regional center for the Philadelphia area. APPROVED

N• Calculated the economic impact of a proposed office building and mixed-use facility for an EB-5 regional center in Dallas, Texas APPROVED

N• Calculated the economic impact for various mixed-use projects for a proposed EB-5 regional center in the greater New York City area, including an extended stay hotel, urgent care center, financial lending firm for alternative assets, retail stores, apartments, office space, warehouses, industrial "flex" space, entertainment centers, restaurants,

conference and convention centers, nursing home and assisted living facilities, medical offices, medical technology facilities, and high-tech manufacturing. APPROVED

N• Calculated the economic impact of "green" hotels in 10 counties in Central California. APPROVED

N• Calculated the economic impact of generic projects in manufacturing, financial services, health services, hotels, and restaurants for a proposed regional center for the state of Florida. APPROVED

E• Calculated the economic impact of 12 different types of economic activity for an expansion of the Palm Beach Regional Center to five contiguous counties. APPROVED

N• Calculated the economic impact of a new auto parts plant in Alabama to supply parts to Kia automobiles. APPROVED

N• Calculated the economic impact of opening fast-food restaurants in Miami/Dade and Broward counties in FL. APPROVED

N• Calculated the economic impact of a mixed-use commercial center in Flushing, Queens County, NY.

E• Calculated the economic impact of revitalizing and renovating part of the Brooklyn Navy Yard for "green" manufacturing facilities. APPROVED

SEC-USCIS-P-0000826

41

E• Calculated the economic impact of 12 different types of economic activity for various counties in Charlotte and Sarasota counties, FL  APPROVED

E•  Calculated the economic impact of four new manufacturing and distribution companies in Palm Beach County, FL.  APPROVED

N• Calculated the economic impact of developing a resort area and building residences in rural Tennessee.

N•  Calculated the economic impact of developing and operating a resort area in Southern Arizona.  APPROVED

N•  Calculated the economic impact of revitalizing the depressed East Side of Cleveland, Ohio, with new commercial and industrial buildings.  APPROVED

N•  Determined the nationwide economic impact of a $1 billion investment in ·Mississippi for a new hybrid motor vehicle plant.  APPROVED

N•  Determined the economic impact of expanding a shipyard in Southeastern Louisiana.  APPROVED

N•  Calculated the economic impact of a new shopping center in Buena Vista, California, and two other generic shopping centers in Los Angeles and San Bernardino counties.  APPROVED

E•  Calculated the economic impact of enhancing resort areas in eight rural counties in Colorado.  APPROVED

N•  Calculated the economic impact of the rehabilitation of Fitzsimons Village in Aurora,

Colorado, by adding an office building with medical labs, hotel, shopping center, and residences. APPROVED

E• Determined the economic impact of a mixed-use commercial center for the Kansas City metropolitan area.

N• Calculated the number of jobs created for a film production company in New York City. APPROVED

N• Calculated economic impact of small-scale rooftop solar panels in various counties in California.

N• Calculated economic impact of 7 different types of proposed businesses for a proposed regional center in the Bay Area of California. APPROVED

N• Determined the economic impact of a new biological research park, office building, and logistics center in Wooster, Ohio. APPROVED

E• Calculated the economic effect of a mixed-use urban renewal project in Cleveland, Ohio. APPROVED

N• Calculated economic impact of dairy farm and cheese processing plant in Northern California. APPROVED

SEC-USCIS-P-0000827

42

N• Determined economic impact of a shipyard, food processing plant, and semiconductor plant for a proposed regional center in Louisiana and Mississippi. APPROVED

N• Calculated the economic impact of a new gaming casino in Natchez, Mississippi. APPROVED

N• Developed an Input/output Model for Guam, which was then used to calculate the economic impact of several generic projects. APPROVED

N• Calculated the economic impact of a retail shopping center in suburban Los Angeles County. APPROVED

N• Prepared an economic impact analysis for the "timber to homes" project for a proposed regional center in Colorado. APPROVED

N• Calculated the economic impact for a proposed regional center in Baltimore, Maryland that would include the rebuilding of depressed areas in East Baltimore and along the riverfront.

N• Prepared the economic analysis for a proposed EB-5 regional center for the entire state of Florida that included impact calculations for 14 different types of industries. APPROVED

N• Prepared the economic analysis for a proposed EB-5 regional center in the San Francisco Bay area that included calculations for 10 different types of industries. APPROVED

N• Prepared economic impact calculations for proposed EB-5 regional centers in New

Mexico, including the increase in high quality jobs. NEW MARKETS

• Calculated the economic impact of a rehabilitated skilled nursing center in East Los Angeles, California, including the impact on nearby census tracts. NEW MARKETS

N• Calculated the economic impact of development of warehouse and light industrial manufacturing space in Las Vegas, Nevada. APPROVED

N• Calculated the economic impact of rehabilitation and expansion of a vacation and health spa in Sharon Springs, New York

N• Calculated economic impact of revitalizing an old resort hotel and adding new facilities for Lake Geneva, WI.

• Calculated the employment and tax effects for a portfolio of projects undertaken under the New Market capital program. NEW MARKETS

E• Calculated generic employment changes for proposed EB-5 project for an Inland Port in Palm Beach County, FL APPROVED

N• Calculated the economic impact of construction of El Monte Village in El Monte, CA. APPROVED

SEC-USCIS-P-0000828

43

• Calculated the economic impact of moving the Social Security Administration building in Birmingham, AL, and revitalizing the surrounding neighborhood. NEW MARKETS

• Calculated the economic impact of rehabbing and expanding the Everett Mall in Everett, WA. NEW MARKETS

• Determined the economic impact of building a new medical center in Charleston, SC NEW MARKETS

N• Calculated economic impact of expanding Sugarbush resort in VT. Study included expansion of existing facilities and addition of new facilities. APPROVED

• Calculated economic impact for new market tax credit program in Portsmouth, N.H. Study included both overall economic impact, and the increase in employment and income and the decrease in the unemployment rate and incidence of poverty in individual census tracts. NEW MARKETS

N• Calculated the economic benefits of EB-5 programs for foreign investors for a mixed-use construction project, including a hotel, retail stores, apartments, and a sports stadium in the Washington, D. C. metropolitan area APPROVED

N• Calculated the economic benefits of EB-5 programs for a mixed-used retail shopping center in the New York City metropolitan area. APPROVED

N• Calculated the economic benefits of EB-5 programs for foreign investors for proposed shopping centers in five separate counties in Southern California, including differential impacts of building the shopping centers in different counties. APPROVED

**B. Projects for State and Local Governments**

• Constructed an econometric model for the State of New York and determined the change in employment, labor income, and tax revenues for 43 different tax changes proposed by the Governor's office.

• Constructed a detailed econometric model for the State of Pennsylvania to determine the economic impact of the complete panoply of state taxes levied; the model contains over 1,000 equations. In cooperation with American Economics Group, the model was developed to simulate the effect of changes in any state tax rate on households and businesses by income deciles, household status, age of individuals, size of households, and many other demographic variables. The change in business taxes can also be simulated for detailed industry classifications.

• Determined whether the Washington, D.C. water and sewer authority should accept a high bid for a new waste disposal system. Decision to reject has saved the authority over $200 million, as construction prices turned down sharply as predicted.

SEC-USCIS-P-0000829

• Built an econometric model to determine the "tax gap" caused by Internet sales for the state of Minnesota.

• Determined appropriate levels of shelter grants individual counties in New York State, and for utility allowances in New York City. Reviewed and prepared testimony in ongoing court cases in these areas.

• Calculated the economic impact of the revitalization of downtown Milwaukee, Wisconsin.

## C. Economic Impact of Casino Gaming

• Built an econometric model to predict the growth of the gaming industry over the next decade, and the economic impact of that industry on employment and tax revenues at the Federal and state levels.

• Estimated the economic impact of Indian casino gaming nationally and for the State of Wisconsin.

• Determined the economic impact of the Oneida Indian gaming casino on the Green Bay metropolitan area.

• Estimated the negative economic impact on the Milwaukee area if a new Indian gaming casino were to be built in Kenosha, Wisconsin.

## D. Economic Impact of Smoking Bans and Higher Taxes

• Testified on economic impact of smoking bans in Canada; certified as an expert witness by the Court.

• Examined the impact of smoking bans on restaurant sales in several different locations in the U.S. to determine how much sales changed when these bans were imposed, and the differential effects depending on whether these bans were partial or total.

• Determined the cross-border effects on retail sales from differential rates in cigarette, gasoline, and alcohol excise taxes

• Determined the economic impact of higher cigarette taxes on minority group employment.

• Estimated the economic impact and loss of Federal and state tax revenues when higher cigarette prices lead to increased smuggling.

SEC-USCIS-P-0000830

45

### E. Consulting Projects for Travel and Tourism

• Built an econometric model to predict tourism trips and revenues for the major regions of the U.S. economy.

• Constructed econometric models to predict tourism in Las Vegas and Orlando.

• Using the IMPLAN model, predicted economic impact of tourism and travel expenditures for all counties in Pennsylvania.

### F. Other Private Sector Consulting Projects

• Calculated the revenue gain at the Federal, state and local level generated by domestic manufacturing of Airbus parts and equipment.

• Calculated the economic impact of proposed EPA bans on fluoropolymer production.

• Estimated the size and economic importance of the fluoropolymer industry, and calculated economic impact of shutting down domestic production.

• Built an econometric model to examine how U.S. tax and regulatory policies help determine whether the gold mining industry would invest in the U.S. or other countries. Testified before Congress to help defeat legislation inimical to the mining industry.

• Built an econometric model to predict consumer bankruptcies, based on recent growth in consumer credit outstanding, the overall economic environment, and recent changes in credit regulations

• Estimated the economic impact of the ethanol subsidy on the U.S. economy and Farm Belt States, including the impact on the balance of payments, employment, and tax receipts. Testified before Congress to help pass legislation to extent subsidies to the ethanol industry.

• Built an econometric model to determine the impact of updating and improving the system of locks on the Upper Mississippi River on corn prices and exports, farm income, and the overall economy.

SEC-USCIS-P-0000831

46

## BOOKS PUBLISHED

Macroeconomics for Managers, Blackwell, 2003

Practical Business Forecasting, Blackwell, 2002

Economic Impact of the Demand for Ethanol, Diane Publishing Company, 1998

How to Make Your Shrinking Salary Support You in Style for the Rest of Your Life, Random House, 1991

The Truth About Supply-Side Economics. Basic Books, 1983.

A Supply-Side Model of the U. S. Economy, mimeo (prepared for Senate Finance Committee), 1980.

An Econometric Model of the French Economy: A Short-Term Forecasting Model. O.E.C.D, March 1969.

Econometric Gaming (with L. R. Klein and M. J. Hartley). Random House, 1969.

Macroeconomic Activity: Theory, Forecasting and Control. Harper & Row, 1969.

The Wharton Econometric Forecasting Model. (with L. R. Klein). Economics Research

The Wharton Econometric Forecasting Model (with L.R. Klein), Economics Research Unit, Wharton School: University of Pennsylvania Press, 1967. Enlarged edition, 1968.

Over 30 articles in major academic journals and publications (list on request)

SEC-USCIS-P-0000832

# EXHIBIT

J

# ATTACHMENT
# 5-A

SEC-USCIS-P-0000837



**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**OF**

**A CHICAGO CONVENTION CENTER, LLC**

**AN ILLINOIS LIMITED LIABILITY COMPANY**

THE LIMITED LIABILITY MEMBERSHIP INTERESTS EVIDENCED BY THIS DOCUMENT (THE "**INTERESTS**") HAVE NOT HAVE NOT BEEN REGISTERED WITH OR QUALIFIED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE. THE INTERESTS ARE BEING SOLD IN RELIANCE UPON EXEMPTIONS FROM SUCH REGISTRATION OR QUALIFICATION REQUIREMENTS. THE INTERESTS CANNOT BE SOLD, TRANSFERRED, ASSIGNED, OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT AND APPLICABLE FEDERAL AND STATE SECURITIES LAWS.

SEC-USCIS-P-0000838

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| **ARTICLE I** | THE COMPANY | 4 |
| 1.1 | Formation; Continuation | 4 |
| 1.2 | Name | 4 |
| 1.3 | Principal Place of Business | 4 |
| 1.4 | Purposes and Powers | 5 |
| 1.5 | Registered Office and Agent | 5 |
| 1.6 | Fiscal and Taxable Year | 5 |
| 1.7 | Term | 5 |
| 1.8 | Filings | 5 |
| **ARTICLE II** | DEFINITIONS | 5 |
| **ARTICLE III** | CAPITAL CONTRIBUTIONS | 12 |
| 3.1 | Closings; Acceptance of Subscriptions | 12 |
| 3.2 | Capital Contributions | 12 |
| 3.3 | No Right to Redemption of Interests or Return of Capital Contributions | 13 |
| 3.4 | Uncertificated Interests | 13 |

3.5    Limitation on Liability of Investing Members............................................. 13

3.7    Negative Capital Accounts ............................................................................ 13

ARTICLE IV    ALLOCATIONS OF PROFITS AND LOSSES ................................... 13

    4.1    Losses.............................................................................................................. 13

    4.2    Profits............................................................................................................ 14

    4.3    Special Allocations ...................................................................................... 14

ARTICLE V    DISTRIBUTIONS .............................................................................. 16

    5.1    Distributions.................................................................................................. 16

    5.2    Administrative Fee........................................................................................ 17

    5.3    Amounts Withheld.......................................................................................... 17

    5.4    Form I-829 Exception .................................................................................. 18

    5.5    Pro Rata Calculation ................................................................................... 18

i

SEC-USCIS-P-0000839

ARTICLE VI    MANAGEMENT ............................................................................ 18

   6.1    Management; Authority of the Managing Member ................................ 18

   6.2    Participation by Investing Members ....................................................... 20

   6.3    Filing of Schedules, Reports, Etc ........................................................... 21

   6.4    Business with Affiliates ............................................................................ 21

   6.5    Removal of Managing Member ............................................................... 21

ARTICLE VII    EXPENSES AND FEES ........................................................... 21

   7.1    Operating Expenses .................................................................................. 21

   7.2    Organizational Expenses .......................................................................... 22

ARTICLE VIII    EXCULPATION AND INDEMNIFICATION ....................... 22

   8.1    Exculpation and Indemnification ............................................................ 22

   8.2    Exclusive Jurisdiction .............................................................................. 23

ARTICLE IX    BOOKS AND RECORDS ......................................................... 24

   9.1    Books and Accounts ................................................................................. 24

   9.2    Reports to Members ................................................................................. 24

ARTICLE X    TRANSFERABILITY OF A MEMBER'S INTEREST ............... 24

   10.1    Restrictions on Transfer ......................................................................... 24

   10.2    Expenses of Transfer; Indemnification .................................................. 25

10.3    Recognition of Transfer ...................................................................... 25

10.4    Effect of Transfer ................................................................................ 26

ARTICLE XI    DISSOLUTION ....................................................................... 26

11.1    Events of Dissolution .......................................................................... 26

11.2    Cancellation of Certificate .................................................................. 27

11.3    Compliance With Timing Requirements of Regulations ..................... 27

11.4    Termination .......................................................................................... 28

ARTICLE XII    NOTICES; POWER OF ATTORNEY ................................... 28

12.1    Method of Notice ................................................................................ 28

12.2    Routine Communications; Wire Transfers ......................................... 29

12.3    Power of Attorney ............................................................................... 29

2

SEC-USCIS-P-0000840

ARTICLE XVIII  GENERAL PROVISIONS ............................................................................ 30

    13.1    Entire Agreement ............................................................................................... 30

    13.2    Amendment ........................................................................................................ 30

    13.3    Approvals ........................................................................................................... 30

    13.4    Side Letters ........................................................................................................ 30

    13.5    Governing Law ................................................................................................... 31

    13.6    Captions ............................................................................................................. 31

    13.7    Successors .......................................................................................................... 31

    13.8    Severability ........................................................................................................ 31

    13.9    Gender and Number ........................................................................................... 31

    13.10  Third-Party Rights ............................................................................................. 31

    13.11  Counterparts ....................................................................................................... 31

    13.12  Duties ................................................................................................................. 31

    13.13  Confidentiality. ................................................................................................... 32

    13.14  Jurisdiction and Service of Process .................................................................... 32

    13.15  Trial ................................................................................................................... 32

**3**

SEC-USCIS-P-0000841

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## A CHICAGO CONVENTION CENTER, LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of A Chicago Convention Center, LLC, an Illinois limited liability company (the "Company"), is dated as of February _____ 16 , 20 12 by and among Intercontinental Financial Group, LLC, an Illinois limited liability company, as the Managing Member of the Company (the "Managing Member"), and each Person (as defined herein) admitted to the Company as a member from time to time pursuant to this Agreement who (a) executes and delivers a counterpart signature page of this Agreement which counterpart signature page is accepted by the Company and (b) is identified in the records of the Company as a member of the Company (each such Person, an "Investing Member"). The Managing Member and the Investing Members are hereinafter sometimes referred to collectively as the "Members" and each of them individually as a "Member."

### ARTICLE I

### THE COMPANY

1.1     Formation; Continuation.     The Company was formed upon the filing and acceptance of a Certificate of Formation (the "Certificate") with the Secretary of State of the State of Illinois on [date] (the "Formation Date"). Each party hereto acknowledges and agrees that upon a Person's execution of a counterpart signature page of this Agreement in the form attached hereto as Exhibit A, which counterpart signature page is accepted by the Company, such

party will be admitted to the Company as an Investing Member of the Company and will be shown as an Investing Member on the books and records of the Company as of the effective date of such acceptance. The parties hereto hereby agree to continue the Company as a limited liability company under and pursuant to the provisions of the Act, and agree that the rights and duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. Promptly after the execution of this Agreement, the Members shall execute documents, and the Managing Member shall file and record with the proper offices in the State of Illinois, such certificates, and shall cause to be made such publications, as shall be required by the Act.

    1.2    <u>Name</u>. The name of the Company shall be "A Chicago Convention Center, LLC." All business of the Company shall continue to be conducted under such name and such name shall continue to be used at all times in connection with the Company's business and affairs.

    1.3    <u>Principal Place of Business</u>. The principal place of business of the Company shall be 8201 West Higgins Road, Chicago Illinois, 60631, or such place or places as the Managing Member may, from time to time, designate.

4

SEC-USCIS-P-0000842

1.4     Purposes and Powers. The business of the Company shall be: (i) the ground-up construction and management of "A Chicago Convention Center," the World's First Zero Carbon Platinum LEED®-certified and 100% Allergen Free convention center and hotel complex, including convention and meeting space, five upper-upscale hotels, and amenities including restaurants, lounges, bars and entertainment facilities, (ii) to do all other acts which may be necessary, incidental, or convenient to the foregoing, and (iii) to engage in any and all other lawful activities for which a limited liability company may be organized under the Act.

1.5     Registered Office and Agent. The registered office of the Company in the state of Illinois shall be 8201 West Higgins Road, Chicago Illinois, 60631, or such other address within the United States as may be designated from time to time by the Managing Member. The name and address of the registered agent for service of process on the Company in the state of Illinois shall be Mr. Anshoo Sethi at 1314 S. Plymouth Court, Chicago, IL 60605, or such other agent and address as may be designated from time to time by the Managing Member.

1.6     Fiscal and Taxable Year. The fiscal year and taxable year of the Company shall be the calendar year (the "Company Year"), unless such other taxable year is otherwise required by Section 706 of the Code.

1.7     Term. The term of the Company commenced upon the filing of the Certificate and shall continue until the date that the Company is terminated in accordance with the provisions of Article XI hereof.

1.8     Filings. Upon the execution of this Agreement by the parties hereto, the Managing Member shall do, and continue to do, all things as may be required or advisable to continue and maintain the Company as a limited liability company, qualified to do business in such jurisdictions as may be required, and to protect the limited liability of the Investing Members in any jurisdiction in which the Company shall transact business.

## ARTICLE II

### DEFINITIONS

The following defined terms used in this Agreement shall have the respective meanings specified below.

"Act" shall mean the Illinois Limited Liability Company Act, as set forth in the Illinois Compiled Statutes as 805 ILCS 180 *et seq.*, as amended from time to time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Company Year, after giving effect to the following adjustments:

(a)     credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and (i)(5) of the Regulations; and

5

SEC-USCIS-P-0000843

(b) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Administrative Fee" shall mean, the monies contributed by each Investing Member as an administrative fee pursuant to the applicable Subscription Agreement.

"Affiliate" shall mean, with respect to any Person, any Person Controlling, Controlled by, or under common Control with, such Person.

"Agreement" shall mean this limited liability company operating agreement of the Company (including Exhibits A and B hereto), as the same may be amended from time to time.

"Bankruptcy" shall mean, with respect to any Person, (a) the filing by such Person of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal, state or foreign insolvency law, or such Person's filing an answer consenting to or acquiescing in any such petition, (b) the making by such Person of any assignment for the benefit of its creditors, (c) the expiration of sixty (60) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for a material portion of the assets of such Person, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal, state or foreign insolvency law, provided that the same shall not have been vacated, set aside or stayed within such sixty-day period or (d) the entry against it of a final and nonappealable order for relief under any bankruptcy, insolvency or similar law now or hereafter in effect. The term "Bankruptcy" as defined in this Agreement

"Business Day" shall mean any day except a Saturday, Sunday or other day on which commercial banks in Cook County, Illinois are authorized by law to be closed.

"Capital Account" shall mean, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(a)     To each Member's Capital Account there shall be credited the aggregate amount of such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Article IV hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any Company property distributed to such Member.

(b)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Article IV hereof, and

6

SEC-USCIS-P-0000844

the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c)     If any Interest is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(d)     In determining the amount of any liability for purposes of determining Capital Account balances hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. If the Managing Member shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Managing Member may make such modification if, and only if, it is not likely to have an adverse effect on the amounts distributable to any Member pursuant to Article XIV hereof upon the dissolution of the Company.

"Capital Contribution" shall have the meaning set forth in Section 3.2 hereof.

"Capital Event" shall mean (a) the sale, transfer, exchange, pledge, hypothecation, or other disposition (other than in the ordinary course of its business and occurring after all Investing Members cease to participate in the EB-5 Program), of all or a portion of the membership interests of the Company, or (b) the sale of all or a portion of the assets of the Company (other than in the ordinary course of its business and occurring after all Investing

Members cease to participate in the EB-5 Program).

"Certificate" shall have the meaning set forth in Section 11 hereto.

"Closing" shall mean the Initial Closing and each Subsequent Closing.

"Closing Date" shall have the meaning set forth in Section 3.1(a) hereof.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Control" shall mean, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another Person without the consent or approval of any other Person.

"Company" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Company Minimum Gain" shall have the meaning set forth in Section 1.704-2(b)(2) of the Regulations.

7

SEC-USCIS-P-0000845

"Company Year" shall have the meaning set forth in Section 1.6 hereof.

"Covered Persons" shall have the meaning set forth in Section 8.1(a) hereof.

"Damages" shall have the meaning set forth in Section 8.1(a) hereof.

"Depreciation" shall mean, for each Company Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted tax basis of such property is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managing Member.

"Final Closing Date" shall have the meaning set forth in Section 3.1(a) hereof.

"Formation Date" shall have the meaning set forth in the Section 1.1 hereof.

"Gross Asset Value" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

      (a)    the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset at the time of such contribution, as agreed between the Managing Member and such Member;

(b)    the Gross Asset Values of all Company assets may, in the sole discretion of the Managing Member, be adjusted to equal their respective gross fair market values, as determined by the Managing Member, as of the following times:  (i) the acquisition of an additional Interest by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest; and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(c)    the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Managing Member; and

(d)    the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations and Article IV hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (d) to the extent the Managing Member determines that an adjustment pursuant to clause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d).

8

SEC-USCIS-P-0000846

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clause (a), (b) or (d) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Indebtedness" shall mean any indebtedness incurred by the Company, including, but not limited to, any guarantees by the Company and any repurchase obligations of the Company.

"Initial Closing" shall mean the first closing at which Persons are admitted to the Company as Investing Members.

"Interest" shall mean, with respect to any Member, the interest of such Member as a member in the Company at any particular time, including the member interest of such Member, and the rights and obligations of such Member as provided in this Agreement and the Act.

"Investing Member" shall have the meaning set forth in the introductory paragraph of this Agreement.

"LLC Authorized Representative" shall have the meaning set forth in Section 13.13(a) hereof.

"Managing Member" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Maturity Date" shall mean that date which occurs on the fifth anniversary of the Final Closing Date.

"Member Nonrecourse Debt" shall have the meaning set forth in Section 1.704-2(b)(4)

of the Regulations.

"<u>Member Nonrecourse Debt Minimum Gain</u>" shall have the meaning set forth in Section 1.704-2(i)(2) of the Regulations.

"<u>Member Nonrecourse Deductions</u>" shall have the meaning set forth in Section 1.704-2(i)(2) of the Regulations.

"<u>Member</u>" shall have the meaning set forth in the introductory paragraph of this Agreement.

"<u>Net Distributable Cash</u>" shall mean Net Distributable Cash From Operations, Net Distributable Cash from Capital Events, and other distributions described in Section 5.1.

"<u>Net Distributable Cash From Capital Events</u>" shall mean all cash receipts of the Company from Capital Events; in each case, reduced by the portion thereof used to, in the discretion of the Managing Member, (a) pay principal or interest on any Indebtedness of the Company, (b) establish Reserves, (c) pay Operating Expenses and Organizational Expenses, and (d) pay other expenses of the Company. Net Distributable Cash from Capital Events shall

9

SEC-USCIS-P-0000847



not be reduced by depreciation, amortization, cost recovery deductions, or similar non-cash allowances and expenses.

"Net Distributable Cash From Operations" shall mean, all cash receipts of the Company (including, without limitation, amounts released from Reserves), other than cash receipts from Net Distributable Cash from Capital Events, reduced by the portion thereof used to, in the discretion of the Managing Member, (a) pay principal or interest on any Indebtedness of the Company, (b) establish Reserves, (c) pay Operating Expenses and Organizational Expenses, and (d) pay other expenses of the Company. Net Distributable Cash from Operations shall not be reduced by depreciation, amortization, cost recovery deductions or similar non-cash allowances and expenses.

"Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"Operating Expenses" shall have the meaning set forth in Section 7.1(b) hereof.

"Organizational Expenses" shall have the meaning set forth in Section 7.2 hereof.

"Percentage Interest" shall mean, with respect to each Member, a representation of such Member's Interest as of the applicable date of determination, expressed as a percentage of all Members' Interests and based on relative Capital Contributions. The Company shall keep an up-to-date Schedule of Members which shall include a statement of each Member's Percentage Interest.

"Person" shall mean any individual, company, joint venture, corporation, limited liability company, trust or other entity.

"Preferred Rate" shall mean (i) prior to and on the Maturity Date a rate of return calculated in the same manner as interest, but shall not compound, at an annual rate of one percent (1.0%) and (ii) after the Maturity Date a rate of return calculated in the same manner as interest, but shall not compound, at an annual rate of fifteen percent (15.0%), as applicable.

"Preferred Return" shall have the meaning set forth in Section 5.1(b)(i) hereof.

"Profits" and "Losses" shall mean, for each Company Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss;

(b)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-

10

SEC-USCIS-P-0000848

1(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

    (c)    if the Gross Asset Value of any Company asset is adjusted pursuant to clause (b) or clause (d) of the definition of Gross Asset Value herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

    (d)    gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

    (e)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Company Year or other period, computed in accordance with the definition of Depreciation herein; and

    (f)    notwithstanding any other provisions hereof, any items which are specially allocated pursuant to Article IV hereof shall not be taken into account in computing Profit or Losses.

"Regulations" shall mean the final, temporary and proposed Income Tax Regulations promulgated under the Code, as the same may be amended from time to time (including corresponding provisions of succeeding regulations).

"Regulatory Allocations" shall have the meaning set forth in Section 4.3(e) hereof.

"Reserves" shall mean reasonable reserves established by the Company, in the discretion of the Managing Member, for all expenses, debt payments, capital improvements, replacements and contingencies, including, but not limited to, loss and liquidity reserves, of the Company.

"Restricted Distribution" shall have the meaning set forth in Section 5.5 hereof.

"Schedule of Members" shall mean the Schedule of Members of the Company, a copy of which is attached hereto as Exhibit B, as the same may be amended from time to time.

"Side Letter" shall have the meaning set forth in Section 13.4 hereof.

"Subscription Agreement" shall mean each Subscription Agreement between the Company and an Investing Member, as the same may be amended, supplemented or replaced from time to time.

"Subsequent Closing" shall mean a closing, subsequent to the Initial Closing, at which the Company accepts a subscription or subscriptions from one or more Investing Members.

11

SEC-USCIS-P-0000849

"Transfer" shall mean, as applicable, a sale, exchange, transfer, assignment, pledge, hypothecation or other disposition of all or any portion of an Interest. When used as a verb, the term "Transfer" shall have a correlative meaning.

"Unrecovered Capital Contribution" means an amount equal to the excess, if any, of the Capital Contribution made by an Investing Member (or that Investing Member's predecessor in interest) over the aggregate amount of distributions under Sections 5.1 and 11.1(b) received by that Investing Member (or that Investing Member's predecessor in interest), determined as of the date required under this Agreement.

"USCIS" shall mean the United States Citizenship & Immigration Service.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

### 3.1    Closings; Acceptance of Subscriptions.

(a)    Persons shall be permitted to subscribe for Interests at the Initial Closing and at one or more Subsequent Closings that may be held, in the discretion of the Managing Member until such time as the Interests are fully subscribed in any offering conducted by the Company or any such offering closed by the Managing Member (the "Final Closing Date"). Subject to the foregoing, each Closing shall be held on such date as may be determined by the Managing Member (each a "Closing Date"); provided, however, that the Company shall only hold the Initial Closing if, after giving effect to such Closing, the aggregate amount of Capital Contributions is five hundred thousand dollars ($500,000) or more.

(b)     Except as otherwise provided herein, no Investing Member shall be admitted to the Company as an Investing Member unless such Person has made a minimum Capital Contribution to the Company of at least five hundred thousand United States dollars (US$500,000).

(c)     Promptly following the admission of any additional Person to the Company as an Investing Member or permitted withdrawal of an Investing Member pursuant to the terms of this Agreement, the Managing Member shall update the Schedule of Members, which update is hereby expressly consented to by the Investing Members.

3.2     Capital Contributions. Pursuant to their respective Subscription Agreements, each Investing Member has agreed to make capital contributions in the aggregate amount set forth on the signature page to such Member's Subscription Agreement (such Member's "Capital Contribution"). The Capital Contributions shall be made in United States Dollars by wire transfer in immediately available funds to an account or accounts of the Company specified by the Managing Member.   Notwithstanding any other provision of this Agreement or the Subscription Agreements to the contrary, except as otherwise required by the Act or other applicable law, in no event shall any Investing Member be required to make additional capital contributions.

12

SEC-USCIS-P-0000850



3.3     No Right to Redemption of Interests or Return of Capital Contributions. Except in the case of where an Investing Member's Form I-526 Immigration Petition (including adjustment of status or consular interview processing) or visa has been denied by USCIS, no Member shall have the right to withdraw from the Company or require that the Company redeem all or any portion of such Member's Interest. No Member shall have a right to receive a return of its Capital Contributions or a dividend in respect of such Member's Interest from any specific assets of the Company. Each Member waives any right which it may have to cause a partition of all or any part of the Company's assets.

3.4     Managing Member's Option for Redemption of Interests or Return of Capital Contributions. Notwithstanding anything to the contrary in Section 3.3, the Managing Member may cause an Investing Member's withdrawal from the Company by paying to such Investing Member its (i) unpaid Preferred Return through the date of withdrawal and (ii) unreturned Capital Contribution, but only at any time after final adjudication of such Investing Member's Form I-829 application for removal of conditions on permanent residence, if applicable.

3.5     Uncertificated Interests. Interests shall be recorded in book-entry form and no Member shall have the right to demand that the Company produce and/or deliver certificates representing such Interests. Without limiting the foregoing, the Managing Member may produce and deliver certificates representing Interests if the Managing Member, in its sole and absolute discretion, determines that such production and delivery would be in the best interests of the Company.

3.6     Limitation on Liability of Investing Members. Except as otherwise required by this Agreement, the Act or other applicable law, the liability of the Investing Members, in their capacity as such, shall be limited to the aggregate amount of each such Investing Member's Capital Contribution. Each Investing Member, to the fullest extent permitted by applicable law,

shall not have any fiduciary or other duty to the Company or any other Member, other than the duty to act in accordance with the contractual covenant of good faith and fair dealing.

3.7     Interest. Other than the Preferred Return (defined in Section 5.1(b)(i), below), no Member shall receive any interest on its Capital Contributions.

3.8     Negative Capital Accounts. At no time during the term of the Company or upon dissolution and liquidation thereof shall an Investing Member with a negative balance in his Capital Account have any obligation to the Company or the other Members to eliminate or restore such negative balance.

## ARTICLE IV

## ALLOCATIONS OF PROFITS AND LOSSES

4.1     Losses. Except as otherwise provided in this Article, Losses of the Company for each Company Year shall be allocated to the Members in accordance with their respective Percentage Interests.

13

SEC-USCIS-P-0000851

4.2     Profits.  Except as otherwise provided in this Article, Profits of the Company for each Company Year shall be allocated to the Members in accordance with their respective Percentage Interests.

4.3     Special Allocations.

(a)     Company Minimum Gain Chargeback.  Notwithstanding anything contained in this Article to the contrary, if there is a net decrease in Company Minimum Gain during any Company Year, except as otherwise permitted by Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, items of Company income and gain for such taxable year (and subsequent years, if necessary) in the order provided in Section 1.704-2(j)(2)(i) of the Regulations shall be allocated among all Members whose shares of Company Minimum Gain decreased during that year in proportion to and to the extent of such Member's share of the net decrease in Company Minimum Gain during such year.  The allocation contained in this Section 4.3(a) is intended to be a minimum gain chargeback within the meaning of Section 1.704-2 of the Regulations, and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Debt Minimum Gain.  Notwithstanding anything contained in this Article to the contrary, if there is a net decrease in Member Nonrecourse Debt Minimum Gain, except as provided in Section 1.704-2(i) of the Regulations, items of Company income and gain for such taxable year (and subsequent years, if necessary) in the order provided in Section 1.704-2(j)(2)(ii) of the Regulations shall be allocated among all Members whose share of Member Nonrecourse Debt Minimum Gain decreased during that year in proportion to and to the extent of such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain during such year.  This Section 4.3(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2 of the Regulations and shall be interpreted consistently therewith.

(c)   Qualified Income Offset. Notwithstanding any provisions of this Article to the contrary, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain (including gross income) shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 4.3(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit.  The allocation contained in this Section 4.3(c) is intended to be a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii)(d) of the Regulations, and shall be subject thereto.

(d)   Ordering. Sections 4.3(a), (b) and (c) hereof shall be applied in the order provided in Section 1.704-2 of the Regulations.

(e)   Curative Allocations. The allocations set forth in Sections 4.3(a), (b) and (c) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Regulations.  Notwithstanding any other provisions of this Section 4.3 (other than the Regulatory Allocations), the Regulatory Allocations shall be

14

SEC-USCIS-P-0000852

taken into account in allocating other Profits, Losses, and items of income, gain, loss and deduction among the Members so that to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

(f)     Section 754 Election Adjustments.   To the extent that the Managing Member elects, in its sole discretion, to cause the Company to make an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

(g)     Nonrecourse Deductions.   Nonrecourse Deductions for any Company Year or other period shall be allocated in accordance with Section 4.1 hereof.

(h)     Member Nonrecourse Deductions.   In accordance with Section 1.704-2(i)(1) of the Regulations, any item of Company loss or deduction which is attributable to Member Nonrecourse Debt for which a Member bears the economic risk of loss (such as a non-recourse loan made by a Member to the Company or an otherwise non-recourse loan to the Company that has been guaranteed by a Member) shall be allocated to that Member to the extent of its economic risk of loss.

(i)     Tax Allocations.   In accordance with Code Section 704(c) and the

Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account to the fullest extent possible of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value. If the Gross Asset Value of any Company asset is adjusted pursuant to clause (b) or (d) of the definition thereof, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Managing Member. Allocations pursuant to this Section 4.3(i) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

(j)     Varying Interests. If a Member sells or exchanges its interest or otherwise is admitted as a substituted Investing Member, Profits and Losses shall be allocated between the transferor and the transferee by taking into account their varying Interests during the Company Year in accordance with Code Section 706(d), using the interim closing of the books method or the daily proration method, as determined by the Managing Member in its sole discretion. Notwithstanding any other provision of this Agreement to the contrary, as soon as practical after

15

SEC-USCIS-P-0000853

each Closing Date, Profits, Losses and items thereof shall be allocated among the Members so as to cause the Capital Accounts of the Members to be in the same ratio as the ratio of the Members' Percentage Interests.

(k)     Tax Credits. Tax credits and tax credit recapture shall be allocated among the Members pursuant to Section 1.704-1(b)(4)(ii) of the Regulations.

(l)     Fractions Rule. Notwithstanding anything to the contrary contained in this Agreement, this Agreement is intended to comply with Code Section 514(c)(9)(E) and the Treasury Regulations thereunder (the "Fractions Rule") and Code Section 704(b) and the Treasury Regulations thereunder, and shall be interpreted and applied in a manner consistent with the Treasury Regulations. Relevant provisions of this Agreement are deemed modified, with effect from the date of this Agreement, to the extent necessary to comply with the Fractions Rule. Without limiting the foregoing, any allocation for a particular year pursuant to this Agreement which would violate the requirements of Sections 704(b) and 514(c)(9)(E) of the Code shall not be effective and there shall instead be made allocations for such year consistent with such requirements and deviating as little as possible from the allocations generally provided herein.

## ARTICLE V

## DISTRIBUTIONS

5.1     Distributions. (a) Except as provided in this Article V, Net Distributable Cash shall be distributed to the Members in accordance with the provisions of this Section 5.1.

(b)     Subject to Section 5.1(d) and (e), distributions of Net Distributable Cash

(b)    Subject to Section 5.1(d) and (e), distributions of Net Distributable Cash From Operations (including dividends) shall be made at such times as determined by the Managing Member in its sole discretion, in the following manner.

Case: 1:18-cv-00992 Document #: 11-3 Filed: 02/06/13 Page 88 of 205 PageID #:1285

(i)    First, one hundred percent (100%) to the Investing Members, *pro rata* based upon their respective Percentage Interests, until each Investing Member has received the unpaid portion of the cumulative amount of their Preferred Rate on their Capital Contributions (the "Preferred Return"), which Preferred Return for each Investing Member shall be calculated from the Closing Date on which the Company received such Investing Member's Capital Contribution;

(ii)    Second, to the Investing Members, *pro rata* based upon their respective Percentage Interests, until each Investing Member has received an amount equal to such Investing Member's aggregate Unrecovered Capital Contribution;

(iii)    Third, the balance to the Managing Member and the Investing Members, *pro rata* based upon their respective Percentage Interests.

16

SEC-USCIS-P-0000854

(c)     Subject to Section 5.1(d) and (e), distributions of Net Distributable Cash From Capital Events shall be made at such times as determined by the Managing Member in its sole discretion, in the following manner:

(i)     First, one hundred percent (100%) to the Investing Members, *pro rata* based upon their respective Percentage Interests, until each such Investing Member has received any unpaid portion of its Preferred Return;

(ii)     Second, to the Investing Members, *pro rata* based upon their respective Percentage Interests, until each Investing Member has received an amount equal to such Investing Member's aggregate Unrecovered Capital Contribution;

(iii)     Third, the balance to the Managing Member and the Investing Members, *pro rata* based upon their respective Percentage Interests.

(d)     Any receipts or other revenues of the Company (excluding Capital Contributions) not included in Net Distributable Cash may be applied by the Managing Member to pay or reserve for the payment of Operating Expenses, Organizational Expenses and Indebtedness, to establish Reserves, or distributed in accordance with the provisions of Section 5.1(b) hereof, in each case, in the discretion of the Managing Member.

(e)     Prior to the dissolution and winding up of the Company, all distributions to the Members shall be paid in cash. Upon the dissolution and winding up of the Company, distributions to the Members may include distributions of the assets of the Company in kind.

(f)     Notwithstanding any provision of this Agreement to the contrary, neither the Company, nor the Managing Member on behalf of the Company, shall make any distribution

to any Member if such distribution would violate the Act or other applicable law.

(g) In the event the aggregate Preferred Return owing to all the Investing Members has not been paid in full by the Managing Member by the end of the fifth year following the date hereof, then the Managing Member's Interest in the Company shall automatically be transferred to all of the Investing Members, who shall take a pro rata portion of the Managing Member's Interest in the same proportion as each Investing Member's individual Percentage Interest bears to those of all other Investing Members.

5.2     Administrative Fee. The Administrative Fee shall be distributed to the Managing Member.

5.3     Amounts Withheld. All amounts withheld pursuant to the Code or any provisions of any foreign, federal, state or local tax law with respect to any payment or distribution to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Article for all purposes under this Agreement. The Managing Member may allocate any such amounts withheld with respect to the Company among the Members in any manner that is in accordance with applicable law (taking into account the extent to which the amount withheld may vary among the Members based upon the identity and tax status of each Member). The Members shall be required, upon request by the Company, to fund their share of any applicable withholding taxes with respect to the Company.

17

SEC-USCIS-P-0000855

5.4    Form I-829 Exception.    Anything to in this Article V to the contrary notwithstanding, prior to final adjudication of an Investing Member's Form I-829 application for removal of conditions on permanent residence, if applicable, distributions made to such Investing Member may only be made to the extent that such distributions do not result in his Unrecovered Capital Contribution being less than five hundred thousand dollars ($500,000). After the final adjudication of such Investing Member's Form I-829 application for removal of conditions on permanent residence, the foregoing distribution restriction shall no longer apply to such Investing Member.

5.5    Pro Rata Calculation.    If any pro rata distribution cannot be made to a Member due to such Member having reached a maximum distribution or due to restrictions (each, an "Restricted Distribution"), the Restricted Distribution shall be re-distributed to the other Members entitled to that particular distribution on a pro rata basis, based on the Unrecovered Capital Contributions of a particular Member over the total Unrecovered Capital Contributions of the Members entitled to such distribution.

## ARTICLE VI

## MANAGEMENT

6.1    Management; Authority of the Managing Member.

(a)    The management, operation and control of the Company and its business and the formulation of its investment policy shall be vested exclusively in the Managing Member, subject to the terms and provisions of this Agreement, including, without limitation, this Article. The Managing Member shall, in its sole discretion, exercise all powers necessary

and convenient for the purposes of the Company and all of the power conferred by the Act on the Managing Member of a limited liability company, including the power to conduct the Company's business as described in Section 1.4 hereof and the power to delegate to one or more Persons the power to perform any of the acts described above but subject to the limitations and restrictions expressly set forth herein, including those enumerated in this Article. The Managing Member shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, whether or not in its immediate possession or control. The Managing Member shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Company. The Managing Member shall take such commercially reasonable actions as may be necessary on its part to ensure that the Company is and continues throughout its term to be classified as a company for federal income tax purposes.

(b)    Subject only to the limitations and restrictions expressly set forth herein, the Managing Member shall perform or cause to be performed all management and operational functions relating to the day-to-day business of the Company. Without limiting the generality of the foregoing, the Managing Member is authorized on behalf of the Company to cause the Company to do the following:

(i)    enter into the Subscription Agreements and the Side Letters, and exercise and perform the Company's rights and obligations thereunder;

18

SEC-USCIS-P-0000856

(ii)    acquire, hold, finance, manage and dispose of any assets of the Company;

(iii)    pay, in accordance with the provisions of this Agreement, all expenses, debts and obligations of the Company to the extent that funds of the Company are available therefor;

(iv)    invest (including through an agent) cash reserves and other liquid assets of the Company prior to their use for Company purposes or distribution to the Members;

(v)    bring, compromise, settle and defend actions at law or in equity;

(vi)    engage in any kind of activity and perform and carry out contracts of any kind necessary to, or in connection with, the accomplishment of the purposes of the Company;

(vii)    enter into agreements and contracts with third parties in furtherance of the Company's business, including all documents and agreements as may be required in connection with the acquisition of the assets of the Company;

(viii)    maintain, at the expense of the Company, adequate records and accounts of all operations and expenditures;

(ix)    purchase, at the expense of the Company, liability, casualty, fire and other insurance and bonds to protect the Company's assets, business, members and employees;

(x)     purchase, at the expense of the Company, director and officer liability insurance to protect the Managing Member and its respective officers and employees;

(xi)    open accounts and deposit, maintain and withdraw funds in the name of the Company in any bank, savings and loan association, brokerage firm or other financial institution;

(xii)   establish reserves for contingencies and for any other proper Company purpose;

(xiii)  retain, and dismiss from retainer, any and all Persons providing legal, accounting, engineering, brokerage, consulting, appraisal, investment advisory or management services to the Company, or such other agents as the Managing Member deems necessary or desirable for the management and operation of the Company;

(xiv)   incur and pay all expenses and obligations incident to the operation and management of the Company, including, without limitation, the services referred to in paragraph (xiii) hereof, taxes, interest, travel, rent, insurance, supplies, salaries and wages of the Company's employees and agents;

19

SEC-USCIS-P-0000857

(xv)   distribute funds to the Members by way of cash or otherwise, all in accordance with the provisions of this Agreement;

(xvi)   prepare and cause to be prepared reports, statements and other relevant information for distribution to Members;

(xvii)   prepare and file all necessary returns, reports and statements and pay all taxes, assessments and other impositions relating to the assets or operations of the Company;

(xviii)   effect a dissolution of the Company as provided herein;

(xix)   act for and on behalf of the Company in all matters incidental to the foregoing; and

(xx)   authorize any member, officer or other agent of the Managing Member to act for and on behalf of the Company in all matters incidental to the foregoing.

By executing this Agreement, each Investing Member shall be deemed to have consented to any exercise by the Managing Member of any of the foregoing powers or other powers of the Managing Member contained in this Agreement.

(c)   Any person dealing with the Company or the Managing Member may rely upon a certificate signed by the Managing Member as to:

(i)   the identity of the Managing Member or any Investing Member hereof;

the existence or non-existence of any fact or facts which constitute a condition precedent to acts by a Managing Member or in any other manner germane to the affairs of the Company;

(iii)    the Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(iv)    any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

6.2    Participation by Investing Members.   Investing Members, in their capacity as such, shall participate in policy-making and otherwise in the management of the business and affairs of the Company as provided herein and as specifically provided for under the non-waivable provisions of the Act or any applicable law.  However, notwithstanding the foregoing, no Investing Member, in his or her capacity as such, shall have any right or power to sign for or to bind the Company in any manner or for any purpose whatsoever, or have any rights or powers with respect to the Company except those expressly granted to such Investing Member by the terms of this Agreement or those conferred upon such Investing Member by non-waivable provisions of applicable law, and no prior consent or approval of the Investing Members shall be

20

SEC-USCIS-P-0000858

required in respect of any act or transaction to be taken by the Managing Member on behalf of the Company unless otherwise provided in this Agreement.

6.3    Filing of Schedules, Reports, Etc. Each Member agrees to reasonably cooperate with the Company in the filing of any schedule, report, certificate or other instrument required to be filed by the Company under the laws of the United States, any state or political subdivision thereof or any foreign nation or political subdivision thereof. In connection therewith, each Member agrees to reasonably provide the Company with all information required to complete such filings.

6.4    Business with Affiliates. The Company may engage the Managing Member or any of its respective Affiliates to provide underwriting, loan servicing, due diligence, property management, construction management, marketing and sales or other services to the Company; provided that the fees or other amounts earned in respect of the rendition of such services are at least as favorable to the Company, as the case may be, as those generally available from experienced and unaffiliated persons. Notwithstanding anything herein to the contrary, the Investing Members acknowledge and approve the business plan of Company, on the terms disclosed to the Investing Members in the Private Placement Memorandum presented to the Investing Members prior to the date of their execution hereof.

6.5    Removal of Managing Member. Except as expressly permitted by the Act, the Managing Member may not be removed.

## ARTICLE VII

## EXPENSES AND FEES

7.1    Operating Expenses.    The Managing Member shall not bear or otherwise be charged with any costs or expenses of the Company's activities and operations, all of which shall be borne by or otherwise charged to the Company, including all activities and operations prior to the date of this Agreement, and including, without limitation: (i) all costs and expenses incurred in developing, negotiating and structuring the assets of the Company, whether consummated or not consummated, and acquiring, financing, disposing of or otherwise dealing with such assets, including, without limitation, any investment banking, engineering, appraisal, environmental, travel, legal and accounting expenses, any deposits and commitment fees and other fees and out-of-pocket costs related thereto, and the costs of rendering financial assistance to or arranging for financing for any assets or businesses of the Company or for working capital or other Company purposes; (ii) all costs and expenses, if any, incurred in monitoring the assets of the Company, including, without limitation, any engineering, environmental, third-party payment processing, travel, legal and accounting expenses and other fees and out-of-pocket costs related thereto; (iii) taxes of the Company; (iv) costs related to litigation and threatened litigation involving the Company; (v) expenses associated with third party accountants, attorneys and tax advisors with respect to the Company and its activities, including the preparation and auditing of financial reports and statements and other similar matters, and costs associated with the distribution of financial and other reports to the Members and costs associated with Company meetings; (vi) brokerage commissions and other investment costs incurred by or on behalf of the Company and

21

SEC-USCIS-P-0000859

paid to third parties; (vii) all costs and expenses associated with obtaining and maintaining insurance for the Company and its assets and director and officer liability insurance to protect the Managing Member and its respective officers and employees; (viii) fees incurred in connection with the maintenance of bank or custodian accounts; (ix) all expenses incurred in connection with the registration (or exemption from registration) of the Company's securities under applicable securities laws or regulations; and (x) all expenses of the Company that are not normally recurring operating expenses (all such expenses, collectively, the "Operating Expenses"). To the extent that any Operating Expenses are paid by the Managing Member, such Operating Expenses shall be reimbursed by the Company. The Operating Expenses shall be paid only with proceeds from Net Distributable Cash or the Administrative Fee, and in no event from Capital Contributions.

7.2     Organizational Expenses. The Company shall bear and be charged with all costs and expenses pertaining to the organization of the Company, including, without limitation, legal and accounting expenses (collectively the "Organizational Expenses"). The Organizational Expenses, including the payment of any placement agent or finders fees in connection with the sale of the Interests shall be paid only with proceeds from Net Distributable Cash or the Administrative Fee.

## ARTICLE VIII

### EXCULPATION AND INDEMNIFICATION

8.1     Exculpation and Indemnification.

(a)     To the fullest extent permitted by applicable law, none of the Managing Member,

its respective shareholders, members, members, directors, officers, employees and other agents (collectively, the "Covered Persons") shall be liable to the Company or the Investing Members for monetary damages for any losses, claims, damages or liabilities ("Damages") arising from any act or omission performed or omitted by such Covered Persons arising out of or in connection with this Agreement or the Company's business or affairs or any other Damage to which such Covered Person may become subject to in connection with any matter arising out of or in connection with this Agreement or the Company's business affairs, except to the extent that any such Damages are established by a court order of final adjudication to be primarily attributable to the gross negligence, willful misconduct, breach of fiduciary duty of loyalty or bad faith of such Covered Person.

(b)  (i)  If a Covered Person becomes involved in any capacity in any action, proceeding or investigation in connection with any matter arising out of or in connection with this Agreement or the Company's business or affairs, the Company shall reimburse such Covered Person for its reasonable legal and other expenses (including the cost of any investigation and preparation) as they are incurred in connection therewith; provided that such Covered Person shall provide the Company with an undertaking to promptly repay to the Company the amount of any such reimbursed expenses paid to it if it shall ultimately be determined by a court order of final adjudication that such Covered Person was not entitled to be indemnified by the Company in connection with such action,

22

SEC-USCIS-P-0000860

proceeding or investigation. If for any reason (other than by reason of the exclusions from indemnification set forth above) the foregoing indemnification is unavailable to such Covered Person, or insufficient to hold it harmless, then the Company shall, to the fullest extent permitted by law, contribute to the amount paid or payable by such Covered Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and such Covered Person on the other hand or, if such allocation is not permitted by applicable law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations.

(ii)    The provisions of this Section 8 shall survive the termination of this Agreement or the dissolution of the Company for any reason.

(c)    No Investing Member shall have any obligation to the Company or any other Member to bring or join in any action against any Covered Person pursuant to Section 8.1(a) or (b) hereof. Nothing contained in this Section 8.1 shall be construed as any waiver of insurance claims or recoveries by the Company or any Covered Person.

(d)    Each Member covenants for itself, its successors, assigns, heirs and personal representatives that such Person will, at any time prior to or after the dissolution of the Company, on demand, whether before or after such Person's withdrawal from the Company, pay to the Company or the Managing Member any amount which the Company or the Managing Member, as the case may be, pays in respect of taxes (including withholding taxes) imposed upon income of or distributions to such Member, to the extent that such amounts have not been withheld from amounts otherwise distributable to such Member.

(e)    Notwithstanding anything else contained in this Agreement, the

obligations of the Company and each Member under this Section 8, respectively, shall:

(i)   be in addition to any liability which the Company or such Member may otherwise have; and

(ii)   inure to the benefit of the Covered Persons, and any successors, assigns, heirs and personal representatives of such Covered Persons.

(f)   The Managing Member may cause the Company to purchase, at the Company's expense, insurance to insure the Covered Persons against liability hereunder.

8.2   <u>Exclusive Jurisdiction</u>. To the fullest extent permitted by applicable law, each of the Members hereby agrees that any claim, action or proceeding by such Member seeking any relief whatsoever against any Covered Person based on, arising out of, or in connection with this Agreement or the Company's business or affairs shall be brought only in the state or federal courts sitting in Cook County, Illinois, and not in any other court.

23

SEC-USCIS-P-0000861

## ARTICLE IX

### BOOKS AND RECORDS

9.1 <u>Books and Accounts</u>. Complete and accurate books and accounts shall be kept and maintained for the Company at the principal place of business of the Company, as determined by the Managing Member. Each Member shall at all reasonable times have access to, and may inspect and, make copies of, such books and accounts. Funds of the Company shall be deposited in the name of the Company in such bank or other account or accounts as the Managing Member may designate and withdrawals therefrom shall be made upon such signature or signatures on behalf of the Company as the Managing Member may designate.

9.2 <u>Reports to Members</u>.

(a) All reports provided to the Members pursuant to this Section shall be prepared on such basis as the Managing Member determines will appropriately reflect the operations and assets of the Company.

(b) Within 120 days after the end of each Company Year, the Company shall prepare (or cause to be prepared) and mail to each Member, a report setting forth as of the end of such Company Year:

(i) a balance sheet of the Company as of the end of such Company Year;

(ii) an income statement of the Company for such Company Year;

(iii) a statement of each Member's Capital Account;

(v)     a status report of the Company's operational activities during such
Company Year.

(c)     The Managing Member shall be the "tax matters partner," as such term is
defined in Section 6231(a)(7) of the Code.

## ARTICLE X

## TRANSFERABILITY OF A MEMBER'S INTEREST

10.1  Restrictions on Transfer.

(a)     No Transfer of all or any portion of an Investing Member's Interest
(including all or some of its rights or obligations hereunder) may be made at any time prior to the
final adjudication of such Investing Member's Form I-829 application for removal of conditions

24

SEC-USCIS-P-0000862

on permanent residence, or thereafter without the prior written consent of the Company (which consent may be granted or withheld in the sole discretion of the Managing Member). Thereafter, no Transfer of all or any portion of a Member's Interest may be made to the extent that such Transfer would (i) result in the Company being subject to regulation under the Investment Company Act, (ii) result in the taxation of the Company at the entity level, (iii) result in the Company's assets being deemed "plan assets" for the purposes of Section 4975 of the Code or ERISA or (iv) have a material adverse effect for tax purposes on any other Member (as determined by the Managing Member in its reasonable discretion), unless such Transfer is consented to by such adversely-effected Member (which consent may not be unreasonably withheld).

(b)     No Transfer shall relieve the transferor of any of its obligations under this Agreement or its Subscription Agreement without the prior written consent of the Company (which consent may be granted or withheld in the sole discretion of the Managing Member).

(c)     Each Member shall be liable to the other Members if a Transfer of any of the interests in the entity or entities of which such Member is composed, including, but not limited to, any Transfer of economic or beneficial interest resulting from any reorganization or restructuring of the entity or entities of which such Member is composed, (i) results in the Company being subject to regulation under the Investment Company Act, (ii) results in the taxation of the Company at the entity level, (iii) results in the Company's assets being deemed "plan assets" for the purposes of Section 4975 of the Code or ERISA or (iii) violates any provision of this Agreement.

10.2    Expenses of Transfer; Indemnification.   All expenses, including attorneys' fees and expenses, incurred by the Managing Member or the Company in connection with any Transfer shall be fully borne, jointly and severally, by the transferring Member and such

Member's transferee. In addition, such transferring Member and such transferee shall indemnify the Company and the Managing Member in a manner satisfactory to the Managing Member, in its sole discretion, against any losses, claims, damages, liabilities or expenses to which the Company or the Managing Member may become subject arising out of or based upon any false representation or warranty made by, or breach or failure to comply with any covenant or agreement of, such transferring Member or such transferee in connection with such Transfer.

10.3    Recognition of Transfer.

(a)    The Company shall not recognize for any purpose any purported Transfer of any Interest (including some or all of its rights or obligations hereunder) and no Transferee of any Interest shall be admitted as an Investing Member hereunder unless:

(i)    the applicable provisions of this Agreement shall have been complied with;

(ii)    the Company shall have been furnished with the documents effecting such Transfer, in form and substance reasonably satisfactory to the Managing Member, executed and acknowledged by both transferor and the transferee;

25

SEC-USCIS-P-0000863

(iii)    such Transfer shall have been made in accordance with all applicable laws and regulations, including without limitation the rules and regulations governing the EB-5 Program, and all necessary governmental consents shall have been obtained and requirements satisfied;

(iv)    the books and records of the Company shall have been changed by the Managing Member to reflect the admission of such transferee; and

(v)    such Transfer will not cause a termination of the Company for Federal income tax purposes.

(b)    Each transferee, as a condition to the Company's recognition of such Transfer, shall execute and acknowledge such instruments, in form and substance reasonably satisfactory to the Managing Member, as the Managing Member may deem necessary or desirable in its sole discretion to effectuate such Transfer and to confirm the agreement of such transferee to be bound by all the terms and provisions of this Agreement with respect to any rights and/or obligations represented by the Interest acquired by such transferee. The recognition of any Transfer shall not require the approval of any other Member.

10.4    Effect of Transfer.  Notwithstanding any other provision of this Agreement or the Act to the contrary, to the fullest extent possible pursuant to applicable law, upon the Transfer by a Member of all of such Member's Interest such former Member shall have no further right as a Member under this Agreement, including, without limitation, any right to vote on any matter regarding the Company and the Company may act without any consent, approval or vote theretofore required to be obtained from such Member (provided, however, that the Company shall still be required to obtain any required consent, approval or vote from the remaining Members). Upon a Transfer by an Investing Member of its entire Interest in accordance with the

provisions of this Agreement, the transferee shall be admitted as a substitute Investing Member
effective as of the time of the Transfer, upon its compliance with the applicable provisions of this
Agreement.

## ARTICLE XI

### DISSOLUTION

11.1    Events of Dissolution.

     (a)    The Company shall be dissolved upon the first to occur of:

     (i)    the date that the Managing Member elects to dissolve the
Company, provided, however, the Managing Member shall use commercially reasonable
efforts to avoid making such an election without the approval of the Investing Members
for a period of five (5) years after the date that the last Investing Member who makes a
capital contribution to the Company in connection with an EB-5 Immigrant Investor
Petition I-526 was admitted into the Company, and in no case at any time prior to final
adjudication of all Investing Members' Form I-829 applications for removal of conditions
on permanent residence;

26

SEC-USCIS-P-0000864

(ii)     at the Managing Member's election, the sale or other disposition of all or substantially all of the assets of the Company and the collection of the proceeds therefrom, which the Managing Member will use commercially reasonable efforts to avoid for a period of five (5) years after the date that the last Investing Member who makes a capital contribution to the Company in connection with an EB-5 Immigrant Investor Petition I-526 was admitted into the Company;

(iii)    the removal of the Managing Member or the occurrence of any other event that causes the Managing Member to cease to be the Managing Member of the Company under the Act, unless the Company is continued without dissolution in accordance with the Act;

(iv)    at any time there are no Investing Members of the Company, unless the Company is continued without dissolution in accordance with the Act; and

(v)     the entry of a decree of judicial dissolution under Section 25.05.300 of the Act.

(b)     Following the dissolution of the Company, the Managing Member shall liquidate the assets of the Company as promptly as shall be practicable and in a commercially reasonable manner. The proceeds of such liquidation shall be applied in the following order of priority:

(i)     first, to the satisfaction (whether by payment or the reasonable provision for payment) of debts and liabilities of the Company, including the establishment of any reserves that the Managing Member may deem reasonably necessary to satisfy any contingent liabilities of the Company, and the satisfaction of the

(ii) then, to the Members in accordance with Section 5.1(c) hereof.

11.2 Cancellation of Certificate. Upon the dissolution of the Company and the completion of the winding up of the Company, the Person acting as liquidating trustee shall cause the cancellation of the Certificate and shall take such other actions as may be necessary or appropriate to terminate the Company. Except as set forth in Section 11.4 or as otherwise specifically provided for in this Agreement, upon cancellation of the Certificate in accordance with the Act, the Company and this Agreement shall terminate.

11.3 Compliance With Timing Requirements of Regulations. If the Company is "liquidated" within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, distributions shall be made pursuant to this Article. In the sole discretion of the Managing Member, a *pro rata* portion of the distributions that would otherwise be made to the Managing Member and the Investing Members pursuant to the preceding sentence may be:

(a) distributed to a trust established for the benefit of the Managing Member and the Investing Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent liabilities or obligations of the Company or of the Managing Member arising out of or in connection with the Company; provided that the

27

SEC-USCIS-P-0000865

assets of any such trust shall be distributed to the Managing Member and the Investing Members from time to time, in the reasonable discretion of the Managing Member, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Managing Member and the Investing Members pursuant to this Agreement; or

(b)     withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company; provided that such withheld amounts shall be distributed to the Managing Member and the Investing Members as soon as practicable.

11.4     Termination.     Upon the cancellation of the Certificate of the Company in accordance with the Act, this Agreement shall terminate other than Sections 8 and 13.13 hereof, which shall survive the termination of this Agreement or the dissolution of the Company for any reason.

## ARTICLE XII

### NOTICES; POWER OF ATTORNEY

12.1     Method of Notice.     All notices required to be delivered hereunder shall be in writing and must be delivered either by hand in person, by electronic mail, by facsimile transmission, by U.S. certified mail, return receipt requested or by nationally recognized overnight delivery service (receipt request) and shall be deemed given when so delivered by hand (with written confirmation of receipt), sent by facsimile transmission (with confirmation of receipt of transmission from sender's equipment), transmitted by electronic mail (in a message to the electronic mail address given to the Company) or, if mailed by U.S. certified mail, three days

after the date of deposit in the U.S. mail, or if delivered by overnight delivery service when received by the addressee, in each case at the appropriate addresses set forth below (or to such other addresses as a party may designate for that purpose upon fifteen (15) days written notice to the other party).

If to the Company (c/o the Managing Member) or to the Managing Member at:

Intercontinental Financial Group, LLC
    8201 West Higgins Road
    Chicago, Illinois 60631
    Attn: Anshoo Sethi
    E-mail: Anshoo.Sethi@Chicago-RC.com
    Fax: (312) 878-1340

with a copy to (which shall not constitute notice):

    Homeier & Law, P.C.
    15233 Ventura Blvd., Ste. 605
    Sherman Oaks, CA 91403
    Attn: Michael G. Homeier, Esq.
    E-mail: michael@homeierlaw.com
    Fax: (818) 907-7876

28

SEC-USCIS-P-0000866

If to an Investing Member, to such Investing Member at such Investing Member's addresses/numbers set forth on the signature page set forth on the Subscription Agreement between such Investing Member and the Company.

12.2    Routine Communications; Wire Transfers. Notwithstanding the provisions of Section 12.1 hereof, routine communications such as distribution checks or financial statements of the Company may be sent by first-class mail, postage prepaid, or by facsimile or electronic transmission. The Company shall cause distributions to be made by means of wire transfer to any Member who requests the same and who provides the Company with wire transfer instructions or by such other electronic means as are agreed to by the Company and such Member.

12.3    Power of Attorney.    Without limiting the rights of the Investing Members pursuant to Section 6.2, each Investing Member does hereby constitute and appoint the Managing Member, and any officer of the Managing Member acting on its behalf from time to time, as such Investing Member's true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, deliver and file (a) any amendment to the Certificate required by the Act because of an amendment to this Agreement or in order to effectuate any change in the Members of the Company, (b) any amendment to this Agreement permitted to be made by the Managing Member pursuant to Section 13.2 hereof; provided, however, that if such amendment is stated in Section 13.2 hereof to be an amendment which requires the prior written consent (or other specified approval) of the affected Investing Member, Investing Members holding at least a majority of the Percentage Interests or all of the Investing Members, as the case may be, such prior written consent (or such other specified approval) must be obtained, (c) any and all financing statements, continuation statements and other documents necessary or desirable to create, perfect, continue or validate any security interest granted by such Investing Member or

to exercise or enforce the Company's rights hereunder with respect to such security interest, and

(d) All such instruments, documents and certificates which may from time to time be required by the laws of the United States of America, the State of Illinois or any other state, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Company and its power to carry out its purposes as set forth in this Agreement or to dissolve and terminate the Company in accordance with the Act. The Managing Member shall deliver a copy of each document executed pursuant to this power of attorney to each Member in whose name such document was executed. Insofar as possible pursuant to applicable law, the power of attorney granted hereby is irrevocable. This power of attorney is coupled with an interest and shall survive the subsequent incapacity, disability or dissolution of the Investing Member granting such power.

## ARTICLE XIII

## GENERAL PROVISIONS

13.1    Entire Agreement.  This Agreement, the Subscription Agreement and the Side Letters (as defined herein), if any, constitute the entire agreement among the parties hereto with

29

SEC-USCIS-P-0000867

respect to the subject matter hereof and thereof, and supersede any prior agreement or understanding among the parties hereto with respect to the subject matter hereof or thereof.

13.2 Amendment. Except as required by law, this Agreement may be amended by the Managing Member, from time to time, with the prior written consent of Investing Members holding at least a majority of the outstanding Percentage Interests; provided, however, that amendments which do not adversely affect the Investing Members or the Company, as determined by the Managing Member in its sole and reasonable discretion, may be made to this Agreement and the Certificate, from time to time, by the Managing Member, in its sole discretion, without the prior written consent of any of the Investing Members, to: (a) admit any Person to the Company as an Investing Member pursuant to the terms of this Agreement; (b) amend any provision of this Agreement and the Certificate which requires any action to be taken by or on behalf of the Managing Member or the Company pursuant to requirements of Illinois law if the provisions of Illinois law are amended, modified or revoked so that the taking of such action is no longer required; (c) add to the representations, duties or obligations of the Company or the Managing Member, or to surrender any right granted to the Company or the Managing Member herein, for the benefit of the Investing Members; (d) correct any clerical mistake herein or in the Certificate or correct any printing, stenographic or clerical errors, or omissions, which shall not be inconsistent with the provisions of this Agreement or the status of the Company as a company for federal income tax purposes; and (e) change the name of the Company or to make any other change which is for the benefit of, or not adverse to the interests of, the Investing Members.

13.3 Approvals. Except as otherwise specifically provided herein and to the extent permitted by applicable law, each Member agrees that the written approval of Members holding the required Percentage Interests shall bind the Company and each Member and shall have the same legal effect as the written approval of each Member, for purposes of granting the approval

same legal effect as the written approval of such Member, for purposes of granting the approval of the Members with respect to any proposed action of the Company, the Managing Member, or any of their respective Affiliates. Each Investing Member agrees that for purposes of any vote sought by the Managing Member pursuant to any provision of this Agreement requiring the approval of the Investing Members (whether pursuant to an amendment or otherwise), in calculating the percentage required for such approval, the numerator and denominator will exclude the Percentage Interest of any Investing Member who does not indicate approval or disapproval of any matter presented for its approval within such time period as may be specified by the Managing Member (which time period in any event will not be less than 10 Business Days), and such Investing Member will be deemed for purposes of this Agreement to have not indicated any approval or disapproval of such matter.

13.4     <u>Side Letters</u>.   Notwithstanding any provisions of this Agreement (including Section 13.2 hereof) or of any Subscription Agreement to the contrary, it is hereby acknowledged and agreed that the Company, and the Managing Member on its own behalf or on behalf of the Company, may, without the approval of any other Member, enter into a side letter or similar agreement (each, a "<u>Side Letter</u>") to or with an Investing Member which has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or of a Subscription Agreement between such Investing Member and the Company. The parties hereto agree that any terms contained in a Side Letter shall govern with respect to such Investing Member notwithstanding the provisions of this Agreement or of any Subscription Agreement.

30

SEC-USCIS-P-0000868

Except as required by law, the Managing Member and the Company shall not be required to deliver the Side Letter or disclose the existence of any Side Letter or the terms and agreements contained therein to any Member.

13.5  Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the state of Illinois, without giving effect to the provisions, policies or principles thereof relating to choice or conflict of laws.

13.6  Captions. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

13.7  Successors. Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

13.8  Severability. In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and other application thereof shall not in an way be affected or impaired thereby.

13.9  Gender and Number. Whenever required by the context hereof, the singular shall include the plural and the plural shall include the singular. The masculine gender shall include the feminine and neuter genders.

13.10  Third-Party Rights. Each Covered Person shall be deemed a third party beneficiary of the provisions of Article VIII hereof. Subject to the foregoing, nothing in this Agreement shall be deemed to create any right in any Person not a party hereto and this

Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third party (except as aforesaid).

Case: 1:13-cv-00982 Document #: 11-3 Filed: 02/06/13 Page 118 of 205 PageID #:1315

13.11 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

13.12 <u>Duties</u>. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement a Person is permitted or required to make a decision (a) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Person shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (b) in its "good faith" or under another express standard, such Person shall act under such express standard and shall not be subject to any other or different standard. To the extent that, at law or in equity, a Person has duties (including fiduciary or statutory duties) and liabilities relating thereto to the Company or to any Member, such Person acting under this Agreement shall not be liable to the Company or any Member for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Person otherwise

31

SEC-USCIS-P-0000869

existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Person.

13.13 Confidentiality. Unless otherwise approved in writing by the Managing Member, each Investing Member agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest in the Company or for purposes of filing such Investing Member's tax returns or immigration filings or for other routine matters required by law) nor to disclose to any Person, any information or matter relating to the Company and its affairs and any information or matter related to the business of the Company (other than disclosure to such Investing Member's owners, employees, agents, advisors or representatives (each such Person being hereinafter referred to as an "LLC Authorized Representative"), except that a Person who is not subject to the direction or control of such Investing Member will not constitute an LLC Authorized Representative unless such Person shall agree for the benefit of the Company and the Managing Member to be bound by a confidentiality undertaking on substantially the same terms as set forth in this Section 13.13): provided that such Investing Member and its LLC Authorized Representatives may make such disclosure to the extent that (i) the information being disclosed is publicly known at the time of any proposed disclosure by such Investing Member or LLC Authorized Representative, (ii) the information subsequently becomes publicly known through no act or omission of such Investing Member or LLC Authorized Representative, (iii) the information otherwise is or becomes legally known to such Investing Member other than through disclosure by the Managing Member or the Company, (iv) such disclosure, in the opinion of legal counsel (which may be inside counsel) of such Investing Member or LLC Authorized Representative, is required by law or (v) such disclosure is in connection with any litigation or other proceeding between any Investing Member and the Managing Member and/or the Company; provided, further, that each Investing Member will be permitted, after notice to the Managing Member, to correct any false or misleading information which may become public...

which may become public concerning such Investing Member's relationship to the Managing Member, the Company, or any Person in which the Company holds or contemplates acquiring an investment. Prior to making any disclosure required by law, each Investing Member shall notify the Managing Member of such disclosure and advise the Managing Member as to the opinion referred to above. Prior to any disclosure to any LLC Authorized Representative, each Investing Member shall advise such LLC Authorized Representative of the obligations set forth in this Section 13.13, inform such LLC Authorized Representative of the confidential nature of such information and direct such LLC Authorized Representative to keep all such information in the strictest confidence and to use such information only for purposes relating to such Investing Member's Interest.

13.14 <u>Jurisdiction and Service of Process</u>. THE COMPANY AND EACH MEMBER HEREBY CONSENT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN COOK COUNTY, ILLINOIS AND IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE APPLICABLE SUBSCRIPTION AGREEMENT(S) BETWEEN THE COMPANY AND SUCH MEMBER, ANY INVESTOR LETTER OF SUCH MEMBER REFERRED TO IN SUCH SUBSCRIPTION AGREEMENT(S), ANY SIDE LETTER BETWEEN THE COMPANY AND SUCH MEMBER AND ALL OTHER DOCUMENTS OR TRANSACTIONS AND ANY OTHER DEALINGS BETWEEN THE COMPANY AND SUCH MEMBER RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF

32

SEC-USCIS-P-0000870

WHICH MAY BE LITIGATED MAY BE LITIGATED IN SUCH COURTS. EACH OF THE COMPANY AND EACH MEMBER ACCEPTS FOR SUCH PARTY AND IN CONNECTION WITH SUCH PARTY'S PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION HEREWITH OR THEREWITH. EACH OF THE COMPANY AND EACH MEMBER HEREBY IRREVOCABLY CONSENTS TO THE FULLEST EXTENT PERMITTED BY LAW TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF, BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED), TO SUCH PARTY AT ITS ADDRESS AS SET FORTH IN SECTION 12.1 HEREOF, SUCH SERVICE TO THE FULLEST EXTENT PERMITTED BY LAW TO BE DEEMED EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING PROCEEDINGS AGAINST ANY OTHER PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

13.15 Trial. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE COMPANY AND EACH MEMBER HEREBY WAIVES SUCH PARTY'S RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE APPLICABLE SUBSCRIPTION AGREEMENT(S) BETWEEN THE COMPANY AND SUCH MEMBER, ANY INVESTOR LETTER OF SUCH MEMBER REFERRED TO IN SUCH SUBSCRIPTION AGREEMENT(S), ANY SIDE LETTER BETWEEN THE COMPANY AND SUCH MEMBER AND ALL OTHER DOCUMENTS OR TRANSACTIONS AND ANY OTHER DEALINGS

BETWEEN THE COMPANY AND SUCH MEMBER RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF. EACH OF THE COMPANY AND THE MEMBER ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF THE COMPANY AND EACH MEMBER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE OTHER PARTY'S DECISION TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH PARTY HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT, THE APPLICABLE SUBSCRIPTION AGREEMENT(S) BETWEEN THE COMPANY AND SUCH MEMBER, ANY SIDE LETTER BETWEEN THE COMPANY AND SUCH MEMBER AND ALL OTHER DOCUMENTS OR TRANSACTIONS AND ANY OTHER DEALINGS BETWEEN THE COMPANY AND SUCH MEMBER RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF AND THAT EACH PARTY WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH OF THE COMPANY AND EACH MEMBER FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH SUCH PARTY'S LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND

33

SEC-USCIS-P-0000871

VOLUNTARILY WAIVES SUCH PARTY'S JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THAT THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, THE APPLICABLE SUBSCRIPTION AGREEMENT(S) BETWEEN THE COMPANY AND SUCH MEMBER, ANY SIDE LETTER BETWEEN THE COMPANY AND SUCH MEMBER AND ALL OTHER DOCUMENTS OR TRANSACTIONS AND ANY OTHER DEALINGS BETWEEN THE COMPANY AND SUCH MEMBER RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**[SIGNATURE PAGES FOLLOW]**

34

SEC-USCIS-P-0000872

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

THE MANAGING MEMBER:

INTERCONTINENTAL FINANCIAL GROUP, LLC,
An Illinois Limited Liability Company

By: _____

Name: _Anshoo Sethi_____

Title: _Managing Member_____

THE INVESTING MEMBERS:

Each person who shall sign an Investing Member Signature Page in the form attached hereto as Exhibit A and whose signature page hereto shall be accepted by the Company.

[SIGNATURE PAGE TO THE OPERATING AGREEMENT OF A CHICAGO CONVENTION CENTER, LLC]

SEC-USCIS-P-0000873

## EXHIBIT A

### INVESTING MEMBER SIGNATURE PAGE

**SIGNATURE PAGE TO THE LIMITED LIABILITY COMPANY
AGREEMENT OF A CHICAGO CONVENTION CENTER, LLC,
DATED AS OF _____July_____ 15 , 20 12**

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement as of _____July_____ 15 , 20 12 .

By:_____ ←

Mr. SHEN Tao
Name of the Investing Member (Please type or print)

By:_____

Accepted, as of the date first written above:

[A CHICAGO CONVENTION CENTER, LLC]

By:  INTERCONTINENTAL FINANCIAL GROUP, LLC
Its:  Managing Member

By: _____

Name: _Anshoo Sethi_____

Title: _Managing Member_____

[SIGNATURE PAGE TO THE OPERATING AGREEMENT OF A CHICAGO CONVENTION CENTER, LLC]

SEC-USCIS-P-0000874

## EXHIBIT B

### SCHEDULE OF MEMBERS

[Attached.]

| Name | Contribution | Percentage Interest |
|------|--------------|---------------------|
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |
|      |              |                     |

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

[SCHEDULE OF MEMBERS TO THE INVESTING MEMBERSHIP AGREEMENT OF February 16, 20 12]

SEC-USCIS-P-0000875

# EXHIBIT

K

# RESPONSE TO REQUEST *FOR EVIDENCE*
# *EB-5 REGIONAL CENTER* APPLICATION

**SUBMISSION CONTAINS CONFIDENTIALCOMMERCIAL INFORMATION.**
**PER FOIA (5 U.S.C. § 552 (b)(4)), SUBMITTER REQUESTS PREDISCLOSURE NOTIFICATION PER**
**PRESIDENTIAL EXECUTIVE ORDER NO. 12,600, 52 Fed. Reg. 23781 (June 23, 1987)**

August 23, 2012

U.S. Citizenship and Immigration Services
California Service Center
Attention: EB-5 RC Proposals
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677

**Re: RCW-1131850352- Intercontinental Regional Center Trust of Chicago Application**

Dear Examiner,

This letter is a timely response to the June 7, 2012 Request For Evidence issued in connection with the

Intercontinental Regional Center Trust of Chicago Application (the "IRCTC Application") submitted by Intercontinental Regional Center Trust of Chicago LLC ("IRCTC"). The bolded section headings below correspond to the section headings in the Request for Evidence.

*Job Creation (8 C.F.R. § 204.6(m)(3)(ii)):*

Issue #1: Upon further review, it appears that IRCTC is using EB-5 capital to construct a convention center. The job creation estimates employed in this application are based, at least in part, on the assumption that direct employees of the future tenants of the convention center can be utilized as inputs into the applicable input- output model. However, USCIS has concerns that the attribution of these direct jobs to the EB-5 investment may not be based on reasonable economic methodologies, and therefore do not demonstrate in "verifiable detail" that the requisite jobs will be created. Rather, economic methodologies appear to indicate that such jobs would more appropriately be attributed to the tenants themselves and not to IRCTC because the demand for labor precedes the decision about where to house that labor as a general economic principle. For example, if a federal agency determined that additional federal employees needed to be hired to fulfill the agency's mission at a particular location, the federal agency would seek to hire the requisite number of employees and as part of that process, would also take steps to lease the appropriate physical premises to provide sufficient workspace for the new hires. In this instance, it is the federal agency that is creating the jobs through its decision to hire more employees, not the landlord who will ultimately lease the workspace to the federal agency.

SEC-USCIS-P-0000985

USCIS observes that the tenant-occupancy methodology (that the direct jobs created by future tenants are intended to be attributable to the EB-5 investments) is not economically reasonable on the facts as presented. To allow for the existing methodology would require USCIS to credit the prospective EB-5 investors in the new commercial enterprise with the employment impacts created by the unrelated business ventures of future tenants (even though such tenants might engage in business activities within the requested industry categories and NAICS codes). After reviewing the tenant-occupancy methodology presented thus far, USCIS observes that the nexus between the investment and the job creation is either too attenuated or too incomplete to constitute a reasonable economic methodology. Consequently, the existing record presents USCIS with a justification to recognize only those employment impacts that could be attributed to IRCTC, such as those resulting indirectly from the construction activity and, if applicable, the ongoing building management activities that will be required to maintain the building.

However, USCIS does not foreclose the possibility that IRCTC might present additional evidence to demonstrate an economically acceptable nexus between the EB-5 investment and responsibility for the job creation asserted in the application. Accordingly, IRCTC may present additional evidence to demonstrate that the proposed methodology is economically reasonable.

To help illustrate the factors that USCIS finds central to adjudicating the fundamental reasonableness of this particular economic methodology, USCIS requests that any response address the following points:

1. Evidence that there is excess demand for the specific types of tenants (hotels, restaurants, parking garage) to your construction project and business plan. Please provide a data-based assessment, and

the source of the data utilized by the assessment.

To show such excess demand, the assessment should:

a. Analyze whether prospective tenants which would locate in the commercial or industrial space that will be constructed and/or renovated under the proposed project are currently suffering from a lack of a unique or specialized business space, that, in economic terms, such prospective tenants are "constrained" from commencing or expanding their businesses by a lack of unique or specialized business space.

b. Provide a data-based analysis, including the source of the data, which establishes whether there is "pent up" demand for the specific professional and business services relevant to your project. Such data-based analysis should include:

i. Evidence of congestion externalities as demonstrated by a low vacancy- unemployment ratio pursuant to specific space and businesses seeking to expand, respectively; and

ii. Evidence of upward wage and rental pressures in specific regional sectors that are likely to be attracted to the proposed project space.

2. The jobs that become located within the tenant space of the project should be shown to be a result of an expansion in specific services driven by your project as opposed to tenant shifting and/or re-location of already existing jobs. Please explain how it will be verified that the jobs that will become

SEC-USCIS-P-0000986

located within the tenant space of the project can be considered "new" jobs.

Alternatively, IRCTC is afforded an opportunity to provide business plans and an economic impact analysis for any industry categories and NAICS codes to demonstrate employment creation which is not based on tenant occupancy. The business plan(s) and economic analysis must show:

• The feasibility of the project under current market conditions within the Regional Center;

• Employment creation projections are not based on tenant occupancy as described above;

• The transparent basis for die data that will be used as the inputs to the model (to included how the estimation of the creation of the direct jobs were derived); and

• The RIMS II calculations used to determine the jobs that will be created, supported by the relevant RIMS II data.

In addition, the submission must clearly identify the timeframe for the commencement, implementation, and realization of each project, how the investors' funds will flow to the job creating entity, and as a result, how the jobs will be created.

Please note that if the regional center submits a new Economic Impact Analysis and Business Plan(s) for project(s) based on industry categories and NAICS codes which do not relate to job creation based on tenant occupancy, the regional center will need to meet the other requirements for regional centers. Other requirements include:

• Describing how the regional center focuses on a geographical region of the United States;

• Describing how the regional center will promote economic growth through increased export sales, improved regional productivity, job creation, and increased domestic capital investment; and

• Demonstrating the regional or national impact of the Regional Center by submitting a detailed prediction regarding the manner in which the regional center will have a positive impact on the regional or national economy in general as reflected by such factors as increased household

earnings, greater demand for business services, utilities, maintenance and repair, and construction both within and outside of the regional center jurisdiction.

**Response:** The Chicago Convention Center project, sponsored by Intercontinental Regional Center Trust of Chicago, will be owned and operated directly by ACCC, LLC. ACCC will operate each of the five hotels, the restaurants, the convention center, and the parking facilities that comprise the project, and will be responsible for their financing, profitability, and operation. There will be no unrelated tenants sought to operate the facility. The hotels will utilize the brand names and back-end reservation systems of appropriate hotel brands such as Westin, Indigo, Staybridge, Hyatt Place, and Hyatt Summerfield Suites.

Please see the updated Business Plan and the attachments thereto, attached as Exhibit 1, which clarifies the operation of the project in Section 3.1, 3.4, and 10.4:

A Chicago Convention Center will provide space for five hotels, which will together offer a full

SEC-USCIS-P-0000987

range of price and amenity options to business and leisure travelers. These hotels will be owned and operated by ACCC, LLC, which will carefully select, contract with, and oversee the performance of approved hotel management companies to assist with managing the day-to-day operations of the hotel. ACCC, LLC has compiled a list of preferred management companies, detailed in Attachment 1, and will select a suitable company from the list at the appropriate time once construction is closer to completion.

Franchise approvals (attached as Attachment 2) have been obtained by brands believed by the Company to be strong in the upscale and upper-upscale categories. Four of the five brands are specifically positioned in the "all-suite and extended stay" segment of the hotel market.

A Chicago Convention Center, LLC will own and operate the hotels, restaurants, convention center, and parking facilities that comprise the project.


*Capital at Risk-New Markets Tax Credits Program*

**Issue #2: The A Chicago Convention Center LLC Redevelopment Agreement between the City of Chicago and A Chicago Convention Center LLC appears to indicate that IRCTC may raise capital through the New Markets Tax Credits (NMTC) as well as possible conventional financing sources.**

**The NMTC Program is a Federal Tax Credit that equals 39% return on capital investments made in qualifying community development entities. The credit is paid out 5% in the first three years, then 6% in the final four years, for a total of 39%.**

The EB-5 immigrant investors must provide evidence that their capital investment is placed at risk in a job-creating enterprise. If the immigrant investor receives a 35% return (or a portion of the return) on their capital investment, this portion of the capital investment would not be deemed "at risk", as it is guaranteed by the U.S. Government Community Renewal Tax Relief Act of 2000.

If the IRCTC will raise any capital through New Market Tax Credits, then please submit a notarized letter stating that EB-5 Immigrant Investors will not receive any guaranteed return on their capital investment received from government New Market Tax Credits. Any response to this notice, must include documentation that the entire amount of the EB-5 capital investment will be sustained in the new commercial enterprise and will be "at risk" for the investors' period of conditional permanent residence.

**Response:** The Chicago Convention Center project will not use any return from tax credits to repay the investors' investment amount or any portion thereof. The entire amount of the EB-5 investors' investment will be sustained within the project, and as evidence IRCTC has included a notarized declaration to that effect attached as Exhibit 2.

*Regional Center Designation for an I-526 Exemplar*

**Issue #3:** The IRCTC is seeking USCIS review and approval of an exemplar I-526 project to be included in the amended regional center approval notice, However, in order for USCIS to approve proposed exemplar I-526 projects, the IRCTC, must provide a Form I-526, Immigrant Petition by Alien

SEC-USCIS-P-0000988

Entrepreneur.

Additionally, the IRCTC will need to provide evidence of a comprehensive business plan for Chicago Convention Center, LLC in order to be Matter of Ho. 22 I. & N. Dec. 206, Assoc. Comm'r 1998, compliant.

**Response:** Attached as <u>Exhibit 3</u> to this cover letter is a sample (exemplar) I-526 form, cover letter, and sample summary letter for an imaginary investor in the Project, as well as the updated May 25, 2012 TEA letter for the project.

The updated Business Plan attached as <u>Exhibit 1</u> of this response is a *Matter of Ho*-compliant business plan. The following excerpt has been taken from Section 1.1 of the updated Business Plan, and details where in the plan the reader may find the specific information related to *Matter of Ho*:

As such, this business plan contains the following:
- A comprehensive business plan as contemplated by the regulations should contain, at minimum, a description of the business, its products and/or services, and its objectives. (See Section 3.)
- A market analysis, including the names of competing businesses and their relative strengths and weaknesses (See Sections 7 and 8)
- A comparison of the competition's products and pricing structures (See Section 8)
- A description of the target market/prospective customers of the new commercial enterprise (See Section 7)
- The plan should list the required permits and licenses obtained (See Section 4.1)

• If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources (Not applicable)

• The plan should detail any contracts executed for the supply of materials and/or the distribution of products (Not applicable)

• It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. (See Section 3, and 10.4)

• The plan should set forth the business's organizational structure and its personnel's experience. (See Section 2)

• It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. (See Section 4.2)

• It should contain sales, cost, and income projections and detail the bases therefore. (See Section 10.4)

• The business plan, as presented is extremely credible based upon solid management with years of experience, conservative projections, detailed market and competitive analysis, and demonstrates management's solid understanding of the project and market landscape.

### *Examples of Projects*

**Issue #4:** For clarification, business plans may generally be reviewed in conjunction with the I-924 application in one of three ways ~ as a "hypothetical," an "actual," or as an "exemplar I-526" project.

SEC-USCIS-P-0000989



A "hypothetical" project is a project used to demonstrate how an actual investment project will be capitalized and operated in a manner that will create at least 10 direct or indirect jobs per alien investor for a particular industry segment. Although only proposals, hypothetical projects must still show credible job creation and economic impact projections in order to meet the requirements of a regional center, i.e. how the regional center will create jobs in verifiable details utilizing reasonable economic methodologies.

An "actual" project describes a genuine project that will be the focus of EB-5 capital investments throughout the regional center in each of the NAICS industry categories in order to meet job creation requirements. Although real and intended, an "actual" project may meet the requirements of a regional center, but may still not be ready to meet established EB-5 eligibility requirements at the individual Form I-526 petition stage.

An "exemplar I-526" project is an actual project that the petitioner feels certain will meet established EB-5 eligibility requirements at the individual Form I-526 petition stage and is Matter of Ho compliant as seen below. Generally, this would be a project that has advanced to the stage where work may begin once the job creating entity is approved.

Additionally, an "exemplar I-526" project is one that if upon review is determined to be compliant, would be approved and included in the I-924 approval notice, by name, if the amended regional center designation is granted. As such, an "exemplar" project requires the filing of a Form I-526, Immigrant Petition by Alien Entrepreneur, with all supporting documentation to determine if it is in compliance with established EB-5 eligibility requirements.

**Response:** The Regional Center has already been approved in this case, but for clarification, this is an I-526 Exemplar project that is being submitted for I-526 exemplar approval. Please see our response to issue number 3 above for further clarification.

Also note that several dozen actual I-526 applications for individual investors have already been submitted in relation to this project. Once this project is approved by the USCIS, the new approved documents attached hereto and dated 08/23/2012 (specifically, the updated Business Plan) will supersede and control and will be used for every I-526 application. At the USCIS's convenience (and to save a great deal of time, printing, and postage), should this Exemplar petition be approved, the USCIS can approve those pending I-526 applications by noting that they are approved with the updated 08/23/2012 documents attached hereto, or can issue RFEs whereupon we will re-submit all pending I-526 cases with new copies of the updated 08/23/2012 documents attached hereto.

*Clarification of the Applicant's Proposed Project*

**Issue #5: Please clarify at this time, if the petitioner wishes the project described in the petition to be considered as a "hypothetical," an "actual," or as an "exemplar I-526" project.**

If the petitioner wishes to have their project(s) considered as a "hypothetical" or "actual" project individual I-526 petitions may be filed at a later date with more details required at that time concerning the project if the I-924 is approved. Or, the petitioner may file a I-924 Amendment after receiving regional center designation, requesting USCIS review and approval of an exemplar I-526

SEC-USCIS-P-0000990



project that is Matter of Ho compliant.

If, however, the petitioner is seeking USCIS review and approval of the current project as an "exemplar I-526" project, a completed Form I-526, is required. Also, the petitioner must provide additional evidence of a comprehensive business plan in order to be Matter of Ho compliant.
If USCIS determines that the project is not Matter of Ho compliant, but complies with the lesser standard similar to a "hypothetical" or "actual" project, the I-924 may be approved without including the project by name in the I-924 approval letter.
Please include one of the following three options in your response to this request for evidence in order to clarify the type of project you are requesting for each business project presented in your 1-924 proposal:

• Please review the project as a "hypothetical" or "actual" project as it is not Matter of Ho compliant at this time. It is understood that the project will not be specifically named in the I-924 approval notice. It is also understood that either individual I-526 petitions or an I-924 Amendment with an exemplar I-526 will be filed at a later date with more details required at that time to comply with the Matter of Ho standards.

• Please review the project as an "exemplar I-526" that is Matter of Ho compliant. If approved, it is understood that the project will be mentioned by name in the I-924 approval notice. If USCIS determines that the project is not Matter of Ho compliant, but complies with the lesser standard similar to a "hypothetical" or "actual" project, it is understood that the I-924 may be approved without mentioning the project by name in the I-924 approval letter.

**Response:** The business plan attached is to be reviewed as an I-526 Exemplar.

*Evidence of Matter of Ho compliance*

**Issue #6: The business plan submitted with the present petition is insufficient to establish EB-5 compliance pursuant to Matter of Ho.**

A "comprehensive business plan" will demonstrate that "due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the two years subsequent to the filing of the 1-526, and when such employees will be hired." To be considered "comprehensive," a business plan must be sufficiently detailed to permit the Service to reasonably conclude that the enterprise has the potential to meet the job-creation requirements.

In Matter of Ho the Administrative Appeals Office held that a "comprehensive business plan as contemplated by the regulations should contain, at a minimum, a description of the business, its products and/or services, and its objectives." Elaborating on the contents of an acceptable business plan, the decision states the following:

"The plan should contain a market analysis, including the names of competing businesses and their relative strengths and weaknesses, a comparison of the competition's products and pricing structures, and a description of the target market/prospective customers of the new commercial enterprise. The plan should list the required permits and licenses obtained. If applicable, it should describe the

SEC-USCIS-P-0000991

manufacturing or production process, the materials required, and the supply sources. The plan should detail any contracts executed for the supply of materials and/or the distribution of products. It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. The plan should set forth the business's organizational structure and its personnel's experience. It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. It should contain sales, cost, and income projections and detail the bases therefor. Most importantly, the business plan must be credible."

As such, if you are requesting that the project be named in the approval notice, then please provide the following information to establish that the job creating enterprise is at the stage where work is immediately ready to begin should the project be approved.

<u>Permits and Licenses</u>

It appears from the A Chicago Convention Center Development Schedule that all necessary permits to begin construction have not been obtained and may not be obtained until May 2012.

Additionally, under section 3.06 of the A Chicago Convention Center LLC Redevelopment Agreement it states that construction on the project cannot commence until ACCC has obtained all necessary permits and approvals.

Provide evidence of the permits and licenses that have been obtained in order to begin work on the project. For instance, provide evidence of building permits (e.g., zoning, water, sewage, wastewater, Health Department, etc. permits.) have been obtained including any Environmental Protection Agency

health Department, etc. permits), have been obtained including any Environmental Protection Agency permits necessary to immediately begin construction,

**NOTE:** If providing the permits would require the submission of scores of documents, then provide a letter from the appropriate city, county, state, or federal agency that can confirm the appropriate permits have been issued. For instance, a letter from the City of Chicago, Department of Planning and Development ("DPD") stating that all approvals necessary to begin construction have been obtained should suffice.

**Response 6A:** Please see the updated Business Plan, which includes a new detailed timeline of permitting and construction activity, as well as information on zoning approvals already received for the Project. These additional elements are located in Section 4.0 (updated timeline), and Section 4.1 (zoning approvals) of the updated Business Plan. As soon as the project is approved, construction can commence, with additional permits being obtained at the appropriate times during the construction process as explained on the updated timeline.

Additionally, please see the updated property deed showing the property deeded to ACCC, LLC, attached as Exhibit 4, showing that ACCC, LLC owns the property and is ready to begin construction on it.

**Contracts**

**Franchise Agreements**

SEC-USCIS-P-0000992

Please provide copies of any franchise agreements that have been executed, between ACCC and the particular hotel brands listed in the business plan.

**Response 6B:** Please see the updated business plan, Section 3.4, which details the hotel brands that ACCC has executed franchise agreements with, along with the "welcome letters" provided by those franchisors (attached to the Business Plan).

**Leasing**

Provide evidence of any contracts executed between ACCC and hotel chains, restaurants, etc. to occupy the convention center.

NOTE: if providing the contracts would require the submission of hundreds or thousands of pages of documents, then just provide the first and last pages of the contracts along with any other pertinent pages (usually showing location, square footage, and cost of leasing) that confirm that the petitioner has contracted to rent space at the convention center.

If ACCC will own and operate any businesses on its premises, please explain and provide evidence.

**Response 6C:** ACCC will own and operate all businesses located on the premises, including the hotels, restaurants, convention center, and parking facilities. Please review the updated Business Plan for a detailed explanation, including Section 3 and the financial projections included in Section 10.4.

Capital Commitment

The petitioner provided the following capitalization overview in its business plan:

**CAPITALIZATION OVERVIEW**
Convention Center with Five Hotels in Chicago, IL

| SOURCE | Amount |
|---|---|
| 1. EB-5 Investment | $249,500,000 |
| 2. Developer's direct investment | $177,547,465 |
| 3. Government Financing | $485,455,171 |

• Bond financing:   $339,818,620
• Loans generated from federal and state tax credits:   $48,496,971
• Federal, state, and municipal grants:   $97,139,580

| TOTAL | $912,502,635 |
|---|---|

It is understood where the $249,500,000 EB Investor funds will come from. Additionally, the record includes an agreement with the City of Chicago to provide up to $97,300,000 for the project. However, there is nothing in the record to establish the commitment of funds through bond financing ($339,818,620) which appears to be the greatest source of funds for the project. There is only anticipation that the loan from bonds will be available. Additionally, the record does not include

SEC-USCIS-P-0000993



evidence of commitment of $48,496,971 in federal and state tax credits.

Please provide evidence of any arrangements that have been made to establish the commitment of capital to the project through bond financing and federal and state tax credits to establish that the project is immediately ready to begin.

**Response:** A further explanation and verification of the bond financing and federal and state tax credits has been included in the updated Business Plan (section 5.2) and its accompanying attachments. Specifically:

For verification of the $339,818,620 in bond financing, please see the commitment letter from the Illinois Financing Authority, attached as Attachment 4.

The $48,496,971 loan is generated from the value of renewable energy tax credits. As the project is being built to the highest level of LEED energy efficiency, it will contain numerous energy-efficient elements in its construction, including "solar, fuel cells, small wind turbines, geothermal systems, microturbines, and combined heat and power." These credits can be taken as Business Energy Investment Tax Credits or as U.S. Department of Treasury Renewable Energy Grants, and are equal to 10% to 30% of construction costs. [Verification cited and attached as Attachment 5 to the Business Plan.]

<u>Staffing</u>

Explain ACCC's staffing requirements. Indicate whether ACCC will only lease space to hotels and

**Explain ACCC's staffing requirements. Indicate whether ACCC will only lease space to hotels and restaurants or whether it will actually operate the hotels and restaurants under franchise agreements and hire employees.**

**If hotel chains will lease space at the Convention Center indicate if the hotels, restaurants, etc. will move current employees from other locations or if the employees are new hires required to operate a completely new business.**

**Provide a timetable for the hiring of ACCC's staff. Provide job descriptions for all positions with ACCC.**

**Response 6D:** A timetable for the hiring of ACCC's staff has been provided in the updated Business Plan, section 4.2:

> Pursuant to the timeline delineated above, direct employees for hotel operations will be hired based upon the anticipated opening date of the hotel. The management team will be assembled and hired 30–60 days before the opening date of the hotel, so as to prepare for opening day. The remainder of the hotel employees will be hired upon the hotel's opening date.

In addition, a detailed list of job descriptions for all positions has also been included in section 4.2 of the updated Business Plan.

**Projections**

SEC-USCIS-P-0000994



**Infusion of EB-5 Capital**

**Provide actual dates or a detailed explanation of the infusion of EB5 capital into the job creating enterprise in relation to expected job creation within 2 years of the filing of an I-526. Indicate if any of these funds will be used as a bridge loan.**

**Response:** The updated Business Plan (section 4.2) includes further detail about the timing of the infusion of EB-5 capital as it relates to job creation:

As to the timing of job creation, indirect job creation from construction will begin very soon after EB-5 funding. As mentioned above, all operational employees will be hired by the time Tower 3 construction is completed, which is 2 years after the start of construction.

**Conclusion:**

We therefore respectfully request that you adjudicate and approve this regional center application as quickly as possible. Should you require further information please do not hesitate to contact us.

Sincerely,

David Derrico, Esq.

SEC-USCIS-P-0000995

# EXHIBIT

L

**EXHIBIT 1**

SEC-USCIS-P-0000997

# Business Plan for EB-5 Investment in



# A CHICAGO CONVENTION CENTER





**AUGUST 2012**

INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO

8201 W. HIGGINS RD. | CHICAGO, IL 60631

D | 312.404.9275     F | 312.878.1340

www.IRCTC-eb5.com

SEC-USCIS-P-0000998

# A Chicago Convention Center, LLC

| | | |
|---|---|---|
| 1.0 | Executive Summary | 4 |
| 1.1 | *Matter of Ho* Compliance | 5 |
| 2.0 | Organization and Management | 7 |
| 2.1 | Investment Structure | 7 |
| 2.2 | Material Relationships and Agreements | 7 |
| 2.3 | Management Profiles | 9 |
| 2.4 | Consultants and Advisors | 9 |
| 3.0 | Investment Project Description | 10 |
| 3.1 | Overview | 10 |
| 3.2 | Building Specifications | 11 |
| 3.3 | Design Features | 13 |
| 3.4 | Management, Operation, and Branding | 14 |
| 3.5 | Location | 16 |
| 4.0 | Project Development Schedule | 18 |

    4.1   Zoning & Licenses................................................................................20

    4.2   Employment & Staffing.......................................................................20

5.0   Project Costs and Capitalization.................................................................47

    5.1   Project Development Costs...................................................................47

    5.2   Project Capitalization..........................................................................49

6.0   Job Creation...............................................................................................53

    6.1   Economic Analysis..............................................................................53

    6.2   Economic Model Inputs and Verifiable Detail....................................54

7.0   Market Profile.............................................................................................55

    7.1   Neighborhood Profile and Location Advantages ................................55

    7.2   Demand Drivers...................................................................................56

8.0   Feasibility Analysis ....................................................................................57

9.0   Advantages for EB-5 Investors...................................................................60

10.0  Appendices .................................................................................................62

    10.1  Advisor and Consultant Profiles.........................................................62

SEC-USCIS-P-0000999

10.2   A Chicago Convention Center Design Detail ................................................................. 65

10.3   Area Revitalization and Development Activity Detail .................................................... 72

10.4   Operating Income Projections ........................................................................................ 73

SEC-USCIS-P-0001000

## 1.0 EXECUTIVE SUMMARY

A potential EB-5 investment target within Intercontinental Regional Center Trust of Chicago (RCW1031910085) will involve construction and management of a facility for a convention center that will offer convention and meeting space, five upper-upscale hotels, and amenities including restaurants, lounges, bars, and entertainment facilities. This new development, A Chicago Convention Center — A Kyoto Protocol Centre, will be located in Chicago, Illinois. Up to $249.5 million of EB-5 investor capital will be applied to $735 million in development costs for the facility, and 8,495 new jobs will be created. Direct jobs will be created in connection with operations of the convention center, hotels, and amenities, and through indirect and induced impacts of these new enterprises in the regional area.



**Investment Required**
- $735 million including domestic financing and $249,500,000 million of EB-5 capital.

**Use of Funds**
- Demolition, construction, build-out, and initial operation of A Chicago Convention Center.

**Verifiable Detail**
- Occupancy of the facility by job-creating hospitality and related tenants.

**Result**
- 8,495 total jobs including jobs created indirectly



*Conceptual rendering of the proposed new development in Chicago, IL.*
*The three towers will house five hotels as well as providing convention space.*

SEC-USCIS-P-0001001

## 1.1    *MATTER OF HO* COMPLIANCE

This Confidential Business Review is prepared as an I-526 Exemplar submission, compliant with the standards of *Matter of Ho*, 22 I&N Dec. 206 (Assoc. Comm., 1998) (pg. 9), which states:

"A comprehensive business plan as contemplated by the regulations should contain, at minimum, a description of the business, its products and/or services, and its objectives.

The plan should contain a market analysis, including the names of competing businesses and their relative strengths and weaknesses, a comparison of the competition's products and pricing structures, and a description of the target market/prospective customers of the new commercial enterprise. The plan should list the required permits and licenses obtained. If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources. The plan should detail any contracts executed for the supply of materials and/or the distribution of products. It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. The plan should set forth the business's organizational structure and its personnel's experience. It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. It should contain sales, cost, and income projections and detail the bases therefore. Most importantly, the business plan must be credible."

As such, this business plan contains the following:

- A comprehensive business plan as contemplated by the regulations should contain, at minimum, a description of the business, its products and/or services, and its objectives. (See Section 3.)

- A market analysis, including the names of competing businesses and their relative strengths and weaknesses (See Sections 7 and 8)

- A comparison of the competition's products and pricing structures (See Section 8)

- A description of the target market/prospective customers of the new commercial enterprise (See Section 7)

- The plan should list the required permits and licenses obtained (See Section 4.1)

- If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources. (Not applicable)

- The plan should detail any contracts executed for the supply of materials and/or the distribution of products (Not applicable)

SEC-USCIS-P-0001002

- It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. (See Section 3, and 10.4)

- The plan should set forth the business's organizational structure and its personnel's experience. (See Section 2)

- It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. (See Section 4.2)

- It should contain sales, cost, and income projections and detail the bases therefore. (See Section 10.4)

- The business plan, as presented is extremely credible based upon solid management with years of experience, conservative projections, detailed market and competitive analysis, and demonstrates management's solid understanding of the project and market landscape.

SEC-USCIS-P-0001003

## 2.0  ORGANIZATION AND MANAGEMENT

### 2.1  INVESTMENT STRUCTURE

The proposed A Chicago Convention Center — A Kyoto Protocol Centre  project will receive funding from a variety of sources, including EB-5 investment of up to $249.5 million, which will be raised through Intercontinental Regional Center Trust of Chicago (IRCTC).  IRCTC was designated as a Regional Center under the Immigrant Investor Pilot Program of U.S. Citizenship and Immigration Services on June 9, 2011.

EB-5 investors will deposit qualifying capital contributions in A Chicago Convention Center, LLC, (ACCC, LLC) the Illinois Limited Liability Company incorporated on January 24, 2011 which will own, develop, and operate the convention center project.  EB-5 investors will be subscribed as members in ACCC, LLC, which is both the New Commercial Enterprise and the Capital Investment Project. ACCC, LLC will also receive funding from other sources, including government subsidies, to cover total project development costs estimated at approximately $735 million.

### 2.2  MATERIAL RELATIONSHIPS AND AGREEMENTS

| | |
|---|---|
| **The Company ("Offeror")** | A Chicago Convention Center, LLC is an Illinois limited liability company established on January 19, 2010 with its principal place of business located at 8201 W. Higgins Road, Chicago, Illinois 60631. |
| **Managing Member** | The Managing Member of the LLC is Intercontinental Financial Group, LLC, an Illinois limited liability company with its principal place of business located at 8201 W. Higgins Road, Chicago, Illinois 60631. |
| **EB-5 Regional Center Designation** | The Project is sponsored by the Intercontinental Regional Center Trust of Chicago, LLC ("**IRCTC**"), which previously received approval to establish, and now operates, the "Intercontinental Regional Center Trust of Chicago" (the "**Regional Center**") which is IRCTC's fictitious business name. The Regional Center is a "regional center" as authorized by the United States Citizenship & Immigration Service ("**USCIS**") under the "EB-5 Immigrant Investor Pilot Program" (the "**EB-5 Pilot Program**") to establish and solicit investment from foreign investors under the EB-5 Pilot Program. The Project is believed to be a qualifying investment under the EB-5 Pilot Program. The geographic scope of the Regional Center encompasses the entirety of the State of Illinois, |

SEC-USCIS-P-0001004

plus Lake County in the State of Indiana and Dane, Kenosha, Milwaukee, Racine, and Rock Counties in the State of Wisconsin (collectively, the **"Regional Center Territory"**).

**Limited
Partner Role**

All management and other powers relating to day-to-day control of the Company will be held and exercised by the Managing Member, to the maximum extent permitted by law. Investor Members will have the rights described in the Operating Agreement (see Exhibit A) and as provided for in the Illinois Limited Liability Company Act of 1994, but will generally have limited involvement in the management and little control over the actions of the LLC.

**The Project Company:** *A Chicago Convention Center, LLC*

The principals of A Chicago Convention Center, LLC collectively possess over 150 years of combined construction project management and have also served in the same capacity for the property managers for multiple mid-rise and high-rise structures in downtown Chicago. They have a wide range of experience managing major projects from concept through completion, having built over 250+ hotel developments from coast to coast for prestigious clients in all hotel brands. Through these principals, the Project Company is expert in every aspect of new hotel construction, from initial site planning to the property's opening. Its hotel renovation projects are coordinated with property managers to minimize disruption to hotel operations. It also works

coordinated with property managers to minimize disruption to hotel operations. It also works with owners on rebranding and Property Improvement Plans (PIPs) from conceptual estimates through full design and construction.

**The Development Company:** *Upgrowth, LLC*

With more than 35 years of experience, the Development Company Upgrowth, LLC has earned a reputation as a premier nationwide hotel general contractor providing a full range of services to the hospitality industry in both new construction and renovation for all hotel brands (including Marriott, Starwood, Intercontinental Hotels Group, Choice Hotels, and Accor Hotels). The Development Company's services also include construction management and value engineering with a focus on helping clients reduce costs and improve quality. The Development Company provides full service capabilities for both pre-construction planning and construction phases of a project. The Development Company utilizes a variety of delivery methods, from the traditional plans and specs approach, to full service design/build. Upgrowth has been approved as qualified by all relevant governmental financing agencies.

**The Regional Center:** *Intercontinental Regional Center Trust of Chicago*

Intercontinental Regional Center Trust of Chicago is the entity that received USCIS approval to create and operate an EB-5 regional center, and has been engaged to perform advisory as well as sponsorship activities for the Project. Mr. Anshoo Sethi holds 50% of the ownership interests in

SEC-USCIS-P-0001005

the Regional Center, with the remaining interests held by Mr. Ravinder Sethi; thus, the Regional Center is affiliated with the Project Company and the Development Company.

## 2.3 MANAGEMENT PROFILES

**Anshoo R. Sethi**

Mr. Anshoo R. Sethi is the co-founding member of A Chicago Convention Center, LLC and Upgrowth, LLC, as well as the majority owner of Intercontinental Regional Center Trust of Chicago. Mr. Sethi, who graduated from the University of Illinois at Chicago with a degree in International Finance and Marketing, has over fifteen years of experience in real estate development and management, specifically in the lodging arena. Mr. Sethi has executed several corporate acquisitions and divestitures in his career, working with both private and public domestic and foreign funding. Mr. Sethi holds Certified Lodging Owner (CLO), Certified Hotel Administrator (CHA), and Certified Hospitality Technology Professional (CHTP) certification, and expects shortly to finalize his LEED® Professional Accreditation (LEED® AP) from the U.S. Green Building Council ("USGBC"). He is a member of numerous organizations focusing in areas related to estate development and management, sustainability and renewable energy, asset management, and entrepreneurism. In addition, Mr. Sethi serves on the boards of numerous not-for-profit, social, and educational organizations.

Mr. Ravinder Sethi is one of the founding members of A Chicago Convention Center, LLC and Upgrowth, LLC. Mr. Sethi, who graduated from the University of Punjab, Chandigarh, India, with a Masters Degree in Pharmacy, has over thirty years of experience in real estate development and management, specifically in the lodging, pharamaceutical, and educational arenas. His non-medical businesses are engaged in real estate hospitality and educational developments specifically in general contracting major hotel brands and education businesses in the United States and India. He is a member of numerous organizations focusing in areas related to global finance, alternative investments, asset management, and entrepreneurism. In addition, Mr. Sethi serves on the boards of numerous not-for-profit, social, and educaional organizations.

## 2.4    CONSULTANTS AND ADVISORS

Please see Section 10.1 for detailed profiles of the consultants and advisors who will be involved in development, operation, and management of A Chicago Convention Center.

SEC-USCIS-P-0001006

## 3.0 INVESTMENT PROJECT DESCRIPTION

### 3.1 OVERVIEW

A Chicago Convention Center will attract national and international business by providing beautifully appointed convention and hotel facilities that are supplied by proven brand leaders. The complex will feature five upper-upscale hotel brands spread across three atrium towers. In total there are planned to be 797 suites and 198 rooms (totaling 995 keys) throughout the complex.

ACCC, LLC will be responsible for owning, developing, and operating the convention center and the hotels, restaurants, and parking facilities therein. It will select, contract with, and oversee the performance of approved hotel management companies to assist with managing the day-to-day operations of the hotels. Hotels that have expressed an interest or executed franchise agreements to locate at the site include Element by Westin (a Starwood Hotel brand), Hotel Indigo and Staybridge Suites (Intercontinental Hotel Group brands), and Hyatt Place and Hyatt Summerfield Suites (Hyatt Hotel brands). Further details are provided in Section 3.4.

The Convention Center will offer four floors of convention space totaling 290,000 square feet, all of which will be connected across the lower levels of all three towers. The complex will further contain 15 conference suites on the upper floors, with 55,000 square feet allocated for

restaurants, lounges, and bars throughout the structure. The five hotels in the complex will offer a total of 995 rooms and suites. Finally, a parking structure offering 178 of 1,205 spaces will sit below the lower level convention center.



*Conceptual rendering of the proposed convention center in Chicago, IL. The complex will include a parking garage, four levels of convention center space, and three towers housing five hotels (a total of 995 rooms).*

SEC-USCIS-P-0001007

### 3.2 BUILDING SPECIFICATIONS

The following table summarizes the specifications for the A Chicago Convention Center building, based on most current design plans. Exact square footage for each use may vary in practice.

| A Chicago Convention Center Project Specifications | | | | | | |
|---|---|---|---|---|---|---|
| | | Hotel | | Convention and Meeting Space | Food and Beverage | Parking |
| *Building Element* | *Primary Hotel Brand* | *Suites* | *Rooms* | *(approximate building area in square feet)* | | |
| Tower 1 | Starwood Element | 336 | | 102,000 | 19,000 | |
| Tower 2 | Hotel Indigo | | 209 | 94,000 | 17,700 | |
| | Staybridge | 154 | | | | |
| Tower 3 | Hyatt Place | 148 | | 94,000 | 18,300 | |
| | Summerfield Suites | 148 | | | | |
| | | 786 | 209 | | | |
| Lower Level | Parking Structure | | | | | 591,000 (1,720 spaces) |
| | TOTALS | 995 | | 290,000 | 55,000 | 591,000 |

Conceptual renderings for the new development illustrate how the three hotel towers will be built

Conceptual renderings for the new development illustrate how the three hotel towers will be built on a common base. The lower floors will feature convention center space, amenities, and parking, while the upper floors will provide hotel rooms and suites in a variety of brand options to meet the needs of diverse guests at one location.



*Source:* A Chicago Convention Center, LLC

SEC-USCIS-P-0001008

The following sample floor plan (for the first floor) illustrates how one of the shared floors will be divided between hotel lobby and conference and meeting space and restaurants and amenties.



A sample floor plan for the upper levels shows how the towers will be divided into hotel rooms and suites.



SEC-USCIS-P-0001009

## 3.3   DESIGN FEATURES

The proposed "A Chicago Convention Center" will distinguish itself from the competition by a combination of environment-friendly construction and innovative service technology.

The Project will be designed to be the World's first Zero Carbon Emission Platinum LEED® accredited Allergen Free convention center hotel complex in the world. Achieving a Zero Carbon Platinum LEED® certification is not a simple task, but the Company believes that the additional labor and expense involved with obtaining this Zero Carbon Platinum LEED® status will be offset in the long term in two primary ways: the free media attention and public relations benefits that will allow the Company to spend less in marketing, and the energy cost savings in operating the building complex.

With regard to public relations, the media has paid significant attention to LEED- certified hotel openings in recent years. Internet-based travel agencies such as Expedia, Orbitz, and Travelocity have created Green Hotels and Eco-Tourism services. LEED certification will allow the Project to provide Gold Standard Foundation carbon emission credits to corporate guests and convention and conference attendees. Major corporations have begun to attempt to differentiate their brands and reputations by focusing on environmentally- friendly products and services. Recent surveys by trade associations such as the Partnership Travel Industry Association and online retailers like Yahoo revealed that nearly seventy percent (70%) of tourists are willing to pay extra in order to stay at environmentally-friendly lodgings.

Energy Usage and Conservation will be addressed in every aspect of the Project from zoning for heating and cooling to lighting systems, as well as the use of solar control glass to minimize heat load and maximize heat retention. The Company anticipates the savings in this area will directly benefit the Project's performance, adding an estimated 6% to 9% profitability to the net income of the Project complex. Sustainable site strategies include:

- 100% Green Roof - Heat Island Effect - with Water Features
- Saving the use of potable water by over 75% by rainwater collection and recycling
- Hydrogen Fuel Cell Plant--Generating 100% of the Project complex's energy
- 100% Geothermal Heating & Cooling Pump System with Loop Field
- Natural day lighting in all units is maximized to reduce the loads on electronic lighting
- Energy Efficient Control System -- the first room system to register all energy consumption

The Company believes the Project will rank among the most technologically-advanced convention center and hotels in the world. The meeting spaces will be designed to be able to change their look, feel, and functionality at a moment's notice. Lighting, furniture, and meeting tools will be changeable to accommodate the various differing users of the spaces in assisting them in reaching the goals of special differentiation and flexibility. Key features includes:

SEC-USCIS-P-0001010

- "4G" internet service, with transmission speeds approaching 14 Terabits.
- Computer-controlled lighting, zoned for each space
- Computer-controlled sound-systems, with the ability to zone and regulate speakers
- Key card security that will permit a group to track and control access to their meeting space
- Biometric scanners for guest check-in
- First View Security's Digital Door Viewer™
- Control4® Suite Systems, a standards-based entertainment control technology platform
- My IC Phone™, a multimedia hub for the guestroom
- SmartTouch™, an in-room touchscreen that provides guests with access to all hotel services

Please see Section 10.2 for additional details related to the proposed conference center design and Zero Carbon Platinum LEED® certification.

### 3.4  MANAGEMENT, OPERATION, AND BRANDING

A Chicago Convention Center will provide space for five hotels, which will together offer a full range of price and amenity options to business and leisure travelers. These hotels will be owned and operated by ACCC, LLC, which will carefully select, contract with, and oversee the

and operated by ACCC, LLC, which will carefully select, contract with, and oversee the performance of approved hotel management companies to assist with managing the day-to-day operations of the hotel. ACCC, LLC has compiled a list of preferred management companies, detailed in Attachment 1, and will select a suitable company from the list at the appropriate time once construction is closer to completion.

Franchise approvals (attached as Attachment 2) have been obtained by brands believed by the Company to be strong in the upscale and upper-upscale categories. Four of the five brands are specifically positioned in the "all-suite and extended stay" segment of the hotel market.

### Element by Westin (Starwood Hotels)

First opened in 2006, Element by Westin, a brand of Starwood Worldwide, is a chain of environmentally conscious hotels. Each building is eco-friendly from the ground-up, with floors and carpets fashioned from recycled material, energy efficient lighting, Energy Star-rated appliances, and low-volatility paint. Silverware and glassware are used instead of wasteful plastic utensils and paper cups. Each room is standard-equipped with paper and glass recycling bins. The studio, 1-bedroom, and 2-bedroom guest rooms are influenced by nature, promoting balance through flowing, multi-purpose spaces, allowing guests to customize the space to match their personal needs. There are seven Elements by Westin throughout the United States, including Denver, Las Vegas, Houston, and Dallas.

SEC-USCIS-P-0001011

### Hotel Indigo (Intercontinental Hotel Group)

 Hotel Indigo, an Intercontinental Hotel Group brand, combines the localized experience of an independent boutique hotel with the convenience and reliability of a chain. The retail-inspired design concepts will vary from hotel to hotel, not only depending on the neighborhood, but also depending on the time of year. The public spaces and the guest rooms are seasonally customized, and across all the senses, from the aromas and ambient music to the artwork and signage. Since 2004, Hotel Indigo has expanded to 37 properties in North America, Europe, and Asia, with 63 more in the pipeline.

### Staybridge Suites (Intercontinental Hotel Group)

 The all-suite, "residential-style" extended stay brand of the International Hotel Group, Staybridge Suites is the fastest chain in its market class ever to have reached 100 locations. As of May 2011, there are 189 Staybridge locations in North America, South America, and across the globe, with another 99 already in the development process. It's no wonder: in 2009, Staybridge ranked highest in the extended stay segment by a JD Power and Associates survey. Its hotels are designed with the comforts of home in mind. They include such amenities as fitness centers, complimentary wireless, fully-equipped kitchens, an hospitable Great Room with fireplace, and "evening receptions" throughout the week.



### Hyatt Place (Hyatt)

Formerly Amerisuites, Hyatt Place is Hyatt's brand of mid-sized hotels intended for families and the 24/7 lifestyle of today's multi-tasking business travelers. Meeting facilities are available, as well, for modestly-sized corporate conferences. There are over 160 locations across the United States, located in urban, airport, and suburban areas. Signature features of Hyatt Place include a coffee and wine bar, 24-hour room service, and complimentary continental breakfast. The guestrooms feature contemporary decor and 42" high-definition flat-panel televisions. Wireless internet is complimentary at all locations.



### Hyatt Summerfield Suites (Hyatt)

Hyatt Summerfield Suites is an extended-stay brand of Hyatt, with 29 locations across the United States in urban, airport and suburban settings, with 4 more in the pipeline. Summerfield Suites provide the feel and flexibility of a modern residential condominium. Complimentary full

SEC-USCIS-P-0001012

breakfasts are offered every morning and evening socials are held every weekday evening. A Guest Market offers a variety of snacks, upscale frozen entrees and grocery items. Each location includes a fitness center, pool, and recreational area, as well as a barbecue and laundry facilities. All guest suites come equipped with free and secure high-speed internet access.

### 3.5   LOCATION

A Chicago Convention Center will be constructed in Chicago, on a three-acre property off Highway I-90 near Chicago O'Hare International Airport in Chicago, Illinois. The location provides excellent exposure to I-90, also known as the Kennedy Expressway, with a daily traffic count of over 308,400 vehicles and is situated right off the last exit on the highway prior to the airport terminals. The site is in a cluster of hotel development that has been long standing with older properties along Higgins Road to the West, along with River Road and Cumberland Road to the South and West Bryn Mawr to the west. The majority of these hotels are older properties, typically exceeding 20 years old, with varying degrees of need for constant refurbishment. The following map marks the proposed Convention Center location, at address 8201 W. Higgins, Chicago, Illinois.





**Subject Property Status**

The underlying property, approximately three acres in size, currently holds an older hotel building. The Project Company owns this property, having purchased the property in 2003. The

SEC-USCIS-P-0001013

existing hotel building will be demolished by the Project Company at the time of the Project's launch.

SEC-USCIS-P-0001014

## 4.0 PROJECT DEVELOPMENT SCHEDULE

Construction of the proposed convention center complex will be continuous over the course of two years, with three opening Dates to allow for immediate cash flow and stabilization.

The core structures for all towers will be built together so that 95% of construction disturbance will be finalized prior to opening of the conference center and the first hotel. The second and third towers will be completed and occupied in stepwise fashion in the following months.

<u>Project Milestones Completed</u>

The Chicago Convention Center project is shovel-ready as of August 2012.

- Entitlements for the project site are complete. The Project Company owns this property, having purchased it in 2003.
- Full zoning approvals have been obtained from the City of Chicago (see Section 4.1).
- Site studies for the subject property have been completed.
- Franchise agreements have been executed for the hotels to be opened in the newly constructed buildings (see Section 3.4).

<u>Project Construction Schedule</u>

A Chicago Convention Center project is currently shovel ready, and ground-breaking is tentatively scheduled to occur in the first quarter of 2012. Tower One is projected to open 18 months after the start of construction. At this point the core and shell of the remaining two structures will also be complete, thus 95% of the construction disturbance will be finalized prior to opening the Element by Westin Hotel in the first tower. Tower Two will open 3 months after Tower One. Tower Three will open 3 months after Tower Two. The construction schedule is summarized as follows.

| A Chicago Convention Center Construction Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year 1 | | | | Year 2 | | | |
| Q1 | Q2 | Q3 | Q4 | Q5 | Q6 | Q7 | Q8 |
| Tower 1 | | | | | | | |
| Tower 2 | | | | | | | |
| Tower 3 | | | | | | | |

As illustrated by the chart, A Chicago Convention Center is expected to be open and operational two years following ground-breaking. The following page provides a detailed schedule of the permitting and construction process foreseen. Note that the exact dates may vary depending on the timing of EB-5 investment among other factors.

SEC-USCIS-P-0001015



SEC-USCIS-P-0001016

### 4.1 ZONING & LICENSES

The Planned Development for the Chicago Convention Center property was approved by the Chicago Plan Commission on January 15, 2009, and by the Committee on Zoning on January 30, 2009. The approval was ratified by the full City Council on February 11, 2009. The appropriate approvals have been attached as Attachment 3.

### 4.2 EMPLOYMENT & STAFFING

Pursuant to the timeline delineated above, direct employees for hotel operations will be hired based upon the anticipated opening date of the hotel. The management team will be assembled and hired 30–60 days before the opening date of the hotel, so as to prepare for opening day. The remainder of the hotel employees will be hired upon the hotel's opening date.

As to the timing of job creation, indirect job creation from construction will begin very soon after EB-5 funding. As mentioned above, all operational employees will be hired by the time Tower 3 construction is completed, which is 2 years after the start of construction.

All of the jobs are anticipated to be new hires required to operate completely new businesses; ACCC, LLC does not intend to move current employees from any other locations.

The following are the job descriptions and anticipated number of direct job positions for each

that will be required to operate the Chicago Convention Center project. Of course, with a project of this size, job counts listed here are approximate and subject to change based on operational experience; the job projections provided in the economic analysis included as part of this application supersede the job counts below.

## FOOD & BEVERAGE JOBS

1. Banquet Manager-9

Manages the daily operations of a banquet facility. Typically reports to a senior manager.

To ensure that the agreed budgeted targets are achieved or bettered.

To ensure that the food and liquor costs are maintained at their agreed levels and that the correct profit margins are achieved.

To ensure a prompt, courteous response and follow up to all enquiries.

SEC-USCIS-P-0001017

To ensure that once a booking is confirmed, all details and requirements are noted, using a check list, so that nothing is forgotten, e.g.:

- Number of covers

- Where to assemble

- Where to serve

- Details of menu

- Plan of tables

- List of guests

- Drinks, aperitifs, wines, liqueurs, spirits, and whether per-ordered or cash, cigars, cigarettes

- Entertainment

To liaise or ensure liaison with the client a few days before the function to confirm exact numbers, in turn informing the appropriate departmental heads.

To ensure that bands, discos, or entertainment has been booked as directed.

To ensure that duty rosters are compiled, making certain that adequate numbers of experienced permanent and casual waiting staff will be on duty.

To check the function room, ante rooms and cloakrooms for cleanliness before guests arrive, table layout and stipulated specific requirements to enable shortcomings to be rectified.

To greet the host and circulate during the course of the function to ensure availability in the event of a problem or complaint.

To ensure that the accounts department receives accurate information to enable it to correctly bill the client.

To ensure that all staff are correctly and smartly dressed at all times.

To ensure effective briefing of waiting staff before the function commences.

To ensure that bar and waiting staff know the limit of open bars and that this is not exceeded.

To ensure that the service of food and drink is courteous and professional.

To ensure that tables are correctly set and that table appointments, including flower arrangements, are impeccable.

SEC-USCIS-P-0001018

To ensure that surplus equipment is removed once the function is over and returned to its correct storage place.

To check equipment against the function checklist to ensure that no items have been misappropriated or mislaid.

To check equipment regularly against the inventory to ensure minimum losses.

To ensure maximum security of all areas under your control, paying particular attention to valuable assets, e.g. silverware.

To ensure that all items are used for their correct purpose and not abused, e.g. knives used as screwdrivers, table-cloths or napkins used for cleaning.

To give feedback on guest letters and comments.

To ensure that attendance registers are completed daily in accordance with statutory procedures and that any anomalies are reported to the Personnel Department.

To carry out or ensure that regular On-the-Job Training is carried out to enable staff to perform their duties correctly.

To prepare and submit on the required format all information necessary for budgeting purposes, on time and accurately.

Compensation: To be determined by management

2. Catering Manager-5

Plans, coordinates, and implements catered events. May lead and direct the work of others.

To ensure the provision of quality food and service.

This includes all meals, functions and resale items.

To plan and cost menus, making sure that budgetary limits and prescribed menus are adhered to.

To ensure correct and timeous completion of all administrative work.

To ensure that cash-up procedures are strictly adhered to.

To ensure that all monies are banked in accordance with laid-down procedures.

To ensure that staff records are up to date and kept in accordance with company and statutory requirements.

To ensure that hygiene standards comply with statutory requirements.

SEC-USCIS-P-0001019

To ensure effective security in all areas under your control.

To be aware of and respond the needs of your staff, including induction, monitoring performance, coaching and ensuring that appropriate training is affected.

To ensure that staff are correctly dressed at all times.

To recruit, interview and manage subordinates.

To constantly be aware of the needs of the customer, continuously striving to create the right environment.

Compensation: To be determined by management

3. Lounge Manager-4

To achieve hotel and food and beverage revenue, profit and customer satisfaction goals by supervising lounge operations.

Compensation: To be determined by management

4. Restaurant Manager-4

Oversees general restaurant operations

Oversees P&L statement

Manages both Front of House (FOH) and Back of House (BOH)

Hires and manages staff

Works with Executive Chef on marketing initiatives

Compensation: To be determined by management

5. Assistant Restaurant Manager-4

Oversees general restaurant operations when Restaurant Manager is absent

Assists with P&L statement

Assists with hiring and managing staff

Assists with ordering and keeping inventory.

Often takes on management of the bar area

Compensation: To be determined by management

SEC-USCIS-P-0001020

## 6. Food & Beverage Manager-4

The F & B manager's duties encompass office obligations, including checking budgets, payroll and food order invoices from suppliers. He also hires and schedules servers, bartenders and other food service employees, assigns kitchen staff to cooking and preparation tasks, and determines service standards for personnel. A food director needs a thorough knowledge of American and ethnic cuisine, food preparation and the costs of purchasing items for particular dishes. They plan menus for restaurants and special events like banquets.

Compensation: To be determined by management

## 7. Storekeeper-4

To ensure that optimum stock levels are maintained, that all goods, perishable and non-perishable are stored under ideal conditions and that maximum security applies at all times, particularly when receiving or issuing goods

Compensation: To be determined by management

## 8. Maitre D'-10

Ensures smooth communication between kitchen and dining room

Directs servers, runners, and oversees dining room experience