comfort letter that I sent to Mr. Sethi on or about February 6, 2011 is attached as **Exhibit A**. The template form of the comfort letter was not finalized and contained blanks and other template language to be finalized by Hyatt upon the approval and entry of a franchise agreement to Hyatt's satisfaction.

11. On or about March 4, 2011, Mr. Sethi sent me an email stating that he had reviewed the draft comfort letter and asked for certain revisions to be made. I responded to Mr. Sethi via email on or about March 4, 2011 stating that "We do not execute comfort letters before reviewing an application, approve a project and [we] are executing a license agreement. I still haven't even received a set of plans to discuss w[ith] our brand people." A true and correct copy of these email communications is attached as **Exhibit B**.

12. On or about June 27, 2012, I received an email from an individual purporting to be an investor in China in an EB-5 visa investment program related to Mr. Sethi's project

inquiring about Mr. Sethi and Hyatt's involvement in the project, I informed the investor that

Mr. Sethi did not have an agreement with Hyatt to build one of Hyatt's hotels.

13.     The next interaction I had with Mr. Sethi occurred on or about July 15, 2012. On or about that date, Mr. Sethi sent me an email asking to arrange a telephone conference to discuss the renewal of a franchise agreement, though Hyatt had not executed any franchise agreement with Mr. Sethi at that time (or thereafter). Mr. Sethi's email indicated that he was traveling for business in Asia. On the subsequent telephone conference that occurred on or about July 16, 2012, Mr. Sethi stated that he wanted to apply for a Hyatt franchise. I informed him, as I had done more than once in the past, that there is a review process that proposed franchisees must complete, as described in Paragraph 6.

14. Given the inquiry I had received from the Chinese investor approximately two weeks earlier, I also asked Mr. Sethi on our telephone conference if he was using Hyatt's name or trademarks as a part of his fundraising for the project and cautioned him not to overstate Hyatt's involvement in the project, because there was no formal relationship between Hyatt and Mr. Sethi or any of his affiliated entities. I did not want investors to mistakenly think that Hyatt was formally connected with the project.

15. Neither Mr. Sethi, nor any entities with which he is affiliated, has ever had any license to use any of Hyatt's names or trademarks or any franchising agreement with Hyatt.

16. At the request of counsel for the U.S. Securities and Exchange Commission in connection with the preparation of this Declaration, I have reviewed a purported Hyatt comfort letter dated February 15, 2011 pertaining to a franchise agreement to operate a Hyatt Place and Hyatt Summerfield Suites at the site of the Mr. Sethi's proposed hotel project at 8201 W.

Higgins Road, Chicago, Illinois, attached hereto as **Exhibit C**. I was not previously familiar with Exhibit C, although it is on Hyatt letterhead and bears a resemblance to the template form comfort letter I previously provided to Mr. Sethi on or about February 4, 2011 (Exhibit A).

17.    Hyatt has not executed or previously provided Mr. Sethi with an executed comfort letter. After reviewing Exhibit C, and based on my familiarity in the course of my employment with authentic comfort letters that Hyatt issues, I conclude that Exhibit C is a forgery. The following factors and attributes of Exhibit C lead me to conclude that it is a forgery:

   a. A genuine Hyatt comfort letter would contain a signature of a duly-authorized Hyatt employee, but Exhibit C contains no signature.

   b. Exhibit C references a franchise agreement and a rider to that franchise agreement thereto with Mr. Sethi's affiliated entity RASS Hospitality, LLC,

5

but neither Mr. Sethi, nor any entities with which he is affiliated (including RASS Hospitality LLC), has ever had any franchising agreement with Hyatt.

c.  A genuine Hyatt comfort letter would not have referenced a single franchise agreement with both Hyatt Place Franchising LLC and Summerfield Hotel Company LLC. Hyatt Place Franchising LLC and Summerfield Hotel Company LLC each would enter into its own franchise agreement, even in the event a project was contemplating both a Hyatt Place and a Hyatt Summerfield Suites (now, Hyatt House) would be part of the project. Similarly, Hyatt would not have issued one comfort letter – it would have issued one comfort letter regarding the Hyatt Place franchise agreement and a second separate comfort letter regarding the Hyatt Summerfield Suites franchise agreement.

d. A genuine comfort letter would have named the correct Hyatt Summerfield Suite franchising entity, which was Summerfield Hotel Company, LLC, a Kansas limited liability company, and not Hyatt Summerfield Franchising, LLC, a Delaware limited liability company as is listed in the February 15 letter. A genuine Hyatt comfort letter would not contain this legal error.

e. A genuine Hyatt comfort letter would be addressed only to a lender, but Exhibit C is addressed to Mr. Sethi (as purported franchisee) and Mr. Grace of Loop Capital Markets, LLC (as purported underwriter).

f. Exhibit C references the dates of a purported franchise agreement and rider thereto by dates that do not match, whereas the dates of a franchise agreement and rider would be the same.

g. Exhibit C refers to a Hyatt hotel located at 8201 W. Higgins Road, Chicago, Illinois, but there is not, and has never been, any Hyatt hotel at that location.

h. In a genuine Hyatt comfort letter, the name of the lender to whom the letter was addressed would appear in a header at the top of the second page and all subsequent pages, but there is no such header in Exhibit C.

i. Paragraph 12 of Exhibit C states that the comfort letter was an offer that "shall be valid by Franchisor up to 15th February 2012." A genuine Hyatt comfort letter generally provides that the offer shall be deemed revoked and null and void unless signed by the lender and franchisee and returned to the franchisor in a much shorter period than a year, usually 30 days. But Exhibit C purports to be valid for a term of 1 year, which is inconsistent with Hyatt's internal policies and practices.

j.  Exhibit C bears a control number in the lower left corner of the document that

indicates that the document was generated by Hyatt's outside counsel. The

document control number in Exhibit C matches the document control number

in the template form of comfort letter that I provided to Mr. Sethi (Exhibit A).

In most genuine Hyatt comfort letters, however, the control number is

routinely removed prior to issuance.

k.  The last sentence of the first paragraph of Exhibit C states that the Hyatt has

received a fee in connection with the issuance of the purported comfort letter.

In fact, Hyatt had not received payment of any fees from Mr. Sethi or any of

his affiliated entities, and a genuine Hyatt comfort letter would not misstate

such facts. Moreover, such text appears in Hyatt's form of comfort letter

7

(Exhibit A) in brackets with a "Drafter's Note" that provides that the fee for the comfort letter can vary depending on the deal, so that the drafter should insert the correct fee or note that no fee had been paid. In Exhibit C, not only does the sentence misstate that two thousand, five hundred dollars was paid it neglects to remove the brackets that were around the Drafter's Note which would have been removed prior to issuance.

l. Exhibit C is dated February 15, 2011. However, on March 4, 2011, Mr. Sethi and I discussed via email the requirements he would have to complete before Hyatt would issue him the comfort letter he requested. (Exhibit B). Hyatt never issued Mr. Sethi or any of his affiliated companies such a letter because: (a) Mr. Sethi did not provide the supporting documentation about his project; (b) neither he nor any entity he was affiliated with never submitted an

Summerfield Hotel Company; (c) neither he nor any entity he was affiliated

with ever paid any fees required as a part of having a franchise application

considered; (d) neither he nor any entity he was affiliated with completed the

review process to become approved as a franchisee; and (e) neither he nor any

entity he was affiliated with ever negotiated or executed any franchise

agreement with Hyatt.

8

18.     Based on my review of the relevant documents and understanding of the facts, I

conclude that Exhibit C is a forgery based upon the template form of comfort letter like the one I

provided to Mr. Sethi on or about February 4, 2011 (Exhibit A).

I declare under the penalty of perjury that the foregoing is true and correct.

February 6TH, 2013

Kevin Schramm

# EXHIBIT A



71 South Wacker Drive
Chicago, IL 60606

Tel: 312.750.1234

_____, 2010

_____
_____
_____

Re:     Franchise Agreement dated as of _____, 200_, as amended by that certain Rider
        to Franchise Agreement dated as of _____, 200_ (the "Franchise Agreement"), by and
        between Hyatt Place Franchising, L.L.C., a Delaware limited liability company,
        ("Franchisor") and _____ ("Franchisee").

Dear Sir or Madam:

        Reference is made to the Franchise Agreement pursuant to which Franchisee operates or
will operate the Hyatt Place Hotel located at _____ (the "Hotel"). The arrangement

will operate the Hyatt Place Hotel located at _____ (the "Hotel"). The arrangement represented by the Franchise Agreement is called the "Franchise." Franchisee has represented

that (1) _____ ("Lender") entered into, or is about to enter into, a loan agreement pursuant to which the Hotel will secure certain indebtedness owed by Franchisee to Lender and (2) that the loan proceeds will be used for the direct benefit of the Hotel. Franchisee and Lender have requested that Franchisor enter into this Comfort Letter. [Drafters Note: Please choose correct statement depending upon business deal. Franchisor has received a fee in the amount of Two Thousand Five Hundred Dollars ($2,500.00) in connection herewith or Franchisor has not received a fee in connection herewith.]

Franchisor, Franchisee, and Lender agree as follows:

2. While Lender has a valid first mortgage on the Hotel during the term of the Franchise Agreement, Franchisor agrees to use commercially reasonable efforts to give Lender thirty (30) days prior written notice of any voluntary surrender by Franchisee of the Franchise (to the extent that Franchisor is aware in advance of any such voluntary surrender). Franchisor further agrees to use its best efforts to furnish Lender with copies of default notices sent by Franchisor to Franchisee, and Franchisor shall allow Lender thirty (30) days from the date of any such notice to cure or cause to be cured the default(s) specified in such notice. However, notwithstanding the foregoing: (a) in the event of a health or life safety default, the cure period shall be three (3) days; and (b) Lender does not have the ability to cure the following defaults by Franchisee: bankruptcy, assignment for

**EXHIBIT A**

_____, 2010
Page 2

the benefit of creditors; or the appointment of a receiver or trustee, but foreclosure of Lender's mortgage by Lender shall constitute curing of such defaults solely for the purpose of this letter.

3.    If Lender should acquire the Hotel through foreclosure or conveyance in lieu of foreclosure while the Franchise Agreement is in full force and effect, Franchisor shall have the option to require Lender to either (a) sign an assignment and assumption agreement in a form that Franchisor reasonably specifies under which Lender shall take an assignment of and assume all of Franchisee's rights and obligations under the Franchise Agreement; or (b) enter into a new Franchise Agreement with Franchisor to operate the Hotel for a term equal to Franchisee's remaining term in accordance with Franchisor's then prevailing standards, rates, requirements, and terms, except that Lender shall not be charged any Application Fee (as same is described in Franchisor's then current Franchise Disclosure Document for Prospective Franchisees) and Lender shall not be required to perform a renovation or upgrading of the Hotel (although Lender will be required to cure any quality deficiencies as shown on the most current quality inspection report and shall be subject to any renovation or upgrading requirements that are

required of other franchisees then already in Franchisor's franchise system).

4.    Lender agrees to the following:

(i)     To notify Franchisor, by mail, ten (10) days in advance of any action to: (a) commence foreclosure proceedings regarding the Hotel; (b) petition for appointment of a receiver, obtain the entry of an order for relief or take any action under federal or state bankruptcy laws or similar laws with regard to the Hotel; (c) accept a deed for the Hotel in lieu of foreclosure; or (d) take ownership or possession of the Hotel in any manner;

(ii)    To notify Franchisor in writing of the commencement by another party of foreclosure proceedings or the filing of an action for the appointment of a receiver or petition for relief under state or federal bankruptcy laws within thirty (30) days after Lender receives notice of commencement of such proceedings;

(iii)   At Franchisor's option, Lender shall enter into a new Franchise Agreement with Franchisor pursuant to this Comfort Letter within thirty (30) days after Lender acquires the Hotel; and

(iv)    Lender shall agree to cure any existing defaults under the Franchise Agreement by Franchisee within the times specified by Franchisor and

~CHGO1:30734122.v1

_____, 2010
Page 3

bring current all payments due and owing to Franchisor and its affiliated companies.

Franchisor is not obligated to enter into a Franchise Agreement with Lender hereunder if Lender fails to comply with the requirements of (i), (ii), (iii), or (iv) above within the times provided. If Lender should acquire the Hotel, Lender shall appoint an agent or management company to operate the Hotel under the Franchise Agreement with Franchisor, provided that such agent or management company (i) is approved in writing by Franchisor; (ii) meets Franchisor's then current requirements for such agents or management companies, including by signing such agreements and other documents as Franchisor periodically specifies; and (iii) the Hotel's general manager and other management personnel complete or have completed Franchisor's then current training requirements in accordance with the Franchise Agreement.

5.     This Comfort Letter and the rights hereunder are not assignable by Lender or Franchisee. Lender agrees that neither Franchisee nor Lender has any right or authority to sell, transfer, or assign, or in any manner convey to any third party the

authority to sell, transfer, or assign, or in any manner convey to any third party the Franchise Agreement or any rights under this Comfort Letter, except as provided in the Franchise Agreement. If a third party should become the owner of the Hotel, that third party may apply to Franchisor for a new Franchise to operate the Hotel, and such application shall be considered in accordance with the same standards by Franchisor with respect to other franchise applications unless otherwise required by law. Notwithstanding the foregoing, Lender may assign the Comfort Letter to any subsequent holder or holders of all or any portion of the Loan (the "Assignee") without Franchisor's consent; provided that the Assignee (i) is a commercial bank, investment bank, pension fund, finance company, insurance company, trustee in a securitization or other financial company, or other financial institution or such other type of established organization (so long as such established organization is not a Brand Owner as defined in the Franchise Agreement or does not exclusively lend to a Brand Owner) primarily engaged in the business of making or holding loans and any fund or trust managed or serviced by any of the foregoing and (ii) does not own, directly or indirectly, any equity interest in Franchisee or its constituent owners; provided further that upon the sale or transfer of the Loan, Assignor pays to Franchisor a processing charge of $7,500 and that promptly upon the sale or transfer of the Loan to the Assignee, Lender, Assignee, and Franchisee shall execute and deliver to Franchisor and assignment and assumption agreement (the "Assignment"), and provided further that, in the event there is more than one Assignee, such Assignees shall have (i) designated one representative to receive notices, negotiate on behalf of and bind

each such Assignee in connection with this letter agreement and any Assignment thereof, and (ii) acknowledge that Franchisor shall be entitled to rely on such designation and deal solely with such representative without the necessity of notifying, negotiating with, or obtaining the consent of, each such Assignee.

6.   The rights which accrue to Lender under this Comfort Letter upon the taking of title to the Hotel's premises by foreclosure or deed in lieu thereof shall also accrue to any wholly-owned subsidiary that takes title to the premises by foreclosure or deed in lieu thereof provided that Lender guarantees all obligations to Franchisor of such subsidiary.

7.   All notices required under this Comfort Letter shall be in writing, sent by certified mail, return receipt requested, or by Federal Express or other express service and addressed, if to Lender, to _____, attention: Collateral Management, if to Franchisor, to Hyatt Place Franchising, L.L.C., 200 West Monroe Street, 8th Floor, Chicago, Illinois 60606, and if to Franchisee, _____. Any notice sent pursuant to this Comfort Letter shall be deemed to be given three (3) days after mailing or on the day of delivery by hand

By its signature below, Franchisee acknowledges that this Comfort Letter was provided to Lender at Franchisee's request and in consideration thereof, Franchisee hereby (i) releases Lender and Franchisor, as well as each of their respective subsidiaries, parents, divisions, successors, assigns, heirs and representatives, including but not limited to their respective employees, agents, officers, directors and owners, of and from any and all actions, causes of action, suits, claims, demands, contingencies, debts, accounts and judgments whatsoever, at law or in equity, whether known or unknown, arising from the exercise by Lender of any of the rights granted hereunder and the recognition and compliance with such exercise by Franchisor and (ii) agrees that Lender and Franchisor may discuss and agree to the terms of a franchise agreement or any of the matters to which the Lender is entitled to notice.

9.    The provisions of this Comfort Letter are not intended to, and do not in any way, alter, modify or amend the Franchise as between Franchisor and Franchisee.

10.   It is further acknowledged and agreed that Franchisor shall be entitled to rely upon any written notice or request by Lender made pursuant to the provisions hereof without requirement of necessitating the accuracy or authenticity of such written notice or any facts or allegations contained therein.  Lender shall notify

~CHGO1:30734122.v1

_____, 2010
Page 5

Franchisor promptly upon the satisfaction or cancellation of Lender's mortgage on the Hotel.

11.     Lender's rights under this Comfort Letter shall terminate if Lender has been taken over in any manner by any state or federal agency or are in a receivership, conservatorship, reorganization, or liquidation, or Lender or any of its officers or directors have entered into or are subject to a cease and desist order or any other formal or informal written agreement with a federal or state regulatory agency.

12.     This Comfort Letter constitutes an offer which shall be deemed revoked and null and void unless the duplicate originals hereof are signed by both Lender and Franchisee and received by Franchisor on or before _____ day, _____, 2010. An executed copy will be returned to both Lender and Franchisee.

**FRANCHISOR**

**HYATT PLACE FRANCHISING, L.L.C.**
**a Delaware limited liability company**

**a Delaware limited liability company**

By:_____
Name: _____
Title: _____

**FRANCHISEE**

_____

By:_____
Name: _____
Title: _____

~CHGO1:30734122.v1

_____, 2010
Page 6

**LENDER**

_____

By: _____
Name: _____
Title: _____

~CHGO1:30734122.v1

# EXHIBIT B

**From:** Kevin Schramm <kevin.schramm@hyatt.com>
**Sent:** Friday, March 04, 2011 5:09 PM
**To:** anshooo
**Subject:** Re: Fw: Form comfort letter

We do not execute comfort letters before reviewing an application, approve a project, and are executing a license agreement.

I still haven't even received a set of plans to discuss w our brand people and design team.

---

**From:** anshooo [anshooo@aol.com]
**Sent:** 03/04/2011 04:41 PM CST
**To:** Kevin Schramm
**Subject:** Re: Fw: Form comfort letter

Kevin - Hope all is great.

We've fully reviewed the Comfort Letter and wanted to know is there another version that is specifically to the franchisee and not including the lender. Given as you know of the government financing piece of the deal being underwritten by Loop Capital, it's best for the comfort letter to simply be with the franchisee.

Also, please not to include both franchises in the comfort letter as this version only stated Hyatt Place.

It can be addressed to:
Mr. Anshoo Sethi
Managing Partner & CEO
RASS Hospitality, LLC
8201 W. Higgins Rd.
Chicago, IL 60631

We are ready to move forward with it. It would be ideal to have the comfort letter dated March 10, 2010 for execution.

Best,
ANSHOO SETHI

**EXHIBIT B**

D | 312.404.9275    F | 312.786.0583
E-MAIL: ANSHOOO@AOL.COM
UPGROWTH.COM

CONFIDENTIALITY NOTICE: This electronic message transmission contains information from the Company that may be proprietary, confidential and/or privileged. The information is intended only for the review and use of the individual(s) or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify the sender immediately by replying to the address listed in the "From:" field.

In a message dated 02/06/11 14:31:52 Central Standard Time, Kevin.Schramm@hyatt.com writes:


see attached comfort letter.


----- Original Message -----
From: Rebecca Koper
Sent: 02/04/2011 02:37 PM CST
To: Kevin Schramm
Subject: Form comfort letter
Hi Kevin,

Attached is a form comfort letter. Provo will be out shortly, Maria was
giving it a final review. I will copy you on the e-mail.

Have a great weekend!
Rebecca

(See attached file: Hyatt Place Comfort Letter 2010.DOC)

Rebecca M. Koper

Rebecca M. Koper
Legal Manager - Real Estate & Development
71 South Wacker Drive Chicago, IL 60606
P: 312.780.5828   F: 312.780.5284   E: rebecca.koper@hyatt.com
hyatt.com

(Embedded image moved to file: pic16118.jpg)

THINK BEFORE YOU PRINT: Please consider the environment before printing
this email.

# EXHIBIT C





February 15, 2011

Mr. Anshoo Sethi
Managing Partner & CEO
RASS Hospitality, LLC
8201 W. Higgins Rd.
Chicago, IL 60631

Mr. Albert R. Grace Jr.
President
Loop Capital Markets, LLC.
200 W. Jackson Blvd., Suite 1600
Chicago, IL 60606

Re:     Franchise Agreement dated as of February 15, 2011, as amended by that certain Rider to
        Franchise Agreement dated as of February 01, 2011 (the "Franchise Agreement"), by and
        between Hyatt Place Franchising, L.L.C. and Hyatt Summerfield Franchising, L.L.C., a

Delaware limited liability company, ("Franchisor") and RASS Hospitality, LLC, an Illinois limited liability company ("Franchisee")

Dear Mr. Sethi and Mr. Grace:

Reference is made to the Franchise Agreement pursuant to which Franchisee will operate the Hyatt Place and Hyatt Summerfield Suites Hotel located at 8201 W. Higgins Rd., Chicago, IL 60631 (the "Hotel"). The arrangement represented by the Franchise Agreement is called the "Franchise." Franchisee has represented that (1) State of Illinois / Loop Capital Markets, LLC. (underwriter) ("Lender") entered into, or is about to enter into, a loan agreement pursuant to which the Hotel will secure certain indebtedness owed by Franchisee to Lender and (2) that the loan proceeds will be used for the direct benefit of the Hotel. Franchisee and Lender have requested that Franchisor enter into this Comfort Letter. [Note: Franchisor has received a fee in the amount of Two Thousand Five Hundred Dollars ($2,500.00) in connection herewith]

Franchisor, Franchisee, and Lender agree as follows:

2. While Lender has a valid first mortgage on the Hotel during the term of the Franchise Agreement, Franchisor agrees to use commercially reasonable efforts to give Lender thirty (30) days prior written notice of any voluntary surrender by Franchisee of the Franchise (to the extent that Franchisor is aware in advance of any such voluntary surrender). Franchisor further agrees to use its best efforts to

CHI01 30734122.v1

**EXHIBIT C**

SEC-USCIS-P-0001105

furnish Lender with copies of default notices sent by Franchisor to Franchisee, and Franchisor shall allow Lender thirty (30) days from the date of any such notice to cure or cause to be cured the default(s) specified in such notice. However, notwithstanding the foregoing: (a) in the event of a health or life safety default, the cure period shall be three (3) days; and (b) Lender does not have the ability to cure the following defaults by Franchisee: bankruptcy, assignment for the benefit of creditors, or the appointment of a receiver or trustee, but foreclosure of Lender's mortgage by Lender shall constitute curing of such defaults solely for the purpose of this letter.

3.  If Lender should acquire the Hotel through foreclosure or conveyance in lieu of foreclosure while the Franchise Agreement is in full force and effect, Franchisor shall have the option to require Lender to either (a) sign an assignment and assumption agreement in a form that Franchisor reasonably specifies under which Lender shall take an assignment of and assume all of Franchisee's rights and obligations under the Franchise Agreement; or (b) enter into a new Franchise Agreement with Franchisor to operate the Hotel for a term equal to Franchisee's remaining term in accordance with Franchisor's then prevailing standards, rates, requirements, and terms, except that Lender shall not be charged any Application Fee (as same is described in Franchisor's then current Franchise Disclosure

Document for Prospective Franchisees) and Lender shall not be required to perform a renovation or upgrading of the Hotel (although Lender will be required to cure any quality deficiencies as shown on the most current quality inspection report and shall be subject to any renovation or upgrading requirements that are required of other franchisees then already in Franchisor's franchise system).

4.     Lender agrees to the following:

(i)     To notify Franchisor, by mail, ten (10) days in advance of any action to: (a) commence foreclosure proceedings regarding the Hotel; (b) petition for appointment of a receiver, obtain the entry of an order for relief or take any action under federal or state bankruptcy laws or similar laws with regard to the Hotel; (c) accept a deed for the Hotel in lieu of foreclosure; or (d) take ownership or possession of the Hotel in any manner;

(ii)     To notify Franchisor in writing of the commencement by another party of foreclosure proceedings or the filing of an action for the appointment of a receiver or petition for relief under state or federal bankruptcy laws within thirty (30) days after Lender receives notice of commencement of such proceedings;

-CHKOI 30734122.v1

SEC-USCIS-P-0001106

February 15, 2011
Page 3

(iii)    At Franchisor's option, Lender shall enter into a new Franchise Agreement
         with Franchisor pursuant to this Comfort Letter within thirty (30) days
         after Lender acquires the Hotel; and

(iv)     Lender shall agree to cure any existing defaults under the Franchise
         Agreement by Franchisee within the times specified by Franchisor and
         bring current all payments due and owing to Franchisor and its affiliated
         companies.

         Franchisor is not obligated to enter into a Franchise Agreement with
         Lender hereunder if Lender fails to comply with the requirements of (i),
         (ii), (iii), or (iv) above within the times provided. If Lender should acquire
         the Hotel, Lender shall appoint an agent or management company to
         operate the Hotel under the Franchise Agreement with Franchisor,
         provided that such agent or management company (i) is approved in
         writing by Franchisor; (ii) meets Franchisor's then current requirements
         for such agents or management companies, including by signing such
         agreements and other documents as Franchisor periodically specifies; and
         (iii) the Hotel's general manager and other management personnel
         complete or have completed Franchisor's then current training

5.    This Comfort Letter and the rights hereunder are not assignable by Lender or Franchisee. Lender agrees that neither Franchisee nor Lender has any right or authority to sell, transfer, or assign, or in any manner convey to any third party the Franchise Agreement or any rights under this Comfort Letter, except as provided in the Franchise Agreement.  If a third party should become the owner of the Hotel, that third party may apply to Franchisor for a new Franchise to operate the Hotel, and such application shall be considered in accordance with the same standards by Franchisor with respect to other franchise applications unless otherwise required by law. Notwithstanding the foregoing, Lender may assign the Comfort Letter to any subsequent holder or holders of all or any portion of the Loan (the "Assignee") without Franchisor's consent; provided that the Assignee (i) is a commercial bank, investment bank, pension fund, finance company, insurance company, trustee in a securitization or other financial company, or other financial institution or such other type of established organization (so long as such established organization is not a Brand Owner as defined in the Franchise Agreement or does not exclusively lend to a Brand Owner) primarily engaged in the business of making or holding loans and any fund or trust managed or serviced by any of the foregoing and (ii) does not own, directly or indirectly, any equity interest in Franchisee or its constituent owners; provided further that upon the sale or transfer of the Loan, Assignor pays to Franchisor a processing charge of $7,500 and that promptly upon the sale or transfer of the Loan to the Assignee,

CHGO1 30734122 v1

SEC-USCIS-P-0001107

Lender, Assignee, and Franchisee shall execute and deliver to Franchisor and assignment and assumption agreement (the "Assignment"), and provided further that, in the event there is more than one Assignee, such Assignees shall have (i) designated one representative to receive notices, negotiate on behalf of and bind each such Assignee in connection with this letter agreement and any Assignment thereof, and (ii) acknowledge that Franchisor shall be entitled to rely on such designation and deal solely with such representative without the necessity of notifying, negotiating with, or obtaining the consent of, each such Assignee.

6.  The rights which accrue to Lender under this Comfort Letter upon the taking of title to the Hotel's premises by foreclosure or deed in lieu thereof shall also accrue to any wholly-owned subsidiary that takes title to the premises by foreclosure or deed in lieu thereof provided that Lender guarantees all obligations to Franchisor of such subsidiary.

All notices required under this Comfort Letter shall be in writing, sent by certified mail, return receipt requested, or by Federal Express or other express service and addressed, if to Lender, to Loop Capital Markets, LLC. Mr. Albert R. Grace Jr., President. 200 W. Jackson Blvd., Suite 1600, Chicago, IL 60606 attention: Collateral Management, if to Franchisor, to Hyatt Place Franchising, L.L.C., 200

West Monroe Street, 8th Floor, Chicago, Illinois 60606, and if to Franchisee, Mr.
Higgins Rd., Chicago, IL 60631

7. Any notice sent pursuant to this Comfort Letter shall be deemed to be given three (3) days after mailing or on the day of delivery by hand.

8. By its signature below, Franchisee acknowledges that this Comfort Letter was provided to Lender at Franchisee's request and in consideration thereof, Franchisee hereby (i) releases Lender and Franchisor, as well as each of their respective subsidiaries, parents, divisions, successors, assigns, heirs and representatives, including but not limited to their respective employees, agents, officers, directors and owners, of and from any and all actions, causes of action, suits, claims, demands, contingencies, debts, accounts and judgments whatsoever, at law or in equity, whether known or unknown, arising from the exercise by Lender of any of the rights granted hereunder and the recognition and compliance with such exercise by Franchisor and (ii) agrees that Lender and Franchisor may discuss and agree to the terms of a franchise agreement or any of the matters to which the Lender is entitled to notice.

9. The provisions of this Comfort Letter are not intended to, and do not in any way, alter, modify or amend the Franchise as between Franchisor and Franchisee.

-CHICAGO 10714122 v1

SEC-USCIS-P-0001108

February 15, 2011
Page 5

10. It is further acknowledged and agreed that Franchisor shall be entitled to rely upon any written notice or request by Lender made pursuant to the provisions hereof without requirement of necessitating the accuracy or authenticity of such written notice or any facts or allegations contained therein. Lender shall notify Franchisor promptly upon the satisfaction or cancellation of Lender's mortgage on the Hotel.

11. Lender's rights under this Comfort Letter shall terminate if Lender has been taken over in any manner by any state or federal agency or are in a receivership, conservatorship, reorganization, or liquidation, or Lender or any of its officers or directors have entered into or are subject to a cease and desist order or any other formal or informal written agreement with a federal or state regulatory agency.

12. This Comfort Letter constitutes an offer which shall be valid by Franchisor upto 15th day, February, 2012.

FRANCHISOR
HYATT PLACE FRANCHISING, L.L.C.

a Delaware limited liability company

**FRANCHISEE**
**RASS Hospitality, LLC**

**LENDER**
**State of Illinois (Lender) /**
**Loop Capital Markets, LLC (Underwriter)**

CHKX1 30734122 v1

SEC-USCIS-P-0001109

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES SECURITIES )
AND EXCHANGE COMMISSION )
)
        Plaintiff, )
)
        v. )
)
)
A CHICAGO CONVENTION CENTER, )
LLC, ANSHOO R. SETHI, and )
INTERCONTINENTAL REGIONAL )
CENTER TRUST OF CHICAGO, LLC )
)
)
        Defendants. )
_____ )

# DECLARATION OF AUDRA BOONE, Ph.D.

I, Audra Boone, Ph.D., pursuant to 28 U.S.C. § 1746. declare as follows:

1.     My name is Audra Boone.  I am currently a visiting scholar in the

Division of Risk, Strategy, and Financial Innovation at the U.S. Securities and Exchange

Commission ("SEC"). I am also an Associate Professor of Finance and Mays Research

Fellow in the Department of Finance of the Mays Business School at Texas A&M

University. The Mays Research Fellow is an honorary title awarded to Business School

faculty who have achieved distinction or who display promise in future research.  I am

presently an Associate Editor at the *Journal of Corporate Finance* and an ad hoc referee

for several top finance and management journals, including *Journal of Finance, Journal*

*of Financial Economics, Review of Financial Studies, Journal of Financial &*

*Quantitative Analysis, Journal of Corporate Finance, Financial Management, Journal of Banking and Finance, Journal of Financial Intermediation, Journal of Financial Research, Financial Review, Management Science*, and *European Journal of Finance.*. My research has been published leading outlets such as: *Journal of Financial Economics, Journal of Finance, Review of Financial Studies, Journal of Corporate Finance, Journal of Financial and Quantitative Analysis, and Financial Management,* among others and I have been an invited lecturer in finance at universities and colleges throughout the United States. I received my Ph.D. in finance from Pennsylvania State University and a B.S. in Business from the University of Kansas. My curriculum vitae is attached as **Exhibit A** hereto.

2.    I submit this declaration in support of the SEC's motion for a temporary restraining order and other equitable relief against the Intercontinental Regional Center

Trust of Chicago, LLC ("IRCTC"), its affiliated entity, A Chicago Convention Center,

LLC ("ACCC"), and principal and managing member of both ACCC and IRCTC,

Anshoo Sethi ( "Sethi") (collectively, with IRCTC and ACCC, the "Defendants").

Defendants have – through a Confidential Private Offering Memorandum – offered to sell

foreign nationals 499 Limited Liability Company Membership Interests in ACCC for

$500,000 each (plus a $41,500 administrative fee) to purportedly develop and build the

"World's First Zero Carbon Emission Platinum LEED-certified" hotel and conference

center outside of Chicago (the "Project") and, in doing so, to provide a path to citizenship

for its foreign investors through to the EB-5 Immigrant Investor Program[1] administered

---

[1] EB-5 Immigrant Investor Program was created by the Immigration and Nationality Act of 1990 to provide
a method for foreign nationals to obtain permanent U.S. residency visas by investing money and creating
jobs in the U.S. To obtain the visa, individuals must invest $1,000,000 (or at least $500,000 in a "Targeted

by the U.S. Citizenship and Immigration Services ("USCIS"), an agency of the

Department of Homeland Security.

    3.    I have been asked by counsel for the SEC to analyze the representations

and assumptions relating to the costs, revenues and job-creation estimates set forth in the

Offering Memorandum, Business Plan and certain economic analysis reports

(collectively, the "Reports") filed with USCIS by IRCTC and Sethi, in connection with

their offering of securities in ACCC.  In conducting my analysis, I have reviewed the

following materials provided to the SEC by USCIS, among others:

> 1.  "A Chicago Convention Center Confidential Private Offering
>
>     Memorandum" dated December 13, 2011 ("Offering Memorandum")
>
>     (bearing the Bates number SEC-USCIS-P-0000383-468)
>
> 2.  "Business Plan for EB-5 Investment in A Chicago Convention Center"

dated August 23, 2012 ("Business Plan") (bearing the Bates number

SEC-USCIS-P-0000997-0001072)

3. Economic analysis report by Evans, Carroll & Associates, Inc. dated

June 6, 2011 ("Evans Carroll Analysis") (bearing the Bates number

SEC-USCIS-0000786-832)

4. In addition, I have examined reports, publications and data that are

publicly-available or available on a subscription basis, that are relevant to evaluating the

facts, figures and assumptions set forth by IRCTC and Sethi in the Reports related to the

Project. A list of materials I have reviewed and relied upon in connection with the facts

and opinions stated herein are appended at the end of this declaration. The facts and

---

Employment Area" – *i.e.*, a high unemployment or rural area), creating or preserving at least 10 jobs for
U.S. workers, excluding the investor and his or her immediate family.

opinions stated in this declaration are based upon my review of the relevant information made available to me.

## I.    Summary of Conclusions

5.    The following is a summary of my conclusions based upon my analysis:

- The facts, figures, and assumptions presented in the Reports related to the Project are not tied to the economic realities of the area and location of the Project. Moreover, the Reports use circular references to justify values and at other times appear to have misrepresented material facts and figures that would be relevant to an investor's financial analysis of the offering.

- Many of the costs and revenue figures and the land values stated in the Reports have been overstated (upward biased) relative to economic reality,

which in turn overstates the Project's capitalization, return on investment,

and the ability to create jobs from the development of the Project.

## II.  The "Project"

6.  According to the Business Plan and Offering Memorandum, the Project

involves building a hotel and convention center complex on property located at 8201 W.

Higgins Road, Chicago, Illinois, near Chicago O'Hare airport. The Project proposes to

have a total of 995 rooms in the "upper-upscale" hotel category, comprised of 797 suites

and 198 regular rooms. The Project purports to include hotels branded Starwood

Element, Hotel Indigo, Staybridge Suites, Hyatt Place, and Summerfield Suites. The

Business Plan purports that the gross square footage of the project will be 1,744,510,

including 290,000 square feet of convention space along with 55,000 square feet of

restaurants and a parking structure with over 1,700 parking spaces. According to the

Offering Memorandum, the Project will purportedly be "the World's first Zero Carbon

Emission Platinum LEED accredited Allergen Free convention center and hotel

complex."

      7.     The Business Plan reports that the hard costs of the Project will be

$686,351,381, with an additional $48,589,790 in soft costs such as design and

engineering, for a total cost estimate of $734,955,171. This represents a cost of $738,348

per room (key) and $421.30 per square foot. In addition, in the Offering Memorandum,

the Defendants represent that they will – in connection with the offering – contribute a

2.8 acre parcel of land for construction of the Project. My review of public land records

indicates that the land was most recently owned by a limited liability company controlled

by Anshoo Sethi and Ravinder Sethi, who I believe to be Anshoo Sethi's father. The

Defendants claim that the land is worth $177,547,465, which, if included, raises the

estimated cost of the Project to $912,502,636 and raises the estimated cost per room to $917,088.

8.     The Offering Memorandum states that the Project is sponsored by IRCTC, which previously was designated by USCIS in 2011 to establish and solicit investment from foreign investors under the Program as a "regional center." According to the Offering Memorandum, "[t]he Project is believed to be a qualifying investment under the EB-5 Pilot Program," meaning that, if successful, foreign investors in the Project may qualify to receive U.S. permanent residency visas based on their investment in the Project and the expected creation or retention of a sufficient number of jobs.

4

9.      As a result, the costs, revenues, and return on investment, all affect the

ability to create jobs from the development of the Project sufficient to qualify the investor

for a permanent residency visa under the Program.

## III.     The Offering Memorandum and Other Reports Overestimate Costs and Inflate Employment Projections

10.     I have compared the figures and assumptions in the Reports with publicly-

available reports, publications and data concerning the costs associated with similar hotel

projects in the relevant market.  Based on my analysis, I conclude that the Offering

Memorandum and other Reports overstate the construction costs and employment

projections.

11.     The Business Plan reports that the hard costs of the Project will be

$686,351,381, with an additional $48,589,790 in soft costs such as design and

engineering, for a total cost estimate of $734,965.07. This represents a cost of $738,648 per room (key) and $421.30 per square foot. The developers claim that the land is worth $177,547,465, which, if included, raises the estimated cost per room to $917,088.

12.     In comparison, I examined a report by HVS Consulting and Valuation entitled "HVS Hotel Development Cost Survey 2011/12" dated January 2012 ("HVS Report") (**Exhibit B**) that provides estimates of development and construction costs for a range of hotel categories. HVS Consulting and Valuation is a consulting and services organization focused on the hotel, restaurant, shared ownership, gaming, and leisure industries. The HVS Report estimates that full-service hotels (a step below luxury hotel) had an average total cost of $212,300 per room. Luxury hotels, excluding convention center space, had an average total cost of $610,500 per room. For a hotel complex with

995 rooms, these values produce a cost estimate ranging from $211,238,500 to $607,447,500. Therefore, as compared to the Business Plan, the projected total cost of the Project and the cost per room far exceeds even the high-end averages.

13.     To gauge the costs associated with the convention center portion of the Project, I examined the construction costs of the McCormick Place Convention Center West expansion in Chicago that included exhibit, meeting, and ballroom space. This project was completed in 2007 and is LEED certified space so it provides a relatively close comparison to the proposed project. The gross square feet of the McCormick Place expansion is 2,700,000 (2,100,000 net) with an estimated build cost of $883,000,000 or a per square foot cost of $32.70 ($42.05 net).  These numbers suggest that even when accounting for the additional cost of LEED certification, the cost of constructing convention center space is much less than the construction cost of hotel rooms. Based on

the 290,000 sq ft convention space, this produces an estimate of $9,484,074 ($12,103 million net). Using the highest end estimates for room construction and the net point estimate for convention center space yields a price of $619,641,309, which is much lower than the development costs listed in the Business Plan.

14.     I also examined other sources that indicate that expected construction costs for full service hotels are approximately of $300,000 per room to build and that the industry rule-of-thumb is that the average daily rate needs to be $1 for every $1,000 spent per room to recuperate costs. With a cost of at least $700 million to construct the Project, this would imply an approximate price per room of more than $700 per night. This value is significantly higher than the rate comparable hotels in the area have charged.

6

15.     I also examined sales of previously constructed hotels in the area to provide other means to estimate the market value of hotels and hence the amount of costs that would be reasonable for a new hotel in the area. Reports of recent sales reveal that prices of hotels in the area have typically ranged from $206,000 to $389,000 per room. The highest price recorded in the Chicago area was $505,000 per room for a new 188-room hotel in downtown Chicago in the luxury group. According to a press release by Starwood Hotels & Resorts Worldwide, Inc., its W Chicago-City Center hotel sold for $128.8 million, or $350,000 per key, in 2011. This property was also considered luxury, and had 12,000 square feet of meeting and event state and top of the line restaurant and other amenities.

16.     I also examined a report dated August 2, 2012, entitled "Analysis of Market Conditions for The O'Hare Hotel Market" published by T.R. Mandigo &

Company ("Mandigo Report") (Exhibit C), a Chicago-based hotel consulting firm

specializing in market feasibility studies, impact analysis, litigation support, asset

management, financial analysis, and acquisition due-diligence of hotels, resorts and food

and beverage operations. In regard to the ACCC Project, the Mandigo Report concludes

that "[t]his project has been in planning stages since at least 2006, though has yet to get

off the ground. The project is dependent on the international financing program currently

pursued by the developer. **We do not anticipate that this hotel will open, for a**

**number of reasons, not least of which is the staggering cost of the project.**" (emphasis

added). These statements are of particular significance because the principal of T.R.

Mandigo & Company and author of the Mandigo Report, Theodore R. Mandigo, is

named in the ACCC's Offering Memorandum as a consultant for the Project and as one

7

of the appraisers of the land at the Project site. The inconsistencies between the statements in the Offering Memorandum and the Mandigo Report give me additional concern about the reliability of the facts, figures and assumptions attributed to Mr. Mandigo and T.R. Mandigo & Company in the Offering Memorandum and in promotional materials provided to investors in the Project.

17.　　In sum, the cost estimates provided in the Business Plan and Reports do not appear to reflect the actual or reasonable costs for comparable projects in Chicago. By overestimating costs, the employment projections in the Business Plan also appear to be inflated. This is because the Evans Carroll Analysis purports to use a RIMS II demand multiplier to estimate the number of jobs created by the project. The Evans Carroll Analysis relies on cost and revenue figures provided in by HVS Consulting and Valuation and information supplied by IRCTC. Thus, based on this methodology, to the

extent costs are overestimated so too are the estimated jobs created by the Project. Such inflated costs affect the ability of the project to create a sufficient number of jobs under the Program to allow investors to obtain a U.S. permanent residency visa.

**IV.     The Reports Appear to Misstate the Project's Capitalization Based on Inflated Land Values**

18.     A substantial part of the capitalization of the Project is derived from the contribution of 2.8 acres of land for the Project by Sethi or his affiliated entities. If the land value is inflated, the total asset value of the project and the potential recoverable value if the project had to be liquated, is inflated as well. Conversely, a lower liquidation value reduces the expected recovery for equity and debt investors if the project fails.

Therefore, the value placed on the land contributed by the sponsors is relevant to a potential investor's decision to invest.

19.     To evaluate the value of the land contributed by Sethi or his affiliated companies, I reviewed publicly-recorded real estate records, including deeds and mortgages, and publicly-available property tax assessments related to the Project, provided by the Cook County Recorder of Deeds and the Cook County Assessor's Office. These records indicate that ACCC, Sethi or his affiliated entities, acquired the property for less than $10 million in 2008. In addition, the Cook County Assessor's Office valued the land in 2011 and 2012 for assessment purposes at only $603,960. Even accounting for appreciation consistent with the rates experienced in the metropolitan Chicago area since 2008 when the property was first acquired, the value of the land is nowhere near the $177 million as represented in the Offering Memorandum and other materials.

I also reviewed a comparable real estate sale to estimate the market value of the subject property. A property of 20 acres (approximately 7 times larger than the subject property) with existing structures on site sold in 2011 for $7.7 million. This land included improvements, including a 429-room hotel and a water park. This sale is only one observation, but it suggests to me that the $177 million land value is a gross overestimate– by a factor of approximately 16x.[2]

21.    The HVS Report (Exhibit B) states the following about land values, "With little available financing for new hotel construction . . . hotel site values are not expected

---

[2] This calculation is based on a price per acre basis (*i.e.*, $7.7 million sale price of the comparable property divided by its 20 acres produces a per acre price of $3.85 million). Since the ACCC Project is on 2.8 acres, multiplying the acreage by the $3.85 million equates to a value of $10.78 million. As compared to the approximately $177 million value stated in the Offering Memorandum, this is an overstatement of approximately 16x. This calculation attributes no value to the improvements on the land.

to appreciate significantly." This statement suggests that land values have not risen

significantly due to the economic downturn. Given that the land has been zoned for

commercial and hotel use at all relevant times, it is unclear what had changed to warrant

such a huge increase in supposed value.

22.     Notably, the Offering Memorandum states that the land that ACCC and

Sethi will contribute to the project, "recently has been separately appraised by both T.R.

Mandigo & Co. and Integra Realty Resources at a net valuation of $177,547,465."

However, a report entitled "Investment Analysis: A Chicago Convention Center" by

Integra Realty Resources-Chicago Metro ("Integra Report") (**Exhibit D**) addressed to

Sethi disclaims, "**This analysis is not an appraisal and should not be construed as**

**such**" (emphasis added).  Instead, the Integra Report describes the purpose of its

"consultation" as providing a "price analysis for the land based on allocation of the

forecasted stabilized income stream . . . as of the date of stabilized occupancy valuation, January 1, 2018" derived for "investment underwriting purposes."

23.     Moreover, the purported $177 million land value is not mentioned anywhere in the Integra Report. Instead, the Integra Report posited a 2018 land value for the finished hotel and convention center of between $615 and $757 million. The Integra Report does not purport to provide any current value for the construction site whatsoever.

## V.      The Reports Appear to Overstate Projected Revenues and Income

24.     The Reports cite revenue and income figures that are based on projections and other forecasts that are inconsistent with publicly-available materials that I examined. Use of these overstated figures results in the Defendants' overstatement of projected revenues and income that an investor could anticipate from the Project.

10

*Airport Traffic*

25.     The demand drivers listed in the Business Plan claim that the expansion of

the Chicago O'Hare airport will increase the traffic and hotel demand in the area in which

the purported Project will be located. The Business Plan cites a statistic in the Mandigo

Report that O'Hare had 70 million passengers in 2008, and projected an increase to 110

million passengers by 2013. This number is much higher than a report published by the

Federal Aviation Administration indicating O'Hare airport had 34.6 million passengers

enplanements in 2008 with a projected total of 35.8 million enplanements in 2013. The

difference is that the higher passenger figure represents people passing through the

airport, and not those who necessarily deplane and spend time or money in the Chicago

area. Thus, facts, figures and assumptions cited in the Reports to justify growth in

demand for hotel services in the area based on expansion of O'Hare airport appear to be

substantially overstated.

26.     The Evans Carroll Analysis provided by IRCTC to USCIS in furtherance of the Project cites figures supplied by T.R. Mandigo & Company that hotels in the Chicago O'Hare area currently yield 7% to 10% of incoming traffic, and that those figures would increase to 10% to 15% for the Project. Thus, if revenues are based on a percentage of incoming traffic into O'Hare, and that traffic is potentially overstated, then it would follow that the Project's pro forma revenues would also be overstated.

*Unfavorable Outlook*

27.     An investor's ability to qualify for a U.S. permanent residency visa under the Program and to achieve a positive return on investment is dependent on the success of the Project. However, the Mandigo Report posits that the market is not favorable for

11

hotel projects in the Chicago area. For example, the Mandigo Report observes that "newer properties have faced considerable hurdles in entering the market, and in [one particular development] haven't yet achieved their target occupancy or rates." Furthermore, "[t]he suppression of rate increases is exacerbated by the increasingly competitive corporate and leisure meetings market where new products and a more aggressive marketing program by all the area properties has led to rate compression during all but the very peak spring and fall convention seasons. The impact of these rates will gradually offset by more aggressive pricing strategies in the commercial sector and peak meeting periods."

28. The Evans Carroll Analysis further states that upper-upscale hotels in the area have had a 77.1% occupancy rate with an average room rate of $186. The Mandigo Report notes that Chicago suffered both a decrease in prices and rates following the

economic downturn. Moreover, the O'Hare area, where the Project purports to be located, did not fare as well as the downtown region. The Mandigo Report states that 2011 occupancy rates in Chicago were at 72% with an average daily rate of $160 as of the end of 2011. The Mandigo Report projected that occupancy will remain near 74% through 2017 with a price per room of close to $220 by the end of 2017. The O'Hare area in particular has fared worse, with 2011 occupancy rates around 66% and daily room rates of approximately $100.

29.     In addition, the Mandigo Report suggests that the number of rooms (supply) will increase over time and that the demand will trend up slightly but will remain mostly flat in the Chicago area.  The Mandigo Report notes that the current convention space has actually experienced a decline in convention revenue compared to

other cities, which suggests that there is excess supply for conventions in the area. In addition, the Mandigo Report observes that "as a rule of thumb, the average guest would likely prefer to stay downtown, all things being equal," rather than near O'Hare airport, the location of the proposed Project.

30.     Other industry articles note that O'Hare area hotels experience greater volatility in their revenues, which according to financial theory means that investors in the Project would demand an even higher rate of return on their investment. According to one article I reviewed in a real estate trade publication dated January, 26, 2010, which contains quotations and analysis from Mr. Mandigo, several hotels in the area of the Project had closed and other projects under development would likely be cancelled.

31.     Despite the above trends, the Evans Carroll Analysis bases its revenue projections on an assumed 87% occupancy rate at the Project with an average daily room

rate of $222. This daily rate is much higher than what is being obtained by other hotels in the area. This daily rate is higher than the $186 per night earned by upper-scale hotels in the area as reported by the Evans Carroll Analysis. This amount translates into a 19% premium over current prices at the highest end properties. The report also assumes these premium rates would be achieved for all rooms of the Project; however, the first year includes a phased-in roll out of hotel rooms, so not all planned rooms will generate revenue immediately.

32.     These values suggest that the occupancy rates and prices used in the Reports are high compared to the economic reality of the region

*Revenue Projections*

13

33.     I examined the necessary assumptions to justify room revenues as reported in the pro forma statement in the Reports. The projected room revenues for 2017, for example, are $105,077,000, which according to the construction time frame should result in all 995 rooms being ready for occupancy. To achieve those room revenues, all 995 rooms would need to be occupied every day of the year at a price of $289 per night. This necessarily requires the Project's occupancy rates and prices to be even higher than the optimistic projections used in the Reports.

34.     The projected revenues for parking at the Project assumes that parking spots will consistently be full – an unrealistic assumption under any circumstance. Furthermore, one purported benefit of the Project's location, touted in the Business Plan, is its accessibility to mass public transportation between O'Hare airport and downtown Chicago. Thus, it is likely that at least some portion of the Project's occupants will not,

on a consistent basis pay for parking. Therefore, it seems extremely unlikely that Project can achieve a consistent full share of the projected parking revenue. In addition, although the Business Plan bases its revenue projection on paid occupancy of 1,720 parking spots, my review of publicly-available zoning permits for the Project indicates that the Project only has approved zoning for a maximum of up to 1,365 parking spots.

*Job Creation*

35.     The Evans Carroll Analysis estimates that a total of 8,495 jobs would be created by the Project, based on a multiplier approach based on Input-Output tables where a certain amount of revenue translates into new jobs. However, to the extent that the construction cost and revenue projections are both inflated, as my review described above indicates, that overstatement will dramatically impact the job creation projections.

14

Some job creation estimates in the Evans Carroll Analysis do not make intuitive sense, such as attributing 291 permanent jobs to the Project's parking facility (*i.e.*, at least one job created for every six parking spots planned at the Project).

## VI. The Offering Memorandum and Business Plan Overstate Management's Qualifications

36.     The Offering Memorandum states that management personnel are critical to the success of the offering, and that the loss of Sethi's services "could have a material adverse effect on the Company's business, financial condition, and results of operations." The Offering Memorandum and Business Plan also emphasizes Sethi's "over fifteen years of experience in real estate development and management, specifically in the lodging area."[3]

37.     I reviewed publicly-available information on commercial databases that