**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:13-cv-00982 |
| v. | ) ) ) | Honorable Judge Amy J. St. Eve |
| A CHICAGO CONVENTION CENTER, LLC, ANSHOO SETHI, and INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, LLC | ) ) ) ) ) | Magistrate Judge Rowland |
| Defendants. | ) ) ) | |

**PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS A CHICAGO CONVENTION CENTER, LLC AND INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, LLC'S MOTION TO DISMISS**

A Chicago Convention Center, LLC's ("ACCC's") and Intercontinental Regional Center Trust of Chicago, LLC's ("IRCTC's") Motion to Dismiss [Dkt. #77] is frivolous and should be denied. Defendants' motion rests on the mistaken belief that *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), applies to the SEC's claims. It does not.

In July 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, 124 Stat. 1376 (2010) (the "Dodd-Frank Act"), which overrides *Morrison* and grants jurisdiction to federal district courts over actions brought by the SEC alleging a violation of the antifraud provisions of the federal securities laws "*even if the securities transaction occurs outside the United States and involves only foreign investors.*" 15 U.S.C. §78aa(b)(1) (emphasis added). Thus, the SEC need not satisfy the *Morrison* "domestic transaction" requirement to state a claim.

1

Despite the plain language of Section 929P(b), Defendants contend that Section 929P(b) addresses only a court's subject matter jurisdiction and not the extraterritorial application of the federal securities laws in SEC enforcement matters. Thus, Defendants contend that in passing Section 929P(b) Congress intended to specifically grant a court jurisdiction over SEC cases involving *foreign* transactions only to dismiss all such cases for failure to state a claim under *Morrison's* "domestic transaction" test. Congress intended this result, according to Defendants, although courts already possessed subject matter jurisdiction in SEC cases under the *pre*-Dodd Frank Act statutory regime—meaning enactment of Section 929P(b) was superfluous. Defendants' unique interpretation of Section 929P(b), however, cannot be squared with the plain language of that section, *Morrison*, or the legislative history which evinces Congress' clear intent to override *Morrison* in SEC enforcement actions.

In any event, even if Section 929P(b) was superfluous and did nothing to override *Morrison*, as Defendants contend, the SEC's Complaint alleges facts demonstrating that the Defendants conducted sales of securities in the United States and satisfies the (*pre*-Dodd-Frank) domestic transaction test. Accordingly, Defendants' motion to dismiss should be denied.

## The Supreme Court's *Morrison* Decision

*Morrison* considered the extraterritorial reach of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act").[1] Prior to *Morrison*, lower courts had used two tests to determine whether U.S. securities laws applied extraterritorially. The "effects test" examined "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens," while the "conduct test" examined "whether the wrongful conduct occurred in the United

---

[1] *Morrison* was decided in the context of a "foreign-cubed action" in which "(1) foreign plaintiffs [were] suing (2) a foreign issuer in an American court for violations of American securities laws based on securities transactions in (3) foreign countries." 130 S. Ct. at 2894 n.11. The plaintiffs were Australians who had purchased an Australian bank's stock on an Australian stock exchange. *Id.* at 2875-76.

States." *Morrison*, 130 S. Ct. at 2879. *Morrison* rejected both tests as being without statutory basis and inconsistent with the presumption that a statute only applies domestically unless there is a clear indication that Congress intended otherwise. *Morrison* instead adopted a "transactional" test that focuses on "purchases and sales of securities in the United States." *Id.* at 2884. *Morrison* held that Section 10(b) of the Exchange Act applies only to "securities listed on domestic exchanges, and domestic transactions in other securities," but did not provide criteria to identify "domestic transactions." *Id.* Because that case "involve[d] no securities listed on a domestic exchange, and all aspects of the purchases complained of . . . occurred outside the United States," the Court concluded dismissal was required. *Id.* at 2888.

## Section 929P of the Dodd-Frank Act of 2010

Shortly after *Morrison* was decided, Congress passed the Dodd-Frank Act. The Dodd-Frank Act was passed "[t]o promote the financial stability of the United States . . . [and] to protect consumers from abusive financial services practices." Pub. L. No. 111–203, 124 Stat. 1376 (2010) (Preamble). Section 929P of the Dodd-Frank Act, entitled "Strengthening Enforcement by the Commission," amends several federal securities laws, including the Securities Act of 1933 and the Exchange Act, to expand the powers of the SEC and the Department of Justice (DOJ) to combat financial fraud and abuses. Part (b) of that section expands the cross-border reach of the SEC and DOJ, empowering them to bring enforcement actions involving transnational frauds irrespective of whether the fraudulent transactions occurred in the United States. *Id.* §929P(b). Specifically, Section 929P(b) grants jurisdiction to federal district courts over actions brought by the SEC alleging a violation of the antifraud provisions of the federal securities laws involving: "(1) conduct within the United States constituting a significant step in furtherance of a violation, *even if the securities transaction*

3

*occurs outside the United States and involves only foreign investors*, or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States." *Id.* (codified at 15 U.S.C. §78aa(b) (emphasis added).)

## The SEC's Complaint

On February 6, 2013, the SEC commenced a civil enforcement action against ACCC, IRCTC, and the principal managing member and "CEO" of both companies, Anshoo Sethi.[2] The SEC alleges Defendants raised $156 million through a fraudulent investment scheme that exploited a federal visa program known as the "EB-5 Program." (Compl. ¶ 1.) Under the EB-5 Program, foreign nationals may qualify to obtain a green card if they invest a minimum of $500,000 in the U.S. and that investment creates or preserves at least 10 jobs for U.S. workers. (*Id.* ¶ 2.) Using the prospect of gaining U.S. residency through the EB-5 Program, along with promises of substantial investment returns, Defendants solicited investors to purchase securities in ACCC, an Illinois limited liability company based in Chicago. (*Id.* ¶¶ 3, 15.)

ACCC was purportedly formed "for the purpose of financing and developing the ground-up construction and management of" a convention center and hotel complex in Chicago (referred to as the "Project"). (Compl. Ex. A (Offering Mem.) at 0000385.) Under Defendants' scheme, ACCC is the domestic "offeror" or issuer of securities, Compl. ¶ 23, and IRCTC (also an Illinois limited liability company based in Chicago) is the "sponsor" of the securities offering, *id.* ¶¶ 16, 23. Defendants' claim that the Project is "a qualifying investment under the EB-5" Program. (Compl. Ex. A at 0000390.)

The SEC alleges that Defendants "engaged in the sale of securities in the United States." (*Id.* ¶ 13.) Under the terms of the Defendants' securities offering, prospective investors must "execute a subscription agreement . . . and send [it] to the Defendants in the U.S." (*Id.* ¶ 13a.)

---

[2]     On April 1, 2013, Defendant Anshoo Sethi answered the SEC's Complaint. (*See* Dkt. #54.)

Prospective investors were also "instructed to wire funds to an escrow agent in the U.S." (*Id*. ¶¶ 13c. and d.; *see also* Compl. Ex. B (Subscription Agmt.) at 0000471.) Even after Defendants receive an investor's Subscription Agreement and money, "Defendants—U.S. residents—have sole discretion whether to accept or reject an investor's subscription agreement." (Compl. ¶ 13b.) Simply put, "[s]ales were not final until approved by the sponsors—residents of the United States—and the investors remit payment to a U.S.-based escrow agent."[3] (*Id*. ¶ 13.e.)

Defendants' offering materials also demonstrate sales were not final until approved by the sponsors in the U.S. For example, the Defendants' Offering Memorandum provides that *no offer* is made to investors until the U.S.-resident Defendants review the materials submitted by a prospective investor and determine that the investor meets the standards for the offering:

> NO OFFER IS BEING MADE HEREBY TO ANY PERSON WHO HAS NOT FURNISHED TO THE MANAGING MEMBER COMPLETED AND SIGNED SUBSCRIPTION MATERIALS ATTACHED AS EXHIBITS TO THIS MEMORANDUM, AND WHO IS NOT SHOWN BY SUCH INFORMATION TO MEET THE SUITABILITY STANDARDS FOR THIS OFFERING.

(Compl. Ex. A at 0000388 (capitalization in original; emphasis added).) Further, it provides that "[a]cceptance of subscriptions is not guaranteed and is subject to a number of conditions." (*Id*. at 0000394.) Similarly, the Defendants' Subscription Agreement expressly provides that no subscription is "accepted" until approved and countersigned by the Defendants:

> **If your subscription agreement is accepted**, the Managing Member will countersign your Subscription Agreement to confirm your admission to the Company and will send you a copy of the countersigned signature page.

(Compl. Ex. B at 0000471 (emphasis in original); *see also id*. at 0000474 ("The Investor understands that the Company and/or the Managing Member may reject this subscription for any reason, in either of their sole and exclusive discretions.").) The execution page of the Subscription Agreement likewise confirms that no subscription is accepted—and no sale of

---

[3] All of the conduct alleged in the Complaint occurred *after* enactment of the Dodd-Frank Act.

securities is completed—until (at the earliest) the Subscription Agreement is approved and countersigned by the U.S.-based Managing Member of ACCC:



(*Id*. at 0000481 (emphasis added).)  Even after Defendants' acceptance, however, the investment is still revocable if an investor's EB-5 visa application is denied.[4]  (*See id*. at 0000474; Compl. ¶¶ 5, 51; Ex. A at 0000394.)

## ANALYSIS

### I.  Section 929P of the Dodd-Frank Act Overrides *Morrison* and Restores the Conduct and Effects Tests in SEC Enforcement Cases.

The plain language of Section 929P(b) overrides *Morrison's* "domestic transaction" test for SEC enforcement actions.  It expressly provides the court has jurisdiction over SEC enforcement actions "*even if the securities transaction occurs outside the United States and involves only foreign investors*." 15 U.S.C. §78aa(b)(1) (emphasis added).  Notwithstanding the plain language of Section 929P(b), Defendants contend that this provision can only be read as

---

[4]     The Subscription Agreement and the Offering Memorandum direct potential investors to contact Anshoo Sethi in the U.S. if they have any questions about the Defendants' offering. (*See* Compl. Ex. A at 0000384 (identifying Sethi as the point of contact and listing his domestic address and telephone number); Ex. B at 0000471 (same).)  The Subscription Agreement also states that it "shall be interpreted and enforced in accordance with, and governed by, the laws of the State of Illinois applicable to agreements made and to be performed wholly with that jurisdiction."  (Ex. B at 0000480.)

granting courts subject matter jurisdiction over SEC enforcement cases involving foreign transactions, but did nothing to override *Morrison's* "domestic transaction" test. (Defs.' Mem. of Law In Supp. of Mot. [Dkt. #88] ("Mem.") at 7-9.) In other words, Defendants contend that in passing the Dodd-Frank Act Congress intended to confer upon the Court subject matter jurisdiction over SEC enforcement cases involving foreign securities transactions and foreign investors (jurisdiction it possessed *before* passage of the Dodd-Frank Act), only to dismiss all such enforcement cases for failure to state a claim under *Morrison's* domestic transaction requirement. Defendants' interpretation makes little logical sense. And, notably, Defendants fail to cite any authority to support their view that *Morrison* still governs in SEC enforcement actions. This is not surprising because since passage of Section 929P(b) courts and commentators alike have concluded that in passing Section 929P(b) Congress did exactly what it set out to do—override *Morrison* for SEC enforcement actions.[5]

       Not only is Defendants' interpretation of the impact of Section 929P(b) contrary to the

---

[5]     *See In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 456 n.28 (S.D.N.Y. 2012) ("To the extent that a broad reading of *Morrison* may raise policy concerns that parties will engage in foreign transactions to avoid the reach of the Exchange Act, Congress has attempted to remedy that problem by restoring the conduct and effects test for SEC enforcement actions.") (citing §929P(b)); *SEC v. Gruss*, No. 11 Civ. 2420, 2012 WL 3306166, at *3 (S.D.N.Y. Aug. 13, 2012) ("Section 929P(b) of the Dodd-Frank Act allows the SEC to commence civil actions extraterritorially in certain cases."); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 627 n.3 (S.D.N.Y. 2010) (dismissing private securities action under *Morrison* but observing "[f]or whatever comfort it may bring to Plaintiffs and counsel, and however much restoration of the Second Circuit's pride and vindication of its venerable jurisprudence it is worth, the Court notes that in legislation recently enacted, *Congress explicitly granted federal courts extraterritorial jurisdiction under the conduct or effect test for proceedings brought by the SEC*") (citing § 929P(b) (emphasis added)); *Asadi v. G.E. Energy (USA), LLC*, No. 4:12-345, 2012 WL 2522599, at *4 (S.D. Tex. Jun. 28, 2012) (acknowledging Section 929P(b) restores the "extraterritorial scope of the" Exchange Act in SEC enforcement actions); *SEC v. Compania Int'l Financiera S.A.*, No. 11 Civ. 4904 (DLC), 2011 WL 3251813, at *6 n.2 (S.D.N.Y. July 29, 2011) (observing Section 929P(b) "may demonstrate the Congressional intent for the extraterritorial application of certain provisions of the federal securities laws that the *Morrison* court found lacking in prior versions of those laws."); Michael J. Kaufman, <u>Securities Litigation: Damages</u>, §10:2.60 ("Congressional Response to *Morrison*") ("Part of the Dodd-Frank Act addresses the Supreme Court's decision in *Morrison* . . . The Dodd-Frank Act extends the reach of the jurisdiction of the antifraud provisions of the securities laws, but only with respect to actions by the SEC. . . . This would in effect reverse *Morrison* with respect to actions brought by the SEC.").

views of courts that have examined the issue, it is also at odds with the very reasoning of *Morrison* and the legislative history of Section 929P(b) which demonstrates that Section 929P(b) fully restored the pre-*Morrison* conduct and effects tests. In *Morrison*, the Court examined the Exchange Act for any evidence of the "affirmative intention of the Congress clearly expressed" to give the statute extraterritorial effect. *Morrison*, 130 S. Ct. at 2877 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).) Finding none—because prior to the passage of the Dodd-Frank Act the Exchange Act's jurisdictional provision was silent on the issue of extraterritorial reach of the statute—the Court concluded that the Exchange Act did not apply extraterritorially. *See Morrison*, 130 S. Ct. at 2882-83.

As the Court observed, "Congress knows how to give a statute explicit extraterritorial effect," but Congress need not pass laws which state "this law applies abroad" to do so. *Id*. at 2883 & n.8. Moreover, Congress can extend a statute's territorial reach either through a statute's jurisdictional or merits provisions. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514-15 (2006); *see also Morrison*, 130 S. Ct. at 2877 (citing *Arbaugh* and its progeny). Thus, the extraterritorial reach of the Exchange Act is examined as a "merits issue" only in the absence of clear Congressional intent that it should be examined as matter of subject matter jurisdiction. *Id*.

In codifying the broad reach of conduct and effects tests (*see* 15 U.S.C. §78aa(b)) Congress made clear that, as for SEC (and DOJ) actions, it intended to undo *Morrison* and to examine extraterritoriality of the federal securities laws as an issue of subject matter jurisdiction. Section 929P(b) as well as the legislative history behind that provision thus provides what the Supreme Court indicated was lacking in *Morrison*—a clear expression of Congressional intent that the extraterritorial reach of Section 10(b) and the other antifraud provisions be based on the conduct and effects tests. As *Morrison* made clear, "[a]ssuredly context can be consulted as

8

well" as the literal text to resolve the extraterritoriality issue, *Morrison*, 130 S. Ct. at 2883, and here the context makes clear that Congress "[a]ssuredly" intended to restore the conduct and effects tests for SEC actions under Section 10(b).

*First*, as the Supreme Court in *Morrison* observed, the lower courts already "had jurisdiction under [*pre*-Dodd-Frank] 15 U.S.C. §78aa" over securities claims, even those alleging foreign transactions and foreign plaintiffs as in *Morrison*. *Id*. at 2877. Thus, if the *Morrison* domestic transaction test still applied to SEC enforcement actions, as Defendants contend, the absurd result would follow that in passing Section 929P(b)—contained in a provision of the Act entitled "Strengthening Enforcement by the Commission"—Congress changed nothing, notwithstanding clear intent to undo *Morrison*.[6]

*Second*, the legislative history confirms that Congress intended Section 929P(b) to override the *Morrison* presumption against Section 10(b)'s extraterritorial reach. For example, as Defendants acknowledge, Rep. Kanjorski (the author of Section 929P(b)) stated unequivocally that in Section 929P(b) Congress intended to override *Morrison*:

> In the case of *Morrison v. National Australia Bank*, the Supreme Court last week held that section 10(b) of the Exchange Act applies only to transactions in securities listed on United States exchanges and transactions in other securities that occur in the United States. In this case, the Court also said that it was applying a presumption against extraterritoriality. This bill's provisions concerning extraterritoriality, however, are intended to rebut that presumption by clearly indicating that Congress intends extraterritorial application in cases brought by the SEC or the Justice Department. *Thus, the purpose of the language of section 929P(b) of the bill is to make clear that in actions and proceedings brought by the SEC or the Justice Department, the specified provisions of the Securities Act, the Exchange Act and the Investment Advisers Act may have*

---

[6] The Court must "assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp*., 498 U.S. 19, 32 (1990), and "that Congress is knowledgeable about existing law pertinent to the legislation it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988). By assuming Congress did nothing in passing Section 929P(b), Defendants ignore these fundamental precepts of statutory construction. *See also City of Burlington v. Turner*, 336 F.Supp. 594, 605 (S.D. Iowa 1972) ("Obviously, the Court cannot hold as a matter of law that Congress intended to pass redundant and superfluous legislation").

> *extraterritorial application, and that extraterritorial application is appropriate,*
> *irrespective of whether the securities are traded on a domestic exchange or the*
> *transactions occur in the United States . . .*

156 Cong. Rec. H5237 (daily ed. Jun. 30, 2010) (emphasis added). "[W]hen Congress passed

the . . . Dodd-Frank Wall Street Reform Act, Pub. L. No. 111–203**, § 929P**, 124 Stat. 1376,

1862–63 (2010) (amending 15 U.S.C. § 78u), it was well aware of how to grant an agency access

to the courts to seek judicial enforcement of specific sanctions, including monetary penalties."

*Fiero v. Fin'l Indus. Reg. Auth., Inc*., 660 F.3d 569, 575 (2d Cir. 2011) (emphasis added).)  As

the legislative history confirms, with the passage of Section 929P(b), Congress did precisely that.

*Third*, additional evidence of congressional intent comes from the fact that in a related

provision of the Dodd-Frank Act, Congress required the SEC to "conduct a study to determine

the extent to which private rights of action under the antifraud provisions . . . should be

extended" extraterritorially using precisely the same conduct and effects tests embodied in

Section 929P(b).  *See* Pub. L. No. 111-203, §929Y(a), 124 Stat. 1376 (2010).  With respect to

SEC enforcement actions, however, Congress did not require such a study for the evident reason

that, by enacting Section 929P(b), Congress had already restored the conduct and effects tests for

SEC enforcement actions.

In sum, in arguing that Section 929P(b) "only speaks to jurisdiction" and does not apply

in this case, Mem. at 7, Defendants ignore the Supreme Court's reasoning in *Morrison* as well as

"the affirmative intention of the Congress clearly expressed" in Section 929(b), *Morrison*, 130 S.

Ct. at 2877.  Defendants instead ask the Court to construe the term "jurisdiction" in Section

929P(b) solely as "subject matter jurisdiction."  As the Supreme Court has observed, however,

"[j]urisdiction" "is a word of many, too many, meanings." *Steel Co. v. Citizens for Better Env't*,

523 U.S. 83, 90 (1998) (internal quotation marks omitted).  But more importantly, as explained

above, Defendants offer a distinction without a difference.  Congress can extend the territorial

reach of a statute through the jurisdictional or merits provisions of a statute. In codifying the broad reach of the conduct and effects tests Congress made clear that, as for SEC actions, it intended to override *Morrison* and to examine extraterritoriality of the federal securities laws as an issue of subject matter jurisdiction.

Because the Dodd-Frank Act restored the pre-*Morrison* conduct and effects tests with respect to SEC enforcement actions, and because Defendants do not contest that the SEC's Complaint satisfies these tests, Defendants' motion to dismiss should be denied.

## II. Even if Applicable, *Morrison* Does Not Bar the SEC's Claims.

Even if Section 929P(b) of the Dodd-Frank Act did not restore the pre-*Morrison* conduct and effects tests, as Defendants contend, the SEC's Complaint states a claim under *Morrison's* "domestic transaction" test. Following *Morrison*, courts have held that securities transactions are domestic if "irrevocable liability" is incurred or title passes within the United States. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67-68 (2d Cir. 2012). Thus, allegations "concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money" are relevant to determine whether a plaintiff has sufficiently plead a "domestic transaction."[7] *Id.* at 70.

Here, the SEC's Complaint and the exhibits thereto demonstrate that "Defendants have engaged in the sale of securities *in the United States*." (Compl. ¶ 13 (emphasis added).) As discussed above, under the terms of the Defendants' offering, prospective investors are instructed to "execute a subscription agreement . . . and send to the Defendants *in the U.S.*" (*Id.* ¶ 13a. (emphasis added).) They were further instructed to wire funds to the Defendants' U.S.-based escrow agent. (*See id.* ¶ 13c.) Under the terms of Defendants' offering, investors' subscription

---

[7] "In evaluating the sufficiency of the complaint, [a court must] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

amounts would only be released to the Defendants for the purchase of shares in ACCC upon approval of the investors' U.S. visa applications. (*See id.* ¶ 5.)

On these facts alone, the court in *Securities and Exchange Commission v. Geranio*, CV 12-04257 DMG, at *7-*8 (C.D. Cal. Jan. 29, 2013) (slip opinion) (attached as Exhibit A), concluded that the *Morrison* domestic transaction test was satisfied. There, as here, the defendant created U.S. companies to issue stock to foreign investors solicited overseas. *Id.* at *1. Investors were also instructed, as here, to wire their funds to escrow agents in the U.S. Thereafter, funds for a particular sale were released from the escrow account after an investor had returned a completed subscription agreement. *Id.* at *2. On these facts, the *Geranio* court concluded that "[a]lthough the [Defendants'] solicitation of foreign Investors took place entirely overseas, the sales were not final until the Investors remitted payment to U.S.-based escrow agents and sent signed subscription agreements to the Issuers directly in the United States." *Id.* at *7. Because "the parties' finalized their agreements within the United States . . . the transactions were 'domestic' as contemplated in *Morrison.*" *Id.*

Furthermore, here, the Complaint and Subscription Agreement make clear that investors are bound only "**If [the] subscription agreement is accepted**" and countersigned by the Managing Member—an act that occurs in the United States. (Compl. Ex. B at 0000471 (emphasis in original); *see also id.* at 0000484; Compl. ¶ 13e. ("Sales [are] not final until approved by the sponsors—residents of the United States—and the investors remit payment to a U.S.-based escrow agent.") Thus, it is not until the Managing Member signs and "hereby accepts" the investor's subscription that a contract is formed, let alone irrevocable liability is incurred. (Compl. Ex. B at 0000471, -481; Compl. ¶ 13e.)

Notably, *MVP Asset Management v. Vestbirk*, No. 2:10-cv-02483-GEB-CKD, 2013 WL

1726359 (E.D. Cal. Mar. 22, 2013), a case cited by Defendants, *see* Mem. at 12, supports this very conclusion. There, the plaintiff alleged that the defendant's subscription agreement provided that the "subscription is irrevocable by the Investor [plaintiff]" once the plaintiff wired funds in accord with the subscription agreement. *MVP Asset Mgmt.*, 2013 WL 1726359 at *6. However, the subscription agreement also provided, as here, that the defendant "reserves the right to reject without cause all subscriptions up to the time shares are issued." *Id.* at *7. The court found that because the defendant had the right to reject any subscription, offer *and* acceptance did not occur until defendant's acceptance of the subscription. *Id*. at *6-*7.[8] Because the *MVP* plaintiff did not allege whether the foreign-domiciled defendant accepted the subscription in the U.S., the court could not "determine when and where the parties incurred irrevocable liability" and thus dismissed plaintiff's complaint. *Id*. at *6 (citing *Absolute Activist*, 677 F.3d at 68).

Here, however, the Complaint expressly alleges that "[s]ales were not final until" the Subscription Agreement was "approved by the sponsors" in the United States. (Compl. ¶¶ 13e., 14-16; *see also id*. ¶ 5.) Defendants' offering documents also demonstrate that "acceptance" of a Subscription Agreement occurs only after that agreement is countersigned by Defendants' Managing Member. (*See* Compl. Ex. B at 0000481.) Simply put, although Defendants primarily solicited investors overseas, the Complaint and exhibits thereto demonstrate that the actual sale of securities occurs domestically.

Despite the clear allegations of the Complaint and the provisions of the Defendants' own offering documents demonstrating that sales of securities were conducted in the U.S., Defendants contend that the SEC's Complaint fails to state a claim under *Morrison's* transaction test because

---

[8] *See also Geranio*, CV 12-04257 DMG, at *7-*8 (observing that the "irrevocable liability" test was also satisfied because "the agreements became irrevocable when the Issuers countersigned them in the United States and escrow released the funds.")

"offer and acceptance – the requisite meeting of the minds – occurred abroad." (Mem. at 12.). Defendants claim that by executing the "Subscription Agreement, a foreign investor accepted the offer"; and, the investor's investment was "irrevocable" upon signing the Subscription Agreement. (*Id*.) But, as discussed above, none of these assertions are supported by the allegations of the Complaint or the Subscription Agreement that Defendants purport to quote. To the contrary, both the Defendants' offering documents and Complaint make clear that offer and acceptance occurred only upon Defendants' approval of an investor's subscription, an act alleged to occur in the U.S.[9] (*See*, *e.g.*, Compl. Ex. A at 0000388; Ex. B at 0000471, -474, 481.)

Nevertheless, Defendants contend paragraph 7 of the Subscription Agreement demonstrates that investors are "irrevocably" bound upon signing the Subscription Agreement. (Mem. at 12.) But that provision—entitled "Power of Attorney"—merely provides that investors "irrevocably" appoint the Managing Member of ACCC to take any action "necessary or advisable in connection with" the operation of ACCC. (Compl. Ex. B at 0000479.) That provision, like every other provision of the Subscription Agreement, can only be effective after the "subscription agreement is accepted" and countersigned by the Managing Member in the U.S. (Compl. Ex. B at 0000471, -481; *see also* Compl. ¶¶ 13a.-e., 15-16.)

In a last ditch effort to support their contention "that irrevocable liability occurred abroad," Defendants point to the "General Representations" and disclaimer provisions of the Subscription Agreement which provide, for example, "No offer or sale of the Interests was made

---

[9]    Purportedly quoting Paragraph 26 of the SEC's Complaint, Defendants also claim that "offers were made and accepted in China via 'foreign sales agents' and directly to investors 'in China.'" (*See* Mem. at 2, 12.) Defendants' assertion, however, is not supported by paragraph 26 of the Complaint, which alleges in full:

> Sethi has also provided the Offering Memorandum to one or more foreign sales agents, made presentations regarding the offering to investors in China, communicated with representatives of hotel chains [in the U.S.], and had signing authority over the [domestic] administrative account from which over $2.5 million was transferred to an account in his name in Hong Kong.

to the investor in the United States."  (Mem. at 13.)  But those provisions say nothing about when and where an investor becomes "irrevocably" bound under the agreement.  Further, if a contractual disclaimer provision controlled whether a transaction is "domestic" for purposes of *Morrison*, then a defendant could effectively render any transaction "foreign" by including self-serving language in offering documents that the sale of securities occurred outside of the United States.  Defendants cite no authority in support of this proposition; nor could they.  Rather, courts have held that where a contract is formed and where a party becomes bound under that contract govern whether a sale of securities constituted a "domestic transaction."  *See*, *e.g*., *Absolute Activist*, 677 F.3d at 67; *Geranio*, CV 12-04257 DMG (slip opinion) at *7.

Here, Defendants' offering documents and the facts alleged in the Complaint demonstrate that Defendants' sales of securities were completed in the United States, satisfying *Morrison's* domestic transaction test.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.


Dated: May 30, 2013                                    Respectfully submitted,


                                                        /s/ Patrick M. Bryan
                                                       Patrick M. Bryan (ARDC No. 6277194)
                                                       U.S. Securities & Exchange Commission
                                                       100 F Street, NE
                                                       Washington, DC 20549
                                                       Telephone: (202) 551-4420
                                                       BryanP@sec.gov

                                                       Charles J. Felker
                                                       Adam Eisner
                                                       Mika Donlon
                                                       U.S. Securities & Exchange Commission
                                                       100 F Street, NE

Washington, DC 20549
FelkerC@sec.gov
EisnerA@sec.gov
DonlonM@sec.gov

*Counsel to Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I, Patrick M. Bryan, certify that on May 30, 2013 I electronically filed the foregoing PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS A CHICAGO CONVENTION CENTER, LLC AND INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, LLC's MOTION TO DISMISS with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties of record.

*/s/     Patrick M. Bryan*
Patrick M. Bryan

# EXHIBIT A

| Case No. | **CV 12-04257 DMG** | Date | January 29, 2013 |
|---|---|---|---|

| Title | *Securities and Exchange Commission v. Geranio, et al.* | Page | 1 of 9 |
|---|---|---|---|

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| VALENCIA VALLERY | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER DENYING DEFENDANTS' MOTION TO DISMISS [DOC. # 16]**

## I.   INTRODUCTION

Plaintiff, Securities and Exchange Commission ("SEC") filed the Complaint in this action on May 16, 2012 against Defendants, Nicholas Louis Geranio, The Good One, Inc., Kaleidoscope Real Estate, Inc., and BWRE Hawaii, LLC, on July 31, 2012 [Doc. # 1]. The Complaint raises claims under Securities Exchange Act ("SEA") Sections 17(a)(1) and (3) (15 U.S.C. §§ 77q(a)(1), (3)); Section 17(a)(2) (15 U.S.C. § 77q(a)(2)); Section 10(b) and Rule 10b-5(a) and (c) (15 U.S.C. § 78j(b), 17 C.F.R. §§ 240.10b-5(a), (c)); and Section 20(a) (15 U.S.C. § 78j(b)).

Defendants Geranio, The Good One, Inc., Kaleidoscope Real Estate, Inc., and BWRE Hawaii, LLC, filed the present Motion to Dismiss on July 31, 2012 [Doc. # 16]. Defendants amended the Motion on August 1, 2012 [Doc. # 18]. Defendants seek to dismiss the Complaint based on lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1); failure to name indispensable parties under Fed. R. Civ. P. 12(b)(7); and failure to state particular facts sufficient to state a claim under Fed. R. Civ. P. 12(b)(6). Plaintiff, Securities and Exchange Commission, opposed the Motion on September 28, 2012 [Doc. # 23], and Defendants replied on October 5, 2012 [Doc. # 24]. On October 10, 2012, the Court took the Motion under submission because it deemed the Motion appropriate for decision without oral argument under Fed. R. Civ. P. 78(b); C.D. Cal L.R. 7-15 [Doc. 25].

## II.   FACTUAL BACKGROUND

The Complaint alleges that Defendant Geranio is the alter ego of Corporate Defendants The Good One, Inc. and Kaleidoscope Real Estate, Inc., consulting companies. (Compl. ¶ 2.) From approximately April 2007 to September 2009, Geranio created eight U.S. companies ("Issuers") to issue Regulation S stock to offshore investors ("Investors") through offshore

---

CV-90                     **CIVIL MINUTES—GENERAL**                     Initials of Deputy Clerk vv

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 12-04257 DMG | | Date | January 29, 2013 |
|---|---|---|---|---|

| Title | *Securities and Exchange Commission v. Geranio, et al.* | | Page | 2 of 9 |
|---|---|---|---|---|

"boiler rooms" that Geranio recruited. (*Id.*) Regulation S stock is exempt from registration with the SEC because it is offered solely to investors who are outside the United States. (*Id.*) Geranio allegedly recruited Defendant Field to draft materially misleading business plans, marketing materials, and website material for the Issuers. (*Id.* at 3.) He directed traders, including Field, to engage in matched orders and manipulative trades to establish artificially high stock prices and attract buyers. (*Id.* at ¶ 4.)

Using The Good One and Kaleidoscope as aliases, Geranio allegedly organized the Issuers, installed management, and introduced them to offshore boiler rooms he had recruited to sell the Issuers' stock. (Compl. ¶ 26.) Geranio and Field created Worth Systems International, a Panamanian entity, through which the Issuers distributed large blocks of their stock to Investors. (*Id.* at ¶¶ 120, 122.) The boiler rooms used high-pressure sales tactics to convince overseas investors to purchase the Issuers' stock at a price significantly above the price-per-share listed in the agreements with the Issuers. (*Id.* at ¶¶ 6, 121.) After convincing an Investor to buy the Regulation S stock, a boiler room agent instructed the Investor to send payment to an escrow agent in the United States and sent the selling Issuer a trade sheet listing the sale information. (*Id.* at ¶ 135.) The Investors were also required to complete and return a completed Subscription Agreement. (*Id.* at ¶¶ 135, 138.) The Issuers' CEOs reconciled the funds listed in their trade sheets with corresponding funds in the escrow accounts to ensure consistency. *Id.* Upon receipt of the Subscription Agreement, the escrow released the funds. (*Id.* at ¶ 138.) Approximately 60-75% of sale proceeds went to the boiler rooms as sales markups, 2.5% of the sale proceeds went to the escrow agent, and the remaining balance went to the Issuers. (*Id.* at ¶ 7.) According to the Complaint, the Issuers then funneled approximately $2.135 million of the sale proceeds to Geranio through The Good One and Kaleidoscope. (*Id.*) Field allegedly received approximately $279,000. (*Id.*)

The Complaint alleges that Geranio fraudulently manipulated the value of the Regulation S stock in several ways. First, he recruited Field, who served as an officer, director, or investor relations representative for each of the Issuers. (Compl. ¶ 53.) In that capacity, Field drafted business plans, press releases, brochures, and website content. (*Id.* at ¶¶ 54-56.) These promotional materials contained materially false and misleading statements about the status of planned or hypothetical business activities; plagiarized content; misrepresented the nature of relationships between the Issuers and other entities; and provided misleading information about the experience and number of management. (*Id.* at ¶ 57.) The boiler rooms distributed these false statements to potential Investors, in addition to making explicit false statements about the Issuers. (*Id.* at ¶¶ 139-40.) The Complaint states that Geranio and Field knew that the boiler rooms were making fraudulent statements to Investors because Investors complained. (*Id.* at ¶¶ 147-61.) Geranio also directed stock promoters and other individuals to manipulate the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 12-04257 DMG | Date | January 29, 2013 |
|---|---|---|---|

| Title | *Securities and Exchange Commission v. Geranio, et al.* | Page | 3 of 9 |

Issuers' share prices in the United States. (*Id.* at ¶¶ 67-73.) He also directed U.S. investors to particular brokers and orchestrated matched orders and manipulative trades to raise the Issuers' share prices in order to induce purchases by the overseas Investors. (*Id.* at ¶¶ 74-118.)

The Complaint alleges that Geranio controlled every aspect of the fraudulent scheme. He created and controlled The Good One, whose primary officer is his former wife, and Kaleidoscope, whose primary officer is his girlfriend. (Compl. ¶¶ 15-16.) He recruited the boiler rooms and negotiated the terms of their agreements with the Issuers. (*Id.* at ¶¶ 125-30.) He recruited the escrow agents and negotiated the terms of their agreements. (*Id.* at ¶¶ 131-33.) Through The Good One and Kaleidoscope, Geranio and Field received a significant portion of the proceeds from the Regulation S sales. (*Id.* at ¶¶ 163-64.)

## III. DISCUSSION

### A. Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a complaint for lack of subject matter jurisdiction. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) (citing *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). Defendants assert that, under *Morrison v. Nat'l Australia Bank Ltd.*, __ U.S. __, 130 S. Ct. 2869, 2877, 177 L. Ed. 2d 535 (2010), this Court lacks jurisdiction to hear Plaintiff's claims under SEA § 10(b) because the transactions at issue did not take place within the United States.

Defendants misread *Morrison*. In that case, the district and circuit courts dismissed the plaintiff's claims under Section 10(b) for lack of subject matter jurisdiction. *See* 130 S. Ct. at 2876. The Supreme Court held that the lower courts incorrectly analyzed the question of Section 10(b)'s extraterritorial reach as a jurisdictional one, and instead characterized this inquiry as a "merits question" appropriate for analysis under Fed. R. Civ. P. 12(b)(6). *Id.* The Court unequivocally held that the reach of Section 10(b)'s authority does not delineate federal court jurisdiction over Section 10(b) claims. *Id.* Accordingly, the Court construes Defendants' argument on this issue as one for dismissal under Rule 12(b)(6).

### B. Failure to Join Indispensable Parties

Defendant asserts that Plaintiff's failure to join the Issuers, boiler rooms, or escrow agents in this action requires dismissal under Federal Rule of Civil Procedure 12(b)(7). Under that Rule, a party may move to dismiss the complaint for failure to join a required party under

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 12-04257 DMG** | | Date | January 29, 2013 |
|---|---|---|---|---|

| Title | *Securities and Exchange Commission v. Geranio, et al.* | | Page | 4 of 9 |
|---|---|---|---|---|

Rule 19.  Determinations by regulatory agencies about which parties to name in an enforcement action, however, are presumed immune from judicial review.  *See Heckler v. Chaney*, 470 U.S. 821, 832, 105 S. Ct. 1649, 1656, 84 L. Ed. 2d 714 (1985).  In recent years, several courts have found that an enforcement action brought by a regulatory agency need not name all parties involved in the allegedly unlawful scheme to survive a Motion to Dismiss.  *See Commodity Futures Trading Commission v. Paron Capital Management, LLC*, No. CV 11-04577, 2011 U.S. Dist. LEXIS 146207 at *7 (N.D. Cal. Dec. 20, 2011) (denying motion to dismiss on the basis that CFTC failed to join indispensable defendants); *SEC v. Princeton Econ. Int'l Ltd.*, 2001 U.S. Dist. LEXIS 948 at *3 (S.D.N.Y. Feb. 7, 2001) ("The SEC and the CFTC are the sole architects of their enforcement proceedings and [defendants] may not circumvent the exercise of agency discretion through compulsory joinder rules.").  This Court too finds that Plaintiff is not required to join the Issuers, boiler rooms, or escrow agents in this action.

### C. Failure to State a Claim

Defendant next asserts that the Complaint must be dismissed because it fails to state an actionable claim under SEA § 20(a).[1]  Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007).  Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may seek dismissal of a complaint for failure to state a claim upon which relief can be granted.  A court may grant such a dismissal only where the plaintiff fails to present or to allege sufficient facts to support a cognizable legal theory.  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("Rule 8 . . . does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.").

Claims involving fraud must meet the heightened pleading standard set forth in Fed. R. Civ. P. 9(b).  ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  To comply with Rule 9(b), the SEC is "not required to prove its case in the pleadings," but it "must not make conclusory allegations of fraud."  *SEC v. Ficeto*, 839 F. Supp. 2d 1101, 1103 (C.D. Cal. 2011) (internal quotation omitted).

---

[1] As noted above, the Court construes Defendants' argument that the Court lacks subject matter jurisdiction under *Morrison* as a motion to dismiss Plaintiff's SEA § 10(b) claim under Fed. R. Civ. P. 12(b)(6).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 12-04257 DMG | Date | January 29, 2013 |
|---|---|---|---|

| Title | *Securities and Exchange Commission v. Geranio, et al.* | Page | 5 of 9 |
|---|---|---|---|

A court must accept all factual allegations as true. *Twombly*, 550 U.S. at 555. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. While ordinarily a Court may only look to the face of the complaint in deciding a Rule 12(b)(6) motion, *see Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002), the Ninth Circuit has held that the Court may also consider evidence "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *see also Van Buskirk*, 284 F.3d at 980 (the court may consider such documents without converting the motion to dismiss into a motion for summary judgment). "The court may treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Id.*

### 1. The Complaint States a Claim Under Section 10(b) and Rule 10b-5

The Third Claim for Relief seeks relief under SEA § 10(b) and Rule 10b-5(a) and (c) promulgated thereunder. (Compl. ¶¶ 178-181.) In *Morrison*, the Supreme Court examined whether Section 10(b) permitted a "foreign-cubed action" in which foreign plaintiffs sue foreign and American defendant-issuers for misconduct in connection with securities traded on foreign exchanges. *See* 130 S. Ct. at 2875, 2894 n.1. The Court emphasized the "longstanding principle" that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 2877. The Court rejected calls from the petitioners and the Solicitor General to extend Section 10(b) to some extraterritorial transactions, finding that it contains no "clear statement of extraterritorial effect." *Id.* at 2883. Rather, the Court held that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* at 2888. Under this new bright-line "transactional test," the Court found that the foreign transactions at issue in *Morrison* did not give rise to a claim under Section 10(b) and affirmed the dismissal of the Complaint. *Id.*

Here, the Regulation S stock at issue is not "listed on an American stock exchange" because it is not required to be registered with the SEC. (Compl. ¶ 2.) Therefore, the Court must determine whether the transactions at issue were for "the purchase or sale of any other security in the United States" under the second prong of the *Morrison* test. *Morrison*, 130 S. Ct. at 2888.

There is little precedent on what constitutes a domestic sale or purchase after *Morrison*.

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 12-04257 DMG** | | Date | January 29, 2013 |
|---|---|---|---|---|

| Title | *Securities and Exchange Commission v. Geranio, et al.* | Page | 6 of 9 |
|---|---|---|---|

Although the Ninth Circuit has not addressed the issue, the Second Circuit did so in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012). There, the Second Circuit considered whether a foreign hedge fund's purchase of off-exchange shares of U.S. companies, brokered through a U.S. broker-dealer, constituted a domestic purchase or sale under *Morrison*. *Id.* at 62-63. The court noted that, under the Exchange Act, the terms "buy" and "purchase" "include any *contract* to buy, purchase, or otherwise acquire." *Id.* at 67 (citing 15 U.S.C. § 78c(a)(13)) (emphasis added). Similarly, the terms "sale" and "sell" "include any *contract* to sell or otherwise dispose of." *Id.* (citing 15 U.S.C. § 78c(a)(14)) (emphasis added). The court reasoned that these definitions "suggest that the act of purchasing or selling securities is the act of entering into a binding contract to purchase or sell securities." *Id.* This conclusion comported with Second Circuit cases holding that a securities transaction occurs "when the parties incur irrevocable liability," that is "the point at which, in the classic contractual sense, there was a meeting of the minds of the parties" and "the parties obligated themselves to perform . . . ." *Id.* at 67-68 (citing *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972)).

The *Absolute Activist* court concluded that "the point of irrevocable liability can be used to determine the locus of a securities purchase or sale." *Id.* In other words, a stock transaction is domestic if the purchase and sale agreement is formed in the United States. Alternatively, the court held that a transaction is domestic if the "title to the shares was transferred within the United States." *Id.* (citing *Quail Cruises Ship Management Ltd. v. Agencia De Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310-11 (11th Cir. 2011) (holding that a foreign plaintiff alleged a domestic transaction because parties submitted their purchase and sale agreement to Florida and the agreement "confirm[ed] that it was not until this domestic closing that title to the shares was transferred")). Applying this test to the facts in that case, the *Absolute Activist* court determined that the complaint failed to plead a domestic transaction because it contained no "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money . . . ." *Id.* at 70.

The Ninth Circuit has yet to interpret *Morrison*, but several cases suggest an inclination to adopt the "irrevocable liability" test. *See SEC v. Levine*, No. CV 10-16238, 2011 U.S. App. LEXIS 25635 at *2 (9th Cir. Dec. 21, 2011) (noting, in *dicta*, "the Securities Act governs the [defendants'] sales because the actual sales closed in Nevada when [the defendants] received completed stock purchase agreements and payments"); *MVP Asset Management (USA) L.L.C. v. Vestbirk*, No. CV 10-2483, 2012 U.S. Dist. LEXIS 97104 at *18 (E.D. Cal. Jul 12, 2012) (citing *Absolute Activist*'s "irrevocable liability" standard, but finding allegations that certain funds were transferred within the United States insufficient to state a claim after *Morrison*).

---

**CIVIL MINUTES—GENERAL**  Initials of Deputy Clerk <u>vv</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 12-04257 DMG** | | Date | January 29, 2013 |
|---|---|---|---|---|

| Title | ***Securities and Exchange Commission v. Geranio, et al.*** | Page | 7 of 9 |
|---|---|---|---|

Here, the Complaint states that after agreeing to purchase shares, overseas investors were instructed to wire their funds to one of several escrow agents in the United States. (Compl. ¶ 131.) Thereafter, "[t]he Regulation S funds for a particular sale were released from the escrow account after an investor had returned a completed subscription agreement." (Compl. ¶ 138.) Although no Subscription Agreement is attached to the Complaint, Plaintiff filed a sample Subscription Agreement with its Opposition to the Motion. (Opp'n to Mot. to Dismiss, Exh. 2.) The sample Subscription Agreement is for the purchase of shares of Spectrum Acquisition Holdings, Inc., one of the U.S.-based Issuers organized by Geranio. (*Id.* at 1.) It instructs the Investor to sign and return the Agreement and to wire payment to a bank located in Lake Grove, New York. (*Id.*) The Subscription Agreement requires that the Issuer sign after receipt to accept the sale agreement.[2] (*Id.* at 8.)

As a preliminary matter, the Court finds it appropriate to consider the sample Subscription Agreement as part of the Complaint. *See Marder*, 450 F.3d at 448. First, the Complaint refers to the Subscription Agreements. (Compl. ¶ 138.) Second, the Agreements are "central to the plaintiff's claim" because they effectuated the allegedly fraudulent sales at issue. *Marder*, 450 F.3d at 448. Third, Defendants did not object to Plaintiff's submission of the sample Subscription Agreement in their Reply and the Court therefore assumes that Defendants do not object to the document's authenticity. *See id.*

Having considered the limited case law on this subject and the sample subscription agreement, the Court finds that the Regulation S sales are within the reach of Section 10(b). Although the boiler rooms' solicitation of foreign Investors took place entirely overseas, the sales were not final until the Investors remitted payment to U.S.-based escrow agents and sent signed subscription agreements to the Issuers directly in the United States. The Court finds that the parties' finalized their agreements within the United States and therefore the transactions were "domestic" as contemplated in *Morrison*. This finding also comports with the Second Circuit's "irrevocable liability" test, as the agreements became irrevocable when the Issuers

---

[2] In this respect, the Subscription Agreement appears inconsistent with the Complaint. The Complaint suggests that the Issuers distributed their shares to Worth, which then transferred the shares to the boiler rooms, which finally transferred them to Investors after sale. (Compl. ¶¶ 120-21.) *See Absolute Activist*, 677 F.3d at 68 (finding that a transaction may take place at the location where title is transferred). The sample Subscription Agreement, however, informs the Investor that "the issued shares, after being exchanged for payment in full, shall be forwarded by the Escrow Agent to Worth Systems, Inc. for delivery to Subscriber." (Opp'n to Mot. to Dismiss, Exh. 2 at 2.) This suggests that the shares remained with the Issuers until after the sales were finalized. The Court need not resolve this inconsistency for purposes of the present Motion because it is sufficient that the locus of the agreement between the Issuers and the Investors was in the United States where the sale was finalized. *See Levine*, 2011 U.S. App. LEXIS 25635 at *2.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES—GENERAL

| Case No. | CV 12-04257 DMG | Date | January 29, 2013 |
|---|---|---|---|

| Title | *Securities and Exchange Commission v. Geranio, et al.* | Page | 8 of 9 |
|---|---|---|---|

countersigned them in the United States and escrow released the funds. *See Absolute Activist*, 677 F.3d at 67-68. Accordingly, the Complaint states a claim for relief under Section 10(b).

### 2.     The Complaint States a Claim Under Section 20(a)

Defendants also assert that the Complaint fails to state a claim that Geranio is liable as a "control person" for the actions of the Issuers and boiler rooms under SEA § 20(a). Under Section 20(a),

> Every person who, directly or indirectly, controls any person liable under any provision of [the SEA] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Defendants apparently misread the Complaint. Plaintiff's Fifth Claim for Relief alleges that Geranio is a control person of The Good One and Kaleidoscope under SEA § 20(a), such that he should be held jointly and severally liable for their violations. (Compl. ¶¶ 187-190.) No other cause of action relates to control-person liability under SEA § 20(a). Although some facts alleged in the Complaint may be relevant to whether Geranio also controlled Issuers and boiler rooms, their presence does not alter the text of the Fifth Claim for Relief. Because Defendants do not challenge the sufficiency of the pleadings with respect to Geranio's control-person liability for The Good One and Kaleidoscope, the Court need not examine whether the Fifth Claim for Relief is adequately pleaded.

## IV.     CONCLUSION

In light of the foregoing, Defendants' Motion to Dismiss is **DENIED** in its entirety. Defendants shall have 21 days from the date of this Order to file an Answer.

**IT IS SO ORDERED.**

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk vv