**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| A CHICAGO CONVENTION CENTER, LLC, ANSHOO SEHTI, and INTERCONTINENTAL REGIONAL CENTER TRUST OF CHICAGO, LLC, | ) ) ) ) ) ) |
| Defendants. | ) ) |

No. 13 C 982

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

On February 26, 2013, the United States Securities and Exchange Commission ("SEC") filed a three-count Complaint against Defendants A Chicago Convention Center, LLC ("ACCC"), Anshoo Sethi ("Sethi"), and Intercontinental Regional Center Trust of Chicago, LLC ("IRCTC"), alleging violations of the Securities Act of 1933, 15 U.S.C § 77q(a)(1)-(a)(3) (the "Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 2401.10b-5 ("Rule 10b-5"). (R. 3, Compl.) On April 29, 2013, A Chicago Convention Center, LLC and Intercontinental Regional Center Trust of Chicago, LLC (collectively, the "Corporate Defendants") filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (R. 77, Mot.) For the following reasons, the Court denies the Corporate Defendants' motion.

## BACKGROUND

The SEC's allegations, which the Court must take as true at this stage, are as follows. For "over . . . 18 months," Anshoo Sethi ("Mr. Sethi") and the Corporate Defendants (collectively, "Defendants") "have perpetrated a large scale investment scheme." (Compl. ¶ 1.) Specifically, Defendants "fraudulently sold over $145 million in securities and collected an additional $11 million in administrative fees from over 250 investors." (*Id.* ¶¶ 1, 7.) These investors were Chinese nationals who hoped to obtain United States citizenship through their investments as part of the EB-5 Program. (*Id.* ¶¶ 2-3.) The Immigration and Nationality Act of 1990 created the EB-5 Program, which allows foreign nationals to qualify for a green card "if the individuals invest $1,000,000 (or at least $500,000 in a "Target Employment Area"—*i.e.*, a high unemployment or rural area), creating or preserving at least 10 jobs for U.S. workers." (*Id.* ¶ 2.) Defendants, "[u]sing the lure" of the EB-5 program, "targeted" these foreign investors by selling securities in the form of an interest in ACCC, an Illinois limited liability company claiming to "finance and build the 'World's First Zero Carbon Emission Platinum LEED certified' hotel and conference center in the Chicago area." (*Id.* ¶¶ 3, 15, 20.) According to the SEC, ACCC and IRCTC were "alter egos for Sethi." (*Id.* ¶ 18.) Mr. Sethi "is the primary representative of each company in their business dealings with USCIS and investors," and he "controlled nearly every aspect of ACCC's and IRCTC's business, and asserted control over their actions." (*Id.*)

The SEC further alleges that Defendants made false claims to further this scheme. First, Defendants "used false and misleading information" to solicit investments in the project. (*Id.* ¶ 4.) Defendants, for example, have falsely claimed "that several major hotel chains have signed on to the Defendants' project, that Defendants have acquired all the necessary permits and approvals to construct the project, that the Defendants will contribute land valued at over $177

million to the project, and that the project is likely to generate over 8,000 jobs." (*Id*. ¶¶ 4, 21, 28-36, 40.) Defendants also made false claims and presented false documents to U.S. Citizenship and Immigration Services ("USCIS"), the agency that oversees the EB-5 program. (*Id.* ¶¶ 2, 5, 17, 37.) Specifically, Defendants provided false information to USCIS in order to obtain the agency's "preliminary approval of the project," so that USCIS would grant "provisional visas" to the foreign investors. (*Id.* ¶¶ 5-6.) To do this, Defendants "provided a business plan and two economic studies to USCIS" to demonstrate that "the project will create or save enough U.S. jobs to qualify investors for green cards under the EB-5 program." (*Id.* ¶ 55.) The SEC contends that this "fraud upon USCIS is a necessary part of the scheme to defraud investors and misappropriate investment funds." (*Id.* ¶ 6.)

To date, Defendants "have convinced over 250 Chinese investors to wire a minimum of $500,000 apiece plus a $41,500 'administration fee' to the Defendants' U.S. bank accounts." (*Id.* ¶¶ 3, 20.) Defendants claimed that the "administrative fees" were fully refundable, but have in fact "already spent or dissipated *over 90%* of the administrative fees collected from investors." (*Id.* ¶ 7 (emphasis in original)); (*see also id.* ¶¶ 51-52.) In response to Defendants' alleged conduct, and in an effort "to protect the interests of current and future investors," the SEC brought this lawsuit, seeking various forms of injunctive relief. (*Id.* ¶ 8; R. at 23-26.)

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir. 2011); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ("faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true").

## ANALYSIS

The Corporate Defendants argue that the Supreme Court's holding in *Morrison v. National Australia Bank Ltd.,* 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010), governs this case and necessitates dismissal for failure to state a claim. (R. 89, Defs.' Mem. at 1.) Specifically, the Corporate Defendants argue that, under the "transactional" test set forth in *Morrison*, the SEC cannot assert a claim against them because the transactions at issue here were not "domestic transactions." (*Id*. (citing *Morrison*, 130 S. Ct. at 2883).) The SEC, however, contends that the "transactional" test is not the proper inquiry because the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (the "Dodd-Frank Act") superseded *Morrison* and revived the previously applied "conducts and effects" test for SEC actions. (R. 89, Resp. at 1.) As explained below, the Court need not determine whether the "transactional" test or the "conducts and effects" test governs this suit – which is a complicated question – because the SEC has stated a claim under either inquiry.

## I.     The Supreme Court's Decision in *Morrison*

In *Morrison*, the Supreme Court considered the extraterritorial reach of Section 10(b) of the Exchange Act in the context of an action involving foreign investors making foreign transactions on foreign exchanges – a "foreign-cubed" action.  Specifically, the foreign investors had filed a putative class action against an Australian banking corporation, alleging securities fraud relating to securities traded on foreign exchanges, but not on any exchange in the United States.  *Morrison*, 130 S. Ct. at 2875-76, 2894 n. 11.  The respondents had moved to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  *Id*. at 2876.  The district court granted the motion under Rule 12(b)(1) finding no subject-matter jurisdiction.  *Id*.  The Second Circuit affirmed.  *Id*.  The Supreme Court concluded that the Second Circuit had erred in deeming the extraterritorial reach of Section 10(b) a matter of subject-matter jurisdiction.  *Id*. at 2876-77.  In doing so, the Supreme Court held that the issue of "what conduct Section 10(b) reaches . . . is a merits question," rather than a matter of subject-matter jurisdiction.  *Id*. 2877.  The Supreme Court specifically noted that the "district court [] had jurisdiction under 15 U.S.C. § 78aa to adjudicate the question whether § 10(b) applies to [the defendants'] conduct."  *Id*. at 2877.  The Supreme Court, therefore, addressed whether the petitioner's allegations stated a claim to survive a motion to dismiss under Rule 12(b)(6).  *Id*.

When analyzing the petitioner's allegations in *Morrison*, the Supreme Court applied a presumption against giving a statute extraterritorial effect "unless there is the affirmative intention of Congress clearly expressed" to give it such effect.  *Morrison*, 130 S. Ct. at 2877.  The Supreme Court explained that the Second Circuit jurisprudence had developed an "effects test" and a "conduct test" to determine whether to apply Section 10(b) extraterritorially.  *Id*. at 2878-80.  These tests, according to the Supreme Court, had no basis in the statutory text and led

to unpredictable and inconsistent applications of Section 10(b) to transnational cases. *Id*. at 2879-81. It, therefore, concluded that courts must apply the presumption against extraterritoriality "in all cases." *Id*. at 2881. With that presumption in mind, the Supreme Court looked to the text of Section 10(b), and stated that, "[i]n short, there is no affirmative indication in the Exchange Act that § 10(b) applies, and we therefore conclude that it does not." *Id*. at 2883.

The analysis did not end there. The Supreme Court explained that the presumption against extraterritoriality often "is not self-evidently dispositive, but its application requires further analysis." *Morrison*, 130 S. Ct. at 2883. In a footnote, the Court explained that additional analysis is necessary – and consistent with its finding that Section 10(b) does not apply extraterritorially – because if Section 10(b) did apply abroad, then it would apply to all transnational funds. *Id*. at 2884 n. 9. Because Section 10(b) does not apply abroad, however, it needed to "determine which transnational funds it applied to." *Id*. The Supreme Court then developed its own test – the "transactional test" – to determine whether the petitioner had stated a claim under Section 10(b). *Id*. at 2886. Under this new test, a plaintiff may bring a cause of action for securities fraud when "the purchase or sale is made in the United States, or involves a security listed on a domestic exchange." *Id*. Because the allegations in the case before it "involve[d] no securities listed on a domestic exchange, and all aspects of the purchases . . . occurred outside the United States," the Court dismissed the complaint for failure to state a claim. *Id*. at 2888.

## II.     The Effect of Section 929P(b) of the Dodd-Frank Act on *Morrison*

Shortly after the Supreme Court issued its decision in *Morrison*, Congress enacted the

Dodd-Frank Act.  The parties disagree about whether the Dodd-Frank Act superseded the portion

of *Morrison* – as it relates to suits brought by the SEC or the Department of Justice – applying a

presumption against extraterritoriality because the Exchange Act did not include language

expressly indicating that it reached extraterritorial conduct.[1]  Significantly, the parties highlight a

tension created by Section 929P(b), namely that the plain language of the Section 929P(b) seems

purely jurisdictional – particularly in light of its placement in the jurisdictional section of the

Exchange Act – yet the Congressional intent behind that provision supports a conclusion that the

provision is substantive.  Specifically, the Corporate Defendants contend that the plain language

of Section 929P(b)'s addition to the Exchange Act – which it believes is controlling here –

unambiguously establishes that the provision relates only to subject-matter jurisdiction, and does

not "even attempt to address" what constitutes a substantive cause of action.  (Defs.' Mem. at 8-

9.)  The Corporate Defendants argue that the language is clear on its face, in part because the

---

[1] This is a novel question.  Some courts have, in dicta, assumed, without analysis, that Section 929P(b) superseded *Morrison.  See, e.g., S.E.C. v. Tourre*, No. 10 Civ. 3229(KBF), 2013 WL 2407172, at *1 n. 4 (S.D.N.Y. June 4, 2013) ("Because the Dodd–Frank Act effectively reversed *Morrison* in the context of SEC enforcement actions, the primary holdings of this opinion affect only pre-Dodd Frank conduct."); *In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 456 n. 28 (S.D.N.Y. 2012) ("To the extent that a broad reading of Morrison may raise policy concerns that parties will engage in foreign transactions to avoid the reach of the Exchange Act, Congress has attempted to remedy that problem by restoring the conducts and effects test for SEC enforcement actions"); *S.E.C. v. Gruss*, No. 11 Civ. 2420, 2012 WL 3306166, at *3 (S.D.N.Y. Aug. 13, 2012) ("Section 929P(b) of the Dodd-Frank Act allows the SEC to commence civil actions extraterritorially in certain cases."); *S.E.C. v. Compania Internacional Financiera S.A.*, No. 11 Civ. 4904(DLC), 2011 WL 3251813, at * 6 n. 2 (S.D.N.Y. July 29, 2011) ("Section 929P of the [Dodd-Frank Act] may demonstrate the Congressional intent for the extraterritorial application of certain provisions of the federal securities laws that the Morrison court found lacking in prior versions of those laws. It may be that the Dodd–Frank Act was specifically designed to reinstate the Second Circuit's 'conduct and effects' test."); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 627 n. 3 (S.D.N.Y. 2010) ("For whatever comfort it may bring to Plaintiffs and counsel, and however much restoration of the Second Circuit's pride and vindication of its venerable jurisprudence it is worth, the Court notes that in legislation recently enacted, Congress explicitly granted federal courts extraterritorial jurisdiction under the conduct or effect test for proceedings brought by the SEC"); *Asadi v. G.E. Energy (USA)*, No. 4:12–345, 2012 WL 2522599, at *4 (S.D. Tex. June 28, 2012) ("Section 929P(b) gives the district courts extraterritorial jurisdiction, but only over certain enforcement actions brought by the SEC or the United States.").  The parties have not, however, identified any cases where a court has analyzed the interpretation of Section 929P(b) in an SEC enforcement action for conduct that occurred after *Morrison*, and the court found no such case.

provision uses the word "jurisdiction." (*Id.*) They further argue that the location of this provision in the section of the Exchange Act entitled "Jurisdiction of offenses and suits" demonstrates that the provision is jurisdictional rather than substantive. (*Id.*) In response, the SEC asserts that the provision is not jurisdictional, but instead delineates the requirements for determining whether the SEC has stated a substantive claim under Section 10(b). (Resp. at 10.) According to the SEC, Section 929P(b) evidences Congress' intent to overcome the presumption against extraterritoriality expressed in *Morrison* – which stemmed from the fact that the Exchange Act lacked a "clear statement of extraterritorial effect" – and to revive the pre-*Morrison* "conducts and effects" test. *Morrison*, 130 S. Ct. at 2883.

### A.     The Applicable Provisions of the Dodd-Frank Act

Section 929P of the Dodd-Frank Act amended several federal laws, including the Securities Act and the Exchange Act. Section 929P(b) – entitled "Extraterritorial Jurisdiction of the Antifraud Provisions of the Federal Securities Laws" – addressed the issue of transnational securities fraud actions brought by the SEC or the Department of Justice. The provision added the following language to both the Securities Act and Exchange Act:

> district courts . . . shall have jurisdiction over an action or proceeding brought or instituted by the [SEC] . . . involving:
>
> (1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or
>
> (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

Section 929P(b) added this language to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, entitled "Jurisdiction of offenses and suits," and Section 22 of the Securities Act, 15 U.S.C. § 77v, also entitled "Jurisdiction of offenses and suits."

### B.    Interpreting Section 929P(b)

In *Morrison*, the Supreme Court held that when a statute lacks explicit congressional intent to grant extraterritorial scope, a presumption against extraterritoriality applies.  *Morrison*, 130 S. Ct. at 2883.  The Supreme Court further concluded that the Exchange Act lacked such explicit language, and, therefore, applied a "transactional" test to determine if the Exchange Act reached the conduct at issue.  *Id*. at 2883, 2885.  Here, the crux of the issue is that Congress, in passing Section 929P(b), may have intended to fill the void noted by the Supreme Court in *Morrison*, and to rebut the presumption against extraterritoriality, by adding explicit extraterritorial language to the Exchange Act.  The plain language of Section 929P(b), however, does not clearly express this potential intent.  Instead, Section 929P(b), on its face, merely addresses subject-matter jurisdiction – a question which the Supreme Court previously resolved in *Morrison* – rather than the substantive reach of Section 10(b) of the Exchange Act.[2]  The

_____

[2] Numerous commentators have acknowledged that the language of Section 929P(b) may not reflect the intent of Congress.  *See, e.g.,* Meny Elgadeh, *Morrison v. National Australia Bank: Life After Dodd-Frank*, 16 Fordham J. Corp. & Fin. L. 573, 594 (2011) ("Significantly, the legislative text makes no mention of any change in the application of the securities laws.  Rather it only speaks directly to a court's ability to hear a case, a power fully recognized by the majority in Morrison."); Stephen R. Smerek & Jason C. Hamilton, *Extraterritorial Application of United States Law After Morrison v. National Australia Bank*, 5 No. 1 Disp. Resol. Int'l 21, 23-24 (2011) ("While this language appears to express Congress's intent to extend the reach of the Securities and Exchange Act overseas, whether it succeeds in this purpose is less than certain"); John Chambers, *Note: Extraterritorial Private Rights of Action: Redefining the Transactional Test in Morrison v. National Australia Bank*, 31 Rev. Banking & Fin. L. 411, 429 (Fall 2011) ("Congress certainly intended to expand the substantive reach of Section 10(b) in SEC and Department of Justice [] suits, it did not do so."); Richard Painter, et al., *When Courts and Congress Don't Say What They Mean: Initial Reactions to Morrison v. National Australia Bank and to the Extraterritorial Jurisdiction Provisions of the Dodd-Frank Act*, 20 Minn. J. Int'l L. 1, 4 (Winter 2011) ("While the Congress's intent in passing the Dodd-Frank Act seems directed at empowering the SEC and DOJ to combat securities fraud, one can credibly argue that they failed to do so.");  Andrew Rocks, *Notes: Whoops! The Imminent Reconciliation of U.S. Securities Laws with International Comity After Morrison v. National Australia Bank and the Drafting Error in the Dodd-Frank Act*, 56 Vill. L. Rev. 163, 192 (2011) ("[T]he ability of these agencies to enforce the antifraud provisions of the U.S. securities laws is no clearer than it was prior to the Dodd-Frank Act's enactment.  Consequently, despite the drafters' intentions to the contrary, the presumption against extraterritorial application of the provision is not overcome by the Act's provisions."); A.C. Pritchard, *Securities Law in the Roberts Court: Agenda or Indifference?*, 37 J. Corp. L. 105, 142 (Fall 2011) ("The Morrison decision produced an immediate, if somewhat clumsy, reaction from Congress . . . Unfortunately, Congress enacted language ensuring only that the courts would have jurisdiction to hear cases with extraterritorial application, not that Section 10(b) would have extraterritorial application.  Thus, Congress repeated the Second Circuit's error of treating the scope of the law as jurisdictional, rather than a merits question."); Nidhi M. Geervarghese, *Note:  A Shocking Loss of Investor Protection:  The Implications of Morrison v. National Australia Bank*, 6 Brook. J. Corp. Fin. & Com. L. 235, 250 (Fall 2011) ("Congress may have erroneously

question becomes, therefore, how to interpret Section 929P(b) in light of this conflict between the language as drafted and Congress's possible intent in adopting this provision.

### 1. Statutory Interpretation Generally

"When a statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Sebelius v. Cloer*, 133 S. Ct 1886, 1889, 185 L. Ed. 2d 1003 (2013) (citation omitted). Indeed, the Seventh Circuit approaches issues of statutory interpretation by assuming that the "ordinary meaning of the language accurately expresses the legislative purpose." *Commodity Futures Trading Com'n v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550 (7th Cir. 2013) (internal citations omitted). When interpreting a statute, the Court "first and foremost [] give[s] words their plain meaning unless doing so would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." *See United States v. Vallery*, 437 F.3d 626, 630 (7th Cir. 2006); *see also Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121, 1128 (7th Cir. 2008). "When the plain meaning of a statutory term is unclear, outside considerations can be used in an attempt to glean the legislative intent behind the use of the term." *Emerg. Servs. Billing Corp., Inc. v. Allstate Ins. Co.*, 668 F.3d 459, 465 (7th Cir. 2012); *see also McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 882 (7th Cir. 2012) ("Consulting legislative history may be an acceptable means of decoding an ambiguous statute"). Furthermore, "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Marx v. Gen'l Rev. Corp.*, 133 S. Ct. 1166, 1177, 185 L. Ed. 2d 242 (2013).

---

addressed the power of the federal courts to hear a case, rather than the scope of the antifraud provisions of the Exchange Act.").

### 2.    The Plain Language of 929P(b)

Here, the plain language of Section 929P(b) seems clear on its face.  Specifically, the provision uses the word "jurisdiction,"[3] and it appears in the jurisdictional portions of the Exchange Act.  *See Florida Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47, 128 S. Ct. 2326, 171 L. Ed. 2d 203 (2008) ("statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute"); *INS v. Nat'l Ctr. for Immigrants' Rights,* 502 U.S. 183, 189-90, 112 S. Ct. 551, 116 L. Ed. 2d 546 (1991) ("a title of a statute or section can aid in resolving any ambiguity in the legislation's text"); *Miller v. Herman*, 600 F.3d 726, 732 (7th Cir. 2010) (holding that §2301(d)(1) of the Magnuson-Moss Act "has the heading 'Jurisdiction'" and thus "clearly states" that the statute "grants 'appropriate district courts of the United States the ability to hear claims'") (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516, 126 S. Ct. 1235, 1245, 163 L. Ed. 2d 1097 (2006)).  The plain meaning, when looked at in isolation, therefore, suggests that Section 929P(b) is a jurisdictional rather than substantive provision.

### 3.    Interpreting Section 929P(b) to Avoid Superfluity

One concern with interpreting Section 929P(b) as purely jurisdictional based on its plain language is that such an interpretation may render the entire provision superfluous.  Indeed, the Supreme Court in *Morrison* concluded that federal courts already had the power to hear SEC enforcement cases involving foreign transactions.  *See Morrison*, 130 S. Ct. 2869, 2877 ("The District Court here had jurisdiction under 15 U.S.C. § 78aa to adjudicate the question whether § 10(b) applies to National's conduct.").  Interpreting Section 929P(b) as jurisdictional would,

---

[3] The Court is not persuaded by the SEC's citation to *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90, 118 S. Ct. 1003 (1998) for the proposition that jurisdiction "is a word of many, too many, meanings."  (Resp. at 10.)  In *Steel*, the Supreme Court considered that "jurisdiction" sometimes refers to the powers of the court "to enforce the violated requirement and to impose penalties" rather subject-matter jurisdiction.  523 U.S. at 90.  This alternative definition is not applicable here.

therefore, mean that Congress gave the SEC no more power or enforcement capability than it had before *Morrison*. In other words, if Section 929P(b) is purely jurisdictional, it would be redundant and superfluous because other provisions in the "Jurisdiction of offenses and suits" section already granted federal courts extraterritorial jurisdiction.

Interpreting Section 929P(b) as jurisdictional, rather than as a partial refutation of *Morrison,* may, therefore, run contrary to a cardinal principle of statutory construction to avoid superfluous portions of statutes. *Marx,* 133 S. Ct. at 1177; *see also Corley v. United States,* 556 U.S. 303, 314-15, 129 S. Ct. 1558, 173 L.Ed.2d 443 (2009). In fact, the Supreme Court has acknowledged that a statute can "seem[] clear" on its face, but may not have a clear interpretation if a court considers "the absurd results of a literal reading" of the statute. *Corley*, 556 U.S. at 314 n. 5 (stating that "the dissent's point that subsection (a) seems clear when read in isolation proves nothing, for the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.").

It is unclear, however, whether the Court should construe a provision that appears unambiguous on its face to avoid superfluity. *See Ortega v. Holder*, 592 F.3d 738, 743 (7th Cir. 2010) ("If the plain wording of the statute is clear, our work is at an end") (citations omitted). The Seventh Circuit, for example, has applied this anti-superfluity principle "when interpreting ambiguous text." *River Road Hotel Partners, LLC v. Amalgamated Bank,* 651 F.3d 642, 651-52 (7th Cir. 2011) (attempting to avoid superfluity when the statutory text "suggest[ed] more than one plausible understanding"); *see also Harrel v. United States Postal Service*, 445 F.3d 913, 925 (7th Cir 2006).

The Supreme Court has also acknowledged that the "canon against surplusage is not an absolute rule." *Marx,* 133 S. Ct. at 1177; *see also Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.

Ct. 2238, 2249, 180 L. Ed. 2d 131 (2011) ("There are times when Congress enacts provisions that are superfluous"). The canon against surplusage applies, for example, "only where a competing interpretation gives effect to every clause and word of a statute." *Id.* (citation omitted). Also, the "canon against superfluity assists only where a competing interpretation gives effect to every clause and word of a statute." *i4i Ltd. Partnership*, 131 S. Ct. at 2248. Here, interpreting Section 929P(b) as substantive rather than jurisdictional, to avoid redundancy with the previously existing jurisdictional provision in the Exchange Act – 15 U.S.C. § 78aa(a) – may render meaningless Congress's use of the word "jurisdiction" in Section 929P(b).

### 4. The Legislative History of Section 929P(b)

Another issue with interpreting Section 929P(b) as jurisdictional based on its language and placement in the jurisdictional section of the Exchange Act is that the legislative history supports a contradictory interpretation. Indeed, the legislative history seems to indicate that Congress intended Section 929P(b) to override *Morrison's* transactional test. Specifically, Representative Paul Kanjorski, the sponsor of Section 929P(b), indicated that Section 929P(b) directly addressed the Supreme Court's decision in *Morrison* by (1) rebutting the Supreme Court's presumption of extraterritoriality and (2) reviving the conducts and effects test which *Morrison* rejected. *See* 156 Cong. Rec. H5233, 5235-5239. In his remarks, Rep. Kanjorski stated that Section 929P(b) "creates a single national standard for protecting investors affected by transnational frauds by *codifying the authority to bring proceedings under both the conduct and the effects test regardless of the jurisdiction of the proceedings*." *Id.* (emphasis added). Rep. Kanjorski noted that the bill's stated purpose was "to make clear that in actions and proceedings brought by the SEC . . . , the specified provisions of the Securities Act, the Exchange Act, and the Investment Advisers Act may have extraterritorial application." *Id.* In

addition, Rep. Kanjorski added that this extraterritorial application is "irrespective of whether the securities are traded on a domestic exchange or the transactions occur in the United States." 156 Cong. Rec. at 5237.

Rep. Kanjorski also discussed *Morrison*, including how the Supreme Court developed the transactional test in light of a presumption against extraterritoriality. To this end, he directly addressed the Supreme Court and explained that the provisions in 929P(b) are "intended to rebut that presumption by clearly indicating that Congress intends extraterritorial application in cases brought by the SEC or the Justice Department." 156 Cong. Rec. at 5237. Significantly, Rep. Kanjorski concluded this portion of his remarks by indicating that federal courts should use the conducts and effects test. Specifically, he stated that "the specified provisions of the Securities Act, the Exchange Act and the Investment Advisers Act may have extraterritorial application, and that extraterritorial application is appropriate . . . when the conduct within the United States is significant or when conduct outside the United States has a foreseeable substantial effect within the United States." *Id.* at 5237.

It is unclear what weight the Court should give Rep. Kanjorski's remarks[4] in light of the language in Section 929P(b). Indeed, the law is not clear on how a court should interpret a statute when the legislative history and the language of a statute support contradictory interpretations. While "a court should give words their plain meaning unless doing so would . . . contravene clearly expressed legislative intent," *Vallery*, 437 F.3d at 630, a court, nonetheless, "may not ignore the unambiguous language of the statute in order to further Congress's

---

[4] The only other mention of 929P(b) in the Congressional Record comes from Senator Jack Reed (D-RI) on July 15, 2010. 156 Cong. Rec. 105, S5915-16. He notes that 929P(b) added "extraterritoriality language that clarifies that in actions brought by the SEC or the Department of Justice, specified provisions in the securities laws apply if the conduct within the United States is significant, or the external U.S. conduct has a *foreseeable substantial effect* within our country, *whether or not the securities are traded on a domestic exchange or the transactions occur in the United States*." *Id.* (emphasis added).

expressed purpose in enacting the statute." *Shlahtichman v. 1-800 Contacts, Inc*., 615 F.3d 794, 802 (7th Cir. 2010).  Furthermore, "where a statute's language is clear, we look to the legislative history only to determine whether Congress expressed a clear intention to the contrary of the literal application of that language." *Middleton v. City of Chicago*, 578 F.3d 655, 660 (7th Cir. 2009); *see also Emerg. Servs,* 668 F.3d at 465.  Additionally, "[the Supreme Court's] cases have said that legislative history is irrelevant when the statutory text is clear." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 254, 130 S. Ct. 1324, 1342, 176 L. Ed. 2d 79 (2010) (Scalia, J., concurring.).  It is unclear, therefore, how a court should weigh legislative history that expresses an intention directly contrary to the plain language of a statute that is potentially superfluous.  It is clear, though, that legislative history "does not permit a judge to turn a clear text on its head." *Spivey v. Vertrue Inc.*, 528 F.3d 982, 985 (7th Cir. 2008).  It is also clear that a court should not extend its analysis beyond its "sole function" of enforcing the statute "according to its terms" based on its plain language.  *Sebelius*, 133 S. Ct. at 1896.

Furthermore, Rep. Kanjorski spoke just days after the Supreme Court issued its decision in *Morrison*, and Congress adopted the Dodd-Frank Act less than a month later.  The language of Section 929P(b), however, was drafted prior to the *Morrison* decision.  In fact, the House of Representatives passed a substantively identical bill in December of 2009.  *See* Beyea*, supra* at 570 (citing Dodd-Frank Act, H.R. 4173, 111th Cong. § 7216 (2009)).  A revision of that bill, which limited its application to actions brought by the SEC, became Section 929P(b).  *Id.*  This timeline complicates the Court's interpretation of Section 929P(b) for multiple reasons.  First, because the language of Section 929P(b) was drafted prior to *Morrison* and did not materially change after Morrison's ground-breaking refutation of the "conducts and effects test" and proclamation that extraterritoriality was a merits, not jurisdictional, question, it may not have

responded directly to *Morrison*. The Court must, however, "assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990), and "that Congress is knowledgeable about existing law pertinent to the legislation it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85, 108 S. Ct. 1704, 100 L. Ed. 2d 158 (1988). Second, because Rep. Kanjorski made his remarks just days after the Supreme Court issued *Morrison*, his comments may not have accurately represented the intent of Congress as a whole. Indeed, even the views of a bill's sponsor are not controlling when interpreting a statute. *See Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 752, 181 L. Ed. 2d 881 (2012).

Moreover, even if Congress did not clearly articulate its intent in the language of Section 929P(b), or through its placement of Section 929P(b) in the jurisdictional section, courts should not correct drafting errors in statutes.[5] The Supreme Court has stated: "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result." *Lamie v. U.S. Tr.,* 540 U.S. 526, 542, 124 S. Ct. 1023, 1034, 157 L. Ed. 2d 1024 (2004); *see also United States v. Head,* 552 F.3d 640, 643 (7th Cir. 2009) ("Judges do not read between the lines when a statute's text is clear and its structure is coherent."); *Jaskolski v. Daniels,* 427 F.3d 456, 461 (7th Cir. 2005).

### 5.     Avoiding Absurd Results

The SEC also briefly argues that interpreting Section 929P(b) as merely jurisdictional would create an absurd result which the Court should avoid. Specifically, the SEC argues that it

---

[5] Many law review articles on the topic note the conundrum presented by the provision, and attribute the problem to unclear drafting. Description of the statutory language ranges from "less than meticulous" to "seemingly fails to capture the drafters' intent" to outright "drafting error." *See, e.g.,* Joshua L. Boehm, *Private Securities Fraud Litigation After Morrison v. National Australia Bank: Reconsidering A Reliance-Based Approach to Extraterritoriality*, 53 Harv. Int'l L.J. 249, 261 (2012) ("drafting error"); Beyea, *supra* at 573 ("less than meticulous"); Rocks, *supra* at 187 ("seemingly fails to capture the drafters' intent" and "drafting error").

would be illogical to assume that Congress enacted Section 929P(b) to confer subject-matter

"jurisdiction over SEC enforcement cases involving foreign securities transactions and foreign

investors (jurisdiction it possessed *before* passage of the Dodd-Frank Act), only to dismiss all

such enforcement cases for failure to state a claim under *Morrison's* domestic transaction

requirement." (Resp. 7.) Although the Court should avoid literal interpretation of a statute if

such an interpretation would lead to absurd results, it is not clear that such an absurd result would

inevitably occur if Section 929P(b) were jurisdictional. *See Rennell v. Rowe*, 635 F.3d 1008,

1013 (7th Cir. 2011) ("We will not follow a literal interpretation when to do so would lead to an

unreasonable or absurd result.") (internal quotations omitted); *see also United States v. One*

*Parcel of Real Estate Commonly Known as 916 Douglas Ave., Elgin, Ill*., 903 F.2d 490, 492 (7th

Cir. 1990); *Castellon-Contreras v. I.N.S.,* 45 F.3d 149, 153 (7th Cir. 1995); *United States v.*

*Smairat,* No. 05 CR 168, 2006 WL 1554412 at *7 (N.D. Ill. June 1, 2006) (referring to the

overall rule mentioned in *One Parcel* that "the court only looks beyond the express language of a

statute where such language is ambiguous, or where a literal interpretation would lead to absurd

results or thwart the goals of the statutory scheme."). Indeed, the SEC's argument presupposes

that the *Morrison* "transactional" inquiry would be so narrow as to cause "all" actions

encompassed by Section 929P(b) to be dismissed. The precise scope of a "domestic transaction"

for purposes of the "transactional" inquiry, however, is unclear.

### 6.    Conclusion

The plain language of Section 929P(b) and its placement in the jurisdictional section of

the Exchange Act indicate that it may be jurisdictional. It is unclear, however, whether the

Court's analysis should stop there because it is possible that this interpretation would create

superfluity or contradict the legislative intent. The Court need not resolve this complex

interpretation issue, however, because, as explained below, under either the *Morrison* "transactional" inquiry or the allegedly revived "conducts and effects test," the SEC's Complaint survives the present motion to dismiss.

## III. Sufficiency of the Allegations

Here, viewing the facts in the light most favorable to the SEC, as must be done at this stage, the SEC's complaint passes muster under either the pre-*Morrison* "conducts and effects test," which the Dodd-Frank Act may have revived, or the "transactional" test set forth in *Morrison*.

### A. Application of Conducts and Effects Test

As the Supreme Court in *Morrison* describes, the "conduct test" is "whether the wrongful conduct occurred in the United States," while the "effects test" is "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." 130 S. Ct at 2879 (quoting *SEC v. Berger,* 322 F.3d 187, 192-93 (2d Cir. 2003)). Here, the SEC has alleged a variety of facts that, when viewed in the light most favorable to the SEC, place the Corporate Defendants' conduct – or the effects of this conduct – within the United States. The SEC alleges, for example, that the Corporate Defendants solicited investors "using the prospect of gaining U.S. residency through the EB-5 program," in which "foreign nationals may qualify to obtain a green card if they invest a minimum of $500,000 in the U.S. and that investment creates or preserves at least 10 jobs for U.S. workers." (Resp. at 4; Compl. ¶ 2). Specifically, Defendants wanted investors to "purchase securities in . . . an Illinois-based limited liability company based in Chicago." (Resp. at 4; Compl. ¶¶ 3, 15). They formed this company to "financ[e] and develop[] . . . a convention center and hotel complex in Chicago." (Resp. at 4).

18

The Corporate Defendants do not contest that the SEC's allegations are sufficient to state a claim under the conduct and effects test – they only claim that the Court should not apply such a test.

### B.    Application of *Morrison*

The SEC has also stated a claim under the *Morrison* "transactional" test.  The Second Circuit has provided guidance on what constitutes a domestic purchase or sale for purposes of the *Morrison* transactional test.  *See Absolute Activist Value Master Fund Ltd., v. Ficeto*, 677 F.3d 60, 67 (2d. Cir. 2012) ("While *Morrison* holds that § 10(b) can be applied to domestic purchases or sales, it provides little guidance as to what constitutes a domestic purchase or sale.").  Specifically, after evaluating the definitions of the terms "buy," "purchase," "sale," and "sell" in the Exchange Act and jurisprudence regarding the time of a purchase or sale of securities, the Second Circuit held that, "to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange . . . a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States."  *Id*. at 68.  Both parties accept the Second Circuit's interpretation of "domestic transaction" as the relevant standard here, if *Morrison* applies.

Here, the Complaint alleges that "Defendants have engaged in the sale of securities *in the United States*."  (Compl. ¶ 13 (emphasis added).)  It further alleges the following to support the conclusion that the Corporate Defendants conducted a "domestic transaction":

- the terms of the offering instructed investors to "execute a subscription agreement. . . and to send to Defendants in the U.S;" (Compl. ¶ 13a)

- the offering instructed investors to wire funds to the Defendants' U.S.-based escrow agent; (Compl. ¶ 13c)

- the escrow agent would only release the investors' subscription amounts to Defendants upon approval of the investors' U.S. visa applications; and (Compl. ¶ 5)

- the investors were bound only "[i]f the subscription agreement [was] accepted" and countersigned by the Managing Member – an act which would occur in the United States. (Compl. Ex. B at 0000471, 0000481; Compl. ¶ 13e).

The Corporate Defendants argue, to the contrary, that "offer and acceptance – the requisite meeting of the minds – occurred abroad." (Mem. at 12.) According to the SEC, however, "it is not until the Managing Member signs that he 'hereby accepts' the investor's subscription that a contract is formed, let alone irrevocable liability is incurred." (Resp. at 12.) The parties' disagreement highlights factual disputes in the case – whether irrevocable liability attached and if so, where it attached – which the Court cannot resolve at this stage. *See, e.g., In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 373 (S.D.N.Y. 2011) (finding that the defendants' argument – that the sale did not become final until the administrator accepted the subscription form, and therefore the transactions were not "domestic transactions" – was "promising" but "better-suited for a motion for summary judgment in the context of a more fully-developed factual record."). Rather, viewing the facts in the light most favorable to the SEC, the SEC has sufficiently alleged a "domestic transaction" under *Morrison*. *Id.* (concluding that the plaintiffs' allegations that the purchases "took place in the United States," coupled with contract notes indicating the purchase occurred in the United States, was sufficient to survive a motion to dismiss); *Anwar v. Fairfield Greenwich Ltd.,* 728 F. Supp. 2d 371, 401 n. 8 (S.D.N.Y. 2010) (concluding that the court needed a "more developed factual record . . . to inform a proper determination as to whether Plaintiffs' purchase of the Offshore Funds' shares occurred in the United States" for purposes of *Morrison*'s transactional test).

## CONCLUSION

For the foregoing reasons, the Court denies the Corporate Defendants' motion to dismiss.

**DATED: August 6, 2013**

ENTERED

**AMY J. ST. EVE**
**United States District Court Judge**